1  BENBROOK LAW GROUP, PC
2  BRADLEY A. BENBROOK (SBN 177786)
   STEPHEN M. DUVERNAY (SBN 250957)
3  701 University Avenue, Suite 106
   Sacramento, CA  95825
4  Telephone: (916) 447-4900
5  brad@benbrooklawgroup.com
   steve@benbrooklawgroup.com
6
7  Attorneys for Plaintiffs

8

9                **UNITED STATES DISTRICT COURT**

10              **SOUTHERN DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| ALISHA CURTIN; DAKOTA ADELPHIA; MICHAEL SCHWARTZ; DARIN PRINCE; NORTH COUNTY SHOOTING CENTER, INC.; JOHN PHILLIPS; PWGG, L.P.; SAN DIEGO COUNTY GUN OWNERS PAC; CALIFORNIA GUN RIGHTS FOUNDATION; FIREARMS POLICY COALITION, INC.; and SECOND AMENDMENT FOUNDATION, <br><br> *Plaintiffs*, <br><br> v. <br><br> ROB BONTA, in his official capacity as Attorney General of California; and ALLISON MENDOZA, in her official capacity as Director of the California Department of Justice Bureau of Firearms, <br><br> *Defendants*. | Case No.:  3:23-cv-00793-AGS-AHG <br><br> **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** <br><br><br> Date:  November 15, 2024 <br> Time: 2:00 p.m. <br> Courtroom:  5C <br> Judge: Hon. Andrew G. Schopler |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

INTRODUCTION .................................................................................... 1

BACKGROUND ...................................................................................... 2

A.     Statutory and Regulatory Background ............................................ 2

     1.     California's Waiting Period Laws And Background Check Process ...................................................................... 2

     2.     Waiting Period Laws Did Not Appear In California (Or Any Other State) Until The 1920s ................................ 6

B.     Procedural History .......................................................................... 7

STANDARD OF REVIEW ....................................................................... 9

ARGUMENT ........................................................................................... 9

I.     California's Waiting Period Laws Violate The Second Amendment ........... 9

     A.     The Second Amendment's Plain Text Covers Plaintiffs' Conduct ... 10

     B.     California Cannot Show That Its Waiting Period Laws Are Consistent With The Nation's Historical Tradition Of Firearms Regulation ................................................................. 10

          1.     There Is No Historical Comparable Tradition Of Regulation That Could Justify California's Waiting Period Laws ........... 12

          2.     California's Purported Historical Analogues Are Not Relevantly Similar To Modern Waiting Period Laws ............. 13

               a.     Laws Regulating Intoxication (And, Sometimes, Firearms) .............................................. 14

               b.     General Firearm Regulations And Licensing Laws .......... 15

II.     The Many Exemptions To The Waiting Period Laws Violate Equal Protection ............................................................................. 17

CONCLUSION ...................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................9

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ..............................................................11

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).................................................................................9

*District of Columbia v. Heller*,
554 U.S. 570 (2008).................................................................................9

*Hoffman v. United States*,
767 F. 2d 1431 (9th Cir. 1985) ............................................................18

*In re Oracle Corp. Secs. Litig.*,
627 F.3d 376 (9th Cir. 2010) ..................................................................9

*Jones v. Bonta*,
34 F.4th 704 (9th Cir. 2022) ................................................................12

*Konigsberg v. State Bar of Cal.*,
366 U.S. 36 (1961).................................................................................2

*Lara v. Comm'r Pa. State Police*,
91 F.4th 122 (3d Cir. 2024) ..................................................................10

*McDonald v. City of Chicago*,
561 U.S. 742 (2010).................................................................................9

*New York State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)..........................................................................passim

*Olivier v. Baca*,
913 F.3d 852 (9th Cir. 2019) ..................................................................9

*Ramos v. Louisiana*,
590 U.S. 83 (2020).................................................................................11

*Silvester v. Harris*,
41 F. Supp. 3d 927 (E.D. Cal. 2014).........................................4, 5, 6, 7

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016) ..................................................................2

*Timbs v. Indiana*,
586 U.S. 146 (2019).................................................................................11

*United States v. Rahimi*,
144 S. Ct. 1889 (2024).....................................................................passim

*Virginia v. Moore*,
553 U.S. 164 (2008).................................................................................11

*Zablocki v. Redhail*,
434 U.S. 374 (1978).................................................................................18

## Statutes

18 U.S.C. § 922(s) ................................................................. 6

18 U.S.C. § 922(t) ................................................................. 6

1923 Cal. Stat. ch. 339 § 2 ..................................................... 7

1923 Cal. Stat. ch. 339 § 9 ..................................................... 6

1923 Cal. Stat. ch. 339 §§ 10–11 ............................................ 6

1955 Cal. Stat. ch. 1521 § 1 ................................................... 7

1965 Cal. Stat. ch. 1007 §§ 1, 2 ............................................. 7

1975 Cal. Stat. ch. 997 § 1, 2 ................................................. 7

1990 Cal. Stats., ch. 9, § 12 (codified at former Cal. Penal Code § 12083(a)(2)........ 7

1996 Cal. Stats., ch. 128, §§ 3, 4 (codified at former Cal. Penal Code §§ 12071(b)(3)(A), 12072(c)(1)........ 7

Cal. Penal Code § 11106 ....................................................... 3

Cal. Penal Code § 26800 ....................................................... 4

Cal. Penal Code § 26815(a) ................................................ 1, 3

Cal. Penal Code § 27540 ....................................................... 1

Cal. Penal Code § 27540(a) ................................................... 3

Cal. Penal Code § 27545 ....................................................... 3

Cal. Penal Code § 28220(a) ................................................... 4

Cal. Penal Code § 28220(f)(4) ............................................... 5

Cal. Penal Code § 29800 ....................................................... 4

Cal. Penal Code § 29805 ....................................................... 4

Cal. Penal Code § 29905 ....................................................... 4

Cal. Welf. & Inst. Code §§ 8100–8108 ................................... 4

D.C. Code § 22–4508 ........................................................... 6

Fl. Stat. § 790.0655 ............................................................. 6

Haw. Rev. Stat. § 134–2(e) ................................................... 6

Ill. Comp. Stat., ch. 720, § 5/24–3(A)(g) ................................ 6

Iowa Code § 724.20 ............................................................. 6

Md. Pub. Saf. Code Ann. §§ 5–123 ....................................... 6

Minn. Stat. § 624.7132 ......................................................... 6

Minn. Stat. § 624.7132(4) ..................................................... 6

N.J. Stat. § 2C:58–2(a)(5)(a) ................................................ 6

R.I. Gen. Laws §§ 11–47–35(a)(1), 11–47–35.2 ...................... 6

Second Militia Act of 1792 § 1, 1 Stat. 271 (1792) ................. 12

Wash. Rev. Code § 9.41.092 ................................................. 6

**Other Authorities**

Cal. Dep't of Justice,
*Automated Firearms System Personal Information Update* ................................... 3

*New Firearms Law Effective on August 7,*
S.F. Chron., July 15, 1923, at p. 3, col. 1 ............................................... 7

WINKLER, GUNFIGHT (2011) ......................................................... 6

**Rules**

Fed. R. Civ. P. 56(a) ................................................................. 9

**Regulations**

11 CCR § 4281(d) .................................................................. 3

# INTRODUCTION

A right delayed is a right denied. But denying access to the fundamental right to keep and bear arms is precisely what California does by operation of its unconstitutional Waiting Period Laws.[1] Typical law-abiding individuals in California cannot lawfully acquire a firearm without first going in-person to a federally and state-licensed firearm dealer, applying for the transfer of a firearm, and suffering at least a 10-day ban on the possession of that arm—even when the State has confirmed, often within minutes of the application, that the person is eligible to acquire firearms. Then, if the Defendants affirmatively allow the transfer, the buyer must go back to the dealership to take possession of the firearm no sooner than 10 days after submitting the application.[2] And California's firearm dealers must strictly comply with the State's regulatory scheme on pain of criminal liability and loss of their license to do business.

In short, Defendants' enforcement of the Waiting Period Laws prevents law-abiding people from taking possession of lawfully acquired firearms for immediate self-defense and other lawful purposes, even if Defendants know that an individual already possesses a firearm and has passed a background check confirming they are not prohibited from possessing firearms. This outlier regime cannot survive under *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

When, as here, "the Second Amendment's plain text covers an individual's conduct"—acquiring firearms in common use for lawful purposes, including self-defense—"the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may

---

[1] Cal. Penal Code §§ 26815(a), 27540, and Defendants' regulations, policies, and enforcement practices implementing them are hereinafter collectively referred to as the "Waiting Period Laws" or "WPLs." This brief refers to Defendants collectively as "DOJ" for clarity.

[2] The second visit to the dealer must be at least ten (10) 24-hour periods after the Defendants receive a completed application, but may not more than thirty (30) days after the process starts, or, under federal law, the background check expires, and the process must start over.

a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 24 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)) (cleaned up).

Here, Defendants cannot possibly carry that burden. No waiting period or any analogous laws existed in the constitutionally relevant historical period. Rather, no form of a waiting period law was enacted for *any* jurisdiction in America until 1923, well beyond the relevant time period the Supreme Court permits to be considered—after all, the law held unconstitutional in *Bruen* was enacted in 1911.[3]

Adding insult to injury, Defendants broadly discriminate against the average person by allowing *nearly two dozen categories of favored individuals* to take possession of firearms and ammunition *without* being subject to those same delays and burdens. This case is thus also brought on the premise that Defendants' enforcement of California law violates the Equal Protection Clause by discriminating among its citizens in their exercise of the fundamental right to keep and bear arms.

Plaintiffs therefore bring this litigation to vindicate their rights on a simple premise: The State may not prevent a law-abiding person from taking possession of an arm after it confirms, using readily available electronic databases, that the person is not prohibited from possessing firearms.[4]

## BACKGROUND

**A.    Statutory and Regulatory Background.**

**1.    California's Waiting Period Laws And Background Check Process.**

In California, typical law-abiding individuals are required to purchase and transfer firearms and ammunition through state and federally licensed dealers in face-

---

[3] Plaintiffs acknowledge that the relief they seek is contrary to *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016). But *Silvester* has been abrogated, as *Bruen* expressly rejected the "two-step" approach used in *Silvester* to reject a similar challenge to California's Waiting Period laws.

[4] Without conceding the constitutionality of such laws, Plaintiffs do not challenge in this case the federal and state statutes that prohibit certain categories of persons from acquiring firearms or the State's "point of contact" background check requirement.

to-face transactions or face serious criminal penalties. California law provides that "[w]here neither party to [a] [firearm] transaction holds a dealer's license issued pursuant to Sections 26700 to 26915, inclusive, the parties to the transaction shall complete the sale, loan, or transfer of that firearm through a licensed firearms dealer pursuant to Chapter 5 (commencing with Section 28050)." Cal. Penal Code § 27545. In processing these transactions, firearms dealers licensed by Defendants must use DOJ's Dealer's Record of Sale ("DROS") DROS Entry System ("DES"). The DROS system is the computerized, point-of-sale application system firearms dealers use to submit applications to acquire firearms to the Bureau of Firearms. DOJ maintains DROS records within its Automated Firearms System ("AFS"), an omnibus repository of firearm records established by California Penal Code section 11106.[5]

California law provides that "[n]o firearm shall be delivered . . . [w]ithin 10 days of the application to purchase, or, after notice by the department pursuant to Section 28220, within 10 days of the submission to the department of any correction to the application, or within 10 days of the submission to the department of any fee required pursuant to Section 28225, whichever is later." Cal. Penal Code § 26815(a). California law further provides that "[a] dealer . . . shall not deliver a firearm to a person . . . [w]ithin 10 days of the application to purchase, or, after notice by the department pursuant to Section 28220, within 10 days of the submission to the department of any correction to the application, or within 10 days of the submission to the department of any fee required pursuant to Section 28225, whichever is later." Cal. Penal Code § 27540(a).

---

[5] AFS "is populated by way of firearm purchases or transfers at a California licensed firearm dealer, registration of assault weapons (during specified registration periods), an individual's report of firearm ownership to the Department, Carry Concealed Weapons Permit records, or records entered by law enforcement agencies." Cal. Dep't of Justice, *Automated Firearms System Personal Information Update*, https://oag.ca.gov/firearms/afspi; *see also* 11 CCR § 4281(d) (defining "Automated Firearm System"). AFS is the state's most comprehensive database of information about the purchase, sale, transfer, and use of firearms and ammunition.

1    Violation of these restrictions subjects the violator to criminal sanction. *See* Cal.

2    Penal Code § 19.4 ("When an act or omission is declared by a statute to be a public

3    offense and no penalty for the offense is prescribed in any statute, the act or omission

4    is punishable as a misdemeanor."). Further, a license to transact in firearms "is subject

5    to forfeiture for a breach of any of the prohibitions and requirements of [Article 2,

6    Cal. Penal Code §§ 26800 – 26915]" (with some exceptions not applicable here). Cal.

7    Penal Code § 26800.

8        DOJ has access to and uses multiple state and federal electronic databases to

9    investigate an acquirers' eligibility to own a firearm.

10       Since 1995, California law has required that the background check consist of

11   automated analyses of multiple law enforcement databases that are continually

12   updated. *See* Cal. Penal Code § 28220(a) (directing DOJ to "examine its records" "to

13   determine" whether purchaser is prohibited). [6] Any individual who wants to purchase

14   a firearm and does not fall into one of the WPL's exemptions must pass the

15   background check to show that they do not fall into one of the prohibited classes.

16       California law prohibits several classes of people from owning a firearm.

17   Examples of such "prohibited persons" include individuals convicted of a felony,

18   misdemeanor crime of domestic violence, or other violent crime. Cal. Penal Code §§

19   29800, 29805, 29905. State law likewise restricts the mentally ill from possessing

20   firearms. Cal. Welf. & Inst. Code §§ 8100–8108.

---

[6] *See Silvester v. Harris*, 41 F. Supp. 3d 927, 947–52 (E.D. Cal. 2014) (summarizing the background check's various database searches). At least two additional safeguards work to prevent prohibited persons from possessing firearms. First is the Armed and Prohibited Persons System ("APPS"), "a database that cross-references persons with firearms records in the AFS, typically a DROS record, with those who have a prohibiting conviction or circumstance." *Id.* at 957; *see also* Cal. Penal Code §§ 30000–30015. "The purpose behind APPS is to identify prohibited persons who have firearms and to enable law enforcement to retrieve the firearms before those persons can use the firearms to harm others or themselves." *Silvester*, 41 F. Supp. 3d at 957. Second is DOJ's "Rap Back" system, which "is a notification that DOJ receives whenever someone with fingerprints on file with DOJ is the subject of a criminal justice agency record, *e.g.* a notification of a subsequent arrest record." *Id.*

Under Section 28220(f), DOJ has authority to delay a firearm transaction beyond the 10-day waiting period *only* in three limited and expressly enumerated circumstances where its background check reveals potentially disqualifying information and DOJ is "unable to ascertain" whether the purchaser is actually prohibited or ineligible before the waiting period concludes. If DOJ is "unable to ascertain the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm" within 30 days from the date of purchase, it must "immediately notify" the dealer that it can transfer the firearm. Cal. Penal Code § 28220(f)(4).

Yet even after the DOJ's systems confirm that a law-abiding firearm acquirer is eligible to possess a firearm, the acquirer must wait—and dealers must enforce and comply with—at least a full ten-day waiting period before the acquirer may take possession of the gun. "If a background check is completed prior to 10 days, the firearm is not released because state law mandates a 10-day waiting period." *Silvester*, 41 F. Supp. 3d at 954. California's discovery responses demonstrate that, over the 10-year period ending in 2023, DOJ processed 9.3 million DROS applications, and 97.5% were approved within the 10-day waiting period (only 1.1% required analysis beyond the 10-day window).[7] Over that same period, 14.4% were "auto-approved," which means that the transaction is quickly approved in the electronic background process and does not require further review from DOJ staff. *See Silvester*, 41 F. Supp. 3d at 954 (citing DOJ testimony that "a DROS application can be auto-approved somewhere between 1 minute and 120 minutes, but 'probably' auto approvals occur within 60 minutes"). Overall, 98% of all DROS applications were approved over that 10-year period.

---

[7] These calculations are based on the DROS figures provided by DOJ in response to Special Interrogatories. *See* Duvernay Decl., ¶¶ 2–5. These figures exclude 2020, when DOJ delayed approximately 220,000 DROS transactions beyond the 10-day waiting period in the early days of the COVID-19 pandemic due to purported staffing shortages. Even with 2020 included, DOJ approved 95.2% of applications in the 10-day period and 3.43% of applications were delayed for further review. *Id.*, ¶ 3.

### 2. Waiting Period Laws Did Not Appear In California (Or Any Other State) Until The 1920s.

Waiting period laws did not appear until 1923, when they were first proposed in model firearm legislation. *See Silvester*, 41 F. Supp. 3d at 937 ("The first mention of a waiting period law was a 1923 model law that imposed a 1–day waiting period on the delivery of handguns."); *see also* WINKLER, GUNFIGHT 207–209 (2011).

California is one of only ten states that currently imposes any waiting period at all, and one of only five states to impose a wait on all firearm purchases.[8] California's 10-day waiting period is the third-longest in the country; only Hawaii (14 days) and Minnesota (30 days) impose longer delays.[9] Since first enacting a WPL in 1923, California has altered the length of the waiting period as the scope and method of performing background checks has evolved.

**1923-1955: At least one day.** California enacted its first WPL in 1923. It barred delivery of a pistol, revolver, or concealable firearm on the day of purchase. 1923 Cal. Stat. ch. 339 §§ 10–11. This law also created the DROS system, which then required dealers to obtain identifying information about purchasers and mail the form to the local police or county clerk on the day of the sale. 1923 Cal. Stat. ch. 339 § 9. At that

---

[8] The other four states to impose waiting periods on all firearm purchases are Hawaii, Haw. Rev. Stat. § 134–2(e) (14 days); Illinois, Ill. Comp. Stat., ch. 720, § 5/24–3(A)(g) (72 hours); Rhode Island, R.I. Gen. Laws §§ 11–47–35(a)(1), 11–47–35.2 (7 days); and Washington, Wash. Rev. Code § 9.41.092 (10 day maximum – a firearm may be delivered as soon as the background check is complete). The District of Columbia also has a 10-day waiting period, D.C. Code § 22–4508. Five states impose waiting periods for some types of firearms: Florida, Fl. Stat. § 790.0655 (3 day wait for firearms, but exempts licensed hunters purchasing a rifle or shotgun); Iowa, Iowa Code § 724.20 (3 day wait for permit to purchase a handgun); Maryland, Md. Pub. Saf. Code Ann. §§ 5–123 (7 days for handguns and "assault weapons"); Minnesota, Minn. Stat. § 624.7132 (30 days for handguns and "semiautomatic military-style assault weapon[s]"); and New Jersey, N.J. Stat. § 2C:58–2(a)(5)(a) (7 days for handguns).

[9] Notably, Minnesota permits law enforcement officials to "waive all or a portion of the waiting period" if they determine that a purchaser "is not disqualified prior to the waiting period concluding." Minn. Stat. § 624.7132(4). In addition, for a brief period in the 1990s, federal law (through the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922(s)) imposed a five-day waiting period on handgun purchases. This interim measure expired in 1998 with the launch of the National Instant Criminal Background Check System (NICS), at which point dealers could release firearms once an automated background check was complete. *See* 18 U.S.C. § 922(t).

time, the only classes of people disqualified for purchase under the law were felons and unnaturalized immigrants. 1923 Cal. Stat. ch. 339 § 2.[10]

**1955-1965: Three days.** In 1955, the handgun waiting period was extended to three days. 1955 Cal. Stat. ch. 1521 § 1.

**1965-1975: Five days.** In 1965, the Legislature extended the handgun waiting period from three days to five days. 1965 Cal. Stat. ch. 1007 §§ 1, 2.

**1975-1996: Fifteen days.** The waiting period was lengthened from 5 to 15 days in 1975. 1975 Cal. Stat. ch. 997 § 1, 2. In 1991, the Legislature expanded the background check to apply to all firearms purchases. That same bill directed DOJ to undertake a feasibility study concerning technological alternatives to update the background check system (which at that point still relied on manual processing) to enable the State to "[r]educe the current 15-day waiting period to a lesser waiting period as the result of the introduction of automation, computerization, or other devices or means which have increased efficiency in screening the eligibility of persons to purchase and possess firearms." 1990 Cal. Stats., ch. 9, § 12 (codified at former Cal. Penal Code § 12083(a)(2)).

**1996-present: Ten days.** In 1996, the Legislature reduced the waiting period to 10 days along with an advance in technology: the DOJ "switched to an electronic database system, which allowed for faster processing of background checks." *Silvester*, 41 F. Supp. 3d at 946; *see* 1996 Cal. Stats., ch. 128, §§ 3, 4 (codified at former Cal. Penal Code §§ 12071(b)(3)(A), 12072(c)(1)).

**B.  Procedural History.**

Plaintiffs Alisha Curtin, Dakota Adelphia, and Michael Schwartz (collectively, the "Individual Plaintiffs") are law-abiding, responsible gun owners with firearms

---

[10] Indeed, it appears that the main point of California's original gun control law was preventing guns from getting into the hands of immigrants. *See, e.g.*, *New Firearms Law Effective on August 7*, S.F. Chron., July 15, 1923, at p. 3, col. 1 (praising the law's "salutary effect in checking tong wars among the Chinese and vendettas among our people who are of Latin descent").

registered in their name in Defendants' AFS and DROS databases and who are not prohibited under state or federal law from acquiring or possessing firearms or ammunition. Each of the Individual Plaintiffs also hold an active license to carry a concealed weapon issued by the San Diego County Sheriff's Department. Plaintiffs desire and intend to purchase additional firearms in the future and would like to take possession of such firearms as soon as they can be electronically confirmed to not be prohibited from possessing firearms. Curtin Decl., ¶¶ 2–6; Adelphia Decl., ¶¶ 2–8; Schwartz Decl., ¶¶ 2–6.

Plaintiffs also include two firearms dealers (North County Shooting Center and Poway Weapons & Gear, along with their owners Darin Prince and John Phillips (collectively, the "Dealer Plaintiffs")) who brought this action on behalf of their customers and would-be customers who are similarly situated to Individual Plaintiffs, who are themselves customers of these dealers. *See Craig v. Boren*, 429 U.S. 190, 192–97 (1976). Prince Decl., ¶¶ 2–6; Phillips Decl., ¶¶ 2–7.

In addition, several organizations have joined this case as Plaintiffs as well (San Diego County Gun Owners PAC; California Gun Rights Foundation; Firearms Policy Coalition, Inc.; and Second Amendment Foundation (collectively, the "Institutional Plaintiffs")). The Individual Plaintiffs and Dealer Plaintiffs are all members of each Institutional Plaintiff organization. Curtin Decl., ¶ 3; Adelphia Decl., ¶ 3; Schwartz Decl., ¶ 3; Prince Decl., ¶ 3; Phillips Decl., ¶ 3.

Plaintiffs filed this lawsuit on May 1, 2023, alleging that California's Waiting Period Laws violate the Second Amendment, particularly in that they mandate a 10-day wait as-applied to individuals even where (1) Defendants know (through their databases) that an individual already possesses a firearm and (2) after the background check process has confirmed that the individual is not prohibited from possessing firearms. Plaintiffs also assert a claim that the Waiting Period Laws' exemptions violate the Fourteenth Amendment's Equal Protection Clause.

# STANDARD OF REVIEW

The Court must grant summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it could affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Where, as here, the opposing party will have the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" *Olivier v. Baca*, 913 F.3d 852, 857 (9th Cir. 2019) (quoting *Celotex*, 477 U.S. at 325); *accord In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

# ARGUMENT

## I.    California's Waiting Period Laws Violate The Second Amendment.

The Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). And it "elevates above all other interests"—including the Defendants'—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635. The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

To determine whether a firearm regulation is constitutional under *Bruen*, the analysis begins with the question of whether the Second Amendment's plain text covers an individual's conduct; if so, the Constitution presumptively protects that conduct. *See Bruen*, 597 U.S. at 22–24. If that requirement is satisfied, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 24. In other words, it is California's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19 (cleaned up); *see also id.* at 60 ("[W]e are not obliged to sift the historical

materials for evidence to sustain [the State's] statute. That is respondents' burden."). California is unable to do so.

### A.    The Second Amendment's Plain Text Covers Plaintiffs' Conduct.

The first part of the *Bruen* analysis is straightforward. Plaintiffs are among "the people" and the conduct that they wish to engage in—acquiring firearms to keep and bear for lawful purposes including immediate self defense—is plainly covered by the text of the Second Amendment. Accordingly, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. The Court's recent decision in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), confirms that seeking to possess arms in the face of a regulation restricting possession is covered by the Second Amendment's text. *See id.* at 1896–99.

### B.    California Cannot Show That Its Waiting Period Laws Are Consistent With The Nation's Historical Tradition Of Firearms Regulation.

Under *Bruen*, the burden now shifts to California. It must show that Waiting Period Laws are "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 34. "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24). And it must do so by offering persuasive legal history. *See Bruen*, 597 U.S. at 25 & n.6 (Courts "decide a case based on the historical record compiled by the parties."). Under *Bruen* and *Rahimi*, three methodological considerations must guide California's presentation (and the Court's consideration) of the State's historical evidence.

First, the key historical starting point when assessing analogues under *Bruen* is the Founding era, centering on 1791. *See Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 134 (3d Cir. 2024). While *Bruen*, 597 U.S. at 37–38, and *Rahimi*, 144 S. Ct. at 1898 n.1, both acknowledged the "academic debate" over whether courts should also consider the regulatory tradition as of the adoption of the Fourteenth Amendment in

1868, the Supreme Court has separately addressed that debate through its longstanding practice of looking to 1791 when analyzing the content of incorporated rights. *See, e.g.*, *Ramos v. Louisiana*, 590 U.S. 83, 90–91 (2020) (discussing the history of a unanimous jury right by referencing "young American states" and the "backdrop" of the ratification of the Bill of Rights in 1791); *Timbs v. Indiana*, 586 U.S. 146, 150 (2019) (discussing "colonial-era provisions" and the "constitutions of eight States" when analyzing the Eighth Amendment excessive fines clause); *Virginia v. Moore*, 553 U.S. 164, 168 (2008) ("We look to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve."); *see also Bruen*, 597 U.S. at 82–83 (Barrett, J., concurring) (noting that "freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning" of the Second Amendment is improper).

Second, to be a "proper analogue[,]" a law must be "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 597 U.S. at 29. In other words, the modern regulation must impose a "comparable burden on the right of armed self-defense" as did the historical regulation, and for a similar reason. *Id.*; *see Rahimi*, 144 S. Ct. at 1898. This requirement means that historical laws arising in different contexts, and for different reasons, will be inapt comparators.

Third, historical analogues must be part of a tradition that was "broadly in effect" at ratification, *Baird v. Bonta*, 81 F.4th 1036, 1040–41 (9th Cir. 2023), like the affray and surety traditions relied on in *Rahimi*, which were "well entrenched in the common law" by the Founding. *See Rahimi*, 144 S. Ct. at 1899–1901. Laws existing in only a handful of jurisdictions—historical "outliers"—should be disregarded. *Bruen*, 597 U.S. at 30 (cleaned up). A smattering of regulations cannot establish a "historical tradition" of regulation sufficient to inform the original public meaning of the right. *See, e.g.*, *id.* at 65 (rejecting restrictions in one state statute and two state

court decisions as not representative); *id.* at 46 (doubting that "three colonial regulations could suffice to show a tradition of public-carry regulation").

At bottom, the analogical analysis is focused on determining "whether the challenged regulation is consistent with the principles that underpin the Nation's regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. Here, Defendants cannot possibly carry their burden, because no historical tradition of remotely analogous regulation exists: there is no principle whatsoever to be found that the Second Amendment tolerates the government forcing *every single* law-abiding person hoping to acquire a firearm to wait as long as the government decides is appropriate before taking possession.

### 1. There Is No Historical Comparable Tradition Of Regulation That Could Justify California's Waiting Period Laws.

Start with an undisputed point: Waiting period laws are a distinctly modern invention that date to the 1920s, and California is among the small minority of states that have ever adopted firearm waiting periods. As one of California's experts candidly admits, there is not a single historical regulation akin to California's Waiting Period Laws. *See* Spitzer Decl., ¶ 10 ("Gun purchase waiting periods and related background checks as they are understood and implemented today did not exist early in the country's history."). The 20th-century pedigree of waiting period laws casts their constitutionality immediately into doubt: Legislation enacted 132 years after the Founding is irrelevant to determining the scope of the Second Amendment. *See Bruen*, 597 U.S. at 67 n.28. Put differently, California cannot point to a "tradition" of waiting-period laws that began in the 1920s.

California faces an impossible task given the proliferation of laws at the Founding that required every able-bodied man to be possess weapons suitable for militia use. *See, e.g.*, Second Militia Act of 1792 § 1, 1 Stat. 271 (1792); *see also Jones v. Bonta*, 34 F.4th 704, 719, 738 & App'x 2 (9th Cir. 2022) (collecting post-ratification militia laws passed by the States). The principle underpinning these laws,

*Rahimi*, 144 S. Ct. at 1898, was that it was urgent that every law-abiding citizen have ready access to firearms at all times. This demonstrates the absence of any principle in the law that the government could make every citizen wait for whatever period it wishes before taking possession of arms.

To counter this absence of historical support, California has produced four experts. Three of these experts focus on homicide and suicide in general—the point being, it seems, that any delay imposed by the waiting period is justified by some offsetting decrease in firearm crime and violence. While it remains to be seen how California will deploy these experts, this gambit appears to be aimed at tilting the analysis back toward the two-step interest-balancing test that *Bruen* rejected based on general notions of the police power or public safety. The Supreme Court left no room for doubt that this is inappropriate: "To justify its regulation, [California] may not simply posit that the regulation promotes an important interest." *Bruen*, 597 U.S. at 17. And courts may not "engage in independent means-end scrutiny under the guise of an analogical inquiry." *Id.* at 39 n.7. And in all events, both *Bruen* and *Rahimi* underscore that such expert evidence is unnecessary: In neither case did the Court cite or discuss expert evidence, and in both cases the Court emphasized that the task of analogical reasoning is "a commonplace task for any lawyer or judge." *Bruen*, 597 U.S. at 28; *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*).

### 2. California's Purported Historical Analogues Are Not Relevantly Similar To Modern Waiting Period Laws.

One of the State's experts has attempted to pay heed to *Bruen*'s test. The expert report from Professor Robert Spitzer identifies two categories of historical regulations to support California's Waiting Period Laws: (1) regulations restricting intoxicated persons' access to firearms and (2) miscellaneous firearm licensing and permitting laws.

### a. Laws Regulating Intoxication (And, Sometimes, Firearms).

Professor Spitzer argues that an array of historical regulations related to alcohol use and intoxication provides a useful analogy to modern waiting period laws. The argument appears to be that laws aimed at intoxication "utilized the passage of time" to keep individuals under the influence from accessing firearms. *See* Spitzer Decl., ¶ 65. As an initial matter, Spitzer catalogs a wide variety of laws relating to alcohol generally, without distinguishing those that also pertain to firearms. The regulations that do concern firearms—by prohibiting their use by or sale to intoxicated persons— share a common theme: They are all focused on a case-by-case determination of intoxication.[11]

Such laws fail both the "how" and "why" metrics that are "central" to *Bruen*'s analogical analysis. *See Bruen*, 597 U.S. at 29. On the "how" side, the intoxication regulations impose a far lesser burden on the right of armed-self defense. These regulations imposed only a temporary restraint on an individual's Second Amendment rights that was specifically directed at that individual's intoxication. They did not impose any burden at all on anyone else, much less the 99+ percent of other citizens who are sober at any given time. So long as a person was not intoxicated, they were free to exercise their Second Amendment rights without restraint. The Waiting Period Laws, on the other hand, generally apply to every (non-exempt) individual and every firearm transaction across the board—and they apply even after the State has determined that an individual is not prohibited from possessing a firearm. At most, these intoxication regulations confirm a tradition of criminalizing the use of firearms while under the influence, based on distinctions between those who are intoxicated and those who are not.

---

[11] Many of the laws identified in Professor Spitzer's declaration are of dubious utility for *Bruen*'s test because they do not come from historically relevant timeframes, or because they come from the territories or cities. Plaintiffs will address these issues further in response to the State's summary judgment motion.

On the "why" side, the intoxication regulations are not comparably justified to waiting periods. The intoxication regulations are based on the particular dangers that arise from possessing firearms while intoxicated.[12] Waiting periods, by contrast, are justified by the State's purported interest in disarming individuals through a so-called "cooling off" period. (This justification makes no sense as applied to individuals like Plaintiffs, who the State knows already possess firearms.) In other words, California's defense of the waiting period law equates the desire to obtain a firearm to being drunk—surely not an apt analogy.

In sum, historical intoxication regulations are not a proper historical analogue for California's Waiting Period Laws.

**b.    General Firearm Regulations And Licensing Laws.**

The second set of historical regulations collected by Professor Spitzer focuses on licensing and permitting laws. Specifically, Spitzer collects (1) regulations requiring licenses for carrying concealed weapons; (2) regulations requiring a permit to discharge firearms, fireworks, and the like; and (3) general commercial regulations laws governing the sale of firearms and gunpowder.[13] As with the intoxication laws, Spitzer claims that licensing and permitting laws "utilized the passage of time" to restrict firearms access. *See* Spitzer Decl., ¶ 65.

It is difficult to know precisely how California will deploy these laws from an analogical standpoint. It is such a hodgepodge of general firearm regulations that bear no clear resemblance to waiting period laws it is hard to tell how to parse them. But as a bottom-line matter, none of these laws impose a comparable burden to the waiting period laws. These laws did not prevent individuals from taking possession of a

---

[12] Of course, individuals have the choice whether to be intoxicated at any given time, whereas the waiting period is universally applicable.

[13] As above, Plaintiffs will address the analogical suitability of the laws identified in Professor Spitzer's declaration in response to the State's cross-motion for summary judgment.

firearm, nor is there any evidence that these laws relied on the passage of time for the pure sake of delay.

Moreover, the justifications for each swath of regulation identified in Spitzer's report are distinct from those the State seeks to further through the waiting period laws. Put simply, the principles underlying each of these categories of historical regulation are inconsistent with the waiting period.

*First*, to the extent the licensing and permitting regulations reveal a cohesive historical tradition at all, Spitzer's declaration suggests that the State will claim there is a tradition of general regulation of the possession, carry, and discharge of firearms. *Bruen*, however, cautioned against defining the analogical inquiry at such a high level: "[B]ecause '[e]verything is similar in infinite ways to everything else,' one needs 'some metric enabling the analogizer to assess which similarities are important and which are not.'" 597 U.S. at 29 (citations omitted). If California could satisfy *Bruen*'s "why" test by invoking a general tradition of regulatory authority over firearms, every gun law would be considered analogous no matter how different the means. This flies in the face of the face of the analogical inquiry *Bruen* mandates. In any event, licensing and permitting regimes typically are defended on the basis that they ensure that those applying for a license are law-abiding, responsible citizens that do not have a condition that would disqualifying them from possessing firearms. *See Bruen*, 597 U.S. at 38 n.9. This would not support gratuitously withholding a right to possess or carry firearms *after* an applicant was confirmed to qualify.

*Second*, Spitzer's collection of municipal laws requiring permits or licenses to discharge firearms bear no relation to the waiting period. Setting aside the fact that such "localized restrictions" have marginal relevance at best, *Bruen*, 597 U.S. at 67, these laws restricting the discharge of arms and fireworks in city limits seem to be motivated by preventing fire or addressing public nuisance. These laws have little in common with California's waiting period.

*Third*, Spitzer collects a host of miscellaneous commercial regulations (shooting gallery licensing, gunpowder regulations, dealer registration requirements, and restrictions on the sale of firearms to Native Americans and African Americans). Once again, it is difficult to identify a cohesive principle binding this collection of laws to a discrete historical tradition—and it is California's burden to identify analogous historical precursors to support the waiting period. In all events, these laws provide no historical support for a waiting period that arbitrarily extends after the government has completed a background check confirming that an individual is not prohibited from possessing firearms.

The thrust of Spitzer's conclusion is that the government's involvement in firearms must have subjected individuals to some occasional "delay" in the regular course of acquiring or using firearms. *See* Spitzer Decl., ¶ 14 (claiming that "licensing/permitting laws . . . by their nature incorporated the passage of time between the attempt by individuals to acquire or use weapons and the granting of permission by the government to then do so"). Maybe so, although Spitzer provides no historical evidence that the "passage of time" involved anything other than the time to visit the applicable permitting agency and get ministerial approval. Again, this does not establish a historical tradition remotely consistent with requiring all citizens to *continue* waiting *after* the State has confirmed that individuals "are, in fact, 'law-abiding, responsible citizens'" through a background check. *See Bruen*, 597 U.S. at 38 n.9.

In sum, California's Waiting Period Laws do not "comport with the principles underlying the Second Amendment." *Rahimi*, 144 S. Ct. at 1898.

## II.    The Many Exemptions To The Waiting Period Laws Violate Equal Protection.

At the same time California law imposes unconstitutional and unnecessary restraints on the Second Amendment rights of ordinary law-abiding Californians, it carves out numerous exceptions to their waiting period laws for certain favored

classes. To name just a few, destructive device collectors, movie prop houses, auction purchasers, and consultants-evaluators are all granted instant access to the firearms and ammunition they seek, while Plaintiffs and the law-abiding general public are sidelined with delays and burdens.

California Penal Code § 26950 also creates what is routinely referred to as "the Hollywood exception"—specifically, an "entertainment firearms permit," which "authorizes the permitholder to possess firearms loaned to the permitholder for use solely as a prop in a motion picture, television, video, theatrical, or other entertainment production or event." The holder of an entertainment firearms permit is not subject to the 10-day waiting period, among other regulations.

Plaintiffs have challenged ten exemptions for violating the Fourteenth Amendment's Equal Protection Clause.[14] When, as here, "a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (citing cases); *Hoffman v. United States*, 767 F. 2d 1431, 1434–35 (9th Cir. 1985) ("[s]trict scrutiny is applied when the classification involves . . . categorizations impinging upon a fundamental right") (citing cases).

---

[14] Specifically, Plaintiffs challenge the following: (1) certain law enforcement transactions (Cal. Penal Code §§ 26950, 27050, 27055, 27060, 27065 (exempting § 26815); §§ 27600, 27605, 27610, 27615, and 27650 (exempting § 27540)); (2) short barrel rifle and short barrel shotgun permitees (§§ 26965 and 21740 (exempts from § 26815); §§ 27665 and 27740 (exempts from § 27540)); (3) "assault weapons" permitees (§ 21740 (exempts from § 26815); §27740 (exempts from § 27540)); (4) "machinegun" permitees (§§ 26965 and 27140 (exempts from § 26815); §§ 27665 and 27740 (exempts from § 27540)); (5) "machinegun" licensees (§ 26965 (exempts from § 26815); § 27665 (exempts from § 27540)); (6) "destructive device" permitees (§ 26965 (exempts from § 26815); § 27665 (exempts from § 27540); (7) out of state sales (§ 27115 (exempts from § 26815) and § 27715 (exempts from § 27540); (8) loans of firearms for use as props (§ 27000 (exempts from § 26815); § 27745 (exempts from § 27540); (9) loans of firearms to consultants or evaluators (§ 27005 (exempts from § 26815); § 27750 (exempts from § 27540)); and (10) transactions involving cane guns, firearms that are not immediately recognizable as firearms, undetectable firearms, wallet guns, unconventional pistols, and zip guns (§ 21740 (exempts from § 26815); § 27740 (exempts from § 27540).

California cannot possibly justify the distinctions favoring certain classes of citizens under strict scrutiny. California's vast exemptions allow certain favored classes of firearm purchasers to bypass the Waiting Period Laws. These not only include individuals licensed to possess "assault weapons," "machine guns," and "destructive devices," but movie prop houses and "consultants and evaluators." There is no justification to treat these broad classes of purchasers differently than Plaintiffs with respect to the Waiting Period Laws. The lack of tailoring and breadth of classifications is fatal to the challenged exemptions to the Waiting Period Laws.

In sum, California's Waiting Period Laws violate equal protection.

### CONCLUSION

For the reasons set forth above, the Court should grant Plaintiffs' motion for summary judgment.

Dated:  July 26, 2024                    BENBROOK LAW GROUP, PC


                                         By  s/ Bradley A. Benbrook
                                         BRADLEY A. BENBROOK
                                         Attorneys for Plaintiffs