1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    PAUL STEIN
3   Supervising Deputy Attorneys General
    ROBERT L. MEYERHOFF
4   SEBASTIAN BRADY
    Deputy Attorneys General
5   State Bar No. 330904
      455 Golden Gate Avenue, Suite 11000
6     San Francisco, CA  94102-7004
      Telephone:  (415) 510-3592
7     Fax:  (415) 703-5480
      E-mail:  Sebastian.Brady@doj.ca.gov
8   *Attorneys for Defendant Rob Bonta, in his*
    *official capacity as Attorney General of the*
9   *State of California, and Defendant Allison*
    *Mendoza, in her official capacity as Director*
10  *of the Bureau of Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **CLAIRE RICHARDS, ET AL.,**              3:23-cv-00793-AGS(AHG)

17                            Plaintiffs,    **MEMORANDUM OF POINTS AND**
                                             **AUTHORITIES IN SUPPORT OF**
18          **v.**                           **DEFENDANTS' CROSS-MOTION**
                                             **FOR SUMMARY JUDGMENT**
19                                           **AND IN OPPOSITION TO**
    **ROB BONTA, IN HIS OFFICIAL**           **PLAINTIFFS' MOTION FOR**
20  **CAPACITY AS ATTORNEY**                 **SUMMARY JUDGMENT**
    **GENERAL OF CALIFORNIA, ET**
21  **AL.,**                                 Date:          November 15, 2024
                                             Time:          2:00 p.m.
22                            Defendants.    Courtroom: 5C
                                             Judge:         Hon. Andrew G. Schopler
23                                           Action Filed:May 1, 2023

24

25

26

27

28

1

# TABLE OF CONTENTS

2

**Page**

3  INTRODUCTION .................................................................................................. 1

4  BACKGROUND .................................................................................................. 2

    I.    Legal and Factual Background .......................................................... 2

5      II.   This Lawsuit ....................................................................................... 3

6  LEGAL STANDARD .......................................................................................... 4

7  ARGUMENT......................................................................................................... 4

    I.    California's Waiting Period Laws Do Not Violate the Second
8          Amendment ......................................................................................... 4

9          A.   Step One: The Waiting Period Laws Regulate Conduct
              Outside the Scope of the Second Amendment's Plain Text....... 5

10              1.   Taking Immediate Possession of Firearms Is Not
                  Conduct Covered by the Second Amendment's
11                    Plain Text ................................................................. 5

12              2.   The Waiting Period Laws Are Presumptively
                  Lawful Commercial Regulations on the Sale of
13                    Arms ......................................................................... 7

14          B.   Step Two: The Waiting Period Laws Are Consistent with
              the Principles Underlying the Nation's History and
               Tradition of Firearms Regulation ........................................... 10

15              1.   The Waiting Period Laws Are Supported by
16                    Licensing and Background Check Laws....................... 11

17              2.   The Waiting Period Laws Are Supported by
                  Historical Laws Seeking to Prevent Impulsive
                  Firearm Violence...................................................... 14

18                    a.   Governments Have Long Sought to Prevent
19                       Impulsive Firearm Violence ................................ 14

                  b.   The Waiting Period Laws Are Relevantly
20                       Similar to a Historical Tradition of
                     Preventing Impulsive Firearm Violence .............. 17

21      II.   The Waiting Period Laws Do Not Violate Equal Protection.............. 23

22  CONCLUSION..................................................................................................... 25

23

24

25

26

27

28

1

# TABLE OF AUTHORITIES

2

**Page**

3    CASES

4    *Anderson v. Liberty Lobby, Inc.*
5       477 U.S. 242 (1986) ........................................................................... 4

6    *Antonyuk v. Chiumento*
7       89 F.4th 271 (2d Cir. 2023) ............................................................... 8

8    *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*
9       910 F.3d 106 (3d Cir. 2018) ............................................................. 24

10   *B & L Prods., Inc. v. Newsom*
11      104 F.4th 108 (9th Cir. 2024) ............................................... 4, 6, 7, 8

12   *Boardman v. Inslee*
        978 F.3d 1092 (9th Cir. 2020) ........................................................ 25
13
     *Clark v. City of Shawnee*
14      228 F. Supp. 3d 1210 (D. Kan. 2017) ............................................. 24

15   *District of Columbia v. Heller*
16      554 U.S. 570 (2008) ........................................................................... 7

17   *Doe v. Bonta*
18      101 F.4th 633 (9th Cir. 2024) ............................................................ 5

19   *Epona v. Cnty. of Ventura*
20      876 F.3d 1214 (9th Cir. 2017) ........................................................... 4

21   *Gallinger v. Becerra*
22      898 F.3d 1012 (9th Cir. 2018) ........................................................ 25

23   *Jones v. Bonta*
        2023 WL 8530834 (S.D. Cal. Dec. 8, 2023) ............................... 15, 16
24
     *Kolbe v. Hogan*
25      849 F.3d 114 (4th Cir. 2017) .......................................................... 24

26   *Lara v. Comm'r Pa. State Police*
27      91 F.4th 122 (3d Cir. 2024) ............................................................ 22

28

1

2

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

<u>Page</u>

3

4

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ..................................................................... 10

5

6

*McRorey v. Garland*
    99 F.4th 831 (5th Cir. 2024)....................................................... 8, 11

7

8

*Md. Shall Issue, Inc. v. Moore*
    --- F.4th ----, 2024 WL 3908548 (4th Cir. Aug. 23, 2024) ................ 11

9

*Nat'l Rifle Ass'n of Am., Inc. v. ATF*
    700 F.3d 185 (5th Cir. 2012)........................................................ 16

10

11

*NYSRPA v. Bruen*
    597 U.S. 1 (2022) ...................................................................*passim*

12

13

*Olson v. California*
    104 F.4th 66 (9th Cir. 2024)......................................................... 23

14

15

*Ortega v. Lujan Grisham*
    2024 WL 3495314 (D.N.M. July 22, 2024) ........................... 1, 7, 8, 13

16

17

*Pena v. Lindley*
    898 F.3d 969 (9th Cir. 2018)........................................................ 25

18

19

*Rocky Mtn. Gun Owners v. Polis* (*RMGO*)
    701 F. Supp. 3d 1121 (D. Colo. 2023) .........................................*passim*

20

21

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016).....................................................*passim*

22

*State v. Shelby*
    2 S.W. 468 (Mo. 1886) ............................................................... 14

23

24

*Teixeira v. Cnty. of Alameda*
    873 F.3d 670 (9th Cir. 2017)...................................................... 7, 13

25

26

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023)....................................................... 20

27

28

*United States v. Jackson*
    --- F.4th ----, 2024 WL 3711155 (8th Cir. Aug. 8, 2024) ............... 12, 15

iii

1
2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3
4

*United States v. Manney*
   --- F.4th ----, 2024 WL 3853846 (9th Cir. Aug. 19, 2024) ................................. 5

5
6

*United States v. Perez-Garcia*
   96 F.4th 1166 (9th Cir. 2024) ........................................................................*passim*

7
8

*United States v. Rahimi*
   144 S. Ct. 1889 (2024) ...................................................................................*passim*

9
10

*Vt. Fed'n of Sportsmen's Clubs v. Birmingham* (*VFSC*)
   2024 WL 3466482 (D. Vt. July 18, 2024) ....................................................... 13

11

*Walters v. Wolf*
   660 F.3d 307 (8th Cir. 2011) .............................................................................. 9

12
13

*Wiese v. Becerra*
   306 F. Supp. 3d 1190 (E.D. Cal. 2018) ........................................................... 25

14
15

*Wright v. Incline Vill. Gen. Improvement Dist.*
   665 F.3d 1128 (9th Cir. 2011) ......................................................................... 23

16

**STATUTES**

17
18

California Family Code
   § 6389 ................................................................................................................. 2
California Penal Code

19

   § 26800 ............................................................................................................... 2

20

   § 26815 ............................................................................................................ 2, 5
   § 26950 .......................................................................................................... 2, 23

21

   § 26965 .......................................................................................................... 2, 24
   § 27000 .......................................................................................................... 2, 24

22

   § 27005 .......................................................................................................... 2, 24
   § 27050 .......................................................................................................... 2, 23

23

   § 27055 .......................................................................................................... 2, 23
   § 27060 .......................................................................................................... 2, 24

24

   § 27065 .......................................................................................................... 2, 24

25

   § 27115 ............................................................................................................... 2

26

   § 27140 ............................................................................................................. 24

27

   § 27140(f) ...................................................................................................... 2, 24

28

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

4
§ 27540 .................................................................................. 2, 5

§ 27590 ..................................................................................... 2
5
§ 27600 ................................................................................ 2, 23

6
§ 27605 ................................................................................ 2, 23

§ 27610 ................................................................................ 2, 24
7
§ 27615 ................................................................................ 2, 24

8
§ 27650 ................................................................................ 2, 23

§ 27665 ................................................................................ 2, 24
9
§ 27715 ..................................................................................... 2

10
§ 27740(f) ............................................................................ 2, 24

§ 27745 ................................................................................ 2, 24
11
§ 27750 ................................................................................ 2, 24

12
§ 28220(f) ................................................................................ 3

§ 29900 ..................................................................................... 2
13

14
California Welfare and Institutions Code

15
§ 8103(f)(1)(A) .......................................................................... 2

16
1879 Conn. Pub. Acts 393-94 ...................................................... 15

17
16 Del. Laws 225 (1879) ............................................................ 15

18
1881 Fla. Laws 87 ..................................................................... 15

19

20
1883 Kan. Sess. Laws 159 .......................................................... 15

21
1880 Mass. Acts 232 .................................................................. 15

22
N.C. Pub. Laws 20-21 ................................................................ 15

23
1879 N.C. Sess. Laws 355 .......................................................... 15

24
1878 N.H. Laws 170 .................................................................. 15

25
1852 N.M. Laws 69 ............................................................... 14, 15

26

27
1880 N.Y. Laws, Vol. 2 .............................................................. 15

28
1879 Ohio Laws 192 .................................................................. 15

v

1
2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3    1890 Okla. Sess. Laws 496 ....................................................................... 14

4    1879 Pa. Laws 34 .................................................................................... 15

5
     1880 R.I. Acts & Resolves 110 ................................................................ 15
6
7    1878 Vt. Acts & Resolves 30 .................................................................. 15

8    1879 Wis. Sess. Laws 274 ...................................................................... 15

9    **CONSTITUTIONAL PROVISIONS**

10   United States Constitution
11        Second Amendment....................................................................*passim*
          Fourteenth Amendment ......................................................... 1, 3, 15
12

13   **COURT RULES**

14   Federal Rules of Civil Procedure
          Rule 56(a) ...........................................................................................4
15

16   **OTHER AUTHORITIES**

17   *Cong. Globe*, 39th Cong., 1st Sess. ...................................................... 12

18   Greenlee, *The Historical Justification for Prohibiting Dangerous*
19        *Persons from Possessing Arms*, 20 Wyo. L. Rev. 249 (2020) .......................... 15

20   Violence Policy Ctr., *State Overall Suicide Rates, Ranked by Rate,*
          *2021* (2023), https://vpc.org/wp-content/uploads/2023/09/2021-
21        State-Overall-Suicide-Rates-ranked-by-rate.pdf................................ 21

22   Pew Research Ctr., *What the Data Says about Gun Deaths in the U.S.*
23        (April 26, 2023), https://www.pewresearch.org/short-
          reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/................. 20
24

25   Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan.
          L. Rev. Online 30 (2023) .................................................................... 13
26

27   Blocher & Siegel, *Guided by History: Protecting the Public Sphere*
          *from Weapons Threats under* Bruen, 98 N.Y.U. L. Rev. 1795
28        (2023)................................................................................................. 22

vi

1

2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3

4

*Journals of the Continental Congress 1774-1789* (Worthington
    Chauncey Ford ed., 1906) .................................................................... 12

5

6

Kopel & Greenlee, *The History of Bans on Types of Arms Before 1900*,
    50 J. Legis. 223 (2024) ..................................................................... 22

7

Law of June 13, 1923, ch. 339, § 10.......................................................... 2

8

9

*The Public Records of the Colony of Connecticut from May, 1775 to
    June, 1776 inclusive* (Charles J. Hoadly ed., 1890) ........................... 12

10

Baude & Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev.
    809 (2019).......................................................................................... 13

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

For over a century, California has protected public safety by requiring a short period of time between the purchase of firearms and delivery to buyers. Today, California's 10-day waiting period allows for background checks and provides a cooling off period that prevents impulsive firearm violence. As the unrebutted evidence in this case shows, this short period likely prevents hundreds of impulsive firearm homicides and suicides each year.

Plaintiffs seek to upend this longstanding, commonsense law, challenging it under the Second and Fourteenth Amendments. Neither claim passes muster. Their Second Amendment claim fails at the outset because the Amendment's plain text does not encompass same-day pick-up of firearm purchases. Three district courts have reached the same conclusion in the wake of *NYSRPA v. Bruen*, 597 U.S. 1 (2022).[1] And even if the Second Amendment's plain text were implicated, California's reasonable waiting period fits comfortably within this Nation's historical tradition of imposing temporary limitations on firearm access to allow time for background checks and to prevent impulsive acts of violence—especially given that today's epidemic of (often impulsive) gun violence and easy access to deadly weapons are developments beyond our founders' imagination. Indeed, other district courts have concluded so.[2]

Plaintiffs' Fourteenth Amendment claim also fails. Although they contend that reasonable statutory exemptions from the waiting period—such as exceptions for law enforcement officers—violate equal protection, Plaintiffs are simply not similarly situated to law enforcement officers or other exempt individuals. In any event, all the challenged exemptions are supported by a rational basis.

---

[1] *Ortega v. Lujan Grisham*, 2024 WL 3495314, at *29 (D.N.M. July 22, 2024), *appeal filed* No. 24-2121 (10th Cir.); *Vt. Fed'n of Sportsmen's Clubs v. Birmingham* (*VFSC*), 2024 WL 3466482, at *23 (D. Vt. July 18, 2024), *appeal filed* No. 24-2026 (1st Cir.); *Rocky Mtn. Gun Owners v. Polis* (*RMGO*), 701 F. Supp. 3d 1121, 1135 (D. Colo. 2023).

[2] *Ortega*, 2024 WL 3495314, at *36; *VFSC*, 2024 WL 3466482, at *25-28; *RMGO*, 701 F. Supp. 3d at 11436-46.

1

1  The Court should grant summary judgment to Defendants.

2  ## BACKGROUND

3  ## I.  LEGAL AND FACTUAL BACKGROUND

4      California has had some kind of waiting period for firearm purchases since

5  1923.  *See* 1923 Cal. Laws 695, 701 (banning delivery of firearm "upon the day of

6  the application" to purchase).  Today, its Waiting Period Laws prohibit firearm

7  dealers from delivering firearms to purchasers "[w]ithin 10 days of the application

8  to purchase."  Cal. Penal Code § 26815(a); *id.* § 27540(a).[3]  California has

9  separately exempted particular types of transactions from the waiting period—

10  including, as relevant here, certain transactions involving either law enforcement

11  personnel[4] or recipients who already possess certain types of firearms licenses.[5]

12  The waiting period serves two purposes:  "to allow sufficient time for law

13  enforcement to complete a background check, and also to provide a 'cooling off'

14  period."  *Silvester v. Harris*, 843 F.3d 816, 824 (9th Cir. 2016), *abrogated on other*

15  *grounds by Bruen*, 597 U.S. 1.

16      Delaying delivery until a background check is completed ensures that

17  purchasers do not fall within a group prohibited from possessing firearms.  *See,*

18  *e.g.*, Cal. Fam. Code § 6389 (anyone subject to, *inter alia*, a domestic violence

19  prevention order); Cal. Welf. & Inst. Code § 8103(f)(1) (anyone institutionalized as

20  a danger to themselves or others within last five years).  The Department of

21  Justice's (DOJ) background check procedure involves running prospective

22  purchasers' information across various state and federal databases.  *See generally*

23  Lin Decl. ¶¶ 4-10.  In the great majority of cases, a DOJ analyst must manually

24  review these databases to assess criminal history, mental health history, or other

25  ───────────────
   [3] Sections 26815(a) and 27540(a) comprise the Waiting Period Laws.
26  Violating section 26815 is grounds for fining a dealer and revoking their license, *id.*
   § 26800, while violating section 27540 constitutes a misdemeanor, *id.* § 27590.
27      [4] Cal. Penal Code §§ 26950, 27050, 27055, 27060, 27065, 27115, 27600,
   27605, 27610, 27615, 27650, 27715.
28      [5] Cal. Penal Code §§ 26965, 27000, 27005, 27140, 27665, 27740, 27745,
   27750.

2

potential prohibiting factors.  *Id.* ¶¶ 11-20.  In some instances, this review extends beyond the initial 10-day waiting period, in which case delivery may be delayed for up to 30 days.  *Id.* ¶¶ 22-23; *see also* Cal. Penal Code § 28220(g).

The Waiting Period Laws also provide a cooling off period, "since human nature is such that an individual may not act on violent impulses if provided with a period of time to calm down."  *Silvester*, 843 F.3d at 824.  The Ninth Circuit has acknowledged the waiting period's effectiveness, citing studies "showing that a cooling-off period may prevent or reduce impulsive acts of gun violence or self harm," which "confirm the common sense understanding that urges to commit violent acts or self harm may dissipate after there has been an opportunity to calm down."  *Id.* at 928.  More recent studies reinforce this conclusion.  As detailed in Professor Poliquin's expert report, waiting periods likely reduce gun homicides by 17% and gun suicides by 7-11%.  Brady Decl. Ex. 10 (Poliquin Decl. (Poliquin) ¶¶ 11, 16).  In California, that translates to 260 fewer gun homicides and 110 fewer gun suicides each year.  *Id.*

## II.    THIS LAWSUIT

Plaintiffs, who include three Individual Plaintiffs, four Dealer Plaintiffs, and four Organizational Plaintiffs, filed this lawsuit in May 2023.  They challenge the Waiting Period Laws on two grounds.  First, they assert that enforcing the Waiting Period Laws after DOJ determines that a purchaser is not prohibited from possessing firearms violates the Second Amendment.  Compl. ¶¶ 8-9, 61-73.  Second, they assert that various statutory exemptions to the Waiting Period Laws for particular types of transactions discriminate against them in violation of the Equal Protection Clause of the Fourteenth Amendment.  *Id.* ¶¶ 7, 57-59, 75-79.  Plaintiffs seek declaratory relief as well as a permanent injunction prohibiting Defendants from enforcing the Waiting Period Laws beyond the time it takes to confirm that purchasers are not prohibited from possessing firearms.  *Id.* at 20.

Plaintiffs moved, and Defendants now cross-move, for summary judgment

3

on both constitutional claims.  In support of their motion, Plaintiffs attach no expert declarations or any other type of evidence.  They appear to advance both a facial and an as-applied Second Amendment challenge—the latter encompassing the application of the Waiting Period Laws to purchases where the purchaser already has a firearm.  Pls.' Mem. of P. & A. in Supp. of Mot. for Summ. J. (MPA) at 8. Their Equal Protection challenge is solely a facial one.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Id.*

A facial challenge is "the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the Act would be valid.'"  *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024).  "In general, courts disfavor facial challenges to legislation." *Epona v. Cnty. of Ventura*, 876 F.3d 1214, 1220 (9th Cir. 2017).

## ARGUMENT

### I.   CALIFORNIA'S WAITING PERIOD LAWS DO NOT VIOLATE THE SECOND AMENDMENT

The Supreme Court has adopted a two-step framework for evaluating Second Amendment claims.  *See Rahimi*, 144 S. Ct. at 1897-98; *Bruen*, 597 U.S. at 17. First, a plaintiff must "establish that 'the Second Amendment's plain text covers an individual's conduct.'"  *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024), *en banc pet. pending*.  If a plaintiff meets this burden, "the Second Amendment presumptively protects that conduct" and, at the second step, "[t]he Government then bears the burden of justifying the challenged regulation by

4

showing that it is consistent with our nation's 'historical tradition of firearm regulation.'" *United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024). Plaintiffs' claim fails at both steps.

**A.    Step One: The Waiting Period Laws Regulate Conduct Outside the Scope of the Second Amendment's Plain Text**

Summary judgment should be granted to Defendants at *Bruen*'s first step for two independent reasons.  First, the conduct Plaintiffs wish to engage in—taking immediate possession of firearms—is not covered by the Second Amendment's plain text.  Second, the Waiting Period Laws are presumptively lawful commercial regulations on the sale of arms that do not prevent Plaintiffs or anyone else from acquiring and possessing arms.

**1.    Taking Immediate Possession of Firearms Is Not Conduct Covered by the Second Amendment's Plain Text**

At this threshold stage, the "initial and critical inquiry" is "what conduct of the plaintiffs is relevant"—that is, what they "wanted to do and what the challenged law prevented them from doing." *Doe v. Bonta*, 101 F.4th 633, 639 (9th Cir. 2024); *see Bruen*, 597 U.S. at 32.  Plaintiffs spend a single paragraph (and cite no evidence) to meet their burden here and claim that the relevant conduct is "acquiring firearms to keep and bear arms for lawful purposes including immediate self defense." MPA at 10.  But this description "is not attuned to the actual activity that the [Waiting Period Laws] regulate." *B & L Prods.*, 104 F.4th at 117 n.17; *see also United States v. Manney*, --- F.4th ----, 2024 WL 3853846, at *3 (9th Cir. Aug. 19, 2024) (rejecting effort to define conduct "at such a high level of generality"). The Waiting Period Laws do not prevent anyone from acquiring firearms.  All they "prevent[] [Plaintiffs] from doing," *Doe*, 101 F.4th at 639, is taking possession of purchased firearms earlier than ten days after submitting purchase applications. Cal. Penal Code § 26815(a); *id.* § 27540(a).  Other courts have understood the relevant conduct the same way.  *See VFSC*, 2024 WL 3466482, at *22 (identifying

5

relevant conduct as "immediately obtain[ing] a firearm through a commercial sale"); *RMGO*, 701 F. Supp. 3d at 1132 (identifying relevant conduct as "the receipt of a paid-for firearm without delay"). In fact, Plaintiffs described their proposed course of conduct in just this way in their Complaint. Compl. ¶¶ 69-71.

The Second Amendment's plain text does not cover that conduct. "On its face," its "language says nothing about commerce, let alone" how promptly gun purchasers should be able to take possession of their purchases. *B & L Prods.*, 104 F.4th at 117-18. The Amendment "directly protects one thing—the right to 'keep and bear' firearms." *Id.* at 117. And as the Ninth Circuit has already noted, the Waiting Period Laws "do[] not prevent any individuals from owning a firearm," nor do they "prevent, restrict, or place any conditions on how guns are stored or used after a purchaser takes possession." *Silvester*, 843 F.3d at 827. Consequently, "it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered." *RMGO*, 701 F. Supp. 3d at 1132.

The plain text must also be examined in its historical context, and it presumptively permits laws that "'regulate[] activity falling outside the scope of the right as originally understood.'" *Bruen*, 597 U.S. at 18. Here, the unrebutted historical evidence confirms that Plaintiffs' proposed conduct falls outside the Amendment's scope. "Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." Brady Decl. Ex. 8 (Spitzer Decl. (Spitzer) ¶ 11) ("No 'Guns-R-Us' outlets existed in the 1600s, 1700s, or most of the 1800s."). Consequently, "individuals in the Founding Era would not have understood the purchase of firearms to include a right to receive a firearm without any delay." *RMGO*, 701 F. Supp. 3d at 1134.

1

**2.    The Waiting Period Laws Are Presumptively Lawful
Commercial Regulations on the Sale of Arms**

2

3          Plaintiffs also fail to meet their burden because the Waiting Period Laws are

4   "laws imposing conditions and qualifications on the commercial sale of arms," and

5   are thus "presumptively lawful regulatory measures."  *District of Columbia v.*

6   *Heller*, 554 U.S. 570, 626-27 & n. 26 (2008); *see B & L Prods.*, 104 F.4th at 118-19

7   (applying "presumptively lawful" categories post-*Bruen*).  "On its face, California's

8   waiting period law is a condition or qualification on the sale of guns:  It imposes a

9   brief delay—to permit compliance with background check requirements and

10   provide a 'cooling off' period—as a prerequisite to acquiring a gun."  *Silvester*, 843

11   F.3d at 830 (S. Thomas, J., concurring); *see also Ortega*, 2024 WL 3495314, at *30

12   ("[T]he Waiting Period Act is a presumptively Constitutional commercial firearm

13   regulation."); *RMGO*, 701 F. Supp. 3d at 1136 (similar).  Accordingly, these

14   "commercial restrictions presumptively do not implicate the plain text of the

15   Second Amendment at the first step of the *Bruen* test."  *B & L Prods.*, 104 F.4th at

16   119.  Plaintiffs can overcome this presumption only by showing that the regulations

17   prevent individuals from acquiring firearms.  *See id.* at 118; *see also Teixeira v.*

18   *Cnty. of Alameda*, 873 F.3d 670, 680 (9th Cir. 2017) (rejecting gun buyers' Second

19   Amendment challenge to zoning restrictions on gun sellers where buyers' "access is

20   not meaningfully constrained").  Plaintiffs have not made that showing here.

21          While the Individual Plaintiffs complain about having to drive to the firearm

22   dealer twice before taking possession of a new firearm, *see* Adelphia Decl. ¶ 7;

23   Curtin Decl. ¶ 5; Schwartz Decl. ¶ 5, "'the Second Amendment does not elevate

24   convenience and preference over all other considerations,' nor does it 'guarantee[] a

25   certain type of retail experience,'" *B & L Prods.*, 104 F.4th at 119 (quoting

26   *Teixeira*, 873 F.3d at 680 & n.13).[6]  *Bruen* itself recognized that temporary delays

27

28   ────────────────────
[6] Even without the waiting period, two trips would be necessary for the 85%
of firearm purchase applications that are not auto-approved.  *See* Lin Decl. ¶ 13.

7

in the exercise of Second Amendment rights generally do not trigger Second Amendment scrutiny, explaining that public carry licensing regimes could be subject to "constitutional challenge" where "*lengthy* wait times in processing license applications . . . deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9 (emphasis added); *see B & L Prods.*, 104 F.4th at 118-19. In concurrence, Justice Kavanaugh approved of the shall-issue public carry regimes in 43 states that necessarily involve some delay—including those that require time-intensive prerequisites like "training in firearms handling and in laws regarding the use of force." *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring).

While there may be some temporal interval at which a waiting period would become "a *de facto* prohibition on possession," "a period of 10 days does not qualify." *McRorey v. Garland*, 99 F.4th 831, 840 (5th Cir. 2024) (rejecting challenge to federal law barring transfer of firearm to 18- to 20-year-olds for 10 business days in certain circumstances). Indeed, courts have routinely rejected similar post-*Bruen* Second Amendment challenges to waiting periods of various types. *See Antonyuk v. Chiumento*, 89 F.4th 271, 315 n.24 (2d Cir. 2023) (rejecting argument that "a thirty-day review period is per se an unconstitutional temporary deprivation of Second Amendment rights"), *cert. granted, judgment vacated on other grounds sub nom. Antonyuk v. James*, 2024 WL 3259671 (U.S. July 2, 2024); *Ortega*, 2024 WL 3495314, at *29 (seven-day waiting period "minimally burdensome on the Plaintiffs' ancillary right to acquire firearms"); *VFSC*, 2024 WL 3466482, at *23 (three-day waiting period "does not unduly burden the protected right").

Moreover, as the unrebutted evidence shows, the Individual Plaintiffs and others who already possess firearms are not restricted from keeping or bearing firearms by the waiting period. The Ninth Circuit has found *Bruen* step one satisfied where "the challenged condition restricts [plaintiff's] ability to bear or keep *any* firearm." *Perez-Garcia*, 96 F.4th at 1181. But here, each Individual

8

1   Plaintiff already has several firearms and carry concealed weapon (CCW) licenses

2   with multiple firearms listed on them.  Plaintiff Schwartz owns about ten guns.

3   Brady Decl. Ex. 1 (Schwartz Special Interrog. Resp. at 14 (listing seven guns));

4   Brady Decl. Ex. 2 (Schwartz Dep., 62-63) (describing purchasing three or four

5   more guns).  His CCW lists two of those guns, which he described as "the most

6   appropriate" firearms for his self-defense available to purchase legally in

7   California.  Schwartz Depo., 64:14; *see also id.* 65:20 (these guns "are just most

8   appropriate, out of the selection I have, for carrying outside the home").  Plaintiff

9   Curtin owns ten guns, all of which are on her CCW.  Brady Decl. Ex. 3 (Curtin

10  Dep., 31:18-23, 38:19-20).  She testified that one of those firearms was previously

11  the "best fit" for her of the firearms available in California and that she has not

12  purchased newly available firearms because of cost.  *Id.* 38-40.  And Plaintiff

13  Adelphia has six guns, two of which are on her CCW.  Brady Decl. Ex. 4 (Adelphia

14  Special Interrog. Resp. at 15); Brady Decl. Ex. 5 (Adelphia Dep., 20:19-20).  She

15  testified that one of these is her "favorite" of the guns she shoots and is the best

16  model of this gun available in California.  Adelphia Dep., 49-50.

17          In these circumstances, and more broadly where a purchaser already owns a

18  firearm, the Waiting Period Laws do not restrict the right to keep and bear firearms

19  for self-defense.  *See Silvester*, 843 F.3d at 832 (S. Thomas, J., concurring) ("[T]he

20  [waiting period] does not even necessarily prevent them from exercising their right

21  to keep and bear arms because they challenge the law on the basis that they already

22  own firearms."); *see also Walters v. Wolf*, 660 F.3d 307, 318 (8th Cir. 2011)

23  (rejecting Second Amendment challenge to policy that "affected one of [plaintiff's]

24  firearms" but that "did not prohibit [plaintiff] from retaining or acquiring other

25  firearms").  Plaintiffs' as-applied challenge thus fails at *Bruen* step one, as does

26  their facial challenge.  *See Rahimi*, 144 S. Ct. at 1898 (rejecting facial Second

27  Amendment challenge where law was constitutional as applied to challenger).

28

9

**B. Step Two: The Waiting Period Laws Are Consistent with the Principles Underlying the Nation's History and Tradition of Firearms Regulation**

Plaintiffs' claim also fails at step two. This analysis asks whether the Waiting Period Laws are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898. This is not, as Plaintiffs suggest, MPA at 12, just an inquiry into when the challenged law was enacted. Nor must Defendants identify a "'dead ringer' or a 'historical twin'" in the historical record. *Rahimi*, 144 S. Ct. at 1898. "[T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897-98; *see McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality) ("[S]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment."). Instead, lest the Second Amendment become a "regulatory straightjacket," *Bruen*, 597 U.S. at 30, Defendants need only show that the Waiting Period Laws are "'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 144 S. Ct. at 1898. In conducting this analysis, "[w]hy and how the regulation burdens the right are central." *Id.* But even where a modern law's "why" and "how" do not "precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster.'" *Id.*

Plaintiffs are thus wrong to assert that "historical laws arising in different contexts, and for different reasons, will be inapt comparators." MPA at 11. This suggests the same "law trapped in amber" that the Supreme Court just rejected in *Rahimi*, 144 S. Ct. at 1897; *see also id.* at 1925 (Barrett, J., concurring) ("To be *consistent* with historical limits, a challenged regulation need not be an updated model of a historical counterpart."). Courts "do not isolate each historical precursor and ask if it differs from the challenged regulation in some way . . . [They] instead examine the historical evidence as a whole." *Perez-Garcia*, 96 F.4th at 1191.

Here, Defendants have established a robust—and unrebutted—record of

10

historical analogues demonstrating the underlying principle that governments may temporarily restrict the exercise of Second Amendment rights to ensure adequate time to complete a background check and to forestall impulsive firearm violence. The Waiting Period Laws fit comfortably within this tradition.

### 1. The Waiting Period Laws Are Supported by Licensing and Background Check Laws

Plaintiffs appear to recognize the constitutionality of some waiting period to complete a background check, arguing only that additional time after a purchaser's background check clears violates the Second Amendment. MPA at 8. This recognition all but resolves their challenge: If some period of time to conduct a background check is constitutionally permissible, Plaintiffs cannot seriously dispute that a reasonable, brief default period of 10 days to ensure proper completion of a background check is likewise constitutional. As the Supreme Court has explained, licensing regimes are constitutional unless they are "put toward abusive ends," as with "lengthy wait times [that] deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38 n.9. A "period of 10 days does not qualify" as such an abusive regime. *McRorey*, 99 F.4th at 840; *see Md. Shall Issue, Inc. v. Moore*, --- F.4th ----, 2024 WL 3908548, at *17 (4th Cir. Aug. 23, 2024) (en banc) (Rushing, J., concurring) (observing that *Bruen* recognized constitutionality of licensing laws that "briefly burden" the right, and that "whether the delay is one day or thirty, a person entitled to a license will temporarily be prevented from exercising his rights while he awaits government approval").

History confirms that commonsense understanding. *See, e.g.*, *RMGO*, 701 F. Supp. 3d at 1145 ("Professor Spitzer details the longstanding history of firearm licensing regimes in the United States and contends 'historical licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods.'"). The tradition of regulation reflects that "the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a

1   firearm in order to ensure that those receiving a firearm are law-abiding,

2   responsible citizens." *Id.* Indeed, the Nation has a long history of commercial

3   regulations aimed at limiting possession of arms by those deemed dangerous and

4   allowing governments to confirm that individuals are eligible to possess arms. S*ee*

5   Spitzer ¶ 54. At the start of the Revolutionary War, for example, the Continental

6   Congress recommended the disarmament of loyalists and those "notoriously

7   disaffected to the cause of America." 4 *Journals of the Continental Congress 1774-*

8   *1789* 205 (Worthington Chauncey Ford ed., 1906); *see Perez-Garcia*, 96 F.4th at

9   1186-89. Many colonies followed suit. *See, e.g.*, Act of Dec. 1775, *The Public*

10  *Records of the Colony of Connecticut from May, 1775 to June, 1776 inclusive* 193

11  (Charles J. Hoadly ed., 1890).

12      To carry out those measures, colonial legislatures also enacted regulatory

13  requirements designed to determine whether individuals were prohibited from

14  possessing arms. In 1777, Pennsylvania required all "male white inhabitants" to

15  "take and subscribe" to a loyalty oath. *See* 9 *The Statutes at Large of Pennsylvania*

16  *from 1682 to 1801* 111 (1777). Those who "refus[ed] or neglecte[d]" to do so were

17  to be "disarmed." *Id.* at 112-13. Massachusetts, Virginia, Rhode Island, North

18  Carolina, and New Jersey all required similar oaths. *See United States v. Jackson*, -

19  -- F.4th ----, 2024 WL 3711155, at *5 (8th Cir. Aug. 8, 2024). Similar regulations

20  appeared during Reconstruction. *See Cong. Globe*, 39th Cong. 1st Sess. at 908-09

21  (1866) (Reconstruction order for South Carolina barring any former rebel from

22  bearing arms "unless he shall have taken the amnesty oath").

23      In addition to loyalty oaths, 19th century legislatures also established

24  eligibility criteria targeted at identifying those who were not law-abiding,

25  responsible citizens more generally. That development was spurred in part by an

26  influx of "cheap, prolific, reliable and easy to get" handguns that created new

27  threats to public safety. Spitzer ¶ 11. Throughout this period, State and local

28  legislatures required residents to acquire licenses after satisfying review criteria

before they were entitled to publicly carry deadly weapons. *Id.* ¶ 38; *see generally id.* ¶¶ 40-51 (describing laws). During the same period, many jurisdictions also adopted surety laws "that required certain individuals to post bond before carrying weapons in public," as a method of insurance for any ensuing breaches of the peace. *Bruen*, 597 U.S. at 55; *see id.* at 55-60 & n.23 (collecting examples).

Colonies and states also sought to protect the public by keeping guns away from those they deemed dangerous. Several colonies restricted providing firearms or ammunition to Native Americans. *Teixeira*, 873 F.3d at 685. And after the founding, "numerous . . . commercial firearm regulations restricted the sale of arms to" enslaved people. *Ortega*, 2024 WL 3495314, at *37.[7]

The Waiting Period Laws are relevantly similar to this tradition. They are intended "to allow sufficient time for law enforcement to complete a background check," thereby ensuring that the purchaser does "not fall into one of the prohibited classes." *Silvester*, 843 F.3d at 823, 824-25. Likewise, "[f]ounding-era restrictions on arms sales were passed to address the 'particular problem' that the arms sold would be used against the public." *Ortega*, 2024 WL 3495314, at *38 (quoting *Rahimi*, 144 S. Ct. at 1898). Moreover, both the Waiting Period Laws and the licensing regulations "mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens." *VFSC*, 2024 WL 3466482, at *26; *see RMGO*, 701 F. Supp. 3d at 1145 (similar). These similarities are "'strong indicator[s] that' the Waiting Period [Laws] 'fall[] within a permissible category of regulations.'" *Ortega*, 2024 WL 3495314, at *38. (quoting *Rahimi*, 144 S. Ct. at 1898).

---

[7] These laws would be obviously unconstitutional today and the Attorney General condemns their application in the past. But they nonetheless confirm traditions of firearm regulation. *See* Baude & Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019); *see also* Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30, 37 (2023). The Ninth Circuit has considered such laws to determine the historical scope of the Second Amendment. *See Teixeira*, 873 F.3d at 685.

### 2. The Waiting Period Laws Are Supported by Historical Laws Seeking to Prevent Impulsive Firearm Violence

#### a. Governments Have Long Sought to Prevent Impulsive Firearm Violence

The Nation's historical tradition of firearm regulation teems with measures aimed at preventing impulsive firearm violence. These include restrictions on firearm use while intoxicated, otherwise considered dangerous, or underage, as well as the surety laws applied in *Rahimi*.

*First*, there is a rich historical record of restrictions on the use of firearms while intoxicated. *See RMGO*, 701 F. Supp. 3d at 1142-44; *VFSC*, 2024 WL 3466482, at *25. People at the founding understood that intoxication degraded one's judgment and reasoning. Spitzer ¶¶ 15-16. Several colonies and early states thus sought to prevent the mixing of intoxication and firearms, and these laws spread even further in the 1800s. *See id.* ¶¶ 22-27. And in 1886, Missouri's high court deemed a similar law "in perfect harmony with" a state analogue to the Second Amendment given "[t]he mischief to be apprehended from an intoxicated person going abroad with fire-arms upon his person." *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886).

Similar laws sought to keep guns and alcohol separate, regardless of whether the possessor was actually drinking or intoxicated. In 1852, for example, New Mexico banned carrying firearms in balls and fandangos where liquor was sold, 1852 N.M. Laws 69, and in 1890 Oklahoma prohibited carrying pistols and revolvers "to any place where intoxicating liquors are sold," 1890 Okla. Sess. Laws 496. Several local laws did much the same thing in the second half of the nineteenth century. *See* Brady Decl. Ex. 11 (1882 New Orleans prohibition on bringing weapons into taverns and public halls); *id.* (similar 1870 San Antonio ordinance); *see also, e.g.*, Spitzer ¶ 30 (1851 Chicago prohibition on issuing permit to keep or sell gunpowder to "retailer[s] of intoxicating liquors"). Colonies and states also restricted the sale of alcohol near militia training. *See* Spitzer ¶ 28.

14

*Second*, authorities historically sought to prevent firearm violence by barring firearm sales altogether to those thought to be mentally ill, disorderly, unhoused, or otherwise deemed dangerous.  In 1881, Florida banned providing "persons of unsound mind any dangerous weapon, other than an ordinary pocket-knife."  1881 Fla. Laws 87.  Kansas likewise criminalized giving a dangerous weapon to someone "of notoriously unsound mind" in 1883.  1883 Kan. Sess. Laws 159; *see also* 1899 N.C. Pub. Laws 20-21 (criminalizing furnishing deadly weapons or ammunition to "any inmate of a state hospital").  Around the same time, Connecticut authorized punishing "transient persons . . . found carrying any firearm or other dangerous weapon" with up to three years in prison.  1879 Conn. Pub. Acts 393-94.  Several other states enacted substantially similar laws in this same period, all of which "were enacted for the purpose of promoting public safety by disarming dangerous persons."  Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 270 (2020).[8]  Finally, as noted, colonies and states disarmed those they deemed dangerous on the basis of disloyalty.  *See Jackson*, 2024 WL 3711155, at *5.

*Third*, governments have long sought to prevent impulsive firearm violence by keeping guns and other weapons out of the hands of minors.  The fact that minors "are not yet fully mature and are prone to impulsive decision making is not new."  *Jones v. Bonta*, 2023 WL 8530834, at *7 (S.D. Cal. Dec. 8, 2023).  Accordingly, "numerous states and municipalities enacted age-based restrictions on the sale, gift, or loan of weapons including firearms, in the time preceding the adoption of the Fourteenth Amendment."  *Id.* at *8 (collecting laws).  All told, "by the end of the 19th century, nineteen States and the District of Columbia had enacted laws expressly restricting the ability of persons under 21 to purchase or use

---

[8] *See* 16 Del. Laws 225 (1879); 1890 Iowa Acts 69; 1880 Mass. Acts 232; 1878 N.H. Laws 170; 1880 N.Y. Laws, Vol. 2, at 297; 1879 N.C. Sess. Laws 355; 1879 Ohio Laws 192; 1879 Pa. Laws 34; 1880 R.I. Acts & Resolves 110; 1878 Vt. Acts & Resolves 30; 1879 Wis. Sess. Laws 274.

particular firearms." *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 700 F.3d 185, 202 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1.  This tradition is also reflected in the widespread prohibition of arms among students at public and private colleges and universities reaching back to the seventeenth century.  *See Jones*, 2023 WL 8530834, at *9 (describing tradition).

*Fourth*, surety laws, which "specifically addressed firearms violence" and "provided a mechanism for preventing violence *before it occurred*," are likewise part of the Nation's historical tradition of firearms regulation.  *Rahimi*, 144 S. Ct. at 1899-1900 (emphasis added).  As *Rahimi* explained, this regime "authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Id.*; *see, e.g., id.* at 1900 (1795 Massachusetts law "authoriz[ed] justices of the peace to 'arrest' all who 'go armed offensively [and] require of the offender to find sureties for his keeping the peace'").  These restrictions could last for months at a time; failure to post a bond was punishable by jail and breaking the peace after posting the bond forfeited it.  *Id.* at 1900.  Surety laws in the early United States "targeted the misuse of firearms" in particular.  *Id.*

Plaintiffs offer no contrary evidence undermining any of these historical traditions, *see Bruen*, 597 U.S. at 25 n.6 ("Courts are thus entitled to decide a case based on the historical record compiled by the parties."), and their methodological arguments at *Bruen*'s step two should be given little weight.  Plaintiffs ask this Court to adopt the blinkered, divide-and-conquer approach the Supreme Court rejected in *Rahimi*.  MPA at 11.  *But see supra* at 9-10.  The Court should also reject Plaintiffs' suggestion to limit the historical inquiry to the founding era, as both the Supreme Court and the Ninth Circuit have considered evidence from a variety of other eras in conducting the analogical analysis.  *See, e.g., Rahimi*, 144 S. Ct. at 1900 (relying on 1836 statute); *Bruen*, 597 U.S. at 34-38 (describing various "periods" bearing on the historical inquiry); *Perez-Garcia*, 96 F.4th at 1187-89 & n.17 (looking to "English tradition," "early American laws," "[p]ost-ratification

16

1  practice," and "post-Civil War practice").  And in any event, as shown in the survey
2  of historical laws discussed above, Defendants have provided evidence of the
3  relevant tradition from the founding—in addition to a variety of other eras.

4         Moreover, Plaintiffs are wrong to assert that "[l]aws existing in only a
5  handful of jurisdictions . . . should be disregarded."  MPA at 11.  *Bruen* approved
6  prohibitions on firearms in legislative assemblies and polling places based on just a
7  handful of historical analogues.  597 U.S. at 30 (citing Kopel & Greenlee, *The*
8  *"Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 229-36, 244-47 (2018),
9  which in turn cited two Maryland colonial laws restricting weapons in legislative
10  assemblies and one 18th century Delaware law restricting weapons in polling
11  places).  And *Rahimi* found just a handful of going-armed statutes sufficient to form
12  a tradition and establish a principle of regulation.  144 S. Ct. at 1901.  Plaintiffs'
13  demand for numerosity "assumes that founding-era legislatures maximally
14  exercised their power to regulate, thereby adopting a 'use it or lose it' view of
15  legislative authority.  Such assumptions are flawed, and originalism does not
16  require them."  *Id.* at 1925 (Barrett, J., concurring).

17         **b.    The Waiting Period Laws Are Relevantly Similar to a Historical Tradition of Preventing Impulsive Firearm Violence**
18

19         The Waiting Period Laws fit comfortably within this historical tradition of
20  preventing impulsive firearm violence.  First, the historical alcohol-related laws,
21  just like the Waiting Period Laws, "identif[y] a period during which [the
22  government] believes that firearms pose an extreme risk to public safety" and then
23  imposes a restriction to address that risk.  *VFSC*, 2024 WL 3466482, at *26.  In that
24  regard, the alcohol-related laws restricted the mixing of firearms with alcohol
25  because of the increased risk of impulsive and irrational violence in such settings;
26  similarly, the Waiting Period Laws impose a "cooling off" period because of the
27  increased risk that impulsive and irrational violence will occur after transactions
28  where the purchaser takes immediate possession.  *See* Poliquin ¶¶ 11, 16.  Plaintiffs

17

1   respond that the source of the risk is different, MPA at 15, but that conducts the

2   historical inquiry at far too granular a level:  Courts "do not isolate each historical

3   precursor and ask if it differs from the challenged regulation in some way." *Perez-*

4   *Garcia*, 96 F.4th at 1191.  Plaintiffs' parsimonious approach is also at odds with the

5   Court's analysis in *Rahimi*, which matched the "why" of a modern law prohibiting

6   gun possession by those subject to domestic violence restraining orders with the

7   "whys" of historical surety and going-armed laws because they both "mitigate

8   demonstrated threats of physical violence."  144 S. Ct. at 1901.

9          The "hows" match as well.  The Waiting Period Laws prevent purchasers

10  from taking possession of new firearms for a brief period.  Likewise, intoxication

11  laws prevented individuals "from carrying or using firearms until those people can

12  exercise their Second Amendment rights safely and effectively." *VFSC*, 2024 WL

13  3466482, at *26.  In fact, the Waiting Period Laws impose a *smaller* burden on

14  Second Amendment rights:  Anyone who already has a firearm may continue to

15  keep and bear that firearm during the waiting period, whereas historical intoxication

16  laws entirely extinguished individuals' Second Amendment rights while they were

17  intoxicated.  Plaintiffs try to get around this by arguing that intoxication laws were

18  specifically targeted at the intoxicated and did not burden anyone else's rights.

19  MPA at 14.  This ignores the various restrictions barring guns from places selling

20  alcohol or prohibiting the sale of alcohol near militia training. *See supra* at 14-15.

21  But this is also wrong as to the laws that specifically targeted bearing arms while

22  intoxicated.  Historical alcohol laws "prevented *all* individuals from becoming

23  intoxicated and engaging in the prohibited conduct.  They did not apply only to

24  those people who would have certainly used a firearm irresponsibly while

25  intoxicated." *RMGO*, 701 F. Supp. 3d at 1144-45.  The Waiting Period Laws thus

26  "'impose a comparable burden on the right of armed self-defense.'" *Id.* at 1144.

27         The laws barring minors from possessing arms are also relevantly similar to

28  the Waiting Period Laws.  Both are animated by a legislative judgment that

18

1  possessing arms during a specific, defined period poses a particular risk to the

2  public.  And on the "how," both restrict arms-possession during this period—

3  though in fact, the age restrictions were more burdensome:  They lasted until the

4  minor reached the age of majority, much longer than California's ten-day waiting

5  period, and they generally prevented minors from keeping and bearing *any* arms

6  (though some had exceptions for hunting), whereas here purchasers may keep and

7  bear arms they already possess during the waiting period.

8         The mental illness and related dangerousness laws are also relevantly similar.

9  They reflected fears that gun possession by those in these categories created an

10  unacceptable risk of violence, and restricted gun possession by such individuals—

11  on an absolute basis, unlike the temporary, limited Waiting Period Laws.

12         In a similar fashion, surety laws, like the Waiting Period Laws, "provided a

13  mechanism for preventing violence before it occurred."  *Rahimi*, 144 S. Ct. at 1900.

14  The burdens imposed are likewise similar—sureties were temporary, just like the

15  waiting period.  Here, too, the Waiting Period Laws in fact impose a smaller

16  burden:  Whereas sureties could last for months, *id.*, the waiting period lasts 10

17  days.  And like intoxication laws, sureties addressed keeping and carrying arms

18  generally, *id.*, whereas the Waiting Period Laws do not prevent those who—like the

19  Individual Plaintiffs—already possess arms from keeping and bearing them.

20         These several strains of laws evince the principle that the government may

21  impose temporary restrictions on firearm possession to forestall impulsive firearm

22  violence.  The "historical analog[y]" between this tradition and the Waiting Period

23  Laws is "relatively simple to draw."  *Bruen*, 597 U.S. at 27.

24         That conclusion is all the more apparent under the "more nuanced approach"

25  laid out in *Bruen*.  *Id.*  As *Bruen* recognized, "[t]he regulatory challenges posed by

26  firearms today are not always the same as those that preoccupied the Founders in

27  1791 or the Reconstruction generation in 1868."  *Id.*  Where the challenged

28  regulation implicates either "unprecedented societal concerns or dramatic

19

technological changes," *id.*, courts should "[v]iew[] the government's proposed analogues" through a more nuanced "lens," *United States v. Alaniz*, 69 F.4th 1124, 1130 (9th Cir. 2023)—that is, at a higher level of generality.  While either development is sufficient to trigger this approach, the Waiting Period Laws implicate both, as explained below.

The Waiting Period Laws address the unprecedented societal concern of impulsive firearm violence.  While impulsive violence is not new, around the founding homicides were relatively rare and rarely involved firearms in contexts often governed by impulsivity:  "Family, household and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns."  Brady Decl. Ex. 7 (Roth Expert Report (Roth) ¶ 15); *see id.* ¶¶ 14-17, 20. Instead, such homicides "were committed almost exclusively with hands and feet or weapons that were close to hand:  whips, sticks, hoes, shovels, axes, or knives."  *Id.* ¶ 17.  Homicides by firearm still comprised less than half of all homicides around Reconstruction.  *Id.* ¶¶ 20, 30.  Thus, "impulsive gun homicide was not prevalent during the Founding Era or Early National Period and . . . instituting waiting periods would not have been a logical measure until at least the end of the nineteenth century."  *RMGO*, 701 F. Supp. 3d at 1139.

Today, by contrast, around 80% of all homicides are committed with firearms.  Pew Research Ctr., *What the Data Says about Gun Deaths in the U.S.* (April 26, 2023).[9]  Many of these homicides are impulsive, shown by the fact that waiting periods—which provide a cooling-off period—have a measurable impact on homicide rates, likely causing approximately 17% fewer gun homicides. Poliquin ¶ 11.  And this reduction in firearm homicides is driven by decreases in "domestic violence and other heat-of-the-moment murders."  *Id*. ¶ 14.

Impulsive firearm suicide is an even starker story.  Around the founding,

---

[9] https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/.

20

suicide rates in Vermont and New Hampshire are estimated at between 3.1 and 5.7 suicides per 100,000 adults per year—only 6% of which were carried out with firearms. Roth ¶ 62. Even after handgun technology improved by the mid-1800s, firearms were still far less commonly used in suicides than, say, hanging or poison. Brady Decl. Ex. 9 (Ruben Expert Report (Ruben) ¶ 31). Now half of the suicides in those states—and nationally—are committed with firearms. Roth ¶ 64; *see* Violence Policy Ctr., *State Overall Suicide Rates, Ranked by Rate, 2021* (2023).[10] And suicides, like homicides, are often impulsive acts: Fewer than 10% of interviewees who survived suicide attempts reported waiting more than seven days between forming the intent to commit suicide and acting, and the majority of those who survive suicide attempts do not go on to die by suicide. Poliquin ¶ 19. Moreover, *firearm* suicides in particular are frequently impulsive, with waiting period laws likely reducing firearm suicides by as much as 11%. *Id.* ¶ 16.

A second, related unprecedented societal concern is the modern understanding of suicide as something that could be prevented beforehand. Around the founding, suicide was viewed—and condemned—through a moral or religious lens that attributed it to demonic possession or the work of the devil. *See* Ruben ¶¶ 13, 15-16. Accordingly, suicide was addressed after the fact: It was criminalized at common law and in American colonies—which also penalized those who died by suicide by requiring dishonorable burials and the forfeiture of property that would otherwise pass to the deceased's family. *Id.* ¶¶ 16-18. Over time, however, society's understanding of mental illness and suicide evolved. *Id.* ¶¶ 22-33. Psychological explanations became dominant around the turn of the 20th century. *Id.* ¶ 33. Moreover, recent empirical research has shown that means-restriction can reduce suicides. *Id.* ¶¶ 34-39. And with respect to firearms in particular, as already discussed, the effectiveness of firearm waiting periods shows

---

[10] https://vpc.org/wp-content/uploads/2023/09/2021-State-Overall-Suicide-Rates-ranked-by-rate.pdf.

21

that firearm suicide—and homicide, for that matter—are also amenable to means-restriction beforehand.  *See supra* at 21.

The Waiting Period Laws also address great technological advances related to firearms unforeseen in historical eras.  One reason that firearms were not the murder weapon of choice around the founding—particularly in impulsive situations—was that "muzzle-loading firearms . . . had significant limitations as murder weapons."  Roth ¶ 16; *cf.* Blocher & Siegel, *Guided by History: Protecting the Public Sphere from Weapons Threats under* Bruen, 98 N.Y.U. L. Rev. 1795, 1827 (2023) ("At the founding, guns were so cumbersome they were rarely used for domestic abuse; but as weapons have become more numerous and deadly, they have amplified the threats, injuries, and lethality of domestic violence.").  This began to shift in the middle of the antebellum period with the development of pistols, which could be concealed and kept loaded.  Roth ¶¶ 24-25.  Around the Civil War, the development of revolvers—in particular the Smith and Wesson revolver, "a near-perfect murder weapon"—exacerbated this trend.  *Id.* ¶ 33; *see id.* ¶¶ 31-34.  After Reconstruction, for the first time in U.S. history, "relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults."  *Id.* ¶ 34.  On top of this, the development of extended magazines and semiautomatic firearms has enabled just one or two individuals to cause mass casualties in a vanishingly short period of time—something that was far more difficult around the founding and thereafter.  *Id.* ¶¶ 41, 44-60.[11]

Because Plaintiffs offer no evidence to rebut any of this, the only evidence before the Court demonstrates that "during the Founding Era and the century that

---

[11] Plaintiffs' reliance on laws requiring possessing firearms for militia use in 1792, MPA at 12-13, is thus misplaced.  Those required arms were muskets, fowling pieces, and the like, *see* Kopel & Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 247-49 (2024), which "had significant limitations as murder weapons," Roth ¶ 16.  More fundamentally, "a duty to possess guns in a militia or National Guard setting is distinguishable from a right to bear arms unconnected to such service."  *Lara v. Comm'r Pa. State Police*, 91 F.4th 122, 137 (3d Cir. 2024).

followed, firearm access and technology, along with violent crime"—and firearm suicides—"was drastically different and a waiting period for firearm purchases would have been unnecessary." *RMGO*, 701 F. Supp. 3d at 1145; *see also VFSC*, 2024 WL 3466482, at *27 ("[T]he rapid availability of guns presents an 'unprecedented social concern' . . . ."). The more nuanced approach thus applies here. *See RMGO*, 701 F. Supp. 3d at 1142; *VFSC*, 2024 WL 3466482, at *27. Under either that approach or the more straightforward analogical analysis, the Waiting Period Laws are "consistent with the principles that underpin our regulatory tradition." *Rahimi*, 144 S. Ct. at 1898.

## II.    THE WAITING PERIOD LAWS DO NOT VIOLATE EQUAL PROTECTION

"To establish an Equal Protection claim, Plaintiffs must demonstrate 'that a class that is similarly situated has been treated disparately.'" *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024). To be sufficiently similarly situated, these groups must be "'in all relevant respects alike.'" *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1140 (9th Cir. 2011). Although it is their burden to make this showing, *see Olson*, 104 F.4th at 77, Plaintiffs make no attempt to demonstrate that they are being treated differently from similarly situated prospective firearm purchasers who are exempt from the Waiting Period Laws. Nor could they, for the classes of individuals exempted from the Waiting Period Laws Plaintiffs point to in support of their Equal Protection claim are fundamentally differently situated.

Plaintiffs allege discrimination based on the exemptions for law enforcement-related transactions, which include purchases by full-time peace officers authorized to carry firearms in the performance of their duties, Cal. Penal Code §§ 26950, 27650; purchases by representatives of law enforcement agencies for use by the agencies, *id.* §§ 27050, 27600; loans from law enforcement agencies to their peace officers who are authorized to carry a firearm for use in the course of their duties, *id.* §§ 27055, 27605; a peace officer's purchase of their service weapon from their employing law enforcement agency, *id.* §§ 27060, 27610; and purchases

23

by retiring peace officers authorized to carry firearms of their service weapons, *id.* §§ 27065, 27615. As numerous courts have recognized, when it comes to firearms, peace officers—active or retired—are categorically different from the general public. *See Kolbe v. Hogan*, 849 F.3d 114, 147 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 125-26 (3d Cir. 2018), *abrogated on other grounds by Bruen*, 597 U.S. 1.

Plaintiffs also allege discrimination based on exemptions involving prospective purchasers who have previously submitted to special processes for obtaining certain firearm licenses, above and beyond what is required for typical firearms purchases. That includes those licensed to sell machineguns and those permitted to possess machineguns, short-barreled rifles or shotguns, and destructive devices, Cal. Penal Code §§ 26965, 27665; those licensed to possess assault weapons, §§ 27140(f), 27740(f); those with valid entertainment firearms permits borrowing guns for use as a prop in a movie, television, or similar production, *id.* §§ 27000, 27745; those possessing a federal firearms license and who live out of state, *id.*, §§ 27115, 27715; and those possessing a certificate of eligibility and who are borrowing firearms as part of a bona fide business relationship with a federally licensed firearm importer, manufacturer, or dealer, *id.* §§ 27005, 27750. Because Plaintiffs and firearm purchasers more generally have not met the various criteria for these licenses, they are not similarly situated with license-holders who have. *See, e.g., Clark v. City of Shawnee*, 228 F. Supp. 3d 1210, 1222-23 (D. Kan. 2017) (holding that non-license-holders are not similarly situated with license-holders).[12]

Even if Plaintiffs were similarly situated to those covered by these exemptions, the Waiting Period Laws satisfy the appropriate level of scrutiny. Where an equal protection challenge "is based on the Second Amendment's

_____

[12] Plaintiffs also challenge exemptions for novelty weapons. Cal. Penal Code §§ 27140, 27740. Purchasers of these guns are not similarly situated with those purchasing more common firearms.

24

fundamental right to bear arms and the disparate treatment of groups in exercising that right . . . that challenge is subsumed in the Second Amendment inquiry," and where, as here, the Second Amendment challenge fails, rational basis applies. *Pena v. Lindley*, 898 F.3d 969, 986 (9th Cir. 2018), *abrogated on other grounds by Bruen*, 597 U.S. 1.

Plaintiffs fail to meet their burden under rational-basis review. "Under rational-basis review, '[a] statute is presumed constitutional, and the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.'" *Boardman v. Inslee*, 978 F.3d 1092, 1118 (9th Cir. 2020). And here, there is a plain rational basis underlying the exemptions: Given that all of the exemptions are for peace officers, those who have already gone through the time-intensive, exacting process of obtaining a particular type of firearm license, or those purchasing novelty weapons, the Legislature could have reasonably believed that these classes posed a diminished risk of the type of impulsive firearm violence that animates the Waiting Period Laws. Courts have repeatedly upheld under rational basis review exemptions for similar groups from similar firearms restrictions. *E.g.*, *Pena*, 898 F.3d 986-87 (exemption from ban on selling handguns without certain safety features for peace officers and the entertainment industry); *Gallinger v. Becerra*, 898 F.3d 1012, 1016-22 (9th Cir. 2018) (exemption from ban on carrying weapons on school grounds for retired police officers); *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1204 (E.D. Cal. 2018) (exemption from ban on large-capacity magazines for entertainment industry). This Court should similarly reject Plaintiffs' equal protection challenge here.

## CONCLUSION

This Court should grant Defendants' Cross-Motion for Summary Judgment and deny Plaintiffs' Motion for Summary Judgment.

Dated:  August 23, 2024

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
PAUL STEIN
Supervising Deputy Attorneys
General
ROBERT L. MEYERHOFF
Deputy Attorney General


*/s Sebastian Brady*
SEBASTIAN BRADY
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in
his official capacity as Attorney
General of the State of California,
and Defendant Allison Mendoza, in
her official capacity as Director of the
Bureau of Firearms*