1  Rob Bonta
   Attorney General of California
2  Mark R. Beckington
   Paul Stein
3  Supervising Deputy Attorneys General
   Robert L. Meyerhoff
4  Sebastian Brady
   Deputy Attorneys General
5  State Bar No. 330904
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3592
7    Fax:  (415) 703-5480
     E-mail:  Sebastian.Brady@doj.ca.gov
8  *Attorneys for Defendant Rob Bonta, in his
   official capacity as Attorney General of the
9  State of California, and Defendant Allison
   Mendoza, in her official capacity as Director
10 of the Bureau of Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

| | |
|---|---|
| 16 **CLAIRE RICHARDS, ET AL.,** | 3:23-cv-00793-AGS(AHG) |
| 17 Plaintiffs, | **DECLARATION OF SEBASTIAN BRADY IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| 18 **v.** | |
| 19 | Date:       November 15, 2024 |
| 20 **ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA, ET AL.,** | Time:        2:00 p.m. Courtroom: 5C |
| 21 | Judge:        Hon. Andrew G. Schopler Action Filed: May 1, 2023 |
| 22 Defendants. | |

23

24

25      I, Sebastian Brady, hereby declare under penalty of perjury that the following

26 is true and correct:

27

28

                                    1

1.   I am over the age of eighteen years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.   I am a Deputy Attorney General with the California Department of Justice and serve as counsel in this action for Defendants Rob Bonta, in his official capacity as Attorney General of the State of California, and Allison Mendoza, in her official capacity as Director of the Bureau of Firearms.

**3.**   Attached as Exhibit 1 is a true and correct copy of Plaintiff Michael Schwartz's Amended Responses to Defendants' First Set of Special Interrogatories, initially received on January 22, 2024, and then verified by Plaintiff Schwartz on February 9, 2024.

4.   On January 23, 2024, Defendants deposed Michael Schwartz.  A true and correct copy of relevant excerpts of the Reporter's Transcript of the Deposition of Michael Schwartz is attached as Exhibit 2.

5.   On January 26, 2024, Defendants deposed Alisha Curtin.  A true and correct copy of relevant excerpts of the Reporter's Transcript of the Deposition of Alisha Curtin is attached as Exhibit 3.

6.   Attached as Exhibit 4 is a true and correct copy of Plaintiff Dakota Adelphia's Amended Responses to Defendants' First Set of Special Interrogatories, initially received on January 22, 2024, and then verified by Plaintiff Schwartz on February 9, 2024.

7.   On February 1, 2024, Defendants deposed Dakota Adelphia.  A true and correct copy of relevant excerpts of the Reporter's Transcript of the Deposition of Dakota Adelphia is attached as Exhibit 5.

8.   Also attached hereto are true and accurate copies of the following expert witness materials disclosed to Plaintiffs on March 12, 2024, pursuant to Federal Rule of Civil Procedure 26(a)(2):

- Exhibit 6:  Defendants' Disclosure of Expert Witnesses pursuant to Federal Rule of Civil Procedure 26(a)(2)
- Exhibit 7:  Expert Report and Declaration of Professor Randolph Roth
- Exhibit 8:  Expert Report and Declaration of Professor Robert J. Spitzer
- Exhibit 9:  Expert Report and Declaration of Professor Eric Ruben
- Exhibit 10:  Expert Report and Declaration of Professor Chris Poliquin

9.   Also attached hereto as Exhibit 11 are true and correct copies of two historical ordinances from the nineteenth century relating to restrictions on carrying firearms in businesses selling alcohol.  These ordinances were compiled from various sources provided by Defendants' experts as well as independent research by the Department of Justice. These ordinances are provided here only to assist the Court and is not a comprehensive or exhaustive list of all laws, rules, or regulations that may be relevant to the historical inquiry.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 23, 2024, at San Francisco, CA.


*/s/ Sebastian Brady*
Sebastian Brady

3

# Exhibit 1

Exhibit 1
0004

BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

CLAIRE RICHARDS; ALISHA
CURTIN; DAKOTA ADELPHIA;
MICHAEL SCHWARTZ; DARIN
PRINCE; NORTH COUNTY
SHOOTING CENTER, INC.; JOHN
PHILLIPS; PWGG, L.P.; SAN DIEGO
COUNTY GUN OWNERS PAC;
CALIFORNIA GUN RIGHTS
FOUNDATION; FIREARMS POLICY
COALITION, INC.; and SECOND
AMENDMENT FOUNDATION,

        *Plaintiffs*,

    v.

ROB BONTA, in his official capacity as
Attorney General of California; and
ALLISON MENDOZA, in her official
capacity as Director of the California
Department of Justice Bureau of
Firearms,

        *Defendants*.

Case No.:  3:23-cv-00793-LAB-WVG

**PLAINTIFF MICHAEL
SCHWARTZ'S RESPONSES TO
DEFENDANTS' FIRST SET OF
SPECIAL INTERROGATORIES**

Exhibit 1
0005

1       Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Michael

2   Schwartz, by his undersigned counsel, hereby serves the following Objections and

3   Responses to Defendants' First Interrogatories.

4   **<u>INTERROGATORIES</u>**

5   **<u>Interrogatory No. 1</u>:**

6       Identify and describe in full and complete detail all harms that you contend you

7   have suffered as a result of the waiting period laws.

8   **Answer:**

9       Plaintiffs have challenged the constitutionality of California's Waiting Period

10   laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.

11   So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which

12   it plainly does here, "the Constitution presumptively protects that conduct. The

13   government must then justify its regulation by demonstrating that it is consistent with

14   the Nation's historical tradition of firearm regulation. Only then may a court conclude

15   that the individual's conduct falls outside the Second Amendment's unqualified

16   command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–

17   30 (2022). Responding Party objects that this request is not tailored to the resolution

18   of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test.

19   Instead, this request seeks information as if the pre-*Bruen* "two step" interest-

20   balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–

21   27.

22       The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal

23   Protection rights secured by the United States Constitution. "It is well established that

24   the deprivation of constitutional rights 'unquestionably constitutes irreparable

25   injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.

26   Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be

27   adequately remedied through damages [such violations] therefore generally constitute

28   irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059

Exhibit 1
0006

1 (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second

2 Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir.

3 2011) (Second Amendment deprivation is "irreparable" because there is "no adequate

4 remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the

5 enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v.*

6 *Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023)

7 (collecting cases holding that Second Amendment deprivations constitute irreparable

8 harm). Holding otherwise would render the Second Amendment "a second-class right,

9 subject to an entirely different body of rules than the other Bill of Rights guarantees."

10 *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

11 　　Furthermore, the Second Amendment protects not only tangible, but "intangible

12 and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables

13 one to possess not only the means to defend oneself but also the self-confidence—and

14 psychic comfort—that comes with knowing one could protect oneself if necessary."

15 *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply,

16 "[u]nlike the exercise of other constitutional rights, the inability to exercise one's

17 Second Amendment right when needed could be a matter of life or death." *Koons v.*

18 *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

19 *also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

20 to keep and bear arms is the insurance policy behind the right to life. If a state

21 regulation prevents a citizen from protecting his life, his other constitutional rights

22 will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

23 at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

24 being forced to give up their right to armed self-defense outside the home because

25 they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

26 　　Finally, when a person eligible to possess a firearm determines they need a

27 firearm for lawful purposes, including self-defense, the Second Amendment

28 guarantees their right to possess such weapon as soon as it is determined they are, in

Exhibit 1
0007

1   fact, eligible to possess it. Indeed, *Heller* recognized the need for "immediate self-

2   defense" in finding Washington, D.C.'s storage requirement unconstitutional. *District*

3   *of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

4   **Interrogatory No. 2:**

5       Do you contend that you need to take possession of a firearm for a lawful

6   purpose sooner than 10 days after commencement of the background check?

7   **Answer:**

8       Plaintiffs have challenged the constitutionality of California's Waiting Period

9   laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.

10  So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which

11  it plainly does here, "the Constitution presumptively protects that conduct. The

12  government must then justify its regulation by demonstrating that it is consistent with

13  the Nation's historical tradition of firearm regulation. Only then may a court conclude

14  that the individual's conduct falls outside the Second Amendment's unqualified

15  command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–

16  30 (2022). Responding Party objects that this request is not tailored to the resolution

17  of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test.

18  Instead, this request seeks information as if the pre-*Bruen* "two step" interest-

19  balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–

20  27.

21      This request improperly seeks discovery aimed at determining Plaintiffs'

22  "need" to exercise their Second Amendment protected rights, but *Bruen*'s test does

23  not turn on the extent of a plaintiff's "need" to exercise their rights. Indeed, *Bruen*

24  expressly rejected that notion: "Because the State of New York issues public-carry

25  licenses only when an applicant demonstrates a special need for self-defense, we

26  conclude that the State's licensing regime violates the Constitution." 142 S. Ct. at

27  2122. "We know of no other constitutional right that an individual may exercise only

28  after demonstrating to government officers some special need. That is not how the

Exhibit 1
0008

1    First Amendment works when it comes to unpopular speech or the free exercise of

2    religion. It is not how the Sixth Amendment works when it comes to a defendant's

3    right to confront the witnesses against him. And it is not how the Second Amendment

4    works when it comes to public carry for self-defense." *Id*. at 2156.

5         The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal

6    Protection rights secured by the United States Constitution. "It is well established that

7    the deprivation of constitutional rights 'unquestionably constitutes irreparable

8    injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.*

9    *Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be

10   adequately remedied through damages [such violations] therefore generally constitute

11   irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059

12   (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second

13   Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir.

14   2011) (Second Amendment deprivation is "irreparable" because there is "no adequate

15   remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the

16   enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v.*

17   *Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023)

18   (collecting cases holding that Second Amendment deprivations constitute irreparable

19   harm). Holding otherwise would render the Second Amendment "a second-class right,

20   subject to an entirely different body of rules than the other Bill of Rights guarantees."

21   *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

22        Furthermore, the Second Amendment protects not only tangible, but "intangible

23   and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables

24   one to possess not only the means to defend oneself but also the self-confidence—and

25   psychic comfort—that comes with knowing one could protect oneself if necessary."

26   *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply,

27   "[u]nlike the exercise of other constitutional rights, the inability to exercise one's

28   Second Amendment right when needed could be a matter of life or death." *Koons v.*

Exhibit 1
0009

1  *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

2  *also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

3  to keep and bear arms is the insurance policy behind the right to life. If a state

4  regulation prevents a citizen from protecting his life, his other constitutional rights

5  will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

6  at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

7  being forced to give up their right to armed self-defense outside the home because

8  they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

9      Finally, when a person eligible to possess a firearm determines they need a

10  firearm for lawful purposes, including self-defense, the Second Amendment

11  guarantees their right to possess such weapon as soon as it is determined they are, in

12  fact, eligible to possess it. Indeed, *Heller* recognized the need for "immediate self-

13  defense" in finding Washington, D.C.'s storage requirement unconstitutional. *District*

14  *of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

15  **Interrogatory No. 3:**

16      If your answer to interrogatory no. 2 is in the affirmative, state all facts

17  supporting your contention that you need to take possession of a firearm for a lawful

18  purpose sooner than 10 days after commencement of the background check.

19  **Answer:**

20      Plaintiffs have challenged the constitutionality of California's Waiting Period

21  laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.

22  So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which

23  it plainly does here, "the Constitution presumptively protects that conduct. The

24  government must then justify its regulation by demonstrating that it is consistent with

25  the Nation's historical tradition of firearm regulation. Only then may a court conclude

26  that the individual's conduct falls outside the Second Amendment's unqualified

27  command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–

28  30 (2022). Responding Party objects that this request is not tailored to the resolution

Exhibit 1
0010

1    of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test.

2    Instead, this request seeks information as if the pre-*Bruen* "two step" interest-

3    balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–

4    27.

5        This request improperly seeks discovery aimed at determining Plaintiffs'

6    "need" to exercise their Second Amendment protected rights, but *Bruen*'s test does

7    not turn on the extent of a plaintiff's "need" to exercise their rights. Indeed, *Bruen*

8    expressly rejected that notion: "Because the State of New York issues public-carry

9    licenses only when an applicant demonstrates a special need for self-defense, we

10    conclude that the State's licensing regime violates the Constitution." 142 S. Ct. at

11    2122. "We know of no other constitutional right that an individual may exercise only

12    after demonstrating to government officers some special need. That is not how the

13    First Amendment works when it comes to unpopular speech or the free exercise of

14    religion. It is not how the Sixth Amendment works when it comes to a defendant's

15    right to confront the witnesses against him. And it is not how the Second Amendment

16    works when it comes to public carry for self-defense." *Id*. at 2156.

17        The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal

18    Protection rights secured by the United States Constitution. "It is well established that

19    the deprivation of constitutional rights 'unquestionably constitutes irreparable

20    injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.*

21    *Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be

22    adequately remedied through damages [such violations] therefore generally constitute

23    irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059

24    (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second

25    Amendment violations. *See, e.g., Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir.

26    2011) (Second Amendment deprivation is "irreparable" because there is "no adequate

27    remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the

28    enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v.*

Exhibit 1
0011

1   *Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023)

2   (collecting cases holding that Second Amendment deprivations constitute irreparable

3   harm). Holding otherwise would render the Second Amendment "a second-class right,

4   subject to an entirely different body of rules than the other Bill of Rights guarantees."

5   *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

6        Furthermore, the Second Amendment protects not only tangible, but "intangible

7   and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables

8   one to possess not only the means to defend oneself but also the self-confidence—and

9   psychic comfort—that comes with knowing one could protect oneself if necessary."

10  *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply,

11  "[u]nlike the exercise of other constitutional rights, the inability to exercise one's

12  Second Amendment right when needed could be a matter of life or death." *Koons v.*

13  *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

14  *also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

15  to keep and bear arms is the insurance policy behind the right to life. If a state

16  regulation prevents a citizen from protecting his life, his other constitutional rights

17  will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

18  at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

19  being forced to give up their right to armed self-defense outside the home because

20  they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

21  Finally, when a person eligible to possess a firearm determines they need a firearm

22  for lawful purposes, including self-defense, the Second Amendment guarantees their

23  right to possess such weapon as soon as it is determined they are, in fact, eligible to

24  possess it. Indeed, *Heller* recognized the need for "immediate self-defense" in finding

25  Washington, D.C.'s storage requirement unconstitutional. *District of Columbia v.*

26  *Heller*, 554 U.S. 570, 635 (2008).

27  **Interrogatory No. 4:**

28

---

Exhibit 1
0012

State all facts supporting your contention, as averred in paragraph 5 of the complaint, that you wish to acquire firearms to keep and bear for lawful purposes including immediate self-defense.

**Answer:**

The contention speaks for itself: I wish to acquire firearms to keep and bear for lawful purposes, including immediate self-defense. Firearms ownership is important to me because it is the most effective self-defense tool ever created.

**Interrogatory No. 5:**

State all facts supporting your contention, as averred in paragraph 42 of the complaint, that upwards of 99% of all DROS applications are approved by the Defendants and that a large percentage of approvals occur within a matter of minutes.

**Answer:**

Responding Party objects that information concerning the operation of DROS system and processing of DROS applications is a matter within Defendants' knowledge. As set forth in the complaint, Plaintiffs' allegations concerning the processing of DROS applications are based on the district court's findings in *Silvester v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014). In short, Defendants have "access to [all of the] relevant information" sought by this Request. Fed. R. Civ. P. 26(b)(1).

**Interrogatory No. 6:**

State all facts supporting your contention, as averred in paragraph 44 of the complaint, that no modification to the Defendants' DROS systems would be required in order to comply with an injunction prohibiting enforcement of the waiting period laws as to non-prohibited individuals.

**Answer:**

Responding Party objects that information concerning the operation of DROS system and processing of DROS applications is a matter within Defendants' knowledge. As set forth in the complaint, Plaintiffs' allegations concerning the processing of DROS applications are based on the district court's findings in *Silvester*

Exhibit 1
0013

*v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014). Furthermore, the DROS DES User Guide details how firearms dealers process "exempt" transactions, which confirms that the system can process and approve transactions that are not subject to the Waiting Period Laws. *See* Cal. Dep't of Justice, Bureau of Firearms, *DROS Entry System (DES) Firearms Dealership User Guide* at 42–62 (Rev. 4 Jan. 2020). In short, Defendants have "access to [all of the] relevant information" sought by this Request. Fed. R. Civ. P. 26(b)(1).

**Interrogatory No. 7:**

State all facts supporting your contention, as averred in paragraph 54 of the complaint, that California's purported justifications for its waiting period laws seek to address general societal problems that have persisted since the 18th century.

**Answer:**

In the prior litigation challenging the operation of the Waiting Period Laws, California's stated justification for requiring a wait after a background check is completed—"to provide a 'cooling off' period (*i.e.*, a period in which weapons purchasers may reconsider, particularly when an impulsive act of violence or self harm may be contemplated)," *Silvester v. Harris*, 843 F.3d 816, 823 (9th Cir. 2016)—seeks to address a societal problems that has obviously persisted since the 18th century. And, to the extent California continues to assert a more general interest in reducing firearm violence, as it did in *Silvester* (Opening Br. of Defendant-Appellant, *Silvester v. Harris*, 9th Cir. No. 14-16840, ECF No. 24-1), that likewise has existed since the 18th century. *See, e.g.*, *Bruen*, 142 S. Ct. at 2131 ("[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."); *id*. at 2131-32 (observing that "handgun violence" in "urban

Exhibit 1
0014

1  areas" has persisted since the founding). If, however, it is Defendants' position that

2  firearm violence has not been a general societal problem since the 18th century,

3  Plaintiffs will confer further on this issue.

4  **Interrogatory No. 8:**

5      State all facts supporting your contention, as averred in paragraphs 64 of the

6  complaint, that the waiting period laws, and the Defendants' regulations, policies, and

7  enforcement practices applying them, impose "other burdens and costs" separate from

8  the ten-day waiting period.

9  **Answer:**

10      The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal

11  Protection rights secured by the United States Constitution. "It is well established that

12  the deprivation of constitutional rights 'unquestionably constitutes irreparable

13  injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.*

14  *Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be

15  adequately remedied through damages [such violations] therefore generally constitute

16  irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059

17  (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second

18  Amendment violations. See, *e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir.

19  2011) (Second Amendment deprivation is "irreparable" because there is "no adequate

20  remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the

21  enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v.*

22  *Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023)

23  (collecting cases holding that Second Amendment deprivations constitute irreparable

24  harm). Holding otherwise would render the Second Amendment "a second-class right,

25  subject to an entirely different body of rules than the other Bill of Rights guarantees."

26  *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

27      Furthermore, the Second Amendment protects not only tangible, but "intangible

28  and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables

Exhibit 1
0015

1   one to possess not only the means to defend oneself but also the self-confidence—and

2   psychic comfort—that comes with knowing one could protect oneself if necessary."

3   *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply,

4   "[u]nlike the exercise of other constitutional rights, the inability to exercise one's

5   Second Amendment right when needed could be a matter of life or death." *Koons v.*

6   *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

7   *also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

8   to keep and bear arms is the insurance policy behind the right to life. If a state

9   regulation prevents a citizen from protecting his life, his other constitutional rights

10  will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

11  at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

12  being forced to give up their right to armed self-defense outside the home because

13  they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

14      Finally, when a person eligible to possess a firearm determines they need a

15  firearm for lawful purposes, including self-defense, the Second Amendment

16  guarantees their right to possess such weapon as soon as it is determined they are, in

17  fact, eligible to possess it. Indeed, *Heller* recognized the need for "immediate self-

18  defense" in finding Washington, D.C.'s storage requirement unconstitutional. *District*

19  *of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

20      Like all law-abiding Californians who wish to purchase firearms, I am subject

21  to the burdens and costs associated with traveling to and from a firearm dealership,

22  sometimes multiple times, before taking possession of their firearm. Furthermore, like

23  all law-abiding Californians who wish to purchase firearms, the waiting period laws

24  burden my ability to have the firearm I desire "for the purpose of immediate self-

25  defense." *Heller*, 554 U.S. at 635.

26  **Interrogatory No. 9:**

27      State all facts supporting your contention, as averred in paragraph 69 of the

28  complaint, that you desire and intend to apply for the transfer of a firearm and to take

Exhibit 1
0016

possession of it as soon as you can be electronically confirmed to not be prohibited from possessing firearms, and would do so, but for the defendants' enforcement of the waiting period laws and the risk of criminal and other penalties.

**Answer:**

The contention speaks for itself: I desire and intend to apply for the transfer of a firearm and to take possession of it as soon as I can be electronically confirmed to not be prohibited from possessing firearms, and would do so, but for the Defendants' enforcement of the waiting period laws and the risk of criminal and other penalties.

**Interrogatory No. 10:**

Identify the number and type of firearms you own.

**Answer:**

Plaintiffs have challenged the constitutionality of California's Waiting Period laws, which is fundamentally a legal question governed by the test set forth in *Bruen*. So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which it plainly does here, "the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). Responding Party objects that this request is not tailored to the resolution of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test. Instead, this request seeks information as if the pre-*Bruen* "two step" interest-balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–27.

The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal Protection rights secured by the United States Constitution. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.*

Exhibit 1
0017

*Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (Second Amendment deprivation is "irreparable" because there is "no adequate remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v. Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023) (collecting cases holding that Second Amendment deprivations constitute irreparable harm). Holding otherwise would render the Second Amendment "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

Furthermore, the Second Amendment protects not only tangible, but "intangible and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply, "[u]nlike the exercise of other constitutional rights, the inability to exercise one's Second Amendment right when needed could be a matter of life or death." *Koons v. Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right to keep and bear arms is the insurance policy behind the right to life. If a state regulation prevents a citizen from protecting his life, his other constitutional rights will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by being forced to give up their right to armed self-defense outside the home because they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

Exhibit 1
0018

1    The number and type of firearms Plaintiffs own is not relevant to *Bruen*'s test,

2 which does not turn on whether Plaintiffs already own a firearm. Indeed, *Heller* has

3 already rejected the similar argument that the government can justify a ban of some

4 arms in common use by pointing to the availability of other arms: "It is no answer to

5 say, as petitioners do, that it is permissible to ban the possession of handguns so long

6 as the possession of other firearms (i.e., long guns) is allowed." *District of Columbia*

7 *v. Heller*, 554 U.S. 570, 629 (2008). "[R]estating the Second Amendment right in

8 terms of what IS LEFT after the regulation rather than what EXISTED historically . .

9 . is exactly backward from *Heller*'s reasoning." *Nat'l Rifle Ass'n v. Bureau of Alcohol,*

10 *Tobacco, Firearms, & Explosives*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J.,

11 dissenting from denial of rehearing en banc).

12    Subject to and without waiving these objections, Responding Party responds as

13 follows: Glock 19 (9mm); Glock 30 (.45 caliber); Colt Army (.45 long caliber); AR

14 Pattern rifle (5.56mm); Mossberg 500 shotgun (12 gauge); Kel-Tec KSG shotgun (12

15 gauge); Steyr SSG 04 (.300 Win Mag).

16 **Interrogatory No. 11:**

17    Identify the number and type of firearms you would like to purchase in the

18 future.

19 **Answer:**

20    Plaintiffs have challenged the constitutionality of California's Waiting Period

21 laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.

22 So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which

23 it plainly does here, "the Constitution presumptively protects that conduct. The

24 government must then justify its regulation by demonstrating that it is consistent with

25 the Nation's historical tradition of firearm regulation. Only then may a court conclude

26 that the individual's conduct falls outside the Second Amendment's unqualified

27 command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–

28 30 (2022). Responding Party objects that this request is not tailored to the resolution

of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test. Instead, this request seeks information as if the pre-*Bruen* "two step" interest-balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–27.

The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal Protection rights secured by the United States Constitution. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (Second Amendment deprivation is "irreparable" because there is "no adequate remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v. Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023) (collecting cases holding that Second Amendment deprivations constitute irreparable harm). Holding otherwise would render the Second Amendment "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

Furthermore, the Second Amendment protects not only tangible, but "intangible and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply, "[u]nlike the exercise of other constitutional rights, the inability to exercise one's Second Amendment right when needed could be a matter of life or death." *Koons v.*

Exhibit 1
0020

1    *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

2    *also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

3    to keep and bear arms is the insurance policy behind the right to life. If a state

4    regulation prevents a citizen from protecting his life, his other constitutional rights

5    will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

6    at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

7    being forced to give up their right to armed self-defense outside the home because

8    they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

9      The number and type of firearms Plaintiffs own is not relevant to *Bruen*'s test,

10   which does not turn on whether Plaintiffs already own a firearm. Indeed, *Heller* has

11   already rejected the similar argument that the government can justify a ban of some

12   arms in common use by pointing to the availability of other arms: "It is no answer to

13   say, as petitioners do, that it is permissible to ban the possession of handguns so long

14   as the possession of other firearms (i.e., long guns) is allowed." *District of Columbia*

15   *v. Heller*, 554 U.S. 570, 629 (2008). "[R]estating the Second Amendment right in

16   terms of what IS LEFT after the regulation rather than what EXISTED historically . .

17   . is exactly backward from *Heller*'s reasoning." *Nat'l Rifle Ass'n v. Bureau of Alcohol,*

18   *Tobacco, Firearms, & Explosives*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J.,

19   dissenting from denial of rehearing en banc).

20      Subject to and without waiving these objections, Responding Party responds as

21   follows: While it is impossible to know at this time the precise "number and type of

22   firearms [I] would like to purchase in the future," I am interested in purchasing at least

23   the following: I intend to purchase additional handguns and long guns for self-defense

24   and other lawful purposes. And if the Handgun Roster were not in place, I would

25   specifically like to purchase the following: Springfield Hellcat 9mm; Glock 19 9mm

26   Generation 5; Glock 30SF .45 caliber Gen 4; Glock 43X 9mm; Smith & Wesson

27   Shield EX 9mm.

28

Exhibit 1
0021

1   Dated:  November 8, 2023            BENBROOK LAW GROUP, PC

2

3                                       By   s/ Stephen M. Duvernay
                                        STEPHEN M. DUVERNAY
4                                       Attorneys for Plaintiffs

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DocuSign Envelope ID: E4D3F7C9-8E4B-4029-AF65-3596E29BE548

1  BENBROOK LAW GROUP, PC
2  BRADLEY A. BENBROOK (SBN 177786)
   STEPHEN M. DUVERNAY (SBN 250957)
3  701 University Avenue, Suite 106
4  Sacramento, CA  95825
   Telephone: (916) 447-4900
5  brad@benbrooklawgroup.com
6
7  Attorneys for Plaintiffs
8
9                  UNITED STATES DISTRICT COURT
10              SOUTHERN DISTRICT OF CALIFORNIA
11
12 CLAIRE RICHARDS; ALISHA            Case No.:  3:23-cv-00793-LAB-WVG
   CURTIN; DAKOTA ADELPHIA;
13 MICHAEL SCHWARTZ; DARIN            **PLAINTIFF MICHAEL**
   PRINCE; NORTH COUNTY               **SCHWARTZ'S VERIFICATION OF**
14 SHOOTING CENTER, INC.; JOHN        **DISCOVERY RESPONSES**
   PHILLIPS; PWGG, L.P.; SAN DIEGO    **(INDIVIDUALLY AND ON**
15 COUNTY GUN OWNERS PAC;             **BEHALF OF PLAINTIFF SAN**
   CALIFORNIA GUN RIGHTS              **DIEGO COUNTY GUN OWNERS**
16 FOUNDATION; FIREARMS POLICY        **PAC)**
   COALITION, INC.; and SECOND
17 AMENDMENT FOUNDATION,
18            *Plaintiffs,*
19       v.
20 ROB BONTA, in his official capacity as
   Attorney General of California; and
21 ALLISON MENDOZA, in her official
   capacity as Director of the California
22 Department of Justice Bureau of
   Firearms,
23
24           *Defendants.*
25
26
27
28

MICHAEL SCHWARTZ/SDCGO VERIFICATION OF DISCOVERY RESPONSES

Exhibit 1
0023

DocuSign Envelope ID: E4D3F7C9-8E4B-4029-AF65-3596E29BE548

1
## VERIFICATION OF DISCOVERY RESPONSES

2    I, Michael Schwartz, believe, based upon reasonable inquiry, that the following

3 answers are true and correct to the best of my knowledge, information and belief:

4    Responses to Defendants' First Set of Special Interrogatories, dated November

5 8, 2023.

6    Responses to Defendants' First Set of Requests for Production, dated

7 November 8, 2023.

8    Amended Responses to Defendants' First Set of Special Interrogatories, dated

9 January 22, 2024.

10    Amended Responses to Defendants' First Set of Requests for Production, dated

11 January 22, 2024.

12    Furthermore, on behalf of San Diego County Gun Owners PAC, I am

13 authorized to verify that the following answers are true and correct to the best of my

14 knowledge, information and belief:

15    Responses to Defendants' First Set of Special Interrogatories, dated November

16 8, 2023.

17    Responses to Defendants' First Set of Requests for Production, dated

18 November 8, 2023.

19    I verify under penalty of perjury that the foregoing is true and correct.

20
    Dated: 2/12/2024                                 By

21

22

23

24

25

26

27

28

MICHAEL SCHWARTZ/SDCGO VERIFICATION OF DISCOVERY RESPONSES
-1-

Exhibit 1
0024

# Exhibit 2

Exhibit 2
0025

In the Matter of:

**Claire Richards**

**vs**

**Rob Bonta**

---

**MICHAEL  SCHWARTZ**

***January 23, 2024***

---



Swivel Legal Solutions   |   Phone: 800.540.9099   |   www.swivellegal.com

Exhibit 2
0026

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   CLAIRE RICHARDS, et al.,

 5                    Plaintiffs,              Case Number

 6        -v-                                  3:23-CV-00793

 7   ROB BONTA, in his official capacity

 8   as Attorney General of California,

 9   et al.,

10                    Defendants.

11    ------------------------------------------------------

12

13              DEPOSITION BY VIDEOCONFERENCE-ONLY OF

14                    MICHAEL A. SCHWARTZ,

15             Individually and as Representative of

16                San Diego County Gun Owners PAC

17

18                  Tuesday, January 23, 2024

19                  2:03 P.M. TO 4:26 P.M.

20                  Pacific Standard Time

21

22

23

24             Swivel Legal Solutions Job 2876

25                    www.SwivelLegal.com
```

Exhibit 2
0027

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   CLAIRE RICHARDS, et al.,

 5                  Plaintiffs,              Case Number

 6      -v-                              3:23-CV-00793

 7   ROB BONTA, in his official capacity

 8   as Attorney General of California,

 9   et al.,

10              Defendants.

11     ----------------------------------------------------

12

13            VIDEOCONFERENCE-ONLY DEPOSITION,

14            VIA SWIVEL LEGAL'S ZOOM PORTAL,

15                       OF

16               MICHAEL A. SCHWARTZ,

17   individually and as representative of San Diego County

18   Gun Owners PAC, taken on Tuesday, January 23, 2024 at

19   2:03 P.M. Pacific Standard Time, before Lori Byrd,

20   Registered Professional Reporter, Certified Realtime

21   Reporter, Certified LiveNote Reporter, Realtime Systems

22   Administrator, Kansas Certified Court Reporter 1681,

23   California Certified Shorthand Reporter 13023, and

24   California Certified Realtime Reporter 209.

25
```

Exhibit 2
0028

```
 1              APPEARANCES FROM REMOTE LOCATIONS

 2

 3    On behalf of the plaintiffs, including the witness

 4    Michael A. Schwartz:

 5    Via Swivel Legal's Zoom Videoconference Portal

 6              BENBROOK LAW GROUP, P.C.
                Claire Richards vs Rob Bonta          Job 2876
                MICHAEL  SCHWARTZ on 01-23-2024
 7              BY:  STEPHEN M. DUVERNAY, ESQUIRE

 8              701 University Avenue

 9              Suite 106

10              Sacramento, California  95825

11                 Phone 916-447-4900

12                 Fax 916-447-4904

13                 E-mail steve@benbrooklawgroup.com

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 2
0029

```
 1          CONTINUING APPEARANCES FROM REMOTE LOCATIONS

 2

 3   On behalf of defendant Rob Bonta in his official

 4   capacity as Attorney General of the State of California,

 5   and Defendant Allison Mendoza in her official capacity

 6   as Director of the Bureau of Firearms:

 7   Via Swivel Legal's Zoom Videoconference Portal

 8             ATTORNEY GENERAL OF CALIFORNIA

 9             BY:  ROBERT L. MEYERHOFF, ESQUIRE

10             AND: SEBASTIAN BRADY, ESQUIRE

11             Deputy Attorneys General

12             455 Golden Gate Avenue

13             Suite 11000

14             San Francisco, California  94102-7004

15                 Phone 415-510-3592

16                 Fax 415-703-5480

17                 E-mail Robert.Meyerhoff@doj.ca.gov

18                 E-mail Sebastian.Brady@doj.ca.gov

19             ----------------------------------------

20

21

22

23

24

25
```

Exhibit 2
0030

```
 1        Q.    You can answer.

 2        A.    I own firearms, yes.

 3        Q.    And turning your attention to paragraph --

 4   excuse me.

 5              Turning your attention to page 14.

 6              Do you see where it says:

 7                   "Subject to and without waiving

 8                    these objections, responding party

 9                    responds as follows."

10              And then there's a list of firearms.

11        A.    Yes.

12        Q.    Are those all of the firearms that you

13   currently possess?

14        A.    They were at the time.  But no, I have one

15   more.

16              And then, if I can ever get to Poway Weapons &

17   Gear, I'll have three more.  But they're currently in

18   their 10-day wait period, and it's been very difficult

19   to get there and pick them up.

20        Q.    So those three additional firearms that are

21   at -- what's the name of the --

22        A.    Poway Weapons & Gear.  PWG.

23        Q.    Those weapons that are PWG, when did you

24   purchase those firearms?

25        A.    They were -- the private party transfer
```

Exhibit 2
0031

1   happened on the 12th.

2        Q.    So the 10-day --

3        A.    Initiated on the 12 -- I'm sorry -- it was

4   initiated on the 12th.

5        Q.    I'm sorry.

6              So the 10-day waiting period has expired.  Is

7   that correct?

8        A.    The 10-day wait period -- yes.  So --

9        Q.    So you could take possession of those firearms

10  today.  Correct?

11       A.    I could.

12       Q.    And when do you expect to take possession of

13  those firearms?

14       A.    Well, hopefully within the next week.

15             But I also, over in December, there's a

16  revolver, a .38 caliber Smith & Wesson revolver, that it

17  was a private party transfer as well.

18       Q.    And you currently have possession of that?

19       A.    I do.

20       Q.    And from the time you initiated the transfer

21  of that firearm until the time you took possession, how

22  long was that?

23       A.    The time I initiated the transfer to the time

24  I took possession?  Was at least 10 days.

25             I don't recall exactly, but it was between 10

Exhibit 2
0032

1   and 20 days.

2        Q.   These firearms listed on page 14, what do you

3   use these firearms for?

4        A.   A variety of legal activities.  It's all kinds

5   of stuff.

6             What -- is there something specific?  Or ...

7        Q.   I guess I can go firearm by firearm.

8        A.   The two on my carry permit are the Glock 19

9   and the Glock 30.

10       Q.   And what do you use those two firearms for?

11       A.   I carry them for self-defense.

12       Q.   And why did you select those two firearms to

13  carry for self-defense?

14       A.   They are the most appropriate out of the

15  selection I have.

16       Q.   And do you think those two firearms are the

17  most appropriate firearms for self-defense for you on

18  the market?

19       A.   Part of the problem is I don't know, because I

20  don't have access to such a huge variety of -- of

21  firearms.

22             So for carrying, for example, you know,

23  carrying for self-defense where somebody with my body

24  type, my hands, my training, and my experience, there's

25  a whole world of pistols that are not available for me

Exhibit 2
0033

Claire Richards vs Rob Bonta                                    Job 2876
MICHAEL  SCHWARTZ on 01-23-2024                                  Page 65

1   to purchase through a dealer in California.

2              So when it comes to, you know, that specific

3   need to carry for self-defense, for me specifically, a

4   Glock 19 and a Glock 30 are as close as I can come

5   within the legal restraints in California.

6        Q.   And what are the three firearms that you

7   initiated transfer of but haven't taken possession of

8   yet?

9        A.   Well, there are two shotguns and a -- and a

10   .22 rifle.  A .22 caliber rifle.

11       Q.   So none of those would be ...

12              You could not list any of those on a CCW

13   permit.  Correct?

14       A.   Correct.

15       Q.   You mention self-defense purposes for the

16   Glock 19 and the Glock 30.

17              What do you use the Colt Army for?

18       A.   Well, all the firearms I own are potentially

19   used for self-defense, depending on the situation.

20              The Glock 19 and Glock 30 are just most

21   appropriate, out of the selection I have, for carrying

22   outside of the home.

23              The Colt Army -- again, all the firearms I own

24   are potentially for self-defense.  But the Colt Army was

25   a gift, and I shoot it mainly for -- for fun.  It's a

Exhibit 2
0034

# Exhibit 3

Exhibit 3
0035

In the Matter of:

**Claire Richards**

**vs**

**Rob Bonta**

---

**ALISHA CURTIN**

***January 26, 2024***

---



Swivel Legal Solutions  |  Phone: 800.540.9099  |  www.swivellegal.com

Exhibit 3
0036

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  CLAIRE RICHARDS, ET AL.,        )
                                    )
 5                  Plaintiffs,     )
                                    )
 6  -vs-                            ) Case No. 3:23-CV-00793
                                    )
 7  ROB BONTA, IN HIS OFFICIAL      )
    CAPACITY AS ATTORNEY GENERAL    )
 8  OF CALIFORNIA, ET AL.,          )
                                    )
 9                  Defendants.     )
    _____)

10

11

12

13

14

15              DEPOSITION OF ALISHA CURTIN

16                      Taken On

17             Friday, January 26, 2024

18

19

20

21

22

23

24  STENOGRAPHICALLY REPORTED BY:
    AI ARIAS, CSR 14334
25  JOB NO.: 2878
```

Exhibit 3
0037

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4  CLAIRE RICHARDS, ET AL.,        )
                                   )
5                 Plaintiffs,      )
                                   )
6  -vs-                            ) Case No. 3:23-CV-00793
                                   )
7  ROB BONTA, IN HIS OFFICIAL      )
   CAPACITY AS ATTORNEY            )
8  GENERAL OF CALIFORNIA, ET       )
   AL.,                            )
9                                  ) 
                  Defendants.      )
10 _____)

11

12          DEPOSITION of ALISHA CURTIN, taken

13          remotely via Zoom on behalf of the

14          Defendants, commencing at 9:33 a.m.,

15          and ending at 10:58 a.m. on Friday,

16          January 26, 2024, before Ai Arias,

17          Certified Shorthand Reporter No. 14334.

18

19

20

21

22

23

24

25

Exhibit 3
0038

```
 1                A P P E A R A N C E S
                        ---oOo---
 2

 3
     FOR THE PLAINTIFFS:
 4        BENBROOK LAW GROUP
          BY:   STEPHEN M. DUVERNAY, ESQ.
 5        701 University Avenue
          Suite 106
 6        Sacramento, California 95825
          916.447.9100
 7        steve@benbrooklawgroup.com

 8

 9   FOR THE DEFENDANTS:
          CALIFORNIA DEPARTMENT OF JUSTICE
10        BY:   ROBERT L. MEYERHOFF,
          DEPUTY ATTORNEY GENERAL
11        455 Golden Gate Avenue
          Suite 11000
12        San Francisco, California 94102
          415.510.3592
13        robert.meyerhoff@doj.ca.gov

14

15   ALSO PRESENT:

16        ANTHONY CASTANEDA, Swivel Legal

17

18

19

20

21

22

23

24

25
```

Exhibit 3
0039

1          MR. MEYERHOFF:  I'm going to pull up what

2   I'll mark as -- I'm going to share on my screen a

3   document.  Midway down the page, it says, "Plaintiff

4   Alisha Curtin's Responses to Defendant's First Set of

5   Special Interrogatories."

6          (Exhibit No. 2 was marked for

7          identification.)

8   BY MR. MEYERHOFF:

9      Q.   Do you see that, Ms. Curtin?

10     A.   Yes, I do.

11     Q.   This is an 18-page document, but to the best

12  of your knowledge, based on what you can see on the

13  first page, have you ever seen this document before?

14     A.   Yes.  This is one of the ones I reviewed.

15     Q.   Do you see the top of page 15 at lines 3 and

16  4, it lists a number of firearms?  Do you see that?

17     A.   I do see that.

18     Q.   Do you own any other firearms other than the

19  Smith & Wesson Shield, the Smith & Wesson M&P40, the

20  Glock 17, the Glock 26, the Glock 22, the Rock Island

21  Armory 1911, the Walther P22, and the GSG-16 rifle?

22     A.   Since the -- about a week or so ago, I did

23  pick up two additional firearms.

24     Q.   And what are those firearms?

25     A.   One was simply a stripped AR Lower, but it's

1  a registered item.  And then the other was a CZ 75 BD.

2      Q.   Do you recall the exact date that you picked

3  those up?

4      A.   I do not, but I would estimate it was eight

5  to ten days ago -- well, maybe just a little over a

6  week.

7      Q.   And do you recall when you initiated the

8  purchase of those firearms?

9      A.   On the 31st of December.

10     Q.   So if you purchased them -- if you initiated

11 the purchase on the 31st of December and you picked it

12 up between eight and ten days ago, approximately, to

13 the best of your recollection, and today being

14 January 26th, it's fair to say that you did not pick

15 those firearms up on the first possible day, correct?

16     A.   That would be correct.

17          MR. DUVERNAY:  Object to the form of the

18 question.

19 BY MR. MEYERHOFF:

20     Q.   Which of these firearms we've discussed was

21 the first firearm you purchased?

22          MR. DUVERNAY:  Object to the form of the

23 question.

24 BY MR. MEYERHOFF:

25     Q.   What was the first firearm you ever

Exhibit 3
0041

1   purchased?

2       A.   Smith & Wesson MP40.

3       Q.   And approximately how long ago -- or what

4   year did you purchase that firearm?

5       A.   I believe it was 2013 -- could have been

6   2012.  It was -- I know that it was towards the end of

7   the year, so it would have been December of one of

8   those years.

9       Q.   Why did you acquire the Smith & Wesson MP40?

10      A.   I had -- I had been going and having some

11  shooting range time with a friend, and first, it

12  became something that I enjoyed.  My husband has been

13  encouraging me for the purpose of self-defense.  He

14  thought that it would be a good idea.  And so once I

15  became trained and felt comfortable enough, I decided

16  to go out and purchase my own firearm.

17      Q.   And what do you currently use the Smith &

18  Wesson MP40 for?

19      A.   I now simply use it just as a training --

20  range shooting.  It's a -- it's a larger frame firearm

21  than I'm comfortable carrying on a regular basis, so I

22  choose not to carry it.  I do keep it in a proper

23  place for home defense, but it's -- in my opinion,

24  it's too large to carry and so just range practice and

25  home defense.

Exhibit 3
0042

1    Q.   Why do you possess the Smith & Wesson Shield

2  firearm?

3    A.   That is my primary concealed carry at this

4  time.

5    Q.   And why do you concealed carry that firearm?

6    A.   I am a mom to four kids; I have a husband who

7  works a lot of hours, he travels for work, so I'm home

8  alone; I'm also a woman, and I feel that I have the

9  right and the desire to have a weapon or a tool should

10 I need to defend myself or my children, because if I

11 need to be defended, it's going to have to be me that

12 provides that defense.

13   Q.   Why do you possess a Glock 17?

14   A.   The Glock 17 is one that I purchased mainly

15 to be able to have available for people to work with

16 that work with me for firearms training.  It's a very

17 popular universal firearm that works well for most

18 people, so that was one that I thought would be a wise

19 purchase in order for me to be able to help and train

20 other people.

21   Q.   Why do you have the Glock 26?

22   A.   The Glock 26 was initially going to be a

23 carry gun.  I purchased it for that purpose.  I

24 decided after I had it and wore it on my person for a

25 period of time that it was just a little too thick.

Exhibit 3
0043

1  It was hard for me to properly conceal, and so I

2  decided it would no longer be my primary, and it --

3  and then that's when I purchased the Shield instead,

4  but it was purchased to be a defense carry gun.

5      Q.   Why do you possess the Glock 22?

6      A.   The Glock 22 is a .40 caliber.  It was an

7  opportunity that I had to purchase -- it is an older

8  generation.  It was simply an opportunity that I had

9  to purchase it, and I wanted to take advantage of that

10  opportunity.  It does serve as an additional training

11  tool.  When I run classes with multiple people, I do

12  like to have a variety of calibers as well as frame

13  sizes available, so it's not a primary home defense

14  gun for me.  It's more so a training tool that I have

15  available for other people.

16      Q.   Why do you possess the Rock Island Armory

17  1911?

18      A.   The Rock Island I actually acquired from a

19  friend who passed away, through his estate, and I got

20  that through -- through his -- when he passed away,

21  his widow didn't want to keep it, and so I was able to

22  purchase it from her, and so part of it is

23  sentimental.  I also wanted to be able to have -- I

24  like the 1911 platform.  It was an opportunity to get

25  something not only that was sentimental from a friend,

Exhibit 3
0044

1   also, though, was that platform that I was interested

2   in, and it's also a hammer-fired gun, which also can

3   serve as a training opportunity for people that are

4   interested in hammer fire, because it's a different

5   firing mechanism.

6        Q.   Sorry to hear about your friend.

7        A.   Thank you.

8        Q.   Is the Rock Island Armory 1911 -- is that a

9   weapon that's capable of being concealed?

10       A.   It is a handgun, so I would say yes.

11            MR. DUVERNAY:  Object to the form of the

12   question.

13   BY MR. MEYERHOFF:

14       Q.   What about -- why do you possess the Walther

15   P22?

16       A.   With the rising cost of ammunition during

17   Covid, the 22 was an attractive option to be able to

18   still practice and to shoot with cheaper ammo.  And it

19   also, again, provides an option for when I work with

20   my own children or train my own children.  It's less

21   recoil, and it allows them to learn safely with

22   something that they can manage, and the ammunition is

23   cheaper.

24       Q.   And then why do you possess the GSG-16 rifle?

25       A.   The GSG-16, that's also chambered in .22, so,

Exhibit 3
0045

1  again, that is going to go with -- it's a rifle

2  platform that is cheaper ammunition to shoot, so

3  that's, again, something that I enjoy doing with my

4  kids.  Having four children, they're all proficient

5  and safe.  I do take them and train them, and

6  sometimes, you know, the choice is to shoot a rifle,

7  and that's what we work on.

8       Q.   Why did you purchase the AR rifle?

9       A.   The lower.

10           MR. DUVERNAY:  Object to the form of the

11  question, object to the extent it misstates

12  Ms. Curtin's prior testimony about what she purchased.

13  BY MR. MEYERHOFF:

14       Q.   You can answer, if you understand the

15  question.

16       A.   The AR is simply what's called a stripped

17  lower.  It's not a full firearm.  It is a registered

18  piece, however, it's not functional, so right now, it

19  has no use.  Someday I was interested in building my

20  own AR.  I just haven't done it yet.

21       Q.   And why do you possess the CZ 75 BD?

22       A.   That was another hammer-fired firearm.  That

23  one had a dual purpose.  I also am a competitive

24  shooter, and I thought it would be interesting to try

25  competition shooting with a hammer-fired firearm.

Exhibit 3
0046

1  It's a very heavy steel-framed firearm, and I thought

2  it would be interesting to try and also to -- again,

3  because all of my firearms double as training tools,

4  that I can use to work with other people to train

5  them, and it's a hammer-fired heavy,

6  comfortable-to-shoot option to train people on.  The

7  Rock Island also is hammer fired and heavy, however,

8  being a .45 caliber, that still can be too much for

9  some people to ~~manage~~, so the CZ is a 9, which is

10 easier to manage.

11     Q.   Is it fair to say out of all the firearms you

12 currently possess, that the Smith & Wesson Shield is

13 the weapon you primarily concealed carry?

14          MR. DUVERNAY:  Object to the form of the

15 question.

16 BY MR. MEYERHOFF:

17     Q.   You can answer.

18     A.   That would be correct.  That's my primary.  I

19 do carry some of the others.  They're all listed on my

20 permit; however, that is my primary.

21     Q.   And you may have stated this already.  If you

22 did, I don't recall at this moment.

23          What about the Smith & Wesson Shield makes it

24 the -- in your view, the best weapon that you

25 currently possess to concealed carry?

Exhibit 3
0047

1      A.    Because here in California, we are limited by

2   a roster.  The Shield would normally not be my first

3   choice, however, we are limited by the roster.  Given

4   the options that I have available to me because of the

5   roster, it was the -- I felt that it met the criteria

6   of being a sufficient caliber.  It's also a slim,

7   small firearm that I felt was reasonable and

8   comfortable enough to conceal carry.  There are some

9   things that I really don't care for about it, however,

10  the ease and the ability to conceal carry on a regular

11  basis is why I've chosen that to be my concealed carry

12  firearm.

13      Q.    And is it fair to say that there are no other

14  concealable firearms, currently available for sale in

15  California, that you think are more appropriate for

16  you for the purpose of self-defense?

17          MR. DUVERNAY:  Object to the form of the

18  question.

19          You can answer.

20          THE WITNESS:  I'm sorry, can you repeat the

21  question in full.

22          MR. MEYERHOFF:  Can you read back the

23  question, Ms. Arias.

24          (The record was read as follows:

25              "Q.  And is it fair to say.

Exhibit 3
0048

1              that there are no other concealable

2              firearms, currently available for

3              sale in California, that you think

4              are more appropriate for you for

5              the purpose of self-defense?")

6          MR. DUVERNAY:  Object to the form of the

7    question, object to the extent it calls for the

8    witness to know precisely what is on the handgun

9    roster at this particular point in time.

10         You can answer the question.

11         THE WITNESS:  I would definitely say that

12   it's not the only viable good concealed carry option.

13   The roster has recently opened up and put some really

14   great options on, however, funds are a consideration.

15   I haven't purchased them yet.  There's also the 30-day

16   wait requirement, so the fact that I purchased the CZ

17   at the end of the year, I now -- I cannot begin a DROS

18   or begin another purchase, so there's that limitation

19   as well.  So even if I -- you know, even though I'm

20   interested, I can't yet.  But I would say no, there

21   are definitely a lot -- a number of other options.

22   The Shield is just the one that I had chosen that I

23   felt was the best fit, but I would say there are

24   others that are good, viable options as well.

25         MR. MEYERHOFF:  Why don't we take a -- I feel

Exhibit 3
0049

# Exhibit 4

Exhibit 4
0050

1  BENBROOK LAW GROUP, PC
2  BRADLEY A. BENBROOK (SBN 177786)
   STEPHEN M. DUVERNAY (SBN 250957)
3  701 University Avenue, Suite 106
4  Sacramento, CA  95825
   Telephone: (916) 447-4900
5  brad@benbrooklawgroup.com
6
7  Attorneys for Plaintiffs
8
9                **UNITED STATES DISTRICT COURT**
10              **SOUTHERN DISTRICT OF CALIFORNIA**
11
12  CLAIRE RICHARDS; ALISHA           Case No.:  3:23-cv-00793-LAB-WVG
    CURTIN; DAKOTA ADELPHIA;
13  MICHAEL SCHWARTZ; DARIN
    PRINCE; NORTH COUNTY              **PLAINTIFF DAKOTA**
14  SHOOTING CENTER, INC.; JOHN       **ADELPHIA'S RESPONSES TO**
    PHILLIPS; PWGG, L.P.; SAN DIEGO   **DEFENDANTS' FIRST SET OF**
15  COUNTY GUN OWNERS PAC;            **SPECIAL INTERROGATORIES**
    CALIFORNIA GUN RIGHTS
16  FOUNDATION; FIREARMS POLICY
    COALITION, INC.; and SECOND
17  AMENDMENT FOUNDATION,
18              *Plaintiffs*,
19        v.
20  ROB BONTA, in his official capacity as
    Attorney General of California; and
21  ALLISON MENDOZA, in her official
    capacity as Director of the California
22  Department of Justice Bureau of
    Firearms,
23
              *Defendants*.
24
25
26
27
28

DAKOTA ADELPHIA'S RESPONSES TO DEFENDANTS' FIRST SET OF SPECIAL INTERROGATORIES

Exhibit 4
0051

1    Pursuant to Federal Rules of Civil Procedure 26 and 33, Plaintiff Dakota

2  Adelphia, by her undersigned counsel, hereby serves the following Objections and

3  Responses to Defendants' First Interrogatories.

4                            **INTERROGATORIES**

5  **Interrogatory No. 1:**

6    Identify and describe in full and complete detail all harms that you contend you

7  have suffered as a result of the waiting period laws.

8  **Answer:**

9    Plaintiffs have challenged the constitutionality of California's Waiting Period

10 laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.

11 So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which

12 it plainly does here, "the Constitution presumptively protects that conduct. The

13 government must then justify its regulation by demonstrating that it is consistent with

14 the Nation's historical tradition of firearm regulation. Only then may a court conclude

15 that the individual's conduct falls outside the Second Amendment's unqualified

16 command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–

17 30 (2022). Responding Party objects that this request is not tailored to the resolution

18 of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test.

19 Instead, this request seeks information as if the pre-*Bruen* "two step" interest-

20 balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–

21 27.

22    The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal

23 Protection rights secured by the United States Constitution. "It is well established that

24 the deprivation of constitutional rights 'unquestionably constitutes irreparable

25 injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.

26 Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be

27 adequately remedied through damages [such violations] therefore generally constitute

28 irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059

Exhibit 4
0052

1   (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second

2   Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir.

3   2011) (Second Amendment deprivation is "irreparable" because there is "no adequate

4   remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the

5   enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v.*

6   *Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023)

7   (collecting cases holding that Second Amendment deprivations constitute irreparable

8   harm). Holding otherwise would render the Second Amendment "a second-class right,

9   subject to an entirely different body of rules than the other Bill of Rights guarantees."

10   *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

11       Furthermore, the Second Amendment protects not only tangible, but "intangible

12   and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables

13   one to possess not only the means to defend oneself but also the self-confidence—and

14   psychic comfort—that comes with knowing one could protect oneself if necessary."

15   *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply,

16   "[u]nlike the exercise of other constitutional rights, the inability to exercise one's

17   Second Amendment right when needed could be a matter of life or death." *Koons v.*

18   *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

19   *also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

20   to keep and bear arms is the insurance policy behind the right to life. If a state

21   regulation prevents a citizen from protecting his life, his other constitutional rights

22   will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

23   at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

24   being forced to give up their right to armed self-defense outside the home because

25   they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

26       Finally, when a person eligible to possess a firearm determines they need a

27   firearm for lawful purposes, including self-defense, the Second Amendment

28   guarantees their right to possess such weapon as soon as it is determined they are, in

Exhibit 4
0053

1  fact, eligible to possess it. Indeed, *Heller* recognized the need for "immediate self-

2  defense" in finding Washington, D.C.'s storage requirement unconstitutional. *District*

3  *of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

4  **Interrogatory No. 2:**

5      Do you contend that you need to take possession of a firearm for a lawful

6  purpose sooner than 10 days after commencement of the background check?

7  **Answer:**

8      Plaintiffs have challenged the constitutionality of California's Waiting Period

9  laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.

10  So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which

11  it plainly does here, "the Constitution presumptively protects that conduct. The

12  government must then justify its regulation by demonstrating that it is consistent with

13  the Nation's historical tradition of firearm regulation. Only then may a court conclude

14  that the individual's conduct falls outside the Second Amendment's unqualified

15  command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–

16  30 (2022). Responding Party objects that this request is not tailored to the resolution

17  of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test.

18  Instead, this request seeks information as if the pre-*Bruen* "two step" interest-

19  balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–

20  27.

21      This request improperly seeks discovery aimed at determining Plaintiffs'

22  "need" to exercise their Second Amendment protected rights, but *Bruen*'s test does

23  not turn on the extent of a plaintiff's "need" to exercise their rights. Indeed, *Bruen*

24  expressly rejected that notion: "Because the State of New York issues public-carry

25  licenses only when an applicant demonstrates a special need for self-defense, we

26  conclude that the State's licensing regime violates the Constitution." 142 S. Ct. at

27  2122. "We know of no other constitutional right that an individual may exercise only

28  after demonstrating to government officers some special need. That is not how the

First Amendment works when it comes to unpopular speech or the free exercise of religion. It is not how the Sixth Amendment works when it comes to a defendant's right to confront the witnesses against him. And it is not how the Second Amendment works when it comes to public carry for self-defense." *Id*. at 2156.

The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal Protection rights secured by the United States Constitution. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (Second Amendment deprivation is "irreparable" because there is "no adequate remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v. Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023) (collecting cases holding that Second Amendment deprivations constitute irreparable harm). Holding otherwise would render the Second Amendment "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

Furthermore, the Second Amendment protects not only tangible, but "intangible and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply, "[u]nlike the exercise of other constitutional rights, the inability to exercise one's Second Amendment right when needed could be a matter of life or death." *Koons v.*

Exhibit 4
0055

1  *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

2  *also, e.g., Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

3  to keep and bear arms is the insurance policy behind the right to life. If a state

4  regulation prevents a citizen from protecting his life, his other constitutional rights

5  will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

6  at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

7  being forced to give up their right to armed self-defense outside the home because

8  they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

9      Finally, when a person eligible to possess a firearm determines they need a

10  firearm for lawful purposes, including self-defense, the Second Amendment

11  guarantees their right to possess such weapon as soon as it is determined they are, in

12  fact, eligible to possess it. Indeed, *Heller* recognized the need for "immediate self-

13  defense" in finding Washington, D.C.'s storage requirement unconstitutional. *District*

14  *of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

15  **Interrogatory No. 3:**

16      If your answer to interrogatory no. 2 is in the affirmative, state all facts

17  supporting your contention that you need to take possession of a firearm for a lawful

18  purpose sooner than 10 days after commencement of the background check.

19  **Answer:**

20      Plaintiffs have challenged the constitutionality of California's Waiting Period

21  laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.

22  So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which

23  it plainly does here, "the Constitution presumptively protects that conduct. The

24  government must then justify its regulation by demonstrating that it is consistent with

25  the Nation's historical tradition of firearm regulation. Only then may a court conclude

26  that the individual's conduct falls outside the Second Amendment's unqualified

27  command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–

28  30 (2022). Responding Party objects that this request is not tailored to the resolution

Exhibit 4
0056

1   of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test.

2   Instead, this request seeks information as if the pre-*Bruen* "two step" interest-

3   balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–

4   27.

5       This request improperly seeks discovery aimed at determining Plaintiffs'

6   "need" to exercise their Second Amendment protected rights, but *Bruen*'s test does

7   not turn on the extent of a plaintiff's "need" to exercise their rights. Indeed, *Bruen*

8   expressly rejected that notion: "Because the State of New York issues public-carry

9   licenses only when an applicant demonstrates a special need for self-defense, we

10  conclude that the State's licensing regime violates the Constitution." 142 S. Ct. at

11  2122. "We know of no other constitutional right that an individual may exercise only

12  after demonstrating to government officers some special need. That is not how the

13  First Amendment works when it comes to unpopular speech or the free exercise of

14  religion. It is not how the Sixth Amendment works when it comes to a defendant's

15  right to confront the witnesses against him. And it is not how the Second Amendment

16  works when it comes to public carry for self-defense." *Id*. at 2156.

17      The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal

18  Protection rights secured by the United States Constitution. "It is well established that

19  the deprivation of constitutional rights 'unquestionably constitutes irreparable

20  injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v.

21  Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be

22  adequately remedied through damages [such violations] therefore generally constitute

23  irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059

24  (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second

25  Amendment violations. *See, e.g., Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir.

26  2011) (Second Amendment deprivation is "irreparable" because there is "no adequate

27  remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the

28  enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v.*

1  *Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023)

2  (collecting cases holding that Second Amendment deprivations constitute irreparable

3  harm). Holding otherwise would render the Second Amendment "a second-class right,

4  subject to an entirely different body of rules than the other Bill of Rights guarantees."

5  *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

6      Furthermore, the Second Amendment protects not only tangible, but "intangible

7  and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables

8  one to possess not only the means to defend oneself but also the self-confidence—and

9  psychic comfort—that comes with knowing one could protect oneself if necessary."

10  *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply,

11  "[u]nlike the exercise of other constitutional rights, the inability to exercise one's

12  Second Amendment right when needed could be a matter of life or death." *Koons v.*

13  *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

14  *also, e.g., Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

15  to keep and bear arms is the insurance policy behind the right to life. If a state

16  regulation prevents a citizen from protecting his life, his other constitutional rights

17  will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

18  at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

19  being forced to give up their right to armed self-defense outside the home because

20  they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

21  Finally, when a person eligible to possess a firearm determines they need a firearm

22  for lawful purposes, including self-defense, the Second Amendment guarantees their

23  right to possess such weapon as soon as it is determined they are, in fact, eligible to

24  possess it. Indeed, *Heller* recognized the need for "immediate self-defense" in finding

25  Washington, D.C.'s storage requirement unconstitutional. *District of Columbia v.*

26  *Heller*, 554 U.S. 570, 635 (2008).

27  **Interrogatory No. 4:**

28

1    State all facts supporting your contention, as averred in paragraph 5 of the
2    complaint, that you wish to acquire firearms to keep and bear for lawful purposes
3    including immediate self-defense.

4    **Answer:**

5    The contention speaks for itself: I wish to acquire firearms to keep and bear for
6    lawful purposes, including immediate self-defense. Firearm ownership is important to
7    me for several reasons. I am particularly concerned about being trained and prepared
8    for self-defense. I appreciate knowing I could protect myself if the need arose. And as
9    the partner of a man who travels frequently for work, I am in our house alone at night
10   regularly and like the additional layer of security. I find great comfort in knowing that
11   firearms give me the ability to protect my own life from a violent attacker. Since police
12   in my city take over half an hour to arrive to Priority 1 calls, if I were unarmed, I could
13   be killed before help arrives.

14   I am also active in shooting sports. As a competitive shooter, the sporting aspect
15   and ability to hone my craft requires patience, practice, and attention to detail.
16   Participating in individual sports like United States Practical Shooting Association
17   events encourages me to stay physically fit and active, while providing a community
18   and family of like-minded athletes. To that end, I have used firearms for indoor and
19   outdoor target shooting, clay shooting, USPSA and Steel Challenge (speed shooting)
20   competitions, and hunting. I have also participated in a 3-gun competition, and a
21   variety of other defensive and competitive sports and classes. I desire to get more
22   involved in the sport called "The Tactical Games," and participate in more 3-gun
23   competitions.

24   To me, the Second Amendment means I have the right to purchase, possess,
25   and own firearms to protect my life, my family, and my loved ones. I have the right
26   to use firearms for hunting, training, self-defense, education, marksmanship,
27   competition, and more.

28   **Interrogatory No. 5:**

Exhibit 4
0059

1   State all facts supporting your contention, as averred in paragraph 42 of the
2   complaint, that upwards of 99% of all DROS applications are approved by the
3   Defendants and that a large percentage of approvals occur within a matter of minutes.
4   **Answer:**

5   Responding Party objects that information concerning the operation of DROS
6   system and processing of DROS applications is a matter within Defendants'
7   knowledge. As set forth in the complaint, Plaintiffs' allegations concerning the
8   processing of DROS applications are based on the district court's findings in *Silvester*
9   *v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014). In short, Defendants have "access to
10  [all of the] relevant information" sought by this Request. Fed. R. Civ. P. 26(b)(1).

11  **Interrogatory No. 6:**

12  State all facts supporting your contention, as averred in paragraph 44 of the
13  complaint, that no modification to the Defendants' DROS systems would be required
14  in order to comply with an injunction prohibiting enforcement of the waiting period
15  laws as to non-prohibited individuals.

16  **Answer:**

17  Responding Party objects that information concerning the operation of DROS
18  system and processing of DROS applications is a matter within Defendants'
19  knowledge. As set forth in the complaint, Plaintiffs' allegations concerning the
20  processing of DROS applications are based on the district court's findings in *Silvester*
21  *v. Harris*, 41 F. Supp. 3d 927 (E.D. Cal. 2014). Furthermore, the DROS DES User
22  Guide details how firearms dealers process "exempt" transactions, which confirms
23  that the system can process and approve transactions that are not subject to the Waiting
24  Period Laws. *See* Cal. Dep't of Justice, Bureau of Firearms, *DROS Entry System*
25  *(DES) Firearms Dealership User Guide* at 42–62 (Rev. 4 Jan. 2020). In short,
26  Defendants have "access to [all of the] relevant information" sought by this Request.
27  Fed. R. Civ. P. 26(b)(1).

28  **Interrogatory No. 7:**

Exhibit 4
0060

1    State all facts supporting your contention, as averred in paragraph 54 of the

2    complaint, that California's purported justifications for its waiting period laws seek to

3    address general societal problems that have persisted since the 18th century.

4    **Answer:**

5    In the prior litigation challenging the operation of the Waiting Period Laws,

6    California's stated justification for requiring a wait after a background check is

7    completed—"to provide a 'cooling off' period (*i.e.*, a period in which weapons

8    purchasers may reconsider, particularly when an impulsive act of violence or self harm

9    may be contemplated)," *Silvester v. Harris*, 843 F.3d 816, 823 (9th Cir. 2016)—seeks

10   to address a societal problems that has obviously persisted since the 18th century.

11   And, to the extent California continues to assert a more general interest in reducing

12   firearm violence, as it did in *Silvester* (Opening Br. of Defendant-Appellant, *Silvester*

13   *v. Harris*, 9th Cir. No. 14-16840, ECF No. 24-1), that likewise has existed since the

14   18th century. *See, e.g.*, *Bruen*, 142 S. Ct. at 2131 ("[W]hen a challenged regulation

15   addresses a general societal problem that has persisted since the 18th century, the lack

16   of a distinctly similar historical regulation addressing that problem is relevant

17   evidence that the challenged regulation is inconsistent with the Second Amendment.

18   Likewise, if earlier generations addressed the societal problem, but did so through

19   materially different means, that also could be evidence that a modern regulation is

20   unconstitutional."); *id*. at 2131-32 (observing that "handgun violence" in "urban

21   areas" has persisted since the founding). If, however, it is Defendants' position that

22   firearm violence has not been a general societal problem since the 18th century,

23   Plaintiffs will confer further on this issue.

24   **Interrogatory No. 8:**

25   State all facts supporting your contention, as averred in paragraphs 64 of the

26   complaint, that the waiting period laws, and the Defendants' regulations, policies, and

27   enforcement practices applying them, impose "other burdens and costs" separate from

28   the ten-day waiting period.

Exhibit 4
0061

**Answer:**

The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal Protection rights secured by the United States Constitution. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second Amendment violations. See, *e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (Second Amendment deprivation is "irreparable" because there is "no adequate remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v. Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023) (collecting cases holding that Second Amendment deprivations constitute irreparable harm). Holding otherwise would render the Second Amendment "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

Furthermore, the Second Amendment protects not only tangible, but "intangible and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply, "[u]nlike the exercise of other constitutional rights, the inability to exercise one's Second Amendment right when needed could be a matter of life or death." *Koons v. Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right to keep and bear arms is the insurance policy behind the right to life. If a state

Exhibit 4
0062

1  regulation prevents a citizen from protecting his life, his other constitutional rights

2  will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

3  at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

4  being forced to give up their right to armed self-defense outside the home because

5  they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

6       Finally, when a person eligible to possess a firearm determines they need a

7  firearm for lawful purposes, including self-defense, the Second Amendment

8  guarantees their right to possess such weapon as soon as it is determined they are, in

9  fact, eligible to possess it. Indeed, *Heller* recognized the need for "immediate self-

10 defense" in finding Washington, D.C.'s storage requirement unconstitutional. *District*

11 *of Columbia v. Heller*, 554 U.S. 570, 635 (2008).

12      Like all law-abiding Californians who wish to purchase firearms, I am subject

13 to the burdens and costs associated with traveling to and from a firearm dealership,

14 sometimes multiple times, before taking possession of their firearm. Furthermore, like

15 all law-abiding Californians who wish to purchase firearms, the waiting period laws

16 burden my ability to have the firearm I desire "for the purpose of immediate self-

17 defense." *Heller*, 554 U.S. at 635.

18 **<u>Interrogatory No. 9:</u>**

19      State all facts supporting your contention, as averred in paragraph 69 of the

20 complaint, that you desire and intend to apply for the transfer of a firearm and to take

21 possession of it as soon as you can be electronically confirmed to not be prohibited

22 from possessing firearms, and would do so, but for the defendants' enforcement of the

23 waiting period laws and the risk of criminal and other penalties.

24 **Answer:**

25      The contention speaks for itself: I desire and intend to apply for the transfer of

26 a firearm and to take possession of it as soon as I can be electronically confirmed to

27 not be prohibited from possessing firearms, and would do so, but for the Defendants'

28 enforcement of the waiting period laws and the risk of criminal and other penalties.

Exhibit 4
0063

**Interrogatory No. 10:**

Identify the number and type of firearms you own.

**Answer:**

Plaintiffs have challenged the constitutionality of California's Waiting Period laws, which is fundamentally a legal question governed by the test set forth in *Bruen*. So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which it plainly does here, "the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–30 (2022). Responding Party objects that this request is not tailored to the resolution of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test. Instead, this request seeks information as if the pre-*Bruen* "two step" interest-balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–27.

The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal Protection rights secured by the United States Constitution. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (Second Amendment deprivation is "irreparable" because there is "no adequate remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v.*

Exhibit 4
0064

1   *Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023)

2   (collecting cases holding that Second Amendment deprivations constitute irreparable

3   harm). Holding otherwise would render the Second Amendment "a second-class right,

4   subject to an entirely different body of rules than the other Bill of Rights guarantees."

5   *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

6         Furthermore, the Second Amendment protects not only tangible, but "intangible

7   and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables

8   one to possess not only the means to defend oneself but also the self-confidence—and

9   psychic comfort—that comes with knowing one could protect oneself if necessary."

10   *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply,

11   "[u]nlike the exercise of other constitutional rights, the inability to exercise one's

12   Second Amendment right when needed could be a matter of life or death." *Koons v.*

13   *Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see*

14   *also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right

15   to keep and bear arms is the insurance policy behind the right to life. If a state

16   regulation prevents a citizen from protecting his life, his other constitutional rights

17   will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966,

18   at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

19   being forced to give up their right to armed self-defense outside the home because

20   they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

21         The number and type of firearms Plaintiffs own is not relevant to *Bruen*'s test,

22   which does not turn on whether Plaintiffs already own a firearm. Indeed, *Heller* has

23   already rejected the similar argument that the government can justify a ban of some

24   arms in common use by pointing to the availability of other arms: "It is no answer to

25   say, as petitioners do, that it is permissible to ban the possession of handguns so long

26   as the possession of other firearms (i.e., long guns) is allowed." *District of Columbia*

27   *v. Heller*, 554 U.S. 570, 629 (2008). "[R]estating the Second Amendment right in

28   terms of what IS LEFT after the regulation rather than what EXISTED historically . .

Exhibit 4
0065

1   . is exactly backward from *Heller*'s reasoning." *Nat'l Rifle Ass'n v. Bureau of Alcohol,*
2   *Tobacco, Firearms, & Explosives*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J.,
3   dissenting from denial of rehearing en banc).

4   Subject to and without waiving these objections, Responding Party responds as
5   follows: Franklin Armory CA7 AR Pistol; Glock 19; Smith & Wesson M&P Shield;
6   Smith & Wesson M&P Performance Center 2.0; Winchester SXP Pump Action
7   Shotgun; Heritage Manufacturing Co. Rough Rider Revolver. In addition, I am in the
8   process of completing the paperwork for an intra-familial transaction to take
9   ownership of a Sig Sauer P365 XL.

10  **Interrogatory No. 11:**

11  Identify the number and type of firearms you would like to purchase in the
12  future.

13  **Answer:**

14  Plaintiffs have challenged the constitutionality of California's Waiting Period
15  laws, which is fundamentally a legal question governed by the test set forth in *Bruen*.
16  So long as the "the Second Amendment's plain text covers" Plaintiffs' conduct, which
17  it plainly does here, "the Constitution presumptively protects that conduct. The
18  government must then justify its regulation by demonstrating that it is consistent with
19  the Nation's historical tradition of firearm regulation. Only then may a court conclude
20  that the individual's conduct falls outside the Second Amendment's unqualified
21  command." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2129–
22  30 (2022). Responding Party objects that this request is not tailored to the resolution
23  of a factual or legal question presented by Plaintiffs' complaint under the *Bruen* test.
24  Instead, this request seeks information as if the pre-*Bruen* "two step" interest-
25  balancing approach applies, but *Bruen* categorically rejected that test. *See id.* at 2125–
26  27.

27  The Waiting Period Laws infringe Plaintiffs' Second Amendment and Equal
28  Protection rights secured by the United States Constitution. "It is well established that

Exhibit 4
0066

the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Because "constitutional violations cannot be adequately remedied through damages [such violations] therefore generally constitute irreparable harm." *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (citation omitted). This principle applies with equal force to Second Amendment violations. *See, e.g.*, *Ezell v. Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011) (Second Amendment deprivation is "irreparable" because there is "no adequate remedy at law"); *Duncan v. Becerra*, 265 F. Supp. 3d at 1135 ("Loss of . . . the enjoyment of Second Amendment rights constitutes irreparable injury."); *Koons v. Reynolds*, --- F. Supp. 3d ---- (2023), 2023 WL 128882, at *22 (D. N.J. Jan. 9, 2023) (collecting cases holding that Second Amendment deprivations constitute irreparable harm). Holding otherwise would render the Second Amendment "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. 2156 (quoting *McDonald v. Chicago*, 561 U.S. 742, 780 (2010)).

Furthermore, the Second Amendment protects not only tangible, but "intangible and unquantifiable interests." *Ezell*, 651 F.3d at 699. "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). Put simply, "[u]nlike the exercise of other constitutional rights, the inability to exercise one's Second Amendment right when needed could be a matter of life or death." *Koons v. Platkin*, --- F. Supp. 3d ----, 2023 WL 3478604, at *105 (D.N.J. May 16, 2023); *see also, e.g.*, *Rhode v. Becerra*, 445 F. Supp. 3d 902, 953–54 (S.D. Cal. 2020) ("The right to keep and bear arms is the insurance policy behind the right to life. If a state regulation prevents a citizen from protecting his life, his other constitutional rights will be superfluous."); *Spencer v. Nigrelli*, --- F. Supp. 3d ----, 2022 WL 17985966, at *13 (W.D.N.Y. Dec. 29, 2022) (finding that plaintiffs suffered irreparable harm by

1   being forced to give up their right to armed self-defense outside the home because

2   they "cannot regain . . . peace of mind or readiness [for self-defense] after the fact").

3       The number and type of firearms Plaintiffs own is not relevant to *Bruen*'s test,

4   which does not turn on whether Plaintiffs already own a firearm. Indeed, *Heller* has

5   already rejected the similar argument that the government can justify a ban of some

6   arms in common use by pointing to the availability of other arms: "It is no answer to

7   say, as petitioners do, that it is permissible to ban the possession of handguns so long

8   as the possession of other firearms (i.e., long guns) is allowed." *District of Columbia*

9   *v. Heller*, 554 U.S. 570, 629 (2008). "[R]estating the Second Amendment right in

10  terms of what IS LEFT after the regulation rather than what EXISTED historically . .

11  . is exactly backward from *Heller*'s reasoning." *Nat'l Rifle Ass'n v. Bureau of Alcohol,*

12  *Tobacco, Firearms, & Explosives*, 714 F.3d 334, 345 (5th Cir. 2013) (Jones, J.,

13  dissenting from denial of rehearing en banc).

14      Subject to and without waiving these objections, Responding Party responds as

15  follows: While it is impossible to know at this time the precise "number and type of

16  firearms [I] would like to purchase in the future," I am interested in purchasing at least

17  the following: Walther PPKS (for teaching lessons), Taurus G3 (teaching lessons),

18  HK VP9 (for home defense and/or range use), Glock 43x (concealed carry), Glock 48

19  (concealed carry), Staccato 2011 CS (concealed carry), Staccato 2011 XL

20  (competition purposes), Canik SFx Rival (competition purposes), Walther PDP F-

21  Series (range use and teaching), and Daniel Defense AR-15.

22

23   Dated:  November 8, 2023              BENBROOK LAW GROUP, PC

24

25                                        By  s/ Stephen M. Duvernay
                                          STEPHEN M. DUVERNAY
26                                        Attorneys for Plaintiffs

27

28

Exhibit 4
0068

DocuSign Envelope ID: 01D100D9-A37B-4BD2-BB66-F5720AA162BF

1   BENBROOK LAW GROUP, PC
2   BRADLEY A. BENBROOK (SBN 177786)
    STEPHEN M. DUVERNAY (SBN 250957)
3   701 University Avenue, Suite 106
4   Sacramento, CA  95825
    Telephone: (916) 447-4900
5   brad@benbrooklawgroup.com
6
7   Attorneys for Plaintiffs
8
9                    **UNITED STATES DISTRICT COURT**
10                  **SOUTHERN DISTRICT OF CALIFORNIA**
11
12  CLAIRE RICHARDS; ALISHA              Case No.:  3:23-cv-00793-LAB-WVG
    CURTIN; DAKOTA ADELPHIA;
13  MICHAEL SCHWARTZ; DARIN
    PRINCE; NORTH COUNTY               **PLAINTIFF DAKOTA**
14  SHOOTING CENTER, INC.; JOHN        **ADELPHIA'S VERIFICATION OF**
    PHILLIPS; PWGG, L.P.; SAN DIEGO    **DISCOVERY RESPONSES**
15  COUNTY GUN OWNERS PAC;
    CALIFORNIA GUN RIGHTS
16  FOUNDATION; FIREARMS POLICY
    COALITION, INC.; and SECOND
17  AMENDMENT FOUNDATION,

18              *Plaintiffs,*

19          v.

20  ROB BONTA, in his official capacity as
    Attorney General of California; and
21  ALLISON MENDOZA, in her official
    capacity as Director of the California
22  Department of Justice Bureau of
    Firearms,
23
              *Defendants.*
24
25
26
27
28

Exhibit 4
0069

DocuSign Envelope ID: 01D100D9-A37B-4BD2-BB66-F5720AA162BF

**VERIFICATION OF DISCOVERY RESPONSES**

I, Dakota Adelphia, believe, based upon reasonable inquiry, that the following answers are true and correct to the best of my knowledge, information and belief:

Responses to Defendants' First Set of Special Interrogatories, dated November 8, 2023.

Responses to Defendants' First Set of Requests for Production, dated November 8, 2023.

Amended Responses to Defendants' First Set of Special Interrogatories, dated January 22, 2024.

Amended Responses to Defendants' First Set of Requests for Production, dated January 22, 2024.

I verify under penalty of perjury that the foregoing is true and correct.

Dated: 2/9/2024                     By Dakota Adelphia

---

Exhibit 4
0070

# Exhibit 5

Exhibit 5
0071

In the Matter of:

**Claire Richards**

**vs**

**Rob Bonta**

---

**DAKOTA ADLEPHIA**

***February 01, 2024***

---



Swivel Legal Solutions   |   Phone: 800.540.9099   |   www.swivellegal.com

Exhibit 5
0072

```
 1              IN THE UNITED STATES DISTRICT COURT

 2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  CLAIRE RICHARDS, ET AL.,          )
                                      )
 5                  Plaintiffs,       )
                                      )
 6  -vs-                              ) Case No. 3:23-CV-00793
                                      )
 7  ROB BONTA, IN HIS OFFICIAL        )
    CAPACITY AS ATTORNEY GENERAL      )
 8  OF CALIFORNIA, ET AL.,            )
                                      )
 9                  Defendants.       )
    _____)

10

11

12

13

14

15              DEPOSITION OF DAKOTA ADLEPHIA

16                       Taken On

17               Thursday, February 1, 2024

18

19

20

21

22

23

24  STENOGRAPHICALLY REPORTED BY:
    AI ARIAS, CSR 14334
25  JOB NO.: 2882
```

Exhibit 5
0073

Claire Richards vs Rob Bonta                                    Job 2882
DAKOTA ADLEPHIA on 02-01-2024                                    Page 2

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4  CLAIRE RICHARDS, ET AL.,        )
                                    )
 5              Plaintiffs,         )
                                    )
 6  -vs-                           ) Case No. 3:23-CV-00793
                                    )
 7  ROB BONTA, IN HIS OFFICIAL      )
    CAPACITY AS ATTORNEY            )
 8  GENERAL OF CALIFORNIA, ET       )
    AL.,                            )
 9                                  )
                Defendants.         )
10  _____)

11

12          DEPOSITION of DAKOTA ADLEPHIA, taken

13          remotely via Zoom on behalf of the

14          Defendants, commencing at 9:32 a.m.,

15          and ending at 11:00 a.m. on Thursday,

16          February 1, 2024, before Ai Arias,

17          Certified Shorthand Reporter No. 14334.

18

19

20

21

22

23

24

25
```

Exhibit 5
0074

```
 1              A P P E A R A N C E S
                    ---oOo---
 2


 3

    FOR THE PLAINTIFFS:
 4      BENBROOK LAW GROUP
        BY:    STEPHEN M. DUVERNAY, ESQ.
 5      701 University Avenue
        Suite 106
 6      Sacramento, California 95825
        916.447.9100
 7      steve@benbrooklawgroup.com


 8


 9  FOR THE DEFENDANTS:
        CALIFORNIA DEPARTMENT OF JUSTICE
10      BY:    SEBASTIAN BRADY,
        DEPUTY ATTORNEY GENERAL
11      BY:   ROBERT L. MEYERHOFF,
        DEPUTY ATTORNEY GENERAL
12      455 Golden Gate Avenue
        Suite 11000
13      San Francisco, California 94102
        415.510.3592
14      sebastian.brady@doj.ca.gov
        robert.meyerhoff@doj.ca.gov
15


16


17  ALSO PRESENT:

18      ANTHONY CASTANEDA, Swivel Legal

19

20

21

22

23

24

25
```

Exhibit 5
0075

 1   your name, they cannot be registered to your spouse or

 2   to somebody else in your home.  They have to be

 3   registered to you, and you have to pass a shooting

 4   qualification with each of those firearms in order for

 5   them to be listed.  Some counties have additional

 6   restrictions that you can only have two or three or

 7   five firearms listed on your permit.

 8           Luckily, in San Diego County, our sheriff is

 9   fairly pro CCW, and we don't have those types of

10   restrictions.  But we are only allowed to modify our

11   permit twice per year, so if I were to come into

12   possession of more than two firearms in a calendar

13   year, I would have to wait to qualify with those and

14   get those added to my license so that I only qualify

15   twice in that year.

16       Q.   Okay.  And so how many guns -- or which guns

17   do you have sort of active on your CCW from San Diego

18   County right now?

19       A.   Right now, I have my Glock 19 and my Smith &

20   Wesson Shield.

21       Q.   Okay.

22       A.   Smith & Wesson M&P Shield.

23       Q.   And you also have a valid COE.  What's a COE?

24       A.   Certificate of eligibility -- essentially, my

25   understanding is it's a document the Department of

Exhibit 5
0076

1  interesting about it is that it is chambered in 223,

2  so it's still chambered as if it were a rifle, but you

3  hold it with your hands instead.  So it's just

4  something a little bit different that most people

5  haven't ever shot in California.

6      Q.    And the Glock 19, do you recall when you got

7  that?

8      A.    That's a great question.  I think probably

9  2019, but it could have even been early 2020.  That

10  was the second firearm that I ever purchased.

11      Q.    And what do you use this one for?

12      A.    That is my main choice for concealed carry.

13  I carry that firearm on my body almost every day.  I

14  also use it in the context of home defense at night.

15  It goes -- you know, when I take my holster system off

16  my body, the gun stays holstered in that holster, and

17  it goes into the nightside safe, so that would be the

18  gun that would be used for home defense, if needed.

19          It's what I do the majority of my

20  competitions with -- USPSA-style competitions, steel

21  shooting, steel challenge.  Most of the different

22  shooting competitions and organizations have rules

23  about what types of firearms you can use for their

24  competitions, so the Glock 19 just kind of puts me in

25  the -- in the main kind of category of, you know,

Exhibit 5
0077

Claire Richards vs Rob Bonta                                    Job 2882
DAKOTA ADLEPHIA on 02-01-2024                                   Page 49

1  concealed-carry, self-defense firearms, because it's

2  not, you know, particularly fancy.  It's just kind of

3  a standard stock firearm.

4      Q.   And what about it made you choose that as

5  your primary concealed carry firearm?

6      A.   Going back just a little bit further, my

7  first firearm that I ever purchased was at the

8  suggestion of the guy at the gun store.  He told me

9  that this is a good gun for women and that, you know,

10 it's really small and light, and it's going to be

11 great.

12          And I started shooting and realized that the

13 smaller and lighter the gun is, the more recoil there

14 is, and it was actually less fun, and I was less

15 accurate, and I couldn't shoot as fast as I wanted to

16 be able to shoot.

17          And so when I was kind of doing my research

18 of what would fit my hands well and what would be a

19 good balance between compact enough to conceal on my

20 body, while also not being so compact that I had a

21 hard time controlling the firearm -- so I, you know,

22 shot some different firearms and just kind of came to

23 believe that the Glock 19 was a good choice for my

24 hands.  And once I got it, I just kind of committed to

25 it and did the majority of my training and practice

Exhibit 5
0078

1  with that one, and it's still, I would say, probably

2  my favorite of all the guns that I shoot, just because

3  it has been with me through so much of my training and

4  has really kind of brought me to where I am now in the

5  competitive space and all of that, so --

6      Q.   Do you have any complaints about it, I guess?

7      A.   Just that it's a Gen 3, because that's all I

8  can get in California.  There's Gen 5's now, which are

9  safer and not on the roster, so, you know, there's

10 lots of other reasons why I think that the Gen 5 is a

11 little bit of a better choice, but it's the best

12 Glock 19 I could get in this state.

13     Q.   And the Smith & Wesson M&P Shield, do you

14 recall when you got that?

15     A.   Yes.  That was my first ever firearm, and

16 that would have been the same time I got my Firearm

17 Safety Certificate, so February 17th of 2019

18 approximately.

19     Q.   And at this point, what do you use that one

20 for?

21     A.   I don't use that firearm that often.  If I

22 absolutely have to be completely concealed in a

23 setting where I don't trust that the Glock 19 is fully

24 concealable, I will sometimes carry the Shield.  There

25 are some inherent downsides to it -- I won't get all

Exhibit 5
0079

# Exhibit 6

Exhibit 6
0080

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    PAUL STEIN
3   Supervising Deputy Attorneys General
    ROBERT L. MEYERHOFF
4   KEVIN J. KELLY
    SEBASTIAN BRADY
5   Deputy Attorneys General
    State Bar No. 330904
6     455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 510-3592
    Fax: (415) 703-5480
8   E-mail: Sebastian.Brady@doj.ca.gov
    *Attorneys for Defendant Rob Bonta in his*
9   *official capacity as Attorney General of the*
    *State of California and Defendant Allison*
10  *Mendoza in her official capacity as Director*
    *of the Bureau of Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

| | |
|---|---|
| 16 **CLAIRE RICHARDS, ET AL.,** | 3:23-cv-00793-LAB-AHG |
| 17                    Plaintiffs, | **DEFENDANTS' DISCLOSURE OF EXPERT WITNESSES** |
| 18         **v.** | **[Fed. R. Civ. P. 26(a)(2)]** |
| 19 **ROB BONTA, IN HIS OFFICIAL** | Judge:        The Honorable Larry A. Burns |
| 20 **CAPACITY AS ATTORNEY GENERAL OF CALIFORNIA, ET** | Action Filed: May 1, 2023 |
| 21 **AL.,** | |
| 22                    Defendants. | |

23

24          In accordance with Federal Rule of Civil Procedure 26(a)(2) and this Court's

25   September 21, 2023 Order (ECF No. 13), Defendants Rob Bonta, in his official

26   capacity as Attorney General of the State of California, and Allison Mendoza, in

27   her official capacity as Director of the Department of Justice Bureau of Firearms,

28

---

1

Exhibit 6
0081

1  hereby disclose the following expert witnesses upon whose testimony they intend to

2  rely at trial:

3

4  **Randolph Roth, College of Arts and Sciences Distinguished Professor of**

5  **History and Sociology, The Ohio State University.** Professor Roth will provide

6  expert opinion regarding the history of homicides, suicides, and mass murders in

7  the United States, with special attention to the role that technologies have played in

8  shaping the character and incidence of homicides, suicides, and mass murders over

9  time, and the historical restrictions that local and federal authorities have imposed

10  in response to new technologies that they deemed particularly lethal, prone to

11  misuse, and a danger to the public because of the ways in which they reshaped the

12  character and incidence of homicides and mass murders.  A true and correct copy of

13  Professor Roth's expert report and declaration in this matter accompanies this

14  disclosure.  Professor Roth's rate for services performed in this matter is $250 per

15  hour.  He will also be compensated for travel time and expenses.

16

17  **Robert J. Spitzer**, **Distinguished Service Professor of Political Science**

18  **Emeritus at the State University of New York at Cortland and Adjunct**

19  **Professor at the College of William and Mary School of Law.**  Professor Spitzer

20  will provide expert opinion regarding the history of firearms restrictions and related

21  historical context, including historical restrictions on the intoxicated and general

22  licensing regimes.  A true and correct copy of Professor Spitzer's expert report and

23  declaration in this matter accompanies this disclosure.  Professor Spitzer's rates for

24  services performed in this matter include a rate of $500 per hour for record review

25  and consultation, document preparation, and other non-testimony services, and

26  $750 per hour for deposition and trial testimony.  He will also be compensated for

27  travel time and expenses.

28

Defendants' Disclosure of Expert Witnesses  (3:23-cv-00793-LAB-AHG)

Exhibit 6
0082

1    **Eric Ruben, Associate Professor of Law, Dedman School of Law at**

2    **Southern Methodist University.**  Professor Ruben will provide expert opinion

3    regarding societal understandings of suicide at the Founding; the development of

4    our modern understanding of suicide, its causes, and how it can be prevented; and

5    how these different understandings help explain any differences between regulatory

6    approaches to firearm suicide prevention at the Founding and today.  A true and

7    correct copy of Professor Ruben's expert report and declaration in this matter

8    accompanies this disclosure.  Professor Ruben's rates for services performed in this

9    matter include a rate of $500 per hour for record review and consultation, document

10   preparation, and other non-testimony services, and $750 per hour for deposition and

11   trial testimony.  He will also be compensated for travel time and expenses.

12

13   **Chris Poliquin, Assistant Professor, UCLA Anderson School of**

14   **Management.**  Professor Poliquin will provide expert opinion regarding the

15   modern understanding of gun suicide and homicide as often impulsive acts that may

16   be effectively prevented through means-restriction, including through waiting

17   period laws.  A true and correct copy of Professor Poliquin's expert report and

18   declaration in this matter accompanies this disclosure.  Professor Poliquin's rate for

19   services performed in this matter is $250 per hour.  He will also be compensated for

20   travel time and expenses.

21

22

23   The information required under Federal Rule of Civil Procedure 26(a)(2)(B) is

24   provided in each expert witness's respective expert report and declaration,

25   including the exhibits annexed thereto.  Defendants reserve the right to designate

26   additional expert witnesses for rebuttal as provided in the Court's Scheduling Order

27   and pursuant to the Federal Rules of Civil Procedure.

28

Defendants' Disclosure of Expert Witnesses  (3:23-cv-00793-LAB-AHG)

Exhibit 6
0083

1      The expert witnesses disclosed herein shall be contacted only through

2  Defendants' counsel.

3

4  Dated:  March 12, 2024                    Respectfully submitted,

5                                            ROB BONTA
                                             Attorney General of California
6                                            MARK R. BECKINGTON
                                             PAUL STEIN
7                                            Supervising Deputy Attorneys General
                                             ROBERT L. MEYERHOFF
8                                            KEVIN J. KELLY

9

10                                           */s/ Sebastian Brady*
                                             SEBASTIAN BRADY
11                                           Deputy Attorneys General
                                             *Attorneys for Defendant Rob Bonta in*
12                                           *his official capacity as Attorney*
                                             *General of the State of California and*
13                                           *Defendant Allison Mendoza in her*
                                             *official capacity as Director of the*
14                                           *Bureau of Firearms*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendants' Disclosure of Expert Witnesses  (3:23-cv-00793-LAB-AHG)

Exhibit 6
0084

<u>**DECLARATION OF SERVICE BY E-MAIL**</u>

Case Name:   **Richards, Claire, et al. v. Rob Bonta, et al.**
No.:          **3:23-cv-00793-LAB-AHG**

I declare:

I am employed in the Office of the Attorney General and a member of the California State Bar.  I am 18 years of age or older and not a party to this matter; my business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of electronic correspondence.

On <u>March 12, 2024</u>, I served the documents described as:

- **DEFENDANTS' DISCLOSURE OF EXPERT WITNESSES**
- **EXPERT REPORT AND DECLARATION OF PROFESSOR ROBERT SPITZER**
- **EXPERT REPORT AND DECLARATION OF PROFESSOR ERIC RUBEN**
- **EXPERT REPORT AND DECLARATION OF PROFESSOR CHRISTOPHER POLIQUIN**
- **EXPERT REPORT AND DECLARATION OF PROFESSOR RANDOLPH ROTH**

by transmitting a true copy via electronic mail to the following E-mail addresses:

**BENBROOK LAW GROUP, PC**
701 University Avenue, Suite 106
Sacramento, CA 95825
Telephone: (916) 447-4900
- Email Address: blgadmin@benbrooklawgroup.com
Stephen M. Duvernay, Esq.
- Email Address: steve@benbrooklawgroup.com
Bradley A. Benbrook, Esq.
- Email Address: brad@benbrooklawgroup.com
*Attorneys for Plaintiffs*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on March 12, 2024, at San Francisco, California.

|      Sebastian Brady      |      */s/ Sebastian Brady*      |
|:---:|:---:|
| Declarant | Signature |

Exhibit 6
0085

# Exhibit 7

Exhibit 7
0086

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   PAUL STEIN
3  Supervising Deputy Attorneys General
   ROBERT L. MEYERHOFF
4  KEVIN J. KELLY
   SEBASTIAN BRADY
5  Deputy Attorneys General
   State Bar No. 330904
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA  94102-7004
7   Telephone:  (415) 510-3592
    Fax:  (415) 703-5480
8   E-mail:  Sebastian.Brady@doj.ca.gov
   *Attorneys for Defendant Rob Bonta in his*
9  *official capacity as Attorney General of the*
   *State of California and Defendant Allison*
10 *Mendoza in her official capacity as Director*
   *of the Bureau of Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16 | **CLAIRE RICHARDS, ET AL.,** | 3:23-cv-00793-LAB-AHG |
   |---|---|
17 | Plaintiffs, | **EXPERT REPORT AND** |
   |  | **DECLARATION OF PROFESSOR** |
18 | **v.** | **RANDOLPH ROTH** |
19 | **ROB BONTA, IN HIS OFFICIAL** | Judge:      The Honorable Larry A. |
20 | **CAPACITY AS ATTORNEY** | Burns |
   | **GENERAL OF CALIFORNIA, ET** | |
21 | **AL.,** | Action Filed: May 1, 2023 |
22 | Defendants. | |

23

24        **EXPERT REPORT AND DECLARATION OF RANDOLPH ROTH**

25         I, Randolph Roth, declare under penalty of perjury that the following is true

26 and correct:

27         The California Department of Justice has asked me to provide an expert

28 opinion pertaining to firearms waiting periods and related restrictions in the United

                                    1

States in the above-captioned matter. This expert report and declaration ("Declaration") provides that opinion, and is based on my own personal knowledge and experience; if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## BACKGROUND AND QUALIFICATIONS

1.     I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.  I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter Prize for the outstanding honors thesis in History.  I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field Prize for the outstanding dissertation in the humanities and the George Washington Eggleston Prize for the outstanding dissertation in American history.  I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this Declaration.

2.     I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Book Award from the Social Science History Association for outstanding books in social science history.[2]  *American Homicide* was also named one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding book of 2009 by *reason.com*.  The book is an interregional,

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

[2] See Social Science History Association, Allan Sharlin Memorial Book Award, https://ssha.org/awards/sharlin_award/.

1  internationally comparative study of homicide in the United States from colonial
2  times to the present.  I am a Fellow of the American Association for the
3  Advancement of Science, and I have served as a member of the National Academy
4  of Sciences Roundtable on Crime Trends, 2013-2016, and as a member of the
5  Editorial Board of the *American Historical Review*, the most influential journal in
6  the discipline. And in 2022 I received the inaugural Distinguished Scholar Award
7  from the Historical Criminology Division of the American Society of Criminology.

8      3.      I am the principal investigator on the National Homicide Data
9  Improvement Project, a project funded by the National Science Foundation (SES-
10  1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406) and
11  the Harry Frank Guggenheim Foundation to improve the quality of homicide data
12  in the United States from 1959 to the present.  The pilot project on Ohio has drawn
13  on a wide range of sources in its effort to create a comprehensive database on
14  homicides (including narratives of each incident) based on the mortality statistics of
15  the Ohio Department of Health, the confidential compressed mortality files of the
16  National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports,
17  death certificates, coroner's reports, the homicide case files of Cincinnati,
18  Cleveland, and Columbus, obituaries, and newspaper accounts.

19      4.      I have published numerous essays on the history of violence and the
20  use of firearms in the United States, including a) "Guns, Gun Culture, and
21  Homicide: The Relationship between Firearms, the Uses of Firearms, and
22  Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59:
23  223-240 (https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b)
24  "Counting Guns: What Social Science Historians Know and Could Learn about
25  Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social*
26  *Science History* (2002) 26: 699-708
27  (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why
28  Guns Are and Aren't the Problem: The Relationship between Guns and Homicide

3

1  in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining,

2  eds., *A Right to Bear Arms? The Contested Role of History in Contemporary*

3  *Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution

4  Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United

5  States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of*

6  *Research in Crime and Delinquency* (2021)

7  (https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_

8  Homicide_in_the_United_States).

9        5.      I am also co-founder and co-director of the Historical Violence

10  Database.  The web address for the Historical Violence Database is:

11  http://cjrc.osu.edu/research/interdisciplinary/hvd.  The historical data on which this

12  declaration draws are available through the Historical Violence Database.  The

13  Historical Violence Database is a collaborative project by scholars in the United

14  States, Canada, and Europe to gather data on the history of violent crime and

15  violent death (homicides, suicides, accidents, and casualties of war) from medieval

16  times to the present.  The project is described in Randolph Roth et al., "The

17  Historical Violence Database: A Collaborative Research Project on the History of

18  Violent Crime and Violent Death." *Historical Methods* (2008) 41: 81-98

19  (https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-

20  98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-

21  L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).

22  The only way to obtain reliable historical homicide estimates is to review every

23  scrap of paper on criminal matters in every courthouse (indictments, docket books,

24  case files, and judicial proceedings), every jail roll and coroner's report, every diary

25  and memoir, every article in every issue of a number of local newspapers, every

26  entry in the vital records, and every local history based on lost sources, local

27

28

tradition, or oral testimony. That is why it takes months to study a single rural county, and years to study a single city.[3]

6.    My work on data collection and my research for *American Homicide*, together with the research I have conducted for related essays, has helped me gain expertise on the causes of homicide and mass violence, and on the role technology has played in changing the nature and incidence of homicide, suicide, and mass violence.  I hasten to add that the insights that my colleagues and I have gained as social science historians into the causes of violence and the history of violence in the United States stem from our tireless commitment to empiricism.  Our goal is to gather accurate data on the character and incidence of violent crimes and to follow the evidence wherever it leads, even when it forces us to accept the fact that a hypothesis we thought might be true proved false.  As my colleagues and I are fond

_____

[3] It is also essential, in the opinion of historians and historical social scientists involved in the Historical Violence Database, to use capture-recapture mathematics, when multiple sources are available, to estimate the number of homicides where gaps or omissions exist in the historical record. The method estimates the percentage of the likely number of homicides that appear in the surviving records by looking at the degree to which homicides reported in the surviving legal sources overlap with homicides reported in the surviving non-legal sources (newspapers, vital records, diaries, etc.). A greater degree of overlap means a higher percentage in the surviving records and a tighter confidence interval. A lesser degree of overlap, which typically occurs on contested frontiers and during civil wars and revolutions, means a lower percentage and a wider confidence interval. See Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates" (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-Estimates.pdf); Roth, "Child Murder in New England," *Social Science History* (2001) 25: 101-147 (https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and James M. Denham,  "Homicide in Florida, 1821-1861: A Quantitative Analysis," *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91 (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

of saying in the Criminal Justice Network of the Social Science History Association, the goal is not to be right, but to get it right.  That is the only way to design effective, pragmatic, nonideological laws and public policies that can help us address our nation's problem of violence.

7.     I have previously served as an expert witness in cases concerning the constitutionality of state and municipal gun laws, including *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-1017 (S.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.); *Jones v. Bonta*, No. 3:19-cv-01226-L-AHG (S.D. Cal.); *Ocean State Tactical v. Rhode Island*, No. 22-cv-246 (D.R.I.); *Hanson v. District of Columbia*, No. 1:22-cv02256-RC (D.D.C.); *State of Vermont v. Misch*, No. 173-2-19 Bnrc (Superior Court, Criminal Division, Bennington Unit, VT.); *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431-FDS (D. Mass.); *Nat'l Ass'n for Gun Rights v. City of Highland Park, Illinois*, No. 1:22-cv-04774 (N.D. Ill.); *Ass'n of New Jersey Rifle and Pistol Clubs v. Platkin*, No. 3:18-cv-10507 (D.N.J.); *Cheeseman v. Platkin*, No. 7-:22-cv-04360 (D.N.J.); *Ellman v. Platkin*, No. 3:22-cv-04397 (D.N.J.); *Oregon Firearms Fed'n v. Brown*, No. 2:22-cv-01815-IM (D. Or.); *Nat'l Ass'n for Gun Rights v. Brown*, No. 22-cv-00404-DKW-RT (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lamont*, No. 3:22-cv-01118 (D. Conn.); *Harrell v. Raoul*, No. 23-141-SPM (S.D. Ill.); *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01076-PAB (D. Co.); and *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-710 (D. Vt.).

**RETENTION AND COMPENSATION**

8.     I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $250 per hour. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

9.      The opinions I provide in this report are based on my review of the complaint filed in this lawsuit, my review of the statutes at issue in this lawsuit, and my education, expertise, and research in the field of history—including a variety of scholarly works, laws, cases, popular and learned commentaries, and various other related materials I have reviewed in forming my opinions.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

**OPINIONS**

## I.      SUMMARY OF OPINIONS

10.      I have been asked by the State of California to provide opinions on the history of homicides, suicides, and mass murders in the United States, with special attention to the role that technologies have played in shaping the character and incidence of homicides, suicides, and mass murders over time, and the historical restrictions that local and federal authorities have imposed in response to new technologies that they deemed particularly lethal, prone to misuse, and a danger to the public because of the ways in which they reshaped the character and incidence of homicides, suicides, and mass murders. Over the past 232 years, local, state, and federal governments have responded in measured ways whenever new weapons, including certain classes of firearms, or new uses of deadly weapons have posed a threat to the safety of law enforcement, government officials, or the public.

11.      For the past thirty-five years, I have dedicated my career to understanding why homicide rates rise and fall over time, in hopes of understanding why the United States—which, apart from the slave South, was perhaps the least homicidal society in the Western world in the early nineteenth century—became by far the most homicidal, as it remains today.  I discovered that the key to low homicide rates over the past 450 years has been successful nation-building. High homicide rates among unrelated adults—friends, acquaintances, strangers— coincide with political instability, a loss of trust in government and political leaders,

7

a loss of fellow feeling among citizens, and a lack of faith in the justice of the social hierarchy.[4]  As a nation, we are still feeling the aftershocks of our failure at nation-building in the mid- and late-nineteenth century, from the political crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the rise of Jim Crow.

12.     Against that backdrop, the evidence shows that the availability of guns and changes in firearms technology, especially the emergence of modern breech-loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic weapons and extended magazines in the late twentieth century, have pushed the homicide and suicide rates in the United States well beyond what they would otherwise have been.

13.     My opinion will address in turn:

a.  firearms restrictions on colonists from the end of the seventeenth century to the eve of the Revolution, when homicide rates were low among colonists and firearms were seldom used in homicides among colonists when they did occur;

b.  the development during the Founding and Early National periods of laws restricting the use or ownership of concealable weapons in slave and frontier states, where homicide rates among persons of European ancestry soared after the Revolution in large part because

---

[4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dkP_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwiRWPEom7M), for an introduction to the ways that social science historians can measure the feelings and beliefs that lead to successful nation-building.  My research has shown that those measures have gone up and down with homicide rates among unrelated adults in the United States from colonial times to the present.  In social science history, as in the non-experimental historical sciences (geology, paleontology, evolutionary biology), correlations that persist across wide stretches of time and space are not random. They reveal deep patterns that are causal.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0094

of the increased manufacture and ownership of concealable percussion cap pistols and fighting knives;

c. the spread of restrictions on carrying concealed weapons in every state by World War I, as homicide rates rose across the nation, beginning around the time of the Mexican War of 1846-1848 and lasting until World War I—a rise caused in part by the invention of modern revolvers, which were used in a majority of homicides by the late nineteenth century;

d. the difficulty that local and federal officials faced from the colonial era into the early twentieth century in addressing the threat of mass murders, which, because of the limitations of existing technologies, were carried out by large groups of individuals acting in concert, rather than by individuals or small groups;

e. the spread of restrictions in the twentieth and early twenty-first centuries on new technologies, including rapid-fire firearms and large capacity magazines, that changed the character of mass murder, by enabling individuals or small groups to commit mass murder; and

f. the distinctly modern issue of significant rates of firearm suicide.

## II.    GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS

### A.    Homicide and Firearms in the Colonial Era (1688-1763)

14.    In the eighteenth century, the use and ownership of firearms by Native Americans and African Americans, enslaved and free, were heavily regulated.[5]  But laws restricting the use or ownership of firearms by colonists of European ancestry were rare, for two reasons.  First, homicide rates were low among colonists from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-

---

[5] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016). Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0095

1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government.[6]  By the late 1750s and early 1760s, the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7]  Violence among colonists was not a pressing problem on the eve of the Revolution.

15.     Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.  Approximately 50 to 60 percent of households in the colonial and Founding eras owned a working firearm, usually a musket or a fowling piece.[8]  Fowling pieces, like muskets, were muzzle-loading. But unlike muskets, which were heavy, single-shot firearms used for militia service, fowling pieces were manufactured specifically to hunt birds and control vermin, so they were designed to fire shot, primarily, rather than ball, and were of lighter construction than muskets.[9] Family, household, and intimate partner

---

[6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together.  The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9] *See, e.g.*, Kevin M. Sweeney, "Firearms, Militias, and the Second

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0096

homicides were rare, and only 10 to 15 percent of those homicides were committed with guns. In New England, the rate of family and intimate partner homicides stood at only 2 per million persons per year for European Americans and 3 per million for African Americans for the seventeenth and most of the eighteenth century, and fell to 1 per million for both European and African Americans after the Revolution. The rates in the Chesapeake were likewise low, at 8 per million per year for European Americans and 4 to 5 per million for African Americans.[10] And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[11]

16.     Firearm use in homicides was generally rare because muzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era.[12] They were lethal and accurate enough at short range, but they were liable to misfire, given the limits of flintlock technology, and with the exception of a few double-barreled pistols, they could not fire multiple shots without reloading.[13] They could be used effectively to threaten and intimidate, but once they were fired (or misfired), they lost their advantage: they could only be used as clubs in hand-to-hand combat. They had to be reloaded manually to enable the firing of another shot, which was a time-consuming process that required skill and experience.[14] And more important, muzzle-loading firearms could not be used

Amendment," in Saul A. Cornell and Nathan Kozuskanich, eds., *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (University of Massachusetts Press, 2013), 310, 327 & nn. 101-102.

[10] Roth, "Why Guns Are and Aren't the Problem," 116.

[11] Ibid., 116-119.

[12] Ibid., 117.

[13] Ibid.

[14] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-

11

impulsively unless they were already loaded for some other purpose.[15]  It took at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand.[16]  The user had to pour powder down the barrel, hold it in place with wadding, and drop or ram the shot or ball onto the charge.[17]  The firing mechanism also had to be readied, often with a fresh flint.[18]  And muzzle-loading guns were difficult to keep loaded for any length of time, because black powder absorbed moisture and could corrode the barrel or firing mechanism or make the charge liable to misfire.[19]  The life of a charge could be extended by storing a gun in a warm, dry place, typically over a fireplace, but even there, moisture from boiling pots, drying clothes, or humid weather could do damage.[20]  That is why most owners stored their guns empty, cleaned them regularly, and loaded them anew before every use.[21]

17.     The infrequent use of guns in homicides in colonial America reflected these limitations.  Family and household homicides—most of which were caused by abuse or fights between family members that got out of control—were committed almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives.[22]  It did not matter whether the type of homicide was rare—like family and intimate homicides—or common, like murders of servants, slaves, or owners committed during the heyday of indentured

---

10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[15] Roth, "Why Guns Are and Aren't the Problem," 117.

[16] Ibid.

[17] Ibid.

[18] Ibid.

[19] Ibid.

[20] Ibid.

[21] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

[22] Roth, "Why Guns Are and Aren't the Problem," 117.

12

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0098

servitude or the early years of racial slavery.[23]  Guns were not the weapons of choice in homicides that grew out of the tensions of daily life.[24]

18.   When colonists anticipated violence or during times of political instability, gun use was more common.  When homicide rates were high among unrelated adults in the early and mid-seventeenth century, colonists went armed to political or interpersonal disputes,[25] so the proportion of homicides committed with firearms was at that time 40 percent and rose even higher in contested areas on the frontier.[26]  Colonists also armed themselves when they anticipated hostile encounters with Native Americans, so 60 percent of homicides of Native Americans by European Americans in New England were committed with firearms.[27]  And slave catchers and posses kept their firearms at the ready, so 90 percent of runaway slaves who were killed in Virginia were shot.[28]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[29]  That is why firearms had a modest impact on homicide rates among colonists.

---

[23] Ibid.

[24] Ibid.  Contrary to popular belief, dueling was also rare in colonial America. Roth, *American Homicide*, 45, 158.

[25] Roth, "Why Guns Are and Aren't the Problem," 118-119.

[26] Ibid., 116-117.

[27] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[28] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[29] Ibid., 118-119.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0099

**B.    The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

19.    The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[30]  The threats that such citizens posed to public safety could be checked in most instances by ordinary criminal statutes, drawn largely from British common law.  But at times those threats could be checked only by statutes that placed limits on basic rights.[31]

---

[30] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

[31] On the Founders' belief that rights might have to be restricted in certain instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints on freedom of speech and the press during the administration of John Adams; Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions on searches and seizures during the administration of Thomas Jefferson; and Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History: Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution*

---

14

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0100

20.     The Founders were aware that the rate at which civilians killed each other or were killed by roving bands of Tories or Patriots rose during the Revolution.[32]  And they recognized that more civilians, expecting trouble with neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[33]  But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas, homicide rates fell to levels in some instances even lower than those which had prevailed in

_____

(New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that constituted the realms of life, liberty, property, and religion were subject to regulation by the state; no obvious landmarks marked the boundaries beyond which its authority could not intrude, *if* its actions met the requirements of law." See also Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-Kent Law Review 76 (2000), 157 (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=3289&context=cklawreview): "[At] the time when the Second Amendment was adopted, it was still possible to conceive of statements of rights in quite different terms, as assertions or confirmations of vital principles, rather than the codification of legally enforceable restrictions or commands."

[32] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of Independence: America's Violent Birth* (New York: Broadway Books / Penguin Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers, and the Northern Borderland of the American Revolution* (New York: Knopf, 2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and the Hudson River Valley in the American War for Independence* (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., *Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland* (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, *Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania* (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 1996), 3-18.

[33] Roth, "Why Guns Are and Aren't the Problem," 119-120.

15

the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England.  Only New York City stood out, at 6 per 100,000 adults per year.[34]  And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low— between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[35]

21.    The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[36]  And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread.  By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[37]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the

---

[34] Roth, *American Homicide,* 180, 183-186; and Eric H. Monkkonen, *Murder in New York City* (Berkeley: University of California Press, 2001), 15-16.

[35] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On weapons use in homicides in the North, see Figures 25 through 46.

[36] Roth, *American Homicide*, 180, 183-186.

[37] Ibid., 180, 183-186.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0102

North, about earning their own living and forming their own churches and voluntary organizations.[38]

22.    That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels. They took a strong stand against dueling in the wake of Alexander Hamilton's death, because of the threat the practice posed for the nation's democratic polity and the lives of public men: editors, attorneys, military officers, and politicians.[39]

23.    Laws restricting the everyday use of firearms did appear, however, in the early national period in a number of slave states,[40] where violence among citizens increased after the Revolution to extremely high levels.  Revolutionary ideas and aspirations wreaked havoc on the status hierarchy of the slave South, where homicide rates ranged from 8 to 28 per 100,000 adults per year.[41]  Poor and middle-class whites were increasingly frustrated by their inability to rise in a society that remained class-bound and hierarchical.[42]  Prominent whites were

---

[38] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

[39] Joanne B. Freeman, *Affairs of Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America," *Vanderbilt Law Review* 54 (2001): 1805-1847 (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=vlr).

[40] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger, 1999); and Cornell, *Well-Regulated Militia*, 141-144.

[41] Roth, *American Homicide*, 180, 199-203.

[42] Ibid., 182.

---

17

subjected to the rough and tumble of partisan politics and their position in society was threatened by people from lower social positions.[43]  African Americans despaired over the failure of the abolition movement in the South, and whites were more fearful than ever of African American rebellion.[44]  As a result, impatience with restraint and sensitivity to insult were more intense in the slave South, and during this period the region saw a dramatic increase in the number of deadly quarrels, property disputes, duels, and interracial killings.[45]  The violence spread to frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever Southerners settled in the early national period.[46]  During the Early National period, the proportion of homicides committed with firearms went up accordingly, to a third or two-fifths, as Southerners armed themselves in anticipation of trouble, or set out to cause trouble.[47]

24.    Citizens and public officials in these states recognized that concealable weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an alarming proportion of the era's murders and serious assaults.[48]  They were used to ambush both ordinary citizens and political rivals, to bully or intimidate law-abiding citizens, and to seize the advantage in fist fights.  As the Grand Jurors of Jasper County, Georgia, stated in a plea to the state legislature in 1834 for restrictions on concealable weapons,

---

[43] Ibid.

[44] Ibid.

[45] Ibid., 182, 199-203.

[46] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982).

[47] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51 through 57.

[48] Roth, *American Homicide*, 218.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0104

The practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[49]

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[50]  These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates.  Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

25.     The pistols of the early national period represented a technological advance.  Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[51]  The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[52]

---

[49] Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes County, Georgia, Superior Court Minutes, July 1839 term.

[50] Roth, *American Homicide*, 219.

[51] Roth, "Why Guns Are and Aren't the Problem," 117.

[52] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting*

19

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0105

26.     The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana, Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws differed from earlier laws that restricted access to arms by Native Americans or by free or enslaved African Americans, because they applied broadly to *everyone* but also applied more *narrowly* to certain types of weapons and to certain types of conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of deadly weapons" was the most restrictive.  It made it unlawful for merchants

> and any other person or persons whatsoever, to sell, or offer to sell, or to keep, or have about their person or elsewhere . . . Bowie, or any other kind of knives, manufactured or sold for the purpose of wearing, or carrying the same as arms of offence or defence, pistols, dirks, sword canes, spears, &c.

The sole exceptions were horseman's pistols—large weapons that were difficult to conceal and were favored by travelers.  But the laws in the other five states were also strict: they forbid the carrying of concealable weapons in all circumstances.  Indiana made an exemption for travelers.[53]

27.     Thus, during the lifetimes of Jefferson, Adams, Marshall, and Madison, the Founding Generation passed laws in a number of states that restricted

---

*Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

[53] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of those laws.  Alabama and Tennessee prohibited the concealed carrying of fighting knives, but not pistols.  See also the Duke Center for Firearms Law, Repository of Historical Gun Laws (https://firearmslaw.duke.edu/search-results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9, 2022).  Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846), held that prohibiting the concealed carry of certain weapons was valid, but that the state could not also prohibit open carry, which would destroy the right to bear arms.  That decision put Georgia in line with the five other states that had prohibited the carrying of concealable firearms.

20

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0106

the use or ownership of certain types of weapons after it became obvious that those weapons, including certain fighting knives and percussion-cap pistols, were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates.[54]

### C. Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

28.     By the early twentieth century, every state either banned concealed firearms or placed severe restrictions on their possession.[55] They did so in response

---

[54] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836. On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[55] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22. These sources identify laws that either banned concealed firearms or placed severe restrictions on their possession in every state except Vermont. However, Vermont also had such a law by the early twentieth century. *See* An Act Against Carrying Concealed Weapons, No. 85, § 1 (12th Biennial Session, General Assembly of the State of Vermont, Nov. 19, 1892) ("A person who shall carry a dangerous or deadly weapon, openly or concealed, with the intent or avowed purpose of injuring a fellow man, shall, upon conviction thereof, be punished by a fine not exceeding two hundred dollars, or by imprisonment not exceeding two years, or both, in the discretion of the court.").

to two developments: the nationwide surge in homicide rates, from the North and South to the Trans-Mississippi West; and the invention of new firearms, especially the revolver, which enabled the firing of multiple rounds in succession without reloading and made the homicide problem worse.  Between the mid-nineteenth and the early twentieth century homicide rates fell in nearly every Western nation.[56] But in the late 1840s and 1850s those rates exploded across the United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Rates that had ranged in the North in the 1830s and early 1840s from a low of 1 per 100,000 adults per year in northern New England to 6 per 100,000 in New York City, rose to between 2 and 33 per 100,000 in the northern countryside and to between 10 and 20 per 100,000 in northern cities. In the South, rates in the plantation counties of Georgia rose from 10 per 100,000 adults to 25 per 100,000, and rates soared even higher in rural Louisiana to 90 per 100,000 and in mountain communities in Georgia and Missouri from less than 5 per 100,000 adults per year to 60 per 100,000. And in the West, the rates reached 65 per 100,000 adults per year in California, 76 per 100,000 in Texas, 119 per 100,000 in mining towns in South Dakota, Nevada, and Montana, and 155 per 100,000 in cattle towns in Kansas. Americans, especially men, were more willing to kill friends, acquaintances, and strangers.  And so, the United States became—and remains today—by far the most murderous affluent society in the world.[57]

---

[56] Roth, *American Homicide*, 297-300.
[57] Ibid., 199, 297-300, 302, 337, 347; and Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 173-195 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0108

29.     The increase occurred because America's heretofore largely successful effort at nation-building failed at mid-century.[58]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[59]  Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.[60]  They were losing the sense that they were participating in a great adventure with their fellow Americans.[61]  Instead, they were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own.[62]  And most ominously, law and order broke down in the wake of the hostile military occupation of the Southwest, the political crisis of the 1850s, the Civil War, and Reconstruction.[63]

30.     The proportion of homicides committed with firearms increased as well from the Mexican War through Reconstruction, as it had during previous increases in nondomestic homicides during the Revolution, in the postrevolutionary South, and on contested frontiers.[64]  Because the pistols, muskets, fowling pieces, and rifles in use in the early years of the crisis of the mid-nineteenth century were still predominantly single-shot, muzzle-loading, black powder weapons, the

---

[58] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[59] Roth, *American Homicide*, 299-302, 384-385.  See also Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide."

[60] Roth, *American Homicide*, 300.

[61] Ibid.

[62] Ibid.

[63] Ibid., 299-302, 332, 337, 354.

[64] Roth, "Why Guns Are and Aren't the Problem," 116-117.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0109

proportion of homicides committed with guns stayed in the range of a third to two-fifths, except on the frontier.[65]  Concealable fighting knives, together with concealable percussion-cap pistols, remained the primary murder weapons.  But in time, new technologies added to the toll in lives, because of their lethality and the new ways in which they could be used.

31.    Samuel Colt's cap-and-ball revolvers, invented in 1836, played a limited role in the early years of the homicide crisis, but they gained popularity quickly because of their association with frontiersmen, Indian fighters, Texas Rangers, and cavalrymen in the Mexican War.[66]  They retained some of the limitations of earlier firearms, because their rotating cylinders—two of which came with each revolver—had to be loaded one chamber at a time.  Users had to seat a percussion cap on a nipple at the rear of each chamber, pour powder into each chamber, secure the powder with wadding, and ram the bullet down the chamber with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-loaders, could not be loaded quickly, nor could they be kept loaded indefinitely without risk of damaging the charge or the gun.  But they were deadlier than their predecessors, because they made it possible for a person to fire five or six shots in rapid succession and to reload quickly with the second cylinder.[67]

---

[65] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

[66] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

[67] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware: Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York: Bonanza Books, 1940), 17-43.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0110

32.     Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1 rimfire revolver, invented in 1857, appeared on the market when the homicide crisis was already well underway.  But it had none of the limitations of percussion-cap pistols or cap-and-ball revolvers.  It could be loaded quickly and easily because it did not require powder, wadding, and shot for each round; and it could be kept loaded indefinitely because its corrosive powder was encapsulated in the bullet.[68] And it did not require a new percussion cap for each chamber, because the primer was located in a rim around the base of the bullet, set to ignite as soon as it was hit by the hammer.[69]  As Smith and Wesson noted in its advertisements,

> Some of the advantages of an arm constructed on this plan are:
> The convenience and safety with which both the arm and ammunition may be carried;
> The facility with which it may be charged, (it requiring no ramrod, powder-flask, or percussion caps);
> Certainty of fire in damp weather;
> That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[70]

33.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[71]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.  The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[72]

---

[68] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld, 1977), 38-57.

[69] Ibid., 38-57.

[70] Ibid., 39.

[71] Ibid., 38-57.

[72] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media,

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0111

34.     These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[73]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled toughs who engaged in shootouts in bars, streets, and even churchyards.[74]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.  By the eve of World War I, rates had fallen in the New England states to 1 to 4 per 100,000 adults per year, to 2 to 5 per 100,000 in the Prairie states, and 3 to 8 per 100,000 in the industrial states. In the West, rates had fallen to 12 per 100,000 adults per year in California, 15 per 100,000 in Colorado, and approximately 20 to 30 per 100,000 in Arizona, Nevada, and New Mexico.  Homicide rates whipsawed, however, in the South.  They fell in the late 1870s and 1880s, only to rise in the 1890s and early twentieth century, to just under 20 per 100,000 adults in Florida, Kentucky, Louisiana, Missouri, and

---

2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

[73] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

[74] Ibid., 124-125.

Tennessee, and 35 per 100,000 in Virginia and North Carolina.[75]  Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[76]  That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers— reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[77]  And that is why every state in the Union restricted the right to carry certain concealable weapons.

35.    It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June 1865 to June 1868,[78] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of weapons, including firearms, on social occasions[79]; and it followed in 1871 with a

---

[75] Ibid., 125-127, 388, 403-404; and Roth, "American Homicide Supplemental Volume: American Homicides in the Twentieth Century," Figures 4a and 5a.

[76] Ibid., 125.

[77] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[78] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public

---

27

bill banning in most circumstances the carrying, open or concealed, of small deadly

weapons, including pistols, that were not designed for hunting or militia service.[80]

---

assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611. Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25. The third section of the act reads,

These laws were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[81]

36.   Tennessee and Arkansas went farther than Texas to stem the tide of post-Civil War interpersonal violence.  In 1871, Tennessee flatly prohibited the

'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930 (Ph. D. dissertation: Texas Christian University, 2019), 72-83, 124-163 (https://repository.tcu.edu/handle/116099117/26778).

[81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.  See also Rivas, "Deadly Weapon Laws of Texas," 164-195.

carrying of pocket pistols and revolvers, openly or concealed, except for the large army and navy pistols commonly carried by members of the military, which could be carried openly, but not concealed.[82]  Arkansas followed suit in 1881.[83]  Tennessee's law withstood a court challenge, and Arkansas's was never challenged.[84]  And both states moved to prevent the sale or transfer of pocket pistols or ordinary revolvers.  In 1879, Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[85]  Arkansas passed a similar prohibition in 1881, but went even further by prohibiting the sale of pistol cartridges as well: "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any

---

[82] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872) ("It shall not be lawful for any person to publicly carry a dirk, sword cane, Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such as are commonly carried and used in the United States army, and in no case shall it be lawful for any person to carry such army pistol publicly or privately about his person in any other manner than openly in his hands.").

[83] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.").

[84] See Brennan Gardner Rivas, "The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan. 20, 2022), https://firearmslaw.duke.edu/2022/01/the-problem-with-assumptions-reassessing-the-historical-gun-policies-of-arkansas-and-tennessee/.

[85] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0116

manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[86]

37.    California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[87] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[88]

38.    But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides

---

[86] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[87] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[88] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0117

in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[89]  A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[90]  In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[91]  And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[92]

39.    Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[93]

The burden of proof remained with the person who carried the concealed weapon.

40.    It is important to remember, however, that even when states enacted different types of firearms restrictions, the fact remains that many jurisdictions

---

[89] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

[90] Ibid., 11.

[91] Ibid., 11-13.

[92] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

[93] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0118

enacted statutory restrictions at that time to ensure the safety of the public and law enforcement.

### III. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY TWENTIETH CENTURY

41.     The Republic faced threats not only from individual murderers, but from groups of murderers.  Mass murder has been a fact of life in the United States since the mid-nineteenth century, when lethal and nonlethal violence of all kinds became more common.  But mass murder was a group activity through the nineteenth century because of the limits of existing technologies.[94]  The only way to kill a large number of people was to rally like-minded neighbors and go on a rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own.  Mass killings of this type were rare in the colonial, Revolutionary, and Early National eras, outside of massacres of Native Americans, irregular warfare among citizens seeking political power, or public demonstrations that turned deadly, like the Boston Massacre, in which seven soldiers opened fire on a crowd of roughly fifty men and boys, killing five and wounding six.[95]  But from the 1830s into the early twentieth century, mass killings were common.

---

[94] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996). On the Boston Massacre, see Alan Taylor, *American Revolutions: A Continental History, 1750-1804* (New York: W. W. Norton, 2016), 109-110; Eric Hinderaker, *Boston's Massacre* (Cambridge: The Belknap Press of Harvard University Press, 2017); Bernard Bailyn, *The Ordeal of Thomas Hutchinson* (Cambridge: Belknap Press of Harvard University Press, 1974), 156-163; and Alfred F. Young, *The Shoemaker and the Tea Party: Memory and the American Revolution* (Boston: Beacon Press, 1999), 36-41.

[95] For examples of massacres of unarmed Native Americans, see the murder

42.     Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871. Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent.  Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[96]

---

in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)]. For examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

[96] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates, *The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney, *The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary

43.    The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[97]  But when federal troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[98] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes.  Rioters and vigilantes remained a threat well into the twentieth century.  In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[99]

---

Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

[97] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

[98] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[99] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge:

**IV. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT**

44.    The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time.  These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers.  The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

45.    The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare.  The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[100]

46.    Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, while now a base model of the AR-15 semiautomatic rifle can be

Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

[100] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0122

purchased for less than $400 and a 30-round magazine for as little as $10).[101]  That

is why Thompsons were favored by those with resources: law enforcement, the

Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.

Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08

today), so it was favored by labor activists and anarchists.[102]  Federal, state, and

local officials and law enforcement officers suddenly confronted novel threats to

their personal safety.  Submachine guns were used most notoriously in gangland

slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day

Massacre and the Kansas City Massacre.[103]  Dynamite was used in a string of

anarchist bombings in 1919-1920.  Those included the murder of 38 people and the

wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice

officials, newspaper editors, and businessmen (including John D. Rockefeller), and

---

[101] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919 dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022. The prices of AR-15 style rifles today are from guns.com (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-%20%24499), accessed October 4, 2022.  The prices of 30-round magazines of .233 caliber ammunition are from gunmagwarehouse.com (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines), accessed October 4, 2022.

[102] Department of Commerce, Bureau of the Census, *Fourteenth Census of the United States Manufactures: Explosives* (Washington, D.C.: Government Printing Office, 1922), 6.  Note that a pound of dynamite would be far more expensive today—potentially hundreds of thousands of dollars—because it would require the purchase of a blasting license, a storage bunker, and an isolated plot of land for the storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal Explosives Law and Regulations, 2012* (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-and-regulations-atf-p-54007/download), accessed October 4, 2022.

[103] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre: The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville: Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

---

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0123

a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[104] Dynamite was also used effectively for malicious, private ends. For example, Osage Indians were murdered by an individual in Oklahoma in an attempt to gain their headrights and profit from insurance policies on them.[105]

47. Because of the threats these new technologies posed for public safety, public officials widened their regulatory focus beyond concealed and concealable weapons. Thirteen states restricted the capacity of ammunition magazines for semiautomatic and automatic firearms between 1927 and 1934,[106] and Congress passed the National Firearms Acts of 1934 and 1938, which restricted ownership of machine guns and submachine guns (known today as automatic weapons) because of their ability to fire rapidly from large-capacity magazines.[107] And the Organized Crime Control Act of 1970 restricted ownership of a wide range of explosives,

---

[104] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110. Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[105] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[106] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13). In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[107] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0124

building upon regulations that began in 1917 with the passage of the Federal Explosives Act, which restricted the distribution, storage, possession, and use of explosive materials during the time of war.[108]

48.     Since 1970, public officials have continued to reserve the right to regulate the sale, ownership, and control of new technologies that can be used by individuals or small groups to commit mass murder.  The Homeland Security Act of 2002 improved security at airports and in cockpits to ensure that airplanes could not be used by terrorists to commit mass murder.  The Secure Handling of Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to prevent terrorist attacks like the one that killed 165 people in Oklahoma City in 1995.[109]  And in the wake of the massacre of 58 people and wounding of hundreds of others at a concert in Las Vegas in 2017, the Trump administration issued a regulation that banned the sale or possession of bump stocks.  It gave owners 90 days to destroy their bump stocks or turn them in to the Bureau of Alcohol, Tobacco, Firearms, and Explosives.[110]

49.     In recent decades, criminal organizations, terrorists, and lone gunmen with an intent to commit mass murder have also discovered the effectiveness of rapid-fire semiautomatic weapons with large capacity magazines.  These weapons, which were designed for offensive military applications rather than individual self-

---

[108] The Organized Crime Control Act of 1970, 84 Statute 922; and the Federal Explosives Act of 1917, 40 Statute 385.

[109] Public Law 107-296, November 25, 2002, "To Establish the Department of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and 6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J).  The ammonium nitrate regulations were to be enforced no later than 90 days after December 26, 2007.  Accessed August 31, 2022.

[110] *New York Times*, December 18, 2018 (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html), accessed October 4, 2022.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0125

defense, emerged from technologies developed for military use during the Cold War, beginning with the Soviet AK-47 assault rifle, which was invented in 1947, adopted by the Soviet Army in 1949, and used in the 1950s by the Soviets or their allies during the Hungarian Revolution, the Vietnam War, and the Laotian Civil War.[111]  The signature military firearm of that era—the M-16 rifle with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[112]—was capable of firing 750 to 900 rounds per minute when set on fully automatic.[113]  But the M-16 was used more often in combat—and more accurately, effectively, and sustainably as a weapon for inflicting mass casualties—when set on semiautomatic, which was standard military procedure.  That is why the U.S. Army defines "rapid fire" as 45 rounds per minute (the rate of fire of an M-16 when set on semiautomatic), not 750 to 900.[114]  And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst (but otherwise the same weapon as the M-16)—an alteration that slows the potential rate of fire, conserves ammunition, and improves accuracy.[115] The civilian version of the M-16—the ArmaLite AR-15—has approximately the same muzzle velocity as the M-

[111] Edward and Ezell, *The AK-47 Story: Evolution of the Kalashnikov Weapons* (Harrisburg, Pennsylvania: Stackpole Books, 1986).

[112] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[113] Edward Ezell, *The Great Rifle Controversy: Search for the Ultimate Infantry Weapon from World War II through Vietnam and Beyond* (Harrisburg, Pennsylvania: Stackpole Books, 1984)

[114] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016).  Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[115] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

16 (3,300 feet per second) and the same rate of fire as the M-16 on semiautomatic: 45 rounds per minute.[116]

50.     The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second.  But technological advances have increased the speed at which semiautomatic handguns can be fired.  An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[117] And they are affordable.  A new semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[118]

51.     It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that arrived on the domestic market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff, which is why many police and sheriff departments across the United States have purchased semiautomatic rifles and armored vehicles to defend themselves and decrease the likelihood that officers are killed or wounded.[119]

---

[116] Ezell, *The Great Rifle Controversy, 177-192*.

[117] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM."  YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

[118] See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

[119] Sam Bieler, "Police Militarization in the USA: The State of the Field," Policing: An International Journal 39 (2016): 586-600, available at https://www.emerald.com/insight/content/doi/10.1108/PIJPSM-03-2016-0042/full/pdf?casa_token=TYUuIouUCc8AAAAA:IWXQRQOtW90KZ2AKwzHNMX2tfRix0zAxRRkjQSy3rA-uUpnylZrnp0Xolhj7UFIf05WGZkr_92L__QGk_OAxnSH-3h26oxKC4e7vM79VCBpFl9_cHg.

41

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0127

52.     Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*—a modification that doubles the rate at which semiautomatic weapons can be fired.[120]

53.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[121]

---

[120] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement. Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida. (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

[121] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted),"

54.     The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings. The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

**Figure 1**

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |
| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.

55.     And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

---

YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

43

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0129

**Figure 2**

|  | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings with semiautomatic handgun | 10.3 | 26.4 |
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

56.     Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and 26 percent more than semiautomatic handguns.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and 41 percent more than semiautomatic handguns.  And extended magazines are two-and-a-half times more likely to be used in mass shootings with semiautomatic rifles than with semiautomatic handguns: in 30 percent versus 12 percent of incidents.  Semiautomatic rifles and extended magazines are deadly on their own.  But in combination, they are extraordinarily lethal.

57.     The data in Figures 1 and 2, and in the immediately above paragraph, are from the Violence Project.[122]  The Violence Project, which has compiled data on

---

[122] The Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022.  The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons.  Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, not yet included in the Violence Project's data, that fit the Violence Project's definition of a mass shooting: the Buffalo, New York, supermarket shooting on May 14; the Robb Elementary School shooting in Uvalde, Texas, on May 24; the Tulsa, Oklahoma medical center shooting on June 1; the concrete company shooting in Smithsburg, Maryland, on June 9; the Highland Park, Illinois, Fourth of July Parade shooting; and the Greenwood, Indiana, Park Mall shooting on July 17.  Three were

44

mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  Other authorities have adopted similar definitions of "mass shootings" and "mass murder."  For example, the FBI has defined mass murder as "a number of murders (four or more) occurring during the same incident, with no distinctive time period between the murders."[123]  Federal legislation enacted in 2013 authorized the Attorney General to assist in the investigation of mass killings, defined to mean "3 or more killings in a single incident."[124]

58.  What is remarkable about the mass shootings that have plagued the United States since 1965 is that all but four involved a lone shooter, and those four involved only two shooters: in 1998 in Jonesboro, Kentucky; in 1999 in Littleton, Colorado; in 2015 in San Bernardino, California; and in 2019 in Jersey City, New Jersey. In the nineteenth and early twentieth centuries, it required scores of individuals to gather together as mobs, rioters, vigilantes, or terrorists to kill or wound dozens of people in a short space of time—generally because of their race, ethnicity, or faith.

---

committed with semiautomatic rifles and three with semiautomatic handguns.  The table in this declaration, unlike the tables in the Violence Project, does not include the Las Vegas shooting of 2017 (58 killed,  887 wounded). The Las Vegas shooting is an outlier in the number killed and wounded which would skew the results of the analysis.

[123] FBI, *Serial Murder: Multi-Disciplinary Perspectives for Investigators* at 8 (2005) (https://www.fbi.gov/stats-services/publications/serial-murder#two), accessed January 3, 2023.

[124] 28 U.S.C. § 530C(b)(1)(M).

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0131

59.     Today, thanks especially to extended magazines and certain classes of semiautomatic firearms, it requires only one or two individuals to kill or wound that many people. And because of these modern technologies, which were developed for warfare, angry, alienated individuals can commit mass murder for reasons that are simply personal. Mass murderers no longer require collaborators to rally to a cause. For example, they can kill large numbers of people simply because they feel slighted at school, because they don't get along with their coworkers, because they were rejected romantically, or because they simply want to make a name for themselves.  And since it is impossible in our society—indeed, in any society—to ensure that no one is angry or alienated, restricting immediate access to extended magazines and certain classes of semiautomatic firearms mitigates the risk to every American.

60.     For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene—usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines.  Every one of those rounds hit an individual, killing six and injuring twelve.[125]

---

[125] "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0132

## V.   THE HISTORICAL CONTEXT FOR CALIFORNIA'S 1923 WAITING PERIOD LAW: THE PROBLEM OF FIREARMS SUICIDES

61.    Modern scholars understand that suicides are often impulsive rather than premeditated. The decision to commit suicide comes in the great majority of cases less than a day before the attempt.[126] That is why access to a firearm—the deadliest means for attempting suicides—can have such dire consequences when a citizen experiences a sudden burst of anger or despair.[127] That is why scholars have found a strong correlation between firearms regulations and lower rates of suicides with firearms and suicides as a whole.[128]

62.    At the time of the nation's founding, suicides—and especially gun suicides—were rare, which is why today's gun suicide problem did not come to the

---

[126] See for example Harvard T. H. Chan School of Public Health, Duration of Suicidal Crises; Yari Gvion, Yossi Levi-Belz, Gergö Hadlaczky, and Alan Apter, "On the Role of Impulsivity and Decision-Making in Suicidal Behavior. *World Journal of Psychiatry* 5:3 (2015): 255–259; O. R. Simon, A. C. Swann, K. E. Powell, L. B. Potter, M. Kresnow, and P. W. O'Carroll, "Characteristics of Impulsive Suicide Attempts and Attempters." *Suicide Life Threatening Behavior* 32 (2001): supplement, 49-59, doi:10.1521/suli.32.1.5.49.24212; and Eberhard A. Deisenhammer, Chy-Meng Ing, Robert Strauss, et al., "The Duration of the Suicidal Process: How Much Time Is Left for Intervention between Consideration and Accomplishment of a Suicide attempt?" *Journal of Clinical Psychiatry* 70:1 (2009):19-24.

[127] See for example L. G. Peterson, M. Peterson, G. J. O'Shanick, and A. Swann, "Self-Inflicted Gunshot Wounds: Lethality of Method versus Intent. *American Journal of Psychiatry* 142 (1985):228-231, doi:10.1176/ajp.142.2.228; and Ziyi Cai, Alvin Junus, Qingsong Chang, and Paul S.F. Yip, "The Lethality of Suicide Methods: A Systematic Review and Meta-Analysis." *Journal of Affective Disorders* 300 (2022): 121-129, doi:10.1016/j.jad.2021.12.054.

[128] Patrick Sharkey and Megan Kang, "The Era of Progress on Gun Mortality: State Gun Regulations and Gun Deaths from 1991 to 2016." *Epidemiology* 34 (2023): 786-792, doi:10.1097/EDE.0000000000001662; and Ziyi Cai, Alvin Junus, Qingsong Chang, and Paul S.F. Yip, "The Lethality of Suicide Methods: A Systematic Review and Meta-Analysis." *Journal of Affective Disorders* 300 (2022): 121-129, doi:10.1016/j.jad.2021.12.054.

attention of citizens or legislators in the early national period. I completed a historical analysis of suicides in Vermont and New Hampshire, 1783-1824, with evidence drawn from newspapers, coroner's inquests, and town histories. Using estimation techniques, I determined with 95 percent confidence that the suicide rate over those years was remarkably low by today's standards: between 3.1 and 5.7 per 100,000 adults per year for all suicides, and 0.19 and 0.35 per 100,000 adults per year for suicides by firearm, because only 6 percent of suicides were committed with firearms. That is remarkable, because 50 to 60 percent of households in northern New England owned a working muzzle-loading firearm.[129] Fifty-two percent of suicide victims in New Hampshire and Vermont hanged themselves, while another 35 percent drowned or cut themselves with knives or razors. Muzzle loading firearms were not the preferred means for committing impulsive suicides, just as they were not for committing homicides.[130]

63.    As breech loading firearms replaced muzzle loading firearms, however, the proportion of suicides committed with firearms rose, as did the suicide rate, because they could be kept loaded all the time and thus used readily on impulse. By the late 1920s and early 1930s, when the transition to breech loaders was complete, the suicide rate in New Hampshire had risen to 22 per 100,000 adults

---

[129] Roth, "Guns, Gun Culture, and Homicide," 232-234; and James Lindgren and Justin L. Heather, "Counting Guns in Early America." *William & Mary Law Review* 43:1 (2002): 1777-1824. Of the 244 suicides for which the means is known, 15 were committed with a firearm.

[130] Red flag laws that required domestic abusers to surrender their firearms for a specified period were absent in the early national period for a similar reason. Domestic homicides were rare by today's standards, and few of those that occurred were committed with firearms, because muzzle-loading firearms were difficult to use on impulse. Roth, *American Homicide*, 115-116; Roth, "Why Guns Are and Aren't the Problem," 113, 117; and Roth's contribution to "Brief for Amici Curiae Professors of History and Law in Support of Petitioner," *United States of America v. Zachary Rahimi*, Supreme Court of the United States, No. 22-915, 23-24.

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0134

per year and the rate with firearms to 9 per 100,000, because 41 percent of suicides were committed with guns. The suicide rate in Vermont had risen to 24 per 100,000 adults per year and the rate with firearms to 11 per 100,000, because 47 percent of suicides were committed with guns. And the suicide rate in California was 36 per 100,000 adults per year and the rate with firearms 15 per 100,000, because 41 percent of suicides were committed with firearms. Indeed, the suicide rate by firearms was greatest in the late 1920s and early 1930s in the Southwest and the Mountain West (Figure 1).[131]



64.     Today, firearm suicides have become an even higher percentage of overall suicides, making up fully 54.6% of all suicides nationwide in 2021.  At a state level, this figure has increased to 49.8% of all suicides in New Hampshire and 52.1% in Vermont, while in California—which imposed the waiting period law challenged in this case—the proportion actually decreased to 38%.[132]

---

[131] Bureau of the Census, "Mortality Statistics," 1929-1933. Washington, D. C.: Government Printing Office, 1931-1935.

[132] See *State Overall Suicide Rates, Ranked by Rate, 2021*, Violence Policy Center, available at https://vpc.org/wp-content/uploads/2023/09/2021-State-Overall-Suicide-Rates-ranked-by-rate.pdf (last visited February 22, 2024).

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0135

65.     When California passed its 1923 statute to establish a waiting period for the purchase of a firearm, and when it enacted the current iteration of that waiting period in the late twentieth century, it addressed a new and pressing problem—a problem that the nation's Founding Generation had not faced.[133]

## VI.  CONCLUSION

66.     From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in which the security of the republic and the safety of its citizens require government-imposed restrictions.  That is why the majority of states passed and enforced laws against the carrying of concealable weapons, why the federal government passed the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and the federal government have passed and enforced laws since World War I to restrict ownership or control of modern technologies that enable criminals, terrorists, and malicious or delusional individuals to commit mass murder.  Public officials are not required to pass such laws, of course, but historically, they have always retained the ability to do so.  There is no evidence in the historical record to suggest that they took their decisions lightly when they imposed these restrictions on weapons and armed voluntary organizations.  And mass murders by individuals, including mass shootings, are a recent phenomenon, caused by changes in technology that emerged in the late nineteenth through the late twentieth century.  The same is true of the distinctly modern phenomenon of significant rates of suicide by firearm.  Public officials today are confronting criminological and public health problems that did not exist in the Founding Era, nor during the first century of the nation's existence.

---

[133] 1923 Cal. Stat. ch. 339 §§ 10-11.

50

Declaration of Randolph Roth  (S.D. Cal. 3:23-cv-00793-LAB-AHG)

Exhibit 7
0136

## DECLARATION UNDER PENALTY OF PERJURY
## PURSUANT TO 28 U.S.C. § 1746

I declare that the foregoing is true and correct under penalty of perjury under the laws of the United States.

Executed on March 9, 2024

_Randolph Roth_

Randolph Roth

51

# EXHIBIT A

Exhibit 7
0138

Randolph Roth                                                                                     Page 1

Curriculum Vitae

RANDOLPH ROTH

Department of History                                    6987 Grandee Cliffs Drive
The Ohio State University                                 Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                                             (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                                                     2

Education                                                                                         2
Academic Positions                                                                               2
Honorary Positions                                                                               2
Professional Honors and Awards for Scholarship                                                   2
Professional Honors and Awards for Teaching                                                      3
Grants                                                                                            3

**Bibliography and Research**                                                                4-17

**Teaching**                                                                                 18-20

**Service**                                                                                  21-26

Exhibit 7
0139

Randolph Roth                                                          Page 2

**Personal**

Marital Status:           Married            Allison Sweeney
Children:                 Alexander

**Education**

1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)

**Academic Positions**

1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
1978-1985, Grinnell College: Assistant Professor of History
1978, University of Vermont: Instructor in History
1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

2022, Distinguished Scholar Award, Division of Historical Criminology, American Society of Criminology

2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

2012, Fellow, American Association for the Advancement of Science

2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

2010, Allan Sharlin Memorial Award, Social Science History Association,

Exhibit 7
0140

Randolph Roth                                                         Page 3

for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village
Research Society, for distinguished work in the history of rural society

1982, Theron Rockwell Field Prize, Yale University, for the outstanding
dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the
outstanding dissertation in American history

1973, James Birdsall Weter Prize, Stanford University, for the outstanding
senior thesis in history

**Professional Honors and Awards for Teaching**

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and
Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student
Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in
History at Ohio State University

**Grants**

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the
Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science
Foundation (SBR-9808050)

Exhibit 7
0141

Randolph Roth                                                                                     Page 4

1992, Fellow, Workshop on the Rhetoric of Social History, University of
Iowa

1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

1987, National Endowment for the Humanities, Summer Stipend

1983, Research Fellowship for Recent Recipients of the Ph.D., American Council
of Learned Societies

1981, Fred Harris Daniels Fellowship, American Antiquarian Society


### Bibliography and Research


**Books**

*American Homicide* (an interregional study of violent crime and violent death in
America from colonial times to the present). The Belknap Press of Harvard
University Press (2009), 655 pp.

*The Democratic Dilemma:  Religion, Reform, and the Social Order in the
Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press
(1987), 399 pp.


**Edited Volumes**

Co-founder and co-director, Historical Violence Database (on-line database on
violent crime, violent death, and collective violence).  Web address:
www.sociology.ohio-state.edu/cjrc/hvd

American Homicide Supplementary Volume (on-line supplement to *American
Homicide*, including detailed appendices on methods, supplemental tables, graphs,
and statistical analyses), approx. 750 pp. Web address:
http://cjrc.osu.edu/researchprojects/hvd/AHsup.html


**Essays on Historical Subjects**

"The Rise in Homicide in the United States, 2015-2021: A Historical
Perspective." (New York: Harry Frank Guggenheim Foundation, forthcoming,
2024).

Exhibit 7
0142

"Defining, Recording, and Measuring Crime in the United States from Colonial Times to the Present," in James Campbell and Vivien Miller, eds., *The Routledge History of Crime in America* (New York: Routledge, forthcoming, 2024).

"Data Drudges Unite! Taking Stock of Historical Studies of Homicide," in Karen F. Parker, Richard Stansfield, and Ashley Mancik, eds., *Taking Stock of Homicide: Trends, Emerging Themes and Challenges* (Philadelphia: Temple University Press, 2023), 11-24.

"Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with Richard Rosenfeld and Joel Wallman. *Homicide Studies* 27:3 (2023), 321-337.

"The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-399.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

Exhibit 7
0143

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

 "Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

Exhibit 7
0144

Randolph Roth                                                                    Page 7

 "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.


**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a

Exhibit 7
0145

Randolph Roth                                                                                    Page 8

Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods* (1986) 19: 103-117.

## Public History Essays

"Can Faith Change the World?  Religion and Society in Vermont's Age of Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.

## Works in Progress

*Child Murder in America*. An interregional study of murders of and by children from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of Speaking for Nature" (essay in manuscript)

## Editorial Boards

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*

Exhibit 7
0146

Randolph Roth                                                                    Page 9

2004- , *Crime, History, and Societies*


**Invited Lectures**

"Why Have Homicide Rates Gone Up since 2015? A Historical Perspective." Knowledge against Violence Series, Harry Frank Guggenheim Foundation, March 30, 2023.

"Trust, Legitimacy, and the Recent Rise in Homicide in the United States," Council on Criminal Justice, Washington, D.C., October 19, 2022.

"The History of Police Involved Homicides in the United States," Mary Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime Historians Symposium, Leeds University, Great Britain, Scheduled for September 2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the Available Historical Data, and Why We Have to Worry about Learning the Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020. Postponed.

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of

Exhibit 7
0147

Randolph Roth                                                          Page 10

Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

"Quantitative Analysis of the History of Crime and Violence: Achievements and Prospects," Keynote Address, Conference on "Making Sense of Violence," University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

Exhibit 7
0148

Randolph Roth                                                             Page 11

"American Homicide: Its History," Ohio State University at Newark, Nov. 6, 2007

"American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

"The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group, Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September,

Exhibit 7
0149

2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October, 1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities.  The presentation was televised in Vermont.  It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999


**Papers Delivered at Professional Meetings (recent)**

"The Social and Geographical Context of Child Homicides in the United States, 1989-2015," Homicide Research Working Group, June 2, 2022, Excelsior Springs, Missouri, and Social Science History Association, November 17, 2022, Chicago.

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in

Exhibit 7
0150

Randolph Roth                                                                                    Page 13

the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

 "The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

Exhibit 7
0151

Randolph Roth                                                              Page 14

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

 "The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports," Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6,

Exhibit 7
0152

Randolph Roth                                                                    Page 15

2005

## Reviews

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Exhibit 7
0153

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty:  A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic:  Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness:  Management of Christian Service Organizations* (American Historical Review, 1996).

N. Prabha Unnithan, *The Currents of Lethal Violence:  an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love:  Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America:  Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws:  Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation:  Religion and Social Order in*

Exhibit 7
0154

Randolph Roth                                                                    Page 17

*Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen:  The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change:  Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power:  The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life:  Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture* (Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South* (International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of Rational Religion in New England* (New England Quarterly, 1985).


**Languages**

German
Spanish
French (reading)


**Quantitative Skills**

Probability and Statistics (including econometric techniques of political analysis, exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry
Linear Algebra and Nonlinear Dynamics
Differential and Series Equations

Exhibit 7
0155

Randolph Roth                                                     Page 18

Abstract Algebra

Exhibit 7
0156

Randolph Roth                                                            Page 19

**Teaching**

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| | |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

**Publications on Teaching**

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

**Ph.D Students Supervised**

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

Exhibit 7
0157

Randolph Roth                                                              Page 20

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Associate Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Exhibit 7
0158

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

Exhibit 7
0159

Randolph Roth                                                            Page 22

## Service

**Service in Professional Organizations**

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2022 Michael J. Hindelang Award Committee, American Society of Criminology, for the outstanding book published over the previous three years.

2018-2019 Allen Sharlin Book Prize Committee, Social Science History Association

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

Exhibit 7
0160

Randolph Roth                                                                                    Page 23

1987-1993, Chair, Methods and Theory Network, Social Science History
Association

1987, Program Committee, Social Science History Association

**Reviews of Manuscripts**

American Historical Review
Journal of American History
William and Mary Quarterly
Journal of the Early Republic
Social Science History
Journal of Interdisciplinary History
Historical Methods
Journal of Women's History
Journal of the Family
Crime, History, and Societies
European Journal of Criminology
American Journal of Sociology
Sociological Quarterly
Criminology
Criminal Justice Review
Journal of Criminal Law and Criminology
Law and Social Inquiry
Homicide Studies
International Criminal Justice Review
International Journal of Law, Crime, and Justice
Law and Society Review
City and Community
Eras Review
Western Historical Quarterly
Canadian Journal of Sociology
Journal of the Gilded Age

**Memberships in Professional Organizations (current)**

American Historical Association
Organization of American Historians
Social Science History Association
European Social Science History Association
American Society of Criminology
Homicide Studies Working Group
American Association for the Advancement of Science

Exhibit 7
0161

Randolph Roth                                                              Page 24

**Service at Ohio State University**

    **Department**

    2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

    1994-2015, 2018-present, Undergraduate Teaching Committee

    2017-2018, Chair of Grievance Committee

    2015-2017, 1991-1993, Chair of Graduate Studies

    2012-2013, Chair of Undergraduate Studies

    2011-2013, Advisory Committee and Salary Committee

    1987-1991, History Department Promotion & Tenure Committee

    **College of Humanities**

    2007-2009, Curriculum Committee, College of Humanities

    2002-2005, College of Humanities Computing Advisory Committee

    1996-1997, College of Humanities Committee on the Center for the Study and
    Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

    **College of Arts and Sciences**

    2006-2009, Alternate, Arts and Sciences Faculty Senate

    2006- , Advisory Board, Criminal Justice Research Center, Department of
    Criminology and Sociology

    2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of
    Law

    2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior
    Sciences

Exhibit 7
0162

Randolph Roth                                                          Page 25

**Graduate School**

2018- , Graduate Awards Review Committee

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin: advises City Council on all matters concerning utilities, policing, transportation, parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit Badge Counselor / Eagle Scout Association / Philmont Staff Association / Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic association officers and city commission members

Exhibit 7
0163

Randolph Roth                                                                 Page 26

> 1995-1998, Vice-Chair, Transportation Task Force, City of Dublin
>
> 1995-1997, Community Plan Steering Committee, City of Dublin
>
> 1988-present, President / Vice President / Trustee, East Dublin Civic Association
>
> 1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

**Outreach / Media Appearances**

> Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.
>
> B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.
>
> Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.
>
> Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019
>
> Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019
>
> "Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.
>
> "How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017
>
> "Mass Murder in American History," CSpan-3, April 2, 2017
>
> All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.
>
> Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014
>
> Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)
>
> Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)

Exhibit 7
0164

Randolph Roth                                                                              Page 27

"It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009 (http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; ***American Homicide*** was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 **(http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column)**

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

Exhibit 7
0165

# Exhibit 8

Exhibit 8
0166

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    PAUL STEIN
3   Supervising Deputy Attorneys General
    ROBERT L. MEYERHOFF
4   KEVIN J. KELLY
    SEBASTIAN BRADY
5   Deputy Attorneys General
    State Bar No. 330904
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3592
     Fax:  (415) 703-5480
8    E-mail:  Sebastian.Brady@doj.ca.gov
    *Attorneys for Defendant Rob Bonta in his*
9   *official capacity as Attorney General of the*
    *State of California and Defendant Allison*
10  *Mendoza in her official capacity as Director*
    *of the Bureau of Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  | **CLAIRE RICHARDS, et al.,** | 3:23-cv-00793-LAB-AHG |

17  Plaintiffs,   **EXPERT REPORT AND DECLARATION OF PROFESSOR ROBERT SPITZER**

18  **v.**

19  **ROB BONTA, in his official capacity**   Judge:      The Honorable Larry A. Burns
20  **as Attorney General of California, et al.,**   Action Filed:  May 1, 2023

21  Defendants.

22

23        **EXPERT REPORT AND DECLARATION OF ROBERT SPITZER**

24        I, Dr. Robert Spitzer, declare under the penalty of perjury that the following

25  is true and correct:

26        The California Department of Justice has asked me to provide an expert

27  opinion pertaining to firearms waiting periods and related restrictions in the United

28

                                    1

States in the above-captioned matter. This expert report and declaration ("Declaration") provides that opinion, and is based on my own personal knowledge and experience; if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## BACKGROUND AND QUALIFICATIONS

1.       I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for thirty years.  I am currently an adjunct professor at the College of William and Mary School of Law.  I earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.

2.       I am the author of 16 books on subjects in American politics, including six on gun policy. I have been studying and writing about gun policy for nearly forty years. My first publication on the subject appeared in 1985.[1] Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The ninth edition of the book was recently published by Routledge Publishers (2024). My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015, 2017) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws.  I am frequently interviewed and quoted in the national and international media on gun-related matters. For nearly thirty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

---

[1] Robert J. Spitzer, "Shooting Down Gun Myths," *America* (June 8, 1985), 468–69.

3.      I have provided written testimony as an expert witness in the following cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash.); *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, No. 19-cv-1662 (S.D. Cal.); *Rupp v. Bonta*, No. 17-cv-00746 (C.D. Cal.); *Gates v. Polis*, No. 1:22-cv-01866 (D. Colo.); *Oakland Tactical Supply LLC v. Howell Twp.*, No. 18-cv-13443 (E.D. Mich.); *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington County); *Nat'l Ass'n for Gun Rights, Inc. v. City of Highland Park*, No. 22-cv-4774 (N.D. Ill.); *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass.); *Abbott v. Connor*, No. 20-00360 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Shikada*, No. 1:22-cv-00404 (D. Haw.); *Yukutake v. Shikada*, No. 1:22-cv-00323 (D. Haw.); *Nat'l Ass'n for Gun Rights v. Lopez*, No. 1:22-CV-00404 (D. Haw.); *Abbot v. Lopez*, No. 20-00360 (D. Haw.); *Santucci v. City & County of Honolulu*, No. 1:22-cv-00142 (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*, No. 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, No. 11-cv-9916 (C.D. Cal.); *Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dept. of Safety and Homeland Sec.*, No. 1:22-cv-00951 (D. Del.); *Fitz v. Rosenblum*, No. 22-cv-01859 (D. Ore.); *Harrel v. Raoul*, No. 3:23-cv-00141 (S.D. Ill.); *Mitchell v. Atkins*, No. 19-cv-5106 (W.D. Wash.); *Keneally v. Raoul*, No. 23-cv-50039 (N.D. Ill.); *McGregor v. County of Suffolk*, No. 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, No. 22-cv-10989 (S.D.N.Y.); *Rocky Mountain Gun Owners v. The Town of Superior*, No. 22-cv-02680 (D. Colo.); *Wiese v. Bonta*, No. 17-cv-00903 (E.D. Cal.); *Harrel v. Raoul*, No. 23-cv-141-SPM (S.D. Ill.); *Langley v. Kelly*, No. 23-cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Fed. Firearms Licensees of Illinois v. Pritzker*, No. 23-cv-215-NJR (S.D. Ill.); *Herrera v. Raoul*, No. 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, No. 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, No. 23-cv-05364

3

(W.D. Wash.); *Koppel v. Bonta*, No. 8:23-cv-00813 (C.D. Cal.); *Doe v. Bonta*, No. 8:23-cv-01324 (C.D. Cal.); *Calce v. City of New York*, No. 1:21-cv-08208-ER (S.D.N.Y.); *D.B. v. Sullivan*, No. 22-CV-282 (MAD)(CFH) (N.D.N.Y.); *Richey v. Sullivan*, No. 1:23-cv-344 (AMN-DJS) (N.D.N.Y.); *Commonwealth of Pennsylvania v. Tomlinson*, No. CP-31-CR-217-2023 (Pa. Court of Common Pleas); *Nat'l Ass'n for Gun Rights v. Polis*, No. 1:2024-cv-00001 (D. Colo.); and *O'Neil  v. Neronha*, No. 1:23-cv-00070 (D. Vt.).

4.     I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003); *Republic of Iraq v. Beaty*, 556 U.S. 848 (2009); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Ezell v. Chicago*, 651 F.3d 684 (7th Cir. 2011); and *People of the State of Illinois v. Aguilar*, Illinois Supreme Court, No. 08 CR 12069 (2012).

5.     I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

6.     A true and correct copy of my current curriculum vitae is attached as Exhibit A to this Declaration.

## RETENTION AND COMPENSATION

7.     I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $500 per hour for

record review and consultation, document preparation, and other non-testimony services, and $750 per hour for deposition and trial testimony. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

8.     Counsel for Defendants provided me with the operative Complaint in this matter and copies of the relevant statutes being challenged. Apart from these documents, my report is based on my independent research.

9.     In my report, I cite a variety of scholarly articles, laws, cases, popular and learned commentaries, and various other related materials on which I based my opinions.

## OPINIONS

## I.   GUN PURCHASE WAITING PERIODS

10.     Gun purchase waiting periods and related background checks as they are understood and implemented today did not exist early in the country's history. Yet no special wisdom is required to discern why. Three important differences between early America and the modern era explain why.

11.     First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers,[2] private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made

---

[2] As of 2022, there were nearly 78,000 licensed gun dealers. "Gun Dealers in the United States," Everytown for Gun Safety, https://everytownresearch.org/wp-content/uploads/sites/4/2021/05/Inside-the-Gun-Shop-One-Pager.pdf

guns relatively cheap, prolific, reliable, and easy to get. As Kennett and Anderson note, "By the 1880s gunmaking had completed the transition from craft to industry."[3] The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.[4] When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry and related restrictions in the late 1800s and early 1900s.[5]

12.     Second, no organized system of gun waiting periods and background checking could feasibly exist until the modern era. In fact, the contemporary uniform federal background check system with a five business day waiting period was established by the Brady Handgun Violence Prevention Act in 1993 (although the waiting period was phased out in 1998 and replaced with an instant background check system).[6] As of this writing, 11 states plus D.C. have waiting period laws for at least some firearm purchases ranging in length from three to 30 days.[7] By its nature, a gun waiting period simply delays an otherwise lawful purchase for two sound reasons: to complete a proper background check to insure that the individual

---

[3] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 97.

[4] Kennett and Anderson, *The Gun in America,* 99-100. Sears ended handgun catalog sales in 1924, and other companies followed as pressure for government intervention rose. (194)

[5] Robert J. Spitzer, "Gun History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80(2017): 59-60, 63-67.

[6] 107 Stat. 1536. Robert J. Spitzer, *The Politics of Gun Control,* 9th ed. (NY: Routledge, 2024), 221-28.

[7] "Waiting Periods," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/waiting-periods/. In 2023 Minnesota enacted a law that provides for a 30 day waiting period for the purchase of handguns and assault weapon purchases from dealers.

is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons.[8]

13.    Third, as historian Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.[9]

14.    Beyond these considerations, waiting periods can only exist through the interdiction of the government, or dealers, or both. Given the logical absence of historical twins to modern waiting periods in earlier American history, were there similar, analogous historical gun laws? A close examination of historical laws, ordinances, and regulations shows a long history in this country of (1) temporarily restricting or regulating weapons access based on assumptions about risks posed by an individual's perceived mental condition with respect to alcohol intoxication, and (2) enacting and enforcing licensing/permitting laws, which by their nature

---

[8] E.g. Michael Luca, Deepak Malhotra, and Christopher Poliquin, "Handgun waiting periods reduce gun deaths," *PNAS* 114(October 16, 2017): 12162-12165, https://www.pnas.org/doi/full/10.1073/pnas.1619896114.

[9] Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms?* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116-17. See also Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

7

1   incorporated the passage of time between the attempt by individuals to acquire or

2   use weapons and the granting of permission by the government to then do so.

3   **II.   GUNS AND INTOXICATION**

4       15.   An instructive and analogous historical parallel to modern mental

5   health and waiting period laws is the intersection of historic gun laws pertaining to

6   alcohol use and intoxication with weapons possession and use. Just as those

7   considered mentally ill are similarly understood to reflect a kind of "diminished

8   capacity" such that they also may be deprived of access to weapons, alcohol

9   intoxication was a basis for preventing gun acquisition or use because it diminished

10  capacity, judgment, and reason. The effects of alcohol consumption in reducing and

11  degrading an individual's judgment, reasoning, coordination, and skill were well

12  understood in early America.

13      16.   For example, the foremost American physician of the eighteenth

14  century, Dr. Benjamin Rush, published a highly influential and widely read tract in

15  1785 titled, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and*

16  *Mind*. (The phrase "ardent spirits" referred to strong distilled liquors.) In addition to

17  his pioneering work in medicine, Rush was a signer of the Declaration of

18  Independence, advisor to public officials including Thomas Jefferson, and a social

19  activist. After first noting in his tract the physiological effects of inebriation and

20  alcoholism, Rush then turned to its mental effects. "Not less destructive are the

21  effects of ardent spirits upon the human mind. They impair the memory, debilitate

22  the understanding, and pervert the moral faculties. . . . But the demoralizing effects

23  of distilled spirits do not stop here. They produce not only falsehood, but fraud,

24  theft, uncleanliness and murder."[10]

25

26

27          [10] Benjamin Rush, *An Inquiry into the Effects of Ardent Spirits Upon the Human Body and Mind*, 6th ed. (NY: Cornelius Davis, 1811; first pub. 1785), 7,

28  https://digirepo.nlm.nih.gov/ext/mhl/2569025R/PDF/2569025R.pdf

Spitzer Expert Report and Declaration  (3:23-cv-00793-LAB-AHG)

Exhibit 8
0174

17. It is no crime to be intoxicated from alcohol consumption—a fact no less true today than hundreds of years ago. Similarly, the purchase of alcohol for those eligible to drink is and has been perfectly legal, with the exception of the Prohibition period in the 1920s. When alcohol consumption is combined with other activities or circumstances, however, it has been and is subject to a variety of regulatory measures, including state sanctions, such as those arising from operating a motor vehicle while under the influence of alcohol. When inebriation ends, drivers may resume driving, subject to any restrictions imposed by the government for prior instances of driving while drunk, such as license suspension for a fixed period.

18. That aside, the government has long imposed a wide range of regulatory measures pertaining to the adverse consequences of alcohol consumption (including but not limited to those pertaining to weapons), incorporating "pricing and taxation measures, regulating the physical availability of alcohol, restricting alcohol marketing, education and persuasion strategies, drink-driving countermeasures, modifying the drinking context, and treatment and early intervention."[11]

19. In the century and a half before the American Revolution, "the colonists of North America tended to regard heavy drinking as normal"[12] as such beverages "were considered important and invigorating foods, whose restorative powers were a natural blessing."[13] Reliance on alcoholic beverages was also

---

[11] Thomas F. Babor, et al., *Alcohol: No Ordinary Commodity: Research and Public Policy,* 3rd ed. (NY: Oxford University Press, 2023), Ch. 1, p. 9.

[12] "Alcohol in America: Taking Action to Prevent Abuse," National Library of Medicine, https://www.ncbi.nlm.nih.gov/books/NBK217463/

[13] Paul Aaron and David Musto, "Temperance and Prohibition in America: A Historical Overview," in *Alcohol and Public Policy: Beyond the Shadow of Prohibition,* Mark H. Moore and Dean R. Gerstein, eds. (Washington, D.C.: National Academies Press, 1981), 131.

9

common because of the baneful health effects of drinking contaminated water. Despite the normality of heavy drinking, drunkenness was also recognized even in this early period as a significant problem to be "condemned and punished"[14] partly for the reasons described by Benjamin Rush. Early weapons laws (see below) reflected this understanding. During this period, the adverse consequences of excessive drinking were mitigated to a significant degree because it largely occurred through community taverns where social pressures and a system of tavern licensing, dating to the 1600s, encouraged "responsible oversight"[15] by tavern owners.

20.    The post-Revolution period, however, witnessed a dramatic change in alcohol products as cheaper and more abundant distilled spirits, like domestic whiskey, exploded in production and demand. As production and consumption skyrocketed, earlier safeguards declined, and public drunkenness became much more common.[16] Coinciding with these changes, attitudes began to change as well, as alcohol came to be thought of increasingly as "an addicting and even poisonous drug," the excessive consumption of which led to a host of familial, behavioral, social, and other problems.[17] This growing societal awareness of the adverse consequences of alcohol consumption gave rise to the temperance movement and the Anti-Saloon Leagues of the nineteenth and early twentieth centuries, culminating in the adoption of the Eighteenth (Prohibition) Amendment to the Constitution in 1919, which was then repealed by the Twenty-first Amendment in 1933.

21.    Even though attitudes about alcohol use evolved over time, laws restricting or punishing the handling, carrying, or use of firearms while intoxicated

---

[14] Aaron and Musto, "Temperance and Prohibition in America," 132.
[15] Aaron and Musto, "Temperance and Prohibition in America," 133.
[16] Aaron and Musto, "Temperance and Prohibition in America," 134-36.
[17] "Alcohol in America"; W.J. Rorabaugh, *The Alcohol Republic* (NY: Oxford University Press, 1979), 125-46.

10

appeared among the very earliest weapons regulations in America. From the 1600s through the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated. At least 15 states regulated the commercial sale or distribution of alcohol when firearms were also present; at least two states barred gun sales to those who were intoxicated; at least six states enacted laws prohibiting drunkenness in connection with militia activity; and one state (Arizona) barred providing guns to Native Americans if intoxicated (see Exhibits B and C).

22.     To parse the data chronologically, in the 1600s, at least three states (which at the time were colonies) enacted seven intoxication laws; in the 1700s at least seven states enacted nine laws; in the 1800s at least 19 states enacted 28 laws; and in the 1900s at least 15 states enacted 32 laws (note that some states enacted laws across more than one century; see Exhibits B and C). As noted, a number of these measures appeared very early in the Nation's history, punctuating the country's enduring struggle with "demon rum."

23.     In 1623, 1631, and again in 1632, for example, Virginia enacted measures all directing that "[n]o commander of any plantation, shall either himself or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments."[18] One presumes that the expenditure of powder pertained both to firearms discharges and perhaps to the separate ignition of gun powder. Most important, however, is that the actions under regulation were barred when "drinking" was involved. In a 1655 Virginia law, alcohol-fueled revelry was subject to fines for any who would "shoot any guns at drinking," although the law carved

_____

[18] 1623 Va. Acts 127 Acts of March 5th, 1623, 29; 1631 Va. Acts 173, Acts of February 24th, 1631, Act L; 1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV.

out two special occasions for regulatory exemption: "marriages and funerals only excepted."[19]

24.     In 1636 Rhode Island enacted a measure to punish any who would engage in "shooting out any gun . . . drinking in any tavern alehouse . . . on the first day of the week more than neccesity requireth." Any who did so would find themselves in the stocks or fined five shillings.[20] In 1663 Massachusetts criminalized any on board of ships docked at any colonial harbor where those on board would "be drunk within their vessels by day or night" and "shoot off any gun after the daylight is past, or on the sabbath day." The fine was a substantial twenty shillings for every gun so fired.[21] In 1750 Pennsylvania enacted a law "For Suppressing Idleness, Drunkenness, And Other Debaucheries" that punished with "penalties and forfeitures" any who fired guns or set off fireworks without a special license to do so.[22]

25.     Such measures proliferated in the nineteenth and early twentieth centuries, most commonly as a bar to weapons carrying or discharging. For example, the Tennessee legislature granted a locality the authority to penalize "shooting and carrying guns" along with drinking in 1825.[23] In 1868, Kansas

---

[19] 1655 Va. Acts 401, Acts of March 10, 1655, Act XII. Early in the country's history, alcoholic beverages played an especially important role in marrying and burying. Eric Burns, *The Spirits of America* (Philadelphia, PA: Temple University Press, 2004), 16-17.

[20] 1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636.

[21] The Charters and General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663.

[22] 1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries.

[23] 1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch.

enacted a law to punish any found to carry a deadly weapon while "under the influence of intoxicating drink."[24] Nevada enacted measures in 1881 and 1885 that punished any who discharged firearms in various public spaces while "under the influence of liquor."[25] An 1883 Wisconsin law made it "unlawful for any person in a state of intoxication, to go armed with any pistol or revolver."[26] In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person intoxicated" any pistol or other named weapon[27] (minors and those intoxicated were more than occasionally treated together within these laws[28]). In 1907, Arizona enacted a law making it "unlawful for any constable or other peace

_____

292.

[24] *The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed* 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.

[25] 1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1; David E. Aily, *The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto* 1076, Image 1084 (1885) available at *The Making of Modern Law: Primary Sources. An Act to Prohibit the Use of Firearms in Public Places*, § 1.

[26] 1883 Wis. Sess. Laws 290.

[27] 1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3; Josiah A. Patterson Campbell, *The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes* 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources; Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).

[28] E.g. William H. Bridges, *Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix* 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources. Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.

13

officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm."[29]

26.   In 1879 and again in 1883, Missouri enacted a law to fine or imprison any who carried concealed or brandished "any kind of fire arms" or other listed weapons "when intoxicated or under the influence of intoxicating drinks."[30] Not content with these two state laws, at least 20 similar laws were also enacted in Missouri between 1873 and 1917 that applied to counties, cities, and towns (see Exhibits B and C).

27.   A Maryland state law from 1884 pertaining to Baltimore stated that anyone found to be "drunk or disorderly" who was also carrying a concealed pistol or other weapon was subject to confiscation of the weapon and a fine.[31] Rhode Island enacted a similar law—fine plus weapon confiscation—in 1893.[32] An 1899 South Carolina law said that "any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors" who discharged a firearm of any kind near a road would be subject to a fine and jail.[33] A 1909 Idaho law

---

[29] 1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1. Arizona became a state in 1912.

[30] MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879); 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

[31] John Prentiss Poe, *The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein* 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884.

[32] *General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State* Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893.

[33] 1899 S.C. Acts 97, An Act to Prevent Drunkeness and Shooting Upon The Highway, No. 67, § 1.

14

criminalized anyone who "shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks."[34]

28.     While the focus of these laws was on regulating persons who had weapons while drinking or drunk, another category of laws in early America restricted the sale or distribution of alcohol in the proximity of persons with firearms. A 1679 Massachusetts law prohibited bringing or selling "any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart" on and in the proximity of militia training days unless they were licensed to do so "from the hands of two magistrates" or the commanding military officer then present.[35] In 1746, New Jersey enacted a law penalizing anyone who would "presume to sell any strong Liquor. . . in such Days or Times. . . at the Place of Mustering or Training [of militias], or within a Mile thereof. . . ."[36] Similarly, a 1756 Delaware law forbade militia companies from meeting within a half mile of any inn or tavern. It also punished any attempting to sell "any strong liquor" in a booth or tent in proximity of a militia training area.[37] Also in 1756, Maryland enacted a similar measure to penalize attempts to sell "strong liquor" at the time and location of militia musters.[38] Pennsylvania enacted the same type of measure in

---

[34] 1909 Id. Sess. Laws 6, § 1.

[35] "Order p[ro]hibbiting retaling strong drinckes at traynings," Boston, May 28th, 1679. Beer had a lower alcohol content than other alcoholic beverages.

[36] An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place.

[37] An Act for Establishing a Militia in this Government (Delaware, 1756).

[38] An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756).

15

1780.[39] Such measures extended into the nineteenth century.[40] These laws make abundantly clear that diminished capacity caused by alcohol consumption when gun carrying and use was also occurring was serious enough to proscribe the intersection of the two by law.

29.    Aside from these laws restricting the civilian commercial sale of alcohol, colonies and then states also enacted laws that directly restricted or punished drunkenness among militia ranks[41] for the obvious reason that excessive alcohol consumption undermined military order, morale, and effectiveness.[42] To be

---

[39] An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.

[40] Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852); An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853); Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856); 1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5; Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886); Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

[41] E.g. An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775); An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765); An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756); An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777); An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).

[42] This concern is reflected in Frederick William Baron von Steuben, *Baron*

---

Spitzer Expert Report and Declaration  (3:23-cv-00793-LAB-AHG)

Exhibit 8
0182

sure, alcohol was also very much a part of soldiering during this time. For example, General George Washington "insisted on alcohol for his men"[43] during the Revolutionary War, but like any good commander, he wanted to tightly control its dissemination and consumption. The normal daily alcohol ration for Washington's men was four ounces.[44]

30.    States and localities enacted similar laws in the nineteenth and twentieth centuries.  A Chicago, Illinois ordinance from 1851 imposed a series of strict and wide-ranging regulations concerning licensing for the storage, transport, and handling of gun powder and gun cotton that included this prohibition: "no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person."[45] St. Paul, Minnesota enacted a similar measure in 1858.[46] Delaware enacted laws in 1911 and 1919 that made it "unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges."[47]

## III.  HISTORICAL WEAPONS LICENSING LAWS

31.    Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission

---

*von Steuben's Revolutionary War Drill Manual* (NY: Dover Publications, 1985; first pub. 1779, rev'd. 1794), 82, 105.

[43] Burns, *The Spirits of America*, 16.

[44] Burns, *The Spirits of America,* 16. During the terrible winter at Valley Forge, Pa., of 1777-78, Washington doubled the daily alcohol ration for the men to eight ounces per day.

[45] George Manierre, *The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois* 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.

[46] *The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City* 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858.

[47] Vol. 26 Del. Laws 28, 28- 29 (1911); Vol. 30 Del. Laws 55, 55-56 (1919).

by competent authority to do an act which, without such permission, would be illegal. . . ."[48] Despite the difference of hundreds of years, licensing in early America functioned largely in the way it functions today.

32.     While different in its particulars, historical weapons licensing and permitting laws did, and do, operate in a manner similar to modern waiting periods, in that they are predicated on a process whereby a license applicant provides or submits some kind of information which is then evaluated and judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates the passage of some period of time (even if it be brief) between the time the application for permission to do something is submitted (such as a hunting license application) and the license or permission is granted. In addition, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below). The same might be said of modern waiting periods, in that they are a more nuanced and sophisticated policy tool to winnow out those who might pose a threat with possession of a firearm. In addition, licensing by its nature thwarts any unrestricted ability to acquire or use firearms on demand.

33.     State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers to gun powder to nitroglycerine after its invention).

---

[48] Black, *Black's Law Dictionary*, 634.

34.     In all, a total of at least 47 states (plus D.C.) enacted some kind of licensing measure. At least 29 of those states enacted 61 licensing requirement laws for individuals as a pre-requisite for their weapons ownership or use during this time (see Exhibits D and E); 17 of those states did so in the 1800s. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

35.     At least 14 states imposed licensing requirements on marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states enacted licensing on enslaved persons or free Blacks.

36.     Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

37.     These licensing categories were instances where the prevailing legal standard had been to ban the activity or practice outright—banning concealed carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The governing units enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing

19

represented in most instances a new and more mature form of government regulation of the activities in question.

38.     With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s every state in the country restricted or criminalized such carrying.[49] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units were now allowing legal weapons carrying, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses. The criteria for the granting of these licenses were generally highly discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. They usually set a time limit for permits, ranging from a month to a year (see below).

39.     Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[50] The hunting related laws listed here are all instances where hunting was allowed through permitting by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season). Licensing related to Indigenous people, enslaved persons, and free persons of color is discussed in more detail below.  All of these types of laws are detailed in Exhibits D and E.

**A.     Licensing of Weapons Carrying or Possession**

---

[49] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 63-67.

[50] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

Spitzer Expert Report and Declaration  (3:23-cv-00793-LAB-AHG)

Exhibit 8
0186

40.     In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[51] St. Louis enacted its own municipal version of this law in 1892.[52] A similar measure was enacted for Kansas City, Missouri, in 1880.[53] Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms. . . ."[54]  As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[55]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[56]

---

[51] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871).

[52] The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

[53] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

[54] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[55] https://www.thefreedictionary.com/fowling+piece.

[56] Ordinances of Jersey City, Passed By The Board Of Aldermen since May

41.     The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[57]

42.     Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were granted "by written permission of the Captain of Police."[58] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[59]

43.     New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[60]

---

1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[57] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

[58] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[59] George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources.

[60] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and

44.    This provision also allowed for non-residents who had occasional business in the city to apply for permits as well. An 1884 New York state law barred the carrying or possession of named weapons, including fighting knives and types of clubs, from those under eighteen, unless they possessed a license to do so. Licenses could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor."[61] A year later, the law was extended to all cities in the state and included "any pistol or other firearms of any kind."[62] (This would have included long guns as it did not specify only concealed carry.) In 1891, the state extended permitting to Buffalo covering handguns and other dangerous weapons.[63]

45.    Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[64] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[65]

---

Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources.

[61] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

[62] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[63] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[64] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206, SEC. 14. 1881.

[65] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

46.     An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[66] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a permit either from the mayor or police superintendent.[67] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[68] The California cities of Stockton (1891)[69] and Fresno (1896)[70] did the same.

47.     A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[71] Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle or without first

---

[66] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

[67] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

[68] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[69] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[70] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

[71] Washington D.C. 27 Stat. 116 (1892), CHAP. 159.

taking out a license from the County Commissioner. . . ." In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[72]

48.    Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor. . . ."[73]

49.    A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[74] The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[75] Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry otherwise barred various dangerous weapons including "any pistol or colt" if the city police chief granted a license if "it is

---

[72] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4.

[73] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[74] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

[75] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

---

necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[76]

50.     In the twentieth century, permitting accelerated, spread, and broadened. In 1905 New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[77] Licensing was extended to long guns—machine guns and automatic rifles—in New Jersey in 1927[78] and 1934.[79] (A number of the 32 states that enacted anti-machine gun laws in the 1920s and 1930s made exceptions for possession via licensing.) In 1906 a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[80] It extended licensing to a variety of guns in 1927.[81] In 1908 Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[82] It extended the permitting process in

---

[76] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[77] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

[78] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[79] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[80] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[81] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[82] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

Spitzer Expert Report and Declaration  (3:23-cv-00793-LAB-AHG)

Exhibit 8
0192

1926.[83] Georgia enacted a detailed handgun permitting system in 1910.[84] Thereafter, permitting was enacted in states (not including those that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as well) including Hawaii,[85] Indiana,[86] Michigan,[87] New Hampshire,[88] North

---

[83] 1926 Va. Acts. 285-87, CHAP. 158.

[84] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[85] 1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[86] 1925 Ind. Acts 495, 495-98.

[87] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[88] 1923 N.H. Laws 138.

Spitzer Expert Report and Declaration  (3:23-cv-00793-LAB-AHG)

Exhibit 8
0193

Carolina,[89] North Dakota,[90] Ohio,[91] Oregon,[92] Pennsylvania,[93] Rhode Island,[94] and South Carolina.[95]

51.    The existence and functioning of old licensing laws makes clear that the government had every right to take whatever time it felt was needed to complete the licensing process, consistent with its police powers. The historical realities of licensing provide no notion nor inclination that there was anything resembling a "right" to obtain or use firearms on demand.

### B.    Permits for Firearms Discharge or Use of Explosives

52.    As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms and discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without license."[96] An act pertaining to

---

[89] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[90] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[91] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[92] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-471.

[93] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[94] 1927 (January Session) R.I. Pub. Laws 256.

[95] 1934 S.C. Acts 1288.

[96] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of

---

the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[97] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[98] A 1750 law did the same for the District of Southwark,[99] as did a colony-wide law also in 1750.[100] In 1824, permission from the president of the board of commissioners was required for anyone seeking to test through firing any gun, cannon, or similar weapons in certain sections of Philadelphia.[101]

53.    Charleston, South Carolina enacted an ordinance in 1802 similar to those of Philadelphia where Commissioners of the Streets would grant a license for gun firing and fireworks "at times of public rejoicing" and at specified locations.[102]

---

The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[97] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[98] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

[99] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[100] 1750 Pa. Laws 208.

[101] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[102] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and

---

29

New Hampshire enacted a discharge permit system for Portsmouth in 1823.[103] New York State enacted a law in 1824 that allowed the Schenectady mayor or other city officials to grant permission for discharge of any gun or various fireworks.[104] Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that "the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered."[105] New London, Connecticut singled out "some public day of review" in an 1835 law as a permissible reason for issuing a discharge permit,[106] and New Haven enacted a similar law in 1845.[107] The same was enacted for Quincy, Illinois in 1841,[108] Jeffersonville, Indiana in 1855,[109] and Richmond, Virginia in 1859.[110] Another 20 states enacted such laws from the end of the Civil War up to the end of

---

Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[103] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[104] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[105] The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

[106] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[107] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.

[108] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[109] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[110] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

---

30

the 1800s (not including states that enacted laws both before and after the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits D and E).

### C.   Commercial Licensing

54.     As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries). The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans for guns, knives, tomahawks, or other items, unless they first obtained a license from the governor.[111] A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[112] An 1854 law for San Francisco, California licensed commercial shooting galleries.[113] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements. This historical evidence is consistent with the notion that the government can regulate the commercial activity of selling weapons.

[111] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[112] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

[113] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

Exhibit 8
0197

### D.  Licensing Restrictions on Gunpowder

55.     Gunpowder was widely and extensively regulated in the colonies and states. In fact, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[114] One element of this regulation was gunpowder licensing; at least 21 states enacted such licensing from the 1700s through the early 1900s.  (See Exhibits D & E.)

### E.     Weapons Sellers Recording Purchases

56.     Aside from direct licensing of weapons purchasers by a government official or entity, at least 15 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination. This regulatory mechanism put the burden of information collection and maintenance on the seller or dealer, rather than directly on the government, though it served the same purpose: to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others. In some instances these requirements existed along with direct governmental licensing.

57.     In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is

---

[114] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire Prevention Law, and the Modern Second Amendment," *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society,* Jacob Charles, Joseph Blocher and Darrell Miller, eds. (NY: Oxford University Press, 2023), 195-212; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510.

Spitzer Expert Report and Declaration  (3:23-cv-00793-LAB-AHG)

Exhibit 8
0198

purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[115]

58.    With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

Every individual, firm or corporation engaged . . . in the retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[116]

59.    A 1911 New York law required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[117] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information.  Regulations being placed on the sellers of weapons are a historic normality.

**F.    Licensing Pertaining to Named Groups**

60.    The licensing of "Named Groups" referenced in Exhibit D includes the granting of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who stood to lose their licenses), and Native Americans/Indigenous people.  Licensing the sale of weapons to Native Americans might seem

---

[115] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.

[116] 1911 Colo. Sess. Laws 408, Section 3.

[117] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

33

paradoxical, since white leaders fought protracted conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also traded arms with Natives throughout this entire period, as they sought profitability, access to highly desired goods made available by Indians, and security alliances with some Indians through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[118]

61.     As for licensing related to enslaved persons and free persons of color (listed as "Pre-Civil War Blacks" in Exhibit D), it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved persons. The laws listed here, however, are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

62.     The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain even limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

## IV. CONCLUSION

63.     Gun purchase waiting periods are an artifact of the modern era, but with deep roots in American history and tradition. While the idea of waiting periods as a public policy tool was both beyond contemplation and beyond the reach of the immature and undeveloped American nation-state earlier in history, American

---

[118] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.

34

society did respond to the intersection of weapons acquisition and problematic behavior similar to the modern policy remedy of waiting periods. And as Jacob Charles has persuasively noted, "the absence of positive law. . . . tells us nothing about what our ancestors thought their elected representatives *could* do."[119] There is no reason to believe that the absence of firearm purchase waiting periods early in American history somehow means that our ancestors would have disapproved of such a policy option now. Far from it, especially considering the inherently modest nature of waiting periods.

64.   The examples of old weapons laws pertaining to intoxication and weapons, and old licensing/permitting laws, provide remarkably similar analogs to modern waiting period laws.

65.   Intoxication laws and licensing laws both utilized the passage of time, whether to ward off intoxicated individuals or to conduct a licensing process, to improve the likelihood that those in these circumstances who sought access to firearms did not obtain that access.

66.   When our ancestors in the colonial, post-colonial, and developmental periods of the seventeenth, eighteen, and nineteenth centuries encountered social, behavioral, and other problems with respect to firearms, they responded with public policy techniques appropriate to their time, place, and circumstances. The examples pertaining to alcohol consumption and weapons licensing are all appropriate examples that are analogous to modern waiting period laws.

---

[119] Jacob D. Charles, "The Dead Hand of a Silent Past: *Bruen*, Gun Rights, and the Shackles of History," 73 *Duke Law Journal* 67, 111 (2023).

**DECLARATION UNDER PENALTY OF PERJURY**

**PURSUANT TO 28 U.S.C. § 1746**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 9 , 2024, at Williamsburg, VA.

*Robert J. Spitzer*

Dr. Robert Spitzer

Exhibit 8
0202

# EXHIBIT A

Exhibit 8
0203

**EXHIBIT A**

January 2024

**<u>Curriculum Vitae</u>**

**Robert J. Spitzer**

**Distinguished Service Professor, Emeritus
SUNY Cortland**

**Adjunct Professor, College of William and Mary School of Law**

<u>Address</u>:  5333 Center St.
Williamsburg, VA  23188
(607) 423-1781
<u>Robert.spitzer@cortland.edu</u>; <u>robertjspitzer53@gmail.com</u>
https://sites.google.com/site/robertspitzercortland/

<u>Education</u>:  A.B. (Political Science), <u>summa cum laude</u>, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

<u>Positions Held</u>:

Adjunct Professor, College of William and Mary School of Law, Spring 2023-present.
Affiliated Scholar, Research Scholar of Public Policy, College of William and Mary, 2023-present.
Affiliated Scholar, Government Department, College of William and Mary, 2023-present.
Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997-2021.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.

1

Exhibit 8
0204

Copy Editor, <u>Administrative Science Quarterly</u>, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

<u>Honors</u>:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.
Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.
Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.
Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.
Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.
Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.
Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.
SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.
Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."
Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.
Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.
Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.
<u>Who's Who in the World</u>, 1996.
<u>Dictionary of International Biography</u>, 1995.
<u>Who's Who in the East</u>, 1995-96; 1997-98
<u>Ex officio</u> member, Cortland County Bicentennial Committee, 1987-89.
Chair, SUNY Cortland Bicentennial Committee, 1987-89.

2

Exhibit 8
0205

Phi Eta Sigma, SUNY Cortland, 1994.
Phi Kappa Phi, SUNY Cortland, 1990.
Men of Achievement (1986)
Contemporary Authors, vol. 112 (1985) and subsequent updates.
International Authors and Writers Who's Who, 1985-present.
International Who's Who in Education, Winter 1985-86.
Herbert H. Lehman Graduate Fellowship, 1975-79.
Who's Who Among Students in American Universities and Colleges, 1974-75.
Phi Beta Kappa Club, SUNY College at Fredonia, 1975.
Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008,
2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the
Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents
and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton
L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and
New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and
Politics," 1980.

Publications and Papers:

BOOKS:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University,
AL:  The University of Alabama Press, 1983).  A study of the President's relations with
Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press,
1987).  A study of the New York multi-party system, single-issue third parties, and the
state-based Right to Life Party.

Exhibit 8
0206

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021; 9th ed. 2024). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

4

Exhibit 8
0207

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Theodore Lowi, Margaret Weir, Caroline Tolbert, Andrea Campbell (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021; 14th ed. 2023).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015; revised paperback ed. 2017); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:
> Daniel Hoffman, Our Elusive Constitution, (1997)

Exhibit 8
0208

Martin Sheffer, <u>God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment</u>, (1999)
Daniel Levin, <u>Representing Popular Sovereignty: The Constitution in American Political Culture</u>, (1999)
Robert Spitzer, ed., <u>Politics and Constitutionalism</u>, (2000)
Laura Langer, <u>Judicial Review in State Supreme Courts</u> (2002)
Ian Brodie, <u>Friends of the Court</u> (2002)
Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2002)
Artemus Ward, <u>Deciding to Leave: The Politics of Retirement from the United States Supreme Court</u> (2003)
James T. McHugh, <u>Ex Uno Plura: State Constitutions and Their Political Cultures</u> (2003)
Stephen Newman, ed., <u>Constitutional Politics in Canada and the United States</u> (2004).
Stephen Kershnar, <u>Justice for the Past</u> (2004).
Timothy R. Johnson, <u>Oral Arguments and Decision Making on the U.S. Supreme Court</u> (2004).
Christopher P. Banks, David B. Cohen, and John C. Green, eds., <u>The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics</u> (2005)
Kenneth D. Ward and Cecilia R. Castillo, eds., <u>The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory</u> (2005).
G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform</u> (2006).
Frank P. Grad and Robert F. Williams, <u>State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments</u> (2006).
G. Alan Tarr and Robert F. Williams, eds., <u>State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform</u>, 3 vols. (2006).
Cary Federman, <u>The Body and the State: Habeas Corpus and American Jurisprudence</u> (2006).
Christopher S. Kelley, ed., <u>Executing the Constitution: Putting the President Back into the Constitution</u> (2006).
David Fagelson, <u>Justice as Integrity: Tolerance and the Moral Momentum of Law</u> (2006).
Christopher Shortell, <u>Rights, Remedies, and the Impact of State Sovereign Immunity</u> (2008).
Robert Blomquist, <u>The Quotable Judge Posner</u> (2010).
Kirk A. Randazzo, <u>Defenders of Liberty or Champions of Security?</u> (2010).
Pamela Corley, <u>Concurring Opinion Writing on the U.S. Supreme Court</u> (2010).
Samuel Leiter and William Leiter, <u>Affirmative Action in Antidiscrimination Law and Policy</u> (2nd ed. 2010).
Julia R. Azari, et al., eds., <u>The Presidential Leadership Dilemma</u> (2013).

6

Exhibit 8
0209

Stephen A. Simon, Universal Rights and the Constitution (2014).
Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).
Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).
Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).
Peter J. Galie, et al., eds., New York's Broken Constitution (2016).
Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).
Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).
Clyde H. Ray, John Marshall's Constitutionalism (2019).
Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).
Robert M. Howard, et al., Power, Constraint, and Policy Change: Courts and Education Finance Reform (2021).
Mark C. Dillon, The First Chief Justice (2022).

Book Series Editor, Presidential Briefing Books, Routledge, 2015-present.
Mary Stuckey, Political Rhetoric (2015)
Michael A. Genovese, Presidential Leadership in an Age of Change (2015)
Christopher Fettweis, Making Foreign Policy Decisions (2016)
Nancy Maveety, Picking Judges (2016)
Richard S. Conley, Presidential Relations with Congress (2017)
Andrew L. Stigler, Governing the Military (2019)
Graham G. Dodds, The Unitary Presidency (2020)

Member, Board of Editors for the Encyclopedia of Guns in American Society, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, Issues: Understanding Controversy and Society, ABC-CLIO, 2011-2016.

BOOK CHAPTERS:

"Third Parties in New York," in Governing New York State (formerly New York State Today), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.: SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in Social Regulatory Policy: Recent Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO: Westview Press, 1988), 111-141.

7

Exhibit 8
0210

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar, closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, <u>American Government: Freedom and Power</u> (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in <u>Encyclopedia of the American Legislative System</u>, ed. by Joel Silbey (NY:  Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in <u>The Presidency and the Persian Gulf War</u>, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York:  Praeger, 1993).

"Is the Separation of Powers Obsolete?" in <u>The Presidency Reconsidered</u>, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in <u>Understanding the Presidency</u>, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the <u>Encyclopedia of the American Presidency</u>, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the <u>Encyclopedia of the United States Congress</u>, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in <u>The Constitution and the Conduct of American Foreign Policy</u>, ed. by David Gray Adler, with an introduction

8

Exhibit 8
0211

by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in The Clinton Scandal and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

9

Exhibit 8
0212

"Lost and Found: Researching the Second Amendment," in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

"The Veto King: The 'Dr. No' Presidency of George Bush," in Honor and Loyalty: Inside the Politics of the Bush White House, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the Encyclopedia of Guns in American Society, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; 2nd ed. 2011; 3rd ed. 2023): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the Encyclopedia of the American Presidency, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for The Encyclopedia of New York State, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," Transformed By Crisis: The Presidency of George W. Bush and American Politics, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in Debating the Presidency, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in Thinking About the Presidency, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional

10

Exhibit 8
0213

Power," Executing the Constitution, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in Social Issues in America: An Encyclopedia, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," The Presidency and the Challenge of Democracy, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," Encyclopedia of American Civil Liberties, 4 vols., ed. By Paul Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

11

Exhibit 8
0214

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" <u>You Asked: 20 Questions About America</u>, U.S. Department of State, 2010.

"Liberals and the Presidency," <u>Contending Approaches to the American Presidency</u>, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" <u>The American Presidency in the 21st Century</u>, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in <u>Governing America</u>, ed. By Paul Quirk and William Cunion (New York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns:</u>

**Exhibit 8**
0215

<u>Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," <u>The Conversation on Guns</u>, James A. Densley, ed. (Baltimore: Johns Hopkins University Press, 2023).

"To Brandish or Not to Brandish: The Consequences of Gun Display," <u>New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society</u>, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, 2023).


<u>ARTICLES</u>:

"Jamestown:  Anatomy of an All-American City," <u>Sunday Buffalo Courier Express Magazine</u>, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, <u>The Journal of Politics</u>, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," <u>Presidential Studies Quarterly</u>, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," <u>Presidential Studies Quarterly</u>, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," <u>National Civic Review</u>, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," <u>Party Line</u>, 17 (September 1984).

Exhibit 8
0216

"Shooting Down Gun Myths," <u>America</u>, June 8, 1985, pp. 468-69.  Reprinted in: the <u>Des Moines Register</u>, October 24, 1985; <u>Criminal Justice</u>, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); <u>U.S. News and World Report</u> educational study unit on Gun Control, April/May, 1987; <u>Gun Control</u>, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and <u>The Informed Argument</u>, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," <u>America</u>, June 15, 1985.

"The Item Veto Reconsidered," <u>Presidential Studies Quarterly</u> 15(Summer, 1985): 611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" <u>Policy Studies Journal</u>, 15 (June 1987), 675-89. Reprinted in <u>Public Policy Theories, Models, and Concepts</u>, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," <u>NEWS for Teachers of Political Science</u>, 53 (Spring, 1987).

"But for A Single Vote...," <u>New York Delegate</u>, July, 1987. Abridged version appeared on editorial page of the <u>Rochester Times Union</u>, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", <u>Election Politics</u>, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," <u>Policy Studies Journal</u>, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," <u>Policy Studies Journal</u>, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," <u>PS:  Political Science and Politics</u>, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," <u>PS:  Political Science and Politics</u>, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," <u>Oklahoma City University Law Review</u>, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," <u>Congress and the Presidency</u>, 21 (Spring, 1994): 1-10.

14

Exhibit 8
0217

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," <u>Pace Law Review</u>, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" <u>The Spectator</u>, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," <u>Political Science Quarterly</u>, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," <u>Presidential Studies Quarterly</u>, 28 (Fall 1998): 799-805.

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15.  Reprinted in <u>Annual Editions: Criminal Justice</u> (Dushkin/McGraw-Hill, 2000); and in <u>Criminology</u> (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," <u>Congress Monthly</u>, September/October 2000.

"Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u> 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, <u>Silveira v. Lockyer</u> (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler,

15

Exhibit 8
0218

American Literary History 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, Injury Prevention 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," Albany Government Law Review 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," Presidential Studies Quarterly 38(June 2008): 329-46.

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-

Exhibit 8
0219

Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

"Understanding Gun Law History After Bruen: Moving Forward by Looking Back," Fordham Urban Law Journal 51 (2023): 57-115.

"Historical Weapons Restrictions on Minors," Rutgers University Law Review Commentaries (2024), forthcoming.


OP-ED ARTICLES:

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

Exhibit 8
0220

"Clinton Must Balance Activism, Congress' Constitutional Power," <u>Syracuse Post-Standard</u>, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," <u>Los Angeles Times</u>, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" <u>Christian Science Monitor</u>, September 19, 1997.

"Assault Weapons Ban," <u>Christian Science Monitor</u>, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," <u>Syracuse Post-Standard</u>, February 10, 1999.

"Gun Industry Doesn't Know What's Good for It: Regulation," <u>Syracuse Post-Standard</u>, April 20, 1999.

"The Gun Saga in Congress," <u>Intellectual Capital</u>, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" <u>Intellectual Capital</u>, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," <u>Intellectual Capital</u> 5(February 10-17, 2000).

"Gun Control After Columbine," <u>Intellectual Capital</u> 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," <u>The Catholic Review</u>, March 30, 2000.

"Why Would Anyone Want the Job Now?" <u>Chicago Tribune</u>, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," <u>Syracuse Post-Standard</u>, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," <u>Syracuse Post-Standard</u>, June 12, 2001.

"Exposure Erodes Clout of NRA," <u>Columbus Dispatch</u>, April 24, 2003.

"Hazing Scandals," <u>Syracuse Post-Standard</u>, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 18,

Exhibit 8
0221

2004.

"NRA Loses Its Political Firepower," <u>Los Angeles Times</u>, April 12, 2004. Also in the <u>Deseret News</u>.

"A 'Tortured' Interpretation of the President's Vast Powers," <u>Syracuse Post-Standard</u>, June 18, 2004.

"Clearing the Air," <u>Syracuse Post-Standard</u>, August 4, 2004.

"Why Gun Ban Died Quietly," <u>San Jose Mercury News</u>, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," <u>Christian Science Monitor</u>, August 18, 2005. Also published in the <u>Deseret News</u>, <u>Sacramento Bee</u>, the <u>Fresno Bee</u>, the <u>Modesto Bee</u>, the <u>Ithaca Journal</u>, the <u>Johnstown Breeze</u>, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," <u>Syracuse Post-Standard</u>, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network ([www.hnn.us](www.hnn.us)), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" <u>Syracuse Post-Standard</u>, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network ([www.hnn.us](www.hnn.us)) January 7, 2008.

"The 'Pocket Veto' Peril," <u>Los Angeles Times</u>, January 8, 2008. Reprinted in the <u>St. Louis Post-Dispatch</u>, <u>St. Paul Pioneer Press</u>, <u>Wilmington Star News</u> (NC), <u>News and Observer</u> (NC), <u>The Morning Call</u> (Pa.), <u>Contra Costa Times</u> (CA), the <u>Sun News</u> (FL), <u>The Vindicator</u>, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, <u>Cleveland Plain Dealer</u>, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge ([www.thefacultylounge.org](www.thefacultylounge.org)), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network ([www.hnn.us](www.hnn.us)), June 9,

Exhibit 8
0222

2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network (www.hnn.us), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network (www.hnn.us), January 12, 2009.

"Early Voting for New York Elections," Cortland Standard, May 27, 2009.

"A Better Way to Run Our Elections," Syracuse Post Standard, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post (www.huffingtonpost.com), posted December 22, 2009.

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

20

Exhibit 8
0223

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

21

Exhibit 8
0224

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

22

Exhibit 8
0225

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,* January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post*, June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

Exhibit 8
0226

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com*, September 13, 2018.

24

Exhibit 8
0227

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,* August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

Exhibit 8
0228

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

26

Exhibit 8
0229

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

"Guns at voting sites have long sparked fears of intimidation and violence – yet few states ban their presence," *The Conversation,* November 2, 2022.

"Guns at voting sites have long sparked fears of intimidation, violence," *Syracuse Post-Standard,* November 4, 2022.

"What our past tells us about young people and guns," *The Hill,* March 28, 2023.

"Stand-Your-Ground, the Castle Doctrine, and Public Safety," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 3, 2023.

"For Most of U.S. History We've Had Both Gun Rights and Gun Regulations," *TIME.com,* June 6, 2023.

"Is domestic abuse really protected by the Second Amendment?" *The Hill,* July 14, 2023.

"America's Original Gun Control," *The Atlantic Monthly,* August 12, 2023.  163

"The Unusual Thing About Hunter Biden's Indictment," *CNN.com*, September 15, 2023.


TESTIMONY, BRIEFS, AND REPORTS:

"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany,

Exhibit 8
0230

N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Exhibit 8
0231

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a

29

Exhibit 8
0232

Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.


PAPERS AND PRESENTATIONS (NOT INCLUDING THOSE GIVEN ON THE CORTLAND CAMPUS):

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981.

30

Exhibit 8
0233

Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX,

Exhibit 8
0234

October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit, the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

32

Exhibit 8
0235

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to

33

Exhibit 8
0236

Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI,

Exhibit 8
0237

November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on

35

Exhibit 8
0238

the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

Exhibit 8
0239

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of

Exhibit 8
0240

the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"College and Life: Really the Same," SUNY Cortland Commencement Address, May 14, 2017.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

38

Exhibit 8
0241

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

Exhibit 8
0242

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

"The Gun Rights 2.0 Movement: Public Policy Consequences," 2022 National Research Conference on Firearm Injury Prevention, Omni Shoreham Hotel, Washington, D.C., November 29-December 1, 2022.

"Gun Law History in America," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., February 16, 2023.

"The Obama Presidency and Gun Policy," Paper Presented for Hofstra University's 13th Presidential Conference on The Barack Obama Presidency, Hempstead, NY, April 19-21, 2023.

"Gun Law History and Virginia," League of Women Voters, Williamsburg, Va., June 22, 2023.

"Gun Policy in the U.S.: Past, Present, Future," College of William and Mary, Williamsburg, Va., September 21, 2023.

"Historical Gun Laws Pertaining to Minors," 2023 Cooper-Walsh Colloquium, Conference on *Public Health, History, and the Future of Gun Regulation After Bruen,* Fordham University School of Law, New York City, NY, October 12-13, 2023.

"Presidential Impeachment: What It Is, How It Works, Why It Matters," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 19, 2023.

"The Politics of Gun Control," TORCH Club of Williamsburg, VA, January 16, 2024.

<u>PANEL PARTICIPATION</u>:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York

Exhibit 8
0243

State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-

41

Exhibit 8
0244

6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

42

Exhibit 8
0245

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association,

Exhibit 8
0246

April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.


BOOK REVIEWS:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142: An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers: Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Exhibit 8
0247

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective, Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political

Exhibit 8
0248

Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

Exhibit 8
0249

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

47

Exhibit 8
0250

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).

48

Exhibit 8
0251

SELECTED MEDIA APPEARANCES/QUOTATIONS:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi"; "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

PROFESSIONAL ASSOCIATIONS:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group),
    APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

Exhibit 8
0252

TEACHING AREAS:

American Government:  courses taught include Law and Politics, Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Politics and Policy, Introduction to Public Policy, Gun Policy.  Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

TEACHING-RELATED AWARDS:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

OTHER PROFESSIONAL ACTIVITIES

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in

50

Exhibit 8
0253

2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.

Exhibit 8
0254

<u>SELECTED COMMUNITY SERVICE</u>

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).
Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's (N.Y.) Odyssey 2010 Project, 1996.

52

Exhibit 8
0255

# EXHIBIT B

Exhibit 8
0256

**EXHIBIT C**

**INTOXICATION/WEAPONS LAWS**

| STATE | NO CARRY/ USE INTOX | ALCOHOL BUSINESS/ SALES | NO GUN SALE TO DRUNKS | MILITIA/ MILITARY/ POLICE | NAMED GROUPS |
|---|---|---|---|---|---|
| Alabama | | | | | |
| Alaska | | | | | |
| Arizona | 1907 | 1901 guns/saloons | | | 1901 Natives |
| Arkansas | | | | | |
| California | | | | | |
| Colorado | | | | | |
| Connecticut | | 1859 | | 1775 | |
| Delaware | | 1756 | 1911,1919 | | |
| District of Columbia | | | | | |
| Florida | | | | | |
| Georgia | | | | 1765,1903 | |
| Hawaii | | | | | |
| Idaho | 1909 | | | | |
| Illinois | | 1851 | | | |
| Indiana | 1921 | | | | |
| Iowa | | 1896 | | | |
| Kansas | 1868 | | | | |
| Kentucky | | | | | |
| Louisiana | | | | | |
| Maine | | 1856 | | | |
| Maryland | 1884,1927 | 1756 | | (1756) | |
| Massachusetts | 1663,1891 1891,1902 1903 | 1679 | | | |
| Michigan | 1931 | | | | |
| Minnesota | | 1858 | | | |
| Mississippi | | | 1878,1880, 1908 | | |
| Missouri | 20 laws* | 1923 | | | |
| Montana | | | | | |
| Nebraska | | | | | |
| Nevada | 1881,1885 (discharge) | | | | |
| New Hampshire | | | | | |

Exhibit 8
0257

| | | | | | |
|---|---|---|---|---|---|
| New Jersey | 1916 (hunting) | 1746 | | | |
| New Mexico | | | | | |
| New York | | | | | |
| North Carolina | | | | | |
| North Dakota | 1921 | | | | |
| Ohio | | 1886 | | | |
| Oklahoma | 1890,1891 | | | (1890), (1891) | |
| Oregon | | | | | |
| Pennsylvania | 1750 | 1875 | | 1777,1780 | |
| Rhode Island | 1636,1893, 1893 | 1853 | | | |
| South Carolina | 1899,1900 | | | 1782 | |
| South Dakota | | | | | |
| Tennessee | 1825 | | | | |
| Texas | | | | | |
| Utah | 1925 | | | | |
| Vermont | | 1852 | | | |
| Virginia | 1623,1631, 1632,1655 | | | | |
| Washington State | | | | | |
| West Virginia | 1925 | | | | |
| Wisconsin | 1883 | | | | |
| Wyoming | | | | | |
| TOTAL STATES | 20 | 15 | 2 | 6 | 1 |
| TOTAL LAWS | 52 | 15 | 5 | 9 | 1 |

SOURCE: https://firearmslaw.duke.edu/repository/search-the-repository/. A total of 30 states in this table enacted some kind of law designed to sever the link between alcohol/inebriation and weapons.

*Of the 20 Missouri laws that criminalized the carrying or possession of weapons while intoxicated, two of them (1879 and 1883) were state laws. The rest (1873, 1881, 1890, 1894, 1898, 1900, 1902, 1903, 1903, 1903, 1903, 1907, 1907, 1908, 1908, 1910, 1910, and 1917) all applied to counties, cities, and towns.

Exhibit 8
0258

**EXHIBIT C**

Exhibit 8
0259

**EXHIBIT D**

**INTOXICATION/WEAPONS LAWS**

**ARIZONA**

Laws regulating the sale of firearms to minors and Native Americans, Title 10, §§ 342 & 362 of AZ Penal Code in The Revised Statutes of Arizona Territory (1901).
"Sec. 342. Any person who shall sell or give to any minor under the age of fourteen years, or to any person for the use of such minor, any firearms, or toy pistols from which dangerous and explosive substances may be discharged, shall be deemed guilty of a misdemeanor."…
"Sec. 362. Any person who sells, gives, rents, barters or furnishes any rifles, carbines, pistols or revolvers, or any ammunition or cartridges for rifles, carbines, pistols or revolvers, or any shot larger in size than standard number six (6) shot, or any spirit, malt or vinous liquor, to Indians, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished by imprisonment in the county jail not less than one or more than six months, or by a fine not less than fifty dollars or more than three hundred dollars, or by both such imprisonment and fine."
1901, AZ, Title 10, §§ 342 & 362 of the AZ Penal Code

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387 and 391.
§ 387 If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person. § 391: It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 of this act, and the sheriffs of the various counties shall notify the keeprs of hotels, boarding houses and drinking saloons, in their respoective counties, of their duties under this law, and if after such notificiation any keeper of a hotel, boarding house or drinking saloon shall fail to keep notices posted, as required by this act, he shall, on conviction thereof before a justice of the peace, be fined in the sum of five dollars, to go to the county treasury.

1907 Ariz. Sess. Laws 15, An Act to Prohibit Officers from Carrying Firearms While Under the Influence of Liquor and for Other Purposes, ch. 16, § 1.
It shall be unlawful for any constable or other peace officer in the Territory of Arizona, while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm, or while so intoxicated to strike any person, or to strike at any person with a pistol, gun or other firearm . . .

Exhibit 8
0260

## CONNECTICUT

An Act for regulating and ordering the Troops that are, or may be raised, for the Defence of this Colony, Article 19 (11 May, 1775).
"That whatsoever Commissioned Officer shall be found drunk on his Guard, Party, or other Duty under Arms, shall be cashiered for it: Any Non-Commissioned Officer or Soldier, so offending, shall suffer such Punishment as shall be ordered by the Sentence of a Regimental Court-Martial."
1775, CT, Act for Regulating and Ordering the Troops that are, or May be Raised, Art. 19 Connecticut, At a General Assembly of the Governor and Company of the English Colony of Connecticut, in New-England in America, Holden at Hartford, in Said Colony, on the Second Thursday of May, in the 15th Year of the Reign of His Majesty George the Third, King of Great-Britain, &C. A.D. 1775. An Act for Regulating and Ordering the Troops That Are, or May Be Raised, for the Defence of This Colony (New London, Conn.: Timothy Green printer to the governor and Company, 1775), 11. Article 19.

1859 Conn. Acts 62, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. In Public Acts Passed by the General Assembly of the State of Connecticut, Ch. 82, §5 (1859).
"Sec. 5. If any booth shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling, the officer commanding said parade-ground, muster-field or encampment, the sheriff or deputy-sheriff of the county, or any justice of the peace, selectman, or constable of the town in which such booth, shed, tent, or other temporary erection is situated, upon having notice or knowledge that the same is so used or occupied, shall notify the owner or occupant thereof to vacate and close the same immediately; and, if said owner or occupant shall refuse or neglect so to do, said commanding officer, sheriff, deputy-sheriff, justice of the peace, selectman or constable, may forthwith abate such booth, shed, tent, or other such temporary erection, as a nuisance, and may pull down or otherwise destroy the same, with the assistance of any force, civil or military."
1859, CT, Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances
Public Acts Passed by the General Assembly of the State of Connecticut, May Session, 1859 (Hartford, CT: Day & Clark State Printers, 1859), 62. Ch. 82 An Act in Addition to and in Alteration of "An Act for Forming and Conducting the Military Force," §5 Temporary Erections for Sale of Liquors or Gaming, Near Parade Ground, May Be Abated as Nuisances. Approved 24 June, 1859.

## DELAWARE

An Act for Establishing a Militia in this Government (Delaware, 1756)
"And be it further enacted by the authority Aforesaid that no Captain or other Officer shall Appoint any place of Meeting for his Company (town Companys only Excepted) within the Distance of half a mile of any Inn or Tavern under the Penalty of Forty Shillings for every such Offence and that no person or persons shall presume to keep a Booth or tent or expose to sale at or Bring on any Pretence whatsoever any strong Liquor to such place of Meeting under the Penalty or Forty shillings for every such offence."

Exhibit 8
0261

1756, DE, An Act for Establishing a Militia in this Government
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 3 (Washington, D.C.: Government Printing Office, 1947), 13.

Vol. 26 Del. Laws 28, 28- 29 (1911)
Section 3. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.

Vol. 30 Del. Laws 55, 55-56 (1919)
Section 222. It shall be unlawful for any person or persons, or a member of any firm, or the agents or officers of any corporation to sell to a minor or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made for the defense of one's person.
It shall be the duty of any person or persons, firm, company or corporation desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business, in which said book lie shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so purchased, the color of the person so purchasing the same, and the apparent age of the purchaser, and the names and addresses of at least two freeholders resident in the County wherein the sale is made, who shall positively identify the purchaser before the sale can be made; Provided, that no clerk, employee or other person associated with the seller shall act as one of the identifying freeholders. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## **GEORGIA**

An Act For the better ordering of the Militia of this Province §19 Savannah, GA (25 March, 1765).
"And be it further Enacted, by the authority aforesaid, That in case any person who shall be obliged to bear arms, whilst the regiment, troop, or company, to which he shall belong, shall be under arms, or in array, shall neglect or refuse to fire his gun not exceeding six times each muster day, or shall wilfully neglect or refuse to do his duty, or to obey the other lawful commands of his officer, or if any such militia-man be drunk at the time of his exercising, the majority of the officers of the troop or company to which such person belongs, if the offence shall be committed in a single troop or company, or any two field officers of the regiment to which such person shall belong, if the offence shall be committed in a regiment, shall have full power and authority to inflict on the person so offending any pecuniary mulct not exceeding ten shillings Sterling[.]"
1765, GA, An Act for the Better Ordering of the Militia of this Province, §19
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest

Exhibit 8
0262

Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 4 (Washington, D.C.: Government Printing Office, 1947), 60.

1903 Ga. Laws 71, An Act for the Protection of the Officers and Employees of the Georgia Penitentiary at the Various Camps throughout the State, and for all other purposes, § 1.
Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by authority of the same, That from and after the passage of this Act it shall be unlawful for any person in the State of Georgia to come inside of the guard-lines established, with gun, pistol or any other weapon, or any intoxicating liquors without the knowledge and consent of the deputy wardens in charge.

## IDAHO

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
If any person . . . or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor under the age of sixteen (16) years any such weapon, without the consent of the parent or guardian of such minor, he shall upon conviction, be punished by a fine of not less than twenty-five dollars ($25.00) nor more than two hundred dollars ($200.00), or by imprisonment in the county jail for a period of not less than twenty (20) nor more than sixty (60) days, or by both such fine and imprisonment: Provided, however, that it shall be a good defense to the charge of carrying such concealed weapons if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, family home or property.

## ILLINOIS

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one

Exhibit 8
0263

time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

## INDIANA

1921-23 Ind. Acts 108, Intoxicating Liquor—Transportation—Penalty, ch. 34, § 1. 1921 . . . That any person who shall transport intoxicating liquor in any wagon, buggy, automobile, water or air craft, or other vehicle or who shall transport intoxicating liquor in any such vehicle when such vehicle is not owned by said person, or without the consent of the owner of such vehicle, or when such vehicle is mortgaged property, or who shall transport intoxicating liquor in any such vehicle if there be in, or upon such vehicle or upon any person therein any firearms or guns, shall be guilty of a felony and upon conviction shall be imprisoned not less than one year nor more than two years and fined in a sum not exceeding one thousand dollars ($1,000).

## IOWA

Selling Liquors on Camp Grounds Prohibited, § 22 of Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia in Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa (1896).

Exhibit 8
0264

"Sec. 22. Any person who shall trespass on the encampment grounds, or the camp grounds of the guard in active service, or interrupt, molest, or interfere with any member of the guard in the discharge of his duties, or sell any malt, spirituous, or other intoxicating liquors within one mile of such encampment or camp, except under permit issued by the district or superior court, shall be guilty of a misdemeanor, and the commanding officer of such force may order the arrest of such person and cause him to be delivered to a peace officer or magistrate as soon as practicable."
1896, IA, An Act to Revise, Amend, and Codify the Statutes Relative to the Militia, § 22
Acts and Resolutions Passed at the Regular Session of the Twenty-Sixth General Assembly of the State of Iowa, Begun January 13 and Ended April 11, 1896 (Des Moines, IA: F.R. Conaway, 1896), 104. Chapter 102—An Act to Revise, Amend, and Codify the Statutes Relative to the Militia, § 22. Approved April 10, 1896.

## KANSAS

The General Statutes of the State of Kansas, to Which the Constitutions of the United State of Kansas, Together with the Organic Act of the Territory of Kansas, the Treaty Ceding the Territory of Louisiana to the United States, and the Act Admitting Kansas into the Union are Prefixed Page 378, Image 387 (1868) available at The Making of Modern Law: Primary Sources.
Crimes and Punishments, § 282. Any person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States, who shall be found within the limits of this state, carrying on his person a pistol, bowie-knife, dirk or other deadly weapon, shall be subject to arrest upon the charge of misdemeanor, and upon conviction shall be fined in a sum not exceeding one hundred dollars, or by imprisonment in the county jail not exceeding three months, or both, at the discretion of the court.

## MAINE

Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed, Acts and Resolves of Maine, Ch. 265 "An Act to Organize and Discipline the Militia," §73 (1856).
"Sect. 73. The mayor and aldermen of any city, or the selectmen of any town, upon complaint made to them under oath, that the complainant has reason to believe that any booth, shed, or other temporary erection, situated within one mile of any muster field, is used and occupied for the sale of spirituous or fermented liquors, or for the purpose of gaming for money, or other property, may, if they consider the complaint well founded, order the owner or occupant thereof to vacate and close the same immediately ; and if the owner or occupant shall refuse or neglect so to do, the said mayor and aldermen or selectmen may forthwith abate such booth, shed or other temporary erection, as a nuisance, and pull down or otherwise destroy the same in any manner they may choose, or through the agency of any force, civil or military, which they may see fit to employ."
1856, ME, Temporary Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed
Acts and Resolves Passed by the Thirty-Fifth Legislature of the State of Maine, A. D. 1856 (Augusta, ME: 1856), 97. Ch. 265 An Act to Organize and Discipline the Militia, §73 Temporary

Exhibit 8
0265

Buildings within One Mile of Muster Field, Used for Sale of Intoxicating Liquors, May Be Removed. Approved 9 April, 1856.

## MARYLAND

An Act for Regulating the Militia of the Province of Maryland (MD General Assembly, Lower House, L.H.J. Liber No. 48, Assembly Proceedings, May 22, 1756)
"And be it Enacted by the Authority aforesaid that any Person of the Militia who shall get drunk on any Muster-day before or at Muster shall forfeit the Sum of Ten Shillings Current Money and any Person who shall presume to vend Sell or Dispose of any Strong Liquor at any Place of training or at any other Place within Five Miles of any Place of training to any Person belonging to the Militia on any Muster day except between the Time of Discharge from such Training for that day and the Sun sitting thereof Such Person so vending selling or disposing of Such Strong Liquors Shall forfeit and pay the Sum of Five Pounds Current Money And no Person other than a licenced Ordinary Keeper shall vend Sell or dispose of any Strong Liquors to any Person whatever at such Time and Place aforesaid even between the Hours aforesaid under the Penalty of Five Pounds Current Money for every Such Offence and it Shall and may be lawfull for the Commanding Officer of the Party at such Muster and he is hereby directed and required to order the Strong Liquors of the Person so offending to be Siezed and Destroyed Provided always that nothing herein contained shall be construed to extend to any Merchant or licenced Ordinary-Keeper who shall vend Sell or Dispose of any Strong Liquors in his or her House the same not being to any Person of the Militia or any for the Use of Such Person[.]"
1756, MD, Proceedings and Acts of the General Assembly, 1755-1756, An Act for regulating the Militia of the Province of Maryland
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 5 (Washington, D.C.: Government Printing Office, 1947), 92-93.


John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources. 1884
City of Baltimore, § 742. Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

Exhibit 8
0266

1927 Md. Laws 156, § 388-B.

That no person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS

The Charters And General Laws Of The Colony And Province Of Massachusetts Bay Page 190, Image 197 (1814) available at The Making of Modern Law: Primary Sources. 1663 Colony Laws. § 4. Be it also enacted by the authority of this court, that no masters of ships, or seamen, having their vessels riding within any of our harbors in this jurisdiction, shall presume to drink healths, or suffer any healths to be drunk within their vessels by day or night, or to shoot off any gun after the daylight is past, or on the sabbath day, on penalty for every health twenty shillings, and for every gun so shot twenty shillings.

Order p[ro]hibbiting retayling strong drinckes at traynings, Boston, May 28th, 1679
"… it is ordered by this Court and the authority thereof, that henceforth no person whatsoeuer shall presume to bring into the feild and sell by retayle vpon such occasions [i.e., militia training days] any wine, strong liquor, cider, or any other inebriating drinckes, excepting beere of a penny a-quart, vnless he or they so doing haue license from the hands of two magistrates, or the cheife military officer or officers in the feild[.]"
1679, MA, Order p[ro]hibbiting retayling strong drinckes at traynings

Report of the Board of Park Commissioners of the City of Springfield, Mass., Park Ordinances (1891)
The Board of Park Commissioners of the City of Springfield, by virtue of its authority to make Rules for the use and government of the Public Parks of said city, and for breaches of such rules to affix penalties, hereby ordains that within the Public Parks, except with prior consent of the Board, it is forbidden: . . .
3. To throw stones, balls, or other missiles; to discharge or carry firearms, firecrackers, torpedoes, or fireworks; to make fires; to play musical instruments; to have any intoxicating beverages; to sell, offer, or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or to have possession of instruments of gambling; to make orations, harangues, or loud outcries; to enter into political canvassing of any kind; to utter profane, threatening, abusive, or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Exhibit 8
0267

Third Annual Report of the Park Commissioners of the City of Lynn for the year ending December 20, 1891, at 23, Ordinances

The Board of Park Commissioners of the City of Lynn , by virtue of its authority to make rules for the use and government of the Public Parks of said City, and for breaches of such rules to affix penalties, hereby ordains that within the limits of Lynn Woods, Meadow Park and Oceanside, except with the prior consent of the Board, it is forbidden: . . .

3. To throw stones or other missiles; to discharge or carry firearms, except by members of the police force in the discharge of their duties; to discharge or carry fire – crackers, torpedoes or fireworks; to make fires; to have any intoxicating beverages; to sell, to offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions; to play games of chance, or have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to do any obscene or indecent act; to bathe or fish; to solicit the acquaintance of, or follow, or otherwise annoy other visitors.

Office of Park Commission, New Bedford, Mass., Park Ordinances (1902)

September 1, 1902. The Board of Park Commissioners of the City of New Bedford, by virtue of its authority to make rules for the use and government of the public parks of said city, and for breaches of such rules to affix penalties, hereby ordain that within the public parks and commons of the city, except with prior consent of the Commissioners, all persons are hereby forbidden: . . .

3. To throw stones, balls or other missiles; to discharge or carry firearms, firecrackers, torpedoes or fireworks; to make fires, to play musical instruments; to have for sale or otherwise any intoxicating liquors or beverages; to sell or offer for sale any goods or wares; to post or display signs, placards, flags or any advertising devices whatsoever; to play games of chance or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language; to make orations or loud outcries; to in any manner annoy other visitors.

Rules and Regulations Governing the Public Parks within the City of Lowell,, at 58 (1903)

The Board of Park Commissioners of the City of Lowell, by virtue of its authority to make rules and regulations for the use and government of the Public Parks and Commons of said City, and to fix penalties for breaches of rules and regulations, hereby ordains that, within such Public Parks and Commons, except by and with the consent of the Board: . . .

3. It is forbidden to throw stones, balls or other missiles; to discharge or carry firearms, fire crackers, torpedoes or fire-works; to make fires; to have any intoxicating beverages; to sell, offer or expose for sale any goods or wares; to post or display signs, placards, flags or advertising devices; to solicit subscriptions or contributions, to play games of chance, or to have possession of instruments of gambling; to utter profane, threatening, abusive or indecent language, or to commit any obscene or indecent act; to solicit the acquaintance of, or to follow, or in any way annoy visitors to said Parks and Commons.

## **MICHIGAN**

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 36, §237.

Possession or use of fire-arm by person under influence of liquor or drug–Any person under the influence of intoxicating liquor or any exhilarating or stupefying drug who shall carry, have in

Exhibit 8
0268

possession or under control, or use in any manner or discharge any fire-arm within this state, shall be guilty of a misdemeanor.

## MINNESOTA

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858

Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

## MISSISSIPPI

1878 Miss. Laws 175-76, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, ch. 46, §§ 2-3.

§ 2. It shall not be lawful for any person to sell to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any weapon of the kind or description in the first section of this Act described [pistols, various knives etc.], or any pistol cartridge, and on conviction shall be punished by a fine not exceeding two hundred dollars, and if the fine and

Exhibit 8
0269

costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court, not exceeding six months. § 3. Any father, who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any weapon of the kind or description in the first section of this act described [pistols, knives, etc.], shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor under the direction of the board of supervisors or of the court.

Josiah A.Patterson Campbell, The Revised Code of the Statute Laws of the State of Mississippi: With References to Decisions of the High Court of Errors and Appeals, and of the Supreme Court, Applicable to the Statutes Page 776-777, Image 776-777 (1880) available at The Making of Modern Law: Primary Sources. 1880
Carrying Concealed Weapons, § 2986. It shall not be lawful for any person to sell to any minor or person intoxicated knowing him to a minor or in a state of intoxication, any weapons of the kind or description in the foregoing section described, or any pistol cartridge and on conviction he shall be punished by a fine not exceeding two hundred dollars, and if the fine and costs are not paid, be condemned to hard labor under the direction of the board of supervisors or of the court not exceeding six months. § 2987. Any father who shall knowingly suffer or permit any minor son under the age of sixteen years to carry concealed, in whole or in part, any person of the kind or description in the forgoing section described, shall be deemed guilty of a misdemeanor, and on conviction, shall be fined not less than twenty dollars, nor more than two hundred dollars, and if the fine and costs are not paid, shall be condemned to hard labor as provided in the proceeding section. § 2988. Any student of any university, college, or school, who shall carry concealed, in whole or in part, any weapon of the kind or description in the foregoing section described, or any teacher, instructor or professor who shall knowingly, suffer or permit any such weapon to be carried by any student or pupil, shall be deemed guilty of a misdemeanor and on conviction be fined not exceeding three hundred dollars, and if the fine and costs are not paid, be condemned to hard labor as above provided.

Laws regulating carrying and brandishing firearms, who can own them, where they can be brought, etc., Ch. 20, §§ 293-300, in The Charter and Code of the Ordinances of Yazoo City (1908).
"Deadly weapons; carrying of concealed.
Sec. 293. Any person who carries concealed, in whole or in part, any bowie knife, dirk knife, butcher knife, pistol, brass or metallic knuckles, slungshot, sword, or other deadly weapon of like kind or description, shall be guilty of a misdemeanor, and, on conviction, shall be punished by a fine of not less than twenty-five dollars nor more than one hundred dollars, and all costs, or be imprisoned in the county jail not more than ninety days, or both, in the discretion of the court. Weapon forfeited.
Sec. 294. Upon the conviction of any person under the preceding section, the weapon shown in such case to have been carried concealed, in whole or in part, shall be forfeited to the state, and shall be delivered to the sheriff of Yazoo county, who shall forthwith publicly destroy the same. The same; not applicable to certain persons.
Sec. 295. Any person indicted or charged for a violation of the last section may show as a defense—

Exhibit 8
0270

(a) That he was threatened, and had good and sufficient reason to apprehend a serious attack from an enemy, and that he did so apprehend; or

(b) That he was traveling and was not a tramp, or was setting out on a journey, and was not a tramp; or

(c) That he was a peace officer or deputy in the discharge of his duties; or

(d) That he was at the time in the discharge of his duties as a mail carrier; or

(e) That he was at the time engaged in transporting valuables for an express company or bank; or

(f) That he was in lawful pursuit of a felon.

And the burden of proving either of said defenses shall be on the accused.

Dealers to keep record of cartridges and weapons sold.

Sec. 296. Every merchant or dealer or pawnbroker that sells bowie knives, dirk knives, pistols, brass or metallic knuckles, or slungshots, or pistol or rifle cartridges, shall keep a record of all sales of such weapons and cartridges sold, showing the description of the weapon and kind and caliber of cartridges so sold, the name of the purchaser, and the description of weapons and the quantity of cartridges and date of sale. This record to be opened to public inspection at any time to persons desiring to see it. The dealer who violates this section shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than seven dollars and fifty cents nor more than twenty-five dollars.

The same; and cartridges not sold to infant or drunk person.

Sec. 297. It shall not be lawful for any person to sell, give, or lend to any minor or person intoxicated, knowing him to be a minor or in a state of intoxication, any deadly weapon, or other weapon the carrying of which concealed is prohibited, or pistol cartridge; and, on conviction thereof, he shall be punished by a fine of not less than twenty-five dollars nor more than two hundred dollars, or imprisoned not exceeding ninety days, or both.

The same; father not to suffer infant son to have or carry.

Sec. 298. Any father who shall knowingly suffer or permit any son under the age of sixteen years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

The same; pupil in any public school not to have, etc.

Sec. 299. Any student or pupil in any public school of this city, who shall carry into such school any weapon of the kind mentioned or described in section 293, concealed, in whole or in part, or any professor, teacher, or instructor in such school who shall knowingly suffer or permit any such weapon to be carried into such school, concealed, as aforesaid, shall be guilty of a misdemeanor, and, on conviction thereof in the city court, shall be punished as provided in section 293.

The same; exhibiting in rude, angry, or threatening manner, etc.

Sec. 300. If any person, having or carrying any dirk, dirk knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in any sum not less than seven dollars and fifty cents nor more than five hundred dollars, or be imprisoned not exceeding ninety days, or both. In prosecutions under this section, it shall not be necessary for the affidavit or

Exhibit 8
0271

indictment to aver, nor for the city to prove on the trial, that any gun, pistol, or other firearm was charged, loaded, or in condition to be discharged."

Edwin Ruthven Holmes, ed., The Charter and Code of the Ordinances of Yazoo City, Mississippi (Yazoo City, MS: The Council of Yazoo City, 1908), 172-175. Chapter 20—Misdemeanors, §§ 293-300. Undated.

## MISSOURI

1873 Mo. Laws 328, An Act to Incorporate The Town Of Moberly, art. III, § 1, pt. 15.
To . . . punish . . . any person who shall threaten, quarrel, challenge or fight within said city, or any person who shall be found intoxicated, who shall carry concealed deadly weapons in said city, or any person who shall be found guilty of a misdemeanor, and to define what acts shall constitute a misdemeanor.

MO. REV. STAT. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879 224 (John A. Hockaday et al. eds. 1879).
1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.
If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

J. H Johnston, The Revised Charter and Ordinances of the City of Boonville, Mo. Revised and Collated, A.D.1881 Page 91, Image 91 (1881) available at The Making of Modern Law: Primary Sources.
Offences Affecting the Public Peace § 6. If any person shall carry concealed upon or about his person any pistol, revolver, dirk, dagger, slungshot, knuckles of metal, or other deadly or dangerous weapon, within said city, or shall, in the presence of any one, exhibit such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person while intoxicated, he shall upon conviction thereof be fined not less than five nor more than ninety dollars: Provided, That nothing herein contained shall prevent any police officer, or any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests, from carrying such weapons in the necessary discharge of his duty.

Exhibit 8
0272

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure," § 1.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., Ch. 17, §§ 160-164 in General Ordinances of the Town of Columbia. 1890

"Sec. 160. Any person who shall fire or discharge, or who shall cause the same to be done by any person under his authority or control, any gun, pistol, cannon, anvil, or any device or contrivance, charged with any explosive, shall be deemed guilty of a misdemeanor and on conviction be fined not less than ten dollars for each offense.

Sec. 161. Any person who shall ignite or explode any explosive compound, or suffer the same to be done by any person under his control, or who shall fire, or cause to be fired or exploded, or suffer the same to be done by any person under his control, any fire cracker, or crackers, Roman candles, rockets, torpedoes, squibs, or any other kind of fireworks whatever, shall be deemed guilty of a misdemeanor and on conviction be fined not less than five dollars for each offense.

Sec. 162. Any person who shall be guilty of carrying concealed upon or about his person any pistol, bowie knife, dirk, dagger, slung shot, or other deadly or danger-ous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than one hundred dollars for every such offense.

Sec. 163. Any person who shall go into any church, or place where people have assembled for religious wor-ship; or into any school room, or place where people are assembled for educational, literary or social purposes; or into any court room, during the sitting of court, or to any election precinct on any election day; or into any other public assemblage of persons met for any lawful purpose, other than for military drill, or meetings, called under the militia laws of this state, carrying concealed or in sight upon or about his person, any fire arms or other deadly or dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one hundred nor more than one hun-dred and fifty dollars for ever such offense.

Sec. 164. Any person who shall be guilty of exhibit-ing any fire arms, or other deadly or dangerous weapon in a rude, angry, or threatening manner; or who shall carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, shall be deemed guilty of a misdemeanor, and shall upon conviction be fined not less than fifty dollars for every such offense.

Exhibit 8
0273

Provided, that the three last preceding sections shall not apply to police officers, nor to any officer whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to any posse when lawfully summoned and on duty; nor shall sec-tion 162 apply to persons moving or traveling peaceably through the state."

1890, MO, Ch. 17—Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., §§ 160-164

General Ordinances of the Town of Columbia, in Boone County, Missouri, Revised, Published and Promulgated by Authority of the Board of Trustees of Said Town, in the Year 1890: To Which Are Appended the Provisions of the State Constitution Respecting Municipal Corporations; Also the General and Special Charters of Said Town (Columbia, MO: Statesman Book and Job Office, 1890), 34-35. Chapter 17—Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, etc., §§ 160-164. Passed May 22, 1890.

The Revised Ordinances of the City of Huntsville, Missouri, of 1894. Collated, Revised, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Huntsville, Missouri, Under an Ordinance of the Said City, Entitled: "An Ordinance in Relation to Ordinances, and the Publication Thereof." Approved on the 11th Day of June, 189 Page 58-59, Image 58-59 (1894) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Huntsville, An Ordinance in Relation to Carrying Deadly Weapons, § 1. If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permission to any person to discharge gun, pistol or other firearms under the proper circumstances shown to him. § 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to exercise process or warrants, or to suppress breaches of the peace or to make arrests, nor to persons moving or travelling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

Carrying Deadly Weapons, Discharging Fire-Arms, etc., Ch. 12, Art. 3, §§ 50-52, in The Revised Ordinances of the City of Bloomfield (1898).

"Sec. 50. Carrying Deadly Weapons, etc.—If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place, within this city, where people are assembled for religious worship, or into any school room or place where people are assembled in this city, for educational, or social purposes, or to any election precinct, in this

Exhibit 8
0274

city on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons, in this city, met for any lawful purpose other than for malitia [sic] drill, or meeting called under the militia laws of this State, having upon or about his person any kind of firearms, bowieknife [sic], dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollars, or by imprisment [sic] in the city calaboose, or city jail not less than five days nor more than six months, or by both such fine and imprisonment.

Sec. 51. Above Section Not to Apply to Certain Officers:—The next proceeding section shall not apply to any police officer in this city, or to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this State, and it shall be a good defense to the charge of carrying any such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.

Sec. 52. Discharging Fire-Arms Prohibited, When.—It shall be unlawful for any person in this city, except he be a police officer of this city or other officer in the discharge of his official duty, to discharge or fire off any gun, pistol or fire-arms of any description within the corporate limits of this city, and every person violating this section, shall, upon conviction, be deemed guilty of a misde-meanor and punished by a fine of not less than five nor more than twenty dollars, or by imprisonment in the city calaboose not exceed-ing twenty days."


A law forbidding weapons in certain places, sales of weapons to minors, etc., Ch. 45—Misdemeanors, § 32, in General Ordinances of the City of Brookfield Linn County, Missouri (1900).

"Sec. 32. Carrying Concealed Weapons.—If any person shall, with-in this city, carry concealed upon or about his person, any deadly or dan-gerous weapon, or shall go into any church or place where people have as-sembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room dur-ing the sitting of court, or into any other public assembly of persons met for any lawful purpose other than military drill, or meeting called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon, in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxi-cated or under the influence of intoxicating drinks, or shall directly or indirectly, sell or deliver, loan or barter, to any minor any such weap-on, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction shall be fined not less than ten nor more than one hundred dollars, or be im-prisoned in the city jail not less than five nor more than thirty days."

Chas. K. Hart, ed., General Ordinances of the City of Brookfield Linn County, Missouri, to Which Are Prefixed a Copy of the Record in the Matter of Changing the City of Brookfield from a Fourth Class to a Third Class City, of the Ordinance Fixing the City Limits, a List of City Officers, and to Which is Added the Ordinance Ordering Publication Thereof (Brookfield, MO: The Gazette, 1900), 116. Chapter 45—Misdemeanors, § 32. Undated.

Exhibit 8
0275

Not to Carry Weapons Concealed; Where; nor Sell to Minors, etc., Ch. 43, An Ordinance in Relation to Dangerous and Deadly Weapons, §§ 1-3, in The Revised Ordinances of the City of Pattonsburg, Missouri (1902).

"An Ordinance in Relation to Dangerous and Deadly Weapons.

Be it ordained by the Board of Aldermen of the City of Pattonsburg, as follows:

Sec. 1. Not to Carry Weapons Concealed; Where; nor Sell to Minors.—Any person, who shall, within the corporate limits of the City of Pattonsburg, carry concealed upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct, on any election day, or into any court room during the setting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill or meetings called under the militia law of the state of Missouri, having upon or about his person any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the in-fluence of intoxicating drinks, or shall directly or indirectly, sell or deliver, loan or barter to any minor, any such weapon, without the consent of the parent or guardian of such minor, shall, upon conviction, be fined in any sum not less than twenty-five nor more than one hundred dollars.

Sec. 2. Section One Not to Apply to Whom; Defense.—Section one of this chapter shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapons, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.

Sec. 3. Toy Pistols Not to Be Carried; Where; Penalty.—Any person, who shall, within the corporate limits of said city, be found upon any street or alley, or upon premises not his own, without license from the owners or occupants thereof, having upon or about his person any kind of toy pistol which may be used for the purpose of discharging any missile by force of gun powder, or explosive caps, or exploding percussion caps or powder, shall, upon conviction, be fined in any sum not less than one nor more than one hundred dollars.

Approved April 7th, 1902."

The Pattonsburg Board of Aldermen, eds., The Revised Ordinances of the City of Pattonsburg, Missouri, a City of the Fourth Class: Embracing All the Ordinances of General Application, Together With the Rules and Order of Business Adopted by the Board of Aldermen of Said City (Pattonsburg, MO: Pattonsburg Call Print, 1902), 108-109. Chapter 43—Concealed Weapons, An Ordinance in Relation to Dangerous and Deadly Weapons, §§ 1-3. Approved April 7, 1902.

Chapter 16—Misdemeanors, § 11—Carrying Concealed Weapons, in, Charter and Revised Ordinances of the City of Glasgow, Howard County, Missouri (1903).

"Sec. 11. Carrying concealed weapons.— If any person shall in this city carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school- room or place where the people are assembled for educational, literary or social purposes, or to any election precinct on any elec-tion day, or into any court-room during the sitting of court, or into any other public

Exhibit 8
0276

assemblage of persons met for any lawful pur-pose other than for militia drill, or meeting called under militia law of this state, having upon or about his person any kind of fire- arms, bowie knife, dirk, dagger, slung-shot or other deadly weap-on, or shall, in the presence of one or more person, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxi-cated, or under the influence of intoxicating drinks, or shall, di-rectly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than one hundred dollars: Provided this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to sup-press breaches of the peace, or to make arrests." Charter and Revised Ordinances of the City of Glasgow, Howard County, Missouri (Glasgow, MO: Glasgow Missourian Print, 1903), 64-65. Chapter 16—Misdemeanors, § 11—Carrying Concealed Weapons. Approved May 5, 1903.

Laws concerning carrying weapons in certain places, sales of weapons to minors, etc., Chapter 21—Misdemeanors, § 162, in Revised Ordinances of the City of Hamilton, Cauldwell County, Missouri (1903).
"Sec. 162. Any person who shall carry concealed upon or about his person any deadly or dangerous weap-on, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educa-tional, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for malitia [sic] drill, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, sling shot or oth-er deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall, di-rectly or indirectly, sell or deliver, loan or barter, to any minor any such weapon without the consent of the par-ent or guardian of such minor, he shall be deemed guilty of a misdemeanor: Provided, however, that this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or to make arrests, nor to persons moving or traveling peaceably through the state. And it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property."
S. M. Young, ed., Revised Ordinances of the City of Hamilton, Cauldwell County, Missouri, 1903 (S. L., Hamiltonian Print, 1903), 57-58. Chapter 21—Misdemeanors, § 162. In Force March 9, 1903.

Laws that prohibit carrying concealed weapons, bringing weapons to certain places, and selling weapons to minors, Revised Ordinance No. 16, §§ 44-45, in The Revised Ordinances of the City of Maryville (1903).
"Sec. 44. Carrying Concealed Weapons.—If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people are assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purpose, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for

Exhibit 8
0277

any lawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie knife, dirk, dagger, slung-shot or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction thereof be fined not less than ten nor more than one hundred dollars.

Sec. 45. Above Section Not to Apply to Certain Officers.—The next preceding section shall not apply to police officers, or any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property."

The Revised Ordinances of the City of Maryville 1903 to Which Is Prefixed Charter of Cities of the Fourth Class under Revised Statues of Missouri of 1899 and Amendments Thereto (Maryville, MO: Maryville Tribune, 1903), 148-149. Revised Ordinance No. 16, Offenses against Good Order and Public Peace, §§ 44-45. Passed & Approved June 1, 1903.


Ordinances that prohibit carrying concealed weapons, bringing weapons to certain places, and firing weapons, Ch. 23, Art. 1, Ord. No. 2019, §§ 75-76 in Revised and Republished Ordinances of The City of Joplin, Missouri (1903).

"Sec.75. CARRYING CONCEALED WEAPONS.—If any person shall, in the City of Joplin, carry concealed upon or about his person, any deadly or dangerous weapon or shall go into any church or place where people have assembled for religious worship, or into a school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings, called under the militia law of this State, having upon or about his person any kind of fire-arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons exhibit any such weapon, in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon without the consent of parent or guardian of said minor, any such person shall be deemed guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than fifty dollars, nor to exceed two hundred dollars, or by imprisonment in the city prison not less than five days, nor more than six months, or by both such fine and imprisonment; Provided, that this section shall not be so construed as to apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests; nor to persons moving or traveling peacefully through this State, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, home or property.

Sec. 76. DISCHARGE OF FIRE-ARMS IN THE CITY.—Any person who shall, in this city, without sufficient or reasonable cause, discharge any revolver, pistol, gun or other fire-arm

Exhibit 8
0278

shall be deemed guilty of a misdemeanor, and be fined in a sum of not less than five dollars, nor more than fifty dollars for each shot discharged."

1903, Joplin, MO, Ch. 23, Art. 1, Ord. No. 2019, §§ 75-76

Revised and Republished Ordinances of The City of Joplin, Missouri: Revision of 1903 Together with the Provisions of the Constitution of the State of Missouri Affecting Municipal Corporations and their Charters, also Extracts of the Statutes of the State Affecting Cities, Towns and Villages of all Classes (Joplin, MO: Pratt Printing House, 1904), 201. Chapter 23, Misdemeanors and Police Regulations, Article I—Misdemeanors, Ordinance No. 2019—An Ordinance Defining Certain Offenses Against the Peace and Good Order of the City, and Prescribing the Punishment Therefor, §§ 75-76. Approved October 17, 1903.


Deadly Weapons Concealed, Etc., & Shooting Firearms, Ch. 30, §§ 184-185, in Revised Ordinances City of Sarcoxie, Jasper County, MO (1907).

"Sec. 184—Deadly Weapons Concealed, Etc. If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meeting called under the militia law of this State, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapons, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any  such weapon without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor and upon conviction be punished by a fine of not less than fifty [$50.00] dollars nor more than two hundred [$200.00] dolars, or by imprisonment in the city jail not less than five days nor more than six months, or by both such fine and imprisonment. Provided, that this section shall not apply to persons moving or traveling peaceably through this state, nor to persons who have been threatened with great bodily harm or had good reason to carry the same in the necessary defense of themselves, home or property, nor to any police officer, or person whose duty it is to execute process or warrants, or to suppress breaches of the peace or make arrests.

Sec. 185—Shooting Firearms. No person in this city shall discharge any gun, pistol or other fire-arms, or explode any detonating material, and any person so offending shall be deemed guilty of a mis-demeanor, but this section shall not apply to any officer in the discharge of his duty nor to the operator or workman in any mine, nor to persons properly using any lawful target gun in any licensed shooting gallery."

Revised Ordinances City of Sarcoxie, Jasper County, MO, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Sarcoxie, Jasper County, Missouri. Revision of 1907 (Sarcoxie, MO: Record Power Job Print, 1907), 46-47. Chapter 30—Misdemeanors, §§ 184-185. Undated.


An Ordinance Concerning Misdemeanors, §§ 14-15, in General Ordinances of the City of New Franklin (1907).

Exhibit 8
0279

"Sec. 14. If any person shall carry concealed upon or about his person any deadly or dangerous weapon or shall go into any church or place where people are assembled for religious worship or into any school room or place where people are assembled for educational, literary or social purpose or to any election precinct on any election day or into any court room during the sitting of the court or into any other public assemblage of persons met for any lawful purpose, other than for militia drills or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, slung-shot or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks he shall upon conviction be punished by a fine not less than fifty nor more than two hundred dollars or by imprisonment in the City prison or work house not less than five days nor more than six months or by both such fine and imprisonment.

Sec. 15. The next preceding section shall not apply to police officers nor to any officer or person whose duty it is to execute process or warrants or to suppress breaches of the peace or make arrests nor to persons moving or traveling peaceably through this state and it shall be a good defence to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm or had good reason to carry the same in the necessary defense of his person, home or property."

Carrying Concealed Weapons, No. 36, Art. 6, § 3, in The Charter and Revised Ordinances of the City of Palmyra, Missouri (1908).

"Sec. 3. If any person in this city shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under the militia law of this State, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating, drinks, or shall directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than one hundred and fifty dollars."

Full Text (Subscription Required): The Making of Modern Law

The Charter and Revised Ordinances of the City of Palmyra, Missouri: To Which are Prefixed the Provisions of the State Constitution Affecting Municipal Corporations and Statutory Laws Affecting Cities under Special Charter (Palmyra, MO: Sosey Bros., 1908), 216. No. 36—An Ordinance in Relation to Misdemeanors, Article 6—Offences Against Official Authority, § 3—Carrying Concealed Weapons. Approved July 2, 1908.

A law regulating the carrying of weapons in Slater, MO, Ch. 19, § 231, in Revised Ordinances of the City of Slater, Saline County, Missouri (1908).

"Sec. 231. If any person shall, within the City limits, carry concealed upon or about his person any dangerous or deadly weapon, or shall go into any church or place where people have

Exhibit 8
0280

assembled for religious worship, or into any school room or place where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meeting called under the militia law of this state, having upon or about his person any fire arms, bowie-knife, dirk, dagger, slung shot or other deadly weapon or shall, in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than fifty nor more than two hundred dollars. The foregoing provisions of this section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through this state, and it shall be a good defense to the charge of carrying such weapon if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his person, his home or property." Revised Ordinances of the City of Slater, Saline County, Missouri, of 1908: Revised, Printed and Published in Pursuance of an Ordinance Duly Passed by the Board of Aldermen of Said City and Approved by the Mayor of Said City on the 24th Day of August, 1908, Which Ordinance Is Numbered 575 and Entitled, An Ordinance Relating to the Revision of the Ordinances (Slater, MO: Rustler, 1908), 104-105. Chapter 19—Miscellaneous Offenses, § 231. Undated.

Ordinances that prohibit carrying concealed weapons, bringing weapons to certain places, and selling weapons to minors, Ch. 21, Art. 1, §§ 329-330, in, The Revised Ordinances of the City of Bevier, Missouri (1910).

"Sec. 329, Carrying Deadly Weapons, etc.—

If any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school-room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose, other than for militia drill, or meetings called under the militia law of this state, having upon or about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated, or under the influence of intoxicating drinks, or shall, directly or indirectly, sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than five days nor more than six months, or by both such fine and imprisonment. (§ 16, Ord. 109.)

Sec. 330. Above Section Not to Apply to Certain Officers.— The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to execute process or warrants, or to suppress breaches of the peace, or make arrests, nor to persons moving or traveling peaceably through the state, and it shall be a good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or

Exhibit 8
0281

had good reason to carry the same in the necessary defense of his person, home or property. (17, Ord. 109.)"
E. Francis, ed., The Revised Ordinances of the City of Bevier, Missouri, of 1903 (No Publication Information), 104-105. Chapter 21—Misdemeanors, Article 1—Offenses Against Public Order and Peace, §§ 329-330. Undated.

A law regulating weapons: carrying concealed or in certain places, brandishing, and sales to minors, Ordinance No. 31, § 10, in Revised Ordinances of the City of Richmond, Missouri (1910).
"If any person shall carry, concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room where people have assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the setting of court, or into any other public assemblage of persons met for lawful purpose, other than for military drill or meetings called under the militia law of this state, having upon or about his person, any kind of fire-arms, bowie knife, dirk, dagger, slung shot or other deadly weapon, or shall, in the presence of one or more persons, exhibit such weapon in a rude, angry and threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drink, or shall directly or indirectly loan or barter to any minor, any such weapon without the consent of the parent or guardian of such minor, he shall upon conviction be punished by a fine of not less than fifty dollars nor more than one hundred dollars, or by imprisonment in the city prison not less than five days nor more than six months, or by both such fine and imprisonment."
Revised Ordinances of the City of Richmond, Missouri: 1910-1911 (Richmond, MO: The Conservator Print, 1911), 130-131. Ordinance No. 31—An Ordinance in Relation to Public Peace and Order, § 10. Approved December 21, 1910.

Joplin Code of 1917, Art. 67, § 1201. Weapons; Deadly. 1917
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

Exhibit 8
0282

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.

Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## NEVADA

1881 Nev. Stat. 19-20, An Act to Prohibit the Use of Firearms in Public Places, ch. 7, § 1.

Any person in this State, whether under the influence of liquor or otherwise, who shall, except in necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theater, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the County Jail for a term not less than two nor more than six months, or by a fine not less than one hundred nor more than five hundred dollars, or by both such fine and imprisonment; provided, that no Sheriff, Deputy Sheriff, Marshal, Constable, Deputy Constable or other peace officer shall be held to answer under the provisions of this Act for discharging firearms in the lawful pursuance of his or their duty.

David E. Aily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1076, Image 1084 (1885) available at The Making of Modern Law: Primary Sources.

[An Act to Prohibit the Use of Firearms in Public Places, § 1. Any person in this state, whether under the influence of liquor or otherwise, who shall, except I necessary self-defense, maliciously, wantonly or negligently discharge or cause to be discharged any pistol, gun or any other kind of firearm, in or upon any public street or thoroughfare, or in any theatre, hall, store, hotel, saloon or any other place of public resort, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by imprisonment in the county jail for a term not less than two nor more than six months, or by a fine not less than one hundred nor more than five hundred dollars, or by both such fine and imprisonment: provided that no Sheriff, Deputy Sheriff, Marshal, Constable, Deputy Constable, or other peace officer shall be held to answer under the provisions of this Act for discharging firearms in the lawful pursuance of his or their duty.]

Exhibit 8
0283

**NEW JERSEY**

An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions. Passed May 8, 1746. Section 3. Officers and Soldiers to behave well while under Arms; and, Section 23. Penalty on selling strong Liquor near the mustering Place

"3. And be it further Enacted by the Authority aforesaid, That no Officer shall beat or abuse any of the Soldiers whilst under Arms on any such Days of Training as aforesaid : But if any Soldier shall, during that Time, use any reproachful or abusive Language towards any of his superior Officers, or shall quarrel himself, or promote any Quarrel amongst his Fellow-Soldiers, or appear in Arms disguised in Liquor, it shall and may be lawful for the Captain or Commanding Officer to disarm such Soldier at the Head of his Company, and to set a Centinel over him during the Time of the Company's being in Arms and no longer, or to fine him in Manner and Form aforesaid, as the said Captain or Commanding Officer in his Discretion shall think proper."

"23. And be it further Enacted by the Authority aforesaid, That no Innholder, or any other Person or Persons whatsoever, without Leave from the Captain or Commanding Officer for the Time being, shall presume to sell any strong Liquor to any of the Persons so listed, in such Days or Times that they are obliged to appear in Arms at the Place of Mustering or Training, or within a Mile thereof, until after they are dismissed for that Day ; and every Person or Persons so selling strong Liquor, contrary to the Directions of this Act shall forfeit the Sum of Three Pounds, to be recovered by any Person that will sue for the same, before any Justice of the Peace ; the one Half to such Person as will prosecute the same to Effect, the other Half to be applied for purchasing the Arms and Ammunitien aforesaid."

1746, NJ, An Act for better settling and regulating the Militia of this Colony of New-Jersey, for the repelling Invasions, and Suppressing Insurrections and Rebellions
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 8 (Washington, D.C.: Government Printing Office, 1947), 25-26, 31.


1916 N.J. Laws 275-76, An Act to Prohibit Any Person from Going into the Woods or Fields with a Gun or Other Firearm when Intoxicated, or under the Influence of any Drug or Intoxicating Liquor, ch. 130, §§ 1-2.
1. It shall be unlawful for any person to go into the woods or fields at any time with a gun or firearm when intoxicated or under the influence of any drug or drugs or of intoxicating liquor. 2. Any person violating any of the provisions of this act shall be liable to a penalty of fifty dollars for each offense, to be sued for and recovered in the manner provided and by the persons authorized to sued for and recover penalties. . . . Upon the conviction of any person for violating the provisions of this act, the license to hunt and fish of such person issued to him . . . shall become void, and the justice of the peace, District Court judge, or police magistrate before whom such conviction is had, shall take from the person so convicted the license, mark the same "revoked" and send it to the Board of Fish and Game Commissioners. If such conviction is reversed on appeal the license shall be restored to the defendant. Any license to hunt or fish issued to any person convicted of a violation of this act during the calendar year in which such offense occurred shall be null and void.

Exhibit 8
0284

## NORTH DAKOTA

1921 N.D. Laws 173, An Act to Prohibit Intoxicating Liquors and Beverages and Property Intended for Manufacture of Same; Prohibiting the Transportation of Liquor . . . , ch. 97, § 13. Provided, however, that if the evidence in such case convinces the court that the person convicted of transporting intoxicating liquors in violation of this Act, was in charge of and used any wagon, buggy, automobile, water or aircraft, or other vehicle or conveyance not owned by him, or without permission of the owner, or when such vehicle or conveyance so sued was mortgaged property, or if there be in or upon such conveyance so used or upon any person therein any firearms, or guns, he shall be deemed guilty of a felony, and be punished by imprisonment in the penitentiary not less than six months and not more than five years.

## OHIO

Amendments to Militia Regulations, Ohio Senate Bill No. 7, § 1, in The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session (1886).
"…Or, if any person shall temporarily erect any stand, booth, or other structure for the purpose of exposing for sale, giving, bartering, or otherwise dispose of any spirituous or other intoxicating liquors whatsoever, at or within a distance of one mile from any such parade or encampment, he may be put immediately under guard, and kept at the discretion of the commanding officer, and such commanding officer may turn over such person to any police officer or constable of the city, township or town wherein such duty, parade or drill, encampment or meeting is held, for examination or trial before any court of justice having jurisdiction of the place."
1886, OH, Amendments to Militia Regulations, Senate Bill No. 7, § 1
The State of Ohio: General and Local Acts Passed, and Joint Resolutions Adopted by the Sixty-Seventh General Assembly at Its Regular Session Begun and Held in the City of Columbus January 4, 1886, vol. 83 (Columbus, OH: Myers Brothers, 1886), 100. Senate Bill no. 7, An Act to Amend Sections 3033, 3034, 3036, 3037, 3038, 3039, 3041, 3042, 3043, 3044, 3045, 3046, 3047, 3048, 3049, 3050, 3051, 3052, 3054, 3055, 3056, 3057, 3058, 3059, 3963, 3064, 3067, 3068, 3069, 3070, 3071, 3074, 3076, 3078, 3079, 3080, 3081, 3082, 3083, 3084, 3085, 3104 and 3105 of the Revised Statutes of Ohio, and to Repeal Sections 3035, 3060, 3061, 3062, 3065 and 3066, § 1, Amending § 3079 of Chapter 4—Uniforms, Drill, and Pay. Passed April 28, 1886.

## OKLAHOMA

1890 Okla. Laws 495, art. 47
Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

Exhibit 8
0285

Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

. . .

Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Ch. 25—Crimes & Punishment, Art. 47—Concealed Weapons, §§ 1-10 in The Statutes of Oklahoma (1890).

"Sec. 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

Sec. 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.

Sec. 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

Sec. 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

Sec. 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.

Sec. 6. Any person violating the provisions of any one of the foregoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.

Exhibit 8
0286

Sec. 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

Sec. 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

Sec. 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

Sec. 10. Any person violating the provisions of section seven, eight or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three not more than twelve months."

1891, OK, Ch., 25—Crimes & Punishment, Art. 47—Concealed Weapons, §§ 1-10

Will T. Little, L G. Pitman, and R. J. Barker, The Statutes of Oklahoma 1890: Compiled under the Supervision and Direction of Robert Martin, Secretary of the Territory, by Will T. Little, L G. Pitman and R. J. Barker, from the Laws Passed by the That Legislative Assembly of the Territory (Guthrie, OK: The State Capital Printing Co., 1891), 495-496. Chapter 25—Crimes & Punishment, Article 47—Concealed Weapons, §§ 1-10. Undated.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.

Concealed Weapons, § 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided. §2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided. § 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person. § 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise. §6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less

Exhibit 8
0287

than thirty days nor more than three months or both, at the discretion of the court. § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article. § 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man. § 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise. § 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Leander G Pitman The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 496, Image 512 (Guthrie, 1891) available at The Making of Modern Law: Primary Sources.
Crimes and Punishment. § 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

## PENNSYLVANIA

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

An Act to regulate the Militia of the Common-Wealth of Pennsylvania, §§ IX-X (1777).
"IX. Any officer or private man found drunk when under arms, shall be suspended from doing duty in the battalion, company or troop on that day, and be fined at the discretion of a General or Regimental Court-Martial.
X. Whatever centinel shall be found sleeping or drunk on his post, or shall leave it before he is regularly relieved, shall be fined at the discretion of a Court-Martial."

Exhibit 8
0288

1777, PA, An Act to regulate the Militia of the Common-Wealth of Pennsylvania, § 9-10
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 11 (Washington, D.C.: Government Printing Office, 1947), 38.

An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania (20 March, 1780), § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule.

§ 57 "…and if any non-commissioned officer or private shall, on any occasion of parading the company to which he belongs, appear with his arms and accoutrements in an unfit condition, or be found drunk or shall disobey orders or use any reproachful or abusive language to his officers or any of them ; or shall quarrel himself, or promote any quarrel among his fellow soldiers, he shall be disarmed and put under guard, by order of the commanding officer present, until the company is dismissed, and shall be fined in any sum not exceeding the price of ten day's [sic] labour, nor less than one day's labour.

§ 60 "12th. No company or battalion shall meet at a tavern on any of the days of exercise, nor shall march to any tavern before they are discharged ; and any person who shall bring any kind of spiritous liquor to such place of training shall forfeit such liquors so brought for the use of the poor belonging to the township where such offender lives."

1780, PA, An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania § 57 & § 60

Thomas McKean, The Acts of the General Assembly of the Commonwealth of Pennsylvania Carefully Compared with the Originals : And an Appendix Containing the Laws Now in Force, Passed between the 30th Day of September 1775, and the Revolution : Together with the Declaration of Independence, the Constitution of the State of Pennsylvania, and the Articles of Confederation of the United States of America (Philadelphia, PA: Francis Bailey, in Market-Street, 1782), 365-366; 368. An Act for the Regulation of the Militia of the Commonwealth of Pennsylvania: § 57, Penalty on Officers Misbehaving while on Parade; § 60, Rules and regulations, 12th rule. Passed 20 March, 1780.

See also, The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 11 (Washington, D.C.: Government Printing Office, 1947), 97; 100.

1875 Pa. Laws, no. 52, § 1, AN ACT To prevent the sale of intoxicating liquors, and for the preservation of order at soldiers' encampments or re-unions

"Section. Be it enacted &c., That it shall not be lawful for any person or persons to erect, place or have any booth, stall, tent, carriage, boat, vessel, or any other place whatever, for the purpose of selling, giving, or otherwise disposing of any spirituous, vinous or malt liquors, or cider, or any fermented liquors whatsoever, or any admixtures thereof, or any liquid compounded or composed, in whole or part, of alcohol, or any other intoxicating drink whatever, (except as hereinafter excepted,) within three miles of the place of holding any soldiers' encampment or re-union in this state, during the time of holding such encampment or re-union."

Exhibit 8
0289

1875, PA, AN ACT To prevent the sale of intoxicating liquors, and for the preservation of order at soldiers' encampments or re-unions
Laws of the General Assembly of the State of Pennsylvania Passed at the Session of 1875 (Harrisburg, PA: B.F. Meyers, State Printer, 1875), 48.

## RHODE ISLAND

1636-1748 R.I. Pub. Laws 31, At A General Assembly Held For Rhode Island Colony At Newport 6th of May, 1679. 1636
That if any person or persons shall presume to sport game or play at any manner of game or games or shooting out any gun or shall set tipling & drinking in any tavern alhouse ordinary or vitling house on the first day of the week more than neccesity requireth and upon examination of the fact it shall be judged by any Justice of the Peace and the Person or Persons so offending as aforesaid. Upon conviction before one Justice of Peace Shall by the said Justice of the Peace be sentenced for every the aforesaid offences to set in the stocks three hours or pay five shillings in money for the use of the poor of the town or place where the offence was committed.

An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10, Acts & Resolves of the General Assembly of the State of Rhode Island (1853).
"It shall be the duty of any mayor, alderman, city marshal, city or town sergeant, constable or police officer, of any city or town, if he shall have information that any ale, wine, rum, or other strong or malt liquors, or any mixed liquors as aforesaid, are kept for sale or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any kind, to search such suspected place, and if such officer shall find upon the premises any ale, wine, rum, or other strong or malt liquors, or any mixed liquors as aforesaid, he shall seize them and apprehend the keeper or keepers of such place, and take them with the liquors and the vessels containing them, so found and seized, forthwith or as soon as may be convenient, before some justice of the peace, or court exercising the jurisdiction of at justice of the peace, of the town where found, and thereupon such officer shall make a written complaint under oath, and subscribed by him, to such justice or court, that ale, wine, rum, or other strong or malt liquors, or mixed liquors, a part of which is ale, wine, rum, or other strong or malt liquors, was found in the possession of such keeper or keepers, in a tent, shanty, hut, or place for selling refreshments, and upon proof that said liquors are either ale, wine, rum, or other strong or malt liquors, or mixed liquors as aforesaid, that they were found in the possession of the accused, in a tent, shanty or other place as aforesaid, for sale, he or they shall be sentenced to imprisonment in the county jail of the same county for twenty days, and the liquor and vessels so seized shall be dealt with, by order of such justice or court, as provided in the ninth section of this act. But from the sentence and order of said justice or court as aforesaid, the defendant may appeal to the Court of Common Pleas next to be holden in the same county after ten days; in the same manner, and upon the same terms and conditions and with the like effect, as prescribed in section 6th of this act. And in case of such appeal, if the final decision shall be against the appellant, sentence as aforesaid shall be passed upon him by the appellate court, and the liquor and vessels seized as aforesaid shall be dealt with as aforesaid."
Full Text: HeinOnline (subscription required)

Exhibit 8
0290

Acts & Resolves of the General Assembly of the State of Rhode Island and Providence Plantations Passed January, A. D., 1853, Being the Adjournment of the October Session; with the Roll of Members, and the Reports Ordered to Be Published (Providence, RI: Sayles, Miller & Simons, 1853), 238-239. An Act for the More Effectual Suppression of Drinking Houses and Tippling Shops, §10. Passed at the January Session, 1853.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010, Image 1026 (1896) available at The Making of Modern Law: Primary Sources. 1893
Offences Against Public Policy, § 25. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section twenty-three, such person, upon complaint and conviction, in addition to the penalties provided in section twenty-four, shall be subject to a fine of not less than five dollars nor more than twenty-five dollars, and the confiscation of the weapon so found.

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act. § 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year. § 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

## SOUTH CAROLINA

An Act for the Regulation of the Militia of this State (South Carolina) § 5 Regulations for the government of the militia, Rule 7 (1782).
"Any officer or private who shall be found drunk on guard, or at any other time of duty, if an officer, be cashiered and turned into the ranks, or receive such other punishment as the court shall inflict ; if a non-commissioned officer or private, he shall be confined til sober, and serve ten days longer than he was otherwise liable to."
1782, SC, An Act for the Regulation of the Militia of this State
The Selective Service System, Backgrounds of Selective Service: Military Obligation. The American Tradition a Compilation of the Enactments of Compulsion from the Earliest Settlements of the Original Thirteen Colonies in 1607 through the Articles of Confederation 1789, Ed. Arthur Vollmer, vol. 2 pt. 13 (Washington, D.C.: Government Printing Office, 1947),

Exhibit 8
0291

96. An Act for the Regulation of the Militia of this State (SC, 1782), § 5 Regulations for the government of the militia, Rule 7.

1899 S.C. Acts 97, An Act To Prevent Drunkeness And Shooting Upon The Highway, No. 67, § 1
§ 1. Be it enacted by the General Assembly of the State of South Carolina, That any person who shall engage in any boisterous conduct, under the influence of intoxicating liquors, or while feigning to be under the influence of such liquors, or without just cause or excuse, shall discharge any gun, pistol or other firearms while upon or within fifty yards of any public road, except upon his own premises, shall be guilty of a misdemeanor, and upon conviction thereof shall pay a fine of not more than one hundred dollars or be imprisoned for not more than thirty days.

1900 S.C. Acts 449, An Act to amend an act entitled "An Act to Prevent Drunkenness and Shooting upon the Highway": § 1.
§ 1. . . That any person who shall, without just cause or excuse, or while under the influence, or feigning to be under the influence of intoxicating liquors, engage in any boisterous conduct, or who shall, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be guilty of a misdemeanor, and, upon conviction thereof, shall pay a fine of not more than one hundred dollars, or be imprisoned for not more than thirty days.

## TENNESSEE

1825 Tenn. Priv. Acts 306, An Act to Amend an Act Passed at Murfreesboro, October 20, 1821, Incorporating Winchester and Reynoldsburgh, ch. 292.
§ 3. Be it enacted, That said mayor and aldermen may, and shall, have power and authority to make any rules and laws regulating the police of said town and the inhabitants thereof, to restrain and punish drinking, gaming, fighting, breaking the sabbath, shooting and carrying guns, and enact penalties and enforce the same, so that they do not conflict or violate the constitution of this State, and are consistent with the laws of this state.

## UTAH

Utah 1925, Chapter 21
Utah in 1925 passed an act punishing the use of firearms by persons in the pursuit of any "kind of birds or animals" while under the influence of liquor. Joseph P. Chamberlain, "Current Legislation," 11 A.B.A.J., 598 (Sept. 1925).

## VERMONT

Acts & Resolves of Vermont, 25, no. 24, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 (1852).
"Sec. 15. It shall be the duty of any sheriff, sheriff's deputy, constable, selectman, or grand juror, if he shall have information that any intoxicating liquor is kept or sold in any tent, shanty, hut or place of any kind for selling refreshments in any public place, except dwelling houses, on or near the ground of any cattle show, agricultural exhibition, military muster or public occasion of any

Exhibit 8
0292

kind, to search such suspected place without warrant, and if such officer shall find upon the premises any intoxicating liquor, he shall seize and apprehend the keeper or keepers of such place, and take them, with the liquor so found and seized, forthwith, or as soon as conveniently may be, before some justice of the peace of the town in which the same was found ; and thereupon such officer shall make a written complaint under oath, and subscribed by him, to such justice ; and upon proof that such liquor is intoxicating, that the same was found in the possession of the accused, in a tent, shanty, or other place as aforesaid, he or they shall be sentenced to imprisonment, in the county jail of the county where such offence was committed, for thirty days, and the liquor so seized shall be destroyed by order of said justice, as provided in the twelfth section of this act ; and if any person, apprehended under this section and sentenced as aforesaid, shall claim an appeal, before his appeal is allowed, he shall recognize, with good and sufficient sureties, in the sum of one hundred dollars, that he will prosecute his said appeal to effect, and pay all fines and costs, and suffer such penalty as may be awarded against him. And if he is convicted upon such appeal, he shall, in addition to the penalty imposed by such justice, pay a fine of ten dollars to the town where said liquor was seized as aforesaid. And any person resisting an officer in the execution of his duties under this or any other section of this act, shall be liable to the same penalties as are provided by law for resisting a sheriff in the execution of legal process."

1852, VT, An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15 The Acts and Resolves Passed by the General Assembly of the State of Vermont at the October Session, 1852 (Montpelier, VT: E. P. Walton & Son, 1852), 25. Acts & Resolves 25, no. 24 – An Act to Prevent Traffic in Intoxicating Liquors for the Purpose of Drinking, §15. Approved 23 Nov., 1852.

## **VIRGINIA**

1623 Va. Acts 127 Acts of March 5th, 1623
29. That no commander of any plantation do either himselfe or suffer others to spend powder unnecessarily in drinking or entertainments, &c.
https://archive.org/details/statutesatlargeb01virg

1631 Va. Acts 173, Acts of February 24th, 1631, Act L
No commander of any plantation, shall either himselfe or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments. (edited for clarity).
https://archive.org/details/statutesatlargeb01virg

1632 Va. Acts 198, Acts of September 4th, 1632, Act XLIV
No commander of any plantation, shall either himselfe or suffer others to spend powder unnecessarily, that is to say, in drinking or entertainments. (edited for clarity).
https://archive.org/details/statutesatlargeb01virg

1655 Va. Acts 401, Acts of March 10, 1655, Act XII
What persons or persons soever shall, after publication hereof, shoot any guns at drinking (marriages and funerals only excepted) that such person or persons so offending shall forfeit 100 lb. of tobacco to be levied by distress in case of refusal and to be disposed of by the militia in ammunition towards a magazine for the county where the offence shall be committed.

Exhibit 8
0293

https://archive.org/details/statutesatlargeb01virg/page/402/mode/2up?q=401

## WEST VIRGINIA

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.

Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. . . .

## WISCONSIN

Arthur Loomis Sanborn, Supplement to the Revised Statutes of the State of Wisconsin, 1878, Containing the General Laws from 1879 to 1883, with the Revisers' Notes to the Statutes of 1878 and Notes to Cases Construing and Applying These and Similar Statutes by the Supreme Court of Wisconsin and the Courts of Other States Page 848, Image 890 (1883) available at The Making of Modern Law: Primary Sources. 1883.

Offenses Against Lives and Persons of Individuals, § 3. It shall be unlawful for any person in a state of intoxication to go armed with any pistol or revolver. Any person violating the provisions

Exhibit 8
0294

of this act shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars.

1883 Wis. Sess. Laws 290

Section 1. It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession. Section 2. It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state. Section 3. It shall be unlawful for any person in a state of intoxication, to go armed with any pistol or revolver. Any person violating the provisions of this act, shall be punished by imprisonment in the county jail not exceeding six months, or by fine not exceeding one hundred dollars ($100).

Exhibit 8
0295

**EXHIBIT D**

Exhibit 8
0296

# EXHIBIT D

## TABLE OF WEAPONS LICENSING LAWS*

| STATE | CARRY OR HAVE | FIRE OR DISCHARGE PERMIT | HUNT SPORT | COMMERCIAL WEAPON SALE FIRE TRANSPORT | GUNPOWDER EXPLOSIVES LICENSING | SELLER REGISTERS BUYER | NAMED GROUPS | PRE-CIVIL WAR BLACKS | REG TAX |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | | 1879 | | 1892, 1898 | | | | 1805 | 1867 |
| Alaska | | | | | | | | 1838 | |
| Arizona | | | | | | | | | |
| Arkansas | | 1871 | | 1882 | | | | | |
| California | 1890, 1891, 1896, 1917, 1923 | 1869 | | 1854 | 1883, 1889 | 1917,1923, 1931 | | | |
| Colorado | | 1875 | | | | 1911 | | | |
| Connecticut | 1890, 1923 | 1835, 1845, 1869, 1877 | | 1923 | 1775, 1827, 1874, 1901, 1909 | | 1665 | | |
| Delaware | | | | 1911 | 1911 | 1911 | 1909 | 1797, 1832, 1841, 1843 | |
| District of Columbia | 1892, 1932 | | | | | | | | |
| Florida | 1893, 1931 | | | 1887, 1895 | | | 1847 | | |
| Georgia | 1910 | | | 1902 | | | | 1768 | |

Exhibit 8
0297

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Hawaii | 1925, 1927, 1933 | | 1870, 1933 | 1927, 1933 | | 1927,1933, 1933 | | | |
| Idaho | | | | | | | | | |
| Illinois | 1876, 1893, 1914, 1917, 1931 | 1841, 1869 | | 1814, 1914 | 1851, 1869 | 1885 | | | |
| Indiana | 1925 | 1855 | | 1895, 1925 | 1847 | | 1925 | | |
| Iowa | | 1853, 1880 | | 1887 | 1873 | | | | |
| Kansas | | | | | | | | | |
| Kentucky | | | | | 1864, 1874 | | | | |
| Louisiana | | 1870 | | 1857 | | | | 1848 | |
| Maine | | | | | 1848, 1873, 1874 | | | | |
| Maryland | | | 1876, 1882 | | | | 1882 | 1806 | |
| Massachusetts | 1906, 1927 | | | | 1651, 1895, 1898 | | 1769,1884 1922 | | |
| Michigan | 1925, 1927 | 1848, 1895 | | | | 1913,1925, 1927 | | | |
| Minnesota | 1882 | 1858 | | | 1858, 1889 | | | | |
| Mississippi | | | | 1906 | | | | 1804 | 1867 |
| Missouri | 1871, 1880, 1892, 1921 | 1843, 1894 | | 1888, 1921 | 1899 | 1921 | 1844 | 1818, 1854 | |
| Montana | 1895 | | | | | 1918 | 1913 | | |
| Nebraska | 1895 | | | | 1869 | | | | |
| Nevada | | | | | | | | | |

Exhibit 8
0298

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| New Hampshire | 1917, 1923 | 1823, 1870 | | | 1820 | | 1917, 1923 | | |
| New Jersey | 1873, 1905, 1927, 1934 | 1871 | 1902 | | | | 1914, 1916 | | |
| New Mexico | | | 1915 | | | | | | |
| New York | 1881, 1885, 1891 | 1824, 1881, 1898 | 1923 | | 1885, 1890, 1903 | 1911 | 1680,1884 1885,1911, 1923 | | |
| North Carolina | 1919 | | | 1919 | | 1919 | | 1840 | 1909 |
| North Dakota | 1915, 1923, 1925, 1931 | | | | | 1923 | | | |
| Ohio | 1933 | 1823, 1855, 1856 | | | 1835,1878, 1884,1889, 1900,1902 | | | | |
| Oklahoma | | | | 1890 | | | | | |
| Oregon | 1898, 1913, 1917, 1925 | 1868, 1879 | | | 1872 | 1913,1917 | | | |
| Pennsylvania | 1929, 1931 | 1713,1721, 1721,1750, 1750,1824 | | | | | 1763,1903 | | |
| Rhode Island | 1927 | | 1907 | | 1821, 1902 | | | | |
| South Carolina | 1934 | 1802 | | 1890, 1893 | | | | 1740 | 1923 |
| South Dakota | | | 1899 | | | | | | |
| Tennessee | | | | 1863, 1879 | | | | | |
| Texas | | 1898 | 1919 | 1872,1880, | | | | | |

Exhibit 8
0299

| | | | | 1899 | | | | |
|---|---|---|---|---|---|---|---|---|
| Utah | 1888 | | 1905 | | 1875 | | 1850,1905 | |
| Vermont | | 1890, 1895 | 1908 | | 1891,1894 | | | |
| Virginia | 1908, 1926 | 1859 | | | | 1926 | | 1792, 1805, 1806 | 1926 |
| Washington State | 1895 | 1890 | | 1892 | 1881,1881, 1883 | | 1911 | |
| West Virginia | 1881, 1925 | 1875 | 1909 | 1876 | | 1925 | | |
| Wisconsin | 1896 | 1888 | | | 1888 | | | |
| Wyoming | | 1893 | 1899, 1913 | | | 1933 | 1915 | |
| TOTAL STATES | 29 | 26 | 12 | 21 | 21 | 15 | 14 | 11 | 5 |
| TOTAL LAWS | 62 | 45 | 15 | 31 | 44 | 22 | 24 | 17 | 5 |

*Source: https://firearmslaw.duke.edu/repository/search-the-repository/

Exhibit 8
0300

# EXHIBIT E

Exhibit 8
0301

# EXHIBIT E

# LICENSE AND LICENSING LAWS

## ALABAMA

Harry Toulmin, A Digest of the Laws of the State of Alabama : Containing the Statutes and Resolutions in Force at the End of the General Assembly in January, 1823. To which is Added an Appendix; Containing the Declaration of Independence; the Constitution of the United States; the Act authorizing the People of Alabama to form a Constitution and State Government; and the Constitution of the State of Alabama Page 627, Image 655 (1823) available at The Making of Modern Law: Primary Sources. 1805

Negroes and Mulattoes, Bond and Free – 1805, Chapter I, An Act respecting Slaves. – Passed March 6, 1805: Sec. 4. And be it further enacted, that no slave shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, except the tools given him to work with, or that he is ordered by his master, mistress, or overseer, to carry the said articles from one place to another, but all and every gun , weapon, or ammunition, found in the possession or custody of any slave, may be seized by any person, and upon due proof made thereof, before any justice of the peace of the county or corporation where such seizure shall be made, shall, by his order, be forfeited to the seizer, for his own use; and moreover, every such offender shall have and receive, by order of such justice, any number of lashes, not exceeding thirty-nine, on his bare back for every such offense : Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing to any slave, on application of his master or overseer, to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and revocable at any time within such term, at the discretion of the said justice, and to prevent the inconveniences arising from the meeting of slaves.

[REGULATORY TAX] The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources. 1867

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Exhibit 8
0302

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery, with the Charter Page151, Image 151 (1879) available at The Making of Modern Law: Primary Sources. 1879 [Ordinances of the City of Montgomery,] § 449. Any person who fires or discharges, or causes to be fired or discharged, any pistol, gun, cannon, anvil, or anything of like kind or character; or who lets off or discharges any rocket, fire-crackers, squib or other fire-works, without first having obtained permission of the Mayor, who shall designate the place where such firing may be done, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources. 1892
[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

1898 Ala. Acts 190, An Act To Amend The Revenue Laws Of The State Of Alabama, pt. 66-67. 66th. For dealers in pistol, bowie or dirk knives, whether principal stock in trade or not, one hundred dollars. 67th. For wholesale dealers in pistol or rifle cartridges in towns or cities of twenty thousand or more inhabitants, ten dollars. In all other places, five dollars: Provided, That the wholesale dealers license shall entitle them to sell at retail.

## ARKANSAS

Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A. D. 1837, in the Year of Our Independence the Sixty-second, and of the State of Second Year Page 587, Image 602 (1838) available at The Making of Modern Law: Primary Sources. 1838
Negroes and Mulattoes, § 17. No free negro shall be suffered to keep or carry any gun or rifle, or weapon of any kind, or any ammunition without a license first had and obtained, for that purpose, from some justice of the peace of the county in which such free negro or mulatto resides, and such license may be granted and revoked by any justice of the peace of the county. §18. Every gun, rifle, or weapon of any kind, or ammunition, found in the possession or custody of any free negro or mulatto, not having a license as required by the preceding section, may be seized by any person, and upon due proof thereof made before some justice of the peace of the county in which such seizure was made, shall by order of such justice be forfeited to the use of the person making the seizure, and such justice shall also impose a fine on such negro or mulatto, for the use of the county, not exceeding twenty dollars.

Exhibit 8
0303

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 231, Image 231 (1871) available at The Making of Modern Law: Primary Sources. 1871
[Offenses Affecting the Public Safety, § 288. No person shall fire or discharge any cannon, gun, fowling piece, pistol, or fire-arms, of any description, or fire, explode, or set off any squibs, cracker, or other thing containing powder or other combustible or explosive material, without permission from the may which permission shall limit the time of such firing, and shall be subject to be revoked by the mayor at any time after it has been granted. Any violation hereof shall subject the party to a fine of not less than two nor more than ten dollars.]

John H. Herry, Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of the State of Arkansas; General Incorporation Laws; and All Acts of the General Assembly Relating to the City; in Force March 10, 1882 Page 149, Image 334 (1882) available at The Making of Modern Law: Primary Sources. 1882
[Ordinances of the] City of Little Rock, [§ 344. That it shall be unlawful for any person to engage in, exercise or pursue any of the following avocations or business without first having obtained and paid for a license therefor from the proper city authorities the amount of which licenses are hereby fixed as follows, to wit: . . . ]§ 27. Shooting galleries, or pistol galleries, $25 per annum, in advance.

## CALIFORNIA

Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854
Ordinances of the [City of San Francisco], § 13. Every person, house, or firm engaged in keeping a pistol or rifle shooting gallery, shall pay for a license to carry on the same, the sum of ten dollars per quarter, in addition to the amount of the powder license.

General orders of the Board of Supervisors providing regulations for the government of the City and County of San Francisco. 1869
[Discharge of Cannon: Permit to be given by Mayor, and filed in office of Chief of Police. Discharge of Fire Arms prohibited within certain limits.]Sec. 22. No person shall discharge any cannon within that portion of this city and county lying between Larkin and Ninth Streets and the outer line of the streets forming the water-front, except by special permission, in writing, from the Mayor, which permit shall designate the time and particular locality of the firing, and the number of discharges which are authorized. A copy of such permit shall be filed by the person obtaining the same, in the office of the Chief of Police, at least two hours before the time of such firing; and the person or persons engaged in the discharge of such cannon, shall, on the demand of any citizen or peace officer, exhibit the permit by which such firing is authorized; and no person shall discharge any fire-arm of any other description in that portion of the city and county bounded by Devisadero, Ridley, Market, and Ninth streets, and the outer line of the streets forming the water-front, or within three hundred yards of any public highway, or upon any ground set apart as a cemetery, or public square, or park, or within three hundred yards of any dwelling-house. But this section shall not be construed so as to prohibit any person from

Exhibit 8
0304

shooting destructive animals within or upon his own inclosure. Any person who shall violate any of the provisions of this section shall be deemed guilty of a misdemeanor; and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, or by imprisonment in the county jail out more than thirty days.

1883 Cal. Stat. 156, § 153.
The Municipal Council shall provide by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also all fines collected in the police court for violations of fire ordinances.

Nathan Newmark, The Political Code of the State of California. As Enacted in 1872, and Amended in 1889. With Notes and References to the Decisions of the Supreme Court Page 963 (1889) available at The Making of Modern Law: Primary Sources. 1889
[Political Code of the State of California,] Charitable Fund, §153. The Municipal Council shall provide, by ordinance, for the payment into a "Fireman's Charitable Fund" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; also, all fines collected in the Police Court for violations of fire ordinances. Said fund shall be under the direction and control of and subject to such regulations as may be prescribed by the Board of Fire Commissioners.

Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890
Section 1 . It shall be unlawful for any person in the City of Oakland, not being a public officer or a traveler actually engaged in making a journey, to wear or carry concealed about his person without a permit, as hereinafter provided, any pistol, slung-shot, brass or iron knuckles, sand club, dirk or bowie knife, or iron bar or other dangerous or deadly weapon, or any sling or other contrivance by which shot or other missiles are or may be hurled or projected. A written permit may be granted by the Mayor for a period of not to exceed one year to any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person.

Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891
Be it ordained by the City Council of the City of Stockton as follows:
One-Concealed Weapons, Burglars' Tools.
Section 1. It shall be unlawful and a misdemeanor: 1. For any person not being a peace officer or actually prosecuting a journey to or from the town, city or county of his residence, to wear or carry concealed about his person any pistol, dirk, bowie-knife, slungshot, sand-club, metallic knuckles or any other deadly or dangerous weapon, except he first have a written permit to so do from the Mayor of the City of Stockton.

Exhibit 8
0305

L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources. 1896
Ordinances of the City of Fresno, § 8. Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, §§ 3-4.
SEC. 3. Every person who carries in any city, city and county, town or municipal corporation of this state any pistol, revolver, or other firearm concealed upon his person, without having a license to carry such firearm as hereinafter provided in section six of this act, shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony.
SEC 4. The unlawful possessing or carrying of any of the instruments, weapons, or firearms enumerated in section one to section three inclusive of this act, by any person other than those authorized and empowered to carry or possess the same as hereinafter provided, is a nuisance, and such instruments, weapons or firearms are hereby declared to be nuisances, and when any of said articles shall be taken from the possession of any person the same shall be surrendered to the magistrate before whom said person shall be taken, except that in any city, city and county, town or other municipal corporation the same shall be surrendered to the head of the police force, or police department thereof. The officers to whom the same may be so surrendered, except upon certificate of a judge of a court of record, or of the district attorney of any county that the preservation thereof is necessary or proper to the ends of justice, shall proceed at such time or times as he deemds proper, and at least once in each year to destroy or cause to be destroyed such instruments, weapons, or other firearms in such manner and to such extent that the same shall be and become wholly and entirely ineffective and useless for the purpose for which it was manufactured.
SEC 6. It shall be lawful for the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue to such person a license to carry concealed a pistol, revolver or other fire-arm; provided, however, that the application to carry concealed such firearm shall be filed in writing and shall state the name and residence of the applicant, the nature of applicant's occupation, the business address of applicant, the nature of the weapon sought to be carried and the reason for the filing of the application to carry the same.

1923 Cal. Stat. 696, An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the

Exhibit 8
0306

Manufacture, Sale, Possession or Carrying of Certain Other Dangerous Weapons Within this State; To Provide for Registering All Sales of Pistols, Revolvers or Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Carrying of Concealed Firearms Except by Lawfully Authorized Persons; To Provide for the Confiscation and Destruction of Such Weapons in Certain Cases; To Prohibit the Ownership, Use or Possession of Any of Such Weapons by Certain Classes of Persons; To Prescribe Penalties for Violations of This Act and Increased Penalties for Repeated Violations Hereof; To Authorize, In Proper Cases, The Granting of Licenses or Permits to Carry Firearms Concealed Upon the Person; To Provide for Licensing Retail Dealers in Such Firearms and Regulating Sales Thereunder; And To Repeal Chapter One Hundred Forty-Five of California Statutes of 1917, Relating to the Same Subject, ch. 339, § 3, 8.

Sec. 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this act shall be construed to apply to and include all firearms having a barrel less than twelve inches in length. Any person who shall violate the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

Sec. 3. If any person shall commit or attempt to commit any felony within this state while armed with any of the weapons mentioned in section one hereof or while armed with any pistol, revolver or other firearm capable of being concealed upon the person, without having a license or permit to carry such firearm as hereinafter provided, upon conviction of such felony, he shall in addition to the punishment prescribed for the crime of which he has been convicted, be punishable by imprisonment om a state prison for not less than five nor more than ten years…

Sec. 8. It shall be lawful for the sheriff of a county, and the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or other police head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue such person a license to carry concealed a pistol, revolver or other firearm for a period of one year from the date of such license…

1923 Cal. Stat. 698–99, An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Manufacture, Sale, Possession or Carrying of Certain Other Dangerous Weapons Within this State; To Provide for Registering All Sales of Pistols, Revolvers or Other Firearms Capable of Being Concealed Upon the Person; To Prohibit the Carrying of Concealed Firearms Except by Lawfully Authorized Persons; To Provide for the Confiscation and Destruction of Such Weapons in Certain Cases; To Prohibit the Ownership, Use or Possession of Any of Such Weapons by Certain Classes of Persons; To Prescribe Penalties for Violations of This Act and Increased Penalties for Repeated Violations Hereof; To Authorize, In Proper Cases, The Granting of Licenses or Permits to Carry Firearms Concealed Upon the Person; To Provide for Licensing Retail Dealers in Such Firearms and Regulating Sales Thereunder; And To Repeal Chapter One Hundred Forty-Five of California Statutes of 1917, ch. 339, § 8.

Exhibit 8
0307

Sec. 8. It shall be lawful for the sheriff of a county, and the board of police commissioners, chief of police, city marshal, town marshal, or other head of the police department of any city, city and county, town, or other municipal corporation of this state, upon proof before said board, chief, marshal or other police head, that the person applying therefor is of good moral character, and that good cause exists for the issuance thereof, to issue such person a license to carry concealed a pistol, revolver or other firearm for a period of one year from the date of such license…

1931 Cal. Stat. 2317, An Act to Control and Regulate the Possesion, Sale and Use of Pistols, Revolvers and Other Firearms Capable of Being Concealed Upon the Person, ch. 1098, §9. Every person in the business of selling, leasing, or otherwise transferring a pistol, revolver or other firearm, of a size capable of being concealed upon the person, whether such seller, lessor or transferor is a retail dealer, pawnbroker, or otherwise, except as hereinafter provided, shall keep a register in which shall be entered the time of sale, the date of sale, the name of the salesman making the sale, the place where sold, the make, model, manufacturer's number, caliber, or other marks of identification on such pistol, revolver or other firearm. Such register shall be prepared by and obtained from the state printer and shall be furnished by the state printer to such dealers on application at a cost of three dollars per one hundred leaves in triplicate . . . [t]he purchaser of any firearm capable of being concealed upon the person shall sign, and the dealer shall require him to sign his name and affix his address to said register in triplicate, and the salesman shall affix his signature in triplicate as a witness to the signature of the purchaser. . . [t]his section shall not apply to wholesale dealers in their business intercourse with retail dealers.

## **COLOLRADO**

Thomas M. Patterson, The Charter and Ordinances of the City of Denver, as Adopted Since the Incorporation of the City and Its Organization, November, 1861, to the First Day of February, A.D., 1875, Revised and Amended, Together with an Act of the Legislature of the Territory of Colorado, in Relation to Municipal Corporations, Page 78, Image 78 (1875) available at The Making of Modern Law: Primary Sources. 1875
[City of Denver,] Charter and Ordinances: Offenses Affecting Public Safety, § 1. If any person shall, within this city, fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker, or other thing containing powder or other combustible or explosive material, without permission from the Mayor (which permission shall limit the time of such firing, and shall be subject to be revoked by the Mayor or City Council at any time after the same has been granted), every such person shall, on conviction, be fined in a sum not less than one dollar and not exceeding one hundred dollars: Provided, that no permission shall be granted to any person or persons to hold or conduct any shooting match or competitive trial of skill with fire arms within the limits of this city.

1911 Colo. Sess. Laws 408
Section 3. Every individual, firm or corporation engaged, within this commonwealth, in the retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and., if residing in a city, the street and number therein where he resides; the make, calibre and

Exhibit 8
0308

finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record- book shall be open at all times to the inspection of any duly authorized police officer.

Section 4. Every individual, firm or corporation fail- ng to keep the record provided for in the first section of this act, or who shall refuse to exhibit such record when requested by a police officer, and any purchaser, lessee or exchanger of a pistol or revolver, who shall, in connection with the making of such record, give false information, shall be guilty of a Misdemeanor, and shall, upon conviction, be punished by a fine of not less than twenty-five, nor more than one hundred dollars, or by imprisonment in the county jail for a term not exceeding one year, or by both such fine and imprisonment.

## CONNECTICUT

The Public Records Of The Colony Of Connecticut, Prior To The Union With New Haven Colony, May, 1665 Page 79, Image 91 (1850) available at The Making of Modern Law: Primary Sources. 1665

It is ordered, that no man within this Jurisdiction shall directly or indirectly amend, repair, or cause to be amended or repaired, any gun small or great belonging to any Indian, nor shall endure the same, nor shall sell or give to any Indian, directly or indirectly, any such gun or gunpowder, or shot, or lead, or mold, or military weapons, or armor, nor shall make any arrow heads, upon pain of a ten pound fine for every offense at least, nor sell nor barter any guns, powder, bullets or lead, whereby this order might be evaded, to any person inhabiting out of this Jurisdiction, without license of this or the particular court, or some two magistrates, upon pain of ten pound for every gun, five pound for every pound of powder, 40s for every pound of bullets or lead, and so proportionately for any greater or lesser quantity.

The Public Records Of The Colony Of Connecticut. Hartford, 1890 Page 190-192, Image 194-196, available at The Making of Modern Law: Primary Sources. 1775

An Act for Encouraging the Manufacture of Salt Petre and Gun Powder. . .Be it enacted, That no salt petre, nitre or gun-powder made and manufactured, or that shall be made and manufactured in this Colony, shall be exported out of the same by land or water without the license of the General Assembly or his Honor the Governor and Committee of Safety, under the penalty of twenty pounds for every hundred weight of such salt petre, ntire or gun-powder, and proportionately for a greater or lesser quantity so without license exported; to be recovered by bill, plaint, or information, in any court of record in this Colony by law proper to take cognizance thereof. . . Be it further enacted by the authority aforesaid, That no powder-mill shall be erected in this Colony for the manufacture of gun-powder without the license of the general assembly, or in their recess the Governor and Council, first had and obtained under the penalty of thirty pounds for every such offence; to be recovered as the other forgoing personalities in this act are above directed to be recovered.

Charter and By-Laws of the City of New Haven, November, 1848 Page 48-49, Image 48-49 (1848) available at The Making of Modern Law: Primary Sources. 1827

A By-Law Relative to the Storage and Sale of Gunpowder. Be it ordained by the Mayor, Aldermen, and Common Council of the city of New Haven, in Court of Common Council

Exhibit 8
0309

assembled, 1st. That hereafter no person or persons shall, within the limits hereafter described, either directly or indirectly, sell and deliver any gunpowder, or have, store, or keep any quantity of gunpowder greater than one pound weight, without having obtained a license for that purpose from said Court of Common Council, in the manner herein prescribed. Provided, that nothing in this by-law contained shall be construed to prevent any person or persons from having or keeping in his or their possession, a greater quantity of powder than one pound weight, during any military occasion or public celebration, while acting under any military commander, and in obedience to his orders, or under permission and authority therefor, first had and obtained of the Mayor or some one of the Aldermen of said city. Provided also, That any person or persons purchasing gunpowder, shall be allowed between the rising and setting of the sun, sufficient time to transport the same from any place without said limits, through said limits to any place without the same. 2d. The Court of Common Council aforesaid, shall have power, on application to them made, to grant and give any meet person or persons a license to sell gunpowder, and for that purpose to have, store, and keep gunpowder in quantity not exceeding at any one time seven pounds weight, and that well secured in a tin canister or canisters, and at such place or places within said limits and for such term of time, not exceeding one year, as said Court shall deem fit; which license shall be signed by the Clerk of said Court, and shall be in the form following, viz — Whereas the Mayor, Aldermen, and Common Council of the City of New Haven, in Court of Common Council convened, have approved of ___, as a suitable and proper person to keep, store, and sell gunpowder within the City of New Haven: We do therefore give license to said ____, to sell gunpowder at (describe the place) and for the purpose aforesaid, to have, keep, and store in said building any quantity of gunpowder not exceeding at any one time seven pounds weight, until the ___ day of ___. Dated, Signed per order, A.B., Clerk. For which license the person receiving the same shall pay the City Clerk twenty-five cents; and the same shall be by said Clerk recorded at full length. And before any license shall be given as aforesaid, the person or persons receiving the same shall pay to the Clerk aforementioned, for the use of said city, a sum after the rate of five dollars per annum. 3d. Before any shall proceed to sell or to store or keep gun-powder by virtue of any such license so given as aforesaid, such person shall put in a conspicuous place upon the front part of the building in which such powder is to be stored or sold, a sign, with the following words plainly and legibly inscribed thereon, viz., "Licensed to keep Powder," and shall continue the same during the time he shall keep, store, or sell gunpowder in said building. 4th section repealed. 5th. That no person or persons shall put or receive or have any quantity of gunpowder on board of any steamboat, for transportation therein in any of the waters within the limits of said city. 6th. If any person shall sell, keep, or store any gunpowder within the limits aforesaid, contrary to the true intent and spirit of this by-law, or without complying with all the pre-requisites enjoined thereby; or if any person or persons shall put or receive, or have on board of any steamboat for transportation on any of the waters within the limits of said city, any quantity of gunpowder, such person or persons shall forfeit and pay the sum of thirty-four dollars, one half to him who shall give information, and the other half to the use of the city.

The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835
Chapter 26. A ByLaw in relation to the Firing of Guns and Pistols, within the limits of the city of New-London, and making parents and guardians, and masters, liable for breaches of by-laws by

Exhibit 8
0310

minors and apprentices. Be it ordained by the mayor and aldermen, and common council and freemen of the city of New-London, That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city; and whosoever shall fire any gun or pistol, contrary to the form and effect of this by-law, shall for every such offence, forfeit and pay the sum of two dollars, to be recovered by due process in any court in said city, proper to try the same. § 2. And whereas the firing of guns and pistols, crackers, or other fire works is most frequently done by apprentices and minors under age, who are unable to pay the forfeiture incurred by the by-law of this city – be it also ordained that where any minor or apprentice shall be guilty of any breach of the by-laws relating to the firing of guns, pistols, crackers, or other fire-works, the parent, guardian, or master of such minor or apprentice, shall be liable to pay the forfeitures incurred by said by-law, and the same shall be recoverable of any parent, guardian or master, by action of debt brought on said by law, before any court in said city proper to try the same. And it shall be the duty of the city attorney and lawful for any other person to prosecute for said penalty; and one-half of said penalty shall go to the informer, or the person prosecuting for the same, and the other half to the use of the city.

1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, chap. 10.
[E]very person who shall fire any gun or other fire-arm of any kind whatever within the limits of the city of New Haven, except for military purposes, without permission first obtained from the mayor of said city, shall be punished by fine not exceeding seven dollars, or by imprisonment in the county jail not exceeding thirty days.

Charles L. Upham, The Charter and By-Laws of the City of Meriden. With Extracts from the Public and Private Acts of the State of Connecticut, Applicable to the City of Meriden; Together with Certain Votes of the Common Council; the Rules and Regulations of the Board of Water Commissioners, and of the Police Department; and the Rules of Order of the Common Council of the City of Meriden Page 135, Image 140 (1875) available at The Making of Modern Law: Primary Sources. 1869
A by-law concerning the discharge of fire-arms and fire-works [, City of Meriden, Conn.], § 1.
Be it enacted by the Court of Common Council of the City of Meriden, § 1. That no person shall discharge any pistol, gun, cannon, or other fire-arm of any sort or description, within the limits of said city, unless on occasion of some public festivity, and then by permission of the mayor or one of the aldermen of said city, or unless on occasion of military exercises and parade, and then by order of some military officer; and whoever shall discharge any pistol, gun, cannon, or other fire-arm of any sort, contrary to the form and effect of this by-law, shall, for every such offense, forfeit and pay, for the use of the treasury of said city, a fine of five dollars.

Charter and Ordinances of the City of Bridgeport: as Amended and Adopted Page 194 (1874) available at The Making of Modern Law: Primary Sources. 1874
An Ordinance Relative to Gunpowder and Explosive Substances. Be it ordained by the Common Council of the City of Bridgeport, § 1. No person shall have, or keep for sale or for any other purpose, within the limits of this city, any quantity of gunpowder or gun-cotton, exceeding one pound in weight; no person shall have, keep for sale, use, or other purpose, within the city limits, any quantity of nitro-glycerine, or other explosive substances or compounds exceeding six

Exhibit 8
0311

ounces, without special license thereof from the common council. No person shall transport any gunpowder through said city without a permit first had and obtained from the fire marshal, and in accordance with such rules and regulations as may be established by said fire marshal. No person shall, within said city, place, receive, or have any gunpowder on board of any steamboat used for the carrying of passengers, with intent to transport the same therein.

J. M. Meech, Charter and Revised Ordinances of the City of Norwich With the Amendments Thereto, and Statutes of the State Relating to Municipal Corporations, in Force January 1st, 1877 Page 178, Page 185 (1876) available at The Making of Modern Law: Primary Sources. 1877 Ordinances of Norwich. § 15. No person or persons shall fire any swivel, musket, fowling-piece, pistol, or other gun of any description within said city at a less distance than fifty rods from any dwelling house, or public highway, or street without written permission from the Mayor or one of the aldermen of said city; and every person so offending shall, for every such offence, forfeit and pay for the use of said city the sum of three dollars: Provided always, that nothing herein contained shall be construed to extend to the members of any military company when under the command of any military officer, not to prevent the firing of any gun or guns for the destruction of any noxious birds or animals by any person or persons upon his or their premises.

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources. 1890
Good Order and Decency § 192. Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

1901 Conn. Pub. Acts 602, § 20.
The warden and burgesses, when assembled according to law, shall have power to make, alter, repeal, and enforce such bylaws, orders, ordinances, and enactments as they deem suitable and proper, not inconsistent with this resolution or contrary to the laws of this state or of the United States, for the following purposes: . . . to license, regulate, or prohibit the manufacture, keeping for sale, or use of fireworks, torpedoes, firecrackers, gunpowder, petrolemn, dynamite, or other explosive or inflammable substance, and the conveyance thereof through any portion of the borough . . . .

1923 Conn. Acts 3707, An Act Concerning the Possession Sale and Use of Pistols and Revolvers, ch. 252, §2.
No person shall advertise, sell, deliver, offer or expose for sale or delivery or have in his possession with intent to sell or deliver any pistol or revolver at retail without having a permit therefor issued as hereinafter provided.

1930 Conn. Stat. 903, Dealing in Explosives; License., ch. 147, § 2644. 1909
No person shall manufacture, store, sell, or deal in gunpowder or any material or compound . . . unless he shall first obtain from the commissioner of state police or the fire marshal of the town

Exhibit 8
0312

where such business is conducted a written license therefor . . . which license shall specify the building where such business is to be carried on or such material deposited or used.

1923 Conn. Pub. Acts 3707, An Act Concerning the Possession, Sale and Use of Pistols and Revolvers, ch. 252, § 2, 3.

No person shall advertise, sell, deliver, offer or expose for sale or delivery or have in his possession with intent to sell or deliver any pistol or revolver at retail without having a permit therefor issued as hereinafter provided.

The chief of police or, where there shall be no chief of police, the warden of the borough of the first selectman of the town, as the case may be, may, upon the application of any person, issue a permit in such form as may be prescribed by the superintendent of state police for the sale at retail of pistols and revolvers within the jurisdiction of the authority issuing such permit. Upon the application of any person having a bona fide residence or place of business within the jurisdiction of any such authority or, upon the application of any bona fide resident of the United States having a permit or license to carry any firearm issued by the authority of any state or sub-division of the United States, such chief of police, warden or selectmen may issue a permit to such person to carry a pistol or revolver within the jurisdiction of the authority issuing the same, provided such authority shall find that such applicant intends to make no use of the pistol or revolver thereunder other than a proper use and that such person is a suitable person to receive such permit. The superintendent of state police may, upon application, issue to any holder of any permit to carry any pistol or revolver hereinbefore provided for, a permit to carry a pistol or a revolver within the state . . . .

Sec. 5. No sale of any pistol or revolver shall be made except in the room, store or place described in the permit for the sale of pistols and revolvers, and such permit or a copy thereof certified by the authority issuing the same shall be exposed to view within the room, store or place where pistols or revolvers shall be sold or offered or exposed for sale, and no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase or to whom delivery thereof is to lic made shall provide evidence of his identity. The vendor of any pistol or revolver shall keep a record of every pistol or revolver sold in a book kept for that purpose, which record shall be in such form as shall be prescribed by the superintendent, of state police and shall include the date of the sale, the caliber, make, model and manufacturer's number of such pistol or revolver and the name, address and occupation of the purchaser thereof, which record shall be signed by the purchaser and by the person making the sale, each in the presence of the other, and shall be preserved by the vendor of such pistol or revolver for a period of at least six years.

Sec. 7. No person, firm or corporation shall sell at retail, deliver or otherwise transfer any pistol or revolver to any alien, nor shall any person deliver any pistol or revolver at retail except upon written application therefor and no sale or delivery of any pistol or revolver shall be mode upon the date of the filing or receipt of any written application for the purchase thereof, and when any pistol or revolver shall b delivered in connection with the sale or purchase, such pistol or revolver shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no pistol or revolver when delivered on tiny sale or purchase shall be loaded or contain therein any gunpowder or other explosive or any bullet, ball or shell. Upon the delivery of any pistol or revolver the purchaser shall sign in triplicate a receipt for such pistol or revolver which shall contain the name, address and occupation of such purchaser, the date of sale, caliber,

Exhibit 8
0313

make, model and manufacturer's number and a general description thereof. One of such triplicate receipts shall, within twenty-four hours thereafter, be forwarded by the vendor of such pistol or revolver to the superintendent of state police and one to the authority issuing the permit for the sale of such pistol or revolver and the other shall be retained by such vendor for at least six years. Sec. 8. No person shall make any false statement or give any false information connected with any purchase, sale or delivery of any pistol or revolver, and no person shall sell, barter, hire, lend, give or deliver to any minor under the age of eighteen years any pistol or revolver.

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, §6.
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1832 Del. Laws 208, A Supplement to an Act to Prevent the Use of Firearms by Free Negroes and Free Mulattoes, and for Other Purposes, chap. 176, § 1.
. . . it shall not be lawful for free negroes and free mulattoes to have, own, keep or possess any gun, pistol, sword or any warlike instruments whatsoever: Provided however, that if upon application of any such free negro or free mulatto to one of the justices of the peace of the county in which such free negro or free mulatto resides, it shall satisfactorily appear upon the written certificate of five or more respectable and judicious citizens of the neighborhood, that such free negro or free mulatto is a person of fair character, and that the circumstances of his case justify his keep and using a gun, then and in every such case it shall and may be lawful for such justice to issue a license or permit under his hand and authorizing such free negro or free mulatto to have use and keep in his posession a gun or fowling piece.

1841 Del. Laws 430, An Act Concerning Fees, ch. 368, § 1.
Justices of the Peace shall receive . . . For licenses to negroes to keep a gun, twenty five cents.

9 Del. Laws 552 (1843), A Further Supplement To An Act Entitled "An Act To Prevent The Use Of Fire-arms By Free Negroes And Free Mulattoes And For Other Purposes, § 1. 1843
That the proviso in the first section of the act to which this is a further supplement, and all and every the provisions of the said act, or any other supplemental act thereto, which authorizes the issuing, by a justice of the peace, of a license or permit to a free negro or free mulatto to have, use and keep in his possession, a gun or fowling piece, be and the same are hereby repealed, made null and void.

1909 Del. Laws 577, House Joint Resolution Providing for Increase in Non-Resident Gunners License Fee, ch. 271.
Whereas, there are numerous gunners from other States who make it a practice to gun in this State, and under existing laws a license fee of Five Dollars is collected from them. And Whereas, our neighboring States charge non-resident gunners a license fee of more than Five Dollars. Therefore be it resolved by the Senate and House of Representatives of the State of Delaware in

Exhibit 8
0314

General Assembly met: That from and after the passage of this Resolution up to and including April 30th, 1911, all non-resident gunners shall be required to pay a license fee of Ten Dollars per annum, said license fee to be collected in the same manner and by the same agency as non-resident gunners' licenses are now collected.

Vol. 26 Del. Laws 28, 28- 29 (1911)

Section 1. That from and after the first day of June, in the year of our Lord, one thousand nine hundred and eleven, it shall be unlawful for any person or persons, firm, company or corporation, to sell, or expose to sale, any pistol or revolver, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons made especially for the defense of one's person, without first having obtained a license therefor, which license shall be known as "Special License to Sell Deadly Weapons;" provided, however, that this provision shall not relate to toy pistols, pocket knives, or knives used in the domestic household, or surgical instruments or tools of any kind.

Section 2. Any person or persons, firm, company or corporation, desiring to engage in the business of selling revolvers, pistols, or revolver or pistol cartridges, stilettos, steel or brass knuckles, or other weapons made for the defense of one's person, shall, after the above mentioned date, apply to the Clerk of the Peace of the County in which it is desired to conduct such business and shall obtain a license therefor, for which he, they, or it shall pay the sum of twenty-five dollars, which said license shall entitle the holder thereof to conduct said business for the term of one year from its date.

Section 3. It shall be unlawful for any person or per- sons, or a member of any firm, or the agents or officers of any corporation to sell to a minor, or any intoxicated person, any revolver, pistol, or revolver or pistol cartridges, stiletto, steel or brass knuckles, or other deadly weapons, made especially for the defense of one's person.

Section 4. It shall be the duty of any person or persons, firm, company or corporation, desiring to engage in the business aforesaid, to keep and maintain in his place of business at all times, a book which shall be furnished him by the Clerk of the Peace of the County wherein he does business in which said book he shall enter the date of the sale, the name and address of the person purchasing any such deadly weapon, the number and kind of deadly weapon so pur- chased, the color of the person so purchasing the same, and the apparent age of the purchaser; and no sale shall be made weapon, etc. until the purchaser has been positively identified. This book shall at all times be open for inspection by any Judge, Justice of the Peace, Police Officer, Constable, or other Peace Officer of this State.

## <u>DISTRICT OF COLUMBIA</u>

Washington D.C. 27 Stat. 116 (1892)

CHAP. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That it shall not be lawful for any person or persons within the District of Columbia, to have concealed about their person any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk knives or dirks, blackjacks, razors, razor blades, sword canes, slung shot, brass or other metal knuckles.

Exhibit 8
0315

SEC. 2. That it shall not be lawful for any person or persons within the District of Columbia to carry openly any such weapons as hereinbefore described with intent to unlawfully use the same, and any person or persons violating either of these sections shall be deemed guilty of a misdemeanor, and upon conviction thereof shall, for the first offense, forfeit and pay a fine or penalty of not less than fifty dollars nor more than five hundred dollars, of which one half shall be paid to any one giving information leading to such conviction, or be imprisoned in the jail of the District of Columbia not exceeding six months, or both such fine and imprisonment, in the discretion of the court: Provided, That the officers, non-commissioned officers, and privates of the United States Army, Navy, or Marine Corps, or of any regularly organized Militia Company, police officers, officers guarding prisoners, officials of the United States or the District of Columbia engaged in the execution of the laws for the protection of persons or property, when any of such persons are on duty, shall not be liable for carrying necessary arms for use in performance of their duty: Provided, further, that nothing contained in the first or second sections of this act shall be so construed as to prevent any person from keeping or carrying about his place of business, dwelling house, or premises any such dangerous or deadly weapons, or from carrying the same from place of purchase to his dwelling house or place of business or from his dwelling house or place of business to any place where repairing is done, to have the same repaired, and back again: Provided further, That nothing contained in the first or second sections of this act shall be so construed as to apply. to any person who shall have been granted a written permit to carry such weapon or weapons by any judge of the police court of the District of Columbia, and authority is hereby given to any such judge to grant such permit for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof; and further, upon the filing with such judge of a bond, with sureties to be approved by said judge, by the applicant for such permit, conditioned to the United States in such penal sum as said judge shall require for the keeping of the peace, save in the case of necessary self defense by such applicant during the continuance of said permit, which bond shall be put in suit by the United States for its benefit upon any breach of such condition.

SEC. 3. That for the second violation of the provisions of either of the preceding sections the person or persons offending shall be proceeded against by indictment in the supreme court of the District of Columbia, and upon conviction thereof shall be imprisoned in the penitentiary for not more than three years.

SEC. 4. That all such weapons as hereinbefore described which may be taken from any person offending against any of the provisions shall, upon conviction of such person, be disposed of as may be ordered by the judge trying the case, and the record shall show any and all such orders relating thereto as a part of the judgment in the case.

SEC. 5. That any person or persons who shall, within the District of Columbia, sell, barter, hire, lend or give to any minor under the age of twenty-one years any such weapon as hereinbefore described shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, pay a fine or penalty of not less than twenty dollars nor more than one hundred dollars, or be imprisoned in the jail of the District of Columbia not more than three months. No person shall engage in or conduct  the business of selling, bartering, hiring, lending, or giving any weapon or weapons of the kind hereinbefore named without having previously obtained from the Commissioners of the District of Columbia a special license authorizing the conduct of such business by such person, and the said Commissioners are hereby authorized to grant such license, without fee therefor, upon the filing with them by the applicant therefor of a bond with sureties, to be by them approved, conditioned in such penal sum as they shall fix to the United States for

Exhibit 8
0316

the compliance by said applicant with all the provisions of this section; and upon any breach or breaches of said condition said bond shall be put in suit by said United States for its benefit, and said Commissioners may revoke said license. Any person engaging in said business without having previously obtained said special license shall be guilty of a misdemeanor and upon conviction thereof shall be sentenced to pay a fine of not less than one hundred dollars nor more than five hundred dollars, of which one half shall be paid to the informer, if any, whose information shall lead to the conviction of the person paying said fine. All persons whose business it is to sell barter, hire, lend or give any such weapon or weapons shall be and they hereby, are, required to keep a written register of the name and residence of every purchaser, barterer, hirer, borrower, or donee of any such weapon or weapons, which register shall be subject to the inspection of the major and superintendent of Metropolitan Police of the District of Columbia, and further to make a weekly report, under oath to said major and superintendent of all such sales, barterings, hirings, lendings or gifts. And one half of every fine imposed under this section shall be paid to the informer, if any, whose information shall have led to the conviction of the person paying said fine. Any police officer failing to arrest any person guilty in his sight or presence and knowledge, of any violation of any section of this act shall be fined not less than fifty nor more than five hundred dollars.

SEC 6. That all acts or parts of acts inconsistent with the provisions of this act be, and the same hereby are, repealed.


Washington D.C. 47 Stat. 650, 651-652 (1932)

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business-within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the

Exhibit 8
0317

District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SELLING TO MINORS AND OTHERS

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## **FLORIDA**

Leslie A. Thompson, A Manual or Digest of the Statute Law of the State of Florida, of a General and Public Character, in Force at the End of the Second Session of the General Assembly of the State, on the Sixth Day of January, 1847 Page 547, Image 582 (1847) available at The Making of Modern Law: Primary Sources. 1847

For the Prevention of Indians Roaming at Large Throughout the State, § 1. From and after the passage of this act, if any male Indian of the years of discretion, venture to roam or ramble beyond the boundary lines of the reservations, which have been assigned to the tribe or nation to which said Indian belongs, it shall and may be lawful for any person or persons to apprehend, seize, and take said Indian, and carry him before some Justice of the Peace, who is hereby authorized, empowered, and required, to direct (if said Indian have not a written permission from the agent to do some specific act) not exceeding thirty-nine stripes, at the discretion of the Justice, to be laid on the bare back of said Indian; moreover, to cause the gun of said Indian (if he has one) to be taken from him, and deposited with the colonel of the county, or captain of the district, in which said Indian may be taken, subject to the order of the superintendent of Indian Affairs.

1887 Fla. Laws 164-165, An Act to Establish the Municipality of Jacksonville Provide for its Government and Prescribe it's jurisdiction and powers, chap. 3775, § 4.

The Mayor and City Council shall within the limitations of this act have power by ordinance to . . . regulate and license the sale of firearms and suppress the carrying of concealed weapons.

1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, chap. 4147, §§ 1-4. 1898

§ 1. That in each and every county of this State, it shall be unlawful to carry or own a Winchester or other repeating rifle or without first taking out a license from the County Commissioner of the respective counties, before such persons shall be at liberty to carry around with him on his person and in his manual possession such Winchester rifle or other repeating rifle. § 2. The County Commissioners of the respective counties in this State may grant such licenses at any regular or special meeting. § 3. The person taking out such license shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the County Commissioners, and at the

Exhibit 8
0318

same time there shall by kept by the County Commissioners granting the same a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same. § 4. All persons violating the provisions of Section 1 of this Act shall be guilty of a misdemeanor, and on conviction shall be fined not exceeding one hundred dollars or imprisonment in the county jail not exceeding sixty days.

1895 Fla. Laws 14
Fourteenth. No merchant, store-keeper or dealer shall keep for sale or sell pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, without first paying a license tax of ten dollars; Provided, Said pistols, Springfield rifles, repeating rifles, bowie knives or dirk knives, shall not be sold to minors. Every violation of this paragraph shall be punished by a fine of fifty dollars, or by imprisonment in the county jail not more than six months.

1931 Fla. Laws 2069, § 7.
The village shall have the following rights and powers . . . To license, tax, regulate, or prohibit, within the village or any part thereof . . . explosives, guns, pistols and other weapons . . . .

## **GEORGIA**

A Digest of the Laws of the State of Georgia. From Its First Establishment as a British Province down to the Year 1798, Inclusive, and the Principal Acts of 1799: In Which is Comprehended the Declaration of Independence; the State Constitutions of 1777 and 1789, with the Alterations and Amendments in 1794. Also the Constitution of 1798 Page 153-154, Image 160-161 (1800) available at The Making of Modern Law: Primary Sources. 1768
Laws of Georgia, An Act to amend and Continue "An Act for the Establishing and Regulating Patrols, and for Preventing any Person from Purchasing Provisions or any Other Commodities from, or Selling Such to any Slave, Unless Such Slave Shall Produce a Ticket from His or Her Owner, Manager or Employer . . . Be it enacted, That immediately from and after passing of this act, it shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of fire arms, or any offensive weapon whatsoever, unless such slave shall have a ticket or license in writing from his master, mistress, or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed every week, or unless there be some white person of the age of sixteen years or upwards in the company of such slave when he is hunting or shooting, or that such slave be actually carrying his master's arms to or from his master's plantation by a special ticket for that purpose, or unless such slave be found in the day-time, actually keeping off birds within the plantation to which such slave belongs, loading the same gun at night, within the plantation to which such slave belongs, loading the same gun at night, within the dwelling house of his master, mistress or white overseer: Provided always, That no slave shall have liberty to carry any gun, cutlass, pistol, or other offensive weapon, abroad at any time between Saturday evening after sunset and Monday morning before sun rise, notwithstanding a license or ticket for so doing. II. And be it further enacted, That in case any or either of the patrols, established or to be established within this province, by virtues of the said act, on searching and examining any negro house for offensive weapons, fire arms and ammunition, shall find any such, or in case any person shall find any slave using or carrying fire arms or other offensive weapons, contrary to the intent and meaning of this act, such patrol, or person or persons, may lawfully seize and take away such offensive weapons, fire arms, and

Exhibit 8
0319

ammunition, but before the property thereof shall be vested in the person or persons who shall seize the same, such person or persons shall, within three days next after such seizure, go before a justice of the peace, and shall make oath of the manner of taking thereof, and if such justice of the peace, after such oath made, or upon due examination, shall be satisfied that the said fire arms, offensive weapon, or ammunition, shall have been seized according to the directions, and agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, that the property is lawfully vested in the person or persons who seized the same.

1902 Ga. Laws 434-35, § 16.
Be it further enacted by the authority aforesaid, That the mayor and aldermen of the said city of Forsyth shall have full power to license, regulate and control by ordinance all . . . gun shops, dealers in guns or pistols . . . .

Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code, Article 3, Carrying pistols without license, § 348(a)-(d). 1910
§ 348 (a). Carrying pistols without license. [It shall be unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the ordinary of the respective counties in which the party resides, before such person shall be at liberty to carry around with him on his person, or to have in his manual possession outside of his own home or place of business: Provided that nothing in this law shall be construed to alter, affect, or amend any laws now in force in this State relative to the carrying of concealed weapons on or about one's person, and provided further, that this shall not apply to sheriffs, deputy sheriffs, marshals, or other arresting officers of this State or United States, who are now allowed, by law, to carry revolvers; nor to any of the militia of said State while in service or upon duty; nor to any students of military colleges or schools when they are in the discharge of their duty at such colleges.] § 348 (b). License, how obtained. [The ordinary of the respective counties of this State in which the applicant resides may grant such license, either in term time or during vacation, upon the application of party or person desiring to apply for such license; provided applicant shall be at least eighteeen years old or over, and shall give a bond payable to the Governor of the State in the sum of one hundred dollars, conditioned upon the proper and legitimate use of said weapon with a surety approved by the ordinary of said county, and the ordinary granting the license shall keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be carried, and the caliber and number of the same.] § 348 (c). Fee for license. [The person making such application and to whom such license is granted, shall pay to the ordinary for granting said license the sum of fifty cents, which license shall cover a period of three years from date of granting same.] § 348 (d). Punishment. [Any person violating any of the provisions of the three preceding sections shall be punished as for a misdemeanor, as prescribed in section 1065 of this Code.]


## HAWAII

1870 Haw. Sess. Laws 26, An Act to License the Carrying of Fowling Pieces and Other Firearms, chap. 20, §§ 1 to 3.

Exhibit 8
0320

Lawrence McCully, Compiled Laws of the Hawaiian Kingdom Page 539, Image 545 (1884) available at The Making of Modern Law: Primary Sources. 1870

An Act to License the Carrying of Fowling Pieces and Other Fire-Arms. Whereas, the Act for the protection of Kolea or Plover and other useful birds, approved on the 20th day of April, A.D. 1859, has proved ineffectual for the purposes intended thereby, and Whereas, The general and indiscriminate use of fire-arms, which are frequently used for the destruction of useful, imported and migratory insectivorous birds and their progeny, is an injury to the agricultural and pastoral interests of this Kingdom, therefore, Be it Enacted by the King and Legislative Assembly of the Hawaiian Islands in the Legislature of the Kingdom assembled: § 1. That the Minister of the Interior may at any time license for a term of one year, any applicant for such license, to use and carry fire-arms for sporting purposes, in the District of Kona, Island of Oahu, on receiving for such license the sum of five dollars. § 2. Any person in said district who shall use or carry for sporting purposes, any gun, carbine, rifle, pistol, or other fire-arms, without having at first obtained a license as hereinbefore provided, shall, upon conviction therefor, before any police or district justice, be fined in a sum not to exceed fifty dollars for every such offense, and in default of payment of such sum, shall be imprisoned at hard labor, until such fine and costs are paid, according to law. § 3. All such licenses shall be signed by the Minister of the Interior, numbered according to their respective dates and impressed with the seal of his department, and no such license shall be transferable.

Revised Laws of Hawaii 1925, 791-92 (1925).

Section 2137. Form or report. It shall be the duty of the sheriff to prepare and furnish to all persons applying therefor [meaning applying under Section 18 of 1927 Haw. Sess. Laws 209-217], proper blanks upon which such information shall be furnished, in the following form: [requiring name of owner, name of possessor, number, description, makers name, factory number, and number disposed of and date].

1927 Haw. Sess. Laws 209-217, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17.

Section 1. Definitions. "Pistol" or "revolver" as used in this Act, means any firearm with barrel less than twelve inches in length. "Crime of Violence", as used in this Act means any of the following crimes, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, larceny, burglary and house-breaking. Section 2. Committing crime when armed. If any person, when armed with a pistol or revolver, shall commit or attempt to commit an act constituting a crime of violence, he may in addition to the punishment otherwise provided for the crime, be punished by imprisonment for not more than one year or by a fine of not more than one thousand dollars ($1,000.00) or by both; provided, that the act aforesaid be one which is capable of being committed or facilitated by means of a pistol or revolver. Section 3. Being armed prima facie evidence of intent. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol or revolver and had no license to carry the same, shall be prima facie evidence of his intention to commit said crime of violence; provided, that the criminal act committed or attempted be one which is capable of being committed or facilitated by means of a pistol or revolver.

Exhibit 8
0321

Section 5. Carrying or keeping small arms by unlicensed persons. Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess, or have under his control a pistol or revolver; provided, however, that any person who shall have lawfully acquired the ownership or possession of a pistol or revolver may, for purposes of protection and with or without a license, keep the same in the dwelling house or business office personally occupied by him, and, in case of an unlawful attack upon any person or property in said house or office, said pistol or revolver may be carried in any lawful, hot pursuit of the assailant.

Section 6. Exceptions. The provisions of the preceeding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen, mail carriers, or other duly appointed law enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States, or of the National Guard, when on duty, or of organizations by law authorized to purchase or receive such weapons from the United States or this territory, or to officers or employees of the United States authorized by law to carry a concealed pistol or revolver, or to duly authorized military organizations when on duty, or to the members thereof when at or going to or from their customary places of assembly, or to the regular and ordinary transportation of pistols or revolvers as merchandise, or to any person while carrying a pistol or revolver unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

Section 9. Transfers regulated. No person shall transfer by way of sale, gift, loan or otherwise, a pistol or revolver unless the prospective transferee, when he applies for the transfer, presents a permit duly granted under Section 2141 of the Revised Laws of Hawaii 1925; nor shall he make such transfer unless the transferee a person in respect of whom there is no reasonable cause, known to the transferor, for believing that such transferee has committed or attempted, or has been convicted of committing or attempting, a crime of violence. No seller shall in any event deliver a pistol or revolver on the day when the application to purchase and the statement hereinafter mentioned shall be made. When delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, race, nationality, color and place of birth, the date of sale, the caliber, make, model, and manufacturer's number of the weapon, and stating that he has never been convicted of a crime of violence. The seller shall promptly sign and forward by registered mail one copy thereof to the treasurer of the territory, and one copy thereof to the sheriff of the county or city and county of which the seller is a resident, and shall retain the other copy for six years. A statement shall be deemed promptly forwarded if it is forwarded within seven days, unless a shorter time is provided therefor in regulations established by the Governor.

Section 10. Dealers to be licensed. No retail dealer or selling agent shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol or revolver without being licensed as hereinafter provided.

Section 11. Dealers' Licenses; by whom granted, and conditions thereof. The duly constituted licensing authorities of any political subdivision of this territory may grant licenses in form prescribed by the treasurer of the territory, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

Exhibit 8
0322

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered unless the purchaser either is personally known to the seller or shall present clear evidence of his identity.

4. The seller shall faithfully comply with the requirements of Section 9 hereof and with all other provisions of this Act and of Chapter 128, Revised Laws of Hawaii 1925. A copy of the statement required by Section 9 hereof shall be entered by the seller in a book of record to be kept in his place of business and to be always open to the inspection of the officers and authorized representatives of the territorial government, including the police. Said book shall be preserved for six years.

5. No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

No license to sell at retail shall be granted to anyone except as provided in this section.

Section 12. False information forbidden. No person shall, in purchasing or otherwise securing delivery of a pistol or revolver, or in applying for a license to carry the same, give false information or offer false evidence of his identity.

Section 17. Penalties. Any violation of any provision of this Act shall constitute an offense punishable by a fine of not more than one thousand dollars ($1,000.00) or imprisonment for not more than one year, or both.

Section 25. Section 2143 of the Revised Laws of Hawaii 1925, is hereby amended by inserting, after the first sentence in said section ["The permit mentioned in section 2141 shall not be issued to any alien until the applicant has filed with the sheriff or a deputy sheriff of the county or city and county a request in writing, signed by two responsible citizens requesting that such permit be issued, and recommending and vouching for the applicant."], the following: "The request aforesaid shall include (1) an expression of the belief of such citizens that the applicant has never committed or attempted a crime of violence, as that phrase is defined in the Small Arms Act; that he has never been convicted thereof anywhere and that he is not likely to commit or attempt any such crime and (2) a brief statement of the facts relating to the age, character, nativity and personal history of the applicant, insofar as these facts are within the personal knowledge of such responsible citizens. Such facts as are within the personal knowledge of one of them, only, shall be included in a supplemental written statement signed by the person having such knowledge." [The rest of Section 2143 reads: "Aliens obtaining a permit as prescribed by the above section shall be required to secure an annual license from the treasurer of the county or city and county, and to pay to the treasurer an annual license tax of five dollars; provided, however, that to aliens who must necessarily use fire-arms in carrying on their business, such as rice planting, such license shall be issued free of charge upon a certificate from the sheriff of the county or city and county in which they carry on such business to the effect that the fire-arms and ammunition mentioned in their permit are necessary to the conduct of their business."]

Section 26. Section 2146 of the Revised Laws of Hawaii 1925, is hereby amended to read as follows: "Section 2146. Penalties. Any person who shall be found in the possession of any firearm or firearms or any ammunition without having complied with the provisions of this chapter, or who shall fail to give, file or forward required information, reports or statements, or who shall otherwise violate the provisions of this chapter in matters not covered by Section 2142 hereof, shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined by

Exhibit 8
0323

the court of appropriate jurisdiction in a sum of not more than five hundred dollars ($500.00). Any person, firm, corporation, copartnership, failing to file any information herein required to be filed, shall be deemed guilty of a misdemeanor and upon conviction shall be fined by the court of appropriate jurisdiction not more than five hundred dollars ($500.00).

The divulging of official information recorded or on file in a public office shall be punishable in like manner; provided, however, that where the information divulged has not tended, or been designed to encourage, or to render formidable armed resistance to the law, the fine shall not exceed twenty-five dollars ($25.00)."

1933 Haw. Sess. Laws 36-37, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 3.

Every person residing or doing business or temporarily sojourning within the Territory on the effective date of this Act who possesses a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, not already registered in the name of the present possessor, or who possesses ammunition of any kind or description, except shotgun ammunition, shall, within ten days of said effective date, register the same with the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn. Every person arriving in the Territory after the effective date of this Act, who brings with him firearms or ammunition of the type and description set out in this section, shall register the same in similar manner within forty-eight hours after arrival. The registration shall be on such forms as may be designated by the bureau of crime statistics and shall include a description of the class of firearm or firearms and ammunition owned by him, or in his possession, together with the name of the maker and the factory number, if known or ascertainable, and the source from which possession was obtained. Within sixty days after the effective date of this Act, the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish the bureau of crime statistics a record of all registrations now on file in their respective offices. Within ten days after the end of each month the chief of police of the city and county of Honolulu and the sheriffs of the several counties, other than the city and county of Honolulu, shall furnish to the bureau of crime statistics duplicate copies of all registrations made during the preceding month. No fee shall be charged for such registration. Any person who fails to comply with the provisions of this section shall be punished by a fine of not more than two hundred and fifty dollars ($250.00).

1933 Haw. Sess. Laws 37-38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 4.

§ 4. No person residing or doing business or temporarily sojourning within the Territory shall take possession of any fire arm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior Acts or unregistered, or of any ammunition of any kind or description, except shotgun ammunition, either through sale, gift, loan, bequest, or otherwise, whether procured in the Territory or imported by mail, express, freight, or otherwise, until he shall first have procured from the chief of police of the city and county of Honolulu or the sheriff of the county, other than the city and county of Honolulu, wherein is his place of business, or if there be no place of business, his residence, or if there be neither place of business nor residence, his place of sojourn, a permit to acquire as prescribed

Exhibit 8
0324

herein. The chief of police of the city and county of Honolulu or the sheriffs of the several counties, other than the city and county of Honolulu, are hereby authorized, within their discretion, to issue permits, within their respective jurisdictions, to acquire rifles, pistols, and revolvers to citizens of the United States, of the age of twenty years or more, and to duly accredited official representatives of foreign nations. Permits to acquire ammunition for rifles, pistols and revolvers acquired prior to the effective date of this Act and registered in accordance with the provisions hereof, may be granted persons [sic] of the age of twenty years or more irrespective of citizenship. Permits to acquire shotguns may be granted to persons of the age of sixteen years or more, irrespective of citizenship. Applications for such permits shall be signed by the applicant upon forms to be specified by the bureau of crime statistics, and shall be signed by the issuing authority. One copy of such permit shall be retained by the issuing authority, as a permanent official record. Such permit shall be void unless used within ten days after the date of issue. In all cases where possession is acquired from another person in the Territory the permit shall be signed in ink by the holder thereof and shall thereupon he delivered to and taken up by the person selling, loaning, giving or delivering the firearm or ammunition, who shall make entry thereon setting forth in the space provided therefor the name of the person to whom the firearm or ammunition was delivered, and the make, style, caliber, and number, as applicable. He shall then sign it in ink and cause it to he delivered or sent by registered mail to the issuing authority within forty-eight hours. In case receipt of such firearms or ammunition is had by mail, express, freight, or otherwise, from sources outside the Territory, the person to whom such permit has been issued, shall make the prescribed entries thereon, sign in ink, and cause it to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearms or ammunition. No person shall sell, give, loan, or deliver into the possession of another any firearm or ammunition except in accordance with the Provisions of this section. Any person acquiring a firearm or ammunition under the provisions of this section shall, within five days of acquisition, register same in the manner prescribed by Section 3 of this Act. No fee shall be charged for permits under this section. Any person who violates any provision of this section shall be punished by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year, or by both.

1933 Haw. Sess. Laws 38, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 5. 1933
Any person who has procured a hunting license under the provisions of Sections 2028-2032, inclusive, of the Revised Laws of Hawaii 1925, as amended, shall, while actually engaged in hunting or while going to or from the place of hunting, be authorized to carry and use any lawfully acquired rifle or shotgun and suitable ammunition therefor.

1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.
§ 8. In an exceptional case, when the applicant shows good reason to fear injury to his person or property, the chief of police of the city and county of Honolulu or the sheriff of a county, other than the city and county of Honolulu, may grant a license to a citizen of the United States or a duly accredited official representative of a foreign nation, of the age of twenty years or more, to carry concealed on his person within the city and county or the county in which such license is granted, a pistol or revolver and ammunition therefor. Unless renewed, such license shall automatically become void at the expiration of one year from date of issue. No such license shall

Exhibit 8
0325

issue unless it appears that the applicant is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony, or adjudged insane, in the Territory or elsewhere. All licenses to carry concealed weapons heretofore issued shall expire at midnight on the effective date of this Act. No person shall carry concealed on his person a pistol or revolver or ammunition therefor without being licensed so to do under the provisions of this section. For each such license there shall he charged a fee of ten dollars ($10.00), which shall be covered into the treasury of the city and county or the county in which such license is granted. Any person violating this section shall be punished by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for not more than one year, or by both.

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.
Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

## **ILLINOIS**

An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814
That it shall not be lawful for any person whatever without license from the Governor or some sub-agent appointed by him to purchase or receive by gift or other wise of any of the before mentioned Indians, any horse, mare, gun, tomohawk, knife, blanket, shrouding, calico, saddle, bridle, or any goods wares or merchandize whatever, that all such sales or gifts shall be considered as fraudulent on the part of the buyer or receiver and that any white person or free person of coulour whatever so buying or receiving any such articles of any one of those Indians shall be liable to pay a fine of twenty dollars to be recovered before a justice of the peace . . . ."

Exhibit 8
0326

Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841
[An Ordinance Regulating the Police of the City of Quincy], § 5. Be it further ordained by the City Council of the City of Quincy, That no person shall, within the limits of said city, fire or discharge any cannon, musket, rifle, fowling piece, or other fire arms, or air-gun, except in cases of necessity, or in the performance of a public or lawful act of duty, or discharge or set of any cracker, rocket, torpedo, squib, or other fire works, within the limits of said city, without permission first obtained from the Mayor or one of the Aldermen, or Marshal of said city; and every person so offending shall forfeit and pay, for the use of said city, not less than one dollar, nor more than three dollars, for every such offense.

George Manierre, The Revised Charter and Ordinances of the City of Chicago: To Which are Added the Constitutions of the United States and State of Illinois Page 123-125, Image 131-133 (1851) available at The Making of Modern Law: Primary Sources. 1851
Ordinances of the City of Chicago: Regulating the Keeping and Conveying Gun Powder and Gun Cotton; § I. (Be it ordained by the Common Council of the city of Chicago) That no person shall keep, sell, or give away gun powder or gun cotton in any quantity without permission of the common council or mayor in writing, signed by the mayor and clerk and sealed with the corporate seal, under a penalty of twenty-five dollars for every offence. § II. All applications for permits shall be addressed to the common council or mayor in writing, signed by the applicant. Not exceeding four permits shall be granted in any block. When the number of applications in any block shall at any time exceed the number to be granted, the requisite number shall be chosen by ballot. When issued the clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business and date of permit. Persons to whom permits may be issued shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gun powder or gun cotton than fifty pounds at one time, and the same shall be kept in tin canisters or cases containing not to exceed thirteen pounds each, and in a situation remote from fires or lighted lamps, candles or gas from which they may be easily removed in case of fire. Nor shall any person sell or weigh any gun powder or gun cotton after the lighting of lamps in the evening, unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business with the words "gun powder and gun cotton" painted or printed theron in large letters. A violation of any clause of this section shall subject the offender to a fine of not less than ten dollars nor exceeding one hundred dollars. § III. No person shall convey or carry any gun or carry any gun powder or gun cotton, (exceeding one pound in quantity), through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the gun powder or gun cotton be secured in tight cases or kegs well headed and hooped, and put into and entirely covered with a leather bag or case, sufficient to prevent such gun powder or gun cotton from being spilled or scattered under a penalty of one hundred dollars. IV. No vessel, laden in whole or in part with gun powder or gun cotton, shall land at, or make fast to any dock or wharf upon the Chicago river, or either branch thereof, between the south line of the school section and Chicago avenue, or to discharge such gun powder or gun cotton within said limits. If any master, or owner of any vessel, or other person shall violate any provision of this section, he shall be subject to a fine of not less then twenty-five dollars and not exceeding one hundred dollars. § V. The mayor shall have power to cause any vessel to be removed form the limits

Exhibit 8
0327

mentioned in the previous section, to any place beyond the same, by a written order, which shall be executed by the marshal or some other member of the police. If any person shall neglect or refuse to obey such order, or shall resist any officer in the execution of the same, he shall be subject to a penalty of one hundred dollars. § VI. Al permissions granted under this ordinance shall expire on the tenth day of June each year. And no permit shall be granted to any retailer of intoxicating liquors or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit so issued. § VII. It shall be the duty of the officers of the police department, fire-wardens, and firemen, to report all violations of this ordinance which may come to the knowledge of the city attorney for prosecution.

James M. Cunningham, The City Charter and the Revised Ordinances of the City of Peoria, Illinois; Also, the Original City Charter, and the Several Amendments Thereto, and the State Laws Relating to the City or Specially Affecting Its Interests; Together with the Rules of Order and Business for the Government of the City Council. Arranged, Revised, and Published, Under the Authority of the City Council, in the Year 1869 Page 254, Image 284 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of the City of Peoria: Public Safety and Convenience], § 1. That it shall not be lawful for any person in said city, without permission from the mayor or superintendent of police, to fire or discharge any cannon, musket, rifle, fowling-piece, pistol, or other fire-arms or air guns, except it is done in cases of necessity, or in the performance of a public act of lawful duty, or by military companies when on parade or in the discharge of duty; and every person violating the provisions of this section shall, on conviction, forfeit and pay not less than one dollar nor more than one hundred dollars for every offense.

Revised Ordinances of the City of Galesburg, the Charter and Amendments, State Laws Relating to the Government of Cities and Appendix Page 122-123, Image 127-128 (1869) available at The Making of Modern Law: Primary Sources. 1869
Revised Ordinances [of Galesburg, Ill.], Gunpowder-Fires, Fire-Arms, § 1. The keeping for sale or selling gunpowder, without a license therefor, is prohibited, and no license shall be issued allowing the keeping in store more than twenty-five pounds of gun powder at any one time, unless kept in some secure magazine or fire-proof powder house, located at least one hundred feet from any other occupied building, and when kept in a store or place for retail it shall be kept in tin or other metallic canisters or cases, and in a part of the building remote from any fire, lamp, candle or burning matter liable to produce explosion, and whoever shall violate this section, or any provision of it, shall be subject to a penalty of twenty dollars. § 2. Each person licensed to sell gunpowder shall keep a sign, with the words "Gunpowder for Sale," in plain letters, in some conspicuous place in the front of the building where such powder is kept. And no sales of gunpowder, except in unopened cans shall be sold after night, and any person convicted of violation of any of the provisions of this section shall be subject to a penalty of ten dollars. § 3. Whoever shall bring or cause to be brought into the city any gunpowder concealed in any box or other package, or in any package marked as containing other articles, in which such powder is contained, shall be subject to a penalty of twenty-five dollars. §4. The carrying gunpowder through the streets or other public places, in a careless or negligent manner, or the remaining with such powder in any place longer than necessary for the transportation of the same from one place to another, shall subject the party offending to a penalty of not less than five dollars. . .

Exhibit 8
0328

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876 Misdemeanors, § 39. No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code Ch. 38, para. 90.
All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public, and all persons who may wish to examine the same may do so at all reasonable times during business hours. A failure to keep such register, or to allow an examination of the same, or to record therein any sale or gift of a deadly weapon, or the keeping of a false register, shall be a misdemeanor, and shall subject the offender to a fine of not less than twenty-five dollars ($25) nor more than two hundred dollars ($200).

George W. Hess, Revised Ordinances of the City of Evanston : Also Special Laws and Ordinances of General Interest Page 131-132, Image 143-144 (1893) available at The Making of Modern Law: Primary Sources. 1893
Concealed Weapons, §531. It shall be unlawful for any person within the limits of the city of Evanston to carry or wear under his clothes or concealed about his person, any pistol, colt or slung shot, cross knucklet, or knuckles of lead, brass or other metal, or bowie knife, dirk, dagger, or any other dangerous or deadly weapon. . . § 537. The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all such licenses at his pleasure. § 538. Applications for such licenses shall be made to the city clerk, and when granted, the applicant therefor shall pay to the said clerk, for the use of the city, the sum of two dollars. § 539. Every such license shall state the name, age and occupation and residence of the person to whom it is granted.

Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-459, Image 458-459 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914
Ordinance of May 25, 1914, § 4a. It shall be unlawful for any person, firm or corporation to sell, barter or give away to any person within the City of Chicago, any pistol, revolver, derringer, bowie knife, dirk or other weapon of like character which can be concealed on the person, except to licensed dealers and to persons who have secured a permit for the purchase of such articles from the general superintendent of police as hereinafter required; provided, this section shall not apply to sales made of such articles which are delivered or furnished outside the City of Chicago. § 5. It shall be unlawful for any person to purchase any pistol, revolver, derringer, bowie knife,

Exhibit 8
0329

dirk or other weapon of like character, which can be concealed on the person, without first securing from the General Superintendent of Police a permit so to do. Before any such permit is granted, an application in writing shall be made therefor, setting forth in such application the name, address, age, height, weight, complexion, nationality and other elements of identification, of the person desiring such permit, and the applicant shall present such evidence of good character as the General Superintendent of Police in his discretion may require. § 6. It shall be the duty of the General Superintendent of Police to refuse such permit to (a) All persons having been convicted of any crime. (b) all minors. "Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the General Superintendent of Police to grant such permit, upon the payment of a fee of one dollar. § 8. Any person, firm or corporation violating any of the provisions of this ordinance, shall be fined not less than Fifty Dollars ($50.00) nor more than Two hundred Dollars ($200.00) for each offense, and every purchase, sale or gift of any weapon mentioned in this ordinance shall be deemed a separate offense.

Samuel Irwin, Reports of Cases At Law And In Chancery 566 (vol. #278, Chicago, Ill, 1917). 1917
It shall be the duty of the general superintendent of police to refuse such permit to (a) all persons having been convicted of any crime; (b) all minors. Otherwise, in case he shall be satisfied that the applicant is a person of good moral character, it shall be the duty of the general superintendent of police to grant such permit upon the payment of a fee of one dollar.

1931 Ill.Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.
Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

## INDIANA

1847 Ind. Acts 93, An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory Thereto Into One Act, and to Amend the Same, chap 61, § 8, pt. 4.
To regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder and other explosive compounds . . . .

W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855

Exhibit 8
0330

Ordinances [of Jeffersonville], § 3, Pt. 11. It shall also be a nuisance and unlawful . . . To discharge or cause to be discharged any fire arms, squibs, bombs or fire works of any kind without license being first obtained therefor.

Revision of 1895. The General Ordinances of the City of Indianapolis. Containing also, Acts of the Indiana General Assembly so far as they Control Said City, to which Prefixed a Chronological Roster of Officers from, 1832 to 1895 and Rules Governing the Common Council Page 290-291, Image 372-373 (1895) available at The Making of Modern Law: Primary Sources. 1895

Laws and Ordinances [of the City of Indianapolis], An Ordinance Licensing Rifle and Pistol Practice in the City of Indianapolis, § 1. Be it ordained by the Common Council and Board of Aldermen of the City of Indianapolis, That it shall hereafter be unlawful for any person to conduct or carry on any shooting gallery or room where rifle or pistol shooting is practiced, in the City of Indianapolis, without first having procured a license so to do, as hereinafter provided. § 2. A license fee of twenty-five dollars for six months and fifty dollars for one year shall be paid by the person conducting such business. Upon the payment of twenty-five dollars to the City Treasurer by any person desiring to carry on such a gallery or room, the City Treasurer shall issue to him a receipt therefor, designating therein what said money is paid for; and upon the surrender thereof to the City Clerk [Comptroller] that officer shall issue to such person a license for the said term of six months; and likewise, upon the payment of fifty dollars, a license for one year shall issue. The Clerk [Comptroller] shall be entitled to charge one dollar for the issue of every such license. Said license shall be in the usual form. § 3. Any person opening or carrying on such a gallery or room without such license shall be fined in any sum not exceeding fifty dollars; and every day's continuance shall constitute a spate offense.

1925 Ind. Acts 495, 495-98
Pistols and Revolvers Defined.
SECTION 1. Be it enacted by the general assembly of the State of Indiana, That the term "pistol or revolver," as used in this act, shall be construed as meaning any firearm with a barrel less than twelve inches in length.
Crime-Committing When Armed With Pistol or Revolver.
SEc. 2. If any person shall, within the State of Indiana, commit or attempt to commit a crime, when armed with a pistol or revolver, and having no permit to carry the same, he shall, in addition to the punishment provided for the crime, be guilty of a felony and shall be punished by imprisonment for not less than one year and not more than five years.
Subsequent Offenses.
SEc. 3. The judge shall have the power to sentence any person who may be convicted for a second or third, or other subsequent offense under section 2 of this act, to double or triple the penalty imposed thereby.
Felony-Conviction For-Prohibited From Possessing Pistol.
SEC. 4. No person who has been convicted of a felony committed against the person or property of another shall own or have in his possession or under his control, within the State of Indiana, a pistol or revolver. A violation of this section shall constitute a felony and be punishable by imprisonment for not less than one year, and not more than five years.
Pistol or Revolver-Possession Without Permit.

Exhibit 8
0331

SEc. 5. No person shall carry, within the State of Indiana, a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a permit therefor as hereinafter provided. Violations of this section shall constitute a misdemeanor and be punished by a line of one hundred dollars ($100.00), to which may be added imprisonment for not more than one year, and upon conviction the pistol or revolver shall be confiscated and destroyed by the sheriff on order of the court.

Persons Exempt From Act.

SEc. 6. The provisions of the preceding section shall not apply to marshals, sheriffs, deputy sheriffs, policemen or any other duly appointed peace officers, nor the pistols or revolvers of any bank, trust company, or common carriers, or to the officers or employes of any bank, trust company, or common carriers, while such officers or employes are guarding money or valuables within the line of their duties as such employes, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps or the mail service of the United States, or the national guard, when on duty, or organizations by law authorized to purchase or receive such weapons from the United States, or the State of Indiana, nor to duly authorized military or civil organizations when parading, nor to the members thereof when at .or going to or from their customary places of assembly.

Permits-Clerk of Circuit Court-Application-Form Fee.

SEC. 7. The clerk of any circuit court of the State of Indiana, shall, upon application of any citizen having a bona fide residence or place of business within the State of Indiana, or of any person having a bona fide residence or place of business within the United States, and a permit to carry a firearm concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a permit to such citizen to carry a pistol or revolver within the State of Indiana, during the period of one year or until revoked, as herein provided. Such application for permit Shall be signed by two resident householders and freeholders of the county in which the applicant lives, and it shall appear from such application that the applicant is a suitable person to be granted a

permit under the law. The permit shall be in duplicate, in form to be prescribed by the adjutant general of the State of Indiana, and shall bear the name, address, description and signature of the applicant and reason given for desiring a permit. The original thereof shall be delivered to the applicant, the duplicate shall be preserved for six years by the clerk of the circuit court issuing the same. For each permit so issued, the applicant shall pay the sum of one dollar ($1.00).

Minors-Sale of Pistols or Revolvers to Prohibited.

SEc. 8. Any person or persons who shall, within the State of Indiana, sell, barter, hire, lend, or give to any minor under the age of twenty-one years, any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars ($100.00), or be imprisoned for not more than three months, or both, except for uses as hereinbefore provided.

Sale of Pistols and Revolvers-Record-Penalty.

SEc. 9. No person shall within the State of Indiana sell, deliver or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is not a citizen or has been convicted of a felony against the person or property of another, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made, the purchaser or his duly authorized agent and the seller or his duly authorized agent shall in the presence of each other sign in duplicate a statement containing the purchaser's full name,

Exhibit 8
0332

age, dress, place of birth, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, forward by registered mail, to the clerk of the circuit court of the county in which the seller resides, one copy thereof and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall constitute a misdemeanor and shall be punished by a fine of not less than one hundred dollars ($100.00), or by imprisonment for not more than one year, or by both such fine and imprisonment.

Pistols and Revolvers-Sale Without License.

SEC. 10. Whoever, within the State of Indiana, without being licensed as hereinafter provided, sells, delivers, transfers, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be deemed guilty of a felony and upon conviction thereof shall be punished by imprisonment for not less than one year nor more than two years.

Dealers' Licenses-Conditions on Which Sold-Record Advertisement.

SEC. 11. The clerk of the circuit court of any county may grant licenses, to any reputable, established dealer, on forms to be prescribed by the adjutant general, permitting the licensee to sell at retail within the State of Indiana pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered: (a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor, (b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor, (c) If the seller has reasonable cause to believe that the purchaser is an unnaturalized foreign-born person or has been convicted of a felony against the person or property of another.

4. A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the adjutant general and shall be signed by the purchaser and by the person effecting the sale, and in the presence of each other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, age, place of birth, nationality of the purchaser. One copy of said record shall,

within seven days, be forwarded by registered mail to the clerk of the circuit court of the county in which the seller resides, and the other copy shall be retained by the seller for six years.

5. No pistol or revolver, or placard advertising the sale thereof, or imitation thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

False Information.

SEC. 12. If any person in purchasing or otherwise securing delivery of a pistol or revolver or applying for a permit to carry same within the State of Indiana shall give false information or offer false evidence of his identity he shall be deemed guilty of a felony and upon conviction shall be punished by imprisonment for not less than one year nor more than five years.

Obliteration of Make, Model, Number-Penalty.

SEC. 13. No person shall within the State of Indiana, change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed,

Exhibit 8
0333

altered, removed, or obliterated, shall be prima facie evidence that such possessor has changed, altered, removed, or obliterated the same. Violations of this section shall be a misdemeanor and shall be punished by imprisonment for not less than six months nor more than one year.

Felony-Possession of Revolver Prima Facie Evidence.

SEC. 14. In the trial of a person charged with committing or attempting to commit a felony against the person or property of another while armed with a pistol or revolver, without having a permit to carry such firearm as hereinbefore provided, the fact that such person was so armed shall be prima facie evidence of his intent to commit such felony.

Weapons Exempt.

SEC. 15. This act shall not apply to antique pistols or revolvers incapable of use as a deadly weapon.

Prior Licenses.

SEC. 16. Any or all licenses heretofore issued to carry or possess revolver or pistol shall be revoked and rendered null and void on and after thirty days from the taking effect of this act.

Revocation of License.

SEC. 17. Hereafter in any court of record upon trial of any person for a penal offense, and upon a showing that such person is not a fit person to carry concealed weapons, the court may enter an order revoking such person's license to carry concealed weapons and such fact shall be communicated to the public officer issuing the same.

Licensed Dealers-Statement–Penalty.

SEC. 17 1/2. It shall be unlawful from and after the taking effect of this act, for any person, firm or corporation to receive or have in his or its possession within the State of Indiana any pistol or revolver purchased or acquired after the taking effect of this act, except a licensed dealer, who shall not have signed and forwarded to the clerk of the county in which he resides the statements provided for in section 9 of this act, before or at the time of taking possession of such pistol or revolver. Whoever shall violate the provisions of this section of this act shall be deemed guilty of a misdemeanor and shall upon conviction thereof be- fined not more than $100, to which may be added imprisonment for not more than sixty days.

Repeal.

SEC. 18. All laws and parts of laws in conflict herewith are hereby repealed.

Unconstitutional Provisions.

SEC. 19. If any provision or section of this act shall be held void or unconstitutional, all other provisions and all other sections of this act, which are not expressly held to be void or unconstitutional, shall remain in full force and effect.


## **IOWA**


John F. Dillon, The Revised Ordinances of the City of Davenport, Revised and Digested by Order of the City Council, Containing the Original and Amended City Charters, with Notes and References to Judicial Decisions Page 145, Image 145 (1866) available at The Making of Modern Law: Primary. 1855

[Ordinances of Davenport Iowa,] Chapter 19, An Ordinance to Prohibit the Discharge of fire-arms, fire-crackers, and rockets within the city, § 1. No person shall discharge any gun, pistol or other fire-arms, or use or discharge any fire-crackers, rockets, or any other description of fire-works, within the limits of said city, without permission in writing from the Mayor. § 2. Any

Exhibit 8
0334

person violating any provision of this ordinance, shall pay a fine of not less than two dollars nor more than ten dollars for each offense.

The Code: Containing All the Statutes of the State of Iowa, of a General Nature, Passed at the Adjourned Session of the Fourteenth General Assembly Page 76-77, Image 88-89 (1873) available at The Making of Modern Law: Primary Sources. 1873
Cities and Incorporated Towns, Powers, § 456. They shall have power to prevent injury or annoyance from anything dangerous offensive or unhealthy, and to cause any nuisance to be abated; to regulate the transportation and keeping of gunpowder or other combustible, and to provide or license magazines for the same; to prevent and punish fast or immoderate riding through the streets; to regulated the speed of trains and locomotives on railways running over the streets or through the limits of the city or incorporated town by ordinance, and enforce the same by a fine not exceeding one hundred dollars: to establish and regulate markets; to provide for the measuring or weighing of hay, coal, or any other article of sale; to prevent any riots, noise, disturbance, or disorderly assemblages; to suppress and restrain disorderly houses, houses of ill fame, billiard tables, nine or ten pin alleys, or tables and ball alleys, and to authorize the destruction of all instruments or devices used for purposes of gaming, and to protect the property of the corporation and its inhabitants and to preserve peace and order therein.

E. E. Aylesworth, Compiled Ordinances of the City of Council Bluffs; Containing the Original and Amended City Charter, with Statutes, Notes and References to Judicial Decisions Page 175, Image 175 (1880) available at The Making of Modern Law: Primary Sources. 1880
[Ordinances of the] City of Council Bluffs, [Misdemeanors,] § 16. Whoever shall discharge any cannon, gun, pistol or other fire-arms in or across any street or other public place, or in or across any private lot, tract of land or other place not of his own property, without first obtaining a permit to do so from the Mayor of the city, if in a public place, or from the owner of the lot or land if in a private place, shall be deemed guilty of misdemeanor, and on conviction thereof shall be punished by a fine of not less than three nor more than thirty dollars.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 168-169, Image 171-172 (1887) available at The Making of Modern Law: Primary Sources. 1887
Ordinances, City of Council Bluffs, Shooting Gallery, § 5. No person shall carry on or take part in carrying on any pistol gallery or shooting gallery without license therefor from said city, and the charge for such license shall be ten dollars per month, or fifty dollars per annum. §6. No licensee or his employee, or any person in charge of any pin alley, ball alley, pistol gallery or shooting gallery, shall at any time, without gain or profit, permit or allow any minor to be or remain in or about the same to play thereat, under penalty of the same fine and forfeiture as set forth in section 2 of this chapter.

## **KENTUCKY**

Charter of the City of Covington, and Amendments Thereto up to the Year 1864, and Ordinances of Said City, and Amendments Thereto, up to the Same Date Page 148-149, Image 148-149 (1864) available at The Making of Modern Law: Primary Sources. 1864

Exhibit 8
0335

Ordinances of the City of Covington, An Ordinance Regulating the Sale of Powder in the City of Covington, § 1. Be it ordained by the City Council of Covington, That it shall not be lawful for any person or persons to erect, within the limits of the corporation, any powder magazine, or any other building for the purpose of storing gun powder in greater quantities than is hereinafter specified; and any person violating the provision of this section, shall, on conviction before the Mayor, forfeit and pay a fine of one hundred dollars, and ten dollars for every twenty-four hours said building shall be used or occupied for the storage of more than twenty-five pounds of powder. § 2. Be it further ordained, That it shall not be lawful for any person to keep, in storage or for sale, more than one hundred pounds of powder in any one house in said city, at any one time: and that amount, or any part thereof, shall be securely and carefully kept, and closed up in a good and sufficient safe, so that it can not by any means be exposed. A violation of this section shall subject the person to a fine, on conviction, of five dollars for every offense. § 3. Be it further ordained, That no person or persons shall sell, or keep for sale, in said city, any gun powder without having first obtained a permission so to do from the Mayor of said city, who shall, before said license is granted, be fully assured and satisfied that the applicant has good and sufficient safes to keep powder in, in conformity with the second section of this ordinance; and when the Mayor is satisfied that the license may be granted, without too much risk to the community at large, he shall issue said license to the applicant, upon his paying into the City Treasury the sum of twenty dollars for one year's license, and to the Mayor fifty cents, and to the City Clerk twenty-five cents, for their certificates. Any person who shall sell any gun powder in said city from and after the passage of this ordinance, without having first obtained a license therefor, shall, for each and every offense, forfeit, pay, on conviction, the sum of five dollars and costs.

1874 Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6. To prohibit the manufacture of gunpowder or other explosive, dangerous, or noxious compounds or substances in said city, and to regulate their sale and storage by license.

## LOUISIANA

John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 68, Image 70 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of the Parish of East Feliciana,] Of Slaves, § 5. No slave shall carry a gun to hunt, except on the plantation of his master or mistress; nor then unless accompanied by the overseer or some other free white member of the family, or has a written permit from his owner or overseer, which permit shall state for what said slave is hunting: Any person having the charge of slaves, who shall permit this section to be violated, shall pay a fine of twenty dollars, for the use of the parish, upon information to any Justice, whose duty it is to take cognizance of the case.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court, and Constitutional Provisions, Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 242, Image 268 (1857) available at The Making of Modern Law: Primary Sources. 1857

Exhibit 8
0336

[Ordinances of the City of New dueOrleans,] Revenue – Taxes and Licenses, § No. 680. Every keeper of a pistol gallery, the whole tax being levied on each and every gallery, sixty dollars.

Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council Page 257, Image 257 (1870) available at The Making of Modern Law: Primary Sources. 1870

[Ordinances of the City of New Orleans,] Offences and Nuisances, § 635. No person shall fire or discharge any gun, pistol, fowling piece or fire-arms, within the limits of the city, or set fire to, or discharge any rocket, cracker, squib or serpent, or shall throw any lighted rocket, cracker, squib or serpent, within the limits of the city, without the license of the common council; Provided, that nothing herein contained shall apply to military reviews or to the lawful use of weapons in self defense.

## MAINE

The Revised Ordinances of the City of Portland, 1848 Page 22, Image 22 (1848) available at The Making of Modern Law: Primary Sources.

[Ordinances of the City of Portland,] Of Gunpowder, § 1. No person not licensed to keep and sell gunpowder shall keep or have in his shop, store, dwelling house or other tenement, at any one time, a larger quantity of gunpowder than one pound. § 2. No person licensed to keep and sell gunpowder shall have or keep in his store, shop, dwelling house or in any other tenement or place whatever at any one time, a larger quantity of gunpowder then twenty-five pounds. § 3. Every person licensed to keep and sell gunpowder shall provide himself with a strongly made copper chest or box with a copper cover well secured, with hinges and a lock of the same material, and the keg or canister in which said powder may be, shall be kept in said copper chest or box, which shall at all times be placed near the outer door of the building in which it is kept, in convenient place to remove in case of fire. § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board a quantity of gunpowder exceeding twenty-five pounds, or receive gunpowder on board exceeding twenty-five pounds, without first having obtained a permit from the mayor and aldermen, and said permit shall designate the wharf at which said powder may be landed, or received on board.

The Charter, Amendments, and Acts of the Legislature Relating to the Municipal Court, and the Ordinances of the City of Lewiston, Together with the Boundaries of the Several Wards, Regulations Respecting Gunpowder, and an Abstract of the Laws Relating to the Powers and Duties of Cities and Towns Page 43, Image 43 (1873) available at The Making of Modern Law: Primary Sources. 1873

Regulations Relating to Gunpowder, § 1. No person shall keep or have in any shop, store, dwelling house or tenement, in the city of Lewiston, at any one time a larger quantity of gun-powder than one pound, unless he is licensed by the mayor and aldermen to keep and sell gunpowder, or except as hereinafter provided. § 2. It shall not be lawful for any person or persons to sell any gunpowder which may at the time be within said city, in any quantity, by wholesale or retail, without having first obtained from the mayor and aldermen a license to sell

Exhibit 8
0337

gunpowder, and every license shall be written or printed, and duly signed by the mayor, on a paper upon which shall be written or printed a copy of the rules and regulations established by the city relative to keeping, selling and transporting gunpowder within said city; and every such license shall be in force one year from the date thereof, unless revoked by the mayor and aldermen; but such license may, prior to its expiration, be renewed by an endorsement thereon by the mayor, for the further term of one year, and so from year to year, provided, always, that it may at any time be rescinded or revoked by the mayor and aldermen, for good and sufficient reasons. § 3. Every person who shall receive a license to sell gunpowder, as aforesaid, shall pay for the same to the treasurer of the city the sum of three dollars, and for each renewal of the same, the sum of one dollar.

A.G. Davis, City Clerk, Charter and Ordinances, and Rules and Orders of the City Council. Revised February 1874 Page 52, Image 53 (1874) available at The Making of Modern Law: Primary Sources. 1874
City Ordinances, § 4. No person shall haul unto, or lay at any wharf in the city, any vessel having on board more than twenty-five pounds of gun-powder, nor discharge or receive on board exceeding that quantity, without having first obtained from the Mayor a permit therefor, designating the wharf at which said powder may be landed or received on board.

## MARYLAND

1806 Md. Laws 44, An Act To Restrain The Evil Practices Arising From Negroes Keeping Dogs, And To Prohibit Them From Carrying Guns Or Offensive Weapons, ch. 81
…it shall not be lawful for any negro or mulatto within this state to keep any dog, bitch or gun , except he be a free negro or mulatto, and in that case he may be permitted to keep one dog, provided such free negro or mulatto shall obtain a license from a justice of the peace for that purpose, and that the said license shall be in force for one year, and no longer, and if any dog or bitch owned by any negro, not possessed of such license, shall be seen going at large, it shall be lawful for any person to kill the same, and in case of any suit instituted therefor, the person or persons killing the said dog or bitch may plead the general issue, and give this act in evidence. II. …it shall not be lawful for any free negro or mulatto to go at large with any gun, or other offensive weapon; and in case any free negro or mulatto shall be seen going at large carrying a gun, or other offensive weapon, he shall be liable to be carried before any magistrate, in virtue of a warrant to be issued by any justice of the peace, directed to a constable of the county, and on conviction of having violated the provisions of this section of the act, such offender shall thereupon forfeit, to the use of the informant, such gun, or other offensive weapon, which shall thus have been found in his or her possession, and be subject to the payment of the costs which shall have accrued in such prosecution; provided, that nothing in this act shall extend to prevent any free negro or mulatto from carrying a gun, or other offensive weapon, who shall, at the time of his carrying the same, have a certificate from a justice of the peace, that he is an orderly and peacable person, which certificate shall be in force for one year from the date thereof and no longer.

Lewis Mayer, Revised Code of the Public General Laws of the State of Maryland, with the Constitution of the State Page 173, Image 202 (1879) available at The Making of Modern Law: Primary Sources. 1876

Exhibit 8
0338

Wild Fowl and Game, § 23. The clerk of the Circuit Court for Harford county, and the clerk of the Circuit Court for Cecil county, shall upon the application of any resident of the State of Maryland, being the owner of any sink-box, craft or sneak-boat, such as is allowed by this act to be used and employed in shooting at wild water fowl therefrom; and giving satisfactory evidence to said clerk that the said applicant is a resident of the State of Maryland, and is the bona fide owner of the sink-box, craft, or sneak-boat, grant a license under the seal of his court, to such applicant to gun after and shoot at wild water-fowl from such sink-box or sneak-boat northward of the line named and described in first section of this act from the first day of November in each and every year to the thirty-first day of March next succeeding thereafter in each and every year; provided that such license shall not authorize any person using such sink-box or sneak-boat to gun after or shoot at wild water-fowl therefrom within a less distance than half a mile from any shore in Harford or Cecil County, or southward of the line particularly described in the first section of this act.

1882 Md. Laws 257, An Act to . . . Exempt All That Portion of the Waters of the Chesapeake Bay Lying Northward of a Certain Line Therein Described from the Operation and Effect of Sections One and Three . . ., ch. 180, § 8
. . . the special police appointed by this act are authorized to arrest any person or persons who may be discovered in the act of hunting or shooting crippled ducks, or in purloining ducks that have been killed by other persons having a proper license to shoot, as well as other persons violating the provisions of this section, and upon conviction thereof before any justice of the peace of Cecil or Harford Counties, the license of such persons or persons shall be revoked, and such persons or persons, whether licensed or not, shall be fined not less than twenty dollars for each offense, and shall forfeit the boat and gun or guns, and material so employed in violation of the provisions of this section, which boat and gun or guns, and material shall be sold, and the proceeds of such fine and sale, after the costs of prosecution have been paid, shall go to the officer or officers making the arrest. . .

1882 Md. Laws 656
Section 1. Be it enacted by the General Assembly of Maryland, That it shall be unlawful for any person or persons within the State of Maryland to manufacture or sell, barter or give away the cartridge toy pistol to any one whomsoever Sec. 2. Be it enacted, That it shall be unlawful for any person, be he or she licensed dealer or not, to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years. Any person or persons violating any of the provisions of this act shall, on conviction thereof, pay a fine of not less than fifty nor more than two hundred dollars, together with the cost of prosecution, and upon failure to pay said fine and cost, be committed to jail and confined therein until such fine and costs are paid, or for the period of sixty days, whichever shall first occur.

## MASSACHUSETTS

William Henry Whitmore, The Colonial Laws of Massachusetts: Reprinted From the Edition of 1672, with the Supplements Through 1686: Containing Also, a Bibliographical Preface and Introduction, Treating of All the Printed Laws From 1649 to 1686: Together with the Body of

Exhibit 8
0339

Liberties of 1641, and the Records of the Court of Assistants, 1641-1644 Page 126, Image 330 (1890) available at The Making of Modern Law: Primary Sources. 1651 Prescriptions, (1651) § 2. And it is further ordered; that no person (except for the defence of themselves and their vessels at Sea) shall transport any gunpowder out of this jurisdiction, without license first obtained from some two of the Magistrates, upon penalty of forfeiting all such powder as shall be transporting or transported, or the value thereof.

A Collection Of Original Papers Relative To The History Of The Colony Of Massachusetts-Bay Page 492, Image 497 (1769) available at The Making of Modern Law: Primary Sources. 1769 Laws of the Colony of Massachusetts, That notwithstanding the ancient law of the country, made in the year 1633, that no person should sell any arms or ammunition to any Indian upon penalty of 10l. for every gun, 5l. for a pound of powder, and 40s. for a pound of shot, yet the government of the Massachusetts in the year 1657, upon the design to monopolize the whole Indian trade did publish and declare that the trade of furs and peltry with the Indians in their jurisdiction did solely and properly belong to their commonwealth and not to every indifferent person, and did enact that no person should trade with the Indians for any fort or peltry, except such as were authorized by the court, under the penalty of 100l. for every offence, giving liberty to all such as should have license from them to sell, unto any Indian, guns, swords, powder and shot, paying to the treasurer 3d. for each gun and for each dozen of swords; 6d. for a pound of powder and for every ten pound of shot, by which means the Indians have been abundantly furnished with great store of arms and ammunition to the utter ruin and undoing of many families in the neighboring colonies to enrich some few of their relations and church members.

The Revised Ordinances of 1885, of the City of Boston, as Passed and Approved December 14, 1885. (With Amendments Thereto, Passed and Approved, to May 1, 1886): Being the Ninth Revision. To Which are Added the Revised Standing Regulations of the Board of Aldermen. 9th Rev. Page 172, Image 182 (1886) available at The Making of Modern Law: Primary Sources. 1884 Ordinances of the City of Boston. Of Fire-Arms, Bonfires, and Brick-Kilns. § 4. No person shall sell to any child under the age of sixteen years without the written consent of a parent or guardian of such child, any cartridge or fixed ammunition of which any fulminate is a component part, or any gun, pistol, or other mechanical contrivance arranged for the explosion of such cartridge, or of any fulminate. But the provisions of this section shall not apply to paper caps of which the only component parts are chlorate of potash and sulphide of antimony, nor to any appliance for exploding the same. The provisions of this section shall be inserted in every license granted for the sale of gunpowder.

Revised Ordinances of 1892, of the City of Boston, and the Revised Regulations of 1892, of the Board of Aldermen of the City of Boston, Being the Eleventh Revision, Third Edition, Containing All Ordinances Passed Between March 3, 1892, and February 1, 1895, and All Regulations of the Board of Aldermen Passed Between July 22, 1892, and February 1, 1895 Page 115, Image 129 (1895) available at The Making of Modern Law: Primary Sources. 1895 Ordinances of Boston, Prohibitions and Penalties, § 91. No person shall manufacture or sell, or expose for sale, any guncotton, nitro-glycerine, or any compounds of the same, nor any fulminate or substance, except gunpowder, intended to be used by exploding or igniting it, in order to produce a force to propel missiles, or to rend substances apart, except in accordance with a

Exhibit 8
0340

permit from the board of fire commissioners; nor shall any person send or carry through the public streets any such substance, except in the manner and in the quantities allowed by statute or ordinance.

Revised Ordinances of the City of Woburn. Revised Woburn, Massachusetts Page 91 Image 91 (1898) available at The Making of Modern Law: Primary Sources. 1898
License to Sell Gunpowder in the City of Woburn. No person shall sell any gunpowder within the city, without such license. Every license shall be in force one year from the date thereof; provided, that any license may be rescinded by the City Council, at their discretion. § 3. Every person so licensed shall keep a sign over and outside of the principal entrance from the street of the building in which the powder is kept, in which shall be printed in capitals the words: "License to keep and sell gunpowder" § 4. The city clerk shall keep a record of all licenses, and of the places designated therein, which places shall not be changed, unless by consent of the City Council, in writing. Every person who receives a license shall sign his name to a copy of the rules prescribed in this chapter, as evidence of his assent thereto. §5. The provisions of the foregoing four sections shall not apply or extend to the keeping or storing of metallic cartridges in fire proof magazines, nor to cartridge manufacturers, so long as they shall keep their powder in canisters, as prescribed in section one, and in fire proof magazines, located and built to the satisfaction of the City Council so long as such manufacturers allow no more than one hundred pounds of gunpowder in any magazine, or five pounds of gunpowder not made into cartrdiges, in any workshop at any one time.

1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons
Section 2. Whoever, except as provided by the laws of this Commonwealth, carries on his person a loaded pistol or revolver, without authority or permission as provided in section one of this act, or whoever carries any stiletto, dagger, dirk-knife, slung-shot or metallic knuckles, shall upon conviction be punished by a fine of not less than ten nor more than one hundred dollars, or by imprisonment for a term not exceeding one year, or by both such fine and imprisonment.

1922 Mass. Acts 563, ch. 485, An Act Relative to the Sale and Carrying of Firearms, ch. 485, § 8 (amending § 130)
§ 8 (amending § 130). Whoever sells or furnishes to a minor under the age of fifteen, or to an unnaturalized foreign born person who has who has not a permit to carry firearms under section one hundred and thirty-one, any firearm, air gun or other dangerous weapon or ammunition therefor shall be punished by a fine of not less than ten nor more than fifty dollars, but instructors and teachers may furnish military weapons to pupils for instruction and drill.

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by

Exhibit 8
0341

gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty–one and one hundred and thirty one B. . . § 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

## MICHIGAN

The Revised Charter and Ordinances of the City of Detroit Page 150, Image 151 (1848) available at The Making of Modern Law: Primary Sources. 1848
[Ordinances of Detroit,] Prevention of Fires, § 9. No person shall fire or set off any squib, cracker, gunpowder or fire works, or fire any gun or pistol in any part of this city, unless by written permission of the Mayor or two Aldermen, which permission shall limit the time of such firing, and shall be subject to be revoked at any time by the Common Council; and any person or persons violating any of the provisions of this section, shall forfeit the penalty of five dollars for each and every offence. § 10. Every person firing a cannon within this city, unless by permission of the Mayor or two Aldermen, shall forfeit the penalty of twenty-five dollars: Provided, that nothing in this or the preceding section shall be construed to prohibit any military company from firing any gun or cannon when authorized by their commanding officer or officers.

1895 Mich. Local Acts 596, § 44
SEC. 44.  No person shall fire or discharge any gun or pistol firearms or fireworks. or carry firearms, or throw stones or other missiles within said park or boulevard, nor shall any person fire, discharge or set off any rocket, cracker, torpedo, squib or other fireworks or things containing any substance of any explosive character on said park or boulevard, without the permission of said commissioners, and then only under such regulations as they shall prescribe.

1913 Mich. Pub. Acts 472, An Act Providing for the Registration of the Purchasers of Guns, Pistols, Other Fire-arms and Silencers for Fire-arms and Providing a Penalty for Violation, § 1-2. Every person, firm or corporation engaged in any way or to any extent in the business of selling at retail guns, pistols, other fire-arms and silencers for fire-arms shall keep a register in which shall be entered the name, age, occupation and residence (if residing in the city with the street number of such residence) of each and every purchaser of such guns, pistols, other fire-arms or silencers for fire-arms together with the number or other mark of identification, if any, on such gun, pistol, other fire-arms or silencer for firearms which said register shall be open to the inspection of all peace officers at all times. § 2. Every person violating any of the provisions of this act shall be deemed guilty of a misdemeanor and shall upon conviction be subject to a fine of not more than fifty dollars or to imprisonment in the county jail for not more than ten days or to both such fine and imprisonment in the discretion of the court.

1925 Mich. Pub. Acts 473, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 2-4.
§ 2. Any person who shall commit or attempt to commit a felony when armed with a pistol, revolver or gun, as defined in section one, shall, in addition to the punishment provided for

Exhibit 8
0342

committing the crime, be punished by imprisonment for not less than two nor more than five years within the discretion of the court. § 3. The court shall have power to sentence any person who may be convicted of a second offense to double the addition penalty imposed under section two thereof for carrying such concealed weapon without a license. § 4. In the trial of a person for the commission of murder, assault with intent to do great bodily harm, robbery, larceny, or any attempt to commit any of such offenses, the fact that he was armed with a pistol, revolver or gun as herein defined and had no permit to carry the same, shall be prima facie evidence of his intention to commit the crime with which he is charged[.]

No person shall carry a pistol, revolver or gun concealed on or about his person or in any vehicle owned or operated by him, except in his dwelling house, place of business or on his premises, without a license therefor, as hereinafter provided. The provisions of this section, however, shall not apply to the regular and ordinary transportation of pistols, revolvers or guns as merchandise, or to any member of the army, navy or marine corps of the United States, or to the national guard when on duty, or organizations by law authorized to purchase or receive such weapons from the United States or from this state, nor to duly authorized military organizations when on duty, nor to the members thereof when going to or returning from their customary places of assembly, nor to wholesale or retail dealers therein, nor to peace officers of the state.


1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7.

No person shall deliver or otherwise transfer a pistol, revolver or gun as defined in this act, to a person unless it be securely wrapped and unloaded. Before the same is delivered to the purchaser, he shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, nationality, the date of sale, the caliber, make, model and manufacturer's number of the weapon. The seller shall, within thirty days thereafter, sign and mail by registered letter one copy thereof to the secretary of state, one copy to the chief of police of the city or village in which the same was sold or to the sheriff of the county of which the seller is a resident and shall retain the other copy. This section shall not apply to sales at wholesale. Any person convicted of wilfully violating the provisions of this section shall be punished by a fine of not less than one hundred dollars or by imprisonment of not more than one year or by both such fine and imprisonment in the discretion of the magistrate.


1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .


1927 Mich. Pub. Acts 891, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 9.

Exhibit 8
0343

SEC. 9. On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county. Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section. A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and field and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be. The provisions of this section shall not apply to wholesale or retail dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five. Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

## MINNESOTA

Henry John Horn, The Charter and Ordinances of the City of St. Paul, Together with Legislative Acts Relating to the City, and the State Constitution, in an Appendix Page 113, Image 114 (1858) available at The Making of Modern Law: Primary Sources. 1858
Revised Ordinances [of the City of St. Paul], An Ordinance to Restrain the Use of Fire Arms and the Exhibition of Fire Works. The Common Council of the City of Saint Paul do ordain as follows: § 1. It shall not be lawful for any person to fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or to exhibit any fire works or make or exhibit any bonfire, within the limits of said city, without permission from the Common Council or written permission from the Mayor, which permission shall limit the time of such firing, and shall be subject to be revoked by the Common Council at any time after it has been granted. §2. Any person violating any provision of this ordinance, shall on conviction thereof, be punished by a fine not exceeding one hundred dollars.

The Charter and Ordinances of the City of St. Paul, (To August 1st, 1863, Inclusive,) Together with Legislative Acts Relating to the City. Page 166-167, Image 167-168 (1863) available at The Making of Modern Law: Primary Sources. 1858
Ordinances of the City of St. Paul, An Ordinance to Regulate the Sale of Gunpowder, § 1. No person shall keep, sell or give away gunpowder or guncotton in any quantity without first having paid into the City Treasurer the sum of five dollars, and obtain from the Common Council a

Exhibit 8
0344

permission in writing, signed by the Mayor and Clerk, and sealed with the corporate seal, under a penalty not exceeding fifty dollars, for every offence, provided any person may keep for his own use not exceeding one pound of powder or one pound of gun cotton, at one and the same time. § 2. All applications for permits shall be addressed to the Common Council, in writing, signed by the applicant. Not exceeding four permits shall be granted in any one block; when the number of applications in any block shall at any time exceed the numbers to be granted, the requisite number shall by chosen by ballot. When issued, the Clerk shall make an entry thereof in a register to be provided for the purpose which entry shall state the name and place of business, and date of permits. Persons to whom permits may be issued, shall not have or keep at their place of business or elsewhere within the city, a greater quantity of gunpowder or guncotton than fifty pounds at one time, and the same shall be kept in tin canisters or cans, or kegs securely looped and headed, containing not to exceed twenty-five pounds each and in a situation remote from fires or lighted lamps, candles or gas, from which they may be easily removed in case of fire. Nor Nor shall any person sell or weigh any gunpowder or guncotton, after the lighting of lamps in the evening, unless in sealed canisters or cans. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word "gunpowder" painted or printed thereon in large letters. Any person violating any clause of this section, shall, upon conviction therof be punished by a fine of not less than ten, nor more than one hundred dollars. § 3. No person shall convey or carry any gunpowder or guncotton, exceeding (one pound in quantity) through any street or alley in the city, in any cart, carriage, wagon, dray, wheelbarrow, or otherwise, unless the said gunpowder or guncotton be secured in tight cans or kegs well headed and hooped, sufficient to prevent such gunpowder or guncotton from being spilled or scattered, under a penalty of fifty dollars. § 4. All permissions granted under this ordinance shall expire on the second Tuesday of May in each year; and no permit shall be granted to any retailer of intoxicating liquors, or to any intemperate person. The clerk shall be entitled to a fee of one dollar for every permit which may be issued.

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882
Concealed Weapons – License, § 1. It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such

Exhibit 8
0345

person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources. 1888.
Making, Selling, etc., Dangerous Weapons, § 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor. Carrying, using, etc., certain Weapons, § 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

Harry Toulmin, Ordinances of the City of Saint Paul, from May, 1887, to July, 1889 Page 90, Image 90 (1889) available at The Making of Modern Law: Primary Sources. 1889
Ordinances of the City of St. Paul, [Establishing and Fixing the License to be Paid to the City of St. Paul for Conducting, Managing or Carrying on Either or any of the Different Branches of Business Hereinafter Mentioned and Limiting the Duration Thereof, and Also Repealing Certain Ordinances Herein Named,] § 2. The different and various kinds of business, employments and avocations for which licenses are hereby fixed and established, and the sum and amount of the license for each separate one are as follows, to wit: Gun powder ……………..$15.00.

## MISSISSIPPI

1804 Miss. Laws 90-91, An Act Respecting Slaves, § 4.
[Slaves not to carry offensive or defensive weapons]. [N]o Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with, or that he is ordered by his master, mistress or overseer to carry the said articles from one place to another, but all, and every gun, weapon or ammunition found in the possession or custody of any slave, may be seized by any person, and upon due proof thereof made before any justice of the peace of the county or corporation, where such seizure shall be made, by his order, be forfeited to the seizer for his own use; and moreover, every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty nine, on his bare back for every such offence: Provided nevertheless, That any justice of the peace may grant, in his proper county, permission in writing, to any slave, on application of his master, or overseer to carry and use a gun and ammunition within the limits of his said master's or owner's plantation, for a term not exceeding one year, and recoverable, at any time within such term, at the discretion of said justice.

[REGULATORY TAX] 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.
[A] tax of not less than five dollars or more than fifteen dollars shall be levied and assessed annually by the board of Police of Washington county upon every gun and pistol which may be

Exhibit 8
0346

in the possession of any person in said county, which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain and seize such gun or pistol, and sell the same for cash at the door of the Court House, after giving ten days notice by advertisement, posted in front of said Court House, and out of the proceeds of such sale, there shall be paid the amount of such tax and the cost of sale, and if any surplus remains, it shall be paid to the owner of such gun or pistol. The amount of the tax so assessed and collected, shall be paid to the county Treasurer, and shall constitute a part of the bridge fund of said county.

1906 Miss. Laws 367, Privilege Taxes, ch. 114, § 3887.
Dealers in Deadly Weapons: On each person or firm dealing in pistols, dirk knives, sword canes, brass or metallic knuckles, or other deadly weapons (shotguns and rifles excepted) – 100.00. And which shall be in addition to all and any other taxes or privileges paid. On each firm or dealer selling air guns, target or flobert rifles (and this shall apply even if the same has a license to sell merchandise, pistols or cartridges) – $25.00.

## MISSOURI

Henry S. Geyer, A Digest of the Laws of Missouri Territory. Comprising: An Elucidation of the Title of the United States to Louisiana:-Constitution of the United States:-Treaty of Session:-Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818
Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Adam B. Chambers, The Revised Ordinances of the City of Saint Louis, Revised and Digested by the Fifth City Council during the First Session, Begun and Held in the City of St. Louis, on the Second Monday of May, A. D. 1843. with the Constitutions of the United States and the State of Missouri, and the City Charter Page 304, Image 305 (1843) available at The Making of Modern Law: Primary Sources. 1843
[Ordinances of Kansas City,] Misdemeanors, § 10. Every person who shall discharge any cannon or other ordinance, or fire off any carbine, fusil, rifle, musket, gun, pistol, or other arms, or set off any squib or cracker, or fly any kite in the air, within the city, shall be deemed guilty of a misdemeanor. This section shall not apply to the firing of salutes by any military corps, or to the

Exhibit 8
0347

firing of salutes upon any occasion of general public interest. Provided, such firing be caused by persons, associations or companies, volunteers or otherwise, who may be engaged in lawful celebrations of public rejoicings, or in the lawful military exercises of said companies or volunteers; nor to prevent any manufacturer from trying or proving the articles manufactured by him within the limits of the city, provided the same be done without danger or injury to the neighborhood. § 11. Every person who shall fire any heavy cannon, or set off any rockets or fire works, or illuminate in any unusual manner any house or building, without first having obtained written permission from the Mayor, specifying the time and place, when and where the same shall be allowed, shall be deemed guilty of a misdemeanor.

1844 Mo. Laws 577, An Act To Restrain Intercourse With Indians, ch. 80, § 4.
No person shall sell, exchange or give, to any Indian, any horse, mule, gun, blanket, or any other article or commodity whatever, unless such Indian shall be traveling through the state, and leave a written permit from the proper agent, or under the direction of such agent in proper person.

1854 Mo. Laws 1094, An Act Concerning Free Negros and Mulattoes, ch. 114, §§ 2-3.
§ 2. No free negro or mulatto shall be suffered to keep or carry any firelock, or weapon of any kind, or any ammunition, without license first had and obtained for the purpose, from a justice of the peace of the county in which such free negro or mulatto resides, and such license may be revoked at any time by the justice granting the same or by any justice of the county. § 3. Any gun, firelock, or weapon of any kind, or any ammunition, found in the possession of any free negro or mulatto not having a license, as required by the last preceding section, may be seized by any person, and upon due proof thereof, before any justice of the peace of the county in which such seizure shall have been made, shall be forfeited by order of such justice, to the person making the seizure, for his own use.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources. 1871
Ordinances of the City of St. Louis, Misdemeanors, § 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence. § 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880
Chapter XXXIV. Public Safety. . . .
Sec. 3. No person shall, in this city, wear under his clothes or concealed about his person, any pistol or revolver, except by special permission from the Mayor; nor shall any person wear under

Exhibit 8
0348

his clothes, or concealed about his person, any slung-shot, cross knuckles, knuckles of lead, brass or other metal, or any bowie knife, razor, billy, dirk, dirk-knife or dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon. Any person, violating any provision or requirement of this section, shall be deemed guilty of a misdemeanor, and, upon conviction thereof before the City Recorder, shall be fined not less than fifty dollars nor more than five hundred dollars : Provided, however, That this section shall not be so construed as to prevent any United States, State, County or City officer, or any member of the City government, from carrying such weapons as may be necessary in the proper discharge of his duties.

Henry Smith Kelley, Laws Applicable to and Governing the City of Saint Joseph, Mo., As a City of the Second Class, Contained in the Revised Statutes of 1879, and Subsequent Legislative Enactments; Also the General Ordinances Now in Force, Revised and Made to Conform to the Laws Governing Such Cities Page 192, Image 222 (1888) available at The Making of Modern Law: Primary Sources. 1888
General Ordinances [of the City of St. Joseph], [Amusement-Shows,] Shooting Gallery; license for. — § 3. No person shall carry on or take part in carrying on, any pistol gallery or shooting gallery, without a license therefor from said city; and the charge for such license shall be five dollars per month.

The Municipal Code of St. Louis (St. Louis: Woodward 1901), p.738, Sec. 1471. 1892
Chapter 18. Of Misdemeanors.
Sec. 1471. Concealed weapons – carrying of, prohibited.
Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offense.

The Revised Ordinances of the City of Huntsville, Missouri, of 1894. Collated, Revised, Printed and Published by Authority of the Mayor and Board of Aldermen of the City of Huntsville, Missouri, Under an Ordinance of the Said City, Entitled: "An Ordinance in Relation to Ordinances, and the Publication Thereof." Approved on the 11th Day of June, 189 Page 58-59, Image 58-59 (1894) available at The Making of Modern Law: Primary Sources. 1894
Ordinances of the City of Huntsville, An Ordinance in Relation to Carrying Deadly Weapons, § 1. If within the city any person shall carry concealed upon or about his person any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under militia law of the state, having upon or about his person any kind of fire arms, bowie-knife, dirk, dagger, sling-shot, or other deadly weapon or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, he shall be deemed guilty of a

Exhibit 8
0349

misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than five nor more than one hundred dollars, or by imprisonment in the city prison not exceeding thirty days nor less than five days or by both such fine and imprisonment; provided, the Mayor may grant permission to any person to discharge gun, pistol or other firearms under the proper circumstances shown to him. § 2. The next preceding section shall not apply to police officers, nor to any officer or person whose duty it is to exercise process or warrants, or to suppress breaches of the peace or to make arrests, nor to persons moving or travelling peaceably through this state; and it shall be good defense to the charge of carrying such weapon, if the defendant shall show that he has been threatened with great bodily harm, or had good reason to carry the same in the necessary defense of his home, person or property.

Francis M. Wilson, The Revised Statutes of the State of Missouri, 1899. To This Volume are Annexed the Acts of Congress in Relation to the Election of United States Senators, in Relation to Fugitives from Justice, Concerning Naturalization and the Authentication of Public Records; an Appendix Containing the Scheme and Charter of and Laws Specially Applicable to the City of St. Louis and the Acts Establishing the Criminal Court of the Fifteenth Circuit, the Criminal Court of Jackson County, the Criminal Court of Buchana County, the Criminal Court of Greene County, the Louisiana Court of Common Pleas, the Hannibal Court of Common Pleas, the Cape Girardeau Court of Common Pleas and the Sturgeon Court of Common Pleas. Revised and Promulgated by the Fortieth General Assembly Page 1752, Image 645 (Vol. 2, 1899) available at The Making of Modern Law: Primary Sources. 1899
[Permit to Keep Explosives, § 7457. No person, corporation or joint-stock company shall, on and after ten days after this article shall take effect, have retain or keep in his possession or under his or her control, nor sell, give away or in any manner or way dispose of dynamite, giant powder, nitro-glycerine or any explosive substance, except gunpowder and blasting powder for ordinary purposes, without first obtaining a permit authorizing the same from the clerk of the county court, or mayor of the city of St. Louis, in whichever county or city such applicant may desire to do such business, nor without first making and delivering the affidavit required by the next succeeding section of this article.]

1921 Mo. Laws 691, 692
Section 1. Pistol, revolver or firearms to be plainly marked. No wholesaler or dealer therein shall have in his possession for the purpose of sale, or shall sell, any pistol, revolver, or other firearm of a size which may be concealed upon the person, which does not have plainly and permanently stamped ,upon the metallic portion thereof, the trademark or name of the maker, the model and the serial factory number thereof, which number shall not be the same as that of any other such weapon of the same model made by the same maker, and the maker, and no wholesale or retail dealer therein shall have in his possession for the purpose of sale, or shall sell, any such weapon unless he keep a full and complete record of such description of such weapon, the name and address of the person from whom purchased and to whom sold, the date of such purchase or sale, and in the' case of retailers the date of the permit and the name of the circuit clerk granting the same, which record shall be open to inspection at all times by any police officer or other peace officer of this state.
Sec. 2. Shall secure permit to acquire weapon.-No person, other than a manufacturer or wholesaler thereof to or from a wholesale or retail dealer therein, for the purposes of commerce, shall directly or indirectly buy, sell, borrow, loan, give away, trade, barter; deliver or receive, in

Exhibit 8
0350

this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, unless the buyer, borrower or person receiving such weapon shall first obtain and deliver to, and the same be demanded and received by, the seller, loaner, or person delivering such weapon, within thirty days after the issuance thereof, a permit authorizing such person to acquire such weapon. Such permit shall be issued by the circuit clerk of the county in which the applicant for a permit resides in this state, if the sheriff be satisfied that the person applying for the same is of good moral character and of lawful age, and that the granting of the same will not endanger the public safety. The permit shall recite the date of the issuance thereof and that the same is invalid after thirty days after the said date, the -name and address of the person to whom granted and of the person from whom such weapon is to be acquired, the nature of the transaction, and a full description of such weapon, and shall be countersigned by the person to whom granted in the presence of the circuit clerk. The circuit clerk shall receive therefor a fee of $0.50. If the permit be used, the person receiving the same shall return it to the circuit clerk within thirty days after its expiration, with a notation thereon showing the date and manner of the disposition of such weapon. The circuit clerk shall keep a record of all applications for such permits and his action thereon, and shall preserve all returned permits. No person shall in any manner transfer, alter or change any such permit or make a false notation thereon or obtain the same upon any false representation to the circuit clerk granting the same, or use or attempt to use a permit granted to another.

Sec. 3. Weapons must be stamped.-No person within this state shall lease, buy or in anywise procure the possession from any person, firm or corporation within or without the state, of any pistol, revolver or other firearm of a size which may be concealed upon the person, that is not stamped as required by section 1 of this act; and no person shall buy or otherwise acquire the possession of any such article unless he shall have first procured a written permit so to do from the circuit clerk of the county in which such person resides, in the manner as provided in section 2 of this act.

Sec. 4. Manufacture not prohibited.-Nothing herein contained shall be considered or construed as forbidding or making it unlawful for a dealer in or manufacturer of pistols, revolvers or other firearms of a size which may be concealed upon the person, located in this state, to ship into other states or foreign countries, any such articles whether stamped as required by this act or not so stamped.

## MONTANA

Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895 Crimes Against the Public Peace, § 759: Every person who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor, is punishable by imprisonment in the state prison not exceeding ten years and by a fine not exceeding ten thousand dollars.

1913 Mont. Laws 53, An Act to Provide that Aliens Shall Pay a Gun License, and Providing a Penalty for Failure to Obtain License; to Provide for and Regulate the Duties of the Game and

Exhibit 8
0351

Fish Warden and His Deputies, and to Provide for the Disposition of the Fines so Collected, ch. 38, § 1.

There is hereby created a gun license for aliens. No person not a bona fide citizen of the United States shall own or have in his possession, in the State of Montana, any gun, pistol or other firearm without first having obtained from the Game and Fish Warden a license therefor, which said license shall cost the owner of said firearm the sum of Twenty-five ($25) Dollars, and shall expire one year from date of issuance thereof; provided, however, that this section shall not apply to one who has obtained the Twenty-five ($25) Dollar hunting license required by the laws of Montana; provided, further, that the provisions of this section shall not apply to any alien who is a bona fide resident of the State of Montana and the owner of not less than one hundred and sixty acres of land therein, nor shall it apply to any settler on the public lands of the State of Montana who shall have begun to acquire land under the laws of the United States by filing thereon, nor shall it apply to persons engaged in tending or herding sheep or other animals, held in herd.

1918 Mont. Laws 6-7,9, An Act Entitled "An Act Providing for the Registration of All Fire Arms and Weapons and Regulating the Sale Thereof and Defining the Duties of Certain County Officers and Providing Penalties for a Violation of the Provisions of This Act," ch. 2, §§ 1, 3, 8.

§ 1. Within thirty days from the passage and approval of this Act, every person within the State of Montana, who owns or has in his possession any fire arms or weapons shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered. § 3. Any person signing a fictitious name or address or giving any false information in such report shall be guilty of misdemeanor, and any person failing to file such report as in this Act provided, shall be guilty of a misdemeanor. § 8. For the purpose of this Act a fire arm or weapon shall be deemed to be any revolver, pistol, shot gun, rifle, dirk, dagger, or sword.

## NEBRASKA

1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

The City Council shall have power to license all . . . vendors of gunpowder[.]

1895 Neb. Laws 210, Laws of Nebraska Relating to the City of Lincoln, An Ordinance Regulating and Prohibiting the Use of Fire-arms, Fire-works and Cannon in the City of Lincoln . . . Prescribing Penalties for Violation of the Provisions of This Ordinance, and Repealing Ordinances in Conflict Herewith, Art. XVI, § 6.

The Mayor may grant to so many and such persons as he may think proper, licenses to carry concealed weapons, and may revoke any and all of such licenses at his pleasure. Every such license shall state the name, age, occupation, and residence, of the person to whom granted, and shall be good for one year. A fee of fifty cents shall be paid therefor to the City Treasurer, and by him placed in the police fund.

Exhibit 8
0352

## NEW HAMPSHIRE

1820 N.H. Laws 274-76, An Act to Provide for the Appointment of Inspectors and Regulating the Manufacture of Gunpowder, ch. 25, §§ 1-9.

§ 1. [T]he Governor . . . is hereby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state, and such other places as may by him thought to be necessary[.] § 2. [F]rom and after the first day of July next, all gunpowder which shall be manufactured within this state shall be composed of the following proportions and quality of materials . . . § 3. It shall be the duty of each of said inspectors to inspect, examine and prove all gunpowder which after the first day of July shall not be deposited at any publick [sic] powder magazine, or manufactory of this state . . . § 4. [N]o gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four and an half inch howitzer, with the howitzer elevated so as to form an angle of forty-five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy-five yards at the least. § 5. [W]henever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure, ill manufactured, or deficient gunpowder, with the word "Condemned" on both heads of the cask . . . § 6. [I]f any person shall knowingly sell any condemned gunpowder . . . every such person, so offending, shall forfeit and pay not less than two hundred nor more than five hundred dollars . . . § 7. [E]ach inspector . . . be sworn to the faithful and impartial discharge of the duties of his office, and each inspector shall be allowed one cent for each pound of gunpowder, by him examined, inspected and proved . . . to be paid by the owner or owners of the gunpowder. § 8. [I]f any manufacturer of gunpowder shall sell or dispose of, or shall cause or permit to be sold or disposed of, or shall export or cause to be exported withou the limits of this state, any powder of his manufacture, before the same has been inspected and marked agreeably to the provisions of this act, he shall forfeit and pay the sum of fifty cents for every pound of powder so sold, disposed of, or exported, to be recovered in the manner provided in the sixth section of this act. § 9. [I]f any person with within this state . . shall knowingly sell, expose, or offer for sale, within this state, any gunpowder which is not well manufactured, or which is composed of impure materials, and which shall not be composed of the proof herein before required, shall forfeit and pay not less than five dollars nor more than fifty dollars for each and every offence, to be recovered in the manner provided in the sixth section of this act.

1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

That if any person or persons shall within the compact part of the town of Portsmouth, that is to say, within one mile of the courthouse, fire or discharge any cannon, gun, pistol or other fire arms, or beat any drum, (except by command of a military officer, having authority therefor) or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, (except by the permission of the police officers, or of a major part of them first had in writing) . . . every such person, for every such act shall be taken and deemed to be an offender against the police of Portsmouth, and shall be liable to the penalties hereinafter expressed.

Exhibit 8
0353

The Charter, with Its Amendments and the General Ordinances of the City of Dover Page 32, Image 32 (1870) available at The Making of Modern Law: Primary Sources. 1870 General Statutes [Ordinances of the City of Dover, [New Hampshire] Offences Against the Police of Towns,] § 5. No person shall, within the compact part of any town, fire or discharge any cannon, gun, pistol, or other fire-arms, or beat any drum, except by command of a military officer having authority therefor, or fire or discharge any rockets, squibs, crackers, or any preparation of gunpowder, except by permission of a majority of the police officers or selectmen in writing, or make any bonfire, or improperly use or expose any friction matches, or knowingly raise or repeat any false cry of fire.

1917 N.H. Laws 727-28, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, §§ 1-3, 6.
§ 1. No person shall manufacture, sell, or deal in firearms or in gunpowder, dynamite, nitro-glycerine, or other form of high explosive, unless he shall first obtain, from the selectmen of the town or the chief of police of the city where such business is to be conducted, a written license therefor, and no person shall conduct such business within the state but outside the limits of any organized town or city, unless he shall first obtain such license from the county commissioners of the county in which such business is to be conducted; which license shall specify the building where such business is to be carried on or material deposited or used. § 2. No such licensed person shall sell or deliver firearms to any person not a citizen of the United States, unless he shall have legally declared his intention of becoming a citizen, or any such explosive material or compound to any person, except upon presentation of a permit such as is hereinafter provided for, nor unless satisfied that the same is to be used for a lawful purpose. § 3. Every person so licensed shall keep, on blanks to be furnished by the secretary of state, a record of the names and residences of all persons to whom he shall sell or deliver firearms or any such explosive material or compound, the purpose of which the same is to be used¸ the date of sale, the amount paid, the date of the purchaser's permit, the name and title of the person by whom the permit was issued, and, within five days after such sale or delivery, shall file such record thereof with the clerk of the city or town wherein he sale or delivery was made, or with the county commissioners in case of sales or deliveries within the state, but outside the limits of any organized city or town. The records thus filed shall at all times be open to the inspection of the police departments, or other public authorities. He shall also affix to the receptacle containing such explosive material or compound a label with the name of the compound, his own name, and the date of sale.
§ 6. No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the

Exhibit 8
0354

firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1917 N.H. Laws 728-29, An Act for the Regulation of the Sale and Use of Explosives and Firearms, ch. 185, § 6.

No person not a citizen of the United States or one who has legally declared his intention of becoming such a citizen shall have in his possession any firearm or firearms of whatsoever kind or description unless he has a written permit to have such possession issued and signed as hereinafter provided. Any such person desiring to possess a firearm or firearms for any lawful purpose shall first make written application to the chief of police or selectmen of the town wherein he resides . . . stating the purposes for which the possession of the firearm or firearms is desired and a description of the firearm or firearms. The applicant shall also state his full name, occupation, place of residence and if in a city the street and number. If such chief of police or selectmen or county commissioners are satisfied that the applicant intends to use the firearm or firearms in a lawful manner and as set forth in his application, a permit shall be issued, signed by the chief of police of the city, a selectmen of the town, or county commissioners, as the case may be, giving to the applicant the right to have in his possession such firearm or firearms. The holder of any such permit shall keep the permit on his person at all times when he is in possession of the firearm or firearms as authority for such possession and shall exhibit the same when so requested by any person.

1923 N.H. Laws 138

SECTION 1. Pistol or revolver, as used in this act shall be construed as meaning any firearm with a barrel less than twelve inches in length.

SECT. 2. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall in addition to the punishment provided for the crime, be punished by imprisonment for not more than five years.

SECT. 3. No unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another shall own or have in his possession or under his control a pistol or revolver, except as hereinafter provided. Violations of this section shall be punished by imprisonment for not more than two years and upon conviction the pistol or revolver shall be confiscated and destroyed.

SECT. 4. No person shall carry a pistol or revolver concealed in any vehicle or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment not exceeding one year or by both fine and imprisonment.

SECT. 5. The provisions of the preceding sections shall not apply to marshals, sheriffs, policemen, or other duly appointed peace and other law enforcement officers, nor to the regular and ordinary transportation of pistols or revolvers as merchandise, nor to members of the army, navy, or marine corps of the United States, nor to the national guard when on duty, nor to organizations by law authorized to purchase or receive such weapons, nor to duly authorized military or civil organizations when parading, or the members thereof when at or going to or from their customary places of assembly.

SECT. 6. The selectmen of towns or the mayor or chief of police of cities may, upon application of any person issue a license to such person to carry a loaded pistol or revolver in this state, for not more than one year from date of issue, if it appears that the applicant has good reason to fear

Exhibit 8
0355

an injury' to his person or property or for any other proper purpose, and that he is a suitable person to be licensed. The license shall be in duplicate and shall bear the name, address, description, and signature of the licensee. The original thereof shall be delivered to the licensee, the duplicate shall be preserved by the selectmen of towns and the chief of police of the cities wherein issued for a period of one year.

SECT. 7. Any person or persons who shall sell, barter, hire, lend or give to any minor under the age of twenty-one years any pistol or revolver shall be deemed guilty of a misdemeanor and shall upon conviction thereof be fined not more than one hundred dollars or be imprisoned not more than three months, or both. This section shall not apply to fathers, mothers, guardians, administrators, or executors who give to their children, wards, or heirs to an estate, a revolver.

SECT. 8. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who is an unnaturalized foreign-born person or has been convicted of a felony against the person property of another, except upon delivery of a written permit to purchase, signed by the selectmen of the town or the mayor or chief of police of the city. Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not more than one hundred dollars or by imprisonment for not more than one year, or by both such fine and imprisonment.

SECT. 9. Whoever, without being licensed as hereinafter provided, sells, advertises, or exposes for sale, or has in his possession with intent to sell, pistols or revolvers, shall be punished by imprisonment for not more than two years.

SECT. 10. The selectmen of towns and the chief of police of cities may grant licenses, the form of which shall be prescribed by the secretary of state, effective for not more than one year from date of issue, permitting the licensee to sell at retail pistols and revolvers subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol or revolver shall be delivered (a) to a purchaser not personally known to the seller or who does not present clear evidence of his identity; nor (b) to an unnaturalized foreign-born person or a person who has been convicted of a felony and has no permit as required by section 8 of this act.

A true record, in duplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which shall be prescribed by the secretary of state and shall be signed by the purchaser and by the person effecting the sale, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded to the selectmen of the town or the chief of police of the city and the other copy retained for one year.

Exhibit 8
0356

SECT. 11. If any person in purchasing or. otherwise securing delivery of a pistol or revolver shall give false information or offer false evidence of his identity he shall be punished by imprisonment punished, for not more than two years.

SECT. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol or revolver. Possession of any such firearms upon which the same shall have been changed, altered, removed, or obliterated, shall be presumptive evidence that such possessor has changed, altered, removed or obliterated the same. Violations of this section shall be punished by a fine of not more than two hundred dollars or by imprisonment for not more
than one year, or both.

SECT. 13. All licenses heretofore issued within the state permitting the carrying of pistols or revolvers upon the person shall expire at midnight of July 31, 1923.

SECT. 14. This act shall not apply to antique pistols or revolvers incapable of use as such.

SECT. 15. All acts and parts of acts inconsistent herewith are hereby repealed, and this act shall take effect upon its passage.

## **NEW JERSEY**

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871

[Ordinances of Jersey City, NJ, In Relation to the Sidewalks, Public Grounds and Streets in Jersey City,] § 26. No person shall, within this city, fire or discharge any gun, pistol, cannon, or fowling piece or other fire-arms, unless in defense of his property or person; nor let off any squibs, crackers or other fireworks, unless by permission of the city authorities, under the penalty of ten dollars for each and every offense; provided, however, that this section of the ordinance shall not apply to the Fourth of July.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1. That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a

Exhibit 8
0357

written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

1902 N.J. Laws 780, An Act to Require Non-residents to Secure Licenses before Hunting or Gunning within the State of New Jersey and Providing Penalties for Violation of Its Provisions, ch. 263, § 1.
Every non-resident of this state shall be required to take out a license before he shall begin hunting or gunning in this state, which license the several county clerks of this state, and each of them, are hereby authorized and required to issue upon the payment by the applicant of a license fee of ten dollars, and an issuance fee of fifty cents to the county clerk issuing the same; such license shall be a certificate of permission to hunt and gun within the state of New Jersey and shall include the name, age and place of residence and business of the applicant with his description as nearly as may be[.]

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.
Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both; provided, however, that nothing in this act shall be construed to prevent any sheriff, deputy sheriff, police officer, constable, state detective, member of a legally organized detective agency or any other peace officer from carrying weapons in the discharge of his duty; nor shall this act apply to any person having a written permit to carry such weapon, firearm, stiletto, razor, dagger or knife, from the mayor of any city, borough or other municipality, having a mayor, or from the township committee or other governing body of any township or other municipality not having a mayor, which permits such officers and governing bodies are hereby authorized to grant; said permits shall be issued at the place of residence of the person obtaining the same and when issued shall be in force in all parts of the state for a period of one year from date of issue unless sooner revoked by the officer or body granting the same; and provided further, that nothing contained herein shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises any such weapon, firearm, stiletto, dagger, razor or knife, or from carrying the same from any place of purchase to his or her dwelling house, or place of business, or from his or her dwelling house or place of business to any place where repairing is done to have the same repaired and returned; and provided further, that nothing in this act shall be construed to make it unlawful for

Exhibit 8
0358

any person to carry a gun, pistol, rifle or other firearm or knife in the woods or fields or upon the waters of this state for the purpose of hunting; a fee of twenty-five cents may be lawfully charged by such officer or body granting such permit.

1914 N.J. Laws 65, Supplement to an Act Entitled "An Act to License Citizens of this State to Hunt and Pursue Wild Animals and Fowl," ch. 43, § 1.
No license to hunt, pursue or kill with a gun or any fire-arm any of the game birds¸ wild animals or fowl of this State, shall be issued to any person under the age of fourteen years, and if any applicant for license shall misrepresent his age he shall be liable to a penalty of twenty dollars, to be sued for and recovered as other penalties under the fish and game laws.

1916 N.J. Laws 275-76, An Act to Prohibit Any Person from Going into the Woods or Fields with a Gun or Other Firearm when Intoxicated, or under the Influence of any Drug or Intoxicating Liquor, ch. 130, §§ 1-2.
1. It shall be unlawful for any person to go into the woods or fields at any time with a gun or firearm when intoxicated or under the influence of any drug or drugs or of intoxicating liquor. 2. Any person violating any of the provisions of this act shall be liable to a penalty of fifty dollars for each offense, to be sued for and recovered in the manner provided and by the persons authorized to sued for and recover penalties. . . . Upon the conviction of any person for violating the provisions of this act, the license to hunt and fish of such person issued to him . . . shall become void, and the justice of the peace, District Court judge, or police magistrate before whom such conviction is had, shall take from the person so convicted the license, mark the same "revoked" and send it to the Board of Fish and Game Commissioners. If such conviction is reversed on appeal the license shall be restored to the defendant. Any license to hunt or fish issued to any person convicted of a violation of this act during the calendar year in which such offense occurred shall be null and void.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.
1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second. 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1927 N.J. Laws 742
   No retail dealer shall sell or expose for sale, or have in his possession with intent to use, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter

Exhibit 8
0359

provided. The Common Pleas judge of any court of this State, by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political-division, pistols or revolvers, subject to the follow-ing conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building or buildings designated in the license.

2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read.

3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside.

4. No pistol or revolver shall be delivered (a) unless the purchaser shall have obtained a permit to purchase days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; provided, however, a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. 5. A true record of every pistol shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser.

Any person who shall knowingly sell any of the firearms or instruments enumerated in section one hereof to a minor under the age of eighteen years, or to a person not of sound mind, or to a drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall he guilty of misdemeanor.

No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue-to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall he signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him. Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit.. and may be obtained from licensed retail dealers. The application, together with a fee of fifty cents. shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless food cause for the denial thereof shall appear, shall rant said permit within seven days from the date of the receipt of the application. The permit shall be in form prescribed

Exhibit 8
0360

by the Secretary of State and shall be issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold tinder the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant.

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business.

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

1. A gangster is hereby declared to be an enemy of the state. 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties. 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster. 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute. 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW MEXICO

1915 N.M. Law 153, An Act to Amend Sections . . . of Chapter 85 of the Laws of 1912 Relative to the Protection of Game and Fish, ch. 101, §7.

. . . No person shall at any time shoot, hunt or take in any manner any wild animals or birds or game fish as herein defined in this state without first having in his or her possession a hunting license as hereinafter provided for the year in which such shooting, fishing or hunting is done. The presence of any person in any open field, prairie or forest, whether enclosed or not with traps, gun or other weapon for hunting, without having in possession a proper hunting license as herein provided, shall be prima facie evidence of the violation of this section.

## NEW YORK

Exhibit 8
0361

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 40-41, Image 62-63 (1896) available at The Making of Modern Law: Primary Sources. 1680. Laws of the Colony of New York, Indians. No person shall sell, give or barter directly or indirectly any gun or guns, powder, bullet, shot, lead nor any vessel or burthen, or row boat, canoes only excepted without license first had and obtained under the governors hand and seal to any Indian whatsoever, nor to any person inhabiting out of this Government, nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapon, vessel, or boat so sold given or bartered, five pounds for every for every pound of powder, and forty shillings for every pound of shot or lead and proportionately for any greater or lesser quantity.

Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources. 1824
[Ordinances of the City of Schenectady,] XI. And be it further ordained, That if any person shall fire or discharge any gun, pistol, rocket, cracker, squib or other fire works, in any street, lane or alley, or in any yard, garden or other enclosure, or in any place which persons frequent to walk within the limits aforesaid, without permission of the mayor or one of the aldermen or assistants of this city, such person shall forfeit for every such offence the sum of one dollar…

Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-215, Image 214-215 (1881) available at The Making of Modern Law: Primary Sources. 1881
Carrying of Pistols, § 264. Every person except judges of the federal, state and city courts, and officers of the general, state and municipal governments authorized by law to make arrests, and persons to whom permits shall have been issued, as hereinafter provided, who shall have in his possession within the city of New York a pistol of any description concealed on his person, or not carried openly, shall be deemed guilty of a misdemeanor, and shall be punished, on conviction by a fine not exceeding ten dollars, or, in default of payment of such fine by imprisonment not exceeding ten days. § 265. Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description. Any non-resident who does business in the city of New York, and has occasion to carry a pistol while in said city, must make application for permission to do so to the officer in command of the station-house of the police precinct in which his so does business, in the same manner as is required by residents of said city, and shall be subject to the same conditions and restrictions.

Exhibit 8
0362

Charles Wheeler, By-Laws of the Village of Mechanicville. Adopted by the Trustees October 18, 1881 Page 7, Image 8 (1881) available at The Making of Modern Law: Primary Sources. 1881 [Ordinances of the Village of Mechanicville, NY,] Fires and Their Prevention, Fire Arms and Fire Works, § 20. No person, except on the anniversary of our national independence, and on that day only, at such place or places as the President or Trustees shall permit, shall fire, discharge or set off, in the village, any gun, cannon, pistol, rocket, squib, cracker or fire ball, under the penalty of five dollars for each offense.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884
Carrying, Using, Etc., Certain Weapons, § 410. A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources. 1885
An Act to Limit the Carrying and Sale of Pistols and other fire arms in the cities of this state. Chap. 375, § 1. No person under the age of eighteen years shall have, carry or have in his possession in any public street, highway or place in any of the cities of this state, any pistol or other firearms of any kind, and no person shall in such cities sell or give any pistol or other fire-arms to any person under such age. § 2. Any person violating any of the provisions of this act shall be guilty of a misdemeanor, and in all trials or examinations for said offense the appearance of the person so alleged or claimed to be under the age of eighteen years shall be evidence to the magistrate or jury as to the age of such person. § 3. Nothing herein contained shall apply to the regular and ordinary transportation of pistols or fire-arms as articles of merchandise in said cities, or to the carrying of a gun or rifle through a street or highway of any city, with the intent to use the same outside the said city; nor to any person under such age carrying an pistol or firearms under license given by the mayor of said cities; but no license so given shall be in force more than one year from its date; and all such licenses may be revoked at the pleasure of the mayor, and a full complete and public record shall be kept by the mayor of said cities of all such licenses and the terms and date thereof.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service

Exhibit 8
0363

Regulations Page 184, Image 185 (1885) available at The Making of Modern Law: Primary Sources. 1885

Ordinances of [the City of Syracuse,] Gunpowder, Etc. § 1. No person except when on military duty in the public service of the United States, or of this State, or in case of public celebration with permission of the mayor or common council, shall have, keep or possess in any building, or carriage, or on any dock, or in any boat or other vessel, or in any other place within the city limits, gun-powder, giant- powder, nitro-glycerine, dynamite or other explosive material, in quantity exceeding one pound, without written permission from the chief engineer of the fire department. Any person violating any of the provisions of this section shall be liable to a fine of not less than ten nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor more than three months, for each offense.

Mark Ash, The New York City Consolidation Act, as in Force in 1891: With Notes Indicating the Statutory Sources, References to Judicial Decisions, and All Laws Relating to New York City, Passed Since January 1, 1882, Together with an Appendix of the Royal English Colonial Charters of New York City Page 209, Image 233 (Vol. 1, 1891) available at The Making of Modern Law: Primary Sources. 1890

Ordinances of the City of New York, § 455. No person shall manufacture, have, keep, sell, or give away any gunpowder, blasting powder, gun-cotton, niro-glycerine, dualin, or any explosive oils or compounds, within the corporate limits of the city of New York, except in the quantities limited, in the manner, and upon the conditions herein provided, and under such regulations as the board of fire commissioners shall prescribe : and said board shall make suitable provision for the storage and safe keeping of gunpowder and other dangerous and explosive compounds or articles enumerated under this title, beyond the interior line of low water-mark in the city and county of New York. The said board may issue licenses to persons desiring to sell gunpowder or any of the articles mentioned under this section at retail, at a particular place in said city to be named in said license (provided that the same shall not be in a building used in any part thereof as a dwelling unless specially authorized by said license), and persons so licensed may on their premises, if actually kept for sale, persons so licensed may have on their premises, if actually kept for sale, a quantity not exceeding at any one time, of nitro-glycerine, five pounds; of gun-cotton, five pounds of gunpowder, fourteen pounds; blasting powder, twenty-five pounds. . .

1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

No person other than members of the police force, regularly elected constables, the sheriff of Erie county, and his duly appointed deputies, shall, in the city, carry concealed upon or about his person, any pistol or revolver, or other dangerous weapon or weapons, without first obtaining a permit, as hereinbefore provided; and such permit shall be produced and exhibited by any person holding the same, upon the request of a member of the police force. A violation of any of the provisions of this section shall be a misdemeanor and punishable as such; and all fines imposed and collected for such violations shall be deposited to the credit of said pension fund by the clerk of the court imposing the same.

Rules, By-Laws and Ordinances of the Village of Wappingers Falls. Adopted September 13, 1898 Page 34, Image 32.(Wappingers Falls, 1898) available at The Making of Modern Law: Primary Sources. 1898

Exhibit 8
0364

Ordinances of Wappinger Falls. Park Ordinances. § 1. No person or persons shall fire or discharge any gun or pistol or other firearm, or any rocket torpedo, or other fireworks of any description, nor send up any balloon, nor throw stones or missiles, nor play ball within the limits of Mesier Park, without the permission obtained of the Park Commissioners at a meeting of the Board.

An Ordinance to regulate the government of parks and other public pleasure grounds of The City of New York, at 600 (1903). 1903
Be it Ordained by the Board of Aldermen of The City of New York, as follows: All persons are forbidden . . .
XXIV. No one shall fire or carry any firearm, fire cracker, torpedo or fire-works, nor make a fire, nor make any oration, nor conduct any religious or other meeting or ceremony within any of the parks, parkways, squares or places in The City of New York under the jurisdiction of the Department of Parks without special permission from the Commissioner having jurisdiction.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.
Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1911 N.Y. Laws 443, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §1.
Any person over the age of sixteen years, who shall have in his possession in any city, village or town of this state, any pistol, revolver or other firearm of a size which may be concealed upon the person, without a written license therefor, issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance in such city, village or town, shall be guilty of a misdemeanor.

1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.
Such chapter is hereby amended . . . § 1914. Sale of pistols, revolvers and other firearms. Every person selling a pistol, revolver or other firearm of a size which may be concealed upon the person whether such seller is a retail dealer, pawnbroker or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence

Exhibit 8
0365

of every purchaser of such a pistol, revolver or other firearm, together with the calibre [sic], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm. Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possessing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereon, if any, and the name of the magistrate or other officer by whom the same was issued. Every person who shall fail to kep a register and enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer. Every person becoming the lawful possessor of such pistol, revolver or other firearm, who shall sell, give or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

1923 N.Y. Laws 140–141, An Act to Amend the Conservation Law in Relation to Aliens, ch. 110, § 2.
2. It shall be unlawful for any unnaturalized foreign born person to hunt for, or capture or kill, in this state any wild bird or animal, either game or otherwise, of any description except in defense of person or property or except under a special license issued directly by the conservation commission; and to that end it shall be unlawful for any unnaturalized foreign born person within this state, to own or be possessed of a shotgun or rifle of any make, unless he possess such special license.


## NORTH CAROLINA

James Iredell, A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846, Inclusive, Omitting All the Acts of a Private and Local Nature, and Such as were Temporary and Whose Operation Has Ceased to Exist Page 73, Image 73 (1847) available at The Making of Modern Law: Primary Sources. 1840
Crimes and Punishments, 1840 – 1. – Ch. 30, If any free negro, mulatto, or free person of color shall wear, or carry about his or her person, or keep in his or her house, any shot gun, musket, rifle, pistol, sword, dagger, or bowie knife, unless he or she shall have obtained a license therefor from the Court of Pleas and Quarter Sessions of his or her county, within one year preceding the wearing, keeping or carrying thereof, he or she shall be guilty of a misdemeanor and may be indicted therefor.

1909 N.C. Sess. Laws 777, Priv. Laws, An Act for a New Charter for the City of Southport, North Carolina, ch. 345, § 23, pt. 14.
[O]n dealers in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars; on dealers in firecrackers, Roman candles, skyrockets, toy pistols or fireworks of any kind, a tax not exceeding fifty dollars.

1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

Exhibit 8
0366

§ 1. That it shall be unlawful for any person, firm, or corporation in this State to sell, give away or dispose of, or to purchase or receive, at any place within the State from any other place within or without the State, without a license or permit therefor shall have first been obtained by such purchaser or receiver from the clerk of the Superior Court of the county in which such purchase, sale, or transfer is intended to be made, any pistol, so-called pump-gun, bowie knife, dirk, dagger or metallic knucksn[sic]. . . § 5. That each and every dealer in pistols, pistol cartridges and other weapons mentioned in section one of this act shall keep and accurate record of all sales thereof, including the name, place of residence, date of sale, etc., of each person, firm, or corporation, to whom or which any and all such sales are made, which said record shall be open to the inspection of any duly constituted State, county or police officer, within this State.

## NORTH DAKOTA

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.
§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot, billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony, unless such instrument weapon or explosive is carried in the prosecution of or to effect a lawful and legitimate purpose. § 2. The possession, in the manner set forth in the preceeding Section, of any of the weapons or explosives mentioned therein, shall be presumptive evidence of intent to use the same in violation of this act. § 3. Penalty – Any person upon conviction of violating the provisions of this Act, shall, in the discretion of the court, be imprisoned in the State Penitentiary nor more than two years, or in the county jail not more than one year, or by a fine of not more than one hundred dollars, or by both such fine and imprisonment. Provided, however, that any citizen of good moral character may, upon application to any district court, municipal, or justice of the court, be granted the permission to carry a concealed weapon upon the showing of reasonable cause. . . . § 5. Emergency. An emergency is hereby declared to exist in that professional criminals are frequently found to carry concealed about their persons, the dangerous weapons or explosives mentioned in Section 1 of this Act. And, whereas, the present law is inadequate to prevent such criminals from carrying concealed weapons or explosives; therefore, this Act shall take effect and be in force from and after its passage and approval.

1923 N.D. Laws 379, 380-82 ch. 266
Sec. 2. Commiting Crime When Armed. If any person shall commit or attempt to commit a crime when armed with a pistol or revolver, and having no permit to carry the same, he shall be in addition to the punishment provided for the crime, be punished by imprisonment for not less than ten years.
Sec. 6. Carrying Pistol Concealed. No person shall carry a pistol or revolver concealed in any vehicle or in any package, satchel, grip, suit case or carry in any way or upon his person, except in his dwelling house or place of business, without a license therefor as hereinafter provided.

Exhibit 8
0367

Violations of this section shall be punished by imprisonment for not less than one year, and upon conviction the pistol or revolver shall be confiscated or destroyed.

Sec. 8. Issue of Licenses to Carry. The justice of a court of record, the chief of police of a city or town and the sheriff of a county, or persons authorized by any of them shall upon the application of any person having a bonafide residence or place of business within the jurisdiction of said licensing authority, or of any person having a bona fide residence or place of business within the United States and license to carry a fire arm concealed upon his person issued by the authorities of any State or sub-division of the United States, issue a license to such person to carry a pistol or revolver within this State for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed . . .

Sec. 10. SALES REGULATED. No person shall sell, deliver, or otherwise transfer a pistol or revolver to a person who he has reasonable cause to believe either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof, nor in any event shall he deliver a pistol or revolver on the day of the application for the purchase thereof, and when delivered, said pistol or revolver shall be securely wrapped and shall be unloaded. Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward by registered mail one copy thereof to the Secretary of State, and one copy thereof to the chief of police of the city or town, or the sheriff of the county of which the seller is a resident, and shall retain the other copy for six years. This section shall not apply to sales at wholesale. Where neither party to the transaction holds a dealer's license, no person shall sell or otherwise transfer a pistol or revolver to any person not personally known to him. Violations of this section shall be punished by a fine of not less than $100 or imprisonment for not less than one year, or by both such fine and imprisonment.

Sec. 11. DEALERS TO BE LICENSED. Whoever, without being licensed as hereinafter provided, sells, or otherwise transfers, advertises, or exposes for sale, or transfers or has in his possession with intent to sell, or otherwise transfer, pistols or revolvers, shall be punished by imprisonment for not less than two years.

Sec. 12. DEALERS' LICENSES: By WHOM GRANTED, AND CONDmoNs THEREOF.) The duly constituted licensing authorities of any city, town or subdivision of this state, may grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

The business shall be carried on only in the building designated in the license.

The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

No pistol or revolver shall be delivered-

(a) On the day of the application for the purchase, and when delivered shall be unloaded and securely wrapped; nor

(b) Unless the purchaser either is personally known to the seller or shall present clear evidence of his identity; nor

Exhibit 8
0368

(c) If the seller has reasonable cause to believe that the purchaser either is an unnaturalized foreign born person or has been convicted of a felony against the person or property of another, or against the Government of the United States or any State or subdivision thereof.

A true record, in triplicate, shall be made of every pistol or revolver sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Secretary of State, and shall be personally signed by the purchaser and by the person affecting the sale, each in the presence of the other, and shall include the date of sale, the caliber, make, model, and manufacturer's number of the weapon, the name, address, occupation, and nationality of the purchaser. One copy of said record shall, within seven days, be forwarded by registered mail to the Secretary of State and one copy thereof to the chief of police of the city or town or the sheriff of the county of which the seller is a resident, and the other copy retained for six years.

No pistol or revolver, or imitation thereof, or placard advertising the sale or other transfer thereof, shall be displayed in any part of said premises where it can readily be seen from the outside.

1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2.
§ 2 Committing Crime When Armed. If any person shall commit, or attempt to commit, a crime when armed with a pistol or revolver, and has no permit to carry the same, he may be punished by imprisonment for not more than ten years, in addition to the punishment provided for the crime. Such imprisonment, if not exceeding one year, to be in the County jail, and if exceeding one year to be in the State Penitentiary.

1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second. § 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun¸ automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO

Exhibit 8
0369

The Act of Incorporation, and the Ordinances and Regulations of the Town of Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823

[Ordinances of Marietta, Ohio; An Ordinance For Preventing the Wanton Use of Fire Arms, Etc., § 1. Be it ordained by the Town of Marietta, in Town meeting legally assembled, and by the authority thereof it is ordained and enacted , That if any person, after this ordinance takes effect, shall discharge or explode, or aid or assist in discharging or exploding any gun powder, from guns, fire arms, or by any other means, within the limits of the town plot of Marietta, where by the quiet of any of the inhabitants may be disturbed, or their lives and safety endangered (unless such firing shall by authorized by permission in writing from the town council then in office, or by the command of some military officer in discharge of his duty as such,) the person so offending may be complained of before any justice of the peace for the town and upon conviction, shall be fined by such justice not than less one dollar (sic), nor more than five dollars for the first offence, and for the second and all subsequent offences against this ordinance, such person shall be fined not less than five, nor more than ten dollars, and pay all costs, to be collected as other penalties by law are. . .

An Act Incorporating the City of Cincinnati: And a Digest of the Ordinances of Said City, of a General Nature, Now in Force, with an Appendix Page 57-58, Image 58-59 (1835) available at The Making of Modern Law: Primary Sources. 1835

Ordinances of the City of Cincinnati, An Ordinance to Regulate the Keeping of Gunpowder, § 1. Be it ordained by the City Council of the City of Cincinnati, That no person or persons in the city of Cincinnati, shall keep, have, or possess, in any house, warehouse, shop, shed, or other building, nor in any street, side walk, lane, alley, passage, way, or yard, nor in any cellar, wagon, cary, or carriage, of any kind whatever; nor in any other place, within said city, Gun Powder, in any way or manner, other than as provided for by this ordinance; nor in any quantity exceeding twenty-five pounds, to be divided into six equal parts. § 2. Be it further ordained, That it shall not be lawful for any person or persons to sell gun powder by retail within said city, without having first obtained a license from the city council for that purpose; and every person obtaining a grant for a license to sell gun powder, shall receive a certificate of such grant from the city clerk, and pay into the city treasury, a sum not exceeding one hundred dollars, nor less than ten dollars; besides fifty cents to the Mayor for issuing the same; Provided that license be granted to not more than four persons in any one ward, and so that they be separated from each other, by at least two entire blocks or squares; and all applications for such license, shall be in writing, stating the situation where such gunpowder is to be kept. § 3. Be it further ordained, That every person who obtains a license as aforesaid to retail gun powder, shall keep the same in tin canisters, well secured with good and sufficient covers; and shall place on the store or building containing the same, a sign with the words, LICENSED TO SELL GUN POWDER, Provided that nothing in this ordinance shall be so construed to prevent any person from carrying gun powder through the streets in its exportation, or to some place of deposit, without the limits of the corporation, if the same be put up in tight and well secured kegs or vessels. § 4. Be it further ordained, That it shall be the duty of the city marshal and his deputies, and any of the fire wardens, on any day, (Sundays excepted) between sun rising and setting, to enter into any house or building, or any other place within said city, where gun powder is kept or suspected to be kept, and examine the premises, and if they or either of them shall find any gun powder, contrary to the provisions of this ordinance, they or either of them shall seize such powder, together with

Exhibit 8
0370

the vessel containing the same, in the name of the city of Cincinnati; and the officer making such seizure, if he be other than the marshal, shall forthwith report such seizure to the marshal, who shall immediately take charge of the gun powder so seized, as if in case of seizure by himself; and in either case he shall immediately take charge of the gun powder so seized; to be conveyed to some safe place of deposit without the limits of the city. And the marshal shall, moreover, forthwith report such seizure to the mayor, with the name of the person in whose possession such gun powder was seized, or with the name of the owner, if his name be known, whereupon the mayor shall issue a citation against the owner, if known and within his jurisdiction, and if not, then against the person whose possession such gunpowder was seized, citing the defendant to appear on a day to be named in such citation, and show cause, if any he have, why the gun powder so seized should not be forfeited to the city, and a fine imposed agreeably to the provisions of this ordinance; upon which citation proceedings shall be had as in other cases upon the city ordinances, and if a final judgment of forfeiture be pronounced against the gun powder so seized, the marshal shall proceed to sell and dispose of the same for the benefit of said city, after having given three days notice of such sale, by advertisement in at least three public places in the city, and at one of the market houses on market day, to the highest bidder; and the net proceeds thereof shall be credited on the execution against the person fined for keeping the same contrary to the provisions of this ordinance: Provided, that, of any lot of powder seized according to the provisions of this ordinance, not more shall be sold by the marshal than will pay the fine and costs of suit and expense attending the seizure.

George W. Malambre, Laws and General Ordinances of the City of Dayton, Containing the Laws of the State upon Municipal Government; All the General Ordinances in Force August 30th, 1855; a List of the Officers of the City under the New Act of Incorporation, Together with the Amount of Taxes Levied in Each Year for General and Special Purposes, since 1851, and the Total Amount in Each Year, of Property Subject to Taxation Page 214, Image 219 (1855) available at The Making of Modern Law: Primary Sources. 1855
Ordinances of the City of Dayton. Offenses. § 38. Sec. XXXIX. If any person, or persons, shall fire any cannon, gun, or other firearms, within the bounds of the building lots, or cemetery ground in this city, or within one hundred yards of any public road, within this corporation, except by permission of council, and except in proper situations for firing salutes, or by command of a military officer in performance of military duty, every person, so offending, on conviction thereof, shall pay a fine not exceeding ten dollars, and costs.

W. H. Gaylord, Standing Rules of Order of the Cleveland City Council: With a Catalogue of the Mayors and Councils of the City of Cleveland, from Its Organization, April, 1836, to April, 1871, and Officers of the City Government for 1872 Page 101, Image 124 (1872) available at The Making of Modern Law: Primary Sources. 1856
[Ordinances of the City of Cleveland,] An Ordinance to Prevent the Firing of Guns and Fire-works, § 1. Be it ordained by the City Council of the City of Cleveland, That no person shall fire any cannon, gun, rifle, pistol, or fire-arms of any kind, or fire or explode any squib, rocket, cracker, Roman candle, or other combustible fire-works within the city. § 2. This ordinance shall not apply to any military company, when drilling under command of any officer thereof, or to the use of fire-arms in the lawful defense of the person, family or property of any person, or to the killing of any dog whose owner or possessor has not complied with the provisions of the ordinance relating to dogs. § 3. The board of city improvements may, at its discretion, give

Exhibit 8
0371

permission to any person or persons to discharge fire-arms or fire-works on the fourth day of July; such permission may be given through any public paper of the city, or otherwise. § 4. That any person violating any provision of this ordinance shall, on conviction thereof, be fined in any sum not exceeding twenty dollars.

1878 Ohio Laws 199, An Act to Amend, Revise, and Consolidate the Statutes Relating to Municipal Corporations, to Be Known as Title Twelve, Part One, of the Act to Revise and Consolidate the General Statutes of Ohio, div. 3, ch. 3, § 1, pt. 14.
To regulate the transportation and keeping of gunpowder, and other explosive and dangerous combustibles, and to provide or license magazines for the same.

M. Augustus Daugherty, Supplement to the Revised Statutes of the State of Ohio Containing All the Statutes Amendatory of or Supplementary to the Revised Statutes, Together with the Miscellaneous Acts, General or Permanent in Their Nature, In Force January 1, 1884. 3d ed. Edited by James M. Williams Page 633, Image 641 (1884) available at The Making of Modern Law: Primary Sources. 1884
Licenses, § 24. All vendors of gunpowder shall pay a license fee of fifteen (15) dollars per annum. All keepers or owners of gunpowder magazines shall pay a license fee of one hundred (100) dollars per annum.

1889 Ohio Laws 164, An Act to Amend Section 2669 of the Revised Statutes, as Amended April 22, 1885, § 1.
The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, venders [sic] of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable[.]

1900 Ohio Laws 730, An Act to Provide a License on Trades, Business and Professions Carried on . . . , §§24-25.
§ 24. All keepers or owners of gun powder magazines shall pay a license fee of one hundred dollars ($100) per annum, and shall notify the chief of the fire department, in writing, of the place where the same is kept or stored; but no license shall be issued under this section without the consent of the mayor. § 25. All keepers of shooting galleries shall pay a license fee of fifty dollars ($50) per annum, or for a less period of one year at a rate of ten dollars ($10) per month, no license to be issued for a less period than one month.

1902 Ohio Laws 23, Extraordinary Sess.,  An Act to Provide for the Organization of Cities and Incorporated Villages . . . and to Repeal All Sections of the Revised Statutes Inconsistent Herewith, § 7, pt. 11.
To regulate the transportation, keeping and sale of gunpowder and other explosives or dangerous combustibles and materials and to provide or license magazines for the same.

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

Exhibit 8
0372

That § 12819 of the General Code be supplemented . . . to read as follows:  Definitions.  § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## <u>OKLAHOMA</u>

General Laws Relating to Incorporated Towns of Indian Territory Page 43, Image 39 (1890) available at The Making of Modern Law: Primary Sources. 1890
Revised Ordinances of the Town of Checotah, [An Ordinance Requiring Persons Engaged in Certain Businesses or Avocations to Procure a License for so Doing and Providing of Penalty for Failure so to do, § 1. That the licenses hereinafter named shall be fixed, imposed and collected at the following rates and sums, and it shall be unlawful for any person or persons to exercise or pursue any of the following avocations or businesses within the corporate limits of Checotah without having first obtained a license therefor from the proper authority, having paid for the same in lawful money of the united States as hereinafter provided,] 29th. Pistol or shooting Gallery – For each and every pistol and shooting gallery, per month, five dollars.

Exhibit 8
0373

## OREGON

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 205-206, Image 206-207 (1872) available at The Making of Modern Law: Primary Sources. 1868
[Concerning Offences and Disorderly Conduct, § 2. That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms within the following limits: the Willamette river on the east and (10) Tenth Street on the west, Caruther's Addition on the south nd F Street on Couch's Addition on the north, shall on conviction thereof before the Recorder, be subject to a penalty of not less than five nor more than fifty dollars, or imprisonment, at the discretion of the Recorder, not exceeding twenty days. Provided that the Marshal shall permit upon the national holidays and other days of public celebration, any appropriate display of fire-arms and other instruments named in this section.]

Charter of the City of Portland, Street and Fire Department Laws, Ordinances, Regulations &C. Page 225-227, Image 226-228 (1872) available at The Making of Modern Law: Primary Sources. 1872
Ordinances of the City of Portland, To Regulate the Storage and Sale of Gunpowder, and Other Explosive Materials, § 1. No person shall keep for sale any gunpowder in any building, store or place in the City of Portland, without having first obtained a license therefor. § 2. The license for selling gunpowder shall be five dollars per quarter, to be issued as other licenses are issued under the provisions of Ordinance 984, entitled "An Ordinance to impose and regulate licenses in the City of Portland." § 3. No person shall receive, keep or store, or aid or assist any person in receiving, keeping or storing gunpowder in a larger quantity than five pounds, in or into any building, or upon any premises, unless the person receiving, keeping or storing the same is duly licensed to sell gunpowder. § 4. No person or persons duly authorized to sell gunpowder, as hereinbefore provided, shall keep, store, or have in any one place more than twenty five pounds of powder, which shall be kept in any air-tight metallic vessel marked with the word "Gunpowder," in plain Roman letters, not less than three inches in height, and of proportionate width, which vessel shall be placed or kept at all times, conspicuously in view near the entrance of the premises where kept, and convenient for removal therefrom. § 5. Upon the front of every building or premises where powder is kept in a conspicuous place a sign with the word "gunpowder" painted thereon in Roman letters, not less than three inches in height. § 6. No person shall convey, cause to be conveyed, or assist in conveying in any vehicle and gunpowder, unless the same shall be securely packed in close packages, nor unless such packages shall be securely covered while on the vehicle. § 7. No vessel shall be allowed to remain at any wharf more than twenty-four hours with gunpowder on board, except such as may be kept for ship's use, and if such vessel shall be at the wharf overnight, a watchman shall be kept on duty on board all night. All gunpowder landed or placed on a wharf, sidewalk, street or public way for forwarding or shipment shall be forwarded or shipped immediately after it shall be so landed or placed. § 8. The provisions of this Ordinance shall be deemed to apply to "giant powder" "gun cotton" or any other explosive substance having an explosive power equal to that of ordinary gunpowder. § 9. Any person or persons violating any of the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and on conviction before the Police Judge, shall be fined not less than ten nor more than one hundred dollars, or by imprisonment in the city jail not less than

Exhibit 8
0374

two nor more than twenty days, or both, at the discretion of the Police Judge. § 10. The officers of the Fire Department and Police are directed to see that the provisions of this Ordinance are enforced, and to make complaint before the Police Judge for the violation of its provisions.

J.C. Moreland, Charter and Ordinances of the City of Portland and Table of Grades: Together with the Rules of Order, Reports of officers, etc. Page 207, Image 212 (1879) available at The Making of Modern Law: Primary Sources. 1879
Ordinances [of the City of Portland], Concerning Offenses and Disorderly Conduct, § 2. The City of Portland does ordain as follows… That any person or persons who shall fire any pistol, gun or rifle, or any other species of fire-arms, within the corporate limits of the city, shall, on conviction thereof before the Police Court, be fined not less than five dollars nor more than fifty dollars: Provided, That all circumstances of necessity may be plead as a defense to the offense described in this section; and, provided further, that the Chief of Police may permit upon the national holidays and other days of public celebration any appropriate display of firearms named in this section.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1913 Or. Laws 497
Section 1. It shall be unlawful for any person, firm or corporation to display for sale at retail any pocket pistol or revolver or to sell at retail, barter, give away or dispose of the same to any person whomsoever, excepting a policeman, member of the militia or peace officer of the State of Oregon, unless the purchaser or person attempting to procure the same shall have a permit for the purpose of procuring such pocket pistol or revolver signed by the municipal judge or city recorder of the city or county judge or a justice of the peace of the county wherein such person resides.
Section 2. Provided, that no judge, city recorder or justice of the peace shall issue such permit until said applicant has furnished him with an affidavit from at least two reputable freeholders as to the applicant's good moral character.
Section 3. All persons, firms or corporations engaged in the retail sale of pocket pistols or revolvers shall keep a record of the sale of such pocket pistols or revolvers by registering the name of the person or persons and the number of the pocket pistol or revolver and shall transmit same to the sheriff of the county in which purchase is made on the 1st and 15th day of each calendar month.

Exhibit 8
0375

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 9.

Section 1. No person shall carry in any city, town, or municipal corporation of this State any pistol, revolver or other firearm concealed upon his or her person, or of a size which may be concealed upon his or her person, without a license or permit therefor, issued to him or her by a chief of police or sheriff of such city, town or municipal corporation, or in such manner as may be prescribed by ordinance of such city, town or municipal corporation. This section, however, shall not apply to sheriffs and their deputies, constables, marshals, police officers or any other duly appointed peace officers, nor to any person or persons summoned by such officers to assist in making arrest or preserving the peace while said person or persons are engaged in assisting such officers; nor to duly authorized military organizations when parading, nor to members thereof when going to and from places of meeting of their respective organizations.

Section 3-A. Any person who violates the provisions of Section 1, Section 2, or Section 3 of this Act, shall be fined in a sum no greater than $100.00, or be imprisoned in the county jail for a term no longer than three months, or by both such fine and imprisonment.

Section 4. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has once been convicted of a violation of any of said sections, is guilty of a misdemeanor, and upon conviction thereof shall be imprisoned in a county jail or reformatory for not less than thirty days nor for more than one year.

Section 4-A. Any person who violates the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has more than once been convicted of a violation of any of said sections, is guilty of a felony, and shall be punished by imprisonment in the State prison for a term not exceeding three years.

Section 4-B. Any person who violates any of the provisions of Section 1, Section 2 or Section 3 of this Act, who theretofore has been convicted of a felony, upon conviction thereof shall be imprisoned in the penitentiary of this State for a period not exceeding five years.

Section 4-C. For the purposes of this Act any pistol, revolver, or other firearm of a size which may be concealed upon his or her person shall be deemed a dangerous weapon.

Section 9. It shall be lawful for the sheriff of any county, chief of police, city or town marshal, or other head of the police department of any city, town or other municipal corporation of this State, upon proof before him that the person applying therefor is of good moral character, and that proper cause exists for the issuance thereof, to issue to such person a license for one year, to have and carry concealed a pistol, revolver or other firearm; provided, however, that no such license shall be issued to any person under the age of twenty-one years.

The person obtaining a permit to carry a concealed pistol or revolver shall pay to the officer issuing such permit the sum of One Dollar. Said license for carrying a concealed pistol or revolver is revocable at any time and must be immediately surrendered on demand. The license while in force entitles the holder to carry the said arm in any county in the State of Oregon.

1925 Or. Laws 468, 469-471

Section 5. Except as otherwise provided in this act, it shall be unlawful for any person within this state to carry concealed upon his person or within any vehicle which is under his control or direction any pistol, revolver or other firearm capable of being concealed upon the person without having a license to carry such firearm, as hereinafter provided in section 8 hereof. Any

Exhibit 8
0376

person who violates the provisions of this section shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony. This section shall not be construed to prohibit any citizen of the United States, over the age of eighteen years, who resides or is temporarily sojourning within this state, and who is not within the excepted classes prescribed by section 2 hereof, from owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person, and no permit or license to purchase, own, possess or keep any such firearm at his place of residence or place of business shall be required of any such citizen. Firearms carried openly in belt holsters shall not be deemed to be concealed within the meaning of this section.

## PENNSYLVANIA

Charter To William Penn, And Laws Of The Province Of Pennsylvania, Passed Between The Years 1682 And 1700 Page 32, Image 37 (1879) available at The Making of Modern Law: Primary Sources. 1676
Laws of the Duke of York, Indians (1676). No person shall sell give or barter directly or indirectly any gun or guns powder, bullet, shot, lead nor any vessel of burthen, or row boat canoes only excepted without license first had and obtained under the Governor's hand and Seal, to any Indian whatsoever, nor to any person inhabiting out of this government nor shall amend or repair any gun belonging to any Indian, nor shall sell any armor or weapons, upon penalty of ten pounds for every gun, armor, weapons, vessel or boat, so sold given or bartered, five pounds for every pound of shot or lead and proportionally for any greater or lesser quantity.

Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713
Pennsylvania Archives 1713, The Act for the Better Government of the City of Philadelphia (1713), This Act inflicts 5s penalty on persons riding a gallop and 10s for persons trotting, with Drays or their Teams in the streets, and 5th for suffering a Dog or a Bitch going at large; or firing a Gun without license, or if a Negro be found in any disorderly practices or other Misbehaviors may be whipped 21 lashes for any one offence or committed to prison, which words "other misbehaviors," are very uncertain and give very arbitrary power where the punishment is great. [(Summary of Statute from Archive compilation)].

Act of 26th August 1721. 1721
[An Act of 9th of February, 1750-51, § 1. If any person or persons whatsoever, within any county, town or within any other town or borough in this province, already built and settled, or hereafter to be built and settled , not hitherto restricted nor provided for by our laws, shall set on fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, or shall fire any gun or other fire arm, or shall make or cause to be made, or sell or utter, or offer to expose to sale, and squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works within any of the said towns or boroughs without the governor's special license for the same, every such person or persons so offending shall be subject to the like penalties and forfeitures, and be recovered in like manner, as in and by an act,

Exhibit 8
0377

passed in the eighth year of the reign of king George the first, entitled 'An act for preventing accidents that may happen by fire are directed to be levied and recovered.]

John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721
[An Act for Preventing Accidents that may Happen by Fire, § IV. And whereas much mischief may happen by shooting of guns, throwing casting and firing of squibs, serpents, rockets, and other fire-works, within the city of Philadelphia, if not speedily prevented: Be it therefore enacted, That if any person or persons, of what sex, age, degree or quality soever, from and after publication hereof, shall fire any gun or other fire-arms, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other fire works, or shall cast, throw or or fire, any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor's special license for the same, of which license due notice shall first be given to the mayor of the said city, such person or persons so offending, and being thereof convicted before any one justice of the peace of the said city, either by confession of the party so offending, or by the view of any of the said justices, or by the oath or affirmation of one or more witnesses, shall for every such offence forfeit and pay the sum of five shillings; one half to the use of the poor of the said city, and the other half to the use of him or them who shall prosecute, and cause such offender to be as aforesaid convicted; which forfeitures shall be levied by distress and sale of the offenders goods as aforesaid; and for want of such distress, if the offender refuse to pay the said forfeiture, he shall be committed to prison, for every such offence the space of two days without bail or main-prize; Provided, that such conviction be made within ten days after such offence committed [ and if such offender be a negro or Indian slave, he shall instead of imprisonment be publically whipped, at the discretion of the magistrate.]

1750 Pa. Laws 208, An Act For The More Effectual Preventing Accidents Which May Happen By Fire, And For Suppressing Idleness, Drunkenness, And Other Debaucheries
That if any persons or persons whatsoever, within any county town, or within any other town or borough, in this province, already built and settled, or hereafter to be built and settled . .. shall fire any gun or other fire-arm, or shall make or cause to be made, or sell or utter, or offer or expose for sale, any squibs, rockets or other fire-works, … within any of the said towns or boroughs without the Governor's special license for the same, every such person or persons, so offending shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, An act for preventing accidents that may happen by fire, are directed to be levied and recovered.

Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750
[Ordinances of the District of Southwark,] An Act for the More Effectual Preventing [of] Accidents, etc. § 1. Be it enacted, That if any person shall fire any gun or other fire-arm, or shall make, or cause to be made, or sell or utter, or offer to expose to sale, any squibs, rockets or other

Exhibit 8
0378

fire-works, or shall cast, throw or fire any squibs, rockets or other fire-works, within any of the said towns or boroughs, without the Governor's special license for the same, every such person or persons, so offending, shall be subject to the like penalties and forfeitures, and to be recovered in like manner, as in and by an act, passed in the eighth year of the reign of King George the first, entitled, " An Act for Preventing Accidents, Etc

1763 Pa. Laws 319, An Act to Prohibit the Selling of Guns, Gunpowder or Other Warlike Stores to the Indians, § 1.
If any person or persons whatsoever shall directly or indirectly give to, sell barter or exchange with any Indian or Indians whatsoever any guns, gunpowder, shot, bullets, lead or other warlike stores without license . . . every such person or persons so offending, being thereof legally convicted . . . shall forfeit and pay the sum of five hundred pounds . . . and shall be whipped with thirty-nine lashes on his bare back, well laid on, and be committed to the common gaol(jail) of the county, there to remain twelve months without bail or mainprise.

An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824
[An Ordinance for the Suppression of Nuisance, and for the regulation of drivers of carriages and horses, in and through the streets, lanes and alleys, within the incorporated part of the township of the Northern Liberties, and for enforcing useful regulations therein.] § 8. And be it further ordained and enacted by the authority aforesaid, That no person or persons shall fire, or discharge any cannon, or piece of artillery, or small arms, or prove any pistol, gun, musket barrels, or cannon, or illuminate, or cause to be illuminated, any house within the regulated parts, incorporated as aforesaid, in said township, without permission from the president of the board of commissioners, under the penalty of forfeiting and paying for every piece of cannon or other artillery, or small arms, or pistol, gun, or musket barrel so fired, or house so illuminated, the sum of two dollars.

1903 Pa. Laws 178, An Act Requiring non-resident hunters, and unnaturalized, foreign born, resident-hunters, to procure a license before hunting in the Commonwealth … §§1 and 2
§ 1. . . . every non-resident and every unnaturalized foreign-born resident of this Commonwealth shall be required to take out a license from the treasurer of the county in which he proposes to hunt. . . § 2. Possession of a gun, in the fields or in the forests or on the waters of this Commonwealth, by an unnaturalized, foreign-born resident or a non-resident of this Commonwealth, without having first secured the license required by this act, shall be prima facie evidence of a violation of its provisions; and any person so offending shall be liable to a penalty of twenty-five dollars for each offense. . .

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 and 2
§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device. § 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this

Exhibit 8
0379

Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years. § 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence. § 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1931 PA. Laws 498, No. 158
Sec. 4. No person who has been convicted in this Commonwealth or elsewhere of a crime of violence shall own a firearm, or have one in his possession or under his control.
Sec. 5. No person shall carry a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

## **RHODE ISLAND**

The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources. 1821
An Act Regulating the Storage, Safe Keeping and Transportation of Gunpowder in the Town of Providence, (1821) § 2. And be it further enacted, That is shall not be lawful for any person or persons to sell any gunpowder which may at the time be within the town of Providence in any quantity, by wholesale or retail, without first having obtained from the town council of said town a license to sell gunpowder; and every such license shall be written or printed, and signed by the president of said council or their clerk, on a paper upon which shall be written or printed a copy of this act; and every such license shall be in force for one year from the date thereof, unless

Exhibit 8
0380

annulled by said council, and no longer; but such license may, prior to the expiration of that time, be renewed, by endorsement thereon, for a further term of one year, and so from year to year: provided, always, that the said town council may annul any such license, if in their opinion the person or persons licensed have forfeited the right of using the same by any violation of the law relative thereto; and every person who shall receive a license as aforesaid shall pay therefor the sum of five dollars, and on having the same renewed shall pay therefor the sum of one dollar, which shall be paid to the clerk of said council, for their use, for the purpose of defraying the expense of carrying this act into execution. § 3. And be it further enacted, That any person or persons who shall keep, have, possess or transport any gunpowder within the town of Providence, contrary to the provisions of this act, or who shall sell any gunpowder therein, without having a license therefor, then in force, shall forfeit and pay a fine of not less than twenty dollars, and not exceeding five hundred dollars, for each and every offence; and if any gunpowder kept contrary to the provisions of this act shall explode in any shop, store, dwelling-house, ware-house or other building, or in any place in said town, the occupant, tenant or owner of which has not a license in force to keep and sell gunpowder therein, or which gunpowder shall have been kept in a manner contrary to the terms and conditions of such license, such occupant tenant or owner shall forfeit and pay a fine of not less than twenty dollars nor more than five hundred dollars. . . § 6. And be it further enacted, That the said firewards, or any of them, may enter the store or place of any person or persons licensed to sell gunpowder, to examine and ascertain whether the laws relating thereto are strictly observed; and also whenever there may be an alarm or fire; and in such last case may cause the powder there deposited to be removed to a place of safety, or to be destroyed by wetting or otherwise, as the exigency of the case may require; and it shall be lawful for any one or more of the firewards aforesaid to enter any dwelling house, store, building or other place in said town to search for gunpowder which they may have reason to suspect to be concealed or unlawfully kept therein; first having obtained from some justice of the peace of said town a search warrant therefor; which warrant any one of the justices of said town is hereby respectively authorized to issue, upon the complaint of such fireward or firewards, supported by his or their oath or affirmation. . . And be it further enacted, That all persons who wish have a license to keep and sell gunpowder within the town shall make application to the town council in writing, stating the place of business and whether they wish to sell by wholesale or retail, or both; and to each person or firm who may be approbated, a certificate of license shall be granted, on payment of the fee established by law. § 14. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by retail, shall be allowed to keep in the place or building designated in the license, twenty-five pounds of gunpowder, and no more, at one time, which shall always be kept in tin or copper canisters, capable of containing no more than twelve and a half pounds each with a small aperture at the top, and a tin or copper cover thereto. § 15. And be it further enacted, That every person or firm who may be licensed to sell gunpowder by wholesale, shall provide and keep a tine or copper chest, with two handles and a tight cover, furnished with a hinge, and secured with a padlock, all of tin or copper chest, with two handles and a tight cover furnished with a hinge and secured padlock, all of tin or copper; such chest shall always be kept on the lower floor, on the right side of and close to the principal door or entrance from the street into the building so licensed, except when otherwise designated by the council and shall always be kept locked, except when powder is put in or taken out; and such person or firm, so licensed shall be allowed to deposit and keep, in such tin or copper chest, a quantity of gunpowder not exceeding four casks of twenty-five pounds each; the heads of each cask not to be opened, and each cask to be kept in a strong

Exhibit 8
0381

leather bag, closely tied and marked as aforesaid. § 16. And be it further enacted, that every person or firm licensed to keep and sell gunpowder as aforesaid, by wholesale or retail, shall have and keep a signboard placed over the door or building in which such powder is kept, on which shall be painted in Roman capitals the words "Licensed to sell Gunpowder"

1902 R.I. Pub. Laws 67, An Act in addition to chapter 40 of the General Laws, Entitled "Of the Town Council": § 1.
Town councils and city councils may from time to time make and ordain all ordinances and regulations for their respective towns, not repugnant to law, which they may deem necessary for the safety of their inhabitants from the manufacture, storage, keeping, having in possession, transportation, sale, or use of gunpowder, gun-cotton, dynamite, nitro-glycerine, nitro-gelatine, lyddite, chlorate of potash, picric acid, sodium calcium carbide, acetylene gas, gasoline gas, and any and all other explosives and explosive chemicals; and may prohibit the manufacture, storage, keeping having in possession, transportation , sale , or use by any and all persons or persons of any or all said substances and gases in their respective towns, unless a license for the same shall be first obtained from the town council or board of aldermen, which license shall be for the term of one years from the date thereof unless sooner revoked by order of said town council or board of aldermen. Any person violating any provision of any such ordinance or regulation, or any such prohibition, shall be fined not less than twenty dollars nor more than one hundred dollars for each such offense.

1907 R.I. Pub. Laws 66, An Act for the Protection of Deer
§ 1. It shall be unlawful to pursue or shoot deer in this state except in accordance with the provisions of this act. § 2. Any person owning or occupying any farm or orchard and any person in his employ may, while on his own premises or the premises of his employer, kill any deer which shall be found destroying any crops, vegatables, or fruit trees belonging to such person or his employer: Provided, however, that no such person shall shoot any deer unless he has obtained from the secretary of state a permit so to do; and the secretary of state shall, upon application, issue to any responsible land owner, or his employees, a permit authorizing such person to shoot deer in accordance with the provisions of this section. No person shall pursue or shoot any deer except with a shot gun, or employ any missile larger than buck shot. § 3. Any person violating the provisions of this act shall be fined not less than one hundred dollars nor more than five hundred dollars for each offence.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: § § 1, 4, 5 and 6
§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend

Exhibit 8
0382

and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly.

§ 2. If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act. In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence.

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act. § 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another. § 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

Exhibit 8
0383

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

## SOUTH CAROLINA

1731-43 S.C. Acts 168, § 23.  1740
It shall not be lawful for any slave, unless in the presence of some white person, to carry or make use of firearms or any offensive weapon whatsoever, unless such negro or slave shall have a ticket or license in writing from his master, mistress or overseer, to hunt and kill game, cattle, or mischievous birds or beasts of prey, and that such license be renewed once every month, or unless there be some white person of the age of 16 or upwards, in the company of such slave when he is hunting or shooting; or that such slave be actually carrying his masters arms to or from his masters plantation, by a special ticket, for that purpose, or unless such slave be found in the day time actually keeping off rice birds, or other birds within the plantation to which such slave belongs, lodging the same gun at night within the dwelling house of his master, mistress or white overseer. And provided also that no negro or other slave shall have liberty to carry any guns, cutlass, pistol or other weapon abroad form at any time between Saturday evening after sunset and Monday morning before sunrise notwithstanding a license or ticket for so doing. And in case any person shall find any slave using or carrying fire-arms, or other offensive weapons, contrary to the true intention of this act; every such person may lawfully seize and take away such fire-arms or offensive weapons; but before the property of such goods shall be vested in the person who shall seize the same, such person shall, within 48 hours next after such seizure, go before the next justice of the peace, and shall make oath of the manner of the taking; and if such justice of the peace after such oath shall be made, or upon any other examination, he shall be satisfied, that the said fire-arms or other offensive weapons, shall have been seized according to the directions and agreeable to the true intent and meaning of this act, the said justice shall, by certificate under his hand and seal, declare them forfeited, and that the property is lawfully vested in the person who seized the same. Provided that no such certificate shall be granted by any justice of the peace until the owner or owners of such fire-arms or other offenisve weapons so to be seized as aforesaid, or the overseer or overseers who shall or may have the charge of such slave or slaves from, whom such fire-arms or other offensive weapons shall be taken or seized shall be duly summoned, to show cause (if any such they have) why the same should not be condemned as forfeited; or until 48 hours after the service of such summons and oath made of the service thereof before the said justice.

Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802
[Ordinances of the City of Charleston, An Ordinance for Appointing Commissioners of the Streets, Defining their Powers, and for other Purposes therein Mentioned, § 8. And be it further ordained by the authority aforesaid, That no person or persons, shall fire any squibs, crackers, or other fireworks, except at times of public rejoicing, and at such places as the intendant for the time being may permit, by license under his hand; nor burn any chips, shavings, or other combustible matters, in any of the streets, lanes, wharves, alleys, or open or enclosed lots of the

Exhibit 8
0384

city, nor fire any gun, pistol, or fire arms, within the limits of the city, except on occasion of some military parade, and then by the order of some officer having the command, under the penalty of ten dollars, for every such offense; nor shall any person or persons, raise or fly any paper or other kite, within the said city, under the said penalty of ten dollars.]

John E. Breazeale, The Revised Statutes of South Carolina, Containing the Code of Civil Procedure, and the Criminal Statutes. Also The Constitutions of the United States and of the State, and the Rules of the Supreme and of the Circuit Courts of the State Page 431, Image 529 (Vol. 2, 1894) available at The Making of Modern Law: Primary Sources. 1890 Chapter XXVIII Violations of the License Laws by Insurance and Other Companies, Emigrant Agents, owners or shows, etc., Persons Selling Pistols, etc. §490. No person or corporation within the limits of this State shall sell or offer for sale any pistol, rifle, cartridge or pistol cartridge less than .45 caliber, or metal knuckles, without first obtaining a license from the county in which such person or corporation is doing business so to do. The County Board of Commissioners of the several Counties of this State are authorized to issue licenses in their respective Counties for the sale of pistols and pistol and rifle cartridges of less than .45 caliber, and metal knuckles, upon the payment to the County Treasurer by the person or corporation so applying for said license of the sum of twenty-five dollars annually; and any person who shall sell or offer for sale any pistol, or pistol or rifle cartridge of less than .45 caliber, or metal knuckles, without having obtained the license provided in this Section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine not exceeding five hundred dollars, or by imprisonment not exceeding one year, or both, at the discretion of the court.

1893 S.C. Acts 426, An Act To Amend An Act Entitled "An Act To Provide For A License For The Sale Of Pistols Or Pistol Cartridges Within The Limits Of This State", § 2
. . . That the County Commissioners of the Several Counties of the State be, and they are herby, authorized to issue licenses in their respective Counties for the sale of pistols and pistol cartridges upon the payment to County Treasurer by the person or corporation so applying for said licenses of the sum of twenty-five dollars annually.

1923 S.C. Acts 19-20, License Tax on Ammunition — Candy — Admissions — Regulations to have force of law.
That every person, firm or corporation doing business within the State of South Carolina and engaging in the business of selling at retail or in any individual instance selling to the final consumer, such articles as are named in this section, for the privilege of carrying on such business, shall be subject to the payment of a license tax which shall be measured by and graduated in accordance with the volume of sales of such person, firm or corporation as follows: (a) There shall be levied, assessed, collected and paid upon all ammunition, including shells for shotguns and cartridges for rifles, pistols, revolvers, automatic pistols, rifles and machine guns, and upon such shells and cartridges partially prepared for use but lacking powder or shot or other necessary constituent, and upon blank shells and cartridges (but not upon powder or shot or caps not prepared and not in form to use in modern firearms), when sold at retail or to the ultimate consumer, the following: Upon all shotgun or other shells, two ($2.00) dollars per thousand rounds; Upon all cartridges, twenty-five (25) caliber or greater, two ($2.00) dollars per thousand rounds. (b) The license taxes imposed upon ammunition shall be paid by stamps to be affixed and cancelled by the retailer or other final seller, and said stamps shall be affixed to the smallest

Exhibit 8
0385

container in which or from which articles are sold, as soon as the original packages are opened or broken, or if received in no other form than that in which sold, as soon as the containers are placed in the place of business of the retailer; in the case of articles inteneded for sale in the packages in which received from outside the State of South Carolina without opening or alteration of any sort, each package must be immediately marked with the date of receipt and the place from which received and no stamps need be affixed so long as such package remains unopened and unaltered.

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6. § 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device. § 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun. § 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun. § 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun. § 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permited by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business,

Exhibit 8
0386

which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued. § 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA

1899 S.D. Sess. Laws 112, An Act For The Protection Of Game And The Appointment Of Wardens, And The Licensing Of Hunters And Prescribing Penalties For The Violation Of Its Provisions, pt. 3
At any time kills or shoots any wild duck, goose or brant with any swivel gun or other gun, except as is commonly shot form the shoulder, or in hunting such birds makes us of any artificial light or battery. . .

## TENNESSEE

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149, Image 149-150 (1863) available at The Making of Modern Law: Primary Sources. 1863
[Ordinances of the City of Memphis, Shooting Galleries, § 1. That no person or persons shall set up or use any pistol gallery, or place for the discharging of pistols, guns or other firearms in the first story of any building in the city; nor shall any gallery be used in any manner involving risk or danger to any person in the city; nor shall any person setting up or using such pistol gallery be exempt from the ordinance and penalties now in force, for discharging or shooting any pistol, gun or firearms within the city limits, until such person or persons have applied and paid for license to set up and use such pistol gallery, according to the provisions of this ordinance. § 2. That the person or persons applying for license to keep such pistol gallery, shall, at the time of obtaining such license, enter into bond with good security, to be approved by the City Register, in the sum of three thousand dollars, payable as other city bonds, conditioned that no gambling of any kind be permitted in such pistol gallery, or in the room used for such pistol gallery, or any room adjacent thereto, under the control and connected with said pistol gallery, or its proprietors or keepers; and that all shooting or discharging of firearms shall be done only with the perfect security against any harm to persons or property in the vicinity of such pistol gallery; such penalty to be recoverable for every violation of this section of this ordinance, and of the conditions of said bond. § 3. That the proprietors or persons keeping such pistol gallery shall not

Exhibit 8
0387

permit any minors to shoot in such gallery without the written consent of the lawful guardian of such minor, unless such guardian be personally present, and consenting to such shooting; nor shall the proprietors or keepers of such gallery permit any shooting in the same after eleven o'clock at night, or on Sunday, nor shall such shooting gallery be allowed to be kept open for shooting after eleven o'clock at night or on Sunday. Any violation of this ordinance is hereby declared a misdemeanor, and each offender, on conviction shall be fined in any sum not less than five nor more than fifty dollars for any violation of this ordinance, recoverable as other fines. § 4. Any person or persons shall before putting up or using such pistol or shooting gallery, first apply for, and obtain license, as other licenses are obtained, and shall pay for such license the sum of one hundred dollars per annum for each and every pistol or shooting gallery establishment under the provision of this ordinance. § 5. That the board of Mayor and Aldermen retain the power and right to, at any time, repeal this ordinance and revoke and recall any license to keep a pistol gallery, by refunding a pro rata part of the amount paid for any license then outstanding.]

1879 Tenn. Pub. Acts 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1.
It shall be a misdemeanor for any person to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away, or otherwise disposing of belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol; Provided that this act shall not be enforced against any persons now having license to sell such articles until the expiration of such present license.

## TEXAS

Charter and Revised Ordinances of the City of Galveston, and All Ordinances in Force to April 2d, 1872 Page 94, Image 107 (1873) available at The Making of Modern Law: Primary Sources. 1872
[Ordinances of the City of Galveston, Taxes – License Tax and Ad-Valorem Tax,] Art. 418, § 26. Every keeper of a billiard or other like table, for public use, a tax of twenty dollars for each and every table so kept; and every keeper of a tenpin alley, a tax of thirty dollars for each and every alley so kept for public use. Every keeper of a pistol or rifle gallery, a tax of twenty-five dollars.

Revised Ordinances of the City of Fort Worth, Texas, 1873-1884 Page 64-65, Image 62-63 (1885) available at The Making of Modern Law: Primary Sources. 1880
Ordinances of the City of Fort Worth, An Ordinance prohibiting the shooting off, firing or discharging of Fire-arms; the firing, exploding or setting off of Squibs, Firecrackers, Torpedoes, Roman Candles, Sky-rockets or other things containing powder or other explosive matter, or the throwing of any fire balls, or making of any bon-fires in the corporate limits of the City of Fort Worth. Be it ordained by the City Council of the City of Fort Worth: § 1. It shall be unlawful for any person or persons to shoot off, fire, or discharge any gun, pistol, revolver or any firearm of any description, or to fire, explode or set off any squib, firecracker, torpedo, roman candle, sky-rocket, or other thing containing powder or other explosive matter, or to throw any fire-ball or make any bon-fire in the corporate limits of this city, and that any person or persons violating the provisions of this ordinance, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be fined in any sum not less than one dollar nor more than one hundred dollars.

Exhibit 8
0388

Provided that this shall not apply to any licensed shooting gallery nor to the shooting of dogs running at large in violation of the city ordinances

The Laws of Texas 1822-1897. Austin's Colonization Law and Contract; Mexican Constitution of 1824; Federal Colonization Law; Colonization Laws of Coahuila and Texas; Colonization Law of State of Tamaulipas; Fredonian Declaration of Indpendence; Laws and Decrees, with Constitution of Coahuila and Texas; San Felipe Convention; Journals of the Consultation; Proceedings of the General Council; Goliad Declaration of Independence; Journals of the Convention at Washington; Ordinances and Decrees of the Consultation; Declaration of Independence; Constitution of the Republic; Laws, General and Special, of the Republic; Annexation Resolution of the United States; Ratification of the Same by Texas; Constitution of the United States; Constitutions of the State of Texas, with All the Laws, General and Special, Passed Thereunder, Including Ordinances, Decrees, and Resolutions, with the Constitution of the Confederate States and the Reconstruction Acts of Congress Page 234-235, Image 734-735 (Vol. 6, 1898) available at The Making of Modern Law: Primary Sources. 1898
[An Act to Incorporate the Town of Round Top, County of Fayette, . . . Article Tenth. That from and after the passage of this act it shall be unlawful to fire any pistol, rifle, shot gun, or other kind of fire-arms, within the limits of the town of Round Top, and any person violating this act shall be guilty of a misdemeanor, and on conviction thereof shall be fined not less than five nor more than twenty-five dollars, to be collected by the mayor of the town; but this act shall not prevent any gunsmith, within the limits of the town, from discharging on the premises thereof, fire-arms made or repaired in his shop, for the purpose of training such fire-arms; provided, that none but gunsmiths shall have the privilege of being authorized to discharge fire-arms; and for that purpose each gunsmith shall build a rock wall, in front of which he shall cause a target to be placed, The mayor shall issue a permit to any gunsmith applying for the same, for the period of one year, which permit may be renewed after its expiration.]

Revised Ordinances of the City of Victoria Texas Page 75, Image 77 (1899) available at The Making of Modern Law: Primary Sources. 1899
[Ordinances of the City of Victoria,] Revised Penal Ordinances: Discharging Firearms, § 1. If any person shall discharge any gun, pistol or firearm of any description on or across any public square, street or alley, or elsewhere within the corporate limits of the City of Victoria, whether the premises on or across which such fire arm is discharged be public or private he shall be fined in any sum not to exceed ten dollars. § 2. Exceptions. The provisions of the foregoing section shall not be construed to apply to gunsmiths discharging fire arms brought to them for repairs, or to training guns or pistols of their own make, when done with the permission and at a place approved by the City Marshal; nor shall parties shooting in galleries licensed by the city come within the meaning of the preceding article. § 3. If any person shall discharge any gun, pistol or fire arm of any description as alarm for fire, or upon the discovery of any fire, or during the progress of any fire, he shall be fined in any sum not to exceed twenty-five dollars.

1919 Tex. Gen. Laws 297-98, An Act to Preserve, Propagate, Distribute, and Protect the Wild Game, Wild Birds, Wild Fowl of the State . . . , ch. 157, § 42.
It shall be unlawful for any citizen of this State to hunt outside of the county of his residence with a gun without first having procured from the Game, Fish and Oyster Commissioner or one of his deputies or from the County Clerk of the County in which he resides a license to hunt, and

Exhibit 8
0389

for which he shall pay to the officer from whom he secures such license the sum of two ($2.00) dollars. . . Any person hunting any game or birds protected by the laws of the State, and who shall refuse to show his license herein provided for to any sheriff . . . on demand shall be deemed guilty of a violation of the provisions of this law, and any person violating any of the provisions of this Section shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum of not less than ten (10.00) dollars nor more than one hundred (100.00) dollars.

## UTAH

An Ordinance Prohibiting the Sale of Arms, Ammunition, or Spiritous Liquors to the Indians, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 63 (Henry McEwan 1866). 1850
"Sec. 1. Be it ordained by the General Assembly of the State of Deseret: That if any person shall hereafter trade or give any guns, rifles, pistols or any other deadly weapons, ammunition or spirituous liquors to any Indian, without having a license, he shall, on conviction thereof before any Justice of the Peace, he fined in a sum not exceeding one hundred dollars for each offense, and also forfeit all the property received from the Indian, which shall be sold and the proceeds thereof paid into the public treasury."

Revised Ordinances and Resolutions of the City Council of Salt Lake City, in the Territory of Utah, with Congressional and Territorial Laws on Townsites and Great Salt Lake City Charter, and Amendments Page 161-162, Image 196-197 (1875) available at The Making of Modern Law: Primary Sources. 1875
Ordinances of Salt Lake City, Relating to Gunpowder, Gun Cotton and Nitro-Glycerine, § 1. Be it ordained, by the City Council of Salt Lake City, that it shall not be lawful for any person or persons to keep, sell or give away, gunpowder, gun-cotton, or nitro-glycerine, in any quantity without permission of the City Council; Provided, any person may keep, for his own use, not exceeding five pounds of gun powder, one pound of gun cotton, or one ounce of nitro-glycerine. § 2. All permits , when issued , shall be registered by the Recorder, and shall state the name and place of business, and date of permit, and the same shall not be granted for a longer time than one year; and no person to whom any permits may be issued, shall have or keep, at his place of business or elsewhere, within the city, (except in such places as may be approved by the City Council), a greater quantity of gunpowder or guncotton than twenty-five pounds, and the same shall be kept in tin canisters or cases, and nitro-glycerine not to exceed five ounces, and in a situation remote from fires lighted lamps or candles. Nor shall any person sell or weigh gunpowder, gun cotton, or nitro-glycerine, after the lighting of lamps or gas in the evening , unless in sealed canisters or cases. It shall be the duty of every person to whom a permit shall be given to keep a sign at the front door of his place of business, with the word gunpowder painted or printed thereon in large letters. § 3. No person shall convey or carry any gunpowder exceeding one pound in quantity through any street or alley in the city, unless the said gunpowder is secured in tight cans, kegs or cases, sufficient to prevent the same from being spilled or scattered , and in no quantity exceeding one hundred pounds, except under the direction of a police officer. § 4. A violation of any clause of this ordinance shall subject the offender to a fine, for each offence, in any sum not exceeding one hundred dollars.

Exhibit 8
0390

The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888)
Dangerous and Concealed Weapons.
SEC. 14. Any person who shall carry any slingshot, or any concealed deadly weapon , without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

1905 Utah Laws 197, An Act for the Protection of Fish, Game, and Birds . . . , ch. 118, § 30.
It shall be unlawful for any non-resident person or for resident who is not a citizen of the United States to kill any game, animals, birds or fish in this State, without first having procured the license to do so hereinafter provided for. Any non-resident person or any resident who is not a citizen of the United States, upon the payment to the State Commissioner, of the sum of twenty-five dollars, shall be entitled to receive a license, from said commissioner, which will entitle him to hunt and kill game, animals, birds and fish, for the period of one year subject to all the laws of this State for the protection of fish and game.

## VERMONT

Act of Incorporation and By-Laws of the Village of Bradford Page 14, Image 15 (1890 ) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of the Village of Bradford] By-laws, Miscellaneous, § 6. Any person who shall fire any cannon, swivel gun, pistol, torpedo, squib, cracker, or throw any fire ball, in any street, alley or lane, except by permission of the trustees, shall be fined five dollars.

Act of Incorporation and By-Laws of the Village of Bradford. 1890 Page 12-13, Image 13-14 (1891) available at The Making of Modern Law: Primary Sources.
Ordinances of the Village of Bradford, § 11. The Trustees may grant licenses, for one year or less, to keep gun powder or gun cotton or other explosives for sale, if in their opinion the public safety is not endangered thereby. Said gun powder or gun cotton or other explosive shall be kept in close tin canisters which shall only be opened in the day time. § 12. The license shall specify the quantity allowed and the place where such gun powder or gun cotton and other explosives shall be kept, and on every building in which such gunpowder or gun cotton or other explosives is kept for sale shall be placed in a conspicuous position a sign with the words, "Licensed to sell Powder," printed or painted thereon. § 13. The Trustees may also grant licenses to store gun powder and other explosives in larger quantities in places used for no other purpose which they consider at a safe distance from other buildings. § 14. The Trustees may at any time inspect the premises where gun powder, gun cotton and other explosives are kept, in order to satisfy themselves that the regulations are complied with. § 15. Any person who shall without license keep in any building in the Village any nitro-glycerine, or more than half a pound of gun powder or two ounces of gun cotton, which shall be only for his own use, shall be fined five dollars for every day so offending. § 16. All licenses granted by the Trustees by virtue of these by-laws shall be signed by a majority of the Trustees and recorded in the office of the Clerk of the Corporation at the expense of the person licensed and shall not become valid until so recorded. § 17. The Trustees are authorized to revoke any license mentioned in these by-laws, whether granted by themselves or their predecessors in office, whenever in their opinion the public good requires it. Such revocation shall be recorded in the Clerk's office, and shall become operative

Exhibit 8
0391

whenever the Trustees shall deliver a written notice thereof to the person whose license is revoked.

Act of Incorporation and By-Laws of the Village of Northfield Page 19-20, Image 19-20 (1894) available at The Making of Modern Law: Primary Sources. 1894

Regulations for Handling Explosives, Artcle XV., § 1. No person shall at any time keep within the limits of said Village, any powder, or guncotton, without a written license, signed by a majority of the trustees, who shall have discretionary power to grant the same for retailing purposes ; not, however, exceeding twenty pounds shall be kept in any one building at a time, and that to be kept in close metal cans, or flasks, which are not to be opened except in the day time, Said license specify the building, or place where said powder or guncotton shall or may be kept, the quantity such person may keep, and shall be conditional that any Trustee may at any time make inspection of the quantity of powder or gun-cotton kept, and the manner of keeping the same; said license to be in force until revoked by a majority of the Trustees. And it shall be the duty of the person or persons so licensed to procure said license to be recorded in the records of said Village, and to put up, in some conspicuous place on every building within the limits of the Village in which he has powder or guncotton stored, a sign with the words "LICENSED TO SELL GUNPOWDER." Provided, that a majority of the Trustees may grant license for storing or keeping larger quantities, and that any person may keep not over two pounds which shall be kept in a metallic flask or a powder horn. Article XVI. PENALTY FOR VIOLATION OF ABOVE ARTICLE. § 1. If any person shall keep, without a license therefore, or as provided in the XVth article, any powder, or gun cotton, or either of said articles, or shall keep either of said articles in any buildings or places except those mentioned in his license, he shall forfeit and pay to the treasurer of said Village Five dollars for each day said powder or guncotton shall be suffered to remain within the limits of said village.

Quoted in Brief of Amicus Curiae Patrick J. Charles at App. 13, N.Y. State Rifle & Pistol Ass'n, v. City of New York (Ordinances of the City of Barre, Vermont). 1895

CHAPTER 16, SEC. 18. No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.

CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.

1908 Vermont Session Laws 132, § 1.

No person shall at any time hunt, shoot, pursue, take or kill any of the wild animals, wild fowl or birds of this state, nor use a gun for hunting the same, without having first procured a license therefor as hereinafter provided, and then only during the respective periods of the year when it shall be lawful, and subject to all the provisions of chapter 220 of the Public Statutes. . .

**VIRGINIA**

Exhibit 8
0392

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources. 1792
[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] § 8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense. § 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

1805 Va. Acts 51, An Act Concerning Free Negroes and Mulatoes
That no free negro or mulato shall be suffered to keep or carry any firelock of any kind…
without first obtaining a license from the court…

1806 Va. Acts 51, ch. 94
Required every "free negro or mulatto" to first obtain a license before carrying or keeping "any fire-lock of any kind, any military weapon, or any powder or lead."

The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859
[Ordinances of Richmond,] Nuisances Not in Streets, § 11. If any person shall sell, or expose for sale in this city, any torpedos, popcrackers, squibs, or other fire-works, of any kind whatever, except in packages containing each at least one hundred, or shall without permission in writing from the mayor, discharge, or set off, in any street or alley of the city, any balloon, rocket, torpedo, popcracker, fireworks or any combination of gunpowder, or any other combustible or dangerous material; or if any person shall, except under the fortieth section of the ordinance concerning streets, without necessity fire or discharge in this city any cannon, gun, pistol, or other fire-arms of any kind, or shall make therein any unusual noise, whereby the inhabitants thereof may be alarmed, or raise or fly a kite in this city, or if any auctioneer shall use any bell or herald to notify the public of any sale, except of real property, every such person herein offending, shall pay a fine of not less than one nor more than twenty dollars.

1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780

Exhibit 8
0393

If any person carry about his person, hid from common observation, any pistol, dirk, bowie knife, razor, slungshot, or any weapon of like kind he shall be fined not less than twenty dollars nor more than one hundred dollars, or be committed to jail not more than thirty days, or both, in the discretion of the court, or jury, trying the case: and such pistol, dirk, bowie knife, razor, slungshot, or any weapon of like kind, shall be forfeited to the Commonwealth and may be seized by an officer as forfeited. Upon conviction of the offender the said weapon shall be sold by the officer and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety; provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, collecting officer while in the discharge of his official duty: provided the judge of any circuit or hustings court in term time, upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon may grant such permission for one year; the order making same shall be entered in the order book of such court.

1926 Va. Acts. 285-87, CHAP. 158-An ACT to improve a license tax on pistols and revolvers; to regulate the sale thereof and of ammunition therefor; and to provide that the proceeds of such tax shall be used for the establishment of a diseased and crippled children's hospital, §§ 1-9.
1. Be it enacted by the general assembly of Virginia, That it shall be the duty of every person residing in this State and owning a pistol or revolver therein, to pay on or before the first day of January of each year a license tax of one dollar on each pistol or revolver so owned, or in the event that such pistol or revolver shall be acquired by any such person on or after the first day of February, such license tax shall be forthwith paid thereon. The application for the license shall give the name of the owner, and the number, make and calibre [sic] of such pistol or revolver, which shall be set forth in the license. All pistol or revolver licenses shall run from the first day of January to the first day of the following January. Such license taxes shall be paid to the treasurer of the city or county whrein the said owner resides, and the said treasurer shall not receive more for handling the funds arising from the tax imposed by this act than he receives for handling other State funds. The treasurers shall not receive compensation for their services in issuing the license cards herein provided for. Upon payment of the tax provided for in this section the person paying the same shall be entitled to a license card therefor, showing the year for which the license is paid, the county or city issuing the card, the serial number of the license, and the number, calibre [sic], make and owner of the pistol or revolver. When the license card is issued the treasurer shall record the name of the owner of the pistol or revolver, and the number, calibre [sic] and make thereof with the number of the license, in a book prepared for the purpose. The license cards and book shall be furnished by the boards herein provided and shall be paid out of the funds derived from the pistol and revolver licenses. If any such card should be lost the owner of the card shall pay to the treasurer twenty-five cents for a duplicate card.
2. It shall be the duty of every retailer selling a pistol or revolver in this State, at the time of such sale, to keep a record of the name and address of the purchaser and the number, make and calibre [sic] of the pistol or revolver, and to report once a month to the treasurer of his county or city the names of such purchasers, if any, together with the number, make and calibre [sic] of each pistol or revolver purchased; and all persons receiving or having in their possession a pistol or revolver for the purpose of repairing the same shall report to the treasurer of his county or city once a month giving the name and address of the owner and the calibre [sic], make and serial number of such pistol or revolver.

Exhibit 8
0394

3. It shall be unlawful for any retailer in this State to sell ammunition for any pistol or revolver to any person unless the person desiring to make such purchase displays the license card for the current year provided for in this act.

4. Any person violating any provision of this act or using a license card not issued to him, for the purpose of purchasing ammunition, or using a license card for the purchase of pistol or revolver ammunition unless the ammunition is intended to be used for the weapon mentioned in the license card shall be guilty of a misdemeanor, and upon conviction shall be fined not less than twenty-five nor more than fifty dollars, or sentenced to the State convict road force for not less than thirty or not more than sixty days, or both, in the discretion of the tribunal trying the case.

5. The provisions of this act shall not apply to any officer authorized by law to carry a pistol or revolver nor to the pistol or revolver of such officer when such pistol or revolver is carried in discharge of his official duty, except that every officer shall list his pistol or revolver with the treasurer of his county or city annually by January first; nor to a pistol of an obsolete type kept as a souvenir, memento or relic, such as cap and ball type, etcetera, or souvenir used or captured by any person or relative in any war. But such pistol shall be registered as herein provided, upon satisfactory proof to the officer issuing such license that the pistol in question comes properly within this exception, in which case, no license tax shall be charged.

6. The tax hereby imposed shall be in lieu of all other taxes on such pistols and revolvers; but nothing in this act shall be construed to apply to such weapons in the stocks of licensed wholesaler or retailers.

7. All funds arising from pistol and revolver licenses, except as hereinbefore provided, shall be kept separate from other funds and shall be paid into the State treasury to establish a fund known as the diseased and crippled children's hospital fund, which shall be used for the purpose of establishing and maintaining within the State at such place or places as may be selected by the board hereinafter provided for, a hospital or hospitals for the care, treatment and vocational training of diseased and crippled children resident in Virginia, or for any such rehabilitation work that the board may deem wise.

Each treasurer shall between the first and fifteenth of July and between the first and fifteenth of January report to the auditor of public accounts collections, which he is required to make by this act, and shall at the same time pay into the State treasury the amount collected less the commissions which he is authorized to retain for collecting same as provided for in this act, and the auditor of public accounts shall keep said funds separate from other funds to be designated and known as "the diseased and cripple children's hospital fund."

8. The adminsitration of the aid fund shall be under the direction of a board of seven physicians to be appointed by the governor. . . . [Description of board and its functions].

9. The State treasurer shall make payments from the fund hereinabove created on warrants from the auditor of pulic accounts, issued on vouchers certified by the chairman of the board hereinabove created on authority of the board.

## WASHINGTON STATE

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15. [T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or risk of injury or damages by fire arising from carelessness, negligence or otherwise . . . to regulate and prohibit the carrying of deadly

Exhibit 8
0395

weapons in a concealed manner; to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and detonation works of all descriptions[.]

1881 Wash. Sess. Laws 93, An Act to Incorporate the City of Dayton, chap. 2, § 20.
The city of Dayton shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation, storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

1881 Wash. Sess. Laws 121-22, An Act to Incorporate the City of Port Townsend, ch. 2, § 21.
The City of Port Townsend has power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy, and . . . to regulate the transportation and keeping of gunpowder, or other combustibles, and to provide or license magazines for the same[.]

1883 Wash. Sess. Laws 161, An Act to Incorporate the City of Ellensburgh, ch. 2, § 20.
The city of Ellensburg shall have power to prevent injury or annoyance from anything dangerous, offensive, or unhealthy . . . to regulate the transportation storing and keeping of gunpowder and other combustibles and to provide or license magazines for the same[.]

Del Cary Smith, Ordinances of the City of Port Townsend, Washington, Comprising the General Ordinances of the City, Together with the Private Ordinances Now in Force Page 27, Image 28 (1890) available at The Making of Modern Law: Primary Sources. 1890
[Ordinances of Port Townsend, WA,] Division III, Offenses Against Public Safety, Convenience and Health, § 15. Whoever shall fire or discharge any cannon, gun, pistol revolver or any firearm of any description, or shall fire, or explode or set off any squib, firecracker, torpedo or other thing containing powder or other explosive material, without permission from the Mayor or common council so to do, within the city limits, shall, on conviction, be punished by a fine of not less than five nor more than twenty dollars; provided that such permission, when given, shall definitely limit the time of such firing, and may at any time be revoked. But nothing in this section shall prevent the ordinary and usual fireworks demonstration on National holidays; subject, however, to such regulation, control and orders as the City Marshal may deem proper to make for the protection of property from fire.

Albert R Heilig, Ordinances of the City of Tacoma, Washington Page 334, Image 335 (1892) available at The Making of Modern Law: Primary Sources. 1892
Ordinances of Tacoma, Defining Disorderly persons and Prescribing the Punishment for disorderly conduct within the city of Tacoma, § 1. . . . All persons (except police officers as aforesaid) who shall draw, exhibit or attempt to use any deadly weapon upon, to or against another person, in said city with intent to do bodily injury to such person; and All persons (except peace officers as aforesaid and persons practicing at target shooting in a shooting gallery duly licensed) who shall, within the city limits, fire off or discharge any gun, pistol or fire arm of any kind, or bomb, shall be deemed and are disorderly persons, and guilty of a misdemeanor.

Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895
ORDINANCE No. A544. AN ORDINANCE TO PUNISH THE CARRYING OF CONCEALED WEAPONS WITHIN THE CITY OF SPOKANE.

Exhibit 8
0396

The City of Spokane does ordain as follows:

SECTION I. If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife ), or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons.

SECTION 2. This ordinance shall take effect and be in force ten days after its passage.

Passed the City Council January 2, 1895.

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources. 1896

Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1. If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons.

1911 Wash. Sess. Laws 303, An Act Relating to the Carrying of Firearms, Requiring Licenses of Certain Persons, and Fixing a Penalty for the Violation Thereof, ch. 52, § 1.

It shall be unlawful for any person who is not a citizen of the United States, or who has not declared his intention to become a citizen of the United States, to carry or have in his possession at any time any shot gun, rifle or other firearm, without first having obtained a license from the state auditor, and said license is not to be issued by said state auditor except upon the certificate of the consul domiciled in the State of Washington and representing the country of such alien, that he is a responsible person and upon the payment for said license of the sum of fifteen dollars ($15.00)[.]

## **WEST VIRGINIA**

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 25, Image 25 (1875) available at The Making of Modern Law: Primary Sources. 1875

[Ordinances of Martinsburg, An Ordinance to Prevent Certain Improper Practices Therein Specified,] § 3. If any person shall fire or discharge within such parts of the town which are or

Exhibit 8
0397

shall be laid out into lots, or within two hundred yards of said limits, any cannon, gun, pistol or fire-arms, or any cracker, squib, rocket or fire-works, except it be in case of necessity, or in the discharge of some public duty, or at a military parade by order of the officer in command, or with the permission of the Mayor or Council of the town, such person for every such offence shall forfeit any pay to the town not less than one nor more than five dollars.

J. Nelson Wisner, Ordinances and By-Laws of the Corporation of Martinsburg: Berkeley Co., West Virginia, Including the Act of Incorporation and All Other Acts of a Special or General Nature Page 76, Image 76 (1875) available at The Making of Modern Law: Primary Sources. 1876

[Ordinances of Martinsburg,] An Ordinance in Relation to Pistol Galleries, § 1. Be it ordained by the Council of the Corporation of Martinsburg, That no pistol gallery, in which air guns or pistols, or guns or pistols in which are fired powder, is used, shall be established or carried on within the limits of the Corporation of Martinsburg by any person or persons, until the person or persons desiring to establish or carry on the same shall first obtain from the Mayor, attested by the Clerk of the Corporation, a permit authorizing the person or persons therein named to prosecute said business, and designating the place at which the same is to be carried on. § 2. That the Mayor shall not issue the permit authorized by the first section of this ordinance, unless the building to be used for said pistol gallery, is so detached from adjacent or surrounding private dwellings, that the noise incident to the carrying on of said business, shall not render the said gallery a nuisance to the surrounding or adjacent dwellings. § 3. Any person or persons violating the provisions of this ordinance, shall be fined for the first offense, not less than two nor more than ten dollars, at the discretion of the Mayor, and for any subsequent offence, not less than two or more than thirty dollars, and commitment in the county jail not exceeding thirty days, either or both of said punishment, at the discretion of the Mayor.

Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p.206. 1881

An Ordinance in relation to offenses . . .

SEC. 14. It shall be unlawful for any person to carry any slung shot, colt, or knucklers of lead, brass or other metal or material, or to carry about his person, hid from common observation, any pistol, dirk , bowie knife, or weapon of the like kind, without a permit in writing from the mayor so to do. It shall also be unlawful for any person or persons to sell or give away to a person not of age, any slung shot, colt, or knuckler or knucklers of lead, brass or other metal or material, or any pistol, dirk, bowie knife or weapon of the like kind.

1909 W.Va. Acts 479-80, An Act to Amend and Re-Enact Sections . . . Relating to the Protection and Preservation of Certain Animals, Birds, and Fishes and of Forests and Streams, ch. 60, § 19. The carrying of any uncased gun in any of the fields or woods of this state, by any person not having the lawful right to hunt, pursue or kill game, birds or animals in such fields or woods shall, as to such person, other than the bona fide owner, or owners of such fields or woods, his or their child or children, tenant or tenants, lessee or lessees, be deemed prima facie evidence of a violation of this section; and any person claiming to hold a license to hunt in this state, having in his possession any gun or other hunting paraphernalia in such woods, or fields, shall, on failure to produce such license for inspection to any warden of this state or owner or agent of the owner of such woods and fields on demand, be deemed guilty of a misdemeanor and shall be punished

Exhibit 8
0398

on conviction, as provided later in this section. Provided, however, that any resident owner, or owners, of farm lands, their resident child or children, or bona fide tenants, shall have the right to hunt, kill and pursue birds or game on such farm lands of which he, or they, are the bona fide owners or tenants, during the season when it is lawful to kill, catch or pursue birds or game, without securing such resident license; and provided, further, that the owners of adjoining lands may each have the privilege of reciprocating the non-licensed privilege, by giving each other written privilege to exchange hunting rights only, on land immediately joining each other, and upon which each party resides.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a.

Section 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court; and it shall be the duty of the prosecuting attorney in all cases to ascertain whether or not the charge made by the grand jury is the first or second offense, and if it shall be the second offense, it shall be so stated in the indictment returned, and the prosecuting attorney shall introduce the record evidence before the trial court of said second offense, and shall not be permitted to use his discretion in charging said second offense nor in introducing evidence to prove the same on the trial; provided, that boys or girls under the age of eighteen years, upon the second conviction, may, at the discretion of the court, be sent to the industrial homes for boys and girls, respectively, of the state. Any person desiring to obtain a state license to carry any such weapon within one or more counties in this state shall first publish a notice in some newspaper, published in the county in which he resides, setting forth his name, residence and occupation, and that on a certain day he will apply to the circuit court of his county for such state license; and after the publication of such notice for at least ten days before said application is made and at the time stated in said notice upon application to said court, it may grant such person a license in the following manner, to-wit: The applicant shall file with said court his application in writing, duly verified, which said application shall show: First: That said applicant is a citizen of the United States of America. Second: That such applicant has been a bona fide resident of this state for at least one year next prior to the date of such application, and of the county sixty days next prior thereto. Third: That such applicant is over twenty-one years of age; that he is a person of good moral character, of temperate habits, not addicted to intoxication, and has not been convicted of a felony nor of any offense involving the use on his part of such weapon in an unlawful manner. Fourth: The purpose or purposes for which the applicant desires to carry such weapon and the necessity therefor and the county or counties in which said license is desired to be effective. Upon the hearing of such application the court shall hear evidence upon all matters stated in such application and upon any other matter deemed pertinent by the court, and if such court be satisfied from the proof that there is good reason and cause for such person to carry such weapon, and all of the other conditions of this act

Exhibit 8
0399

be complied with, said circuit court or the judge thereof in vacation, may grant said license for such purposes, and no other, as said a circuit court may set out in the said license (and the word "court" as used in this act shall include the circuit judge thereof, acting in vacation); but before the said license shall be effective such person shall pay to the sheriff, and the court shall so certify in its order granting the license, the sum of twenty dollars, and shall also file a bond with the clerk of said court, in the penalty of three thousand five hundred dollars, with good security, signed by a responsible person or persons, or by some surety company, authorized to do business in this state, conditioned that such applicant will not carry such weapon except in accordance with his said application and as authorized by the court, and that he will pay all costs and damages accruing to any person by the accidental discharge or improper, negligent or illegal use of said weapon or weapons. Any such license granted after this act becomes effective shall be good for one year, unless sooner revoked, as hereinafter provided, and be co-extensive with the county in which granted, and such other county or counties as the court shall designate in the order granting such license; except that regularly appointed deputy sheriffs having license shall be permitted to carry such revolver or other weapons at any place, within the state, while in the performance of their duties as such deputy sheriffs and except that any such license granted to regularly appointed railway police shall be co-extensive with the state, and all license fees collected hereunder shall be paid by the sheriff and accounted for to the auditor as other license taxes are collected and paid, and the state tax commissioner shall prepare all suitable forms for licenses and bonds and certificates showing that such license has been granted and to do anything else in the premises to protect the state and see to the enforcement of this act. The clerk of the court shall immediately after license is granted as aforesaid, furnish the superintendent of the department of public safety a certified copy of the order of the court granting such license, for which service the clerk shall be paid a fee of two dollars which shall be taxed as cost in the proceeding; within thirty days after this act becomes effective it shall be the duty of the clerks of each court in this state having jurisdiction to issue pistol licenses to certify to the superintendent of the department of public safety a list of all such licenses issued in his county. Provided, that nothing herein shall prevent any person from carrying any such weapon, in good faith and not for a felonious purpose, upon his own premises, nor shall anything herein prevent a person from carrying any such weapon (unloaded) from the place of purchase to his home or place of residence, or to a place of repair and back to his home or residence; but nothing herein shall be construed to authorize any employee of any person, firm or corporation doing business in this state to carry on or about the premises of such employer any such pistol, or other weapon mentioned in this act for which a license is herein required, without having first obtained the license and given the bond as herein provided; and, provided, further, that nothing herein shall prevent agents, messengers and other employees of express companies doing business as common carriers, whose duties require such agents, messengers and other employees to have the care, custody or protection of money, valuables and other property for such express companies, from carrying any such weapon while actually engaged in such duties, or in doing anything reasonably incident to such duties; provided, such express company shall execute a continuing bond in the penalty of thirty thousand dollars, payable unto the state of West Virginia, and with security to be approved by the secretary of state of the state of West Virginia, conditioned that said express company will pay all damages, accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such agent, messenger or other employee while actually engaged in such duties for such express company, in doing anything that is reasonably incident to such duties; but the amount which may be

Exhibit 8
0400

recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state, for the purpose aforesaid, but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such express company to establish that such agent, messenger or other employee was not actually employed in such duties for such express company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and, provided further, that nothing herein shall prevent railroad police officers duly appointed and qualified under authority of section thirty-one of chapter one hundred forty-five of Barnes' code or duly qualified under the laws of any other state, from carrying any such weapon while actually engaged in their duties or in doing anything reasonably incident to such duties; provided, such railroad company shall execute a continuing bond in the penalty of ten thousand dollars payable unto the state of West Virginia and with security to be approved by the secretary of state of the state of West Virginia conditioned that said railroad company will pay all damages accruing to anyone by the accidental discharge or improper, negligent or illegal discharge or use of such weapon or weapons by such railroad special police officer whether appointed in this or some other state while actually engaged in such duties for such railroad company, in doing anything that is reasonably incident to such duties, but the amount which may be recovered for breach of such condition shall not exceed the sum of three thousand five hundred dollars in any one case, and such bond shall be filed with and held by the said secretary of state for the purpose aforesaid but upon the trial of any cause for the recovery of damages upon said bond, the burden of proof shall be upon such railroad company to establish that such railroad police officer was not actually employed in such duties for such railroad company nor in doing anything that was reasonably incident to such duties at the time such damages were sustained; and provided, further, that in case of riot, public danger and emergency, a justice of the peace, or other person issuing a warrant, may authorize a special constable and his posse whose names shall be set forth in said warrant, to carry weapons for the purpose of executing a process, and a sheriff in such cases may authorize a deputy or posse to carry weapons, but the justice shall write in his docket the cause and reasons for such authority and the name of the person, or persons, so authorized, and index the same, and the sheriff or other officer shall write out and file with the clerk of the county court the reasons and causes for such authority and the name, or names of the persons so authorized, and the same shall always be open to public inspection, and such authority shall authorize such special constable, deputies and posses to carry weapons in good faith only for the specific purposes and times named in such authority, and upon the trial of every indictment the jury shall inquire into the good faith of the person attempting to defend such indictment under the authority granted by any such justice, sheriff or other officer, and any such person or persons so authorized shall be personally liable for the injury caused to any person by the negligent or unlawful use of any such weapon or weapons. It shall be the duty of all ministerial officers, consisting of the justices of the peace, notaries public and other conservators of the peace of this state, to report to the prosecuting attorney of the county the names of all persons guilty of violating this section, and any person willfully failing so to do, shall be guilty of a misdemeanor and shall be fined not exceeding two hundred dollars, and shall, moreover, be liable to removal from office for such willful failure; and it shall likewise be the duty of every person having knowledge of the violation of this act, to report the same to the prosecuting attorney, and to freely and fully give evidence concerning the same, and any one failing so to do, shall be guilty of a misdemeanor and upon conviction thereof shall be fined not exceeding one hundred dollars; provided, further, that nothing herein contained

Exhibit 8
0401

shall be so construed as to prohibit sheriffs, their regularly appointed deputies, who actually collect taxes in each county, and all constables in their respective counties and districts, and all regularly appointed police officers of their respective cities, towns or villages, all jailors and game protectors who have been duly appointed as such, and members of the department of public safety of this state, from carrying such weapons as they are now authorized by law to carry, who shall have given bond in the penalty of not less than three thousand five hundred dollars, conditioned for the faithful performance of their respective duties, which said officers shall be liable upon their said official bond, for the damages done by the unlawful or careless use of any such weapon or weapons, whether such bond is so conditioned or not. It shall be unlawful for any person armed with a pistol, gun, or other dangerous or deadly weapon, whether licensed to carry same or not, to carry, expose, brandish, or use, such weapon in a way or manner to cause, or threaten, a breach of the peace. Any person violating this provision of this act shall be guilty of a misdemeanor, and upon conviction, shall be fined not less than fifty nor more than three hundred dollars or imprisoned in the county jail not less than thirty nor more than ninety days, or be punished by both fine and imprisonment in the discretion of the court. Any circuit court granting any such license to carry any of the weapons mentioned in this act, the governor, or the superintendent of the department of public safety, with the consent of the governor, may, for any cause deemed sufficient by said court, or by the governor or by the superintendent of the department of public safety with the approval of the governor aforesaid, as the case may be, revoke any such license to carry a pistol or other weapon mentioned in this act for which a license is required, and immediate notice of such revocation shall be given such licensee in person, by registered mail or in the same manner as provided by law for the service of other notices, and no person whose license has been so revoked shall be re-licensed within one year thereafter; provided, that the authority so revoking such license may, after a hearing, sooner reinstate such licensee.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.

(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same

Exhibit 8
0402

provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

## WISCONSIN

Charter and Ordinances of the City of La Crosse [WI], with the Rules of the Common Council Page 202, Image 205 (1888) available at The Making of Modern Law: Primary Sources. 1888 An Ordinance in Relation to the Discharge of Firearms and firecrackers and to the use and exhibition of fireworks, § 1. No person shall fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or set off or exhibit any fireworks within the limits of the city of La Crosse, without having first obtained written permission from the mayor, which permission shall limit the time and fix the place of such firing, and shall be subject to be revoked at any time after the same may have been granted. Any violation of this ordinance shall subject the person or persons so violating the same to a fine of not less than one dollar nor exceeding twenty-five dollars; but this ordinance shall not be construed to prohibit the discharge of firearms by the chief of police or any of his subordinates or any peace officer when required or made necessary in the performance of any duty imposed by law.

Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 239-242, Image 242-245 (1888) available at The Making of Modern Law: Primary Sources. 1888
Ordinances of La Crosse, An Ordinance to Provide for Licensing Vendors of Gunpowder and Other Explosive Substances and to Regulate the Storing, Keeping and Conveying of all Dangerous and Explosive Materials and Substances within the City of La Crosse, and in relation

Exhibit 8
0403

to the Storage and Sale of Lime Therein, § 1. It shall be unlawful for any person to keep for sale, sell or give away any gunpowder, giant powder, nitro-glycerine, gun-cotton, dynamite or any other explosive substance of like nature or use without having first obtained a license therefor from the city of La Crosse in the manner hereinafter provided. Any person convicted of a violation of this section shall be punished by a fine of twenty-five dollars for each offense. . . § 3. It shall be unlawful for any person licensed pursuant to the foregoing sections of this ordinance to have or keep at his or her place of business an amount of gunpowder or other explosive material greater in the aggregate than fifty pounds at any one time, or to keep the same in any other than cases or canisters made of tin, or other metal holding not to exceed ten pounds each. Such gunpowder or other explosive materials shall be kept in places remote from fires and lighted lamps or candles, and where the same may be easily accessible so as to be removed in case of fire. No person shall sell any gunpowder or other explosive material after the lighting of lamps in the evening unless in sealed canisters or cases; and all places where business is carried on under any such license shall have a sign put up in a conspicuous place at or near the front door thereof with the word "gunpowder" painted thereon in large letters. Any person violating any provision of this section shall, upon conviction, be punished by a fine of not less than five dollars nor more than fifty dollars for each offense; and upon any such conviction the common council may at its discretion by resolution duly passed revoke the license of the person so convicted. This ordinance shall not be construed as to prevent persons who are not vendors of the articles mentioned in the title thereof from keeping gunpowder in quantities not exceeding one pound for their own use.

Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. 1896

Chapter XX. Misdemeanors.

Section 25.  It shall be unlawful for any person except policemen, regular or special, or any officer authorized to serve process, to carry or wear concealed about his person, any pistol or colt, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or bowie -knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee; provided, however, that the chief of police of said city may upon any written application to him made, issue and give a written permit to any person residing within the city of Milwaukee, to carry within the said city a pistol or revolver when it is made to appear to said chief of police that it is necessary for the personal safety of such person or for the safety of his property or of the property with which he may be entrusted, to carry such weapon; and the holding of such permit by such person shall be a bar to prosecution under this ordinance. Said chief of police shall keep the names and residences of all persons to whom he may grant such permits, in a book to be kept for that purpose, and he shall have power to revoke such permit at any time.

Said chief of police shall, upon granting each and every such permit, collect from the person to whom the same is granted, the sum of three ( 3 ) dollars, and he shall pay all moneys so collected by him upon granting such permits, into the city treasury.

Any person who shall wear or carry any such pistol , slung-shot, cross-knuckles, knuckles of brass, lead or other metal, knife, dirk or dagger, or any other dangerous or deadly weapon, within the limits of the city of Milwaukee, contrary to the provisions of this chapter, shall be liable to a penalty of not less than ten nor more than one hundred dollars for each and every offense.

Exhibit 8
0404

**WYOMING**

A. McMicken, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 115-116, Image 116-117 (1893) available at The Making of Modern Law: Primary Sources. 1893

[Ordinances of the] City of Rawlins, Article II, Protection of Persons and Property, § 1. If any person shall within this city fire or discharge any cannon, gun, fowling piece, pistol or firearms of any description, or fire, explode, or set off any squib, cracker, or anything containing powder or other combustible or explosive material, without permission of the Board of Trustees, or the written permission of the mayor (which permission shall limit the time of the firing and shall be subject to be revoked by the mayor or Board of Trustees at any time after the same has been granted) every such person shall, on conviction, be fined in a sum of not less than five dollars and not exceeding one hundred dollars.

1899 Wyo. Sess. Laws 32-33, An Act for the Better Protection of the Game and Fish of this State . . . , ch. 19, § 14.

Any person who is a bona fide citizen of the State of Wyoming shall, upon payment of one dollar to any Justice of the Peace of the county in which he resides, be entitled to receive from said Justice of the Peace, a gun license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor. . . . Any person who is not a resident of the State of Wyoming, shall upon payment to any Justice of the Peace of this State of the sum of forty dollars to be entitled to receive from such Justice of the Peace a license, which license shall permit such person to pursue, hunt and kill any of the animals mentioned in this Section, during the time allowed therefor of the current year.

1913 Wyo. Sess. Laws 165, An Act . . . Relating to the Duties of the State Game Warden, Assistant and Deputy Game Wardens, and the Preservation of the Game Animals and Game Birds and Fish of the State of Wyoming . . . , ch. 121, § 38.

That Section 20 . . . be . . . amended . . . § 20. Any person who is not a bona fide elector of this state, or the child or legal ward of a bona fide elector of this state, or a soldier or sailor who is a bona fide elector of the United States, and has been stationed at a government post within this state for one year past, or non-residents having property in this state on which they pay taxes to the amount of $100.00 or over annually, but who shall be a citizen of the United States or a free-holder in this state, shall upon payment of five dollars to any Justice of the Peace . . . be entitled to receive from such officer a gunner's license, which license shall permit such person to kill any of the game birds of this state during the current season under the restrictions heretofore and hereinafter imposed.

1915 Wyo. Sess. Laws 91, An Act Relating to the Preservation of the Game Animals, Game Birds, and Fish of the State of Wyoming . . . , ch. 91, § 13.

There is hereby created a special gun and fish license for aliens. No person, not a bona fide citizen of the United States, shall own or have in his possession, in the State of Wyoming, any gun, pistol or other firearm, or any fishing tackle, without first having obtained the specified

Exhibit 8
0405

license therefor, which such special gun and fish license shall cost the owner the sum of Twenty-five Dollars[.]

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.

§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale. § 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased. § 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times. § 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

Source: https://firearmslaw.duke.edu/repository/search-the-repository/

Exhibit 8
0406

# Exhibit 9

Exhibit 9
0407

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   PAUL STEIN
3  Supervising Deputy Attorneys General
   SEBASTIAN BRADY
4  KEVIN L. KELLY
   ROBERT L. MEYERHOFF
5  Deputy Attorneys General
   State Bar No. 298196
6   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013-1230
7   Telephone:  (213) 269-6177
    Fax:  (916) 731-2144
8   E-mail:  Robert.Meyerhoff@doj.ca.gov
   *Attorneys for Defendant Rob Bonta in his*
9  *official capacity as Attorney General of the*
   *State of California and Defendant Allison*
10 *Mendoza in her official capacity as Director*
   *of the Bureau of Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **CLAIRE RICHARDS, ET AL.,**              Case No. 3:23-CV-00793

17                          Plaintiffs,    **EXPERT REPORT AND
                                            DECLARATION OF PROFESSOR**
18       **v.**                             **ERIC RUBEN**

19  **ROB BONTA, IN HIS OFFICIAL CAPACITY**
20  **AS ATTORNEY GENERAL OF**
    **CALIFORNIA, ET AL.,**
21
                            Defendants.
22

23

24              **EXPERT REPORT AND DECLARATION OF
                        PROFESSOR ERIC RUBEN**

25       I, Eric Ruben, declare under penalty of perjury that the following is true and

26  correct:

27

28
                                    1

1    The California Department of Justice has asked me to provide an expert

2    opinion pertaining to firearms waiting periods and related restrictions in the United

3    States in the above-captioned matter. This expert report and declaration

4    ("Declaration") provides that opinion, and is based on my own personal knowledge

5    and experience; if I am called as a witness, I could and would testify competently to

6    the truth of the matters discussed in this Declaration.

7    **BACKGROUND AND QUALIFICATIONS**

8    1.    I am a legal scholar whose work spans the fields of legal history, legal

9    empirics, criminal law, constitutional law, and legal ethics. A true and correct copy

10   of my curriculum vitae is attached as **Exhibit A** to this declaration.

11   2.    I received a Bachelor of Arts degree from Dartmouth College in 2003,

12   graduating *magna cum laude*, and a Juris Doctorate degree from New York

13   University School of Law ("NYU Law") in 2007, graduating *cum laude*.

14   3.    Since 2023, I have served as an Associate Professor of Law with

15   tenure at the Dedman School of Law at Southern Methodist University ("SMU

16   Law"). From 2019 to 2023, I was an Assistant Professor of Law at SMU Law.

17   From 2018 to 2019, I was an Adjunct Professor of Law at NYU Law. Since 2014, I

18   have served as a fellow at the Brennan Center for Justice at NYU Law.

19   4.    I have taught law school courses at SMU Law or NYU Law on

20   criminal law, professional responsibility, the Second Amendment, and the

21   regulation of weaponry in democratic societies.

22   5.    My research investigates how the substantive law regulates violence

23   and the instruments of violence. I draw heavily on criminological, sociological, and

24   public health research, and deploy methodologies including doctrinal, historical,

25   and empirical analysis.

26   6.    I have written extensively about firearm regulations, defensive force,

27   and the right to keep and bear arms. That work has appeared in leading law

28   journals, including the CALIFORNIA LAW REVIEW, DUKE LAW JOURNAL,

2

GEORGETOWN LAW JOURNAL, HARVARD LAW REVIEW FORUM, IOWA LAW REVIEW, SOUTHERN CALIFORNIA LAW REVIEW, VIRGINIA LAW REVIEW ONLINE, YALE LAW JOURNAL, and YALE LAW JOURNAL FORUM. My work has served as the basis for written and oral testimony before the U.S. Senate Judiciary Committee, amicus briefs, and popular commentary appearing in various outlets including *ABC News*, *MSNBC*, *CNN*, *Atlantic*, *New York Times*, *Vox*, *Wall Street Journal*, *Washington Post*, *USA Today*, and *NPR*.

7.      My scholarship on the Second Amendment has been cited in numerous federal and state court opinions, including both the majority and dissenting opinions in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). It also informed an amicus brief I co-filed in *United States v. Rahimi*, 143 S.Ct. 2688 (2023). *See* Brief of Second Amendment Law Scholars as Amici Curiae in Support of Petitioner, *United States v. Rahimi*, 143 S.Ct. 2688 (2023) (No. 22-915).

8.      My next article, forthcoming in the MINNESOTA LAW REVIEW, is entitled *Scientific Context, Suicide Prevention, and the Second Amendment After Bruen*. Among other things, it explores the historical legal treatment of suicide, contextualizing that legal treatment against the backdrop of religion and medicine. This declaration draws on my research for that project.

## RETENTION AND COMPENSATION

9.      I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $500 an hour for my work on this declaration, and at a rate of $750 an hour for time spent on depositions or testimony. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

10.     The opinions I provide in this report are based on my review of the complaint filed in this lawsuit, my review of the statutes at issue in this lawsuit, and my education, expertise, and research into relevant legal history—including a

3

1   variety of scholarly works, laws, cases, popular and learned commentaries, and

2   various other related materials I have reviewed in forming my opinions.  The

3   opinions contained herein are made pursuant to a reasonable degree of professional

4   certainty.

5   **SCOPE OF ANALYSIS AND PROFESSIONAL OPINION**

6       11.    I have been retained by the California Department of Justice to provide

7   my professional opinion on the legal treatment of suicide prevention at the

8   Founding and today, contextualizing that treatment to better understand why

9   different approaches were pursued during both time periods.

10       12.    Suicide history is an extensive topic. My declaration focuses on

11   aspects of that history that I believe are most relevant in comparing modern-day

12   efforts at means restriction, such as post-firearm-purchase waiting periods, to

13   historical practices and understandings.

14       13.    Based on extensive reviews and analysis of the relevant evidence, it is

15   my professional opinion that:

16   - In the Founding era, against a backdrop of the dominant

17       moral/religious view of suicide at the time, the law's treatment of

18       suicide was focused on after-the-fact criminal punishment.

19   - Founding-era medicine and science, which generally misunderstood

20       the causes of mental illness and suicide, exerted less influence than

21       religion on suicide prevention policy.

22   - Over time, the societal approach to suicide followed a process of

23       secularization, decriminalization, and medicalization. Along with these

24       trends, twentieth-century scientific research has illuminated the crucial

25       relationship between access to lethal means and suicide risk. It is this

26       scientific understanding, which is the result of population-level

27       analyses unavailable and likely unimaginable at the Founding, that

28

4

informs suicide-prevention measures like the firearm waiting period law at issue here.

## I.  THE RELIGIOUS AND MORAL TREATMENT OF SUICIDE AT THE FOUNDING AND ITS CORRESPONDING CRIMINALIZATION

14.  America has grappled with the problem of suicide since the Colonial Era.  The first newspaper printed in America—on September 25, 1690—recounted a suicide on the front page, beginning a pattern of frequent newspaper complaints about how regular suicide was becoming. That article also highlighted a predominant way that suicide was understood at the time: through religion. The article provided a then-familiar explanation: "The Devil [then] took Advantage of the Melancholy which he thereupon fell into."[1]

15.  Though some cultures took different approaches, even sanctioning suicide,[2] Founding-era American suicide law reflects the strong moral opposition to suicide that itself was rooted in the dominant Christian teachings of the time. Before the rise of secular, scientific understandings, pre-modern societies often viewed suicide and mental illness through the lens of religion. They expressed concern that mental illness was a result of demonic possession and that evil spirits would be released upon an individual's self-destruction.[3] That general view was

---

[1] RICHARD BELL, WE SHALL BE NO MORE: SUICIDE AND SELF-GOVERNMENT IN THE NEWLY UNITED STATES 16 (2012) (citing Publick Occurences (Boston), Sept. 25, 1690)). Bell notes that American interest in suicide at the Founding is also reflected in the fact that one-third of all American novels published between 1789 and 1800 built plots around suicides. *Id.* at 60. The very first American novel, William Hill Brown's *The Power of Sympathy*, featured three characters contemplating suicide. *Id.* at 59.

[2] *See, e.g.*, Thomas J. Marzen, et al., *Suicide: A Constitutional Right?*, 24 DUQUESNE L. REV. 1, 17 (1985) (discussing ancient Chinese and Indian approval of the suicide of widows); *see also Washington v. Glucksberg*, 521 U.S. 702 (1997) (citing Marzen, et al.'s analysis).

[3] Daniel M. Crone, *Historical Attitudes Toward Suicide*, 35 DUQ. L. REV. 7, 7 (1996) ("Most of the ancient societies seemed to regard suicide with a horror that

incorporated into early Christian teachings that "greatly dominated Western attitudes" and connected melancholy and suicide with the workings of the devil.[4] As one historian wrote, "[i]t was Satan, condemned to despair for eternity, who filled humans with desperation by distancing them from divine grace."[5] Influential Christian scholars such as Martin Luther linked their opposition to suicide to their opposition to the devil.[6]

16.   Community standards of morality are closely intertwined with criminal law.[7] Suicide, deemed an immoral act against God, was also considered a crime before and at the Founding. Leading jurists from Matthew Hale to William Blackstone juxtaposed the religious wrongfulness of suicide and its criminality. Matthew Hale explained that "[n]o man hath the absolute interest of himself but: 1. God almighty hath an interest and propriety in him, and therefore self-murder is a sin against God. 2. The king hath an interest in him, and therefore the inquisition in case of self-murder is *felonice and voluntarie seipsum interfecit and murderarit*

---

was often associated with fear of the evil spirits that suicide was believed to set loose."); A.M. Foerschner, *The History of Mental Illness: From Skull Drills to Happy Pills*, 2 INQUIRIES J. (2010), http://www.inquiriesjournal.com/articles/1673/the-history-of-mental-illness-from-skull-drills-to-happy-pills.

[4] Marzen et al., *supra* note 2, at 26, 29.

[5] MARZIO BARBAGLI, FAREWELL TO THE WORLD 53 (Lucina Byatt trans., 2015) (1938); *see also* JENNIFER MICHAEL HECHT, STAY: A HISTORY OF SUICIDE AND THE PHILOSOPHIES AGAINST IT 46-58 (2013) (discussing how in medieval Christianity, "suicide became viewed as [connected to] the devil's temptations").

[6] HECHT, *supra* note 5 at 60 ("In 1544, writing about a woman who had killed herself, Luther speculated that she had been possessed and that she might be considered a victim of the devil.")

[7] *See* Henry M. Hart, Jr., *The Aims of the Criminal Law*, 23 LAW & CONTEMP. PROBS. 401, 405 (1958) (observing how criminal law declares "a formal and solemn pronouncement of the moral condemnation of the community"); United States v. Cordoba-Hincapie, 825 F. Supp. 485, 491 (E.D.N.Y. 1993) (Weinstein, J.) ("It was inevitable that the development of the criminal law, based as it is upon general and evolving societal mores, would track the development of prevailing views about moral wrongdoing.").

Expert Report and Declaration of Professor Eric Ruben
(Case No. 3:23-CV-00793)

Exhibit 9
0413

*contra pacem domini regis* [feloniously and voluntarily killed and murdered himself against the peace of the lord king]."[8] William Blackstone characterized suicide as "[a] double offence; one spiritual, in invading the prerogative of the Almighty, and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects; the law has therefore ranked this among the highest crimes, making it a peculiar species of felony committed on one's self."[9] As a corollary to criminalizing suicide, the criminal law also criminalized aiding and abetting suicide.[10]

17.     The religious-moral opprobrium and corresponding criminalization of suicide was adopted in the American colonies. A Massachusetts statute in 1661 criminalized the "damnable Practice" of suicide that showed "how far Satan doth prevail."[11] Those adjudicated to have died by suicide in sound mind "shall be buried in some Common high-way . . . and a Cart-load of Stones laid upon the Grave as a Brand of Infamy."[12] Massachusetts was not alone; colonial legislatures in New Hampshire, Rhode Island, New Jersey, Maryland, Virginia, South Carolina, and North Carolina also followed the English practice of punishing willful suicide, or felo-de-se, with a dishonorable burial, such as in a potter's field, as well as forfeiture of goods.[13]

---

[8] Matthew Hale, Historia Placitorum Coronae: The History of the Pleas of the Crown 411-12 (1736).

[9] 4 William Blackstone, Commentaries On the Laws of England 189 (1765).

[10] Later, when suicide itself was decriminalized, assisting suicide became a separate substantive offense. *See Washington v. Glucksberg*, 521 U.S. 702, 774 n.13 (1997) (Souter, J., concurring) (quoting State of New York, report of the Law Revision Commission for 1937, p. 831) ("Since liability as an accessory could no longer hinge upon the crime of a principal, it was necessary to define it as a substantive offense.").

[11] Bell, *supra* note 1 at 18.

[12] *Id.* at 18.

[13] *Id.* at 19; *see also Glucksberg*, 521 U.S. at 712-13 (discussing early Rhode

7

18.     At the Founding, in the case of a suspected suicide, a coroner, accompanied by an inquest jury, investigated the deceased's death and the jury issued a posthumous verdict regarding whether a suicide had taken place; if so, the punishment included forfeiture of goods.[14] If the inquest jury determined that the deceased was insane at the time of the act, however, there would be no forfeiture.[15]

19.     Over time, inquest jurors in America increasingly attributed suicide to causes that would not result in forfeiture. According to one account, "no more than 20 percent of inquest verdicts after 1780" were for felo-de-se, compared with "more than 80 percent of decisions before 1720."[16] The move away from forfeiture for suicides accelerated after the Revolution when four states outlawed forfeiture of property as a punishment for suicide.[17] The shift away from forfeiture as a punishment is generally understood as reflecting concern about punishing families for the decedent's offense, not as reflecting a view that suicide was not morally condemnable.[18]

20.     Through the 1800s, states decriminalized suicide, through law or practice, at the same time that mental health and suicide became increasingly

---

Island law).

[14] SAMUEL MILLER, THE GUILT, FOLLY, AND SOURCES OF SUICIDE: TWO DISCOURSES 68–69 (1805) (stating the jury's duties, and noting that "the punishment of suicide prescribed by the common law of England is twofold—ignominious burial . . . and forfeiture of all the criminal's goods and chattels to the king.").

[15] *Id.* at 68 (encouraging jurors not to illegitimately declare a decedent's "lunacy").

[16] BELL, *supra* note 1, at 20.

[17] *Id.* (describing the actions of the states of New Jersey, Maryland, Virginia, and North Carolina).

[18] *See id.* (attributing much of "this tidal shift in judgment" to "petty officials and reluctant volunteers . . . simply submitting to rising pressure from increasingly acquisitive neighbors eager to assume ownership of their loved ones' property"); *Glucksberg*, 521 U.S. at 713 (crediting the "growing consensus that it was unfair to punish the suicide's family for his wrongdoing").

8

secularized and medicalized.[19] Thomas Marzen and coauthors observed how "[d]ecriminalization occurred because of a concern for the despondency or mental disorder that was believed to prompt such deeds . . . ."[20]

21.     Meanwhile, reducing access to suicidal means was not a primary focus of suicide prevention efforts at the Founding, though at least one advertisement urged pharmacists to take care when prescribing arsenic. In particular, in March 1800, Boston's *Columbian Centinel* published a column repeating "observations" from the Royal Humane Society in London ranging from how to avoid lightning to resuscitating still-born babies.[21] One of the column's "cautions" advised druggists to "limit the sale of arsenic to buyers accompanied by 'two or more creditable persons' who could 'testify to the vender [sic] the purpose for which its use is designed.'"[22] There is no record of compliance by pharmacists to this advice.[23]

## II.   FOUNDING ERA MEDICAL PERSPECTIVES ON MENTAL ILLNESS AND SUICIDE

22.     Today, as discussed below in ¶ 34 to ¶ 41, secular, scientific understandings of mental illness and suicide prevention guide policymakers, including with respect to reducing access to lethal means. To contextualize why there was not a similar focus at the Founding, it is relevant to consider the relatively

---

[19] *See* Marzen, et al., *supra* note 2, at 98-99; Helen Y. Chang, *A Brief History of Anglo-Western Suicide: From Legal Wrong to Civil Right*, 46 S.U.L. REV. 150, 168 (2018) (observing that once "the association between mental health treatment and suicide became more substantiated, the criminality of suicide became less defensible").

[20] Marzen et al., *supra* note 2, at 99; *see also id.* (quoting Commonwealth v. Wright, 11 Pa. D. 144, 146 (1902)) ("Calling suicide self-murder is a curt way of justifying an indictment and trial of an unfortunate person who has not the fortitude to bear any more the ills of this life. His act may be a sin, but it is not a crime; it is the result of disease. He should be taken to a hospital and not sent to a prison.").

[21] 33 COLUMBIAN CENTINEL (Boston), Mar. 22, 1800.

[22] *Id.*

[23] BELL, *supra* note 1, at 287 n.23.

9

rudimentary state of medical science at the time as regards mental illness and suicide prevention.

23.     From the fifth century to not long before the Second Amendment's enactment, the dominant theory of physical and psychological disease was the "humoral theory," which maintained that "health was a function of the proper balance of four humors: blood, black bile, yellow bile, and phlegm."[24] Under this conception, depression, or as it was then known, "melancholy," was frequently attributed to an excess of black bile.[25]

24.     English scholar Robert Burton's 1621 book, *The Anatomy of Melancholy*, describes the humoral theory as it applied to melancholy.[26] Burton attributed melancholy to a range of causes, both "supernatural" (including "God," "Devils," "Witches," and "Stars") and "natural" (including "our temperature . . . which we receive from our parents," "diet, retention and evacuation," "bad air," "solitariness," "immoderate exercise," "passions and perturbations of the mind," "imagination," "shame and disgrace," and "overmuch study").[27] Whatever the cause, the somatic effect was the "corruption of humours, which produce [melancholy] and many other diseases."[28]

25.     Burton's proposed solutions sought to rebalance the humors. "Purges" required consuming substances that caused either vomiting ("upward" purges) or diarrhea ("downward" purges).[29] Burton also recommended intentionally bleeding

---

[24] *Humoral Theory*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCH. ASS'N, https://dictionary.apa.org/humoral-theory (last visited Jan. 2, 2024).

[25] George Dunea, *Review, The Anatomy of Melancholy*, 335 BR. MED. J. 351, 351 (2007); *see also Humoral Theory*, *supra* note 24  (noting that black bile was associated with melancholy).

[26] ROBERT BURTON, THE ANATOMY OF MELANCHOLY (New York Farrar & Rinehart ed. 1927) (1577–1640).

[27] *Id.* at 157–282.

[28] *Id.* at 210.

[29] *Id.* at 574–80.

10

patients either by cutting or by applying leeches.[30] Indeed, bloodletting was the first recommended medical intervention "[w]here the melancholy blood possesseth the whole body with the brain."[31]

26.     By the 1700s, the humoral theory of medicine was becoming discredited,[32] but new theories and solutions reflected continuity with the humoral theory in various ways. Benjamin Rush wrote the first American textbook on what is now known as mental illness, *Medical Inquiries and Observations Upon the Diseases of the Mind*, in 1812.[33] Rush became known as "the father of American psychiatry."[34]

27.     Rush attributed mental illness to disease in the blood vessels of the brain.[35] To remedy that disease, Rush prescribed different solutions, many of which mirrored the solutions that were embraced under the humoral theory. Bloodletting was the first remedy prescribed, which results in "relief . . . by the loss of blood from the haemorrhoidal vessels, and by other accidental haemorrhages."[36] "After bleeding, if it be required," doctors should move on to the other treatments like purges to "bring away black bile, and sometimes worms."[37] In addition, Rush

---

[30] *Id.* at 584–85.

[31] *Id.* at 600.

[32] Indeed, according to one review, "the 1000 year old humoral theory of disease . . . was beginning to be discredited" even when Burton wrote his tome on melancholy. Dunea, *supra* note 25, at 351.

[33] *See* BENJAMIN RUSH, M.D., MEDICAL INQUIRIES AND OBSERVATIONS UPON THE DISEASES OF THE MIND (1812); *see also* STEPHEN FRIED, RUSH: REVOLUTION, MADNESS AND THE VISIONARY DOCTOR WHO BECAME A FOUNDING FATHER 451 (2018) (observing that *Medical Inquiries and Observations Upon the Diseases of the Mind* was "the first American book specifically on mental illness and addiction").

[34] *Dr. Benjamin Rush, "Father of American Psychiatry"*, PENN MEDICINE, https://www.uphs.upenn.edu/paharc/features/brush.html.

[35] BENJAMIN RUSH, MEDICAL INQUIRIES AND OBSERVATIONS, UPON THE DISEASES OF THE MIND 24-25 (4th ed. 1830).

[36] *Id.* at 97.

[37] *Id.* at 98.

11

recommended ingesting "aloes, jalap, and calomel," each of which is now known to be toxic, [38] to promote diarrhea.[39] He incorrectly attributed the resulting bloody stool to mental illness and not the toxic substances he prescribed.[40] Rush also recommended emetics to promote vomiting and thereby "remove morbid excitement from the brain, and thus restore the mind to its healthy state."[41] In addition to bloodletting, purges, and emetics, patients were to consume "little nourishment"[42] and drink warm sherry wine and diluted porter.[43] In the alternative, people suffering from mental illness should take opium, a "noble medicine" that "has many advantages over ardent spirits," like operating faster and "not pollut[ing] the breath."[44] Rush recommended warm baths, cold baths, and exercise, as well as trying to increase salivation.[45] Salivation could be increased by ingesting mercury to "abstract[] morbid excitement from the brain to the mouth" and thereby "chang[e] the cause of our patient's complaints, and fix[] them wholly upon his sore mouth,"[46] ultimately "restor[ing] the mind to its native seat in the brain."[47] Doctors should not converse with patients about their melancholy because that would only worsen the condition.[48]

---

[38] *See e.g.*, Xiaoqing Guo & Nan Mei, Aloe Vera*: A Review of Toxicity and Adverse Clinical Effects*, 34 J. Env't Sci. & Health, Part C. Env't Carcinogenesis & Ecotoxicology Revs. 77 (2016) (discussing toxicity of aloe vera); Guenter B. Risse, M.D., PhD., *Calomel and the American Medical Sects During the Nineteenth Century*, 48 Mayo Clinic Proc. 57–58 (Jan. 1973) (discussing Rush's recommendations regarding jalap and calomel).

[39] Rush, *supra* note 35, at 98.

[40] Risse, *supra* note 38, at 58-59.

[41] Rush, *supra* note 35, at 98.

[42] *Id.*

[43] *Id.* at 99.

[44] *Id.* at 100-101.

[45] *Id.* at 101-03.

[46] *Id.* at 103.

[47] *Id.* at 103.

[48] *Id.* at 115.

12

28.     Rush's treatments were not the only ones used by practitioners at the Founding. One medical practitioner, Thomas Gale, published a book in 1802 called *Electricity, or the Ethereal Fire, Considered*, which espoused "medical electricity" to cure a wide variety of ailments, including mental illness.[49] Gale complained that bloodletting only offered "temporary relief," but "strong electric shock" could more effectively "restore an equilibrium in the circulations."[50] Gale "found, by experience, that gentle shocks through every part of the system upon the nerves, and through the stomach, and down the back of the head, upon the top of the head, through the brain to the feet, have assisted in restoring a person to the use of reason."[51]

29.     Meanwhile, other doctors looked to anatomical causes besides blood disease to explain mental illnesses. Jean-Etienne-Dominique Esquirol (1772-1840), an influential French doctor, for example, "championed a theory that lodged 'mental life solely in the nervous system,'"[52] and many in the medical community similarly came to view mental illness as related to a breakdown of the nervous system (hence, "nervous breakdown").[53] To be sure, *some* illnesses, like epilepsy and dementia, have connections to neurological disorders.[54] But throughout the

---

[49] THOMAS GALE, ELECTRICITY, OR THE ETHEREAL FIRE, CONSIDERED 70-71 (1802).

[50] *Id.* at 124.

[51] *Id.* at 125.

[52] JOHN C. WEAVER, A SADLY TROUBLED HISTORY: THE MEANINGS OF SUICIDE IN THE MODERN AGE 35 (2009) (quoting JAN GOLDSMITH, CONSOLE AND CLASSIFY: THE FRENCH PSYCHIATRIC PROFESSION IN THE NINETEENTH CENTURY (Cambridge U. Press 1987)).

[53] *See From Nerves to Neurosis*, SCIENCE MUSEUM, (June 12, 2019), https://www.sciencemuseum.org.uk/objects-and-stories/medicine/nerves-neuroses (discussing the popularization of the term "nervous breakdown" to describe a medical disorder).

[54] *See id.* (discussing how German neurologists of the early 1900s came to "distinguish[] neurological diseases from neuroses").

13

1  1800s, the list of perceived neurological disorders was quite different than doctors

2  accept today. For example, a common diagnosis beginning in 1886 was

3  "neurasthenia," whose "[c]ommon mental symptoms" included depression.[55]

4      30.    The state of medical science at the Founding influenced limited

5  approaches to stopping suicide attempts that were already in motion. For example,

6  humane societies at the Founding recommended taking down a person who was

7  attempting to hang themselves and immediately bleeding them.[56] Such efforts and

8  others conducted by Founding-era humane societies do not appear to have had a

9  meaningful impact on suicide prevention.[57] Overall, "[m]ost failed suicides . . .

10  were not thwarted; they were botched. They did not fail because of a stranger's or a

11  neighbor's intervention but because the methods chosen were not sufficiently

12  lethal."[58]

13      31.    Firearms were, no doubt, lethal, but the evidence we have suggests

14  they were not used as frequently for suicide at the Founding compared to today. To

15  be sure, the government did not systematically collect data on the prevalence of

16  different means of suicide until the mid- to late-1800s, making it impossible to

17  know with modern-day precision the breakdown of different methods. According to

18  press coverage, which is admittedly an imprecise proxy, three means of suicide—

19  drowning, poison, and hanging—accounted for about half of reported-upon suicides

---

[55] Ruth E. Taylor, *Death of neurasthenia and its psychological reincarnation: A study of neurasthenia at the National Hospital for the Relief and Cure of the Paralysed and Epileptic, Queen Square, London, 1870–1932*, 179 BRITISH J. PSYCHIATRY 550, 550 (2001) (citing F. G. GOSLING, BEFORE FREUD: NEURASTHENIA AND THE AMERICAN MEDICAL COMMUNITY, 1870–1910 (U. Ill. Press 1987)).

[56] BELL, *supra* note 1, at 94.

[57] Three decades' worth of records documenting people saved by the Humane Society of the Commonwealth of Massachusetts "described exactly seven as unmistakably suicidal," six of them by drowning, though the actual number of disrupted suicide attempts is likely higher given ambiguity in the records. *Id.* at 98–99.

[58] *Id.* at 96.

14

in early America.[59] Even in the mid-1800s, after handgun technology improved, evidence suggests that firearms did not account for nearly the proportion of suicides that they do today.[60] The first U.S. census to report suicide by method was in 1860.[61] That census reported that 112 people died by suicide by firearm, compared to 306 by hanging and 137 by poison.[62]

32.     In the mid-1800s, some prominent researchers cast doubt on the efficacy of bloodletting. Pierre Charles Alexandre Louis, a French doctor "considered the founder of modern epidemiology," was at the forefront of that effort.[63] Louis's *Research on the Effects of Bloodletting in Some Inflammatory Diseases* was published in French in 1828 but then expanded into a book, translated into English, and published in the United States in 1836.[64] In it, Louis compared the results of 77 patients who had been bled at different times in order to treat pneumonia.[65] He found that those who were bled later in the disease had a higher survival rate than those who were bled earlier in the disease, a finding he concluded

---

[59] *Id.* ("According to newspaper coverage, about half of the reported suicides in early national America were attempted or completed by drowning, asphyxiation, or poisoning.").

[60] An 1845 review of suicides reported in a New York City newspaper during the course of a year counted sixty-four suicides by hanging, compared to twenty-six by firearm. *See* E. K. Hunt, *Statistics of Suicide in the United States* 1 AM. J. INSANITY 225, 230 (1845).

[61] BELL, *supra* note 1, at 252.

[62] SECRETARY OF THE INTERIOR, STATISTICS OF THE UNITED STATES (INCLUDING MORTALITY, PROPERTY, &C.,) IN 1860; COMPILED FROM THE ORIGINAL RETURNS AND BEING THE FINAL EXHIBIT OF THE EIGHTH CENSUS 253 (1866).

[63] THEODORE H. TULCHINSKY & ELENA VARAVIKOVA, THE NEW PUBLIC HEALTH 12 (3d ed. 2014).

[64] Alfredo Morabia, *Pierre-Charles-Alexandre Louis and the Evaluation of Bloodletting*, 99 J. ROYAL SOC'Y MED. 156, 158–59, 160 n.5 (2006) (discussing Louis's experiments with bloodletting).

[65] *Id.* at 158.

15

was "startling and apparently absurd."[66] Though Louis did not discount entirely the usefulness of bloodletting, he concluded that its salutary effects were limited.[67]

33.     Beginning in the late 1800s and into the 1900s, researchers like Sigmund Freud began to acknowledge the psychological determinants of suicidal behavior.[68] In the mid-1900s, American researchers "would take the lead" from their French counterparts in suicide studies.[69] As historian John C. Weaver has described, "[c]ontemporary political, academic, and medical research currents in the United States furthered an abundance of innovative studies" with the assistance of a "surge of statistical manuals."[70] As a result of increasing scientific innovation, new medicines, therapies, and interventions were established.

## III.   MODERN TREATMENT OF SUICIDE IN LAW AND MEDICINE AS RELATES TO MEANS RESTRICTION

34.     Today, scientific methods, more than religious or pseudo-scientific beliefs, inform societal and legal approaches to suicide prevention. One of the most relevant discoveries, as it relates to firearm regulations targeting suicide prevention, is the relationship between access to common, lethal suicidal means and suicide rates.

---

[66] *Id.*

[67] P. Ch. A. Louis, Researches On The Effects Of Bloodletting In Some Inflammatory Diseases, and the influence of tartarized antimony and vesication in pneumonitis 13 (1836) ("Thus, the study of the general and local symptoms, the mortality and variations in the mean duration of pneumonitis, according to the period at which bloodletting was instituted; all establish narrow limits to the utility of this mode of treatment.").

[68] Taylor, *supra* note 55, at 550. For one example, see Sigmund Freud, *On the Grounds for Detaching a Particular Syndrome from Neurasthenia under the Description Anxiety Neurosis* (1895), *reprinted in* 3 Standard Edition Of The Complete Works Of Sigmund Freud 90 (trans. and ed. J. Strachey).

[69] Weaver, *supra* note 52, at 23, 62.

[70] *Id.* at 62-63.

16

35.    The research supporting means restriction as a method for suicide prevention first arose in the context of reducing suicidal means other than firearms, like domestic gas asphyxiation.[71] Asphyxiation from high carbon monoxide concentrations in domestic gas was the leading cause of suicide in the United Kingdom between the early 1900s and the early 1960s.[72] Suicidal people would close windows and turn on unlit gas jets, or stick their heads into turned-on, unlit ovens.[73] Death by this method was "almost entirely due to carbon monoxide poisoning," with coal-based gas at the time containing about 14 percent carbon monoxide.[74] After the introduction of oil-based gas, and then natural gas, however, the carbon monoxide content plummeted, rendering domestic gas asphyxiation much less fatal.[75]

36.    Contemporaneous with the drop in carbon monoxide levels in home gas, researchers noticed that suicide rates declined.[76] Norman Kreitman, who studied the connection between carbon monoxide poisoning and suicide,

---

[71] *See* Deborah Azrael & Matthew J. Miller, *Reducing Suicide Without Affecting Underlying Mental Health*, in THE INTERNATIONAL HANDBOOK OF SUICIDE PREVENTION 637–41 (Rory C. O'Connor & Jane Pirkis, eds., 2016) (discussing methods of suicide and their relationship to means restriction).

[72] R. D. T. Farmer, *Suicide by Different Methods*, 55 POSTGRADUATE MED. J. 775, 778 (1979); *accord* N. Kreitman and S. Platt, *Suicide, Unemployment, and Domestic Gas Detoxification in Britain*, 38 J. OF EPIDEMIOLOGY AND CMTY. HEALTH 1, 1 (1984) (further developing Farmer's findings).

[73] *See, e.g.*, ANNE STEVENSON, BITTER FAME: A LIFE OF SYLVIA PLATH 296 (1989) ("The smell of gas was unmistakable. Forcing open the door to the kitchen, they found Sylvia sprawled on the floor, her head on a little folded cloth in the oven. All the gas taps were full on.").

[74] Kreitman & Platt, *supra* note 72, at 1; Norman Kreitman, *The Coal Gas Story*, 30 BRIT. J. PREV. SOC. MED. 86, 87 (1976). *See also id.* ("Since the lethal agent in domestic gas is carbon monoxide it is convenient to refer to the former simply as CO suicides.").

[75] Kreitman & Platt, *supra* note 72 (discussing the hypothesis that the reduction in suicides was from reduced availability of carbon monoxide in domestic gas).

[76] Kreitman, *supra* note 74, at 88-89.

17

1    documented an increase in suicide by other means among men and women aged 15-
2    24, but the dramatic decrease in home gas suicides dwarfed those increases.[77]
3    Meanwhile, some age groups, like the elderly, experienced especially pronounced
4    suicide rate declines.[78] Kreitman observed that "the close temporal association
5    between the declining [carbon monoxide] content of domestic gas and the fall in
6    suicides due to this agent while those from other causes have followed a quite
7    different trend, lead to the conclusion that there is a direct causal relationship
8    between the two phenomena."[79]

9          37.    Kreitman's subsequent work highlighted how the experience in Britain
10   was anomalous when compared to other European countries where carbon
11   monoxide poisoning was not a primary means of suicide.[80] He also observed that
12   unemployment—a social condition usually correlated with increased suicide
13   rates—rose by about 50 percent at the same time suicide rates dropped by 34
14   percent between 1961 and 1971, implying that the impact of the means restriction at
15   issue (reduced access to carbon monoxide) may have been even greater than
16   observed at first glance.[81] The usual research focus at the time was on the
17   relationship between suicide, on the one hand, and psychiatric morbidity or social
18   factors, on the other.[82] Kreitman concluded that "[i]t would appear that an
19   additional variable—namely, availability of method—may now have to be
20   added."[83]

---

[77] *Id.* at 88.

[78] *Id.*

[79] *Id.* at 92.

[80] Kreitman & Platt, *supra* note 72, at 3-4 ("It seems then, that in relation to the other countries of Europe, as analysed by Sainsbury et al, or with respect to the group of developed countries examined by Boor, the United Kingdom is conspicuously anomalous." (footnotes omitted)).

[81] *Id.*

[82] *Id.* at 5.

[83] *Id.*

18

38.     Subsequently, researchers observed similar effects in different parts of the world following the removal of common suicidal means. One set of studies, for example, evaluated the effects of removing access to highly toxic pesticides on suicide rates in South Asia. Globally, pesticide poisoning, not firearm discharge, is the most common means of suicide.[84] This was true of Sri Lanka, which "had one of the highest suicide rates in the world" in the 1990s.[85] After the Sri Lankan government imposed bans on highly toxic pesticides frequently used for suicide, however, far fewer people died by pesticide ingestion and the overall suicide rate dropped by 50 percent.[86]

39.     When Kreitman conducted his studies, he commented that "[v]irtually nothing is known" about *why* limiting access to suicidal means brings down suicide rates in light of alternative means.[87] Subsequent studies have started to fill in the gaps, including by documenting the impulsivity of many suicide attempts[88] and the generally positive prognosis following a failed attempt.[89] As public health researchers Deborah Azrael and Matthew Miller summarize:

---

[84] José M Bertolote et al., *Suicide, Suicide Attempts and Pesticides: A Major Hidden Public Health Problem*, 84 BULL. WORLD HEALTH ORG. 260, 260 (2006) (extrapolating from recent analyses that "pesticide ingestion [is] the most common method of suicide on a worldwide basis").

[85] Azrael & Miller, *supra* note 71, at 643.

[86] *Id.*

[87] Kreitman, *supra* note 74, at 92.

[88] *See, e.g.*, Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 SUICIDE & LIFE-THREATENING BEHAV. 49, 52 (2001) (providing results of a study of 153 nearly lethal suicide attempts among thirteen to thirty-four-year-olds in Houston, Texas which found that 24 percent of study participants spent less than five minutes between the decision to attempt and the attempt).

[89] *See, e.g.*, David Owens et al., *Fatal and Non-Fatal Repetition of Self-Harm*, 181 BRITISH J. OF PSYCHIATRY 193, 193–94 (2002) ("[I]t seems that a reasonable estimate of non-fatal repetition [of suicide attempts] is 15-16% at 1 year with a slow rise to 20-25% over the following few years.").

19

> The argument that restricting access to a highly lethal method can save lives rests on three well-established observations. . . . First, many suicidal crises are fleeting. . . . Second, the method people use in suicidal acts depends, to a vital extent, on the method's ready availability, over and above—and perhaps even independent of—the attempter's assessment of a method's intrinsic lethality. . . . Third, the prognosis if one survives a suicide attempt is excellent. . . . [F]ewer than 10% of people who attempt suicide and live later go on to die by suicide.[90]

40.     Today, in contrast to at the Founding, firearms are the most commonly used method in U.S. suicides, despite being used in a relatively small proportion of suicide attempts.[91] According to provisional data, 26,993 people in the United States took their lives by self-inflicted gun shots in 2022, the highest number since the Centers for Disease Control began recording suicide data in 1968.[92] Moreover, 2022 was not an outlier year; the gun suicide rate—7.65 per 100,000 in 2022—has been on an upward trajectory since 2006,[93] further cementing the United States' status as the country with the highest gun suicide rate in the world.[94]

41.     While suicide has long been a societal problem, contemporary perspectives on the nature of mental illness and the increasingly scientific understanding of how to reduce suicide rates help shed light on any absence of

---

[90] *See* Azrael & Miller, *supra* note 71, at 638-39.

[91] *See* PHILIP J. COOK & KRISTIN A. GOSS, THE GUN DEBATE: WHAT EVERYONE NEEDS TO KNOW 42 (2020) (describing statistics); Andrew Conner, Deborah Azrael, and Matthew Miller, *Suicide Case-Fatality Rates in the United States, 2007 to 2014*, 171 ANNALS OF INTERNAL MED. 885, 888 (2019) (estimating that firearms accounted for 4.8 percent of suicide attempts but 50.6 percent of suicide deaths).

[92] *CDC Provisional Data: Gun Suicides Reach All-time High in 2022, Gun Homicides Down Slightly from 2021*, JOHN HOPKINS BLOOMBERG SCH. OF PUB. HEALTH (Jul. 27, 2023), https://publichealth.jhu.edu/2023/cdc-provisional-data-gun-suicides-reach-all-time-high-in-2022-gun-homicides-down-slightly-from-2021.

[93] *Id.*

[94] *See* Champe Barton & Daniel Nass, *Exactly How High Are Gun Violence Rates in the U.S., Compared to Other Countries?*, THE TRACE (Oct. 5, 2021), https://www.thetrace.org/2021/10/why-more-shootings-in-america-gun-violence-data-research (noting that the U.S. was the "global leader" in gun suicides).

20

means restrictions during the Founding era. In light of subsequent research—unavailable and in many ways inconceivable at the Founding—regarding the relationship between access to lethal means of suicide and suicide rates, and the proportion of overall suicides caused by gun shots, researchers and policymakers have focused on the connection between access to firearms and suicide rates, and the potential to reduce suicide rates by policies that reduce immediate access to firearms, such as waiting periods.[95]

## DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to the above.

Executed in Dallas, Texas on March __11__, 2024.

*/s/ Eric Ruben*
_____
Eric Ruben

---

[95] *See, e.g.*, *Effects of Waiting Periods on Suicide*, RAND, (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/waiting-periods/suicide (surveying studies of waiting periods' effect on suicide rates).

**EXHIBIT A**

Exhibit 9
0429

**ERIC RUBEN**

SMU Dedman School of Law
3315 Daniel Avenue • Dallas, TX 75205
214-768-2581 • eruben@smu.edu
http://ssrn.com/author=2436317

---

ACADEMIC EXPERIENCE

---

**SMU Dedman School of Law**, Dallas, TX
    *Associate Professor of Law* (with tenure), May 2023-present
    *Assistant Professor of Law*, August 2019-May 2023
    *Courses*: Criminal Law; Professional Responsibility; Second Amendment and Weapons
    Regulation
    *Honors*: Robert G. Storey Distinguished Faculty Fellow, 2023-2024; Elected Graduation Hooder,
    2022, 2023

**Brennan Center for Justice at New York University School of Law**, New York, NY
    *Fellow*, December 2014-Present

**New York University School of Law**, New York, NY
    *Adjunct Professor*, January 2018-January 2019
    *Course*: The Regulation of Weaponry in Democratic Society

---

EDUCATION

---

NEW YORK UNIVERSITY SCHOOL OF LAW, New York, NY
J.D., May 2007, *cum laude*
    *New York University Law Review*, Articles Editor
    Florence Allen Scholar (top 10% after 4 semesters)
    Law Students for Human Rights, Board Member and Treasurer
    Administrative and Regulatory State, T.A. for Prof. Peggy Cooper Davis

DARTMOUTH COLLEGE, Hanover, NH
B.A. in Government, Minor in Mathematics, June 2003, *magna cum laude*
    Honors in writing and philosophy; recipient of Lombard Post-Graduate Fellowship

---

JUDICIAL CLERKSHIP

---

**The Honorable Julio M. Fuentes, U.S. Court of Appeals, Third Circuit**, Newark, NJ
    *Judicial Clerk*, August 2007-August 2008

---

ACADEMIC PUBLICATIONS

---

*Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 MINN. L. REV.
(forthcoming 2024)

*One Year Post-*Bruen*: An Empirical Assessment*, 110 VA. L. REV. O. 20 (2024) (with Rosanna Smart &
Ali Rowhani-Rahbar)

Exhibit 9
0430

*Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99 (2023) (with Joseph Blocher)
- *cited in* various briefs submitted in United States v. Rahimi, No. 22-915 (U.S. Aug. 21, 2023)
- *cited in* Ocean State Tactical, LLC v. Rhode Island, __ F.4th __, 2024 WL 980633 (1st Cir. Mar. 7, 2024); Lara v. Comm'r Pennsylvania State Police, 91 F.4th 122 (3d Cir. 2024); Range v. Att'y Gen. United States of Am., 69 F.4th 96 (3d Cir. 2023) (Krause, J., dissenting)

*Self-Defense Exceptionalism and the Immunization of Private Violence*, 96 S. CAL. L. REV. 509 (2023)

*Public Carry and Criminal Law After* Bruen, 135 HARV. L. REV. F. 505 (2022)
- *formed basis for* quotes in the New York Times and Washington Post, as well as interview on Vox's Today Explained podcast

*"Second-Class" Rhetoric, Ideology, and Doctrinal Change*, 110 GEO. L.J. (2022) (with Joseph Blocher)
- *companion piece* published in the Washington Post
- *featured in* episodes of Strict Scrutiny and Vox's The Most Dangerous Branch podcasts

*Law of the Gun: Unrepresentative Cases and Distorted Doctrine*, 107 IOWA L. REV. 173 (2021)
- *cited in* the brief filed by the Giffords Law Center to Prevent Gun Violence in *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Apr. 26, 2021)

*The Gun Rights Movement and "Arms" Under the Second Amendment*, BRENNAN CTR. FOR JUST. (2021)

*An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIF. L. REV. 63 (2020)
- *cited in* various briefs including those filed by Criminal Law Scholars and United States Senators in *Bruen*, *supra*

*You Can Lead a Horse to Water:* Heller *and the Future of Second Amendment Scholarship*, 68 DUKE L.J. O. 1 (2018) (with Joseph Blocher)

*From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 DUKE L.J. 1433 (2018) (with Joseph Blocher)
- *cited in* various briefs including one filed by Second Amendment Law Professors in *Bruen*, *supra*
- *cited in* Mance v. Sessions, 896 F.3d 390 (5th Cir. 2018)
- *featured in* the New York Times, Wall Street Journal, and USA Today, among others

*Justifying Perceptions in First and Second Amendment Doctrine*, 80 LAW & CONTEMP. PROBS. 149 (2017)

*Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017) (with Darrell A. H. Miller)

*Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015) (with Saul Cornell)
- *cited in* the majority opinion and quoted in the dissenting opinion in *Bruen*, *supra*
- *cited in* various briefs including those filed by the NAACP Legal Defense & Education Fund and New York State in *Bruen*, *supra*
- *cited in Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021), among others
- *companion piece* published in The Atlantic

Exhibit 9
0431

ERIC RUBEN                                                                           MARCH 2024

**Work-in-Progress**

*Numeracy and Constitutional Interpretation*

*Gun-Free Zones* (with Ali Rowhani-Rahbar & Rosanna Smart)

*Felons, Firearms, and Restoration*

**Edited Volumes**

*Protests, Insurrection, and the Second Amendment*, BRENNAN CTR. FOR JUST. (2021)

*Second Generation of Second Amendment Law and Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017) (with Darrell Miller)

## GRANTS

**Arnold Ventures**, "Gun-Free Zones: Legislative Landscape and Relationship with Firearm Violence," Co-Principal Investigator with Ali Rowhani-Rahbar (Lead) and Rosanna Smart, ~$600,000 (2024-2026)

## ACADEMIC PRESENTATIONS

"Social and Non-Physical Impacts of Guns," Everytown for Gun Safety Research Convening (February 2024)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," William & Mary Law School (January 2024)

"One Year Post-*Bruen*: An Empirical Assessment," National Research Conference for the Prevention of Firearm-Related Harms (November 2023)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," Minnesota Law School (October 2023)

"One Year Post-*Bruen*: An Empirical Assessment," Fordham Law School (October 2023)

"Public Carry and Gun-Free Spaces After *Bruen*," Southeastern Association of Law Schools Conference (July 2023)

"The Second Amendment and the Supreme Court After *Bruen*," Brennan Center for Justice at New York University School of Law (May 2023)

"Gun Laws in Tennessee: Understanding the Current Landscape," University of Tennessee College of Law (April 2023)

"The History of the Second Amendment: How We Got to Bruen–and Where We Go from Here," UCLA Criminal Justice Law Review Symposium (October 2022)

"Felons, Firearms, and Restoration," N.Y.U. L. Rev. & Duke Ctr. for Firearms Law Symposium (September 2022)

Exhibit 9
0432

"Felons, Firearms, and Restoration," Duke Law School Firearms Law Workshop (June 2022)

"Public Carry and Criminal Law after *Bruen*," Harvard Law Review Symposium (March 2022)

"Self-Defense Exceptionalism," UC Davis Law Review Symposium (October 2021)

"Gun Law Reform: The Current Legal Landscape," NYU School of Law Symposium (March 2021)

"The Gun Rights Movement and 'Arms' Under the Second Amendment," Brennan Center Workshop (February 2021)

"Unrepresentative Litigation and Constitutional Distortion: The Case of the Gun-Centric Second Amendment," Drexel University School of Law Faculty Workshop (November 2020)

"An Unstable Core: Self-Defense and the Second Amendment," Video Interview, Duke Law (May 2020)

"'The Second Amendment Is Not a Second-Class Right': A Case Study in Constitutional Rhetoric," AALS Conference (January 2020)

"Mistake, Self Defense, and the Role of the Jury: Framing the Botham Jean/Amber Guyger Case," SMU Dedman School of Law (flash class) (October 2019)

"The Second Amendment After *Heller* and *Caetano*: Overlooked Implications for the Future of Weapons Regulation," Duke Law School Workshop (August 2019)

"The Second Amendment and Self-Defense," Hastings School of Law (January 2019); New York University School of Law (April 2018); and University of New Hampshire School of Law (April 2018)

"Guns and Free Speech," New York University School of Law (November 2017)

"Justifying Perceptions in First and Second Amendment Doctrine," Guns in a Civil Society Summit, Washington Alliance for Gun Responsibility (November 2017) and Symposium on Second Generation of Second Amendment Law & Policy, New York University School of Law (April 2016)

"Preemption and Firearms Law," Constitutional Governance Practicum at the Columbia Law School (September 2017)

"The Second Amendment: A Discussion," Fordham Law Chapter of the American Constitutional Society (September 2017)

"Discussion on Second Amendment Jurisprudence and Advocacy," NYU Law Chapter of the American Constitution Society (March 2016)

"An Introduction and Discussion on the Second Amendment," Cardozo Law Chapter of the American Constitution Society (March 2016)

"The Second Amendment: Gun Rights in America," John Jay College, New York, NY (November 2015)

Exhibit 9
0433

**SELECTED PUBLICATIONS, PRESENTATIONS, AND MEDIA APPEARANCES FOR A GENERAL AUDIENCE**

**Publications**

*Second Amendment Meets Domestic Violence in the Supreme Court*, BRENNAN CENTER BLOG (November 2023)

"Research Priorities for Gun Violence Prevention After *Bruen*," RAND (with Ali Rowhani-Rahbar and Rosanna Smart) (May 2023)

Written Testimony, Senate Judiciary Committee, "*Protecting Public Safety After New York State Rifle & Pistol Association v. Bruen*," Washington, D.C., March 15, 2023

*A Smarter Path to Gun Safety Through Property Rights*, N.Y. DAILY NEWS (July 2022)

*Three Supreme Court Cases to Watch Beyond Abortion Rights*, BRENNAN CENTER BLOG (with Alicia Bannon and Harry Isaiah Black) (June 2022)

*A Right to Conceal and Carry?*, BRENNAN CENTER BLOG (with Emil Mella Pablo) (May 2022)

*No, Courts Don't Treat the Second Amendment as a "Second-Class Right*,*"* WASH. POST (November 2021) (with Joseph Blocher)

*First Major Second Amendment Case Before the Supreme Court in Over a Decade Could Topple Gun Restrictions*, THE CONVERSATION (October 2021)
 Republished in over a dozen other publications across the country and online, including MarketWatch, Iowa Capital Dispatch, Houston Chronicle, St. Louis Post-Dispatch, Idaho Press-Tribune, NewsBreak, and The Raw Story

*Claiming Self-Defense Isn't a Get-Out-of-Jail-Free Card*, BRENNAN CENTER BLOG (July 2020)

*The Supreme Court's Second Amendment Surprise*, BRENNAN CENTER BLOG (June 2020)

*What the Supreme Court's Latest Second Amendment Ruling Means for Future Cases*, BRENNAN CENTER BLOG (May 2020)

*The Supreme Court Shouldn't Disrupt the Judicial Consensus on the Second Amendment*, SCOTUSBLOG (November 2019) (with Joseph Blocher)

*Is the Handgun America's "Most Popular" Self-Defense Weapon? It's a Crucial Question at the Supreme Court*, BRENNAN CENTER BLOG (November 2019)

*Misguided 'Second Amendment Protection Acts' Have the Opposite Effect of Their Intent*, BRENNAN CENTER BLOG (June 2019) (with Adam B. Sopko)

*What to Know About the Supreme Court's First Gun Case in 9 Years*, THE TRACE (April 2019) (print interview)

*The Second Amendment Allows for More Gun Control Than You Think*, VOX.COM (May 2018) (with Joseph Blocher)

Exhibit 9
0434

*There Is No Constitutional Bar to Further Gun Control*, N.Y. TIMES (June 2016)

*Exaggerated Claims of "Judicial Nullification" in Gun Cases*, THE JURIST (May 2016)

*Justice Scalia, the Second Amendment, and Judicial Conservatives*, CASETEXT (February 2016)

*The Slave-State Origins of Modern Gun Rights*, THE ATLANTIC (September 2015) (with Saul Cornell)

**Presentations**

Testifying Witness, Senate Judiciary Committee, Senate Judiciary Committee, "Protecting Public Safety After New York State Rifle & Pistol Association v. Bruen," Washington, D.C., March 15, 2023

"*NYSRPA v. Bruen*—Challenges and Responses to NY's Concealed Carry Laws," New Yorkers Against Gun Violence (November 2022)

"From *Heller* to *Bruen*: The Past and Future of the Second Amendment," Potomac Law Group PLLC (July 2022)

"Public Carrying of Firearms: Understanding the Impact of the Supreme Court's Decision," John Hopkins Center for Gun Violence Solutions (July 2022)

"Guns vs. Speech: Does the 2nd Amendment Threaten the 1st?," Brennan Center for Justice Live Event (September 2021)

"The Second Amendment and State Efforts in Gun Violence Prevention," American Constitution Society Northeast Regional Convening (October 2019)

"The Gun Shop," Fulbright Film Series Panel Discussion (February 2018)

"The Second Amendment and Gun Laws: A Primer for Advocates," New York Lawyer Chapter of the American Constitution Society (October 2017)

"When the First and Second Amendment Collide," League of Women Voters Gun Safety Committee (September 2017)

"*Binderup* and the Future of As-Applied Second Amendment Challenges," Consortium for Risk-Based Firearm Policy (February 2017)

"2nd Amendment - Protecting Rights, Protecting People," The Liberty Series, Union League of Philadelphia (January 2017)

"As-Applied Second Amendment Challenges," Second Amendment Litigation and Jurisprudence Conference, Washington, D.C. (December 2016)

"David v. Goliath: The Gun Violence Prevention Movement and Challenging the NRA," Annual RebLaw Conference, Yale University Law School (February 2016)

**Media Appearances**

John Simerman, *Concealing Guns Without a Permit: Some New Orleans Officials Fear the Worst*, NEW ORLEANS ADVOCATE (March 2024) (print)

Exhibit 9
0435

Lydia Wheeler, *Bump Stock Ban Brings Agency Power Dispute to Supreme Court*, BLOOMBERG NEWS (February 2024) (print)

Heather Hollingsworth, Summer Ballentine & Jim Salter, *Could Missouri's 'Stand Your Ground' Law Apply to the Super Bowl Celebration Shooters?*, AP NEWS (February 2024) (print)

Marco Poggio, *For Immigrants, Gun Rights Debate Goes Beyond Firearms*, LAW360 (January 2024) (print)

Michael Heise, *The Bruen Decision After One Year: An Empirical Look*, EMPIRICAL LEGAL STUDIES BLOG (December 2023) (print)

David W. Chen, *Courts Strike Down Gun Control Measures in Two States*, N.Y. TIMES (November 2023) (print)

Tom Brune, *Supreme Court Wrestles with Gun Limits After Ruling in New York Case*, NEWSDAY (November 2023) (print)

Michael Smerconish, SIRIUS XM POTUS 124 (November 2023) (radio)

Henry Gass, *Second Amendment Rights for Abusers? Justices Seem Skeptical*, CHRISTIAN SCIENCE MONITOR (November 2023) (print)

Caroline Love, *Can Alleged Domestic Abusers Keep Their Guns? The Supreme Court May Decide the Answer*, KERA NEWS (November 2023) (print and radio)

Marco Poggio, *Justices Skeptical of Keeping Domestic Abusers Armed*, LAW360 (November 2023) (print)

Tom Brune, *Supreme Court Gun Case Could Prompt New Challenges to New York Laws*, NEWSDAY (November 2023) (print)

*Should Domestic Abusers Lose Gun Rights?*, VOX'S TODAY, EXPLAINED (November 2023) (podcast)

Adam Liptak, *Supreme Court's Devotion to Gun Rights Faces a Challenging Test*, N.Y. TIMES (November 2023) (print)

Abbie VanSickle, *Texas Man at Center of Supreme Court Case Says He No Longer Wants Guns*, N.Y. TIMES (November 2023) (print)

Reena Diamante, *Supreme Court to Weigh Constitutionality of Gun Restrictions on Accused Domestic Abusers*, SPECTRUM NEWS (November 2023) (print and television)

Andrew Goudsward and Nate Raymond, *US Supreme Court Ruling May Help Hunter Biden Fight Gun Charge*, REUTERS (October 2023) (print)

Bloomberg Law Podcast with June Grasso, *Supreme Court to Rule on Guns for Domestic Abusers*, BLOOMBERG RADIO (September 2023) (radio and podcast)

Marco Poggio, *Access to Justice Cases to Watch This Term*, LAW360 (September 2023) (print)

*Carbon Capture is Coming to the King Ranch*, TEXAS STANDARD (August 2023) (radio)

Exhibit 9
0436

Bloomberg Law Podcast with June Grasso, *Landmark Young People's Climate Ruling*, BLOOMBERG RADIO (August 2023) (radio and podcast)

Marco Poggio, *Justices Eye Intersection Of Domestic Violence, Gun Rights*, LAW360 (July 2023) (print)

*Supreme Court Conservatives Could Further Erode Gun Control in Next Term*, THE GUARDIAN (June 2023) (print)

Caroline Love, *Supreme Court Decides to Hear North Texas Case on Guns and Domestic Violence*, KERA NEWS (June 2023) (print)

Avalon Zoppo, *Justices Take Up Gun Case That Puts Landmark 2nd Amendment Ruling to the Test*, NATIONAL LAW JOURNAL (June 30, 2023) (print)

Joseph Stepansky, *How a US Supreme Court Ruling Is Transforming Gun Control*, AL JAZEERA (May 2023) (print)

Terrence T. McDonald, *Ruling on New Jersey Gun Law Shows Democrats Didn't Do Their Homework*, N.J. MONITOR (May 2023) (print)

*The Daniel Perry Case Shows Contradictions of Gun Enthusiasts in Texas*, ECONOMIST (April 2023) (print)

Peter Charalambous', *How Two Decades of Gun Culture Helped Shape America's 'Stand Your Ground' Laws*, ABC NEWS (April 2023) (print)

Caroline Love, *More Domestic Abusers Can Keep Guns After 5th Circuit Court Ruling — Risking Deadly Consequences*, KERA NEWS (April 2023) (print and radio)

Alex Swoyer, *Chaos in the Courts After Justices' Ruling that Firearm Regs Must Align with Nation's Founding*, WASHINGTON TIMES (April 2023) (print)

*Is That Really Legal*, with Eric Ruben (April 2023) (podcast)

Michael Macagnone, *Senate Hears About Legal Fallout from Supreme Court Gun Decision*, ROLL CALL (March 2023) (print)

*Senators Seek Solutions to Address Gun Violence in the Country Due to Supreme Court Decision*, FOX 2 (March 2023) (television and print)

Wisconsin Public Radio, *How Court Ruling on Domestic Violence Restraining Orders Shapes U.S. Gun Law*, NPR WISCONSIN (February 2023) (radio)

Briana Vannozzi, *Legal Challenges Delay Murphy's Gun Control Laws*, NJ SPOTLIGHT NEWS (February 2023) (television)

Scott Reeder, *Choosing Which Laws to Enforce*, ILLINOIS TIMES (January 2023) (print)

The John Howell Show, *Questions Surrounding the Assault-Style Weapons Ban: Will it Hold Up in Court?*, WLS CHICAGO (January 2023) (radio)

Exhibit 9
0437

ERIC RUBEN                                                    MARCH 2024

Peter Charalambous, *At Least 74 Illinois Sheriff's Departments Vow to Defy State Assault Weapons Ban*, ABC NEWS (January 2023) (print)

June Grasso, *Jackson Joins Supreme Court's Million Dollar Book Club*, BLOOMBERG LAW SHOW (January 2023) (radio and podcast)

Frank Main and Tina Sfondeles, *Why Illinois' New Assault Weapons Ban Might Not Hold Up in Court*, CHICAGO SUN TIMES (January 2023) (print)

Douglass Dowty, *Can You Bring a Gun to the Zoo? On a Bus? Syracuse Judge Eagerly Rewrites NY Firearms Law*, SYRACUSE POST STANDARD (December 2022) (print)

William Melhado, *Texas Judge Rules that Disarming Those Under Protective Orders Violates Their Second Amendment Rights*, TEXAS TRIBUNE (November 2022) (print)

Debra Cassens Weiss, *In "Scorching" Opinion, Federal Judge Considers Appointing Historian to Help Him in Gun Case*, ABA JOURNAL (November 2022) (print)

Avalon Zoppo, *Judge May Appoint Historian After Justices' Turn to New Test in Gun Rights Cases*, NAT'L L. J. (November 2022) (print)

Keegan Hamilton, *Ghost Guns Are Causing Chaos in American Courts*, VICE NEWS (October 2022) (print)

Michael Waldman, *Guns Don't Belong at Polling Locations*, BRENNAN CTR. FOR JUST. (October 2022) (print)

Dana Difilippo, *New York Court Rulings Signal Trouble for New Jersey's Fresh Attempt to Regulate Guns*, N.J. MONITOR (October 2022) (print)

S.P. Sullivan, *N.J. Is Seeking Tough Restrictions for Carrying Guns in Public. Will They Hold up in Court?*, STAR-LEDGER/NJ.COM (October 2022) (print)

Kery Murakami, *Court Fights Begin Over Gun Bans in Places Like Subways and Bars*, ROUTE FIFTY (October 2022) (print)

Jonah E. Bromwich, *Court Gives New York State More Time to Argue for Its Gun Law*, N.Y. TIMES (October 2022) (print)

*Second Amendment Expert Discusses NY Gun Law Court Challenge*, SPECTRUM NEWS N.Y. 1 (October 2022) (television)

Jonah E. Bromwich, *Federal Judge Blocks N.Y. Gun Law, Finding Much of It Unconstitutional*, N.Y. TIMES (October 2022) (print)

Scott Neuman, *The 'Gun Dude' and a Supreme Court Case that Changed Who Can Own Firearms in the U.S.*, NPR (August 2022) (print)

Brandon Tensley & Eva McKend, *The Fight to Curb Gun Violence Without Inflaming Racial Biases*, CNN (July 2022) (print)

*What Can We Do About Gun Control?*, LAW DISRUPTED (July 2022) (podcast)

Exhibit 9
0438

Chip Brownlee, *The Real Significance of the Supreme Court's Gun Decision,* THE TRACE (July 2022) (print)

Nusaiba Mizan, *Fact-check: Can Texans 'Too Dangerous to Carry a Loaded Gun in Public' Now Carry?*, AUSTIN AMERICAN-STATESMAN (July 2022) (print)

Marco Poggio, *How Bruen Ruling Will Change Gun Restrictions Scrutiny*, LAW 360 (July 2022) (print)

Naheed Rajwani-Dharsi, *How the New Federal Gun Law Will - and Won't - Affect Texas*, AXIOS DALLAS (June 2022) (print)

Wisconsin Public Radio, *What the Supreme Court's Ruling on a New York Gun Law Means for How We Apply the Second Amendment*, NPR WISCONSIN (June 2022) (radio)

Studio Tulsa, *Interview regarding Bruen*, NPR TULSA (June 2022) (radio)

Roque Planas, *Bombshell Supreme Court Gun Ruling Opens Up New State Battles*, HUFF POST (June 2022) (print)

Eric Lipton et al., *States Rush to Revamp Laws After Supreme Court's Gun Ruling*, NEW YORK TIMES (June 2022) (print)

Mark Weiner, *What Supreme Court Ruling Means for New Yorkers and Handgun Owners*, SYRACUSE POST-STANDARD (June 2022) (print)

Kaila Philo, *The Supreme Court Just Made It a Whole Lot Easier to Conceal-Carry a Gun*, GRID (June 2022) (print)

Chip Brownlee & Tom Kutsch, *What You Need to Know About the Senate Gun Reform Bill*, THE TRACE (June 2022) (print)

TV and Radio Interviews Regarding *Bruen*, June 23-24, 2022
    WPIX 11 NEW YORK (television)
    *Good Morning America*, ABC (television)
    *Morning Edition*, NPR (radio)
    *ABC News Prime*, ABC (television)
    *Balance of Power*, BLOOMBERG RADIO (radio)
    *All Things Considered*, NPR (radio)
    CBS RADIO (radio)
    CNN (television)

Michael Macagnone, *Supreme Court Bolsters Right to Carry Handgun in Public*, Roll Call (June 2022) (print)

Nicole Narea, *Blue States' Gun Control Efforts Hinge on the Supreme Court*, VOX (June 2022) (print)

John Fritze, *Should Guns Be Banned in Bars, Hospitals? Supreme Court Could Spur New 2nd Amendment Fight*, USA TODAY (June 2022) (print)

Brian Pascus, *Adams' Team Braces for Landmark Supreme Court Ruling on Guns*, CRAIN'S NEW YORK (June 2022) (print)

Exhibit 9
0439

Timothy L. O'Brien, *An Executive Order That Might Actually Stop Gun Violence*, BLOOMBERG NEWS & WASHINGTON POST (June 2022) (print)

Ellen Ioanes, *What's in the Bipartisan Plan for Gun Control*, VOX (June 2022) (print)

Nusaiba Mizan, *Fact-check: How many mass shootings have occurred since Uvalde tragedy?*, AUSTIN AMERICAN-STATESMAN (June 2022) (print)

Kery Murakami, *Supreme Court Could Make it Harder For States and Localities to Keep Guns Off Streets*, ROUTE FIFTY (June 2022) (print)

Alex Thomas, *Gun Companies Are More Vulnerable to Lawsuits Than You Think*, NEW REPUBLIC (June 2022) (print)

Ellen Ioanes, *What Does the Second Amendment Mean in 2022?*, VOX (June 2022) (print)

*NBC News Now with Joshua Johnson*, NBC NEWS (June 2022) (television)

Josh Clancy, *America and Guns—Did It Have to Be This Way?*, THE TIMES (May 2022) (print, England)

*Velshi on MSNBC*, MSNBC (May 2022) (television)

Jess Bidgood, *From Concealed Carry to Eliminating Permits, Gun Restrictions Have Loosened Since Sandy Hook*, BOSTON GLOBE (May 2022) (print)

Sherryn Groch & Billie Eder, *Why Can't America Fix Its Gun Crisis?*, SYDNEY MORNING HERALD (May 2022) (print)

Emilie Burditt, *Gun Laws, Reform Following School Shooting in Uvalde, Texas*, WISCONSIN PUBLIC RADIO (May 2022) (radio)

*Trump urges mental health initiatives at NRA event*, NEWSNATION PRIME (May 2022) (television)

*Interview Regarding Uvalde Shooting* FRANCE 24 (May 2022) (television, France)

Timothy L. O'Brien, *Uvalde Families Should Take Gunmakers to Court*, WASHINGTON POST and BLOOMBERG NEWS (May 2022) (print)

*Debate por el control de armas: el callejón sin salidaal que EE.UU. vuelve tras la matanza en Texas*, EL MERCURIO (May 2022) (print, Chile)

Kevin T. Dugan, *The NRA won after Sandy Hook, but today the gun lobby is in disarray and gun safety is slowly making gains in states*, NEW YORK MAGAZINE (INTELLIGENCER) (May 2022) (print)

Tyler Kingkade, *Uvalde shooting renews push for 'red flag' laws — 4 years after Texas Republicans blocked one*, NBC NEWS (May 2022) (print)

*NBC News Now with Joshua Johnson*, NBC News (May 2022) (television)

Annie McDonough, *SCOTUS could soon overturn New York's gun law. Here how the state could respond*, CITY AND STATE (May 2022) (print)

11

Exhibit 9
0440

*Interview Regarding the Uvalde Shooting*, TIMES RADIO (May 2022) (radio, England)

*Coverage of the Uvalde Shooting*, CTV NEWS, (May 2022) (television, Canada)

Lindsay Whitehurst, Michael Tarm, & James Anderson, *Buffalo shooter's previous threat raises red-flag questions*, AP News (May 2022) (print)

Kevin McCoy, *Gun Rights Groups' Wave of Lawsuits Could Change America's Relationship With Firearms*, USA TODAY (February 2022) (print)

Brandan Pierson, *Manslaughter Charges Against Michigan Shooter's Parents Break New Legal Ground*, REUTERS (December 2021) (print)

*Kyle Rittenhouse and the "Self-Defense" Defense*, VOX'S TODAY, EXPLAINED (November 2021) (podcast)

*The Supreme Court, Concealed Carry, and How Your Laws Might Change*, NEW BOOKS NETWORK (November 2021) (podcast)

Kiara Alfonseca, *Arbery, Rittenhouse Cases Spotlight Self-Defense and Vigilantism*, ABC NEWS (November 2021) (print)

Marc Fisher & Mark Berman, *After Rittenhouse: Will Deadly Clashes Multiply as the Right to Self-Defense Expands?*, WASH. POST (November 2021) (print)

Willy Lowry, *Rittenhouse and Arbery Cases Expose Deep Rifts on Gun Rights and Vigilantism in US*, THE NATIONAL (November 2021) (print)

*The Claim of Self-Defense Raising Concerns in Recent Court Cases*, KCBS SAN FRANCISCO (November 2021) (radio)

Shaila Dewan, *Can Self-Defense Laws Stand Up to a Country Awash in Guns?*, N.Y. TIMES (November 2021) (print)

*Interview*, NYC's WPIX 11 TV (November 2021) (television)

Jonah E. Bromwich & Ashley Southall, *What Happens if the Supreme Court Strikes Down New York's Gun Law?*, N.Y. TIMES (November 2021) (print)

Bob Ortega, *Fears of Unlikely Federal Gun-Control Measures Lead to Raft of State Laws*, CNN.COM (November 2021) (print)

*U.S. Supreme Court Firearms Case Could Reshape Gun Control in America*, NPR DETROIT (WDET) (November 2021) (radio)

*Interview*, Houston's ABC 13 KTRK TV (November 2021) (television)

Noah Goldberg, *Supreme Court Appears Likely to Shoot Down New York Gun Law*, N.Y. DAILY NEWS (November 2021) (print)

Exhibit 9
0441

Eric Ruben                                                    March 2024

*La Cour Supreme des États-Unis Examine un Dossier Majeur sur les Armes à Feu*, Le Figaro (November 2021) (print)

Noah Goldberg, *Supreme Court Could Nix New York Gun Law that Limits Right to Carry Guns in Public*, N.Y. Daily News (November 2021) (print)

Amelia Thomson-DeVeaux, *How the Supreme Court Could Make It Easier to Carry Guns in Public*, FiveThirtyEight (November 2021) (print)

Devin Dwyer, *Gun Owners Ask Supreme Court to Back Concealed Carry for Self-Defense*, ABC News Live (November 2021) (television and print)

*US Supreme Court to Hear High-Stakes Gun Rights Case*, Voice of America (November 2021) (print)

Tiana Headley, *New York Is America's Latest Battleground Over Gun Rights*, The River (November 2021) (print)

Robert Gavin, *Law Beat: Supreme Court Ready for Possible Landmark Gun Case from Rensselaer County*, Alb. T. Union (October 2021) (print)

Marcia Coyle, *'Originalists' Gorsuch, Kavanaugh, Barrett Under Microscope in 2nd Amendment Case*, Nat'l L.J. (October 2021) (print)

*The Attitude With Arnie Arneson*, WNHN (October 2021) (radio)

*SCOTUS Returns for Blockbuster Term*, ABC News Live (October 2021) (television)

*This Week with George Stephanopoulos*, ABC News (October 2021) (television)

Dan Frosch and Elizabeth Findell, *Air Force Found Largely Responsible for Texas Church Shooting*, Wall Street Journal (July 2021) (print)

Yanqi Xu, *Fourth Circuit Ruling: Federal Laws Banning Handgun Sales to Young Adults Violate Second Amendment*, NC Policy Watch (July 2021) (print)

Erik Larson, *California Gun Laws Reviled by NRA Face Pivotal Court Test*, Bloomberg News (June 2021) (print)

*Agenda Svijet*, HRT (May 2021) (television)

Jennifer Mascia, *The Supreme Court's Next Big Gun Case, Explained*, The Trace (May 2021) (print)

*"The Week" with Joshua Johnson*, NBC Peacock TV (April 2021) (television)

*Open Carry Laws, Public Safety, and Young v. Hawaii*, Lawyer 2 Lawyer (April 2021) (podcast)

Jolana Humpalova, *To Limit or Not to Limit? Weapons Divide America, It Has the Most in the World*, Seznam Zprávy (April 2021)

Matt Reynolds, *Lawyers Involved in the Gun Debate Are Primed for the Supreme Court to Take the Next Big Case*, ABA Journal (December 2020) (print)

13

Exhibit 9
0442

Stephen Gutowski, *Gun Lawsuits Flood in After Barrett Supreme Court Confirmation*, WASHINGTON FREE BEACON (December 2020) (print)

Olivia Li, *On Guns, Barrett's Philosophy Leaves Little Room for Public Safety*, THE TRACE (September 2020) (print)

Greg Stohr, *Gun Cases Could Prompt Supreme Court to Bolster Second Amendment*, BLOOMBERG NEWS (June 2020) (print)

Annie McDonough, *What Does SCOTUS' Second Amendment Case Mean for New York?*, CITY & STATE NEW YORK (April 2020) (print)

*U.S. Supreme Court Leaves Bump Stock Ban in Place*, CT PUBLIC RADIO (March 2020) (radio)

*Virginia Assault Weapon Bill Shot Down by Senate Committee*, KCBS (February 2020) (radio)

Kaley Johnson, *White Settlement Church Shooter Had a Long Criminal History. So How Did He Get a Gun?*, FORT WORTH STAR-TELEGRAM (January 2020) (print)

*2020 Will Be a Big Year for the Gun Issue*, THE TRACE (January 2020) (print)

Adam Liptak, *After Long Gap, Supreme Court Poised to Break Silence on Gun Rights*, N.Y. TIMES (December 2019) (print)

*Supreme Court Watchers See Chief Justice as Possible Fifth Vote to Dismiss Major Gun Case*, THE TRACE (December 2019) (print)

Richard Wolf, *Supreme Court May Expand Second Amendment Rights Despite Repeal of Disputed Gun Restrictions*, U.S.A. TODAY (December 2019) (print)

John Kruzel, *Supreme Court Poised to Hear First Major Gun Case in a Decade*, THE HILL (December 2019) (print)

Matt Cohen, *Gun Violence Costs Americans Billions Every Year. A California Mayor Has a Plan to Make Gun Owners Pay for It*, MOTHERJONES.COM (August 2019) (print)

Jennifer Mascia, *What to Know About the Supreme Court's First Gun Case in 9 Years*, THE TRACE (April 2019) (print)

*A Historic Ruling on Guns, Ten Years Later*, 1A, NPR (June 2018) (radio)

Jon Schuppe, *Low-Crime Village Bans Military-Style Guns, Citing Parkland and Other Mass Shootings*, NBCNEWS.COM (April 2018) (print)

Andrew Wong, *Why the US Is So Different From the UK and Australia When It Comes to Gun Control*, CNBC.COM (March 2018) (print)

Kiran Alvi, *US: Most Mass Shootings Not Committed by Mentally Ill*, ALJAZEERA.COM (November 2017) (print)

Jared Keller, *Is The End of the Assault Rifle Nigh?*, PACIFIC STANDARD (February 2017) (print)

Exhibit 9
0443

ERIC RUBEN                                                          MARCH 2024

*Does the Second Amendment Leave Any Room for Gun Control Laws?*, TAKE TWO, KPCC (Southern California Public Radio) (June 2016) (radio)

*Guns in the Spotlight: Do Americans Really Need an Assault Weapon to Protect Themselves?*, Paul Henry Show, TV3 (New Zealand) (June 2016) (television)

## OTHER LEGAL EXPERIENCE

**Morvillo Abramowitz Grand Iason & Anello, P.C.**, New York, NY
    *Litigation Associate*, November 2008-November 2014

**U.S. Department of State, Office of the Legal Advisor**, Washington, D.C.
    *Summer Intern*, May-June 2007

**Davis Polk & Wardwell LLP**, New York, NY and Madrid, Spain
    *Summer Law Clerk*, May-August 2006 (offer extended)

**Civil Association for Equality and Justice (ACIJ)**, Buenos Aires, Argentina
    *Legal Intern*, May-August 2005

## UNIVERSITY SERVICE

Appointments Committee, SMU Dedman School of Law (2023-present)
Academic Standards Committee, SMU Dedman School of Law (2022-2023)
Admissions/Financial Aid Committee, SMU Dedman School of Law (2022-2023)
SMU Law Hooder (2022, 2023) (selected by vote of graduating 3Ls)
SMU Law AALS Representative (2020, 2021, 2022, and 2023)
Curriculum/Academic Standards Committee, SMU Dedman School of Law (2020-2022)
Teaching Committee, SMU Dedman School of Law (2020-2022)
Faculty Advisor, 1L Inn of Court, SMU Dedman School of Law (2020-2021)
Faculty Advisory Board, Deason Criminal Justice Reform Center (2019-present)
Endowed Lectures and Faculty Forum Committee, SMU Dedman School of Law (2019-2020)
Faculty Secretary, SMU Dedman School of Law (2019-2020)

## REFEREE ACTIVITY

YALE LAW JOURNAL
STANFORD LAW REVIEW

## BRIEFS AND OTHER ADVOCACY

Brief of Second Amendment Law Scholars as Amici Curiae in Support of Petitioner, United States v. Rahimi, No. 22-915 (U.S.) (August 21, 2023)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S.) (July 20, 2021)
- cited in dissenting opinion

Statement of Professors of Constitutional Law to Senate Judiciary Committee: The Right to Keep and Bear Arms and the Constitutionality of Expanded Background Checks (March 22, 2021)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Defendant-Appellee, Wade v. The Board of Regents of the University of Michigan, MSC No. 156150 (Mich. Sup. Ct.) (March 1, 2021)

Exhibit 9
0444

ERIC RUBEN                                                             MARCH 2024

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York State Rifle & Pistol Ass'n v. City of New York, No. 18-280 (U.S.) (May 14, 2019)
- cited in dissenting opinion

16

Exhibit 9
0445

# Exhibit 10

Exhibit 10
0446

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   PAUL STEIN
3  Supervising Deputy Attorneys General
   KEVIN KELLY
4  SEBASTIAN BRADY
   Deputy Attorneys General
5  ROBERT L. MEYERHOFF
   Deputy Attorney General
6  State Bar No. 298196
    300 South Spring Street, Suite 1702
7   Los Angeles, CA  90013-1230
    Telephone: (213) 269-6177
8   Fax: (916) 731-2144
    E-mail: Robert.Meyerhoff@doj.ca.gov
9  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
10 *State of California and Defendant Allison*
   *Mendoza in her official capacity as Director*
11 *of the Bureau of Firearms*

12              IN THE UNITED STATES DISTRICT COURT

13            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

14

15

16 | **CLAIRE RICHARDS, ET AL.,** | Case No. 3:23-CV-00793 |

17 |                         Plaintiffs, | **EXPERT REPORT AND** |
18 |                                     | **DECLARATION OF PROFESSOR** |
   |              v.                     | **CHRISTOPHER POLIQUIN** |
19 |                                     | |
20 | **ROB BONTA, IN HIS OFFICIAL CAPACITY** | |
   | **AS ATTORNEY GENERAL OF** | |
21 | **CALIFORNIA, ET AL.,** | |
22 |                                     | |
   |                         Defendants. | |
23

24

25

26

27

28

Exhibit 10
0447

1
2

# EXPERT REPORT AND DECLARATION OF
# PROFESSOR CHRISTOPHER POLIQUIN

3    I, Professor Christopher Poliquin, declare under the penalty of perjury that the

4    following is true and correct:

5    The California Department of Justice has asked me to provide an expert

6    opinion pertaining to firearms waiting periods and related restrictions in the United

7    States in the above-captioned matter. This expert report and declaration

8    ("Declaration") provides that opinion and is based on my own personal knowledge

9    and experience; if I am called as a witness, I could and would testify competently to

10   the truth of the matters discussed in this Declaration.

11   ## BACKGROUND AND QUALIFICATIONS

12   1.    I am a scholar whose work spans the fields of public policy, with a

13   focus on gun policy and its impact on violence; organizational design and strategy;

14   and technology.

15   2.    Since 2018, I have served as an Assistant Professor at the UCLA

16   Anderson School of Management.  I joined UCLA's faculty after obtaining my

17   Doctor of Business Administration from Harvard Business School and my

18   bachelor's degree from the University of Pennsylvania.  A true and correct copy of

19   my curriculum vitae is attached as **Exhibit 1** to this declaration.

20   3.    In addition to my other academic work, I have published multiple

21   peer-reviewed papers on firearms policy and violence.  These include *Handgun*

22   *Waiting Periods Reduce Gun Deaths*, published in the Proceedings of the National

23   Academy of Sciences in 2017 and attached as **Exhibit 2**, and *The Impact of Mass*

24   *Shootings on Gun Policy*, published in the Journal of Public Economics in 2020.

25   4.    I have previously provided expert testimony on similar issues at a

26   preliminary injunction hearing in *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-

27   02563-JLK (D. Colo.).

28   ## RETENTION AND COMPENSATION

2

5.      I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $250 an hour for my work on this matter. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.      I have been retained by the California Department of Justice to provide my expert opinion on the impact of firearm waiting periods on firearm deaths and violence more broadly.

7.      Counsel for Defendants provided me with the operative Complaint in this matter and copies of the relevant statutes being challenged.  Apart from these documents, my report is based on my independent research.

**OPINIONS**

8.      Based on my extensive review and analysis of the relevant evidence, it is my professional opinion that:

- Waiting period laws that delay the purchase of firearms reduce firearm-related homicides.
- Waiting period laws reduce firearm-related suicides, especially among young people.
- Reductions in gun homicides from waiting period laws are not offset by a concomitant increase in non-gun violence.

**I.   STUDY OF WAITING PERIOD LAWS**

9.      In 2017, my co-authors at Harvard Business School and I published a peer-reviewed study—attached as **Exhibit 2**—titled *Handgun Waiting Periods Reduce Gun Deaths* in the Proceedings of the National Academy of Sciences. This study examines 45 years of data between 1970 and 2014 on injury-related death and waiting period laws across all 50 states and the District of Columbia (DC). During this time, 44 states (including DC) had an effective waiting period for purchasing a handgun for at least some years.

3

10.     Variation in waiting period laws across states and over time allows my co-authors and I to use modern, quasi-experimental statistical methods to estimate how waiting period laws affect violence. These estimates—which compare how violence changes within states that adopted or were forced to adopt waiting period laws to changes in other states—have a causal interpretation. In other words, our study design allows us to determine if waiting periods cause changes in violence and estimate the magnitude of any effects.

## II.   THE IMPACT OF FIREARM WAITING PERIOD LAWS ON HOMICIDES

11.     According to my study, waiting period laws cause large and statistically significant reductions in firearm-related homicides. Implementation of a handgun waiting period causes an approximately 17 percent reduction in gun homicides (Table 1, **Exhibit 2**). For California, this estimate suggests that the state avoids about 260 gun homicides per year due to its waiting period policy.

12.     This estimate for the effect of waiting periods on gun homicides holds across several statistical models and time periods. It is insensitive to whether the statistical model includes a state-specific time trend or controls for alcohol consumption, poverty, income, urbanization, black population, population in seven age groups, and several other gun policies that may have been enacted coincident with laws that delayed the purchase of a handgun.[1] The estimate is also similar for both the full study period—1970 through 2014—and for the "Brady interim period," a period from November 1993 to November 1998 in which federal law created a new, 5-day waiting period in 19 states to allow for the completion of a background check before firearm sales by federally licensed firearm dealers (Table 2, **Exhibit 2**).[2]

---

[1] Several of these additional analyses appear in an appendix to the article *Handgun Waiting Periods Reduce Gun Deaths*. The appendix, titled "Supporting Information," is attached as **Exhibit 3**.

[2] Brady Handgun Violence Prevention Act, Pub. L. No. 103-159 (1993).

13.    Reductions in gun homicides from the implementation of handgun waiting periods are not offset by increases in non-gun homicide. My estimates for the effect of waiting periods on non-gun homicide are close to zero and not statistically significant, which suggests waiting periods have little, if any, effect on rates of non-gun homicide (Tables 1–2, **Exhibit 2**).

14.    Recent research has supported these findings.  A study of handgun purchases during a spike in gun sales and subsequent homicides found that purchasing delays of various forms decreased handgun homicides, and that this decrease was driven by a decrease in "domestic violence and other heat-of-the-moment murders."[3]

15.    All of these results are consistent with research indicating that certain forms of interpersonal violence—especially domestic violence—are impulsive.  In 2011, for example, researchers found statistically significant increases in police reports of family violence in particular locations immediately after the home professional football team suffered an upset loss.[4]

### III.    THE IMPACT OF FIREARM WAITING PERIOD LAWS ON SUICIDES

16.    Waiting period laws likely reduce firearm-related suicides. According to some analyses, the implementation of a waiting period causes a statistically significant reduction in gun suicide of 7–11 percent (Table 1, **Exhibit 2**). For California, a 7 percent reduction is equivalent to about 110 fewer gun suicides per year. During the "Brady interim period," my co-authors and I estimate that waiting periods caused a 5–6 percent reduction in gun suicide (Table 2, **Exhibit 2**).

17.    My estimates of the effect of waiting periods on gun suicides and total suicides (gun and non-gun) are more sensitive to the inclusion of control variables

---

[3] Christoph Koenig & David Schindler; *Impulse Purchases, Gun Ownership, and Homicides: Evidence from a Firearm Demand Shock.* The Review of Economics and Statistics 2023; 105 (5): 1271–1286.

[4] David Card and Gordon B. Dahl, *Family Violence and Football: The Effect of Unexpected Emotional Cues on Violent Behavior*, The Quarterly Journal of Economics 126, no. 1 (2011): 103–143.

1   and the years examined than the estimates for homicide. While analyses of total
2   suicides for the period 1970–2014 suggest that waiting periods reduce all suicides
3   by a statistically significant 2–7 percent, estimates for the "Brady interim period"
4   suggest reductions of 2–3.5 percent and are less precisely estimated (Tables 1–2,
5   **Exhibit 2**).

6       18.    Recent research—attached as **Exhibit 4**—has expanded on my 2017
7   paper *Handgun Waiting Periods Reduce Gun Deaths* by examining the effects of
8   waiting period laws on suicide for different age groups and by using newer
9   statistical methods developed after my own study.[5] The authors note that
10  impulsivity differs by age and that waiting period laws, which arguably disrupt
11  impulsive suicide, may therefore have different effects on different age groups.
12  Their analyses show that handgun waiting periods reduce gun suicide in the total
13  adult population by 3.3 percent, and reduce gun suicide among young adults, which
14  they define as people between the ages of 21 and 34, by 6.1 percent. The authors'
15  estimates for older adults suggest no statistically significant effect of waiting
16  periods on gun suicide. They report no effect of waiting periods on non-gun
17  suicide.

18      19.    These results are consistent with other studies indicating that suicide is
19  often an impulsive act. Research has found that there is often limited time between
20  the formation of the intent and the completion of the attempt.[6] One study based on
21  interviews with those who have survived a suicide attempt, for example, found that
22  less than 10% of interviewees waited for more than 7 days after deciding to commit
23  suicide before taking the suicidal act.[7] And other research has found that suicidal

---

24      [5] Donohue, John J., Samuel V. Cai, and Arjun Ravi. *Age and Suicide
25  Impulsivity: Evidence from Handgun Purchase Delay Laws*. National Bureau of
    Economic Research (2023). (Attached as **Exhibit 4**.)

26      [6] *See, e.g.*, Megan Spokas, *et al.*, *Characteristics of Individuals Who Make
27  Impulsive Suicide Attempts*, J. Affective Disorders, 2021 Feb; 136(3): 1121-1125.
        [7] Elizabeth A. Deisenhammer, *et al.*, *The Duration of the Suicidal Process:
28  How Much Time Is Left for Intervention Between Consideration and*

6

1  impulses are unlikely to recur: those who survive an initial suicide attempt, for
2  example, usually do not die by suicide later in life.[8]

3      20.    My professional opinion, based on my own and other scholars'
4  research, is that waiting period laws significantly reduce firearm-related homicides
5  and likely reduce gun suicides as well, especially among young people, but that
6  there is mixed evidence regarding the extent to which these reductions are offset by
7  increases in non-gun suicides.

8

9      **DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28**
10                            **U.S.C. § 1746**

11      I declare under penalty of perjury that the foregoing is true and correct, and if
12  called as a witness would testify competently to the above.

13

14      Executed in Los Angeles, California on March  11 , 2024.

15

16                                        _____
17                                        Christopher Poliquin
18

19

20

21

22

23

24

25

26  _____
27  *Accomplishment of a Suicide Attempt?*, J. Clinical Psychiatry, 2009 Jan; 70(1):19-
    24.
28      [8] *See, e.g.*, Owens, *et al.*, *Fatal and Non-Fatal Repetition of Self-Harm:*
    *Systematic Review.*  British Journal of Psychiatry.  2002; 181(3): 193-199;

## Christopher W. Poliquin

UCLA Anderson School of Management, 110 Westwood Plaza, Cornell Hall D-512, Los Angeles, CA 90095
310-206-6553 • chris.poliquin@anderson.ucla.edu • https://www.poliquin.xyz/

### Academic Employment

July 2018 —     UCLA Anderson School of Management
                Assistant Professor

### Education

May 2018        Harvard Business School
                Doctor of Business Administration

May 2009        University of Pennsylvania
                B.A. Philosophy, Politics, and Economics

### Research

*Peer Reviewed Journal Articles*

- Chauvin, Jasmina and Christopher Poliquin. 2023. Supply-side inducements and resource redeployment in multi-unit firms. *Accepted at Strategic Management Journal.*
- Lawrence, Megan and Christopher Poliquin. 2023. The growth of hierarchy in organizations: Managing knowledge scope. *Strategic Management Journal.* 44(13): 3155–3184.
- Hou, Young and Christopher Poliquin. 2023. The effects of CEO activism: Partisan consumer behavior and its duration. *Strategic Management Journal.* 44(3): 672–703.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2020. The impact of mass shootings on gun policy. *Journal of Public Economics*. 181(January 2020).
- Licht, Amir, Christopher Poliquin, Jordan I. Siegel, and Xi Li. 2018. What makes the bonding stick? A natural experiment testing the legal bonding hypothesis. *Journal of Financial Economics.* 129(2) (August): 329–356.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2017. Handgun waiting periods reduce gun deaths. *Proceedings of the National Academy of Sciences*. 114(46): 12162–12165.

*Journal Articles Submitted*

- Chauvin, Jasmina, Carlos Inoue, and Christopher Poliquin. 2023. Resource redeployment as an entry advantage in resource poor settings. *Minor Revision at Strategic Management Journal.*
- Poliquin, Christopher. 2020. The wage and inequality impacts of broadband internet. *Revise and Resubmit at Management Science.*
- Poliquin, Christopher and Young Hou. 2023. Policymaker responses to CEO activism. *Revise and Resubmit at Organization Science.*
- Poliquin, Christopher, Megan Lawrence, and Samina Karim. 2023. Hierarchy expansion in young firms: The impact of internal versus external hiring on performance. *Revise and Resubmit at Management Science.*
- Hou, Young and Christopher Poliquin. 2024.  Political consumerism: Ideology or signaling?

*Working Papers*

- Hou, Young and Christopher Poliquin. 2023. CEO activism and public mobilization.
- Poliquin, Christopher and Young Hou. 2022. The value of corporate political donations: Evidence from the capitol riot.

*Chapters in Books*

- Baron, Jonathan, William T. McEnroe, and Christopher Poliquin. 2012. Citizens' perceptions and the disconnect between economics and regulatory policy. In *Regulatory Breakdown: The Crisis of Confidence in U.S. Regulation*. Ed. Cary Coglianese. Philadelphia, PA: University of Pennsylvania Press. 143–162.

Exhibit 10
0454

Poliquin CV

*Published Conference Proceedings*

- Poliquin, Christopher and Young Hou. 2022. The value of corporate political donations: Evidence from the capitol riot. *Academy of Management Proceedings*. Vol. 1.
- Chauvin et al. 2021. Unpacking internal mobility: Drivers and consequences of employee redeployment inside organizations. *Academy of Management Proceedings*. Vol. 1.
- Chauvin, Jasmina and Christopher Poliquin. 2019. Knowledge sharing and intra-organizational worker mobility. *Academy of Management Proceedings*. Vol. 1.
- Lawrence, Megan Lynn and Christopher Poliquin. 2019. Prior experience and the emergence of hierarchy in young firms. *Academy of Management Proceedings*. Vol. 1.

*Non-Peer Reviewed Publications*

- Poliquin, Christopher and Young Hou. 2023. How policymakers respond to CEO activism. *Blue Sky Blog*. Columbia Law School. 11 December.
- Poliquin, Christopher. 2022. After mass shootings like Uvalde, national gun control fails — but states often loosen gun laws. *The Conversation*. 25 May.
- Poliquin, Christopher and Young Hou. 2022. Corporate political donations and firm value following the Capitol riot. *The FinReg Blog*. Duke University School of Law. 10 February.
- Poliquin, Christopher. 2021. Gun control fails quickly in Congress after each mass shooting, but states often act — including to loosen gun laws. *The Conversation*. 22 March.
- Luca, Michael, Deepak Malhotra, and Christopher Poliquin. 2018. The case for handgun waiting periods. *Behavioral Scientist*. 12 December.

## Grants

2019            Morrison Family Center for Marketing Studies and Data Analytics (with Young Hou)
                UCLA Anderson School of Management

2015            Pellegrini Summer International Economics Research Grant (with Jasmina Chauvin)
                Harvard Economics Department

## Teaching

Winter 2024     Full-time MBA Program, UCLA Anderson
                Business Strategy (MGMT 420-1/2/3/4)

Winter 2023     Full-time MBA Program, UCLA Anderson
                Business Strategy (MGMT 420-1/2/3/4/5)

Winter 2022     Full-time MBA Program, UCLA Anderson
                Business Strategy (MGMT 420-1/2/3/4/5)

Winter 2021     Full-time MBA Program, UCLA Anderson
                Business Strategy (MGMT 420-1/2/3/4/5)

Winter 2020     Full-time MBA Program, UCLA Anderson
                Business Strategy (MGMT 420-1/2/5)

Fall 2018       Fully Employed MBA Program, UCLA Anderson
                Business Strategy (MGMT 420-3/4)

Spring 2015     Harvard John F. Kennedy School of Government
                Teaching Fellow, Economic Analysis of Public Policy

## Case Studies and Course Materials

- Unilever's New Recipe for Growth (with Jordan Siegel and Barbara Zepp Larson)

Exhibit 10
0455

Poliquin CV

- Yum! Brands (with Jordan Siegel)
- Baxter's Asia Pacific "Talent Edge" Initiative (with Jordan Siegel and Mimi Xi)

## Conferences, Consortia, and Invited Talks

2023        Non-Market Strategy Research Community Brown Bag Seminar
            *CEO Activism and Public Mobilization*

2023        University of Michigan
            *CEO Activism and Public Policy*

2023        Insper Institute of Education and Research
            *Resource Redeployment as an Entry Advantage in Resource-Poor Settings*

2023        Academy of Management Annual Meeting
            *Resource Redeployment as an Entry Advantage in Resource-Poor Settings*

2023        Academy of Management Annual Meeting
            *Corporate Engagement in the Aftermath of the Capitol Riot*

2023        DRUID
            *Resource Redeployment as an Entry Advantage in Resource-Poor Settings*

2023        So-Cal Strategy and OT Workshop
            USC Marshall School of Business
            *CEO Activism and Political Participation: Experimental Evidence on Abortion Rights*

2022        Academy of Management Annual Meeting
            *The Value of Corporate Political Donations: Evidence from the Capitol Riot*

2022        Non-Market Strategy Research Community Brown Bag Seminar
            *The Value of Corporate Political Donations: Evidence from the Capitol Riot*

2021        Sumantra Ghoshal Strategy Conference
            London Business School
            *CEO Activism, Consumer Polarization, and Firm Performance*

2021        CCC Corporate Dynamics Brown Bag Seminar
            *CEO Activism, Consumer Polarization, and Firm Performance*

2021        Allied Social Science Association
            *The Impact of Mass Shootings on Gun Policy*

2019        APPAM Fall Research Conference
            *The Impact of Mass Shootings on Gun Policy*

2019        12th Annual People & Organizations Conference
            Wharton, University of Pennsylvania
            *Worker Redeployment in Multi-Business Firms: An Empirical Examination*

2019        Georgetown University
            *The Impact of Mass Shootings on Gun Policy*

2019        University of Utah / BYU Winter Strategy Conference
            *Knowledge Sharing and Intra-Organizational Worker Mobility*

2018        SMS São Paulo, Brazil
            *The Effect of the Internet on Wages*

Exhibit 10
0456

Poliquin CV

| | |
|---|---|
| 2018 | Tufts University<br>*The Impact of Mass Shootings on Gun Policy* |
| 2017 | American Society of Criminology Annual Meeting<br>*The Impact of Mass Shootings on Gun Policy* |
| 2017 | Conference on Empirical Legal Studies<br>Cornell Law School<br>*The Impact of Mass Shootings on Gun Policy* |
| 2017 | TIM Doctoral Consortium<br>Academy of Management Annual Meeting |
| 2017 | Consortium for Cooperation and Competition<br>Wharton, University of Pennsylvania<br>*The Effect of the Internet on Wages* |
| 2017 | Economics Experiments in the Tech Industry<br>Stanford Institute for Economic Policy Research<br>*The Effect of the Internet on Wages* (poster session) |
| 2016 | International Association for Conflict Management Annual Meeting<br>*The Impact of Mass Shootings on Gun Policy* |
| 2014 | EDEN Doctoral Seminar on Advanced Strategic Management<br>IESE Business School, Barcelona |
| 2014 | Strategic Research Initiative PhD Bootcamp<br>IESE Business School, New York |

## Work Experience

| | |
|---|---|
| 2010 − 2012 | Harvard Business School, Boston, MA<br>Research Associate for Jordan Siegel |
| 2009 − 2010 | Guaruma: Jóvenes Hondureños por el Desarrollo Educativo, La Ceiba, Honduras<br>Assistant Director |
| 2009 | University of Pennsylvania, Philadelphia, PA<br>Research Assistant for Jonathan Baron |

Exhibit 10
0457



# Handgun waiting periods reduce gun deaths

Michael Luca[a,1], Deepak Malhotra[a], and Christopher Poliquin[a]

[a]Harvard Business School, Boston, MA 02163

Edited by Philip J. Cook, Duke University, Durham, NC, and accepted by Editorial Board Member Kenneth W. Wachter September 21, 2017 (received for review December 3, 2016)

Handgun waiting periods are laws that impose a delay between the initiation of a purchase and final acquisition of a firearm. We show that waiting periods, which create a "cooling off" period among buyers, significantly reduce the incidence of gun violence. We estimate the impact of waiting periods on gun deaths, exploiting all changes to state-level policies in the Unites States since 1970. We find that waiting periods reduce gun homicides by roughly 17%. We provide further support for the causal impact of waiting periods on homicides by exploiting a natural experiment resulting from a federal law in 1994 that imposed a temporary waiting period on a subset of states.

gun policy | gun violence | waiting period | injury prevention

More than 33,000 people die in gun-related incidents each year in the United States, accounting for as many deaths as motor vehicle accidents (1). This is concerning both in absolute terms and in comparison to other developed countries, all of which have lower rates of gun violence (2). For example, if the United States could lower its firearm death rate to that of Finland (the high-income country with the second highest rate), roughly 20,000 fewer people would die from guns every year. However, there has been no meaningful reduction in the US firearm-related death rate for more than a decade. Moreover, evidence about which policies would be effective at reducing violence remains limited (3), and the types of bills that are enacted depend on the political party in power (4).

One avenue for reducing gun deaths is to draw on insights from behavioral economics and psychology, which suggest that delaying gun purchases, even for a short time, might be an effective policy tool. Visceral factors, such as anger or suicidal impulses, can spur people to inflict harm on others or themselves, but tend to be transitory states (5, 6). For example, Card and Dahl (7) find that there is a 10% increase in domestic violence following an upset loss of the local National Football League team. Moreover, behaviors triggered by such visceral states can be contrary to longer term self-interest (5, 6).

Delaying a gun purchase could create a "cooling off" period that reduces violence by postponing firearm acquisitions until after a visceral state has passed. Increasing the time it takes to acquire a gun might also close the window of opportunity for would-be perpetrators of violence to use their weapons. Finally, a mandatory delay has the potential to deter purchases among people who have malevolent, but temporary, motivations for owning a firearm.

This article explores the impact of "waiting period" laws on firearm-related homicides and suicides using 45 y of data on law changes and mortality at the state level in the United States. A waiting period is a mandatory delay between the purchase and delivery of a gun; it requires purchasers to wait, typically between 2 and 7 d, before receiving their weapons. We exploit plausibly exogenous temporal and geographic variation in waiting period laws to implement a difference-in-differences approach that identifies the causal impact of waiting periods on homicides and suicides.

We find that waiting periods cause large and statistically significant reductions in homicides. Point estimates using our full 45-y sample and all waiting period changes imply a 17% reduction in gun homicides. We provide further evidence of a causal relationship between waiting periods and lower homicide rates based on a natural experiment in which federal law imposed waiting periods on a subset of states. Estimates from this analysis also suggest that waiting periods reduce gun homicides by 17%. The results of both analyses confirm a large and robust effect of waiting periods on homicides. We also find a negative effect of waiting periods on suicides, but the magnitude and statistical significance of the suicide effect vary across model specification.

## Data and Research Design

We construct a panel of every change to waiting period laws in the United States between 1970 and 2014, which we obtained from state statutes and session laws. We combine these changes with annual data on firearm-related deaths from the Centers for Disease Control and Prevention. Fig. 1 shows the number of states with waiting periods over time. Overall, 44 states (including the District of Columbia) have had a waiting period for at least some time between 1970 and 2014. Exploiting the significant geographic and temporal variation in the adoption of waiting periods, we implement a difference-in-differences framework to estimate the causal impact of waiting periods on gun deaths. Essentially, we compare changes in firearm-related deaths within states that adopted waiting periods with changes in firearm-related deaths in other states. We control for changing economic and demographic factors that may be correlated with higher levels of gun violence or with the decision of lawmakers to adopt policies that delay gun purchases.

To support our causal interpretation, we then restrict the analysis to the period from 1990 to 1998, during which federal policy forced many states to implement waiting periods. The Brady Handgun Violence Prevention Act (hereinafter "Brady Act"), which went into effect in February 1994, required background checks on handgun purchases from licensed firearm dealers and created a 5-d waiting period to allow sufficient time for the check. Although it was a federal policy, the Brady Act only created new waiting periods for 19 states, since some states already required a background check and waiting period, and some implemented an "instant check" system that allowed for nearly immediate background checks (thereby obviating the need for a waiting period). We provide further details regarding the Brady Act and affected states in *Identifying Policy Changes* and *Materials and Methods*.

## Significance

Waiting period laws that delay the purchase of firearms by a few days reduce gun homicides by roughly 17%. Our results imply that the 17 states (including the District of Columbia) with waiting periods avoid roughly 750 gun homicides per year as a result of this policy. Expanding the waiting period policy to all other US states would prevent an additional 910 gun homicides per year without imposing any restrictions on who can own a gun.

Author contributions: M.L., D.M., and C.P. designed research, performed research, analyzed data, and wrote the paper.

The authors declare no conflict of interest.

This article is a PNAS Direct Submission. P.J.C. is a guest editor invited by the Editorial Board.

This is an open access article distributed under the PNAS license.

See Commentary on page 12097.

[1]To whom correspondence should be addressed. Email: mluca@hbs.edu.

This article contains supporting information online at www.pnas.org/lookup/suppl/doi:10.1073/pnas.1619896114/-/DCSupplemental.

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.

Exhibit 10
0458

SEE COMMENTARY

ECONOMIC SCIENCES

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.



**Fig. 1.** States with handgun waiting periods and background checks on dealer sales from 1970 to 2015. Many states were required to implement these policies during the Brady interim period between February 1994 and November 1998 (shaded gray). Following prior research (8), Alabama and Ohio are coded as not requiring background checks after the Supreme Court's decision in *Printz v. United States*. Not all states had waiting periods during the Brady interim period because they implemented or already had an instant background check system that obviated the need for a waiting period to investigate gun buyers.

## Results

We begin by examining the effect of waiting periods across the full sample period from 1970 to 2014. The results of Table 1 show that waiting periods are associated with a 17% reduction in gun homicides. This effect is equivalent to ~36 fewer gun homicides per year for a state with an average number of gun deaths. Waiting periods also lead to a 7–11% reduction in gun suicides (depending on the control variables used in the specification), which is equivalent to 22–35 fewer gun suicides per year for the average state. The results in Table 1 use a log-linear specification; we

**Table 1.   Effects of handgun waiting periods and background checks on violence, 1970–2014**

| Type of violence | 1970–2014 | | 1977–2014 |
|---|---|---|---|
| | (1) | (2) | (3) |
| All homicide | | | |
| Waiting period | −0.127 (0.059)** | −0.137 (0.059)** | −0.132 (0.050)** |
| Background check | | 0.049 (0.082) | 0.025 (0.081) |
| Gun homicide | | | |
| Waiting period | −0.188 (0.077)** | −0.187 (0.086)** | −0.186 (0.071)** |
| Background check | | −0.004 (0.103) | 0.022 (0.107) |
| Non-gun homicide | | | |
| Waiting period | −0.016 (0.051) | −0.048 (0.060) | −0.035 (0.037) |
| Background check | | 0.153 (0.076)** | 0.036 (0.057) |
| All suicide | | | |
| Waiting period | −0.047 (0.021)** | −0.070 (0.023)*** | −0.024 (0.011)** |
| Background check | | 0.113 (0.061)* | 0.023 (0.020) |
| Gun suicide | | | |
| Waiting period | −0.097 (0.034)*** | −0.120 (0.031)*** | −0.074 (0.017)*** |
| Background check | | 0.111 (0.073) | 0.029 (0.028) |
| Non-gun suicide | | | |
| Waiting period | −0.017 (0.038) | −0.058 (0.059) | −0.006 (0.033) |
| Background check | | 0.199 (0.072)*** | 0.084 (0.031)** |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Model 3 uses fewer years of data due to missing control variables in earlier years. Summary statistics for all variables are included in Table S1. The 1970–2014 period includes 2,295 state-year observations; the model for gun homicides omits three state-years, and the model for non-gun homicides omits two state years because the death count was zero and the model is specified with a logged dependent variable. Similarly, the 1977–2014 period includes 1,938 state-years, but omits two state-years for gun homicides and one state-year for non-gun homicides. SEs, shown in parentheses, are clustered by state. Alternative model specifications presented in Tables S7 and S8 are not logged and include all state-years. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

Exhibit 10
0459

PNAS   PNAS   PNAS

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.

present models with state-specific trends, models linear in the rate of violence, and Poisson models as part of Tables S3 and S5. The conclusion that waiting periods reduce gun homicides is robust across all specifications. The conclusion regarding suicides is robust to all specifications except those that include state-specific, linear trends (Table S3). Both conclusions are robust across models with and without controls for state-level economic and demographic changes. We also investigate the robustness of the results to the exclusion of individual states in Fig. S1.

To further support the hypothesis that waiting periods lead to a reduction in gun homicides, we then focus on a natural experiment created by the Brady Act, a federal law that forced some states to adopt new waiting period and background check policies between 1994 and 1998. Ludwig and Cook (8) also use the Brady Act to study whether background checks and waiting periods affect violence. They compare "Brady states" that were subject to the Brady Act with "Brady-exempt states" that were not. However, some states that were classified as Brady states already had waiting periods and background checks before the Brady Act, and other states chose to implement an "instant" background check system instead of requiring a waiting period. As a result, the coding of Brady states in the study by Ludwig and Cook (8) fails to capture all states that had preexisting waiting periods. In contrast, we precisely code which states had waiting periods (before 1994) and which implemented waiting periods only because of the Brady Act. In total, our coding differs from theirs for 16 states. This additional accuracy allows us to assess the causal impact of waiting periods resulting from the Brady Act. The full list of differences between our coding and prior research, along with supporting citations, can be found in Table S4.

We find that waiting periods led to large and statistically significant reductions in gun violence (Table 2) during the Brady interim period. Specifically, the results of column 3 of Table 2 show that waiting periods implemented during the Brady interim years resulted in a 17% reduction in gun homicides. This is equivalent to roughly 39 fewer homicides per year for the average state. There was also a 6% reduction in gun suicides (i.e.,

17 fewer suicides per year for the average state). Both results are robust across models with and without controls for state-level economic and demographic changes. Notably, exploiting the Brady Act as a natural experiment produces similar estimates as the longer sample period from 1970 to 2014.

Tables 1 and 2 also show that waiting periods have no significant effect on non-gun homicides, suggesting that people subject to waiting period laws do not substitute other means of committing homicide. This is consistent with other research (9) finding no increase in non-gun homicides in response to policies restricting access to firearms. Results for non-gun suicides, however, are less clear; some specifications suggest partial substitution toward non-gun methods of suicide in response to handgun waiting periods.

## Discussion

Our results show that waiting periods reduce gun homicides. Waiting periods for gun purchases are supported not only by the American Medical Association but also by a majority of Americans and a majority of gun owners (10, 11). Our point estimates, based on 45 y of data, suggest that the 17 states (including the District of Columbia) with waiting periods as of 2014 avoid ~750 gun homicides. Expanding the waiting period policy to states that do not currently have it would prevent an additional 910 gun homicides per year. Waiting periods would therefore reduce gun violence without imposing any restrictions on who can own a gun.

## Materials and Methods

Our main specifications are of the form:

$$r_{it} = \alpha_i + \lambda_t + \beta W_{it} + \gamma B_{it} + \delta' X_{it} + \epsilon_{it},$$

where $r_{it}$ is the natural logarithm of the rate of violence (homicides or suicides) per 100,000 adult residents, $W_{it}$ is an indicator for handgun waiting periods and $B_{it}$ is an indicator for whether background checks are required for dealer handgun sales. We include an indicator variable for background checks on handgun purchases from licensed firearm dealers because a major source of policy variation in our dataset (the Brady Act) also affected

Table 2.   Effects of handgun waiting periods and background checks on violence, 1990–1998

| Type of violence | Brady period, 1990–1998 | | |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| **All homicide** | | | |
| Waiting period | −0.073 (0.084) | −0.130 (0.077)* | −0.145 (0.060)** |
| Background check | | 0.091 (0.064) | 0.010 (0.053) |
| **Gun homicide** | | | |
| Waiting period | −0.103 (0.093) | −0.179 (0.087)** | −0.181 (0.068)** |
| Background check | | 0.120 (0.080) | 0.033 (0.065) |
| **Non-gun homicide** | | | |
| Waiting period | −0.019 (0.068) | −0.035 (0.064) | −0.072 (0.050) |
| Background check | | 0.025 (0.044) | −0.043 (0.039) |
| **All suicide** | | | |
| Waiting period | −0.016 (0.021) | −0.022 (0.023) | −0.036 (0.020)* |
| Background check | | 0.009 (0.022) | −0.007 (0.019) |
| **Gun suicide** | | | |
| Waiting period | −0.039 (0.024) | −0.053 (0.028)* | −0.066 (0.021)*** |
| Background check | | 0.023 (0.028) | −0.003 (0.024) |
| **Non-gun suicide** | | | |
| Waiting period | 0.050 (0.021)** | 0.035 (0.022) | 0.018 (0.022) |
| Background check | | 0.024 (0.023) | 0.009 (0.018) |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. All models include state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and includes alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for all variables are included in Table S2. The sample includes 459 state-year observations for all models. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

Luca et al.

Exhibit 10
0460

SEE COMMENTARY

background check policies. As seen in Tables 1 and 2, the estimated impact of background checks depends on model specification. We also incorporate time-varying state-level control variables that may influence rates of gun violence (8), $X_{it}$, including alcohol consumption, poverty, income, urbanization, black population, and seven age groups. Summary statistics for these variables are included in Tables S1 and S2. The $\alpha_i$ and $\lambda_t$ parameters represent state and year fixed effects. These fixed effects control for stable, state-specific factors affecting violence and time-varying factors that affect all states identically. It is impossible to control for all time-varying, state-specific factors that affect gun violence. For example, policing tactics, drug use, and environmental factors such as lead exposure might not have changed uniformly across states over time and may also affect violence. However, the consistency between our estimates during the short (Brady interim) period and the longer period (including all waiting period changes since 1970) supports our interpretation of the results. The model parameters are estimated via least squares weighted by state population. We then calculate the percentage effect of waiting periods on violence using the estimator described by Kennedy (12).

We code a state as having a waiting period if it imposes any mandatory delay on the purchase of a handgun or has a permitting system for dealer and private sales. (In Table S5, we estimate models with a separate control variable for handgun permit systems and show that the effect of waiting periods is not limited to states with permitting systems.) Currently, 10 states and the District of Columbia impose an explicit waiting period on handgun

sales, and an additional five states have permitting systems for private and dealer sales that result in a delay of firearm purchases. Forty-four states have had a handgun waiting period at some point since 1970, although 19 implemented the policy only due to the Brady Act's interim provisions, in effect from February 1994 to November 1998. These provisions required local law enforcement agencies to conduct background checks on handgun purchases from licensed firearm dealers and required a 5-d waiting period to conduct the check. Some states already required background checks and/or waiting periods before the Brady Act, and were therefore not affected by the new law, but other states were forced to adopt a new waiting period due to the federal policy change. When the permanent provisions of the Brady Act took effect on November 30, 1998, the federal waiting period requirement was replaced with an instant background check system [the National Instant Criminal Background Check System (NICS)]. As a result, many states discarded their waiting periods after 1998 because the NICS eliminated the need for a waiting period to investigate purchasers' backgrounds. We use the subset of waiting period changes that resulted from the Brady Act as a natural experiment to provide further support for our analysis of the full sample period from 1970 to 2014.

Although nine states have also had a waiting period on long-guns (i.e., rifles and shotguns) sometime since 1970, we focus on handgun waiting periods because handguns account for 70–80% of firearm homicides (13) and because a major source of variation in our data, the Brady Act's interim period, only affected handgun sales.

1. National Center for Health Statistics, Centers for Disease Control and Prevention (2015) About Compressed Mortality, 1999-2014. CDC WONDER Online Database. Available at wonder.cdc.gov/cmf-icd10.html. Accessed August 5, 2016.
2. Grinshteyn E, Hemenway D (2016) Violent death rates: The US compared with other high-income OECD countries, 2010. *Am J Med* 129:266–273.
3. Sacks CA (2015) In memory of Daniel—Reviving research to prevent gun violence. *N Engl J Med* 372:800–801.
4. Luca M, Malhotra D, Poliquin C (2017) The impact of mass shootings on gun policy. Harvard Business School NOM Unit Working Paper No. 16-126. Available at dx.doi.org/10.2139/ssrn.2776657. Accessed October 1, 2016.
5. Loewenstein G (1996) Out of control: Visceral influences on behavior. *Organ Behav Hum Decis Process* 65:272–292.
6. Loewenstein G, Lerner JS (2002) The role of affect in decision making. *Handbook of Affective Sciences*, eds Davidson RJ, Scherer KR, Goldsmith HH (Oxford Univ Press, Oxford), pp 619–642.
7. Card D, Dahl GB (2011) Family violence and football: The effect of unexpected emotional cues on violent behavior. *Q J Econ* 126:103–143.
8. Ludwig J, Cook PJ (2000) Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. *JAMA* 284:585–591.
9. Raissian KM (2016) Hold your fire: Did the 1996 Federal Gun Control Act expansion reduce domestic homicides? *J Policy Anal Manage* 35:67–93.
10. American Medical Association (2016) AMA Expands Policy on Background Checks, Waiting Periods for Gun Buyers. Available at https://perma.cc/CNE4-FEQ9. Accessed October 28, 2016.
11. Sides J (December 23, 2012) Gun owners vs. the NRA: What the polling shows. Washington Post, Wonkblog. Available at https://perma.cc/HCC9-4DY5. Accessed October 28, 2016.
12. Kennedy P (1981) Estimation with correctly interpreted dummy variables in semilogarithmic equations. *Am Econ Rev* 71:801.
13. Planty M, Truman J (2013) Firearm Violence, 1993-2011 (US Department of Justice, Washington, DC), NCJ 241730. Available at https://www.bjs.gov/index.cfm?iid=4616&ty=pbdetail. Accessed October 18, 2016.
14. Wolfers J (2006) Did unilateral divorce laws raise divorce rates? A reconciliation and new results. *Am Econ Rev* 96:1802–1820.
15. Webster D, Crifasi CK, Vernick JS (2014) Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. *J Urban Health* 91:293–302.
16. Rudolph KE, Stuart EA, Vernick JS, Webster DW (2015) Association between Connecticut's permit-to-purchase handgun law and homicides. *Am J Public Health* 105: e49–e54.
17. Lott JR, Jr, Mustard DB (1997) Crime, deterrence, and right-to-carry concealed handguns. *J Legal Stud* 26:1–68.
18. Ludwig J (1998) Concealed-gun-carrying laws and violent crime: Evidence from state panel data. *Int Rev Law Econ* 18:239–254.
19. Ayres I, Donohue JJ, III (2002) Shooting down the 'more guns, less crime' hypothesis. *Stanford Law Rev* 55:1193–1312.
20. Manski CF, Pepper JV (2017) How do right-to-carry laws affect crime rates? Coping with ambiguity using bounded-variation assumptions. *Rev Econ Stat*, 10.1162/REST_a_00689.
21. Solon G, Haider SJ, Wooldridge JM (2015) What are we weighting for? *J Hum Resour* 50:301–316.
22. Federal Register 59 (1994). Available at https://www.gpo.gov/fdsys/pkg/FR-1994-07-22/html/94-17819.htm. Accessed June 29, 2016.
23. Manson DA, Gilliard DK, Lauver G (1999) Presale Handgun Checks, the Brady Interim Period, 1994-98 (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC), NCJ 175034. Available at https://www.bjs.gov/content/pub/pdf/phc98.pdf. Accessed June 29, 2016.
24. Vernick J, Hepburn L (2003) State and federal gun laws. *Evaluating Gun Policy: Effects on Crime and Violence*, eds Ludwig J, Cook PJ (The Brookings Institution, Washington, DC), pp 345–402.
25. U.S. Department of Justice Bureau of Justice Statistics (1996) Survey of State Procedures Related to Firearm Sales (US Department of Justice Bureau of Justice Statistics Bulletin, Washington, DC), NCJ 160763. Available at https://www.bjs.gov/index.cfm?ty=pbdetail&iid=1067. Accessed August 2, 2014.
26. Carroll CA, Jr (January 27, 1994) South Carolina Executive order no. 94-03. Available at hdl.handle.net/10827/1350. Accessed June 14, 2017.

ECONOMIC SCIENCES

Downloaded from https://www.pnas.org by UC Los Angeles on February 28, 2024 from IP address 169.232.243.48.

Exhibit 10
0461

# Supporting Information

## Luca et al. 10.1073/pnas.1619896114

### Summary Statistics

Tables S1 and S2 provide summary statistics for variables used in the main analyses. Table S1 shows summary statistics for variables used for analyses presented in Table 1, covering the full 1970–2014 sample period. Table S2 shows summary statistics for variables used for the analysis of the Brady interim period in Table 2, covering 1990–1998.

### Identifying Policy Changes

In our first set of analyses, covering 1970–2014, we extend prior coding of policy changes by including an additional 36 y of data with 25 changes in waiting period policies. Our approach to identifying changes in waiting period policies also improves on Ludwig and Cook's (8) classification of states affected by the Brady Handgun Violence Prevention Act. Prior research coded all states subject to the Brady Act's interim provisions as treatment states, but some of these states already had background checks and/or waiting periods before the interim period. Table S4 details the differences between our coding and that of Ludwig and Cook (8). In total, our coding differs for 16 states; the table footnotes provide supporting citations for each difference. We find that these improvements more accurately measure the effects of waiting periods on homicides, which we now find to be robust and statistically significant at conventional levels, even when we restrict the sample to the same years examined in prior research.

### Robustness: State-Specific Trends

If states that do and do not adopt waiting periods have different trends in violence before the implementation of the waiting period, then one might be concerned that our results reflect these different trends rather than the impact of the waiting period policy. To allow for the possibility of differential secular trends, Table S3 estimates a log-linear model with linear trends that vary by state for the 1970–2014 time period [We do not estimate models with state-specific trends for the analysis of the Brady interim period (1990–1998) because there is too little pretreatment data to identify preexisting, state-specific trends in gun violence (14)]. This model produces similar estimates for the effect of waiting periods on homicides, suggesting that differential trends are not the main driver of the results and providing further support for our interpretation. The results for suicides, however, differ across specification and are not robust to the inclusion of control variables and state-specific trends. The model without trends in column 3 of Table 1 suggests that waiting periods reduce gun suicides by 7%, while the model in column 3 of Table S3 suggests no reduction. The results of Table S3 also suggest that any decrease in gun suicides due to waiting periods is offset by an increase in non-gun suicides.

### Robustness: Falsification Exercise and Dynamic Effects

To shed further light on the dynamics of the effects shown in Table 1, Table S6 reestimates the model in column 3 of Table 1, but includes leads and lags of the policy change, specifically including indicator variables for the years before and after implementation of a waiting period. We find that the impact of waiting periods does not appear until the waiting period has been adopted, providing further support for our causal interpretation. Violence appears to fall soon after implementation, although the single-year estimates are imprecise.

### Robustness: Other Changes in Gun Policy

While the results overall point to the causal effect of waiting periods, one might still be concerned that other gun policy changes are correlated with the timing of waiting period changes. To address this concern, we provide evidence that the effects reported in Table 1 are robust to the inclusion of controls for other gun policies in a state. Specifically, in Table S5, we reestimate the models of columns 2 and 3 in Table 1, but include additional variables for handgun permit and concealed carry policies to account for potential correlation between the implementation of these policies and waiting periods. The results in Table S5 show that the inclusion of other gun policies in the model does not change our conclusion that waiting periods reduce gun homicides and suicides. Our study uses a natural experiment embedded in the Brady Act to identify the impact of waiting periods; estimating the causal impact of exogenous changes to other gun policies is beyond the scope of this study. Other research focuses on the impact of handgun permits (15, 16) and concealed carry laws (17–20).

### Alternative Model Specifications

Alternative specifications for the effect of waiting periods on homicides and suicides produce similar point estimates (Tables S7 and S8). The estimates in Table S7 are based on models linear in the rate of violence. The results in columns 2 and 3 imply that waiting periods reduce gun homicides by roughly 18% and gun suicides by 5–9% for a state with an average rate of violence. Results for the Poisson model (Table S8) imply reductions of 18–20% and 7–11.6% for gun homicides and suicides, respectively, while estimates based on the log-linear model presented in the main text and Table 1 imply 17% and 7–11% reductions.

Additionally, we examine unweighted, least-squares estimates (Tables S9 and S10). The coefficient estimates on the waiting period dummy from the unweighted regressions are attenuated relative to the weighted results. This suggests that the effect of waiting period policies is heterogeneous, with larger states experiencing greater reductions in violence than smaller states (21). To ensure our results are not driven by outlier states, we reestimate the model of gun homicide and suicide rates (column 3 of Table 1), but exclude one state at a time. Fig. S1 shows the 51 resulting coefficients (one from excluding each state and the District of Columbia) for homicides and suicides. The coefficient estimates are consistently negative. As expected from the difference between the weighted and unweighted estimates, large states like Pennsylvania and Florida seem to exert downward pressure on the coefficient.

### Complete Coefficient Estimates

Table S11 presents coefficient estimates for all variables included in model 3 of Table 1. This model uses the same control variables as prior research by Ludwig and Cook (8).

Exhibit 10
0462



**Fig. S1.** Estimates of the effect of waiting periods on gun homicides and suicides, dropping each state individually from the analysis and reestimating model 3 of Table 1. Bars are 1.96 ± SE of the waiting period coefficient. Solid lines mark the full sample estimates, and dashed lines are 1.96 ± full sample SE.

**Table S1.   State-level summary statistics: 1970–2014 (Table 1)**

| Variable | Mean | SD | p5 | p10 | p50 | p90 | p95 |
|---|---|---|---|---|---|---|---|
| Years 1970–2014 | | | | | | | |
|   Gun homicide rate | 5.7 | 4.9 | 1.0 | 1.4 | 4.4 | 11.1 | 14.4 |
|   Homicide rate | 8.5 | 6.7 | 2.1 | 2.6 | 6.8 | 15.6 | 19.4 |
|   Gun suicide rate | 10.2 | 4.2 | 3.1 | 4.0 | 10.2 | 15.0 | 17.1 |
|   Suicide rate | 17.3 | 4.7 | 10.2 | 11.9 | 16.7 | 23.7 | 26.0 |
|   Handgun waiting period | 0.45 | 0.49 | 0 | 0 | 0 | 1 | 1 |
|   Background checks | 0.64 | 0.48 | 0 | 0 | 1 | 1 | 1 |
| Years 1977–2014 (Control variables for model 3) | | | | | | | |
|   Alcohol consumption | 2.9 | 0.8 | 2.0 | 2.1 | 2.7 | 3.8 | 4.3 |
|   Income per capita | 25.4 | 5.8 | 17.2 | 18.6 | 24.8 | 32.6 | 35.7 |
|   Demographics, % | | | | | | | |
|     Poverty | 13.1 | 4.0 | 7.9 | 8.7 | 12.5 | 18.5 | 20.9 |
|     Urban areas | 64.2 | 20.1 | 29.5 | 35.5 | 64.9 | 89.0 | 91.9 |
|     Black | 11.2 | 11.8 | 0.4 | 0.7 | 7.4 | 27.5 | 32.1 |
|     Ages 0–14 y | 21.4 | 2.4 | 17.9 | 18.7 | 21.3 | 24.3 | 25.8 |
|     Ages 15–17 y | 4.5 | 0.6 | 3.7 | 3.9 | 4.4 | 5.5 | 5.8 |
|     Ages 18–24 y | 10.9 | 1.6 | 8.9 | 9.2 | 10.3 | 13.4 | 13.8 |
|     Ages 25–34 y | 15.1 | 2.2 | 12.0 | 12.5 | 15.0 | 17.9 | 18.7 |
|     Ages 35–44 y | 14.0 | 1.9 | 10.8 | 11.3 | 14.1 | 16.3 | 16.9 |
|     Ages 45–54 y | 12.0 | 2.2 | 9.0 | 9.3 | 12.0 | 14.9 | 15.4 |
|     Ages 55–64 y | 9.7 | 1.7 | 7.6 | 7.9 | 9.2 | 12.3 | 12.9 |

Homicide and suicide rates are adult (21+) deaths per 100,000 adult residents. Alcohol consumption is measured in gallons of ethanol per capita, and income is measured in thousands of 1998 dollars. Demographic control variables are percentages of total state population. Columns beginning with "p" represent percentiles of the distribution; for example, "p10" means the 10th percentile.

Exhibit 10
0463

**Table S2.   State-level summary statistics: 1990–1998 (Table 2)**

| Variable | Mean | SD | p5 | p10 | p50 | p90 | p95 |
|---|---|---|---|---|---|---|---|
| Gun homicide rate | 5.9 | 6.1 | 1.0 | 1.4 | 4.6 | 10.4 | 12.3 |
| Homicide rate | 8.8 | 8.0 | 2.1 | 2.7 | 7.0 | 14.7 | 18.3 |
| Gun suicide rate | 10.2 | 4.0 | 3.2 | 4.0 | 10.6 | 15.0 | 17.3 |
| Suicide rate | 16.6 | 4.5 | 9.6 | 11.4 | 16.1 | 22.7 | 24.9 |
| Handgun waiting period | 0.63 | 0.47 | 0 | 0 | 1 | 1 | 1 |
| Background checks | 0.74 | 0.43 | 0 | 0 | 1 | 1 | 1 |
| Alcohol consumption | 2.6 | 0.6 | 2.0 | 2.1 | 2.6 | 3.1 | 4.1 |
| Income per capita | 24.3 | 3.8 | 19.1 | 19.9 | 23.9 | 29.1 | 31.7 |
| Demographics, % | | | | | | | |
| Poverty | 13.3 | 4.0 | 8.2 | 8.9 | 12.5 | 19.0 | 21.1 |
| Urban areas | 63.5 | 19.9 | 29.0 | 35.1 | 63.9 | 87.5 | 91.1 |
| Black | 11.1 | 12.0 | 0.4 | 0.5 | 7.3 | 27.5 | 31.9 |
| Ages 0–14 y | 21.9 | 1.9 | 19.4 | 20.0 | 21.6 | 24.1 | 25.2 |
| Ages 15–17 y | 4.3 | 0.5 | 3.5 | 3.7 | 4.2 | 4.9 | 5.1 |
| Ages 18–24 y | 9.9 | 0.9 | 8.4 | 8.9 | 9.9 | 11.0 | 11.6 |
| Ages 25–34 y | 15.7 | 1.6 | 13.1 | 13.7 | 15.6 | 17.7 | 18.4 |
| Ages 35–44 y | 16.0 | 1.0 | 14.4 | 14.8 | 15.9 | 17.1 | 17.7 |
| Ages 45–54 y | 11.5 | 1.2 | 9.7 | 10.0 | 11.5 | 13.1 | 13.5 |
| Ages 55–64 y | 8.2 | 0.7 | 7.1 | 7.5 | 8.2 | 8.9 | 9.1 |

Homicide and suicide rates are adult (21+) deaths per 100,000 adult residents. Alcohol consumption is measured in gallons of ethanol per capita; income is thousands of 1998 dollars. Demographic control variables are percentages of total state population. Columns beginning with "p" represent percentiles of the distribution; for example, "p10" means the 10th percentile.

Exhibit 10
0464

Table S3.  States that implemented background checks and waiting periods during the Brady Act's interim period from February 1994 through November 1998, according to Ludwig and Cook (8) and this study

| State | Ludwig and Cook (8) | | New coding (this study) | |
| --- | --- | --- | --- | --- |
| | Background check | Waiting period | Background check | Waiting period |
| **Alabama*** | ■ | ■ | ■ | |
| Alaska | | | | |
| **Arizona†** | ■ | ■ | □ Feb–Oct 1994 | □ Feb–Oct 1994 |
| Arkansas | □ | □ | □ Feb 1994–June 1997 | □ Feb 1994–June 1997 |
| California | | | | |
| Colorado | | | | |
| Connecticut | | | | |
| Delaware | | | | |
| District of Columbia | | | | |
| Florida | | | | |
| **Georgia‡** | ■ | ■ | ■ | □ Feb 1994–Dec 1995 |
| Hawaii | | | | |
| **Idaho§** | ■ | ■ | ■ | □ Feb–May 1994 |
| Illinois | | | | |
| Indiana | | | | |
| Iowa | | | | |
| Kansas | ■ | ■ | ■ | ■ |
| Kentucky | ■ | ■ | ■ | ■ |
| Louisiana | ■ | ■ | ■ | ■ |
| Maine | ■ | ■ | ■ | ■ |
| Maryland | | | | |
| Massachusetts | | | | |
| Michigan | | | | |
| **Minnesota¶** | ■ | ■ | ■ | ■ |
| Mississippi | ■ | | ■ | |
| Missouri | | | | |
| Montana | ■ | | ■ | |
| **Nebraska#** | ■ | ■ | ■ | ■ |
| **Nevada‖** | | | | |
| **New Hampshire**** | ■ | ■ | ■ | □ Feb–Dec 1994 |
| New Jersey | | | | |
| New Mexico | ■ | | ■ | |
| New York | | | | |
| **North Carolina††** | ■ | ■ | ■ | ■ |
| North Dakota | □ | □ | □ Feb 1994–June 1997 | ■ |
| **Ohio‡‡** | □ | □ | ■ | ■ |
| Oklahoma | | | | |
| Oregon | | | | |
| **Pennsylvania§§** | ■ | ■ | ■ | ■ |
| **Rhode Island¶¶** | ■ | ■ | ■ | ■ |
| **South Carolina##** | ■ | ■ | ■ | ■ |
| **South Dakota‖‖** | ■ | ■ | ■ | ■ |
| **Tennessee***** | ■ | ■ | ■ | ■ |
| Texas | ■ | ■ | ■ | ■ |
| Utah | ■ | ■ | ■ | ■ |
| Vermont | ■ | | ■ | |
| Virginia | | | | |
| **Washington†††** | ■ | ■ | ■ | ■ |
| West Virginia | ■ | ■ | ■ | ■ |
| Wisconsin | | | | |
| Wyoming | | | | |

The coding of states in boldface differs; an explanation of differences is provided in table footnotes. Dates are noted for cases in which policies changed during the interim period. ■, state got policy for full interim period; □, state got policy for part of interim period.

*Alabama had a 2-d waiting period on handgun purchases before implementation of the Brady Act (Code of Ala. § 13A-11-77).

†Arizona created an instant check background system in October 1994, and therefore had effectively no waiting period for most of the Brady Act's interim period (Ariz. Rev. Stat. Ann. § 13–3114).

‡Georgia implemented an instant check system in January 1996 (Ga. Code Ann. § 16-11-170).

§Idaho implemented an instant check system in June 1994 (Ida. Code § 19-5403).

¶Minnesota created a permit system in 1977 that required background checks and a 7-d waiting period for handgun purchases (Minn. Stat. § 624.7131 et seq.).

#Nebraska was exempt from the Brady Act (22, 23). Furthermore, it created a handgun permit system with a background check and 2-d waiting period in 1991 (Neb. Rev. Stat. § 69-2404 et seq.).

‖Ludwig and Cook (8) say Nevada was classified as a control state because it's pre-Brady Act laws were strict enough to warrant an exemption even though it was subject to the Brady Act. We cannot find evidence of this; Nevada had neither a background check nor waiting period requirement before implementation of the Brady Act (24) and was subject to the act's provisions (23). We classify the state as not having a waiting period because the state implemented an instant check system (25).

**New Hampshire implemented an instant check system in January 1995 (N.H. Rev. Stat. Ann. § 159-C).

††We classify North Carolina as a control state because it implemented a handgun permit system in 1919 (N.C. Gen. Stat. § 14-402 et seq.). An explicit background check requirement was not added to the statutes until 1995, but the law previously required superior court clerks to certify that handgun permit applicants were of "good moral character" and included felonies, indictments, fugitive status, and mentally ill persons among those not of such character (N.C. Gen. Stat. § 14-404).

‡‡Ohio was subject to the Brady Act's interim provisions (22, 23) but had instant background checks (25), and is therefore coded as not implementing a waiting period. Like Ludwig and Cook (8), we code Ohio as stopping background checks after the Supreme Court's decision in *Printz v. United States* in June 1997. We cannot find a statute or executive order for Ohio, and therefore rely exclusively on federal government reports (22, 23, 25).

§§Pennsylvania already had a 2-d waiting period before implementation of the Brady Act (24). We therefore code the state as only implementing the Brady Act's background check provisions. The state abandoned its waiting period in 1998 when instant checks became available (text and legislative history of 18 Pa.C.S.A. § 6111).

¶¶Rhode Island was subject to the Brady Act despite requiring both a background check and waiting period as part of its handgun permit process before 1994 (24). It therefore did not newly implement background checks or waiting periods as a result of the Brady Act (R.I. Gen. Laws § 11-47-35 et seq.).

##South Carolina's Law Enforcement Division ran an instant check system at the time the Brady Act was implemented (22, 25, 26), and is therefore coded as not implementing a waiting period. South Carolina's governor created the instant check system by executive order (26).

‖‖South Dakota had a 2-d waiting period before implementation of the Brady Act (since at least 1935) that was not repealed until 2009 (S.D. Codified Laws § 23-7-9).

***Tennessee was subject to the Brady Act even though it already required a background check and 15-d waiting period (Tenn. Code Ann. § 39-17-1316). It is therefore coded as not newly implementing these laws due to the Brady Act's interim provisions.

†††Washington had background checks before the Brady Act but was not Brady-exempt because it did not require the chief law enforcement officer in the area where the purchaser lived to conduct the check (Wash. Rev. Code Ann. § 9.41.090).

Table S4.   Effects of handgun waiting periods and background checks on violence, including state-specific trends, 1970–2014

| | 1970–2014 | | 1977–2014 |
|---|---|---|---|
| Type of violence | (1) | (2) | (3) |
| **All homicide** | | | |
| Waiting period | −0.118 (0.049)** | −0.129 (0.049)** | −0.086 (0.045)* |
| Background check | | 0.033 (0.057) | 0.001 (0.047) |
| **Gun homicide** | | | |
| Waiting period | −0.181 (0.066)*** | −0.195 (0.071)*** | −0.124 (0.050)** |
| Background check | | 0.043 (0.077) | 0.014 (0.068) |
| **Non-gun homicide** | | | |
| Waiting period | −0.011 (0.039) | −0.014 (0.038) | −0.030 (0.047) |
| Background check | | 0.011 (0.051) | −0.015 (0.035) |
| **All suicide** | | | |
| Waiting period | 0.015 (0.013) | 0.017 (0.013) | 0.022 (0.016) |
| Background check | | −0.005 (0.017) | −0.006 (0.015) |
| **Gun suicide** | | | |
| Waiting period | −0.044 (0.017)** | −0.045 (0.020)** | −0.012 (0.016) |
| Background check | | 0.002 (0.018) | −0.017 (0.017) |
| **Non-gun suicide** | | | |
| Waiting period | 0.056 (0.019)*** | 0.050 (0.020)** | 0.048 (0.024)* |
| Background check | | 0.020 (0.022) | 0.019 (0.024) |

Coefficients represent the effects of waiting periods and background checks on the natural logarithm of deaths per 100,000 adult residents. Models mirror Table 1, but include a state-specific, linear trend in addition to state and year fixed effects. Models 1–2 include only the policy variables shown. Model 3 follows the specification of Ludwig and Cook (8) and uses fewer years of data due to missing control variables in earlier years. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

Table S5.   Effect of handgun waiting periods relative to adoption year, 1977–2013

| | Homicides | | | Suicides | | |
|---|---|---|---|---|---|---|
| | All | Gun | Non-gun | All | Gun | Non-gun |
| Time relative to waiting period | (1) | (2) | (3) | (4) | (5) | (6) |
| 2 y before | −0.024 (0.047) | −0.038 (0.056) | 0.004 (0.060) | 0.015 (0.021) | 0.001 (0.024) | 0.045 (0.031) |
| 1 y before | −0.053 (0.051) | −0.076 (0.060) | −0.014 (0.052) | 0.025 (0.017) | 0.003 (0.018) | 0.046 (0.029) |
| Adoption year | −0.087 (0.054) | −0.106 (0.077) | −0.063 (0.051) | 0.008 (0.021) | −0.014 (0.026) | 0.006 (0.034) |
| 1 y after | −0.147 (0.060)** | −0.178 (0.080)** | −0.11 (0.065)* | −0.032 (0.022) | −0.082 (0.026)*** | −0.016 (0.032) |
| 2 y after | −0.147 (0.058)** | −0.176 (0.082)** | −0.086 (0.043)* | −0.004 (0.016) | −0.061 (0.023)*** | 0.039 (0.030) |
| 3 y after | −0.145 (0.060)** | −0.198 (0.083)** | −0.048 (0.053) | −0.007 (0.017) | −0.063 (0.022)*** | 0.04 (0.034) |
| 4+ y after | −0.129 (0.053)** | −0.188 (0.072)** | −0.021 (0.041) | −0.022 (0.012)* | −0.071 (0.016)*** | −0.006 (0.037) |

Models mirror column 3 of Table 1, but include an indicator variable for years before and after implementation of the waiting period *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

Exhibit 10
0466

**Table S6.** Estimates of the waiting period effect, controlling for other gun policies

| Type of violence | 1970–2014 (1) | 1977–2014 (2) |
|---|---|---|
| **All homicide** | | |
| Waiting period | −0.141 (0.061)** | −0.137 (0.051)** |
| Background check | 0.054 (0.065) | 0.019 (0.068) |
| Handgun permit | 0.021 (0.089) | 0.051 (0.091) |
| Shall-issue CCW | 0.002 (0.104) | 0.056 (0.095) |
| May-issue CCW | 0.006 (0.118) | 0.062 (0.097) |
| **Gun homicide** | | |
| Waiting period | −0.201 (0.086)** | −0.194 (0.074)** |
| Background check | 0.010 (0.084) | 0.007 (0.090) |
| Handgun permit | 0.075 (0.093) | 0.084 (0.125) |
| Shall-issue CCW | −0.019 (0.119) | 0.078 (0.118) |
| May-issue CCW | −0.035 (0.137) | 0.046 (0.118) |
| **Non-gun homicide** | | |
| Waiting period | −0.033 (0.055) | −0.035 (0.033) |
| Background check | 0.135 (0.055)** | 0.042 (0.053) |
| Handgun permit | −0.077 (0.100) | 0.006 (0.054) |
| Shall-issue CCW | 0.063 (0.083) | 0.045 (0.062) |
| May-issue CCW | 0.110 (0.096) | 0.118 (0.073) |
| **All Suicide** | | |
| Waiting period | −0.037 (0.023) | −0.016 (0.011) |
| Background check | 0.066 (0.029)** | 0.012 (0.017) |
| Handgun Permit | −0.167 (0.070)** | −0.092 (0.036)** |
| Shall-issue CCW | 0.044 (0.040) | 0.013 (0.026) |
| May-issue CCW | 0.025 (0.046) | 0.014 (0.026) |
| **Gun suicide** | | |
| Waiting period | −0.083 (0.031)*** | −0.066 (0.019)*** |
| Background check | 0.064 (0.034)* | 0.015 (0.023) |
| Handgun permit | −0.196 (0.078)** | −0.101 (0.037)*** |
| Shall-issue CCW | 0.007 (0.048) | 0.008 (0.031) |
| May-issue CCW | −0.029 (0.063) | −0.012 (0.039) |
| **Non-gun suicide** | | |
| Waiting period | −0.021 (0.047) | −0.001 (0.030) |
| Background check | 0.119 (0.050)** | 0.062 (0.030)** |
| Handgun permit | −0.156 (0.062)** | −0.059 (0.040) |
| Shall-issue CCW | 0.176 (0.049)*** | 0.085 (0.028)*** |
| May-issue CCW | 0.152 (0.054)*** | 0.093 (0.027)*** |

Coefficients estimate the effect of waiting periods and background checks on the number of deaths per 100,000 adult residents. Models mirror those of Table 1. Model 1 includes only the policy variables shown. Model 2 follows the specification of Ludwig and Cook (8) and uses fewer years of data due to missing control variables in earlier years. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$. CCW, carrying of a concealed weapon.

Exhibit 10
0467

**Table S7.   Alternative specifications for the effect of handgun waiting periods and background checks on violence from 1970 to 2014: Linear rate**

| | 1970–2014 | 1977–2014 | |
|---|---|---|---|
| Type of violence | (1) | (2) | (3) |
| All homicide | | | |
| Waiting period | −1.372 (0.772)* | −1.332 (0.790)* | −1.138 (0.477)** |
| Background check | | −0.190 (1.046) | −0.412 (0.960) |
| Gun homicide | | | |
| Waiting period | −1.185 (0.627)* | −1.054 (0.686) | −1.010 (0.412)** |
| Background check | | −0.627 (0.806) | −0.398 (0.791) |
| Non-gun homicide | | | |
| Waiting period | −0.187 (0.186) | −0.278 (0.191) | −0.129 (0.131) |
| Background check | | 0.436 (0.324) | −0.014 (0.219) |
| All suicide | | | |
| Waiting period | −0.906 (0.325)*** | −1.238 (0.391)*** | −0.459 (0.167)*** |
| Background check | | 1.600 (1.157) | 0.070 (0.328) |
| Gun suicide | | | |
| Waiting period | −0.882 (0.277)*** | −0.912 (0.327)*** | −0.533 (0.203)** |
| Background check | | 0.143 (0.669) | −0.453 (0.338) |
| Non-gun suicide | | | |
| Waiting period | −0.024 (0.222) | −0.326 (0.357) | 0.073 (0.174) |
| Background check | | 1.458 (0.615)** | 0.524 (0.189)*** |

Coefficients estimate the effect of waiting periods and background checks on the number of deaths per 100,000 adult residents. All models include state and year fixed effects and mirror those of Table 1. Model 3 uses fewer years of data due to missing control variables in earlier years. The analysis covering 1970–2014 includes 2,295 state-years; the analysis with control variables covering 1977–2014 includes 1,938 state-years. SEs, shown in parentheses, are clustered by state. *P < 0.10; **P < 0.05; ***P < 0.01.

**Table S8.   Alternative specifications for the effect of handgun waiting periods and background checks on violence from 1970 to 2014: Poisson**

| | 1970–2014 | | 1977–2014 |
|---|---|---|---|
| Type of violence | (1) | (2) | (3) |
| All homicide | | | |
| Waiting period | −0.153 (0.049)*** | −0.155 (0.050)*** | −0.125 (0.051)** |
| Background check | | 0.007 (0.076) | −0.002 (0.084) |
| Gun homicide | | | |
| Waiting period | −0.209 (0.064)*** | −0.198 (0.072)*** | −0.177 (0.074)** |
| Background check | | −0.039 (0.094) | −0.007 (0.112) |
| Non-gun homicide | | | |
| Waiting period | −0.031 (0.046) | −0.060 (0.050) | −0.012 (0.036) |
| Background check | | 0.100 (0.072) | 0.001 (0.055) |
| All suicide | | | |
| Waiting period | −0.047 (0.019)** | −0.076 (0.023)*** | −0.032 (0.010)*** |
| Background check | | 0.127 (0.070)* | 0.032 (0.021) |
| Gun suicide | | | |
| Waiting period | −0.089 (0.026)*** | −0.116 (0.030)*** | −0.075 (0.017)*** |
| Background check | | 0.111 (0.075) | 0.032 (0.030) |
| Non-gun suicide | | | |
| Waiting period | −0.010 (0.031) | −0.053 (0.053) | 0.001 (0.032) |
| Background check | | 0.207 (0.078)*** | 0.088 (0.031)*** |

Coefficients are based on a Poisson model for the count of deaths using adult population as the exposure variable. All models include state and year fixed effects and mirror those of Table 1. Model 3 uses fewer years of data due to missing control variables in earlier years. The analysis covering 1970–2014 includes 2,295 state-years; the analysis with control variables covering 1977–2014 includes 1,938 state-years. SEs, shown in parentheses, are clustered by state. *P < 0.10; **P < 0.05; ***P < 0.01.

Exhibit 10
0468

**Table S9.  Unweighted estimates of the effects of handgun waiting periods and background checks on violence: Full sample period**

| Type of violence | 1970–2014 | | 1977–2014 |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| All homicide | | | |
| Waiting period | −0.007 (0.050) | −0.012 (0.052) | −0.047 (0.051) |
| Background check | | 0.018 (0.047) | 0.022 (0.050) |
| Gun homicide | | | |
| Waiting period | −0.042 (0.060) | −0.029 (0.066) | −0.067 (0.066) |
| Background check | | −0.049 (0.068) | 0.011 (0.068) |
| Non-gun homicide | | | |
| Waiting period | 0.055 (0.049) | 0.020 (0.053) | −0.003 (0.044) |
| Background check | | 0.134 (0.049)*** | 0.039 (0.047) |
| All suicide | | | |
| Waiting period | −0.020 (0.017) | −0.045 (0.017)** | −0.028 (0.012)** |
| Background check | | 0.097 (0.029)*** | 0.032 (0.018)* |
| Gun suicide | | | |
| Waiting period | −0.044 (0.023)* | −0.070 (0.021)*** | −0.063 (0.018)*** |
| Background check | | 0.098 (0.032)*** | 0.051 (0.023)** |
| Non-gun suicide | | | |
| Waiting period | −0.016 (0.034) | −0.064 (0.041) | −0.029 (0.029) |
| Background check | | 0.186 (0.044)*** | 0.087 (0.032)*** |

This table mirrors Table 1, but models are not population-weighted. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

**Table S10.  Unweighted estimates of the effects of handgun waiting periods and background checks on violence: Brady period**

| Type of violence | Brady period, 1990–1998 | | |
| --- | --- | --- | --- |
| | (1) | (2) | (3) |
| All homicide | | | |
| Waiting period | −0.047 (0.033) | −0.048 (0.035) | −0.012 (0.040) |
| Background check | | 0.003 (0.035) | −0.019 (0.043) |
| Gun homicide | | | |
| Waiting period | −0.081 (0.044)* | −0.070 (0.048) | −0.015 (0.051) |
| Background check | | −0.032 (0.053) | −0.045 (0.065) |
| Non-gun homicide | | | |
| Waiting period | 0.005 (0.034) | −0.006 (0.039) | 0.009 (0.039) |
| Background check | | 0.033 (0.037) | −0.012 (0.038) |
| All suicide | | | |
| Waiting period | 0.018 (0.016) | 0.023 (0.017) | 0.008 (0.017) |
| Background check | | −0.014 (0.022) | 0.000 (0.014) |
| Gun suicide | | | |
| Waiting period | −0.019 (0.019) | −0.019 (0.023) | −0.010 (0.019) |
| Background check | | −0.000 (0.026) | −0.017 (0.017) |
| Non-gun suicide | | | |
| Waiting period | 0.040 (0.019)** | 0.035 (0.020)* | 0.015 (0.022) |
| Background check | | 0.013 (0.024) | 0.036 (0.023) |

This table mirrors Table 1, but models are not population-weighted. *$P < 0.10$; **$P < 0.05$.

Exhibit 10
0469

Table S11.   Effects of handgun waiting periods on violence, 1970–2014

| | Homicides | | | Suicides | | |
|---|---|---|---|---|---|---|
| | All | Gun | Non-gun | All | Gun | Non-gun |
| Variable | (1) | (2) | (3) | (4) | (5) | (6) |
| Waiting period | −0.132** | −0.186** | −0.035 | −0.024** | −0.074*** | −0.006 |
| | (0.050) | (0.071) | (0.037) | (0.011) | (0.017) | (0.033) |
| Background check | 0.025 | 0.022 | 0.036 | 0.023 | 0.029 | 0.084** |
| | (0.081) | (0.107) | (0.057) | (0.020) | (0.028) | (0.031) |
| Alcohol consumption | 0.155** | 0.142* | 0.198*** | 0.144*** | 0.147*** | 0.128*** |
| | (0.065) | (0.075) | (0.071) | (0.039) | (0.045) | (0.045) |
| Poverty | −0.004 | −0.006 | −0.003 | 0.001 | 0.002 | −0.005 |
| | (0.006) | (0.007) | (0.005) | (0.002) | (0.002) | (0.004) |
| Income | −0.002 | 0.003 | −0.003 | −0.009*** | −0.011** | −0.021*** |
| | (0.011) | (0.013) | (0.011) | (0.003) | (0.004) | (0.005) |
| Urban | 0.002 | 0.001 | 0.003 | 0.003 | 0.002 | 0.009** |
| | (0.006) | (0.007) | (0.006) | (0.003) | (0.003) | (0.004) |
| Black | 0.035* | 0.040* | 0.022 | 0.004 | 0.024* | −0.011 |
| | (0.020) | (0.023) | (0.016) | (0.009) | (0.012) | (0.010) |
| Age under 14 y | 0.033 | 0.057 | 0.005 | −0.003 | 0.002 | 0.013 |
| | (0.038) | (0.055) | (0.027) | (0.015) | (0.017) | (0.021) |
| Age 15–17 y | −0.136** | −0.106 | −0.145* | −0.084*** | −0.171*** | −0.068 |
| | (0.062) | (0.077) | (0.073) | (0.035) | (0.040) | (0.052) |
| Age 18–24 y | 0.015 | 0.017 | 0.014 | 0.002 | 0.037* | 0.010 |
| | (0.046) | (0.061) | (0.047) | (0.020) | (0.021) | (0.025) |
| Age 25–34 y | −0.035 | −0.038 | −0.015 | 0.016 | 0.013 | 0.041 |
| | (0.034) | (0.045) | (0.029) | (0.019) | (0.022) | (0.026) |
| Age 35–44 y | −0.008 | −0.038 | 0.044 | −0.009 | 0.005 | 0.024 |
| | (0.051) | (0.063) | (0.047) | (0.017) | (0.023) | (0.023) |
| Age 45–54 y | 0.056 | 0.107** | 0.009 | 0.037** | 0.027 | 0.016 |
| | (0.034) | (0.046) | (0.029) | (0.016) | (0.020) | (0.028) |
| Age 55–64 y | 0.029 | −0.025 | 0.126*** | 0.020 | 0.022 | 0.090** |
| | (0.061) | (0.085) | (0.044) | (0.022) | (0.033) | (0.036) |
| Observations | 1,938 | 1,936 | 1,937 | 1,938 | 1,938 | 1,938 |
| Adjusted $R^2$ | 0.91 | 0.90 | 0.85 | 0.92 | 0.97 | 0.84 |

This table reports coefficients for all variables included in model 3 of Table 1. The dependent variable is the natural logarithm of adult deaths (21+) per 100,000 adult residents. The observation count for gun homicides is two less than the full sample count because North Dakota had no adult gun homicides in 2008 and Vermont had no adult gun homicides in 2009. The observation count for non-gun homicides is one less than the full sample count because North Dakota had no adult non-gun homicides in 2003. All models include state and year fixed effects. SEs, shown in parentheses, are clustered by state. *$P < 0.10$; **$P < 0.05$; ***$P < 0.01$.

Exhibit 10
0470

NBER WORKING PAPER SERIES

AGE AND SUICIDE IMPULSIVITY:
EVIDENCE FROM HANDGUN PURCHASE DELAY LAWS

John J. Donohue
Samuel V. Cai
Arjun Ravi

Working Paper 31917
http://www.nber.org/papers/w31917

NATIONAL BUREAU OF ECONOMIC RESEARCH
1050 Massachusetts Avenue
Cambridge, MA 02138
November 2023

John Donohue has at various times served as an expert witness in litigation involving firearm regulation. The views expressed herein are those of the authors and do not necessarily reflect the views of the National Bureau of Economic Research.

NBER working papers are circulated for discussion and comment purposes. They have not been peer-reviewed or been subject to the review by the NBER Board of Directors that accompanies official NBER publications.

© 2023 by John J. Donohue, Samuel V. Cai, and Arjun Ravi. All rights reserved. Short sections of text, not to exceed two paragraphs, may be quoted without explicit permission provided that full credit, including © notice, is given to the source.

Exhibit 10
0471

Age and Suicide Impulsivity: Evidence from Handgun Purchase Delay Laws
John J. Donohue, Samuel V. Cai, and Arjun Ravi
NBER Working Paper No. 31917
November 2023
JEL No. H0,I0,I18,K0,K32

## ABSTRACT

We provide the first quasi-experimental estimates of variation in suicide impulsivity by age by examining the impact of firearm purchase delay laws by age. Prior studies of firearm purchase delay laws use traditional two-way-fixed-effects estimation, but we demonstrate that bias due to heterogenous treatment effects may have inflated previous estimates relative to our stacked-regression approach. We also develop a triple-difference stacked-regression estimator to confirm the robustness of our results. We find that purchase delay laws reduce firearm suicide for the overall adult population, but this effect is largely driven by a 6.1 percent reduction in firearm suicides for young adults ages 21-34. We demonstrate that the relationship between purchase delay laws and firearm suicide reduction weakens with age and is not driven by gun ownership rates. We argue that this is due to the impulsiveness of young adults in committing suicide, indicating that removing firearm access for young adults may provide a critical deterrent to suicide.

John J. Donohue
Stanford Law School
Crown Quadrangle
559 Nathan Abbott Way
Stanford, CA 94305
and NBER
donohue@law.stanford.edu

Samuel V. Cai
Yale Law School
sam.cai@yale.edu

Arjun Ravi
University of Oxford
arjun.ravi@stx.ox.ac.uk

Exhibit 10
0472

# Age and Suicide Impulsivity: Evidence from Handgun Purchase Delay Laws

John Donohue, Samuel Cai, and Arjun Ravi  *

## 1   Introduction

In 2021, about 12.3 million American adults had serious suicidal ideation, and 48,000 people died by suicide (CDC, 2023). Given the gravity and prevalence of deaths by suicide, preventing suicide is an increasingly important policy priority and research interest. 988, the Department of Health and Human Services's new Suicide and Crisis Lifeline launched in 2022, has received nearly a billion dollars in federal funding alone (HHS, 2023). Economists have identified important predictors of suicide, such as social cohesion (Becker and Woessman, 2018), income inequality (Daly, Wilson and Johnson, 2013), and unemployment (Breuer, 2014), highlighting the impact of economic and social policy on suicidality. Moreover, economic research has directly measured the beneficial effects of particular policies on suicide rates, such as cash transfers (Christian, Hensel and Roth, 2019), unilateral divorce (Stevenson and Wolfers, 2006), and required mental health benefits as part of health insurance coverage (Lang, 2013). One significant challenge in translating these research findings to policy, however, lies in the fact that much of the economic research studies the effects of socio-economic phenomena and policies on a large and diverse group of adults. As such, the overall findings in these studies may mask substantial heterogeneous effects within different subpopulations. In particular, descriptive evidence indicates that patterns and circumstances of suicide vary substantially across age, suggesting that the effect sizes of various suicide prevention policies may also vary by age (McLone et al., 2016).

One key difference in risk for suicide between younger and older adults is the difference in impulsivity[1] between these two groups. Psychologists and public health researchers have posited several linkages between impulsive tendencies and suicidal behavior, with some attributing suicide

---

*Donohue: Stanford Law School and NBER (email: jjd@law.stanford.edu). Cai: Yale Law School (email: sam.cai@yale.edu). Ravi: University of Oxford (email: arjun.ravi@stx.ox.ac.uk). We are grateful to Matthew Bondy, Henry Manley, Richard Sweeney, and Dustin Swonder for comments on the paper. Amy Zhang provided outstanding research assistance.

[1]While there exist many measures of impulsivity (Mccullumsmith et al., 2014), we define an impulsive suicide as one that could be prevented by a delay in access to a chosen suicide mechanism, namely firearms. This definition of impulsive suicide follows naturally from our study context, and it is also a reasonable definition of impulsive suicide for policymakers and public health officials. Additionally, given that elevated states of suicidal thinking typically only last on average a few hours, the interventions we study that delay firearm purchase by several days will encapsulate most short-term episodes of elevated suicidal thinking (Coppersmith et al., 2023).

Exhibit 10
0473

outcomes directly to elevated impulsivity compared to nonsuicidal mental patients and healthy controls (Anestis et al., 2014; Conner et al., 2004; Dumais et al., 2005). Additionally, McGirr et al. (2008) finds that the impulsivity-suicidality relationship weakens with age. However, there is an absence of quasi-experimental evidence quantifying this relationship. Motivated by this gap in estimating the relationship between age and suicide impulsivity, we use handgun purchase delay laws as an avenue to investigate how disruptions in impulsive firearm[2] suicide plans may have heterogeneous impacts by age. Leveraging differential timing in the adoption and repeal of purchase delay laws, our difference-in-differences estimates suggest that impulsivity directly increases suicide risk through the sudden ideation of suicide plans that could be disrupted by a "cooling off" period and that suicidal impulsivity in adults wanes with age.

Beginning with Cook and Ludwig (2000), which studied the effect of the waiting period provision of the 1994 Brady Handgun Violence Prevention Act, economists have long identified the beneficial effects of adopting firearm purchase delay laws. The Brady Act instituted a five-day waiting period on handgun purchases from federally licensed firearm dealers between February 1994 and November 1998. While Cook and Ludwig (2000) find an imprecisely estimated negative effect of the Brady Act on firearm suicides, more recent studies leveraging longer panels and more treatment variation (beyond Brady) find evidence of statistically significant declines in firearm suicide as a result of handgun purchase delay laws (Edwards et al., 2017; Luca, Malhotra and Poliquin, 2017). We confirm the direction of these prior findings on firearm suicide across all adults, and demonstrate that the "cooling-off" effect of state-mandated delays in handgun purchase leads to a larger decline in firearm suicides for young adults than for older adults.

Beyond providing the first evidence on the differential impacts of purchase delay laws' ability to disrupt suicidal plans by age group, our paper brings superior data to bear on this issue while making a key methodological contribution to the literature. First, previous research on the effect of purchase delay laws on suicide, as well as the broader economic literature on firearms and suicide, has primarily relied on state-year panel data (Depew and Swensen, 2022; Lang, 2012). Instead, we obtained restricted access CDC mortality files that enabled us to use county-year as the unit of observation in our panel data, thereby generating more precisely estimated effect sizes than models using comparable state-year panels.[3]

Second, we develop and implement estimators that are robust to heterogeneous treatment effects. In recent years, researchers have developed new approaches to difference-in-differences estimators (Roth et al., 2023) that are not biased by differential treatment effects across groups in staggered treatment adoption settings. We use a stacked regression approach popularized by Cengiz et al. (2019), which, like the local projection difference-in-differences approach (Dube et al., 2023), is flexible to non-absorbing treatments and specifications with interaction terms as a variable treatment.[4] Additionally, we introduce a novel stacked triple-differences estimator to confirm the robustness of our main findings.

The remainder of this paper proceeds as follows. Section 2 describes the data used to complete

---

[2]Our paper specifically looks at firearm suicide, and we do not suggest that our results on suicide impulsivity are generalizable to non-firearm suicides, although they may be.

[3]We show results from comparable state-year panels in the Appendix.

[4]We do not use interaction terms in our main specification but some of our robustness checks do include them.

Exhibit 10
0474

our empirical analysis. Section 3 presents our methodology. Section 4 presents and discusses our empirical estimates. Section 5 concludes.

## 2   Data

Our county-level data spans all states from 1987-2019, with our sample limited to counties included in the American Community Survey (ACS) in 2019. Our outcome of interest is firearm suicide among adults subdivided into three different age groups, which we measure by aggregating individual-level CDC mortality data to the county-year level. We also create a cause-of-death category for non-firearm suicide. We use the RAND Corporation's state firearm law database (Cherney et al., 2022) to identify changes in handgun waiting period laws (state-mandated delay in receiving a handgun after the initial intent to purchase), handgun permit-to-purchase laws, and background check laws for firearms purchased from federally licensed dealers. Consistent with the prior literature on handgun purchase delay laws, we consider a state to have a purchase delay regime if it has either an active waiting period law or a permit-to-purchase law.[5] In practice, permit-to-purchase laws always lead to nonzero administrative turnaround time to purchase a handgun. Between the late 1920s and the early 1990s, 21 states introduced handgun waiting period laws, with a minimum of 2 days and a maximum of 15 days, and often accompanied by a background check. In 1994, under the federal Brady Handgun Violence Prevention Act, the remaining 29 states adopted a 5-day waiting period and background check. The Brady waiting period requirement was sunsetted after five years and replaced by the National Instant Criminal Background Check System (NICS) in November 1998. Sixteen states stopped enforcing handgun waiting periods at seven points spanning 1996 through 2015.

Our specifications also include socioeconomic and demographic controls associated with suicide. We collected information on state-year level ethanol consumption from The National Institute on Alcohol Abuse and Alcoholism (Kaplan, 2021a). For our primary regressions, we obtain county-year level covariates (population density, household income, percent in poverty, percent Black, percent 21-34, and percent 35-54) from US Census data via Social Explorer (Census, 2023). Data was linearly interpolated in non-Census years. Our dataset contains approximately the largest quarter of US counties by population and 85 percent of the total US population in 2019.

In supplemental results, we study the impact of household gun ownership on the effect of handgun purchase delay laws, constructing a state-age group estimate of household gun ownership using data from the University of Chicago's General Social Survey (Smith and Son, 2015) and estimates from the RAND Corporation (Schell et al., 2020) from 1987-2018. For this state-level analysis, we obtain state-age-year-level (household income, percent in poverty, percent Black, percent living in a metropolitan statistical area) covariates from the US Census via IPUMS (Ruggles et al., 2023). More details on our household gun ownership proxy and other data sources can be found in the Data Appendix.

---

[5]We round the date of adoption or repeal of these laws to the nearest year.

Exhibit 10
0475

# 3   Methods

Our approach leverages differential timing in the adoption and repeal of handgun purchase delay laws across US states using a difference-in-differences design. As described by Goodman-Bacon (2021), estimates recovered from staggered-adoption difference-in-difference analyses are a weighted average of individual 2x2 difference-in-difference comparisons. Some of these comparisons, such as using an earlier-treated group as a control for a later-treated group, yield biased estimates if there are heterogeneous treatment effects across treated groups. To overcome this issue in our analysis, our main results use a stacked-regression approach that is robust to heterogeneous treatment effects (Baker, 2022).

For the estimation of our main results, we first construct a dataset specific to each treatment event, $h$, defined as the adoption or repeal of a purchase delay law in a particular year. Each event $h$-specific dataset includes all counties whose treatment status was affected by event $h$ and all clean control countries across a 10-year panel by event time, from $t = (-5, \ldots, 4)$. Our preferred approach for control groups is to use only never adopters or always adopters, depending on whether the treatment event is the adoption or the repeal of a purchase delay law. We select the control group that matches the treatment status of the county prior to event $h$.[6]

We stack all event $h$-specific datasets together to calculate an average effect of purchase delay laws across all events (Cengiz et al., 2019). We employ a Poisson regression model, since a count model is most appropriate for our empirical context. We prefer a Poisson fixed effects model over a negative binomial model because the negative binomial fixed effect approach does not properly account for time-constant variables (Wooldridge, 1999). Our main specification takes the following form:

$$Y_{it} = \alpha + \beta PurchaseDelay_{it} + \sum_{j \in M} \gamma'_h \chi_{it} I(h = j) + \delta_{ih} + \lambda_{th} + \epsilon_{ith}$$

where $Y_{it}$ represents the number of firearm suicides in county $i$ in year $t$, and $X_{it}$ represents a set of covariates, and $M$ represents the set of all stacks $h$.[7] The coefficient represents the average estimated treatment effect of adopting a purchase delay law on firearm suicides with stack-specific county and year fixed effects. Standard errors are clustered at the state-stack level, since all purchase delay laws in our sample are changed at the state level, and thus the state is the level at which "random assignment" occurs. In all specifications, we use population as an exposure variable.[8]

---

[6]In other words, the control group for adopter treatment-stacks would be the never-treated group. The control group for the repealer stacks would be the always-adopter group.

[7]For our regressions analyzing the impact of purchase delay laws on firearm suicides across all adults aged 21 and over, the covariates are ethanol consumption (measured at the state-year level), the presence of a required background check for firearm purchase from a federally licensed dealer (which applies nationally after 1994, but was in place earlier for 21 states), population density, median household income, percent of people living below the poverty line, percent of people who are Black, the percentages of people within the age groups 21-34, 35-54, and 55 and over, and population as an exposure variable. For our analyses of firearm suicides for a subset of adults, we use all the same covariates, except we do not include the percentages of people within various age groups as controls.

[8]When using count data as an outcome variable, the incidence of the event of interest in an observed group is affected by the size of the group and length of observation; in our context, the larger of two counties with the same suicide rate will see more individual suicides. We choose to include population as an exposure variable simply to constrain its coefficient to less than 1, reflecting our expectation that a one-person increase in population will not lead to a one-incident increase in suicides. In practice, including population as a regular explanatory variable minimally

Exhibit 10
0476

We estimate the average effect of purchase delay laws on firearm suicides across different age groups using the static model presented above and then provide event-study analyses that allow us to assess the conditional parallel trends assumption. Our event study regresses firearm suicides on a set of yearly dummies for each of the 5 years prior and 4 years after a change in purchase delay laws, omitting the dummy for one year prior to adoption. The following equation shows the regression model underlying the event study analyses, where $\psi_h$ is equal to the year of the relevant event for stack $h$ and $\theta_h$ is equal to 1 if the stack $h$ pertains to an adoption event and -1 if the stack $h$ pertains to a repeal event:

$$Y_{it} = \alpha + \sum_{k \in (-5, -4, \ldots, 3, 4)/(-1)} \beta_k I[t = \psi_h + k]\theta_h + \gamma' X_{it} \sum_{j \in M} I(h = j) + \delta_{ih} + \lambda_{th} + \epsilon_{ith}$$

The stacked-regression approach relies on a dataset constructed of many treatment event-specific datasets that include only the treated groups and "clean" control groups. Among many new estimators that are robust to heterogeneous treatment effects, the stacked-regression estimator has many attractive properties that make it suitable for our empirical setting. First, the stacked-regression estimator is flexible to the non-absorbing treatment setting and allows us to select the control groups that would be expected to most closely predict the counterfactual path of the treatment group. The estimator is also easily adaptable to include interaction terms to study the treatment's effectiveness conditional on a second variable. Additionally, the stacked-regression estimator, like many new robust estimators, relies on weaker assumptions in the inclusion of covariates than traditional two-way fixed effects estimators. In particular, the stacked-regression restricts covariate estimation to only the time period of each stack, rather than assuming a uniform estimate of impact of a selected covariate across all group-time observations in the data. Lastly, while the other new estimators that correct for bias in TWFE are restricted to OLS models, the stacked estimator allows for Poisson regression as well.

## 4   Results

### 4.1   Main Specification

We begin by estimating the effect of purchase delay laws on the firearm suicide rate of the entire adult population as well as within three age groups: the young (21-34), middle-aged (35-54), and old (55+) age groups. Table 1 presents these results from both our preferred stacked estimation approach as well as results using a traditional (non-stacked) TWFE estimation approach.[9] The estimates presented in Table 1 and throughout the paper (unless otherwise noted) use incident-rate-ratios (IRRs) for ease of interpretation.

---

changes our results.

[9]The non-stacked TWFE estimation follows a specification similar to stacked estimates. The general regression equation for the non-stacked estimation is: $Y_{it} = \alpha + \beta PurchaseDelay_{it} + \chi'_{it} + \delta_i + \lambda_t + \epsilon_{it}$.

Exhibit 10
0477

**Table 1:** Purchase Delay Laws Effect on Firearm Suicide by Age Group, 1987-2019

|  | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| **Stacked Results** | | | | |
| Handgun Purchase Delay | 0.967* | 0.939** | 0.973 | 0.976 |
|  | (0.013) | (0.019) | (0.019) | (0.018) |
| Age | All Adults 21+ | Young | Middle Aged | Old |
| N | 25580 | 25580 | 25580 | 25560 |
|  | (1) | (2) | (3) | (4) |
| **Non-Stacked TWFE Results** | | | | |
| Handgun Purchase Delay | 0.930*** | 0.905*** | 0.897*** | 0.943** |
|  | (0.014) | (0.020) | (0.020) | (0.017) |
| Age | All Adults 21+ | Young | Middle Aged | Old |
| N | 24849 | 24849 | 24849 | 24849 |

$^{***}p < 0.01$, $^{**}p < 0.05$, $^{*}p < 0.1$

Note: County-level Poisson panel data estimates with state and year fixed effects, 1987-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models include covariates as described in Section II. All regressions use population as an exposure variable.

Because our research design exploits the staggered adoption and repeal of purchase delay laws, a traditional non-stacked TWFE estimator is vulnerable to bias for the reasons stated in Section III. Although the bias can theoretically favor any direction, Table 1 reveals that using a non-stacked estimator substantially overstates the beneficial impact of purchase delay laws on reducing firearm suicides. While our non-stacked results are not directly comparable to those of previous papers studying the impact of purchase delay laws because of our county-level data, Poisson regression specification, and slightly different time period and covariates, our results provide suggestive evidence that prior research on purchase delay laws may have yielded biased estimates due to invalid comparisons embedded within the TWFE estimator.

Given the flaws in the non-stacked TWFE estimator, for the remainder of the paper, we only discuss results from our preferred stacked estimator. For the overall adult population, we find that the presence of a purchase delay decreases the incidence of firearm suicide by a modest yet statistically significant 3.3% (IRR=.967). This overall estimate, however, masks heterogeneity of effect size by age, as shown by columns (2) through (4). The overall effect on adults is driven largely by the young age group, whose estimate is almost two times as large as the overall population: adults aged 21-34 experience a 6.1% (IRR=.939) drop in firearm suicide.[10] For middle-aged and

[10] A two sample t-test confirms that the drop in firearm suicides due to handgun purchase delay laws is statistically

Exhibit 10
0478

older adults, we estimate weaker, non-statistically significant effects. In the Appendix, we show that purchase delay laws have a null effect on non-firearm suicide, providing evidence that there are minimal spillover effects of handgun purchase delays into non-firearm suicides. That is, individuals are not resorting to other means to commit suicide, and the reduction in suicides by purchase delay laws is an absolute decrease in total suicides.

In Figure 1, we also present event plots corresponding to the analyses in Table 1.[11] We find no evidence of non-parallel pre-trends across age groups.[12]

**Figure 1:** Purchase Delay Laws Effect on Firearm Suicide by Age Group, 1987-2019, Poisson Stacked Event Plot



Note: 95 percent confidence intervals with cluster-robust standard errors displayed.

## 4.2    Triple-Difference Estimation

To confirm that our results are not driven by trends in risky behaviors like suicide relative to adoption or repeal of handgun purchase delay laws, we introduce a novel triple-difference stacked regression approach. Our triple-difference analysis compares the effect of handgun purchase delay laws on trends in firearm suicides and arrests made for driving under the influence (DUI). We argue that DUI arrests reflect a risky behavior that may proxy for the underlying level of the self-endangering "acquired capability" for suicide that is described in Joiner (2007). We prefer to use

---

[11]To clarify the figure visually, we run event study analyses for young adults and all other adults rather than having four different event study analyses corresponding to the four columns of Table 1. The event studies directly corresponding to each column of Table 1 are qualitatively similar and are available upon request.

[12]The p-value on the F-test of pre-passage dummies is p=0.60 and p=0.62 for the young adults and all other adults respectively.

Exhibit 10
0479

DUI arrests because they do not vary significantly over time, unlike many other lower-level arrests.[13] Our triple-difference specification assumes that the rate of firearm suicides would have evolved in parallel with the rate of DUI arrests in a county, were it not for the adoption or repeal of a purchase delay. This design flexibly absorbs state-year shocks unrelated to purchasing law changes such as economic conditions or national changes in suicidality.

We aggregate age-specific arrest data from the FBI's Uniform Crime Reporting (UCR) Program (Kaplan, 2021$b$) from the agency-level up to the county-level, following a conservative imputation procedure for missing months and dropping agencies that do not report all sample years, as outlined in the Appendix. We estimate the triple-difference using the following equation:

$$Y_{itd} = \alpha + \beta \cdot PurchaseDelay_{it} \cdot I\{d = FS\} + \delta_{ihd} + \lambda_{ith} + \sigma_{dth} + \epsilon_{ithd}$$

where $d$ represents whether the outcome being observed is firearm suicides (FS) or DUIs.

Results from our stacked-regression approach are displayed in Table 2. The event-study plot is shown in the Appendix. We find that our triple-difference results are consistent with and buttress the findings from our main stacked specification in Table 1. Young adults aged 21-34 see a large, significant drop in firearm suicides of roughly 10% while the depressing effect of purchase delay laws on suicides for older adults is far more muted and not statistically significant.

**Table 2:** Purchase Delay Laws Effect on Firearm Suicide, 1987-2019, Triple Difference Stacked Estimates

|                        | (1)            | (2)       | (3)          | (4)      |
|------------------------|----------------|-----------|--------------|----------|
| Handgun Purchase Delay | 0.953          | 0.897***  | 0.960        | 0.972    |
|                        | (0.034)        | (0.038)   | (0.038)      | (0.043)  |
| Age                    | All Adults 21+ | Young     | Middle Aged  | Old      |
| N                      | 31520          | 31320     | 31480        | 31200    |

***$p < 0.01$, **$p < 0.05$, *$p < 0.1$

Note: County-level Poisson panel data estimates with state and year fixed effects, 1987-2019. Cluster-robust standard errors with clustering at the state-level shown in parentheses. Due to lack of DUI observations for treated groups, we do not include the 2001 or 2009 treatment events in our triple difference analysis.

---

[13]Other potential control groups could have been non-firearm suicides, drug overdoses, or deaths due to alcoholic liver disease. Case and Deaton (2020) have considered suicides, drug overdoses, and deaths due to alcoholic liver disease collectively to be "deaths of despair'," making these other categories of deaths seem like viable control groups. However, using non-firearm suicides in our triple-difference specification would be problematic due to potential spillover effects that would bias results away from zero (although we find no evidence of substantial spillover). Additionally, deaths by alcoholic liver disease are not a practical outcome given our interest in age-specific suicide risk because young people very rarely die of cirrhosis or other alcoholic liver diseases, making this an inappropriate comparison given our interest in age-specific suicide risk. Finally, drug overdoses display significant trends over our study period due to the crack and opioid epidemics. Thus, we opt not to rely on any of the categories traditionally classified as deaths of despair.

Exhibit 10
0480

## 4.3   Single Age Estimation

The age groups presented in our Table 1 and Table 2 analyses were based on data availability in our *county*-level population data. However, we now show that our results showing the increased effectiveness of purchase delay laws on reducing firearm suicide in young adults are not simply an artifact of these age cutoffs. To do this, we run our preferred specification for each individual age at the *state*-level.[14] In Figure 2, we plot coefficients of purchase delay laws for every age between 21-85 using a state-year panel. The resulting regression line shows that purchase delay laws dampen suicides for the youngest adults by about 9 percent but the effect falls to zero by around age 75.[15] The figure provides compelling evidence of the relationship between impulsive suicide and age. The suicide-dampening effect of purchase delay laws subsides as age increases, demonstrating that however we set age group cutoffs, the effect is most prominent for young people.

**Figure 2:** Purchase Delay Laws Effect on Firearm Suicide by Single Age at State Level, 1987-2019



Note: State-level panel data Poisson estimates with state and year fixed effects, 1987-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. All models include covariates as described in Section II, with coefficients reported per single age. All regressions use population as an exposure variable.

---

[14]We use the same model as we used for our county-level results shown in Table 1. While we still control for socioeconomic and demographic conditions, we use slightly different covariates due to data availability. In the state level regressions, we control for: the presence of a required background check for firearm purchase from a federally licensed dealer, ethanol consumption, percent of individuals living in metropolitan statistical areas, household income per capita, percent of individuals who are Black, and population as an exposure variable. We perform this analysis at the state-level to increase the average population of our geographic unit of analysis since studying single ages will dramatically reduce the population represented by each observation.

[15]The slope of the fitted line is .001 with a p-value of .001.

Exhibit 10
0481

## 4.4   Gun Ownership and Effect Size

For purchase delay laws to work, we assume that individuals do not already have a firearm accessible to them and must purchase a new firearm. One possible omitted variable that we are not able to control for in the county-level results is a measure of gun prevalence. It could be that young people are mechanically most impacted by purchase delays because they have a lower level of pre-existing household gun ownership. However, we now show that our results hold at the state-level when we for gun ownership.[16] We consider how the effectiveness of purchase delay laws vary by *both age and household gun ownership*. We use a dataset at the state-age group-year observation level[17] and run the following interaction models shown in columns 1 and 2 of Table 3, respectively:

$$Y_{stk} = \alpha + \beta_1 x_1 + \beta_2 x_2 + \beta_3 x_1 x_2 + \beta_4 x_1 o + \beta_5 x_1 m + \sum_{j \in M} \gamma'_h \chi_{it} I(h = j) + \delta_{skh} + \lambda_{tkh} + \epsilon_{stkh}$$

$$Y_{stk} = \alpha + \beta_1 x_1 + \beta_2 x_2 + \beta_3 x_1 x_2 + + \beta_4 x_1 p + \sum_{j \in M} \gamma'_h \chi_{st} I(h = j) + \delta_{skh} + \lambda_{tkh} + \epsilon_{stkh}$$

where $Y_{stk}$ represents the logged firearm suicide rate in state $s$ in year $t$ in age-group $k$, $x_1$ is equal to $PurchaseDelay_{st}$ as shown in previous equations; $x_2$ is equal to household gun ownership at time $t$ for age group $k$ in state $s$; $o$ represents a dummy variable equal to 1 for the old age group and 0 for all other groups; $m$ represents a dummy variable equal to 1 for the middle age group and 0 for all other groups; and $p$ is a dummy variable equal to 0 for the young adult age group, 1 for the middle-aged group, and 2 for the old age group. The second model assumes an equal gap between the young, middle-aged, and older adults, as is implied by Figure 2, whereas model 1 uses a more flexible approach. Because the unit of analysis is at the state-age bucket level rather than the county-age bucket level, we opt to use a OLS regression instead of a Poisson estimation. We weight our regression by population.

---

[16]We note that throughout the 1980s and 1990s, which includes the time period of the Brady Act waiting period that contributes a substantial part of the treatment variation in our data, household gun ownership rates were not meaningfully different for young adults and elderly adults.

[17]Reliable and nationally representative measures of gun ownership are only available at the state level, requiring us to move to the state level rather than the county level. For reference, when weighted by state population, the mean gun ownership in our sample is 37% with a standard deviation of 3.5%.

Exhibit 10
0482

**Table 3:** Purchase Delay Laws Effect on Firearm Suicide by Age Group and Gun Ownership at State Level, 1987-2019, OLS Stacked Estimates

|  | (1) | (2) |
|---|---|---|
| Handgun Purchase Delay | -0.158*** | -0.161*** |
|  | (0.043) | (0.043) |
| Gun Ownership | -0.002* | -0.002* |
|  | (0.001) | (0.001) |
| Middle Effect (Relative to Young) | 0.019 |  |
|  | (0.037) |  |
| Old Effect (Relative to Young) | 0.054 |  |
|  | (0.038) |  |
| Gun Ownership x Handgun Purchase Delay | 0.002** | 0.002** |
|  | (0.001) | (0.001) |
| Effect As Age Bucket Increases |  | 0.028 |
|  |  | (0.019) |
| Observations | 4050 | 4050 |

*** $p < 0.01$, ** $p < 0.05$, * $p < 0.1$

Note: State-age group level panel data estimates, 1987-2019. Cluster-robust standard errors with clustering at the state level shown in parentheses. Gun ownership is not controlled for separately for each individual stack, but rather a single variable across all stacks, for purposes of presentation. When we control for gun ownership separately by stack, we find similar results on each coefficient. Note that the estimates shown here are not IRRs.

These results suggest that even controlling for gun ownership, purchase delay laws have a strong negative effect on suicides. The results also support the conclusion that the effect weakens as age increases, although using our state-level panel makes it more difficult to precisely measure these effects. Overall, the findings provide evidence consistent with the public health and medical literatures suggesting suicide is an impulsive act for young people and access to a firearm eases barriers for them to commit suicide.

### 4.5   Further Robustness

In addition to providing evidence supporting the conclusion that our main results are robust to underlying trends in firearm suicides (relative to handgun purchase delay law adoption or repeal), varied age cutoffs, and variation in household gun ownership rates, we perform a battery of further robustness checks to confirm the validity of our findings in the Appendix. We use alternate covariates and clustering variables and find qualitatively similar results. We also show that the effects we

Exhibit 10
0483

identify are not driven by a few large counties that may be outliers. Further, we show that other demographic variables such as race and gender are relatively stable across young, middle aged, and older adult suicides, indicating that the heterogenous effects we identify by age are likely not due to confounding by another demographic variable. Moreover, our paper, like all prior studies of handgun purchase delay laws, combines the study of both the adoption and repeal of purchase delay laws. In the Appendix, we provide evidence that these effects are roughly reciprocal and can be studied simultaneously. Lastly, we show that our results hold at the state-level.

# 5   Conclusion

Our paper makes three significant contributions to the economics literature on the effect of handgun purchase delay laws on firearm suicide and impulsivity in firearm suicide. First, it adds to the mounting literature documenting bias in estimates from two-way-fixed-effects models and uses a stacked regression approach to address this issue. Our analysis found that this bias was fairly substantial. Specifically, we find that two-way fixed effects models estimate larger effect sizes than those using a stacked regression approach, which suggests that prior literature on the topic may have inflated the magnitude of the benefits of handgun purchase delay laws as a policy intervention in reducing firearm suicide. Second, we use triple-difference stacked estimation to demonstrate the robustness of our main findings, the first paper that we know of to use this technique. Our stacked triple-difference estimator can be flexibly deployed across many empirical settings and overcomes a separate threat to identification that cannot be addressed simply by using a stacked regression difference-in-differences approach. Third, by breaking down the traditional analysis of purchase delay laws and suicide into age groups within our stacked approach, we were able to identify substantial heterogeneity by age group – establishing that the primary benefit of purchase delay laws is to significantly reduce suicides by young adults. In doing so, we are the first study to quasi-experimentally identify and estimate the relationship between age and suicide impulsivity, confirming many hypotheses of the relationship with estimates.

Our paper adds support to the idea, so far understudied by economists, that young people are impulsive in their decision to commit suicide. Our empirical approach also indicates that more research on suicide should test for heterogenous treatment effects by age group. Doing so may provide additional clarity and robustness to researchers as well as important information to policymakers. There are also rich opportunities for further research. For example, to confirm the suicide-impulsivity hypothesis beyond firearm suicide, researchers may look at policies associated with non-firearm suicide by age. Ultimately, further research into understanding how different populations are affected by suicide prevention policies will help policymakers carefully tailor their approach to suicide prevention and more effectively fight this public health crisis.

Exhibit 10
0484

# References

**Anestis, Michael, Kelly Soberay, Peter Gutierrez, Theresa Hernández, and Thomas Joiner.** 2014. "Reconsidering the Link Between Impulsivity and Suicidal Behavior." *Personality and Social Psychology Review*, 18(4).

**Baker, Andrew.** 2022. "How much should we trust staggered difference-in-differences estimates?" *Journal of Financial Economics*, 144(2): 370–395.

**Becker, Sascha, and Ludger Woessman.** 2018. "Social Cohesion, Religious Beliefs, and the Effect of Protestantism on Suicide." *Review of Economics and Statistics*, 100(3): 377–391.

**Breuer, Christian.** 2014. "Unemployment and Suicide Mortality: Evidence from Regional Panel Data in Europe." *Health Economics*, 24(8): 936–950.

**Case, Anne, and Angus Deaton.** 2020. *Deaths of Despair and the Future of Capitalism.* Princeton University Press.

**CDC.** 2023. *Facts About Suicide.* CDC.

**Cengiz, Doruk, Arindrajit Dube, Attila Lindner, and Ben Zipperer.** 2019. "The Effect of Minimum Wages on Low-Wage Jobs." *The Quarterly Journal of Economics*, 134(3): 1405–1454.

**Census.** 2023. "Census Data." *Social Explorer.*

**Cherney, Samatha, Andrew Morral, Terry Schell, Sierra Smucker, and Emily Hoch.** 2022. "Development of the RAND State Firearm Law Database and Supporting Materials." *RAND.*

**Christian, Cornelius, Lukas Hensel, and Christopher Roth.** 2019. "Income Shocks and Suicides: Causal Evidence From Indonesia." *The Review of Economics and Statistics*, 101(5): 905–920.

**Conner, Kenneth, Sean Meldrum, William Wieczorek, Paul Duberstein, and John Welte.** 2004. "The Association of Irritability and Impulsivity with Suicidal Ideation Among 15- to 20-Year-Old Males." *Suicide and Life-Threatening Behavior*, 4(34): 337–349.

**Cook, Philip J, and Jens Ludwig.** 2000. "Homicide and Suicide Rates Associated With Implementation of the Brady Handgun Violence Prevention Act." *JAMA*, 284(5): 585–591.

**Coppersmith, Daniel, Oisín Ryan, Rebecca Fortgang, Alexander Milner, Evan Kleiman, and Matthew Nock.** 2023. *Mapping the timescale of suicidal thinking.* Vol. 120, PNAS.

**Daly, Mary, Daniel Wilson, and Norman Johnson.** 2013. "Relative Status and Well-Being: Evidence from U.S. Suicide Deaths." *The Review of Economics and Statistics*, 95(5): 1480–1500.

Exhibit 10
0485

**Depew, Briggs, and Isaac Swensen.** 2022. "The Effect of Concealed-Carry and Handgun Restrictions on Gun-Related Deaths: Evidence from the Sullivan Act of 1911." *The Economic Journal*, 132(646): 2118–2140.

**Dube, Arindrajit, Daniele Girardi, Òscar Jordá, and Alan Taylor.** 2023. "A Local Projections Approach to Difference-in-Differences Event Studies." *NBER*.

**Dumais, A., A.D. Lessage, M. Alda, G. Rouleau, M. Dumont, N. Chawky, M. Roy, J.J. Mann, C. Benkelfat, and Gustavo Turecki.** 2005. "Suicide Impulsivity and Age: Evidence from Handgun Purchase Delay Laws." *The American Journal of Psychiatry*, 162(11): 2116–2124.

**Edwards, Griffin, Erik Nesson, Joshua Robinson, and Frederick Vars.** 2017. "Looking Down the Barrel of a Loaded Gun: The Effect of Mandatory Handgun Purchase Delays on Homicide and Suicide." *TheEconomic Journal*, 128(616): 3117–3140.

**Goodman-Bacon, Andrew.** 2021. "Difference-in-differences with variation in treatment timing." *Journal of Econometrics*, 225(2): 254–277.

**HHS.** 2023. "988 Suicide and Crisis Lifeline Adds Spanish Text and Chat Service Ahead of One-Year Anniversary."

**Joiner, Thomas.** 2007. *Why People Die by Suicide*. Harvard University Press.

**Kaplan, Jacob.** 2021a. "Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends 1977-2018." *Data Set. Inter-University Consortium for Political and Social Research*.

**Kaplan, Jacob.** 2021b. "Jacob Kaplan's Concatenated Files: Uniform Crime Reporting Program Data: Offenses Known and Clearances by Arrest, 1960-2019." *Data Set. Inter-University Consortium for Political and Social Research*.

**Lang, Matthew.** 2012. "Firearm Background Checks and Suicide." *The Economic Journal*, 123(573): 1085–1099.

**Lang, Matthew.** 2013. "The impact of mental health insurance laws on state suicide rates." *Health Economics*, 22(1): 73–88.

**Luca, Michael, Deepak Malhotra, and Christopher Poliquin.** 2017. "Handgun waiting periods reduce gun deaths." *PNAS*, 114(46): 12162–12165.

**Mccullumsmith, Cheryl, David Williamson, Roberta May, Emily Bruer, David Sheehan, and Larry Alphs.** 2014. "Simple Measures of Hopelessness and Impulsivity are Associated with Acute Suicidal Ideation and Attempts in Patients in Psychiatric Crisis." *Innovations in Clinical Neuroscience*, 11(9-10): 47–53.

**McGirr, A, AJ Renaud, A Bureau, M Seguin, A Lesage, and G Turecki.** 2008. "Impulsive-aggressive behaviours and completed suicide across the life cycle: a predisposition for younger age of suicide." *Psychological Medicine*, 38(3): 407–417.

Exhibit 10
0486

**McLone, Suzanne, Anagha Loharikar, Karen Sheehan, and Maryann Mason.** 2016. "Suicide in Illinois, 2005-2010: A reflection of patterns and risks by age groups and opportunities for targeted prevention." *Journal of Trauma and Acute Care Surgery*, 81(4): S30–5.

**Roth, Jonathan, Pedro H.C. Sant'Anna, Alyssa Bilinski, and John Poe.** 2023. "What's trending in difference-in-differences? A synthesis of the recent econometrics literature." *Journal of Econometrics*, 325(2): 2218–2244.

**Ruggles, Steven, Sarah Flood, Matthew Sobek, Danika Brockman, Grace Cooper, Stephanie Richards, and Megan Schouweiler.** 2023. "IPUMS: USA: Version 13.0 [dataset]." *IPUMS*.

**Schell, Terry, Samuel Peterson, Brian Vegetabile, Adam Scherling, Rossana Smart, and Andrew Morral.** 2020. "State-Level Estimates of Household Firearm Ownership." *RAND*.

**Smith, Tom, and Jaesok Son.** 2015. "Trends in Gun Ownership in the United States, 1972-2014." *General Social Survey Final Report*.

**Stevenson, Betsey, and Justin Wolfers.** 2006. "Bargaining in the Shadow of the Law: Divorce Laws and Family Distress." *Quarterly Journal of Economics*, 121(1): 267–288.

**Wooldridge, Jefferey.** 1999. "Distribution-free estimation of some nonlinear panel data models." *Journal of Econometrics*, 90(1): 77–97.

Exhibit 10
0487

# Exhibit 11

Exhibit 11
0488

# JEWELL'S DIGEST

OF THE

# CITY ORDINANCES,

TOGETHER WITH THE

CONSTITUTIONAL PROVISIONS, ACTS OF THE GENERAL ASSEMBLY
AND DECISIONS OF THE COURTS RELATIVE TO
THE GOVERNMENT

OF THE

# CITY OF NEW ORLEANS.



BY  AUTHORITY  OF  THE  CITY  COUNCIL.

COMPILED AND PUBLISHED BY EDWIN L. JEWELL,
ATTORNEY AT LAW.

NEW ORLEANS.
1882.

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

Exhibit 11
0489



THE NEW YORK
PUBLIC LIBRARY
622057
ASTOR, LENOX AND
TILDEN FOUNDATIONS
R          19:4          L



Entered according to Act of Congress in the year 1881, by

EDWIN L. JEWELL,

In the Office of the Librarian of Congress at Washington.

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

Exhibit 11
0490

# LAWS AND ORDINANCES

### OF THE

# CITY OF NEW ORLEANS.

### I TITLE.

## AMUSEMENTS.

#### CHAPTER FIRST.

### GENERAL ORDINANCES.

ARTICLE 1. That hereafter it shall not be lawful for any person to carry a dangerous weapon, concealed or otherwise, into any theatre, public hall, tavern, pic-nic ground, place for shows or exhibitions, house or other place of public entertainment or amusement.

*Concealed weapons or otherwise in halls or theatres. May, 1879. A. S. 5045.*

ART. 2. That any person violating the provisions of the first section of this ordinance, by carrying a dangerous weapon, not concealed, into any of the places designated in said section, shall be subject to the payment of a fine not exceeding twenty-five dollars, or to imprisonment in the parish prison not to exceed twenty days, to be imposed by the Recorder within whose jurisdiction the offense is committed.

*Penalty. Ibid.*

ART. 3. That any person violating the provisions of the first section of this ordinance by carrying a dangerous weapon concealed about his person, in any of the places designated in said section, shall be arrested and prosecuted for violation of the law relative to the carrying of dangerous weapons concealed about the person.

*Penalty. Ibid.*

ART. 4. That the Chief of Police and the members of the police force of the city of New Orleans be charged with the enforcement of this ordinance, and to that end they are authorized and required to examine all persons entering any of the places specified in section one of this ordinance, and to arrest and prefer the proper charge against all persons violating this ordinance.

*Police to enforce ordinance. Ibid.*

ART. 5. That the provisions of this ordinance shall not apply to the officers and members of military organizations, when acting as such, nor to the carrying of arms or weapons intended to be used in any show, exhibition or other entertainment.

*Military organizations excepted.*

Generated on 2023-07-06 12:08 GMT / http://hdl.handle.net/2027/nyp.33433014832978
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

Exhibit 11
0491

Copy of this ordinance to be posted.
Dec..1856.
O. S. 3131.

ART. 6. That a printed copy of the ordinances concerning public balls, theatres and public exhibitions, be placed in a conspicuous position within the enclosure of said balls, theatres and public exhibitions, for the purpose of reference; and, that in case of neglect or refusal of the managers or owners of such places to comply with the provisions of this section, they shall be liable to a fine of fifty dollars for said offence, recoverable before any court of competent jurisdiction; and the police officers on duty shall compel the owners of the balls, theatres, etc., to close for that night.

## CHAPTER SECOND.
### BALLS.

Permission to be obtained for balls.
May, 1859.
O. S. 4532.

ART. 7. It shall not be lawful for any person or persons to give, within the limits of the city, any public balls, of whatsoever description, under the penalty of fifty dollars fine for each and every contravention, unless permission, in writing, be previously obtained from the Mayor to give said ball or balls, and after payment of license tax.

Mayor to close balls.
Ibid.

ART. 8. Whenever the foregoing provision shall be violated, it shall be the duty of the mayor to cause the said ball or balls to be closed immediately by the police.

Duration of the ball. Ibid.

ART. 9. Every person giving a public ball, who shall prolong the duration of the same beyond the hour fixed by the Mayor's permit, shall pay a fine of twenty-five dollars for each and every such offence.

License for public balls.
Ibid.

ART. 10 That the Mayor of the city of New Orleans be, and he is hereby requested not to issue in future any license to parties asking for them, to give public balls, when such balls are knowingly derogatory to public morals and decency, or in anywise considered a public nuisance.

## CHAPTER THIRD.
### THEATRES.

Permission and tax.
May, 1859.
O. S. 4582.

ART. 11. No person shall exhibit or cause to be exhibited any dramatic composition, ballet, pantomime or other performance of that kind, in any theatre in the city where all persons are admitted for their money, nor shall any person entertain the public with any display of fire-works, without having obtained from the Mayor permission for that purpose, and paid the tax thereon, under a penalty of a fine of twenty-five dollars for every such offence; and the said permission shall express the object and the length of time for which it is granted.

Digitized by Google

Original from
NEW YORK PUBLIC LIBRARY

Exhibit 11
0492

# An Ordinance.

## Concerning the carrying of Arms or Deadly Weapons.

Be it ordained by the City Council of the City of San Antonio.

SECTION 1. That if any person shall, within the Corporate limits of the City of San Antonio, go into any church, or religious assembly, any school-room, or other place where persons are assembled, for educational, literary or scientific purposes, or into any ball room, social or wedding party, or other assembly or gathering, for amusement or instruction, composed of males and females, or to any election precinct in the city, on the day or days of any election, or into any Court room or court of Justice, or to any other place where people or individuals may be assembled, to perform any public duty, or shall go into any other public assembly, or shall enter any barroom, drinking saloon or any other place where people resort for business or amusement, or shall join or accompany any public procession, having about his or her person, a bowie-knife, dirk, or butcher-knife or any fire-arms or arms, whether known as six-shooter, gun or pistol of any kind, or having about his or her person, what is known as brass-knuckles, slung shot, club, loaded or sword cane, or any other weapon of offence or defence. Such person shall be deemed guilty of a misdemeanor, and upon conviction thereof, before the Recorder of the city, shall be fined not less than five dollars nor more than one hundred dollars and costs, and in default of payment, shall be confined in the city prison, or placed at hard labor on the public works of the city, for not less than five days, nor more than thirty days, to be determined by the Recorder; Provided, this Ordinance shall not apply to any legally authorized conservator of the peace, when he may be in the lawful discharge of his duty.

SEC. 2. It shall be the duty of the Police of the city to strictly enforce this Ordinance, and promptly to arrest and disarm any person violating the same; Provided, that in all cases where arms are taken possession of by the police, as herein provided, they shall be returned to the owner when he leaves the city.

SEC. 3. This ordinance shall take effect and be in force from and after its publication.

Approved, San Antonio, December 14th, A. D. 1870.

WM. C. A. THIELEPAPE,
Mayor City of San Antonio.

Attest :

G. W. BARTHOLOMEW, Jr., City Clerk.

20-12-5d10t.

Exhibit 11
0493