BENBROOK LAW GROUP, PC
BRADLEY A. BENBROOK (SBN 177786)
STEPHEN M. DUVERNAY (SBN 250957)
701 University Avenue, Suite 106
Sacramento, CA  95825
Telephone: (916) 447-4900
brad@benbrooklawgroup.com
steve@benbrooklawgroup.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALISHA CURTIN; DAKOTA ADELPHIA; MICHAEL SCHWARTZ; DARIN PRINCE; NORTH COUNTY SHOOTING CENTER, INC.; JOHN PHILLIPS; PWGG, L.P.; SAN DIEGO COUNTY GUN OWNERS PAC; CALIFORNIA GUN RIGHTS FOUNDATION; FIREARMS POLICY COALITION, INC.; and SECOND AMENDMENT FOUNDATION,<br><br>*Plaintiffs*,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of California; and ALLISON MENDOZA, in her official capacity as Director of the California Department of Justice Bureau of Firearms,<br><br>*Defendants*. | Case No.: 3:23-cv-00793-AGS-AHG<br><br>**PLAINTIFFS' CONSOLIDATED REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: November 15, 2024<br>Time: 2:00 p.m.<br>Courtroom: 5C<br>Judge: Hon. Andrew G. Schopler |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................ ii

INTRODUCTION ................................................................................................ 1

REPLY ARGUMENT .......................................................................................... 2

A.    The Waiting Period Laws Violate The Second Amendment ........................ 2

    1.    Plaintiffs' Proposed Course of Conduct is Protected by the Second Amendment's Plain Text ................................................................... 2

    2.    This Court Should Not Be Enticed by California's Misdirection ........ 4

    3.    The State Cannot Evade Its Burden On The Theory That The Waiting Period Laws Are "Presumptively Lawful" As "Conditions Or Qualifications On The Commercial Sale" of Arms ............................. 6

    4.    The Waiting Period Laws are Inconsistent with the Nation's Historical Tradition of Firearm Regulation ........................................................ 8

        a.    Licensing and Permitting Laws ................................................ 9

        b.    Laws Regulating The Intoxicated, Mentally Ill, and Minors .. 12

B.    The Waiting Period Laws Violate Equal Protection ................................... 14

CONCLUSION ................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*B&L Productions, Inc. v. Newsom*,
  104 F.4th 108 (9th Cir. 2024) ........................................................................... 3

*Baird v. Bonta*,
  81 F.4th 1036 (9th Cir. 2023) ........................................................................... 8

*Bolger v. Youngs Drug Products Corp.*,
  463 U.S. 60 (1983) ......................................................................................... 13

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) .......................................................................... 2, 5, 10, 14

*Erlinger v. United States*,
  144 S. Ct. 1840 (2024) ................................................................................... 11

*Green v. City of Tucson*,
  340 F.3d 891 (9th Cir. 2003) ......................................................................... 14

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
  5 F.4th 407 (4th Cir. 2021) ........................................................................... 7, 8

*Hoffman v. United States*,
  767 F. 2d 1431 (9th Cir. 1985) ...................................................................... 14

*Kev, Inc. v. Kitsap Cnty.*,
  793 F.2d 1053 (1986) ....................................................................................... 3

*Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983) ......................................................................................... 3

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ..................................................................................... passim

*Olson v. California*,
  104 F.4th 66 (9th Cir. 2024) .......................................................................... 15

*Planned Parenthood Arizona, Inc. v. Humble*,
  753 F.3d 905 (9th Cir. 2014) ........................................................................... 3

*Reno v. ACLU*,
  521 U.S. 844 (1997) ....................................................................................... 13

*Rhode v. Bonta*,
  No. 18-cv-802, 2024 WL 374901 (S.D. Cal. Jan. 30, 2024) .......................... 11

*Richmond Newspapers, Inc. v. Virginia*,
  448 U.S. 555 (1980) ......................................................................................... 3

*Teixeira v. Cnty. of Alameda*,
  873 F.3d 670 (9th Cir. 2017) ........................................................................ 2, 5

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*,
  837 F.3d 678 (6th Cir. 2016) ........................................................................... 6

*United States v. Chester*,
  628 F.3d 673 (4th Cir. 2010) ........................................................................... 6

*United States v. Harrison*,
  654 F. Supp. 3d 1191 (W.D. Okla. 2023) ..................................................... 11

*United States v. Hosford*,
  843 F.3d 161 (4th Cir. 2016) ........................................................................... 7

*United States v. Marzzarella*,
  614 F.3d 85 (3rd Cir. 2010) ........................................................................................ 6

*United States v. Rahimi*,
  144 S. Ct. 1889 (2024) ........................................................................................ passim

*Wolford v. Lopez*,
  No. 23-16164, 2024 WL 4097462 (9th Cir. Sept. 6, 2024) ......................... 9, 11, 14

*Zablocki v. Redhail*,
  434 U.S. 374 (1978) ................................................................................................ 14

**Statutes**

Cal. Penal Code §§ 27505(a); 27510 ......................................................................... 13

**Constitutional Provisions**

U.S. CONST. amend. XIV ............................................................................................ 14

# INTRODUCTION

California's 10-day waiting period prevents law-abiding people from taking possession of lawfully acquired firearms for immediate self-defense and other Second Amendment protected purposes, even after the State has completed a background check confirming those individuals are not prohibited from possessing firearms. The State's Waiting Period Laws do not survive the test prescribed by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

Plaintiffs' proposed course of conduct is plainly covered by the text of the Second Amendment. Plaintiffs simply desire to purchase and take possession of firearms. This is covered by the Second Amendment's guarantee that the people have the right to "keep Arms": The Waiting Period Laws prohibit all firearm purchasers from taking possession of arms (*i.e.*, restricting their ability to "have weapons") for a full 10-day period even after California's background check is complete.

California cannot evade its burden on the theory that the Waiting Period Laws are "presumptively lawful" as "conditions or qualifications on the commercial sale" of arms. While the Waiting Period Laws operate to impose restrictions on firearm dealers (by instructing when they may deliver firearms to purchasers) the substance of these regulations is meant entirely to burden consumers (by requiring that they wait long after eligibility is determined to exercise their rights). This is not a "condition" or "qualification" on commercial sales.

Turning to *Bruen*'s historical test, California has failed to meet its burden to show that the Waiting Period Laws are "consistent with the principles that underpin the Nation's regulatory tradition." *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024). No historical tradition of remotely analogous regulation exists: There is no historical principle underlying the Second Amendment that tolerates the government forcing *every single* law-abiding person hoping to acquire a firearm to wait as long as the government decides is appropriate before taking possession. California tries to bolster the record by relying on a series of historical regulations—restrictions on

1 firearms possession by the intoxicated and mentally ill, as well as surety laws and loyalty oaths[1]—that share a key feature that is absent here: An individualized determination that someone is not fit to possess firearms. The Waiting Period Laws, on the other hand, generally apply to every individual and every firearm transaction across the board—and they apply even after the State has determined that an individual is not prohibited from possessing a firearm.

This absence of historical precedent confirms that the Waiting Period Laws violate the Second Amendment. The Court should enter summary judgment in Plaintiffs' favor.

## REPLY ARGUMENT

**A.   The Waiting Period Laws Violate The Second Amendment.**

**1.   Plaintiffs' Proposed Course of Conduct is Protected by the Second Amendment's Plain Text.**

Plaintiffs' proposed course of conduct—to acquire firearms to keep and bear for lawful purposes including immediate self-defense—is plainly covered by the text of the Second Amendment. Specifically, Plaintiffs desire to purchase and take possession of firearms. This is covered by the Second Amendment's guarantee that the people have the right to "keep Arms." As the Supreme Court explained in *Heller*, "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

This commonsense conclusion is buttressed by the Ninth Circuit's recognition that the "Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1061 (S.D. Cal. Apr. 3, 2023) ("[T]he right to keep arms, necessarily involves the right to purchase them[.]"). The

---

[1] The State also relies on laws restricting firearm access to Native Americans and slaves, which is as unsavory as the laws are inapposite.

1  Ninth Circuit's recent decision in *B&L Productions, Inc. v. Newsom* reaffirmed
2  *Teixeira*'s holding as consistent with *Bruen* and explained that the Second
3  Amendment's plain text "prohibits meaningful constraints on the right to acquire
4  firearms." 104 F.4th 108, 118 (9th Cir. 2024). To be sure, prohibiting purchasers from
5  taking possession of firearms after a background check is complete is a "meaningful
6  constraint[]" on Second Amendment protected conduct.[2] The operation of the Waiting
7  Period Laws prevent people from "keep[ing]" or "bear[ing]" firearms until after the
8  10-day period is complete.

9  That the Second Amendment's text covers Plaintiffs' ability to acquire firearms
10  is also consistent with the Supreme Court's longstanding recognition that "certain
11  unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers,*
12  *Inc. v. Virginia*, 448 U.S. 555, 579 (1980). Indeed, the Ninth Circuit has held that
13  delays, increased costs, or "waiting periods" in other contexts implicate court-
14  recognized constitutionally protected rights—even unenumerated ones. *E.g.*, *Planned*
15  *Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 915–17 (9th Cir. 2014) (travel
16  costs and time for clinic visits substantially burdened right to access abortion
17  services); *Kev, Inc. v. Kitsap Cnty.*, 793 F.2d 1053, 1060 (1986) (five-day waiting
18  period for topless dancing license "unreasonably prevent[ed]" exercise of First
19  Amendment rights). Plaintiffs' Second Amendment protected rights are entitled to at
20  least the same measure of solicitude. Put simply, the government cannot restrict
21  constitutionally protected rights indirectly by controlling the means necessary to
22  exercise those rights. *See, e.g.*, *Minneapolis Star & Tribune Co. v. Minn. Comm'r of*
23  *Revenue*, 460 U.S. 575, 585 (1983) (differential tax on paper and ink products
24  consumed by publishers violated First Amendment).

---

[2] The Court must be wary of reading the *B&L Productions* panel's "meaningful constraint" language too loosely, as the Supreme Court has left no doubt that the Second Amendment leaves no room for subjective interest balancing. *Bruen*, 597 U.S. at 22–23.

In short, Plaintiffs' proposed course of conduct is covered by the Second Amendment's plain text and it is therefore "presumptively protect[ed]" by the Constitution. *Bruen*, 597 U.S. at 24.

### 2. This Court Should Not Be Enticed by California's Misdirection.

California tries to dodge the clear issue presented by Plaintiffs—a challenge to California's arbitrary delay on the exercise of their rights—by mischaracterizing the scope of Plaintiffs' challenge and framing their proposed course of conduct here as "immediately" taking possession of a firearm or doing so without any delay at all. Br. 5–6.[3] Not so: As the complaint makes abundantly clear, Plaintiffs seek only to avoid the *arbitrary* delay imposed *after the background check is complete* and the State knows that they are not prohibited from possessing firearms. Compl. ¶¶ 9 & n.3, 43, 45–46, 69–71; Prayer for Relief, ¶¶ 1, 3. To that end, the fact that the Second Amendment's text covers Plaintiffs' conduct is demonstrated by the operation of the Waiting Period Laws themselves: They prohibit all firearm purchasers from taking possession of arms (*i.e.*, restricting their ability to "have weapons") for a full 10-day period even after the background check is complete. These regulations thus impact Plaintiffs' ability to "keep arms" secured by the plain text.

Moreover, the State tries to skew *Bruen*'s initial focus on the "plain text" by claiming that "historical context" can demonstrate that a plaintiff's proposed course of conduct falls outside of the Second Amendment's protection. Br. 6. This is wrong. First, although California quotes *Bruen*'s language, this snippet is taken from the Court's discussion—and rejection—of the old "two-step" tiers-of-scrutiny approach developed by the Courts of Appeals. 597 U.S. at 18. Second, the State's approach puts cart before horse in purporting to look at history to answer the basic question whether

---

[3] The State tries to bolster its argument by relying on a few out-of-circuit district court decisions holding that the plain text does not cover conduct impacted by waiting periods. *See* Br. at 1 n.1 & 5–6. At bottom, each case boils down to the simplistic conclusion that Second Amendment says "keep and bear," and not "buy" or "acquire." The reasoning in these cases is inconsistent with the Ninth Circuit's holding in *Teixeira* and defies the Supreme Court authority discussed above.

the Second Amendment's plain text is implicated by Plaintiffs' proposed conduct. *Bruen*'s simple framing of the conduct at issue in that case—"carrying handguns publicly for self-defense," *id.* at 4—demonstrates that determining whether a plaintiff's proposed conduct is covered by the Second Amendment's text is far simpler than the State makes it out to be.

### 3. The State Cannot Evade Its Burden On The Theory That The Waiting Period Laws Are "Presumptively Lawful" As "Conditions Or Qualifications On The Commercial Sale" of Arms.

The State next argues that the Waiting Period Laws are "presumptively lawful" because they are "laws imposing conditions and qualifications on the commercial sale of arms." Br. 7 (quoting *Heller*, 554 U.S. at 626–27 & n.26). Even if this law is such a regulation (it is not), *Bruen* rejected a categorical approach and clarified that, when regulated conduct is covered by the text, the regulation "[o]nly" survives if it is "consistent with this Nation's historical tradition" of firearms regulation. 597 U.S. at 17. The State asserts that *Heller*'s list of "presumptively lawful regulatory measures" are exempt from *Bruen*'s test, but *Bruen* shows otherwise. *Heller*'s list includes "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings," 554 U.S. at 626, and *Bruen* expressly rejected any suggestion that the government's designation of a new and different place as "sensitive" creates a legal presumption in its favor. Rather, the government must still demonstrate, just as with any other firearm regulation, that sensitive place restrictions are consistent with the Nation's history of firearm regulations. *See Bruen*, 597 U.S. at 30 (courts should "use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible").[4]

---

[4] For its part, the Ninth Circuit has called *Heller*'s discussion about such "presumptively lawful" regulations "opaque." *Teixeira*, 873 F.3d at 683. And even in *Teixeira*'s now-discredited two-step analysis of county zoning requirements, the en banc Court refused to "rely[] on [that language in *Heller*] alone to dispose of" the case, *id.* at 683, like the State requests here.

*Heller* "did not invite courts onto an analytical off-ramp to avoid constitutional analysis" or insulate firearms regulations from constitutional scrutiny. *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686–87 (6th Cir. 2016); *see also United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3rd Cir. 2010) ("If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.").[5] Instead, following *Bruen*, *Heller*'s list of "presumptively lawful" regulations should be understood as a set of regulations that the Court assumed would prove constitutional to some extent, *after the proper historical analysis was completed*. In other words, nothing about *Heller*'s use of the word "presumptively" indicates courts can simply skip the historical analysis *Bruen* prescribes or apply a burden-shifting "presumption" in the government's favor. To the contrary, *Bruen* twice emphasized the legal presumption that actually applies in its test: "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct," and "only" after conducting the necessary historical analysis, where the government bears the burden, "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" 597 U.S. at 17, 24 (citation omitted).

In this vein, the State again leans on *B&L Productions* to assert that the Waiting Period Laws are commercial restrictions that fall outside of the Second Amendment's plain text. Even accepting the mode of analysis prescribed by the panel,[6] the Waiting Period Laws "meaningfully impair[] an individual's access to firearms," 104 F.4th at

---

[5] Moreover, "treat[ing] *Heller*'s listing of 'presumptively lawful regulatory measures,' for all practical purposes, as a kind of 'safe harbor,'" as some courts have done, "'approximates rational-basis review, which has been rejected by *Heller*.'" *Tyler*, 837 F.3d at 686 n.6 (quoting *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010)). Indeed, *Bruen* rejected any scrutiny inquiry at all in favor of historical analysis.

[6] As noted above, the panel's adoption of a "meaningful constraint" standard invites mischief by opening the door for courts to engage in the unrestrained interest balancing that the Supreme Court has repeatedly made clear has no place in Second Amendment analysis.

119, because they impose an across-the-board restriction that prohibits all purchasers in California from taking possession of firearms for 10 days even after the background check is complete. *Cf. id.* (holding that a state law prohibiting gun shows on state property and fairgrounds imposed a "minor constraint" on Second Amendment protected rights because there were several firearm dealers in the affected zip code such that "individuals . . . can acquire the same firearms down the street"). This is a statewide law that imposes a significant burden on every one of the millions of firearms transactions that occur each year.

In any event, the Waiting Period Laws manifestly are *not* "qualifications or conditions on the commercial sale of arms," so the import of this passage from *Heller* is entirely academic. Consider the Fourth Circuit's decision *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407 (4th Cir. 2021), vacated as moot on other grounds, 14 F.4th 322 (4th Cir. 2021), which dealt with federal statutes that prohibit already-licensed firearms dealers from selling handguns and handgun ammunition to anyone under the age of 21. The Fourth Circuit rejected the government's reliance on *Heller*'s "presumptively lawful" passage and observed that "[a] condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records"—classic examples of "conditions" and "qualifications" that apply to "commercial" actors. 5 F.4th at 416. *Hirschfeld* further emphasized that "a law's substance, not its form, determines whether it qualifies as a condition on commercial sales." *Id*. at 416 (citing *United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016)). And while the Waiting Period Laws operate to impose restrictions on firearm dealers (by instructing when they may deliver firearms to purchasers) the substance of the regulation is meant entirely to burden consumers (by requiring that they wait long after eligibility is determined to exercise their rights). The State cannot

1  dispute this point since its entire defense of the Waiting Period Laws—albeit
2  irrelevant under *Bruen*—is that they further the policy of "cooling off" consumers.[7]

3  So here, just like the dealer in *Hirschfeld*, dealers in California have jumped
4  through the "hoops" to get licensed and "qualified" to sell firearms. 5 F.4th at 416.
5  But the Waiting Period Laws prevent consumers from taking possession of firearms
6  until ten days have passed. Just as the statutes in *Hirschfeld* told qualified dealers *to*
7  *whom* they could sell, the Waiting Period Laws tell qualified dealers *when* they can
8  (and cannot) deliver a firearm. These delivery prohibitions have nothing to do with
9  "conditions or qualifications" on commercial sales.

10  The State cannot avoid its burden of justifying the Waiting Period Laws.

### 4. The Waiting Period Laws are Inconsistent with the Nation's Historical Tradition of Firearm Regulation.

Under *Bruen*, the burden now shifts to California. It must show that Waiting Period Laws are "consistent with this Nation's historical tradition of firearm regulation." 597 U.S. at 34. "[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 144 S. Ct. at 1897 (quoting *Bruen*, 597 U.S. at 24). And it must do so by offering persuasive legal history. *See Bruen*, 597 U.S. at 25; *id.* at 25 n.6 (courts "decide a case based on the historical record compiled by the parties"). The "central" component of this careful analogical inquiry looks principally at "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29. To carry its burden, California must "identify a well-established and representative" tradition of analogous regulation. *Id.* at 30 (citation omitted); *see also Baird v. Bonta*, 81 F.4th 1036, 1040–41 (9th Cir. 2023) (the government must show

---

[7] It is again worth noting that, despite the State's attempts to suggest otherwise, this case does not challenge the delay associated with determining a purchaser's eligibility to possess a firearm.

1  that the modern "regulation is identical or closely analogous" to historical analogues
2  that were "broadly in effect").

3        The analogical analysis is focused on determining "whether the challenged
4  regulation is consistent with the principles that underpin the Nation's regulatory
5  tradition." *Rahimi*, 144 S. Ct. at 1898; *accord Wolford v. Lopez*, No. 23-16164, 2024
6  WL 4097462, at *8–10 (9th Cir. Sept. 6, 2024). Here, Defendants have not met their
7  burden because no historical tradition of remotely analogous regulation exists: There
8  is no historical principle underlying the Second Amendment that tolerates the
9  government forcing *every single* law-abiding person seeking to acquire a firearm to
10  wait as long as the government decides is appropriate before taking possession.

11           **a.**    **Licensing and Permitting Laws.**

12       The State leads with an argument that the Waiting Period Laws are analogous
13  to historical regulations "aimed at limiting possession of arms by those deemed
14  dangerous and allowing governments to confirm that individuals are eligible to
15  possess arms." Br. 12. But Plaintiffs do not challenge any delay associated with
16  determining eligibility through a background check. None of the historical licensing
17  or permitting regulations cited by the State impose any delay for delay's sake. This
18  proves Plaintiffs' point: There is no historical precedent for a waiting period that
19  arbitrarily extends after the government has completed a background check
20  confirming that an individual is not prohibited from possessing firearms. Accordingly,
21  the underlying regulations cited by the State are not "consistent with the principles
22  that underpin" the Waiting Period Laws. *Rahimi*, 144 S. Ct. at 1898.

23       California first identifies one proposal from the Continental Congress and a few
24  Colonial laws that disarmed men who refused to take a "loyalty oath." Br. 12. Such
25  laws have little in common with California's blanket waiting period. Without
26  understanding this historical context, perhaps, one might believe the laws to be
27  comparably justified. But in fact, loyalty laws were aimed at groups of people that
28  Colonial and Founding-era lawmakers perceived to be dangerous given the fear they

1 would engage in an armed rebellion. Even taking California's misplaced analogy at face value, that loyalty laws sought to restrict untrustworthy individuals from accessing firearms, while the waiting period is imposed in part to allow California to complete a background check confirming that an individual is not prohibited from possessing firearms, the "similarity" still does not help the State meet its burden because delay imposed during the background check is not at issue here.

The loyalty laws also flunk the "how" test because they operated so differently than the Waiting Period Laws. The loyalty oath laws provide no authority for an across-the-board waiting period: They imposed no delay or temporary period of disarmament at all. Everyone or nearly everyone subject to the loyalty oath requirement already possessed a firearm; they could continue to possess them (*i.e.*, avoid being disarmed) if they subscribed the oath. By contrast, even after California has completed a background check, the Waiting Period Laws continue to impose a delay even though the State has confirmed that an individual is not prohibited from possessing firearms.

The State next identifies a series of late-19th century municipal laws imposing licensing requirements for the public carry of firearms. Br. 12–13 (citing Spitzer Decl., ¶¶ 38, 40–51). This effort falls short in multiple respects. For starters, many of these regulations come too late in time to be probative of the scope of the Second Amendment. Appropriate historical analogues must stem from the Founding era, centering on 1791. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35; *see also Bruen*, 597 U.S. at 34. Thus, "not all history is created equal," and courts must be careful not to overweigh historical evidence that long predates or postdates the Founding. *Bruen*, 597 U.S. at 34.[8] Furthermore, a handful of municipal regulations is

---

[8] California disputes the centrality of the Founding in Second Amendment analysis. Br. 16–17. Although the *Rahimi* Court again found it unnecessary to decide whether courts should primarily rely on Founding- or Reconstruction-era analogues in assessing the prevailing understanding of an individual right, 144 S. Ct. at 1898 n.1,

1 insufficient to constitute a "well-established and representative" historical tradition of regulation of any kind. 597 U.S. at 30. This is especially so given that *Bruen* makes clear that concerns motivating public carry restrictions date back to the Founding era. Under the circumstances, these regulations "are undeserving of much weight," *Wolford*, 2024 WL 4097462, at *9, particularly because they have little in common with the Waiting Period Laws.

The State also identifies historical regulations prohibiting Native Americans and slaves from accessing firearms and ammunition, claiming that these laws "sought to protect the public by keeping guns away from those they deemed dangerous." Br. 13. Because these laws were discriminatory and targeted a small subset of the population, they should be left in the dustbin of history, not used as tools to restrict rights in the modern day. *Cf. Bruen*, 597 U.S. at 58 (cautioning against reliance on laws where prosecutions were directed only against "black defendants who may have been targeted for selective or pretextual enforcement"). Moreover, at the time, Native Americans and slaves were not considered to be among "the People" protected under the Constitution, and thus laws aimed at them are no guide as to how the Constitution should be interpreted to apply to "the People" today. *See, e.g.*, *United States v. Harrison*, 654 F. Supp. 3d 1191, 1216 (W.D. Okla. 2023) ("Indians . . . were . . . generally not considered to be a part of the political community protected by the Second Amendment."); *Rhode v. Bonta*, No. 18-cv-802, 2024 WL 374901, at *12 (S.D. Cal. Jan. 30, 2024) ("It makes little sense to argue . . . that historical restrictions placed on non-citizens, who were not accorded constitutional protections, now justify placing similar modern restrictions on citizens who do enjoy constitutional rights.").

---

the Court focused its analysis on the Founding era. In a decision decided on the same day as *Rahimi*, the Supreme Court rejected the argument that procedures employed by a few states "in the early 19th century" could inform the original meaning of the Fifth and Sixth Amendments. *Erlinger v. United States*, 144 S. Ct. 1840, 1857 (2024); *see also id.* (procedures "in less than a handful of States" are "not the kind of 'uniform postratification practice' that can sometimes 'shed light upon the meaning' of the Constitution").

In short, laws that subjected the "dangerous" Indians and slaves to a *permanent* "cooling off period" do nothing to show that the Waiting Period Laws are consistent with the Nation's historical tradition of firearm regulation.

### b. Laws Regulating The Intoxicated, Mentally Ill, and Minors.

California next seeks to justify the Waiting Period Laws by analogy to laws restricting the possession of firearms by intoxicated individuals, by the mentally ill, and by minors. Br. 14–16. The State claims that, taken together, these laws are evidence of a historical tradition of regulation aimed at preventing impulsive firearm violence.

Consider first the laws regulating intoxicated individuals and the mentally ill. These laws fail both the "how" and "why" metrics that are "central" to *Bruen*'s analogical analysis. 597 U.S. at 29. On the "how" side, these regulations impose a far lesser burden on the right of armed self-defense: They are targeted only at those who are not fit to possess firearms based on an individualized determination. These laws did not impose a burden on anyone else's Second Amendment protected rights. So long as a person was not intoxicated or mentally ill, the laws imposed no restraint. The Waiting Period Laws, on the other hand, generally apply to every individual and every firearm transaction across the board—and they apply even after the State has determined that an individual is not prohibited from possessing a firearm.

On the "why" side, the intoxication and mental illness regulations are not comparably justified to waiting periods. These historical regulations are based on particular dangers that arise from possessing firearms while intoxicated or by the mentally ill. Waiting periods, by contrast, are justified by the State's purported interest in disarming individuals through a so-called "cooling off" period—even where the State has no indication that an individual is prone to "impulsive" acts, as may be the case for an intoxicated or mentally ill person.

Laws restricting firearm possession by minors are even further afield. As a fundamental matter, a historical tradition of restricting minors' access to firearms tells

us very little about a waiting period that applies to all purchasers, especially since California generally prohibits the sale or transfer of firearms to individuals under 21. Cal. Penal Code §§ 27505(a); 27510.[9] And as the Supreme Court has routinely recognized in the analogous context of the First Amendment, the government cannot limit the constitutionally protected rights of adults based on what is appropriate for children. *Reno v. ACLU*, 521 U.S. 844, 875 (1997); *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 74–75 (1983). Setting that aside, historical restrictions on minors' firearm access are poor analogies to the Waiting Period Laws for the same reason that the State's other purported historical traditions fall short: Whereas the restrictions on minors target a discrete subset of individuals based on a purported risk of impulsive behavior, the Waiting Period Laws target each individual and every firearm transaction. And they impose a further delay for delay's sake even after California has confirmed that the individual is not prohibited from possessing firearms.

The surety laws identified by California, *see* Br. 13, 14, are to the same general effect. As the Supreme Court recently recounted in *Rahimi*, surety laws were targeted at specific individuals where "there [was] probable ground to suspect . . . future misbehaviour," and required that they post bond before going armed in public. 144 S. Ct. at 1899, 1900–01 (citation omitted). As the State puts it, these laws (like the "going-armed laws") "'mitigate demonstrated threats of physical violence.'" Br. 18 (quoting *Rahimi*, 144 S. Ct. at 1901). The individualized regime imposed by surety laws is in total contrast to the Waiting Period Laws, which assume that everyone poses a risk of violence.

Taken together, if the laws California has identified "evince principles underpinning our Nation's regulatory tradition," those principles show that the government may disarm people on an individualized basis based on particular

---

[9] In responding to the State's purported historical analogues, Plaintiffs do not concede that restrictions on the Second Amendment protected rights of legal adults aged 18-20 years old are constitutional.

characteristics showing that a person may be dangerous. *See Rahimi*, 144 S. Ct. 1898; *Wolford*, 2024 WL 4097462, at *10 (observing that the *Rahimi* Court "distilled the principle that it is consistent with the Second Amendment to disarm individuals when they pose a clear threat of violence to another"). The Waiting Period Laws are inconsistent with that core principle because they prevent individuals from exercising their Second Amendment protected rights even after the State has completed a background check.[10]

**B.     The Waiting Period Laws Violate Equal Protection.**

The Waiting Period Laws' numerous exemptions for favored classes violates the Equal Protection Clause of the Fourteenth Amendment. U.S. CONST. amend. XIV. When, as here, "a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (citing cases); *Hoffman v. United States*, 767 F. 2d 1431, 1434–35 (9th Cir. 1985) ("Strict scrutiny is applied when the classification involves . . . categorizations impinging upon a fundamental right[.]") (citing cases). Given that Plaintiffs have demonstrated that the Waiting Period Laws "substantially burden[]" their "fundamental" Second Amendment protected rights, "strict scrutiny applies and the [laws] will be upheld only if the state can show that the [regulation] is narrowly drawn to serve a compelling state interest." *Green v. City of Tucson*, 340 F.3d 891, 896 (9th Cir. 2003).

---

[10] The State spends several pages in its brief arguing that the Court should take a "more nuanced approach," *Bruen*, 597 U.S. at 27, to its analysis based on technological advances in firearms and concern over firearm violence, including suicide. This is not surprising given the absence of a robust historical record to support the Waiting Period Laws. But *Heller* and *Bruen* already addressed this when the District of Columbia and New York tried to argue that the keeping and bearing (respectively) of handguns (the modern versions of which certainly represent "technological change" from the founding) should be regulated due to concerns about "firearm violence in densely populated communities." *Heller*, 554 U.S. at 634–35; *Bruen*, 597 U.S. at 27. In each case, the Court said "firearms violence" has existed since the Founding. As such, the State's slicing and dicing does not create an "unprecedented societal concern[]." *Bruen*, 597 U.S. at 27.

The State has made no effort to satisfy this demanding burden—nor could it, given the Waiting Period Laws' vast exemptions. The State responds only that the Waiting Period Laws are subject only to rational basis review because the Second Amendment claim fails. Br. 23–25. The entire opposition proceeds from that faulty premise.

One minor point, however, merits a brief response. California argues that Plaintiffs are not similarly situated to the exempt individuals, Br. 24, but they are sufficiently similar for Equal Protection purposes: "[C]omparator groups 'need not be similar in all respects, but they must be similar in those respects relevant to the [government's] policy.'" *Olson v. California*, 104 F.4th 66, 77 (9th Cir. 2024) (citation omitted). In all relevant respects, Plaintiffs are in the same position as those individuals in the exempt classes with respect to the Waiting Period Laws.

Plaintiffs are therefore entitled to summary judgment based on the State's failure to satisfy strict scrutiny.

## CONCLUSION

For the reasons set forth above and in Plaintiffs' opening brief, the Court should enter summary judgment in Plaintiffs' favor.

Dated: September 20, 2024     BENBROOK LAW GROUP, PC

By  s/ Stephen M. Duvernay
      BRADLEY A. BENBROOK
      STEPHEN M. DUVERNAY
      Attorneys for Plaintiffs